**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| XPERTUNIVERSE, INC.,     ) | |
|     ) | **Civil Action No. 09-157-UNA** |
| Plaintiff     ) | |
|     ) | |
| vs.     ) | **JURY TRIAL DEMANDED** |
|     ) | |
|     ) | **PUBLIC VERSION** |
| CISCO SYSTEMS, INC.,     ) | |
|     ) | |
| Defendant.     ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff XpertUniverse, Inc. ("XpertUniverse"), for its Complaint against defendant Cisco Systems, Inc. ("Cisco") alleges:

### THE PARTIES

1.    Plaintiff XpertUniverse is a Delaware corporation with a principal place of business located at 253 West 35th Street, New York, New York.

2.    On information and belief, Defendant Cisco is a California corporation with a principal place of business at 170 West Tasman Drive, San Jose, California.

### JURISDICTION AND VENUE

3.    This is a civil action concerning: (i) patent infringement in violation of the United States Patent Act of 1952, as amended, 35 U.S.C. § 271 et seq.; (ii) misappropriation of trade secrets under Delaware's Uniform Trade Secrets Act, Del. Code § 6-2001 et seq.; (iii) unfair competition in violation of Section 43(a) of the United States Trademark Act of 1946, as amended, 15 U.S.C. § 1125(a); (iv) related claims of breach of contract, unfair competition, trademark infringement, unjust enrichment, and conversion in violation of the laws of the State

of Delaware and the common law; and (v) deceptive and unfair trade practices in violation of Delaware's Uniform Deceptive Trade Practices Act, Del. Code § 6-2531 et seq.

4.      This Court has jurisdiction over this action pursuant to 15 U.S.C. § 1121, 28 U.S.C. § 1331, and 28 U.S.C. § 1338 (a)-(b), as it involves substantial claims arising under the United States Patent Act of 1952, as amended, 35 U.S.C. § 271 et seq. and the United States Trademark Act of 1946, as amended, 15 U.S.C. § 1125(a).  Personal jurisdiction over Defendant Cisco comports with the United States Constitution and 10 Del. C. § 3104 because, on information and belief, Defendant Cisco has committed the acts complained of within Delaware such that it has purposefully availed itself of the privilege of conducting activities within this District.

5.      This Court has supplemental jurisdiction over the claims in this Complaint which arise under state statutory and common law pursuant to 28 U.S.C. § 1367(a), since the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

6.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400(b).

## FACTS UNDERLYING THE DISPUTE

7.      XpertUniverse, then known as Homework911.com, was founded in 1999 and is in the business of developing innovative expert location, live interaction, and business intelligence technology for use over the Internet and other media.

8.      In or about 1999, XpertUniverse realized that the then current technology used by call centers did not possess an effective capability of connecting a customer's need with the appropriate expert or problem solver.  Call centers were inadequate and inefficient in locating the

2

optimal expert for solving the specific needs of a customer. In particular, call centers required substantial human intervention and the call center agent receiving the customer's request for an expert usually did not have access to available data to locate the best or optimal expert to solve the problems of the caller. Call centers were also limited by the location of its resources (*i.e.*, its experts or problem solvers had to operate out of call centers).

9.      XpertUniverse recognized that the expertise possessed by the employees that operate outside the call center, especially in large organizations, was a highly valuable asset and untapped resource. XpertUniverse realized that this resource could be made available, free of the limitations of the traditional call center model, to other employees, as well as customers of those organizations around the world.

10.      Through substantial innovation and effort, XpertUniverse developed a unique, proprietary platform and technology ("XpertSHARE") that permits locating an expert in an efficient and effective manner via the Internet or other electronic means with limited human intervention. The technology, among other things, combines aspects of call center technology with a rich set of collaboration tools and customer relationship management functionality, coupled with business intelligence capabilities.

11.      The technology also uses a configurable taxonomy to determine the best expert and enables, among other things, the person seeking specific expertise to engage in a real time, live interaction(s) with the expert(s), as desired. Based on this platform and technology, XpertUniverse created a service offering called "Expert On Demand." The information obtained and exchanged between the expert and the expertise seeker can be archived, thereby creating a significant asset, while providing corporations with valuable real-time information for analysis, reporting and training purposes.

3

12.     XpertUniverse saw that its technology would be particularly valuable to companies providing call center software and/or services. Call centers often require operators to connect callers with experts who have the requisite knowledge or expertise to answer a caller's question. For example, a person interested in a new mortgage for an owner-occupied house in Delaware may call a bank's call center seeking information regarding the types of mortgages available and the terms of such products. The call center agent would typically transfer the call to the next available agent, but would have no means by which to locate the best available expert based on the mortgage applicant's specific issues, *e.g.*, an expert in residential mortgages for Delaware owner-occupied dwellings, who also speaks Spanish. As a result, the process was ineffective, inefficient and costly because there was no way to ensure that the caller reached the appropriate or optimal expert. This resulted in poor customer satisfaction, high cost of delivery and lower revenues.

13.     In about 2004, XpertUniverse began a business relationship with Genesys Telecommunications Laboratories, Inc. ("Genesys"), a leading call center technology company , with the goal of offering XpertUniverse's platform to Genesys' customers. Genesys had expressed serious interest in the XpertUniverse technology and platform, as it realized and appreciated the importance and potential of XpertUniverse's technology on a global scale. During their business relationship, XpertUniverse worked with Genesys' middle and executive level management. In or about the summer of 2004, literally weeks away from Genesys' introduction of the XpertUniverse platform to its customer base, Genesys' CEO, who had been XpertUniverse's most senior contact, left Genesys to join Cisco as Cisco's new General Manager of the CCBU (Call Center Business Unit).

4

14.    Shortly after leaving Genesys, this individual advised XpertUniverse that (a) Cisco did not possess anything similar to XpertUniverse's technology and platform, (b) Cisco had great interest in commercializing XpertUniverse's technology and platform, (c) given Cisco's market focus, as well Cisco's global business contacts, Cisco would be the best distributor/partner in the sales and marketing of XpertUniverse's technology and platform, (d) XpertUniverse should, accordingly, focus its efforts on building a relationship with Cisco, rather than Genesys , (e) Cisco would fully support XpertUniverse's efforts and would, *inter alia*, introduce XpertUniverse's platform to Cisco's global customer base, and (f) Cisco would ensure that the trade secrets and confidential information of XpertUniverse were protected.

15.    Based upon the foregoing representations, XpertUniverse ceased pursuing business opportunities with Genesys in favor of a new business relationship with Cisco.  In particular, despite the substantial time and effort it had expended in developing a platform that incorporated Genesys' routing technology, XpertUniverse changed its focus to devote substantially all its time and effort to building a platform specific to Cisco's needs.

16.    Prior to working with Cisco, XpertUniverse insisted that Cisco agree to an appropriate non-disclosure agreement because the technology and platform was and remains the heart of XpertUniverse and was developed by XpertUniverse through the expenditure of great time, intellectual efforts and resources.

17.    In or about August 2004, Cisco provided XpertUniverse with Cisco's Mutual Non-Disclosure Agreement.  On or about August 2, 2004, XpertUniverse and Cisco executed the mutual non-disclosure agreement ("NDA"), whereby each party agreed ███████████

███████████████████████████████████████████████████████████████████

███████████████████████. A copy of the NDA is attached as Exhibit A.

18.     Cisco acknowledged pursuant to the NDA that ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████

19.     After signing the NDA, XpertUniverse began substantive talks with Cisco regarding forming a business relationship around XpertUniverse's expert location, live interaction, and business intelligence technology.  Over the next several years, XpertUniverse dedicated most of its work force and millions of dollars in order to integrate Cisco's routing technology into the XpertUniverse platform, thereby replacing Genesys' routing technology.

20.     Given the protection afforded by the NDA, XpertUniverse in good faith shared each and every facet of its knowledge with Cisco, believing that Cisco would abide by its obligations pursuant to the NDA.  For example, XpertUniverse disclosed to Cisco all of its valuable trade secrets, and proprietary and confidential information, including, by way of example, and without limitation: technical development documents, schematics, system architecture, integration charts, sales and marketing strategies, marketing forecasts, and pricing schedules.

21.     The project, which was undertaken pursuant to the NDA, concerned a new concept and a new product, and XpertUniverse not only taught Cisco how to build the system using XpertUniverse's trade secrets and proprietary and confidential information, but also how to market and sell the new product to Cisco's customers.  By supplying various white papers on the application of XpertUniverse's technology to different industries, XpertUniverse outlined in great detail the value proposition for various vertical markets.

22.     XpertUniverse and its key personnel were, for approximately three years, in constant and almost daily contact with Cisco technologists and software developers, as well as marketing and business development personnel.  The relationship was so close that Cisco and XpertUniverse attended numerous trade shows together, where XpertUniverse, at Cisco's request, would demonstrate and explain to potential customers the value and various uses of its technology and platform.

23.     Cisco recognized the substantial business potential of XpertUniverse's technology.

24.     Cisco, realizing the importance of XpertUniverse's technology, placed XpertUniverse in a special program known as "Solutions Plus," putting XpertUniverse on a fast track or priority status.

25.     Cisco recognized that the XpertUniverse technology would have great demand and, at the same time, would enable Cisco to increase sales of companion hardware and software products.

26.     Given the importance of the project, the highest management levels of Cisco, including its current Chief Executive Officer, the Chief Technology Officer at the time, as well as the current head of its software division, were involved and/or had knowledge of XpertUniverse's capabilities.

27.     XpertUniverse applied for patent protection in order to protect aspects of its novel and innovative intellectual property.  On April 2, 2004, XpertUniverse filed a provisional patent application entitled "System and Method for Managing Questions and Answers Using Subject Lists Styles."  On March 31, 2005, XpertUniverse filed U.S. Patent Application Serial No. 11/097,967, claiming the benefit of the filing date of the previously filed provisional patent

7

application.  The patent application issued to XpertUniverse on April 29, 2008 as U.S. Patent No. 7,366,709.

28.     XpertUniverse advised Cisco that it was seeking patent protection for aspects of its intellectual property.

29.     At the behest of Cisco, XpertUniverse provided on a confidential basis both pricing and marketing information to Cisco, including White Papers regarding how the product could be positioned in various vertical markets and related value propositions.  XpertUniverse did so because Cisco had no prior knowledge or experience concerning this new product and relied heavily on the expertise of XpertUniverse and the confidential information and trade secrets developed by XpertUniverse.

30.     XpertUniverse also coined and commercially used the mark "Expert On Demand" to identify and brand its services.  This mark was used as early as 2005 in presentations given to Citibank.  The mark was also used in presentations and marketing materials to Cisco and its prospective customers.

31.     Cisco was well aware that the mark was coined, used and developed by XpertUniverse.

32.     In or about January 2005, XpertUniverse began to involve IBM as a potential partner in its relationship with Cisco.  IBM, like Cisco, understood that the XpertUniverse technology and platform could deliver significant benefits to its customers.

33.     At the request of both IBM and Cisco, XpertUniverse prepared various marketing materials to use with potential customers explaining the purpose and prospective uses and benefits of the XpertUniverse technology and platform.  Such presentations were made to customers, including Citibank.

34.    Upon information and belief, Citibank personnel were told by Cisco that Cisco was committed to working with XpertUniverse and that Cisco was not planning on offering its own platform or technology similar to that of XpertUniverse.

35.    At no time did Cisco ever convey any problems, issues or objections to XpertUniverse concerning its technology or platform.

36.    Cisco openly and repeatedly stated its support for XpertUniverse and its technology.

37.    In or about January 2007, without any advance notice, Cisco advised XpertUniverse that it needed to reevaluate its business relationship with XpertUniverse, because Cisco did not have the resources to continue the Solutions Plus program.

38.    As of 2007, XpertUniverse had expended most of its resources, both financially and intellectually, to modify its platform in order for it to work with Cisco's routing technology and related platforms.

39.    XpertUniverse employed over 15 people full time to meet the demands and requirements of Cisco for almost three years.

40.    XpertUniverse expended millions of dollars to modify and supplement its technology and platform to meet Cisco's demands.  That work was custom developed for Cisco and has little, if any, value as applied to other routing software and/or call center technologies.

41.    Cisco effectively usurped all of the intellectual property, monetary resources, time and effort  of XpertUniverse during its relationship with XpertUniverse.  On information and belief, as a consequence of Cisco's decision to reevaluate its business relationship with XpertUniverse, other companies, such as IBM, decided to cease pursuing business opportunities with XpertUniverse.

9

42.     In or about September 2008, XpertUniverse learned for the first time that Cisco was offering a new "collaboration portfolio" product line.

43.     In an article appearing in *The New York Times*, dated September 24, 2008, entitled "Cisco Tries to Break Out of the Data Center Role," Cisco announced that it was calling its new product "Expert On Demand." The same "Expert On Demand" mark coined and used by XpertUniverse.  A copy of the article is annexed hereto as Exhibit B.

44.     In an article appearing in *The Wall Street Journal*, dated September 24, 2008, entitled "Cisco Sets Sights on $34 Billion Market," Cisco announced that it estimated that such collaboration products represent a $34 billion market opportunity.  A copy of the article is annexed hereto as Exhibit C.

45.     As evidenced by both articles, Cisco enthusiastically announced that it was committed to the technology.

46.     Information concerning Cisco's new Expert On Demand product offering, including, among other things, architectural diagrams and other documents describing the product's functionality can be found in various product manuals, specifications and reference materials available from Cisco's web site including, but not limited to, the "Cisco Telepresence Expert On Demand", "Cisco Unified Expert Advisor", and the "Cisco Unified Expert Advisor Quick Reference" documents, which are attached hereto as Exhibit D.

47.     Other available Cisco documents describing the structure and functionality of the Cisco product offering include, but are not limited to, "Chapter 7: Cisco Unified Expert Advisor Option," at http://www.cisco.com/en/US/docs/voice_ip_comm/cust_contact/contact_center/ipcc_enterprise/srnd/75/exprtadv.pdf and the "Cisco Unified Expert Advisor – Data Sheet," at

10

http://www.cisco.com/en/US/prod/collateral/voicesw/custcosw/ps5693/ps9675/data_sheet_c78-480625.pdf.

48.     Upon information and belief, these and other Cisco documents show that the Cisco software platforms, including but not limited to, its "Cisco Unified Expert Advisor" and its "Expert On Demand" systems, embody the subject matter of one or more claims of the '709 Patent, use of XpertUniverse's mark, and use and/or are based on the trade secrets and/or confidential information of XpertUniverse.

49.     Cisco has sold, offered for sale and marketed, and continues to sell, offer for sale and market, products and technology in contravention of and based on XpertUniverse's rights in and to its intellectual property, including, without limitation, its trademarks, trade secrets, confidential information, patent rights and contractual rights.

## COUNT I

### INFRINGEMENT OF U.S. PATENT NO. 7,366,709

50.     XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

51.     XpertUniverse is the sole owner by assignment of all right, title, and interest in and to United States Patent No. 7,366,709, entitled "System and Method for Managing Questions and Answers Using Subject Lists Styles" ("the '709 Patent"), which was duly and legally issued by the United Stated Patent and Trademark Office on April 29, 2008.  A copy of the '709 Patent is attached hereto as Exhibit E.

52.     On information and belief, Cisco has been and still is infringing, contributing to and/or actively inducing infringement of the '709 Patent in this judicial district and elsewhere in the United States by the manufacture, use, sale and/or offer for sale in the United States, or importation into the United States, of products, including but not limited to, its "Cisco Unified

Expert Advisor" and its "Expert On Demand" products, which embody the subject matter of and infringe one or more claims of the '709 Patent.

53.     On information and belief, Cisco's infringement of the '709 Patent has been and continues to be willful, wanton, deliberate and without license, thereby rendering this case exceptional within the meaning of 35 U.S.C. § 285.

54.     Cisco's acts have caused irreparable injury and damage to XpertUniverse for which XpertUniverse has no adequate remedy at law.

55.     Unless preliminarily and permanently enjoined by this Court, Cisco will continue its acts of infringement of the '709 Patent to XpertUniverse's substantial and irreparable harm.

**COUNT II**

**MISSAPROPRIATION OF TRADE SECRETS
UNDER THE DELAWARE UNIFORM TRADE SECRETS ACT**

56.     XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

57.     XpertUniverse has expended significant resources in acquiring and developing its trade secrets and confidential information concerning its Expert On Demand offering.  Those trade secrets and confidential information include, at a high level, information relating to the design, development, marketing and sale of a system that matches a user seeking expert services to  the best, qualified expert.

58.     On information and belief, in connection with the efforts undertaken on behalf of Cisco pursuant to the NDA, XpertUniverse made significant additional developments and/or modifications to its XpertSHARE platform and Expert On Demand service offering, including significant additional research, development and marketing of the Expert On Demand service offering for use in connection with certain Cisco products and systems.

12

59.     These development efforts on the part of XpertUniverse resulted in XpertUniverse developing numerous additional trade secrets and confidential information, including, but not limited to, technical development documents, schematics, system architecture, integration charts, as well as sales and marketing forecasts and pricing schedules for integrating XpertUniverse's technology with Cisco's. These trade secrets were not publicly available, but only existed with XpertUniverse and were only available through the knowledge and know-how of the employees of XpertUniverse that worked on the Cisco project.

60.     On information and belief, numerous employees of Cisco had ready access to these trade secrets and confidential information by reason of the Cisco project, and/or were provided with the trade secrets and confidential information pursuant to the NDA entered into between the parties in connection with the Cisco project.

61.     XpertUniverse possesses valuable trade secrets as defined by Delaware's version of the Uniform Trade Secrets Act, Del. Code § 6-2001 et seq. These trade secrets include information disclosed in the XpertUniverse patent applications, which were confidential until published, as well as additional trade secrets and confidential information, including trade secrets and confidential information, developed as a result of the Cisco project, as described above.

62.     XpertUniverse's trade secrets derive independent economic value by virtue of not being generally known to, and not being readily ascertainable by proper means, and would be of great value to others.

63.     On information and belief, reasonable measures, including but not limited to requiring Cisco to execute the NDA, have been taken by XpertUniverse to maintain the secrecy of its trade secrets and confidential information.

64.     XpertUniverse's trade secrets were disclosed to Cisco, pursuant to the NDA, in connection the Cisco project. Cisco understood the technical details of the trade secrets, and appreciated the importance of the trade secrets in the development, marketing and sale of competing products. Cisco knew or should have known that it was not authorized to use the trade secret information owned by XpertUniverse, and yet Cisco subsequently misappropriated XpertUniverse's trade secrets and confidential information for use in Cisco's products, including but not limited to Cisco's Unified Expert Advisor and its Expert On Demand products.

65.     Cisco's unauthorized use of XpertUniverse's trade secrets and confidential information is a misappropriation of XpertUniverse's trade secrets and confidential information. As a consequence of Cisco's misappropriation, XpertUniverse has been and will continue to be damaged, and Cisco has been and will continue to be unjustly enriched at XpertUniverse's expense in an amount to be proved at trial. In addition, XpertUniverse has suffered and will continue to suffer irreparable harm that can only be remedied through equitable relief, including a preliminary and permanent injunction from any further misappropriation.

66.     Cisco's acts have caused irreparable injury and damage to XpertUniverse for which XpertUniverse has no adequate remedy at law.

67.     Unless preliminarily and permanently enjoined by this Court, Cisco will continue its acts of misappropriation to XpertUniverse's irreparable harm.

68.     Because Cisco has acted with fraud and/or malice and in conscious disregard of XpertUniverse's rights, XpertUniverse is entitled to exemplary damages including attorney's fees.

## COUNT III

## BREACH OF CONTRACT

69.     XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

70.     On or about August 2, 2004, XpertUniverse and Cisco entered into a "Cisco System, Inc. Mutual Non-Disclosure Agreement" ("the NDA"). As described above, the NDA ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████ As described above, on information and belief, Cisco materially breached the terms of the NDA ████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████

71.     ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████.

72.     XpertUniverse has performed all conditions to be performed on its part under the NDA.

73.     XpertUniverse has suffered damages resulting from Cisco's breach of the NDA, including, but not limited to, actual, compensatory and incidental damages, lost profits, customers, potential investors and business goodwill, and misuse of confidential information and trade secrets.

## COUNT IV

## FEDERAL UNFAIR COMPETITION

74.   XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

75.   XpertUniverse authored the mark "Expert On Demand" for use in promoting its services, and has and continues to use that term to promote its services.  By reason of all of the foregoing, XpertUniverse has acquired common law rights in the Expert On Demand mark.

76.   Cisco was aware that XpertUniverse used the Expert On Demand mark in promoting the XpertUniverse offering.

77.   The actions complained of herein constitute false designations of origin and false descriptions in that Cisco's use of the term "Expert On Demand" in connection with Cisco's products and/or services is likely to cause confusion or to deceive as to the affiliation, connection or association of XpertUniverse's mark with Cisco's products and/or services, as to the origin, sponsorship or approval of Cisco's products and/or services.

78.   The foregoing acts of Cisco constitute unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

79.   By reason of all the foregoing, XpertUniverse is being damaged by Cisco's willful use of XpertUniverse's mark in the manner set forth above and will continue to be damaged unless Cisco is enjoined from using the "Expert On Demand" term in connection with Cisco's products and/or services.

80.   Cisco's acts have caused irreparable injury and damage to XpertUniverse for which XpertUniverse has no adequate remedy at law.

81.   Unless preliminarily and permanently enjoined by this Court, Cisco will continue its acts of unfair competition to XpertUniverse's irreparable harm.

16

## COUNT V

## COMMON LAW TRADEMARK INFRINGEMENT

82.     XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

83.     Despite XpertUniverse's common law trademark rights in the mark "Expert On Demand," on information and belief Cisco has used and continues to use the same exact mark in describing and promoting its products and/or services.  The actions of Cisco are likely to create confusion, mistake and deception by causing consumers to believe that Cisco is authorized by, licensed by, sponsored by or otherwise associated with common law trademark rights in the Expert On Demand mark.

84.     Upon information and belief, the acts and conduct of Cisco constitute willful and deliberate infringement of XpertUniverse's common law rights in the Expert On Demand mark.

85.     The foregoing acts of Cisco constitute infringement of the Expert On Demand mark in violation of the common law of the State of Delaware.

86.     Cisco's acts have caused irreparable injury and damage to XpertUniverse for which XpertUniverse has no adequate remedy at law.

87.     Unless preliminarily and permanently enjoined by this Court, Cisco will continue its willful use of the "Expert On Demand" mark to XpertUniverse's irreparable harm.

## COUNT VI

## DECEPTIVE TRADE PRACTICES

88.     XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

89.     By reason of all of the foregoing, XpertUniverse has valuable trade secrets and confidential information, and has acquired common law trademark rights in the Expert On Demand mark.

90.     On information and belief Cisco has used and continues to use XpertUniverse's trade secrets and confidential information in its products, and has used and continues to use XpertUniverse's common law mark "Expert On Demand" in describing and promoting its product.

91.     Upon information and belief, the acts and conduct of Cisco constitute willful and deliberate infringement of XpertUniverse's trade secrets and confidential information, and rights in the Expert On Demand mark and will continue in willful and wanton disregard of XpertUniverse's rights.

92.     The foregoing acts of Cisco constitute deceptive trade practices in violation of Delaware's Uniform Deceptive Trade Practices Act, Del. Code § 6-2531 et seq.

93.     Cisco's acts have caused irreparable injury and damage to XpertUniverse for which XpertUniverse has no adequate remedy at law.

94.     Unless preliminarily and permanently enjoined by this Court, Cisco will continue its willful use of XpertUniverse's trade secrets and confidential information, as well as the "Expert On Demand" mark, to XpertUniverse's irreparable harm.

95.     In addition to an injunction, Cisco's willful engagement of deceptive trade practices as described herein entitle XpertUniverse to treble damages and attorney's fees.

**COUNT VII**

**COMMON LAW UNJUST ENRICHMENT**

96.     XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

18

97.    On information and belief, Cisco has been enriched by reason of its unauthorized use of XpertUniverse's trade secrets and confidential information in its products, and its unauthorized use of XpertUniverse's common law mark "Expert On Demand" in promoting and identifying its product.

98.    Cisco has not compensated XpertUniverse for its unauthorized use of XpertUniverse's trade secrets, confidential information, and mark, nor is there any justification for Cisco's unauthorized use of the same.   There is no adequate remedy at law for Cisco's unauthorized use of XpertUniverse's trade secrets, confidential information, and mark.

99.    By reason of all the foregoing, XpertUniverse is being damaged by Cisco's willful use of XpertUniverse's trade secrets, confidential information, and the Expert On Demand mark and will continue to be damaged unless Cisco is enjoined from using the same.

100.    Cisco's acts have caused irreparable injury and damage to XpertUniverse for which XpertUniverse has no adequate remedy at law.

101.    Unless preliminarily and permanently enjoined by this Court, Cisco will continue its willful use of XpertUniverse's trade secrets and confidential information, as well as the "Expert On Demand" mark, to XpertUniverse's irreparable harm.

### COUNT VIII

### COMMON LAW UNFAIR COMPETITION

102.    XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

103.    XpertUniverse had a reasonable expectation of having a successful business relationship with Cisco.  Cisco defeated XpertUniverse's legitimate expectations and wrongfully interfered with the business relationship by misappropriating XpertUniverse's trade secrets, confidential information, and misappropriating XpertUniverse's common law trademark and the

19

goodwill associated therewith, all of which caused and continues to cause harm to XpertUniverse.

104.    The foregoing acts of Cisco constitute unfair competition under the common law of the State of Delaware.

105.    Cisco's acts have caused irreparable injury and damage to XpertUniverse for which XpertUniverse has no adequate remedy at law.

106.    Unless preliminarily and permanently enjoined by this Court, Cisco will continue its acts of unfair competition to XpertUniverse's irreparable harm.

## COUNT IX

## CONVERSION

107.    XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

108.    XpertUniverse had and continues to have a property interest in its intellectual property relating to its XpertSHARE platform and Expert On Demand service offering.  Cisco misappropriated that intellectual property in developing its own offerings, as described above, which are based on, and incorporate, XpertUniverse's trade secrets, concepts, know-how, and strategies.

109.    The foregoing acts of Cisco constitute conversion under the common law of the State of Delaware.

110.    Cisco's acts have caused irreparable injury and damage to XpertUniverse for which XpertUniverse has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff XpertUniverse respectfully requests this Court enter a judgment against Cisco as follows:

A.      For judgment that Cisco has infringed and continues to infringe one or more claims of the '709 Patent under 35 U.S.C. § 271;

B.      For judgment that Cisco's infringement of the '709 Patent has been, and continues to be willful;

C.      For judgment that Cisco has misappropriated the trade secrets and confidential information of XpertUniverse in violation of Delaware's Uniform Trade Secrets Act;

D.      For judgment that Cisco has materially breached its obligations under the August 2, 2004 Mutual Non-Disclosure Agreement;

E.      For judgment that Cisco has committed acts of unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a);

F.      For judgment that Cisco has infringed XpertUniverse's mark in violation of the common law of Delaware;

G.      For judgment that Cisco has committed acts of deceptive trade practices in violation of Delaware's Uniform Deceptive Trade Practices Act, Del. Code § 6-2531 et seq.

H.      For judgment that Cisco has committed acts of unfair competition and conversion, and that Cisco has been unjustly enriched, under the common law of Delaware;

I.      For a preliminary and permanent injunction against Cisco its officers, directors, agents, servants, employees, successors and assigns, and all persons in privity or in concert with them,

(i) From making, using, selling, offering to sell, and/or importing any products that infringe the '709 patent;

(ii) From any further disclosure or use of XpertUniverse's technology, trade secrets or confidential information and from developing or offering any products that incorporate the trade secrets, confidential information or any other intellectual property of XpertUniverse;

(iii) From making statements to consumers and members of the public that mislead or have a tendency to mislead consumers and members of the trade to believe that Cisco is the innovator and originator of the technology and platform encompassed by the trade secrets and confidential information of XpertUniverse or covered under the claims of the '709 Patent;

(iv) From using the "Expert On Demand" mark or any trade name or mark similar thereto;

(v) From using, affixing, offering for sale, selling, advertising, promoting, or rendering goods or services with the Expert On Demand mark or any other trade name or mark similar thereto;

J.      For a mandatory injunction in the form of corrective advertising whereby Cisco shall take all steps necessary, to be approved by the Court, including the issuance of a press release and statements on Cisco's web site and marketing materials, alerting and communicating to consumers and members of the trade that it is XpertUniverse that is the innovator of the technology and platform encompassed by the trade secrets and confidential information of XpertUniverse and covered under the claims of the '709 Patent, not Cisco;

K.      That Cisco and any entity owned, in whole or in part by Cisco, be ordered that all catalogs, signs, displays, labels, brochures, advertising and promotional material bearing XpertUniverse's "Expert On Demand" mark or other similar terms in Cisco's possession or

subject to its control or direction shall be delivered to the Clerk of the Court for maintenance during the pendency of this action and for destruction upon entry of a Final Judgment.

      L.      Pursuant to 35 U.S.C. § 284, for an award of damages adequate to compensate XpertUniverse for Cisco's patent infringement, but in no event less than a reasonable royalty together with prejudgment interest;

      M.      For trebling of any and all damages awarded to XpertUniverse by reason of Cisco's willful, wanton and deliberate acts of infringement of the '709 Patent, pursuant to 35 U.S.C. § 284;

      N.      For judgment that the case is exceptional under 35 U.S.C. § 285 and that the Court award XpertUniverse its attorney's fees and costs in preparing for and pursuing this action;

      O.      For an award of damages by reason of Cisco's misappropriation of the trade secrets and confidential information of XpertUniverse, including, but not limited to, the actual losses suffered by XpertUniverse and the amount by which Cisco has been unjustly enriched due to its misappropriation;

      P.      For an award of exemplary damages and attorney's fees by reason of Cisco's willful and malicious misappropriation of the trade secrets and confidential information of XpertUniverse;

      Q.      For an award of damages for the profits of Cisco and for the direct and compensatory damages sustained by XpertUniverse as a result of Cisco's material breach of the NDA;

      R.      For an award of damages, pursuant to the Lanham Act, including corrective advertising to purge the effects of Cisco's unauthorized use of the Expert On Demand mark.

S.      For an award of damages resulting from Cisco's infringement of XpertUniverse's common law trademark rights, including, but not limited to, an award of Cisco's profits and/or XpertUniverse's damages;

T.      For an award of damages resulting from Cisco's willful deceptive trade practices including, but not limited to, an injunction from any further deceptive trade practices, and award of XpertUniverse's costs and attorney's fees;

U.      For an award of damages resulting from Cisco's unfair competition and conversion under the common law of Delaware, including, but not limited to ordering Cisco to transfer ownership of the converted property to XpertUniverse;

V.      For trebling of any and all damages awarded to XpertUniverse by reason of Cisco's willful, wanton and deliberate acts of unfair competition pursuant to Delaware's Uniform Deceptive Trade Practices Act, Del. Code § 6-2533(c);

W.      For a monetary award disgorging Cisco of ill-gotten gains resulting from its unjust enrichment at the expense of XpertUniverse in an amount to be proven at trial;

X.      For an award of XpertUniverse's actual damages and punitive damages to be proven at trail;

Y.      That Cisco and any entity owned, in whole or in part by Cisco, be ordered to report to the Court in writing under oath with a copy to counsel for XpertUniverse within 30 days of service of notice of any Orders setting forth in detail the manner and form in which Cisco has complied with any order issued hereunder;

Z.      For an award of pre-judgment and post-judgment interest and costs, as appropriate, and an award of XpertUniverse's fees, costs, expenses and disbursements in this action, including reasonable attorney's fess; and

AA.    For such other and further relief both in law and equity to which XpertUniverse is entitled.

## DEMAND FOR JURY TRIAL

Plaintiff XpertUniverse hereby demands a trial by jury for all issues triable to a jury.


POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Joseph Diamante                             By: /s/ Philip A. Rovner
STROOCK & STROOCK & LAVAN LLP                    Philip A. Rovner (#3215)
180 Maiden Lane                                  Hercules Plaza
New York, NY 10038                               P.O. Box 951
(212) 806-5400                                   Wilmington, DE  19899
                                                 (302) 984-6000
Dated:  March 10, 2009                           provner@potteranderson.com
906342

                                            *Attorney for Plaintiff XpertUniverse, Inc.*

25

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that, on March 10, 2009, the within document

was electronically filed with the Clerk of the Court using CM-ECF ; that the document was

served on the following as indicated; and the document is available for viewing and downloading

from CM-ECF:

### BY HAND DELIVERY

Cisco Systems, Inc.
c/o Registered Agent
The Prentice-Hall Corporation System, Inc.
2711 Centerville Road
Suite 400
Wilmington, DE  19808/

/s/ Philip A. Rovner
Philip A. Rovner  (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com