## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

XPERTUNIVERSE, INC.,                )
                                    )   **Civil Action No.  09-157-JAP**
        Plaintiff            )
                                    )
     vs.                          )   **JURY TRIAL DEMANDED**
                                    )
                                    )   **PUBLIC VERSION**
CISCO SYSTEMS, INC.,                )
                                    )
        Defendant.           )

### THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff XpertUniverse, Inc. ("XpertUniverse"), for its Third Amended Complaint against defendant Cisco Systems, Inc. ("Cisco") alleges:

### THE PARTIES

1.    Plaintiff XpertUniverse is a Delaware corporation with a principal place of business located at 253 West 35th Street, New York, New York.

2.    On information and belief, Defendant Cisco is a California corporation with a principal place of business at 170 West Tasman Drive, San Jose, California.

### JURISDICTION AND VENUE

3.    This is a civil action concerning: (i) patent infringement in violation of the United States Patent Act of 1952, as amended, 35 U.S.C. § 271 et seq.; (ii) misappropriation of trade secrets under California's Uniform Trade Secrets Act, Cal. Civ. Code § 3426 et seq.; (iii) unfair competition in violation of Section 43(a) of the United States Trademark Act of 1946, as amended, 15 U.S.C. § 1125(a); and (iv) related claims of fraud, deceit, misappropriation, breach of confidence, breach of contract, rescission, unfair competition, trademark infringement, unjust

enrichment and conversion in violation of the laws of the State of California, and the common law.

4.      This Court has jurisdiction over this action pursuant to 15 U.S.C. § 1121, 28 U.S.C. § 1331, and 28 U.S.C. § 1338 (a)-(b), as it involves substantial claims arising under the United States Patent Act of 1952, as amended, 35 U.S.C. § 271 et seq. and the United States Trademark Act of 1946, as amended, 15 U.S.C. § 1125(a).  Personal jurisdiction over Defendant Cisco comports with the United States Constitution and 10 Del. C. § 3104 because, on information and belief, Defendant Cisco has committed the acts complained of within Delaware such that it has purposefully availed itself of the privilege of conducting activities within this District.

5.      This Court has supplemental jurisdiction over the claims in this Complaint which arise under state statutory and common law pursuant to 28 U.S.C. § 1367(a), since the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

6.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400(b).

## NATURE OF THE ACTION

7.     This is a civil action rising out of a two and a half year relationship between Cisco and XpertUniverse.  Over a two and a half year period Cisco fraudulently induced XpertUniverse to disclose all of its valuable intellectual property, including, but not limited to, its trade secrets, confidential information, concepts, know-how, and strategies, under the pretence that Cisco would not disclose the intellectual property to others, would not use the intellectual property without XpertUniverse's permission, and would abide by its contractual and common law obligations not to misuse the intellectual property for its own benefit.

8.     Cisco, however, concealed the fact that during this period Cisco was filing several patent applications in its own name based on XpertUniverse's intellectual property.  Cisco also concealed the fact that during this period Cisco was sharing XpertUniverse's intellectual property with a third party in an effort to develop competing products and services based on the information Cisco learned from XpertUniverse.

9.     Cisco is a multi-billion dollar corporation with worldwide assets.  XpertUniverse is a small company with intellectual property as its primary asset.  XpertUniverse conceived and developed its intellectual property at much expense and effort.  It is solely because of XpertUniverse's intellectual property that Cisco sought out the relationship with XpertUniverse in 2004.  This relationship was memorialized in a mutual non-disclosure agreement dated August 2, 2004 ("the NDA").

10.     Believing that Cisco would abide by the terms and conditions of the NDA and otherwise act lawfully, XpertUniverse disclosed every aspect of its intellectual property to Cisco. It was, in essence, a wholesale intellectual property transfer from XpertUniverse to Cisco

3

undertaken pursuant to the protections afforded by the NDA and Cisco's related promises to protect and respect XpertUniverse's intellectual property.

11.     The relationship between Cisco and XpertUniverse was intimate and widespread. Cisco and XpertUniverse were in regular contact for two and a half years.  XpertUniverse dedicated almost all of its resources to the project, and over the course of the project Cisco involved approximately 45 of its own employees to interact with XpertUniverse's staff.  As a result of Cisco's deceitful actions, XpertUniverse's investment of approximately $34,000,000 to the project was completely derailed and is of little to no value to XpertUniverse.

12.     In view of the closeness of the relationship that had developed between the companies and the promises that Cisco had made to protect and commercialize XpertUniverse's technology, XpertUniverse had great faith in Cisco.   XpertUniverse relied on Cisco's representations and actions that it was committed to XpertUniverse and would in fact honor XpertUniverse's intellectual property and launch a commercial product together.

13.     However, without XpertUniverse's knowledge or consent, Cisco began to act contrary to the interests of XpertUniverse and in violation of its obligations under the NDA, and in contraventions of its obligations under the common law.

14.     Without XpertUniverse's knowledge or consent, Cisco began to secretly file several patent applications with the U.S. Patent and Trademark Office.  These patent applications disclose and claim ownership and inventorship for technology and ideas specifically conceived and invented by XpertUniverse and conveyed to Cisco by XpertUniverse.

15.     Certain of the named inventors on these Cisco patent applications were the very individuals with whom XpertUniverse had substantial contact during its relationship with Cisco.

4

These individuals managed the Cisco technical team and had direct knowledge of XpertUniverse's intellectual property that had been shared with Cisco.

16.     These Cisco patent applications evidence Cisco's premeditated and willful misappropriation of XpertUniverse's intellectual property.

17.     In addition, on information and belief, without XpertUniverse's knowledge or consent, at some point during the relationship Cisco retained a third party consultant to help Cisco develop a product offering based on XpertUniverse's intellectual property.   On information and belief, Cisco shared XpertUniverse's intellectual property with this third party, in direct violation of its contractual and common law obligations to keep XpertUniverse's information confidential.

18.     On information and belief, at least one Cisco employee raised concerns regarding Cisco's unauthorized, unethical and unlawful disclosure of XpertUniverse's intellectual property to the third party consultant, and the Cisco employee was summarily reprimanded for raising these concerns.

19.     On information and belief, in or about the time Cisco was sharing XpertUniverse's intellectual property with the third party consultant, without XpertUniverse's knowledge Cisco began referring to XpertUniverse as a competitor, rather than a partner.

20.     During the time when Cisco was intentionally and willfully misappropriating XpertUniverse's intellectual property, it was simultaneously and fraudulently inducing XpertUnivsere to fully disclose all aspects of its intellectual property by, *inter alia*:

> a)  promising to promote XpertUniverse and its products/services to Cisco's worldwide customer base;
>
> b)  offering to confer a higher, more exclusive designation of "Solutions Plus" business partner to XpertUniverse so that XpertUniverse's products/services will be expedited and given preferential treatment at Cisco;

5

c)  offering to share in all revenue streams resulting from the sales and marketing of products/services using XpertUniverse's intellectual property;

d)  conducting due diligence on XpertUniverse through Cisco's internal venture operations, to invest and/or acquire XpertUniverse;

e)  utilizing XpertUniverse personnel for Cisco-sponsored trade shows to promote and market XpertUniverse's technology and products as a joint offering; and

f)  concealing Cisco's willful misappropriation of XpertUniverse's intellectual property and other protectable ideas for Cisco's benefit.

21.     Only after having induced XpertUniverse to disclose all of its technology and confidential information, Cisco elected to claim and use the same as its own, and in January 2007 advised XpertUniverse that due to lack of resources it was no longer in a position to pursue the joint business opportunity as originally promised.

22.     In September 2008, Cisco announced in a press release that it was introducing a software platform called Expert Advisor and an offering called Expert on Demand as part of its Unified Communications initiative.  Cisco stated that the market for such collaboration products was $34 billion, and described the offering as an important driver of growth.

23.     As described in more detail below, Cisco engaged in fraudulent, predatory, premeditated behavior purposely designed and orchestrated to usurp all aspects of XpertUniverse's intellectual property.  In so doing, Cisco has willfully and intentionally violated its contractual obligations to XpertUniverse and infringed all rights owned by XpertUniverse.

## FACTS UNDERLYING THE DISPUTE

### XpertUniverse and Its Technology

24.    XpertUniverse, then known as Homework911.com, was founded in 1999 and is in the business of developing innovative expert location, live interaction, and business intelligence technology for use over the Internet and other media.

25.    In or about 1999, XpertUniverse realized that the then current technology used by call centers did not possess an effective capability of connecting a customer's need with the appropriate expert or problem solver.  Call centers were inadequate and inefficient in locating the optimal expert for solving the specific needs of a customer.  In particular, call centers required substantial human intervention and the call center agent receiving the customer's request for an expert usually did not have access to available data to locate the best or optimal expert to solve the problems of the caller.  Call centers were also limited by the location of its resources (*i.e.*, its experts or problem solvers had to operate out of call centers).

26.    XpertUniverse recognized that the expertise possessed by the employees that operate outside the call center, especially in large organizations, was a highly valuable asset and untapped resource.  XpertUniverse realized that this resource could be made available, free of the limitations of the traditional call center model, to other employees, as well as customers of those organizations around the world.

27.    Through substantial innovation and effort, XpertUniverse developed a unique, proprietary platform and technology that permits locating an expert in an efficient and effective manner via the Internet or other electronic means with limited human intervention.  The technology, among other things, combines aspects of call center technology with a rich set of collaboration tools and customer relationship management functionality, coupled with business intelligence capabilities.  The information obtained and exchanged between the expert and the

7

expertise seeker can be archived, thereby creating a significant asset, while providing corporations with valuable real-time information for analysis, reporting and training purposes.

28.     The technology uses a configurable taxonomy to determine the best expert and enables, among other things, the person seeking specific expertise to engage in a real time, live interaction(s) with the expert(s), as desired.   Based on this platform and technology, XpertUniverse created, promoted and marketed a technology called XpertSHARE and a service offering under the "Expert On Demand" mark.

29.     XpertUniverse determined that its technology would be particularly marketable and valuable to companies providing call center software and/or services.   Call centers often require operators to connect callers with experts who have the requisite knowledge or expertise to answer a caller's question.   For example, a person interested in a new mortgage for an owner-occupied dwelling in Delaware may call a bank's call center seeking information regarding the types of mortgages available and the terms of such products.

30.     The call center agent would typically transfer the call to the next available agent, but would have no means by which to locate the best available expert based on the mortgage applicant's specific issues, *e.g.*, an expert in residential mortgages for Delaware owner-occupied dwellings, who also speaks Spanish.   As a result, the process was ineffective, inefficient and costly because there was no way to ensure that the caller reached the appropriate or optimal expert.   This resulted in poor customer satisfaction, high cost of delivery and lower revenues.

## XpertUniverse Was Induced To Abandon Genesys in Favor of Cisco

31.     In about 2004, XpertUniverse began a business relationship with Genesys Telecommunications Laboratories, Inc. ("Genesys"), a leading call center technology company, with the goal of offering XpertUniverse's XpertSHARE technology platform and Expert on

Demand service offering to Genesys' customers.  Genesys had expressed serious interest in the XpertUniverse technology and platform, as it realized and appreciated the importance and potential of XpertUniverse's technology on a global scale.

32.    At the insistence of XpertUniverse, and prior to disclosing any confidential information to Genesys, XpertUniverse and Genesys entered into a non-disclosure agreement requiring that Genesys keep all of XpertUniverse's trade secrets and confidential information secret.

33.    During their business relationship, XpertUniverse worked with Genesys' middle and executive level management.  In or about the summer of 2004, literally weeks away from Genesys' introduction of the XpertUniverse platform to its customer base, Genesys' CEO, Laurent Philonenko, who had been XpertUniverse's most senior contact, left Genesys to join Cisco as Cisco's new General Manager of the CCBU (Call Center Business Unit).

34.    Shortly after leaving Genesys, Mr. Philonenko advised XpertUniverse that (a) Cisco did not possess anything similar to XpertUniverse's technology and platform, (b) Cisco had great interest in commercializing XpertUniverse's technology and platform, (c) given Cisco's market focus, as well Cisco's global business contacts, Cisco would be the best distributor/partner in the sales and marketing of XpertUniverse's technology and platform, (d) XpertUniverse should, accordingly, focus its efforts on building a relationship with Cisco, rather than Genesys, (e) Cisco would fully support XpertUniverse's efforts and would, *inter alia*, introduce XpertUniverse's platform to Cisco's global customer base, and (f) Cisco would ensure that the intellectual property, including the trade secrets and confidential information of XpertUniverse, were protected.

35.     Based upon the foregoing representations, XpertUniverse ceased pursuing business opportunities with Genesys in favor of a new business relationship with Cisco.  In particular, despite the substantial time and effort it had expended in developing a platform that incorporated Genesys' routing technology, XpertUniverse changed its focus to devote substantially all its resources to building a platform specific to Cisco's needs.

### XpertUniverse and Cisco Sign NDA

36.     Prior to working with Cisco, XpertUniverse insisted that Cisco agree to an appropriate non-disclosure agreement, because the technology and platform was and remains the heart of XpertUniverse and was developed by XpertUniverse through the expenditure of great time, intellectual efforts and other resources.

37.     In or about August 2004, Cisco provided XpertUniverse with Cisco's Mutual Non-Disclosure Agreement.  On or about August 2, 2004, XpertUniverse and Cisco executed the mutual  non-disclosure  agreement  ("NDA"),  ███████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████  A copy of the NDA is attached as Exhibit A.

38.     Cisco acknowledged pursuant to the NDA that ███████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████

## XpertUniverse 's Patents

39.     XpertUniverse applied for patent protection in order to protect aspects of its novel and innovative intellectual property.  On April 2, 2004, XpertUniverse filed a provisional patent application entitled "System and Method for Managing Questions and Answers Using Subject Lists Styles."  On March 31, 2005, XpertUniverse filed U.S. Patent Application Serial No. 11/097,967 ("the '967 Patent Application"), claiming the benefit of the filing date of the previously filed provisional patent application.  The '967 Patent Application issued to XpertUniverse on April 29, 2008 as U.S. Patent No. 7,366,709 ("the '709 Patent").

40.     In addition, on January 24, 2005, XpertUniverse filed U.S. Patent Application Serial No. 11/043,014, entitled "Semantic To Non-Semantic Routing For Locating A Live Expert" ("the '014 Patent Application").  The '014 Patent Application issued to XpertUniverse on March 3, 2009 as U.S. Patent No. 7,499,903 ("the '903 Patent").

41.     XpertUniverse advised Cisco that it was seeking patent protection for aspects of its intellectual property.  XpertUniverse disclosed to Cisco the proprietary and novel information that was the subject of its pending and confidential patent applications, the same applications that later matured into the '709 and '903 Patents.

### XpertUniverse and Cisco Work Together For Two and A Half Years During Which Time XpertUniverse Discloses All of Its Intellectual Property To Cisco

42.     After signing the NDA, XpertUniverse began substantive talks with Cisco regarding forming a business relationship around XpertUniverse's expert location, live interaction, and business intelligence technology.  Over the next two and a half years, XpertUniverse dedicated most of its human and financial resources to integrating Cisco's routing technology into the XpertUniverse platform, thereby replacing Genesys' routing technology.

11

43.     Given the protection afforded by the NDA, over the next several months XpertUniverse in good faith shared each and every facet of its knowledge with Cisco, believing that Cisco would abide by its obligations pursuant to the NDA.  For example, XpertUniverse disclosed to Cisco all of its valuable trade secrets, and proprietary and confidential information, including, by way of example, and without limitation: technical development documents, schematics, system architecture, integration charts, sales and marketing strategies, marketing forecasts, and pricing schedules.

44.     Much of the information provided by XpertUniverse to Cisco was marked "Confidential," ███████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████

45.     The project, which was undertaken pursuant to the NDA, concerned a new and novel concept and a new and novel product, and XpertUniverse not only taught Cisco how to build the system using XpertUniverse's trade secrets and proprietary and confidential information, but also how to market and sell the new product to Cisco's customers.  By supplying Cisco with various white papers on the application of XpertUniverse's technology to different industries, XpertUniverse outlined in great detail to Cisco the value proposition for various vertical markets.

46.     XpertUniverse and its key personnel were, for approximately two and a half years, in constant and almost daily contact with Cisco engineers, technologists and software developers, as well as marketing and business development personnel.  The relationship was so close that Cisco and XpertUniverse attended numerous trade shows together, where

XpertUniverse, at Cisco's request, would demonstrate and explain to potential customers the value and various uses of XpertUniverse's technology and platform.

47.    Cisco recognized the substantial business potential of XpertUniverse's technology.

48.    Cisco recognized that the XpertUniverse technology would have great demand and, at the same time, would enable Cisco to increase sales of companion hardware and software products.

49.    Given the importance of the project, the highest management levels of Cisco, including its current Chief Executive Officer (John Chambers), the Chief Technology Officer at the time (Charles Giancarlo), as well as the current head of its software division (Donald Proctor), were involved and/or had knowledge of XpertUniverse's technology and capabilities.

50.    At the behest of Cisco, XpertUniverse provided on a confidential basis both pricing and marketing information to Cisco, including White Papers prepared solely for Cisco regarding how the product could be positioned in various vertical markets and related value propositions.   XpertUniverse did so because Cisco had no prior knowledge or experience concerning this new product and relied heavily on the expertise of XpertUniverse and the confidential information and trade secrets developed by XpertUniverse.

51.    XpertUniverse also coined and commercially used the mark "EXPERT ON DEMAND" to identify and brand its services.

52.    The "EXPERT ON DEMAND" mark was used as early as 2005 in sales presentations to various customers, including Citibank, Prudential Insurance and IBM, among others, and XU prominently and continually used the EXPERT ON DEMAND mark on its website since 2005.

53.     Cisco helped prepare certain materials used for these sales presentations in which XpertUniverse's EXPERT ON DEMAND mark appeared.

54.     The phrase EXPERT ON DEMAND has no accepted or understood meaning in the collaboration field or call center industry.

55.     Prior to the use by XpertUniverse, the mark EXPERT ON DEMAND had never been used to identify any services or products in the call center industry.

56.     The mark EXPERT ON DEMAND cannot be readily understood by the public or the trade unless or until the mark is used in connection with a generic or apt description of the products or services it identifies.  In fact, the mark means locating an individual with specific knowledge regarding a specific subject matter to address a customer's inquiry in an efficient and effective manner via the Internet or other electronic means with limited human intervention.

57.     The mark EXPERT ON DEMAND requires imagination and a creative though process in order to be understood by the public or the trade.

58.     The mark EXPERT ON DEMAND was used by XpertUniverse in a prominent manner, together with its logo, to distinguish its products and services from those of its competitors.

59.     The mark EXPERT ON DEMAND was used by XpertUniverse in a prominent manner to distinguish its products and services from those of its competitors.

60.     Cisco was well aware that XpertUniverse used the EXPERT ON DEMAND mark in a prominent manner to distinguish XpertUniverse's products and services as Cisco participated in many of the sales and marketing opportunities in which the mark was prominently used.

61.   Cisco was well aware that the EXPERT ON DEMAND mark was coined, used and developed by XpertUniverse.

62.   Cisco has used the EXPERT ON DEMAND mark in a prominent manner in marketing its products and services, and, on information and belief, continues to use the EXPERT ON DEMAND mark in a prominent manner in marketing its products and services.

63.   Cisco's use of the EXPERT ON DEMAND mark has caused actual confusion.

64.   In or about January 2005, XpertUniverse began to involve IBM as a potential partner in its relationship with Cisco.  IBM, like Cisco, understood that the XpertUniverse Expert on Demand offering and XpertSHARE technology could deliver significant benefits to its customers.

65.   At the request of both IBM and Cisco, XpertUniverse prepared various confidential marketing materials to use with potential customers explaining the purpose and prospective uses and benefits of the XpertUniverse technology and platform.  Such presentations were marked confidential and were made to customers, including Citibank, AIG, MetLife and Deloitte, among others.

66.   Upon information and belief, Citibank personnel were told by Cisco that Cisco was committed to working with XpertUniverse and that Cisco was not planning on offering its own platform or technology similar to that of XpertUniverse.

67.   At no time did Cisco ever convey any problems, issues or objections to XpertUniverse concerning its technology, platform or any other matter.

68.   Cisco openly and repeatedly stated its support for XpertUniverse and its technology, and enthusiastically, openly and repeatedly promoted the XpertUniverse technology to XpertUniverse's and Cisco's own prospective customers.

## Cisco Fraudulently Induces XpertUniverse
## to "Click Through" Two Subsequent Agreements

69.     Over a two and a half year period Cisco induced XpertUniverse to share all of its valuable and confidential information and technology under the pretence that Cisco would abide by its obligations not to misuse the information for its own benefit.

70.     Cisco, however, concealed the fact that during this period Cisco was filing numerous patent applications in its own name based on XpertUniverse's trade secrets and confidential information.

71.     Cisco also concealed the fact that during this period Cisco was sharing XpertUniverse's trade secrets and confidential information with a third party in an effort to develop a competing product based on the information Cisco learned from XpertUniverse.

72.     At all times during the two and a half year relationship, XpertUniverse believed that the 2004 NDA was effective and the sole operating agreement between the companies. This NDA was negotiated between the parties, personally signed by the CEO of XpertUniverse and a divisional director of Cisco. In point of fact, the signatory for Cisco made a personal visit to XpertUniverse in order to sign the NDA.

73.     The relationship between Cisco and XpertUniverse was extremely intimate. Cisco and XpertUniverse were in regular contact for two and a half years. During this period of time, XpertUniverse provided advice, consultation and knowledge on all aspects of its intellectual property, technology and related services.

74.     The relationship between Cisco and XpertUniverse was also widespread. XpertUniverse dedicated almost its entire human resources to the project, and Cisco involved approximately 45 of its own employees to interact with XpertUniverse on the project.

75.     The relationship between the parties grew to such levels that even top management at Cisco, including its CEO John Chambers, knew of XpertUniverse's initiative with Cisco.

76.     To show its support and commitment to XpertUniverse, Cisco offered to elevate XpertUniverse to a Solutions Plus partner designation with Cisco.  Solutions Plus was a Cisco program through which key products deemed important by Cisco were promoted on a fast-track basis.

77.     The relationship of the parties was so close that at one point, upon learning that XpertUniverse was considering raising additional strategic capital, Cisco considered and investigated purchasing XpertUniverse.  At that time, Cisco was aware that the market value of XpertUniverse was in excess of $100 million.  The CEO of XpertUniverse advised Cisco that, at that time, the company was not for sale.

78.     At or about the time Cisco was contemplating the purchase of XpertUniverse and also entering into the Solutions Plus agreement with XpertUniverse, a Cisco employee emailed a click-through agreement entitled "Cisco Technology Developer Program Partner Agreement" to an employee of XpertUniverse ("the 2005 Click-Through Agreement").

79.     The 2005 Click-Through Agreement was never discussed with the CEO of XpertUniverse, the original signatory of the 2004 NDA.

80.     The employee of XpertUniverse was told that in order for XpertUniverse to continue its technology development efforts with Cisco, he was required to open the email and accept the 2005 Click-Through Agreement.  Accordingly, the employee, without consulting the CEO or an attorney, or even discussing the contents of the click-through agreement internally at XpertUniverse, performed what she believed was a perfunctory aspect of her job.  In point of

fact, the employee never told anyone at XpertUniverse until well after this action commenced that she had engaged in this click-through activity.

81.     From the period of April 2005 through September 2006, XpertUniverse was actively involved in building the relationship with Cisco.  During this period, the companies made several presentations to commercial entities.  At these presentations, the Cisco logo and XpertUniverse's logo were used in close proximity in marketing materials to show the public and prospective customers that the companies were working closely and jointly in the presentation of a joint solution.

82.     In view of the closeness of the relationship that had developed between the companies, and the promises that Cisco had made to commercialize XpertUniverse's technology, XpertUniverse had great faith in Cisco.  XpertUniverse relied on Cisco's representations and actions that Cisco was committed to XpertUniverse and would in fact honor XpertUniverse's intellectual property and launch a commercial product together.

83.     Upon information and belief, in or about 2006, and unknown to XpertUniverse until recently, Cisco began to act contrary to the interest of XpertUniverse and in violation of its NDA, as well as in violation of various laws.

### Cisco Concealed The Fact That It Was Filing Patent Applications Based On XpertUniverse's Trade Secrets and Confidential Information

84.     Without XpertUniverse's knowledge or consent, Cisco began to secretly file patent applications with the U.S. Patent and Trademark Office.  These patent applications disclose and claim ownership and inventorship for technology and ideas specifically invented, conceived, conveyed, taught and disclosed by XpertUniverse to Cisco.

85.     On or about September 13, 2006, Cisco filed U.S. Patent Application Serial No. 11/520,333, entitled "Matching A Contact To A Resource Set" ("the Cisco '333 Patent

Application"). The Cisco '333 Patent Application was published by the U.S. Patent and Trademark Office as Publication No. US 2008/0065450 A1 on March 13, 2008.

86.     On or about February 28, 2007, Cisco filed U.S. Patent Application Serial No. 11/711,960, entitled "Use Of Intelligent Directed Broadcast In Contact Center Solutions" ("the Cisco '960 Patent Application"). The Cisco '960 Patent Application was published by the U.S. Patent and Trademark Office as Publication No. US 2008/0205428 A1 on August 28, 2008.

87.     On or about July 2, 2007, Cisco filed U.S. Patent Application Serial No. 11/772,318, entitled "Search Engine For Most Helpful Employees" ("the Cisco '318 Patent Application"). The Cisco '318 Patent Application was published by the U.S. Patent and Trademark Office as Publication No. US 2009/0012833 A1 on January 8, 2009.

88.     Publication No. US 2008/0065450 A1 indicates that the Cisco '333 Patent Application was assigned to Cisco Technology, Inc. Publication No. US 2008/0205428 A1 indicates that the Cisco '960 Patent Application was assigned to Cisco Technology, Inc. Publication No. US 2009/0012833 A1 indicates that the Cisco '318 Patent Application was assigned to Cisco Technology, Inc. On information and belief, Cisco Technology, Inc. is a subsidiary of defendant Cisco.

89.     On information and belief, each of the listed inventors of the Cisco '333 Patent Application, the Cisco '960 Patent Application and the Cisco '318 Patent Application were employees of Cisco at the time the respective applications were filed with the U.S. Patent and Trademark Office.

90.     At least two of the named inventors of the Cisco '333 Patent Application and the Cisco '960 Patent Application, specifically, Kenneth D. Jordan and Michael P. Lepore, were Cisco employees that were directly involved with the technical discussions between Cisco and

XpertUniverse undertaken pursuant to the NDA, and each had access to the confidential, proprietary and trade secret information of XpertUniverse that was provided from XpertUniverse to Cisco pursuant to the NDA.

91.     On information and belief, each of the named inventors of the Cisco '333 Patent Application, the Cisco '960 Patent Application and the Cisco '318 Patent Application had access to the confidential, proprietary and trade secret information of XpertUniverse that was provided from XpertUniverse to Cisco pursuant to the NDA.

92.     The Cisco '333 Patent Application, the Cisco '960 Patent Application and the Cisco '318 Patent Application each disclose and/or identify confidential, proprietary and trade secret information of XpertUniverse.

93.     The Cisco '333 Patent Application, the Cisco '960 Patent Application and the Cisco '318 Patent Application each disclose and/or identify information that Cisco learned, either directly or derivatively, from XpertUniverse pursuant to the NDA.

94.     On information and belief, the rightful inventors of the information disclosed and/or identified in the Cisco '333 Patent Application, the Cisco '960 Patent Application and the Cisco '318 Patent Application were employees of XpertUniverse.

95.     On information and belief, the rightful owner of all right, title and interest in and to the Cisco '333 Patent Application, the Cisco '960 Patent Application and the Cisco '318 Patent Application is XpertUniverse.

96.     By the filing of the Cisco '333 Patent Application, the Cisco '960 Patent Application and the Cisco '318 Patent Application, and any other Cisco patent application based on the confidential or trade secret information of XpertUniverse, Cisco is wrongfully claiming as

its own certain confidential, proprietary and trade secret information that was invented by others and is rightfully owned by XpertUniverse.

97.     XpertUniverse did not authorize Cisco to file the referenced patent applications, and Cisco did not advise XpertUniverse that it was filing the subject patent applications.

98.     XpertUniverse relied on Cisco's representations and actions that it was committed to XpertUniverse and would in fact honor XpertUniverse's intellectual property.

99.     Cisco concealed its filing of the patent applications from XpertUniverse at the same time it was demanding that employees of XpertUniverse accept the click-through agreements in order to keep working with Cisco.

100.    Had Cisco advised XpertUniverse that it was filing patent applications based on, and claiming ownership to, the intellectual property of XpertUniverse, XpertUniverse would not have clicked-through the agreements.

101.    During the period of time in which Cisco was preparing the patent applications based upon XpertUniverse's intellectual property, on or about September 6, 2006, Cisco emailed another click-through agreement to a different employee of XpertUniverse ("the 2006 Click-Through Agreement").

102.    At that time, XpertUniverse and its employees had no knowledge that Cisco was acting contrary to the interests of XpertUniverse, including Cisco's filing of the patent applications based on XpertUniverse's trade secrets and confidential information.

103.    Not knowing Cisco's real intentions and actions, and induced by Cisco's continued promises and actions to protect, commercialize and monetize XpertUniverse's technology, products and strategies, the employee at XpertUniverse perfunctorily clicked-through the September 2006 email.

104.   This employee did not consult an attorney, did not consult the CEO of XpertUniverse, and did not discuss it with anyone at XpertUniverse at that time. The employee believed the click-through agreement was a perfunctory task that needed to be performed in order to continue XpertUniverse's relationship with Cisco.

105.   Cisco concealed its filing of the patent applications from XpertUniverse at the same time it was demanding that employees of XpertUniverse accept the click-through agreements in order to keep working with Cisco.

106.   Had Cisco advised XpertUniverse that it was filing patent applications based on, and claiming ownership to, the intellectual property of XpertUniverse, XpertUniverse would not have clicked-through the agreements.

### Cisco Concealed The Fact That It Was Sharing XpertUniverse's Trade Secrets And Confidential Information With A Third Party

107.   On information and belief, during the two and a half year period the parties were working together, and without XpertUniverse's knowledge or consent, Cisco retained a third party consultant to help Cisco develop a product offering based on XpertUniverse's trade secrets and confidential information.

108.   On information and belief, without XpertUniverse's knowledge or consent, Cisco shared XpertUniverse's trade secrets and confidential information with this third party, in direct violation of its obligations to keep XpertUniverse's information confidential.

109.   On information and belief, at least one Cisco employee raised concerns regarding Cisco's unauthorized, unethical and unlawful disclosure of XpertUniverse's trade secrets and confidential information to the third party consultant retained by Cisco. The Cisco employee was reprimanded for raising these concerns.

110.    XpertUniverse did not authorize Cisco to share its intellectual property with any

third parties, and Cisco did not advise XpertUniverse that it was sharing XpertUniverse's

intellectual property with any third parties, including this third party consultant.

111.    XpertUniverse relied on Cisco's representations and actions that it was committed

to XpertUniverse and would in fact honor and protect XpertUniverse's intellectual property.

Cisco concealed its sharing of XpertUniverse's intellectual property with the third party

consultant from XpertUniverse at the same time it was demanding that employees of

XpertUniverse accept the click-through agreements in order to keep working with Cisco.

112.    Had Cisco advised XpertUniverse that it was sharing the intellectual property of

XpertUniverse with a third party, XpertUniverse would not have clicked-through the 2005 or

2006 Agreements.

113.    In or about January 2007, without any advance notice, Cisco advised

XpertUniverse that it needed to reevaluate its business relationship with XpertUniverse, because

Cisco did not have the resources necessary to continue the Solutions Plus program.

114.    As of 2007, XpertUniverse had expended most of its resources, both financially

and intellectually, to modify its platform in order for it to work with Cisco's routing technology

and related platforms.

115.    XpertUniverse dedicated approximately 15 individuals on a full time basis to

meet the demands and requirements of Cisco for well over two years.

116.    XpertUniverse expended millions of dollars to modify and supplement its

technology and platform to meet Cisco's demands.  That work was custom developed for Cisco

and has little, if any, value as applied to other routing software and/or call center technologies.

117.    Having learned all of XpertUniverse's technology and confidential information, and having chosen to claim and use the same as its own, in January 2007 Cisco advised XpertUniverse that, due to lack of resources, it was no longer able to pursue the business opportunity.

118.    About 18 months later, Cisco announced that it was introducing an expert location and collaboration platform called Expert Advisor and an offering called Expert on Demand as part of its Unified Communications initiative.  Cisco estimated that the market for such collaboration products was $34 billion, and described the offering as an important driver of growth.

## Cisco Introduces Its Infringing Products

119.    In or about September 2008, XpertUniverse learned for the first time that Cisco was offering a new "collaboration portfolio" product line.

120.    In an article appearing in *The New York Times*, dated September 24, 2008, entitled "Cisco Tries to Break Out of the Data Center Role," Cisco announced that it was calling its new offering "Expert On Demand." The same "Expert On Demand" mark coined and used by XpertUniverse. A copy of the article is annexed hereto as Exhibit B.

121.    In an article appearing in *The Wall Street Journal*, dated September 24, 2008, entitled "Cisco Sets Sights on $34 Billion Market," Cisco announced that it estimated that such collaboration products represent a $34 billion market opportunity.  A copy of the article is annexed hereto as Exhibit C.

122.    As evidenced by both articles, Cisco enthusiastically announced that it was committed to the technology.

123.    Information concerning Cisco's new Expert On Demand offering, including, among other things, architectural diagrams and other documents describing the product's functionality can be found in various product manuals, specifications and reference materials available from Cisco's web site including, but not limited to, the "Cisco Telepresence Expert On Demand", "Cisco Unified Expert Advisor", and the "Cisco Unified Expert Advisor Quick Reference" documents, which are attached hereto as Exhibit D.

124.    Other available Cisco documents describing the structure and functionality of the Cisco product offering include, but are not limited to:

> a)   "Administration and Configuration Guide for Cisco Unified Expert Advisor, Release 7.5(1), dated August 2008, available at http://www.cisco.com/en/US/products/ps9675/prod_maintenance_guides_list.html;
>
> b)   "Chapter 7: Cisco Unified Expert Advisor Option," available at http://www.cisco.com/en/US/docs/voice_ip_comm/cust_contact/contact_center/ ipcc_enterprise/srnd/75/exprtadv.pdf; and
>
> c)   "Cisco Unified Expert Advisor – Data Sheet," available at http://www.cisco.com/en/US/prod/collateral/voicesw/custcosw/ps5693/ps9675/data_sheet_c78-480625.pdf.

125.    Upon information and belief, these and other Cisco documents show that the Cisco software platforms, including but not limited to, its "Expert Advisor" and its "Expert On Demand" offering, embody the subject matter of one or more claims of the '709 Patent and the '903 Patent, use of XpertUniverse's mark, and use and/or are based on the trade secrets and/or confidential information of XpertUniverse.

126.    Cisco has sold, offered for sale and marketed, and continues to sell, offer for sale and market, products and technology in contravention of and based on XpertUniverse's rights in and to its intellectual property, including, without limitation, its trademarks, trade secrets, confidential information, patent rights and contractual rights.

127.    Cisco effectively usurped all of the intellectual property, monetary resources, time and effort of XpertUniverse during its relationship with XpertUniverse.   On information and belief, as a consequence of Cisco's decision to reevaluate its business relationship with XpertUniverse, and Cisco's reference to XpertUniverse as a competitor, resulted in other companies, such as IBM, deciding to cease pursuing business opportunities with XpertUniverse.

## COUNT I

### INFRINGEMENT OF U.S. PATENT NO. 7,366,709

128.   XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

129.   XpertUniverse is the sole owner by assignment of all right, title, and interest in and to United States Patent No. 7,366,709, entitled "System and Method for Managing Questions and Answers Using Subject Lists Styles" ("the '709 Patent"), which was duly and legally issued by the United Stated Patent and Trademark Office on April 29, 2008. A copy of the '709 Patent is attached hereto as Exhibit E.

130.   On information and belief, Cisco has been and still is infringing, contributing to and/or actively inducing infringement of the '709 Patent in this judicial district and elsewhere in the United States by the manufacture, use, sale and/or offer for sale in the United States, or importation into the United States, of products, including but not limited to, its "Cisco Unified Expert Advisor" and its "Expert On Demand" products, which embody the subject matter of and infringe one or more claims of the '709 Patent.

131.   On information and belief, Cisco's infringement of the '709 Patent has been and continues to be willful, wanton, deliberate and without license, thereby rendering this case exceptional within the meaning of 35 U.S.C. § 285.

132.   Cisco's acts have caused irreparable injury and damage to XpertUniverse for which XpertUniverse has no adequate remedy at law.

133.   Unless preliminarily and permanently enjoined by this Court, Cisco will continue its acts of infringement of the '709 Patent to XpertUniverse's substantial and irreparable harm.

## COUNT II

### INFRINGEMENT OF U.S. PATENT NO. 7,499,903

134.    XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

135.    XpertUniverse is the sole owner by assignment of all right, title, and interest in and to United States Patent No. 7,499,903, entitled "Semantic To Non-Semantic Routing For Locating A Live Expert" ("the '903 Patent"), which was duly and legally issued by the United Stated Patent and Trademark Office on March 3, 2009.  A copy of the '903 Patent is attached hereto as Exhibit F.

136.    On information and belief, Cisco has been and still is infringing, contributing to and/or actively inducing infringement of the '903 Patent in this judicial district and elsewhere in the United States by the manufacture, use, sale and/or offer for sale in the United States, or importation into the United States, of products, including but not limited to, its "Cisco Unified Expert Advisor" and its "Expert On Demand" products, which embody the subject matter of and infringe one or more claims of the '903 Patent.

137.    On information and belief, Cisco's infringement of the '903 Patent has been and continues to be willful, wanton, deliberate and without license, thereby rendering this case exceptional within the meaning of 35 U.S.C. § 285.

138.    Cisco's acts have caused irreparable injury and damage to XpertUniverse for which XpertUniverse has no adequate remedy at law.

139.    Unless preliminarily and permanently enjoined by this Court, Cisco will continue its acts of infringement of the '903 Patent to XpertUniverse's substantial and irreparable harm.

## COUNT III

## COMMON LAW FRAUD

140.    XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

141.    Cisco fraudulently induced XpertUniverse to disclose its trade secrets and confidential information, all the while intending to appropriate the same for its own use and benefit.

142.    On the one hand, Cisco was requiring XpertUniverse to execute click-through agreements requiring each party to respect and protect the confidential information of the other, while on the other hand Cisco was filing patent applications based on the trade secrets, confidential information, concepts, know-how, and strategies of XpertUniverse, and was also sharing XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies with a third party consultant that had been specifically retained to develop an offering for Cisco's use and benefit that was based on XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies.

143.    During the time when Cisco was intentionally and willfully misappropriating XpertUniverse's intellectual property, it was simultaneously and fraudulently inducing XpertUniverse to fully disclose all aspects of its intellectual property by, *inter alia*:

> a)  falsely promising to promote XpertUniverse and its products/services to Cisco's worldwide customer base;
>
> b)  falsely offering to confer the designation of "Solutions Plus" to XpertUniverse so that XpertUniverse's products/services will be expedited and given preferential treatment at Cisco, only to withdraw its offer once XpertUniverse had disclosed all of its valuable intellectual property to Cisco;
>
> c)  falsely offering to share in all revenue streams resulting from the sales and marketing of products/services using XpertUniverse's intellectual

property, all the while planning to misappropriate XpertUniverse's intellectual property for its own use and benefit;

d)   conducting due diligence on XpertUniverse through Cisco's internal venture operations, to invest and/or acquire XpertUniverse, and when rebuffed deciding to misappropriate XpertUniverse's intellectual property for its own use and benefit;

e)   utilizing XpertUniverse personnel for Cisco-sponsored trade shows to promote and market XpertUniverse's technology and products as a joint offering, all the while planning to misappropriate XpertUniverse's intellectual property for its own use and benefit.

144.   Cisco fraudulently concealed from XpertUniverse the fact that it had filed patent applications based on the trade secrets, confidential information, concepts, know-how, and strategies of XpertUniverse.  Cisco had exclusive knowledge of the fact that it had filed these patent applications, and actively concealed its filing of the patent applications from XpertUniverse.

145.   Cisco fraudulently concealed from XpertUniverse the fact that it had retained a third party consultant to develop an offering for Cisco's use and benefit that was based on XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies. Cisco had exclusive knowledge of the fact that it had retained the consultant, and actively concealed from XpertUniverse the fact that it had retained the consultant and shared XpertUniverse's intellectual property with the consultant.

146.   Cisco knew or should have known that it was not authorized to file patent applications based on XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies.  Cisco also knew or should have known that it was not authorized to share XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies with the third party consultant.

147.    Cisco induced XpertUniverse into clicking through the 2005 and 2006 Click-Through Agreements under the pretence that the Click-Through Agreements were necessary for XpertUniverse to continue its relationship with Cisco and that without the Click-Through Agreements, XpertUniverse would not be able to continue to partner with Cisco for the purpose of releasing and selling products and services for the mutual benefit of both XpertUniverse and Cisco. Cisco's intent in inducing XpertUniverse to click-through the 2005 and 2006 Click-Through Agreements was, however, to attempt to limit its liability for misappropriating XpertUniverse's valuable intellectual property by including provisions in the 2005 and 2006 Click-Through Agreements that narrowed the scope of what type of information would be kept confidential and attempted to limit Cisco's liability for breach of its confidentiality obligations. XpertUniverse had no opportunity to negotiate or modify the provisions of the 2005 and 2006 Click-Through Agreements. Employees of XpertUniverse were led to believe that they had to accept the 2005 and 2006 Click-Through Agreements or Cisco would sever it relationship with XpertUniverse.  To the extent the 2005 and 2006 Click-Through Agreements are interpreted to narrow the scope of what information must be kept confidential and/or is protectable and interpreted to limit Cisco's liability for misappropriation and numerous intentional torts pled herein, Cisco has mislead XpertUniverse to its prejudice by entering into the 2005 and 2006 Click-Through Agreements.

148.    Cisco owed a duty of confidence under common law and/or under the NDA

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████  Cisco's inducing XpertUniverse to click-through the 2005 and 2006 Click-Through Agreements in an attempt to narrow the scope of what information Cisco is obligated to keep

confidential and to limit its liability for misappropriating XpertUniverse's valuable intellectual property is a breach of Cisco's duty to XpertUniverse causing XpertUniverse detriment by entering into the Click-Through Agreements and incurring other consequential damages.

149. Cisco had exclusive knowledge that it was actively breaching its contractual and common law duties to maintain XpertUniverse's information confidential and not to misuse XpertUniverse's information for its own benefit. Cisco fraudulently and actively concealed its misappropriation and misuse of XpertUniverse's information from XpertUniverse.

150. Cisco's conduct and actions during the two and a half year period the parties were collaborating, as described herein, were all intended to create a false security in the mind of XpertUniverse that Cisco would respect and protect XpertUniverse's intellectual property in order to induce XpertUniverse to disclose the same to Cisco.

151. XpertUniverse justifiably relied on the actions and assurances provided by Cisco in disclosing its intellectual property to Cisco. Absent the actions and assurances as noted herein, including the signing of the NDA, XpertUniverse would not have disclosed its trade secrets, confidential information, concepts, know-how, and strategies to Cisco. XpertUniverse justifiably relied on Cisco's false promises and assurances, and has been harmed as a result of Cisco's intentional and fraudulent conduct.

152. XpertUniverse has suffered damages resulting from Cisco's fraud, including, but not limited to, actual, compensatory and incidental damages, lost profits, customers, potential investors and business goodwill, and misuse of XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies.

32

## COUNT IV

### DECEIT UNDER CALIFORNIA CIVIL CODE §§ 1709, 1710

153.    XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

154.    Cisco willfully deceived XpertUniverse to disclose its trade secrets and confidential information, all the while intending to appropriate the same for its own use and benefit.

155.    On the one hand, Cisco was requiring XpertUniverse to execute click-through agreements requiring each party to respect and protect the confidential information of the other, while on the other hand Cisco was filing patent applications based on the trade secrets, confidential information, concepts, know-how, and strategies of XpertUniverse, and was also sharing XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies with a third party consultant that had been specifically retained to develop an offering for Cisco's use and benefit that was based on XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies.

156.    During the time when Cisco was intentionally and willfully misappropriating XpertUniverse's intellectual property, it was simultaneously and fraudulently deceiving XpertUnivsere to fully disclose all aspects of its intellectual property by, *inter alia*:

> a)    falsely promising to promote XpertUniverse and its products/services to Cisco's worldwide customer base;
>
> b)    falsely offering to confer the designation of "Solutions Plus" to XpertUniverse so that XpertUniverse's products/services will be expedited and given preferential treatment at Cisco, only to withdraw its offer once XpertUniverse had disclosed all of its valuable intellectual property to Cisco;
>
> c)    falsely offering to share in all revenue streams resulting from the sales and marketing of products/services using XpertUniverse's intellectual

property, all the while planning to misappropriate XpertUniverse's intellectual property for its own use and benefit;

d)   conducting due diligence on XpertUniverse through Cisco's internal venture operations, to invest and/or acquire XpertUniverse, and when rebuffed deciding to misappropriate XpertUniverse's intellectual property for its own use and benefit;

e)   utilizing XpertUniverse personnel for Cisco-sponsored trade shows to promote and market XpertUniverse's technology and products as a joint offering, all the while planning to misappropriate XpertUniverse's intellectual property for its own use and benefit.

157.   Cisco fraudulently concealed from XpertUniverse the fact that it had filed patent applications based on the trade secrets, confidential information, concepts, know-how, and strategies of XpertUniverse.   Cisco had exclusive knowledge of the fact that it had filed these patent applications, and actively concealed its filing of the patent applications from XpertUniverse.

158.   Cisco fraudulently concealed from XpertUniverse the fact that it had retained a third party consultant to develop an offering for Cisco's use and benefit that was based on XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies. Cisco had exclusive knowledge of the fact that it had retained the consultant, and actively concealed from XpertUniverse the fact that it had retained the consultant and shared XpertUniverse's intellectual property with the consultant.

159.   Cisco knew or should have known that it was not authorized to file patent applications based on XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies.   Cisco also knew or should have known that it was not authorized to share XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies with the third party consultant.

160.    Cisco induced XpertUniverse into clicking through the 2005 and 2006 Click-Through Agreements under the pretence that the Click-Through Agreements were necessary for XpertUniverse to continue its relationship with Cisco and that without the Click-Through Agreements, XpertUniverse would not be able to continue to partner with Cisco for the purpose of releasing and selling products and services for the mutual benefit of both XpertUniverse and Cisco. Cisco's intent in inducing XpertUniverse to click-through the 2005 and 2006 Click-Through Agreements was, however, to attempt to limit its liability for misappropriating XpertUniverse's valuable intellectual property by including provisions in the 2005 and 2006 Click-Through Agreements that narrowed the scope of what type of information would be kept confidential and attempted to limit Cisco's liability for breach of its confidentiality obligations. XpertUniverse had no opportunity to negotiate or modify the provisions of the 2005 and 2006 Click-Through Agreements. Employees of XpertUniverse were led to believe that they had to accept the 2005 and 2006 Click-Through Agreements or Cisco would sever it relationship with XpertUniverse.  To the extent the 2005 and 2006 Click-Through Agreements are interpreted to narrow the scope of what information must be kept confidential and/or is protectable and interpreted to limit Cisco's liability for misappropriation and numerous intentional torts pled herein, Cisco has mislead XpertUniverse to its prejudice by entering into the 2005 and 2006 Click-Through Agreements.

161.    Cisco owed a duty of confidence under common law and/or under the NDA to keep Cisco's trade secrets and other proprietary information confidential, i.e. ███████████

████████████████████████████████████████████████████████. Cisco's inducing XpertUniverse to click-through the 2005 and 2006 Click-Through Agreements in an attempt to narrow the scope of what information Cisco is obligated to keep confidential and to

limit its liability for misappropriating XpertUniverse's valuable intellectual property is a breach of Cisco's duty to XpertUniverse causing XpertUniverse detriment by entering into the Click-Through Agreements and incurring other consequential damages.

162.    Cisco had exclusive knowledge that it was actively breaching its contractual and common law duties to maintain XpertUniverse's information confidential and not to misuse XpertUniverse's information for its own benefit. Cisco fraudulently and actively concealed its misappropriation and misuse of XpertUniverse's information from XpertUniverse.

163.    Cisco's conduct and actions during the two and a half year period the parties were collaborating, as described herein, were all intended to create a false security in the mind of XpertUniverse that Cisco would respect and protect XpertUniverse's intellectual property in order to deceive XpertUniverse to disclose the same to Cisco.

164.    XpertUniverse justifiably relied on the actions and assurances provided by Cisco in disclosing its intellectual property to Cisco. Absent the actions and assurances as noted herein, including the signing of the NDA, XpertUniverse would not have disclosed its trade secrets, confidential information, concepts, know-how, and strategies to Cisco. XpertUniverse justifiably relied on Cisco's false promises and assurances, and has been harmed as a result of Cisco's intentional and willful deceit.

165.    XpertUniverse has suffered damages resulting from Cisco's deceit, including, but not limited to, actual, compensatory and incidental damages, the reasonable value of time and effort expended by XpertUniverse, the reasonable value of XpertUniverse's intellectual property, lost profits, customers, potential investors and business goodwill, and misuse of XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies.

166.    Additionally, due to Cisco's fraud in connection with the 2005 and 2006 Click-Through Agreements, XpertUniverse has a right to rescind the 2005 and 2006 Click-Through Agreements and seeks such rescission by this action.

## COUNT V

### MISSAPROPRIATION OF TRADE SECRETS
### UNDER THE CALIFORNIA UNIFORM TRADE SECRETS ACT

167.    XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

168.    XpertUniverse has expended significant resources in acquiring and developing its trade secrets. Those trade secrets include, at a high level, information relating to the design, development, marketing and sale of a system that matches a user seeking expert services to the best qualified expert.

169.    XpertUniverse made significant additional developments and/or modifications to its XpertSHARE platform and Expert On Demand service offering in connection with the efforts undertaken on behalf of Cisco, including significant additional research, development and marketing of the Expert On Demand service offering for use in connection with certain Cisco products and systems.

170.    These development efforts on the part of XpertUniverse resulted in XpertUniverse developing numerous additional trade secrets including, but not limited to, technical development documents, schematics, system architecture, integration charts, as well as sales and marketing forecasts and pricing schedules for integrating XpertUniverse's technology with Cisco's.

171.    The Cisco employees that received XpertUniverse's trade secrets understood, or should have understood under the circumstances, that the trade secret information received from

XpertUniverse was confidential to XpertUniverse. Most of this information was in fact marked "confidential" by XpertUniverse prior to being provided to Cisco. These trade secrets were not publicly available, but only existed with XpertUniverse and were only available through the knowledge and know-how of the employees of XpertUniverse that worked on the Cisco project.

172.    Numerous employees of Cisco had ready access to XpertUniverse's trade secrets by reason of the Cisco project, and/or were provided with the trade secrets in connection with the Cisco project. The Cisco employees include, by way of example, at least two of the named inventors on the Cisco '333 Patent Application and the Cisco '960 Patent Application.

173.    XpertUniverse possesses valuable trade secrets as defined by California's version of the Uniform Trade Secrets Act, Cal. Civ.. Code § 3426 et seq. These trade secrets include information disclosed in the XpertUniverse patent applications, which were confidential until published, as well as additional trade secrets developed as a result of the Cisco project, as described above.

174.    XpertUniverse's trade secrets derive independent economic value by virtue of not being generally known to, and not being readily ascertainable by proper means, and would be of great value to others.

175.    On information and belief, reasonable measures, including but not limited to requiring Cisco to execute the NDA, and labeling its trade secret information as "confidential" prior to, or contemporaneously with, sharing it with Cisco, have been taken by XpertUniverse to maintain the secrecy of its trade secrets.

176.    XpertUniverse's trade secrets were disclosed to Cisco in connection with the Cisco project. Cisco understood the technical details of the trade secrets, and appreciated the importance of the trade secrets in the development, marketing and sale of competing products.

Cisco knew or should have known that it was not authorized to use the trade secret information owned by XpertUniverse, and yet Cisco subsequently misappropriated XpertUniverse's trade secrets for use in Cisco's products, including but not limited to Cisco's Unified Expert Advisor and its Expert On Demand offering.

177.   Cisco's misappropriation is further evidenced by its filing of the Cisco '333 Patent Application, the Cisco '960 Patent Application and the Cisco '318 Patent Application, each of which are based either directly or derivatively on the trade secrets of XpertUniverse, and by its unauthorized sharing of XpertUniverse's trade secrets with at least one third party consultant.

178.   Cisco's unauthorized use of XpertUniverse's trade secrets is a misappropriation of XpertUniverse's trade secrets.  As a consequence of Cisco's misappropriation, XpertUniverse has been and will continue to be damaged, and Cisco has been and will continue to be unjustly enriched at XpertUniverse's expense in an amount to be proved at trial.   In addition, XpertUniverse has suffered and will continue to suffer irreparable harm that can only be remedied through equitable relief, including a preliminary and permanent injunction from any further misappropriation.

179.   Cisco's acts have caused irreparable injury and damage to XpertUniverse for which XpertUniverse has no adequate remedy at law.

180.   Unless preliminarily and permanently enjoined by this Court, Cisco will continue its acts of misappropriation to XpertUniverse's irreparable harm.

181.   Because Cisco has acted with fraud and/or malice and in conscious disregard of XpertUniverse's rights, XpertUniverse is entitled to exemplary damages including attorney's fees.

## COUNT VI

## COMMON LAW MISAPPROPRIATION

182.    XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

183.    XpertUniverse expended significant resources, including the investment of time and effort of XpertUniverse employees in addition to significant financial sums, in acquiring and developing its confidential information, concepts, know-how, and strategies.

184.    XpertUniverse made significant additional developments and/or modifications to its XpertSHARE platform and Expert On Demand service offering in connection with the efforts undertaken on behalf of Cisco, including significant additional research, development and marketing of the Expert On Demand service offering for use in connection with certain Cisco products and technology.

185.    These development efforts on the part of XpertUniverse resulted in XpertUniverse developing numerous additional items of confidential information, concepts, know-how, and strategies for integrating XpertUniverse's technology with Cisco's.  The Cisco employees that received XpertUniverse's confidential information understood, or should have understood under the circumstances, that the information received from XpertUniverse was confidential to XpertUniverse.

186.    Most of this information was in fact marked "confidential" by XpertUniverse prior to being provided to Cisco.  The confidential information, concepts, know-how, and strategies were not publicly available, but only existed with XpertUniverse and were only available through the knowledge and know-how of the employees of XpertUniverse that worked on the Cisco project.

187.    Numerous employees of Cisco had ready access to XpertUniverse's confidential information, concepts, know-how, and strategies by reason of the Cisco project, and/or were provided with the confidential information, concepts, know-how, and strategies in connection with the Cisco project. The Cisco employees include, by way of example, at least two of the named inventors on the Cisco '333 Patent Application and the Cisco '960 Patent Application.

188.    XpertUniverse's confidential information, concepts, know-how, and strategies derive independent economic value by virtue of not being generally known to, and not being readily ascertainable by proper means, and would be of great value to others.

189.    On information and belief, reasonable measures, including but not limited to requiring Cisco to execute the NDA, and labeling its information as "confidential" prior to, or contemporaneously with, sharing it with Cisco, have been taken by XpertUniverse to maintain the secrecy of its confidential information, concepts, know-how, and strategies.

190.    XpertUniverse's confidential information, concepts, know-how, and strategies were disclosed to Cisco in connection with the Cisco project. Cisco understood the technical details of the confidential information, concepts, know-how, and strategies, and appreciated the importance of the confidential information, concepts, know-how, and strategies in the development, marketing and sale of competing products.

191.    Cisco knew or should have known that it was not authorized to use the confidential information, concepts, know-how, and strategies owned by XpertUniverse, and yet Cisco subsequently misappropriated XpertUniverse's confidential information, concepts, know-how, and strategies for use in Cisco's products, including but not limited to Cisco's Unified Expert Advisor and its Expert On Demand offering.

192.    Cisco's misappropriation of XpertUniverse's confidential information, concepts, know-how, and strategies is further evidenced by its filing of the Cisco '333 Patent Application, the Cisco '960 Patent Application and the Cisco '318 Patent Application, each of which are based either directly or derivatively on the confidential information, concepts, know-how, and strategies of XpertUniverse, and by its unauthorized sharing of XpertUniverse's confidential information, concepts, know-how, and strategies with at least one third party consultant.

193.    Cisco's unauthorized use of XpertUniverse's confidential information, concepts, know-how, and strategies is a misappropriation of XpertUniverse's confidential information.  As a consequence of Cisco's misappropriation, XpertUniverse has been and will continue to be damaged, and Cisco has been and will continue to be unjustly enriched at XpertUniverse's expense in an amount to be proved at trial.   In addition, XpertUniverse has suffered and will continue to suffer irreparable harm that can only be remedied through equitable relief, including a preliminary and permanent injunction from any further misappropriation.

194.    Cisco's acts have caused irreparable injury and damage to XpertUniverse for which XpertUniverse has no adequate remedy at law.

195.    Unless preliminarily and permanently enjoined by this Court, Cisco will continue its acts of misappropriation to XpertUniverse's irreparable harm.

196.    Because Cisco has acted with fraud and/or malice and in conscious disregard of XpertUniverse's rights, XpertUniverse is entitled to exemplary damages including attorney's fees.

## COUNT VII

### BREACH OF CONFIDENCE

197.    XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

198.    XpertUniverse expended significant resources, including the investment of time and effort of XpertUniverse employees in addition to significant financial sums, in acquiring and developing its confidential information, concepts, know-how, and strategies, as described above.

199.    XpertUniverse made significant additional developments and/or modifications to its XpertSHARE platform and Expert On Demand service offering in connection with the efforts undertaken on behalf of Cisco, including significant additional research, development and marketing of the Expert On Demand service offering for use in connection with certain Cisco products and technology.

200.    These efforts on the part of XpertUniverse resulted in XpertUniverse developing numerous additional items of confidential information, concepts, know-how, and strategies for integrating XpertUniverse's technology with Cisco's.   The Cisco employees that received XpertUniverse's confidential information understood, or should have understood under the circumstances, that the information received from XpertUniverse was confidential to XpertUniverse.

201.    Most of this information was in fact marked "confidential" by XpertUniverse prior to being provided to Cisco.   The confidential information, concepts, know-how, and strategies were not publicly available, but only existed with XpertUniverse and were only available through the knowledge and know-how of the employees of XpertUniverse that worked on the Cisco project.

202.    Numerous employees of Cisco had ready access to the confidential information, concepts, know-how, and strategies by reason of the Cisco project, and/or were provided with the confidential information, concepts, know-how, and strategies in connection with the Cisco

project. The Cisco employees include, by way of example, at least two of the named inventors on the Cisco '333 Patent Application and the Cisco '960 Patent Application.

203. XpertUniverse's confidential information, concepts, know-how, and strategies derive independent economic value by virtue of not being generally known to, and not being readily ascertainable by proper means, and would be of great value to others.

204. On information and belief, reasonable measures, including but not limited to requiring Cisco to execute the NDA, and labeling its information as "confidential" prior to, or contemporaneously with, sharing it with Cisco, have been taken by XpertUniverse to maintain the secrecy of its confidential information, concepts, know-how, and strategies.

205. XpertUniverse's confidential information, concepts, know-how, and strategies were disclosed to Cisco in connection with the Cisco project. Cisco understood the technical details of the confidential information, concepts, know-how, and strategies, and appreciated the importance of the confidential information, concepts, know-how, and strategies in the development, marketing and sale of competing products.

206. Cisco knew or should have known that it was not authorized to use the confidential information, concepts, know-how, and strategies owned by XpertUniverse, and yet Cisco subsequently misappropriated XpertUniverse's confidential information, concepts, know-how, and strategies for use in Cisco's products, including but not limited to Cisco's Unified Expert Advisor and its Expert On Demand products.

207. Cisco's misappropriation is further evidenced by its filing of the Cisco '333 Patent Application, the Cisco '960 Patent Application and the Cisco '318 Patent Application, each of which are based either directly or derivatively on the confidential information, concepts, know-how, and strategies of XpertUniverse, and by its unauthorized sharing of XpertUniverse's

confidential information, concepts, know-how, and strategies with at least one third party consultant.

208.    XpertUniverse authored the mark "Expert On Demand" for use in promoting its services, and has and continues to use that term to promote its services. By reason of all of the foregoing, XpertUniverse has acquired common law rights in the Expert On Demand mark.

209.    The "Expert On Demand" mark is inherently distinctive because the mark is suggestive and not merely descriptive.

210.    The "Expert On Demand" mark has acquired distinctiveness through secondary meaning by way of presentaions to IBM, Citibank, Prudential Insurance, Deloitte, AIG and others.  Cisco's exact copying of the "Expert On Demand" mark demonstrates secondary meaning, and has caused actual confusion.

211.    Cisco was aware that XpertUniverse used the Expert On Demand mark in promoting the XpertUniverse offering.

212.    XpertUniverse's confidential information, concepts, know-how, strategies and common law trademark are protectable ideas that were new and novel when disclosed to Cisco.

213.    XpertUniverse's confidential information, concepts, know-how, strategies and common law trademark were disclosed to Cisco in confidence and with a clear understanding that XpertUniverse would be compensated for their use.

214.    Cisco voluntarily received XpertUniverse's protectable ideas with the understanding that the protectable ideas were not to be used by Cisco for any purpose beyond the limits of XpertUniverse's confidence with Cisco without XpertUniverse's permission and without compensation to XpertUniverse.

215.    Cisco breached its confidence with XpertUniverse by reason of its unauthorized use of XpertUniverse's protectable ideas.  As a consequence of Cisco's breach, XpertUniverse has been and will continue to be damaged, and Cisco has been and will continue to be unjustly enriched at XpertUniverse's expense in an amount to be proved at trial.    In addition, XpertUniverse has suffered and will continue to suffer irreparable harm that can only be remedied through equitable relief, including a preliminary and permanent injunction from any further misuse of XpertUniverse's protectable ideas.

216.    Cisco's acts have caused irreparable injury and damage to XpertUniverse for which XpertUniverse has no adequate remedy at law.

217.    Unless preliminarily and permanently enjoined by this Court, Cisco will continue its acts of misuse to XpertUniverse's irreparable harm.

218.    Because Cisco has acted with fraud and/or malice and in conscious disregard of XpertUniverse's rights, XpertUniverse is entitled to exemplary damages including attorney's fees.

**COUNT VIII**

**FEDERAL UNFAIR COMPETITION**

219.    XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

220.    XpertUniverse authored the mark "Expert On Demand" for use in promoting its services, and has and continues to use that term to promote its services.  By reason of all of the foregoing, XpertUniverse has acquired common law rights in the Expert On Demand mark.

221.    The "Expert On Demand" mark is inherently distinctive because the mark is suggestive and not merely descriptive.

222.    The "Expert On Demand" mark has acquired distinctiveness through secondary meaning by way of presentaions to IBM, Citibank, Prudential Insurance, Deloitte, AIG and others.   Cisco's exact copying of the "Expert On Demand" mark demonstrates secondary meaning, and has caused actual confusion.

223.    Cisco was aware that XpertUniverse used the Expert On Demand mark in promoting the XpertUniverse offering.

224.    The actions complained of herein constitute false designations of origin and false descriptions in that Cisco's use of the term "Expert On Demand" in connection with Cisco's products and/or services is likely to cause confusion or to deceive as to the affiliation, connection or association of XpertUniverse's mark and XpertUniverse with Cisco's products and/or services, as to the origin, sponsorship or approval of Cisco's products and/or services.

225.    The foregoing acts of Cisco constitute unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

226.    By reason of all the foregoing, XpertUniverse is being damaged by Cisco's willful use of XpertUniverse's mark in the manner set forth above and will continue to be damaged unless Cisco is enjoined from using the "Expert On Demand" term in connection with Cisco's products and/or services.

227.    Cisco's acts have caused irreparable injury and damage to XpertUniverse for which XpertUniverse has no adequate remedy at law.

228.    Unless preliminarily and permanently enjoined by this Court, Cisco will continue its acts of unfair competition to XpertUniverse's irreparable harm.

## COUNT IX

## COMMON LAW TRADEMARK INFRINGEMENT

229.    XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

230.    The "Expert On Demand" mark is inherently distinctive because the mark is suggestive and not merely descriptive.

231.    The "Expert On Demand" mark has acquired distinctiveness through secondary meaning by way of presentaions to IBM, Citibank, Prudential Insurance, Deloitte, AIG and others.  Cisco's exact copying of the "Expert On Demand" mark demonstrates secondary meaning, and has caused actual confusion.

232.    Despite XpertUniverse's common law trademark rights in the mark "Expert On Demand," on information and belief Cisco has used and continues to use the same exact mark in describing and promoting its products and/or services.  The actions of Cisco are likely to create confusion, mistake and deception by causing consumers to believe that Cisco is authorized by, licensed by, sponsored by or otherwise associated with common law trademark rights in the Expert On Demand mark.

233.    Upon information and belief, the acts and conduct of Cisco constitute willful and deliberate infringement of XpertUniverse's common law rights in the Expert On Demand mark.

234.    The foregoing acts of Cisco constitute infringement of the Expert On Demand mark in violation of the common law of the State of California.

235.    Cisco's acts have caused irreparable injury and damage to XpertUniverse for which XpertUniverse has no adequate remedy at law.

236.    Unless preliminarily and permanently enjoined by this Court, Cisco will continue its willful use of the "Expert On Demand" mark to XpertUniverse's irreparable harm.

## COUNT X

## BREACH OF CONTRACT – 2004 NDA

237.    XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

238.    On or about August 2, 2004, XpertUniverse and Cisco entered into a "Cisco System, Inc. Mutual Non-Disclosure Agreement" ("the NDA").  The NDA ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████

239.    Cisco materially breached the terms of the NDA at least by reason of its use and/or disclosure of XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies in connection with Cisco's development and sale of competing products, as well as by reason of its filing of the Cisco '333 Patent Application, the Cisco '960 Patent Application and the Cisco '318 Patent Application, and by reason of its unauthorized sharing of XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies with the third party consultant.

240.    Pursuant to Paragraph 10 of the NDA, Cisco acknowledged and agreed that

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████

241.    XpertUniverse has performed all conditions to be performed on its part under the NDA.

242.    XpertUniverse has suffered damages resulting from Cisco's breach of the NDA, including, but not limited to, actual, compensatory and incidental damages, lost profits,

49

customers, potential investors and business goodwill, and misuse of XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies.

## COUNT XI

### BREACH OF CONTRACT – 2005 CLICK-THROUGH

243.   XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

244.   XpertUniverse contends that the 2005 Click-Through Agreement is void and unenforceable. However, if found valid and enforceable, in whole or in part, the 2005 Click-Through Agreement required Cisco not to use or disclose the confidential information of XpertUniverse.

245.   Cisco materially breached the terms of the 2005 Click-Through Agreement at least by reason of its use and/or disclosure of XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies in connection with Cisco's development and sale of competing products, as well as by reason of its filing of the Cisco '333 Patent Application, the Cisco '960 Patent Application and the Cisco '318 Patent Application, and by reason of its unauthorized sharing of XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies with the third party consultant.

246.   XpertUniverse has performed all conditions to be performed on its part under the 2005 Click-Through Agreement.

247.   XpertUniverse has suffered damages resulting from Cisco's breach of the 2005 Click-Through Agreement, including, but not limited to, actual, compensatory and incidental damages, lost profits, customers, potential investors and business goodwill, and misuse of XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies.

## COUNT XII

### BREACH OF CONTRACT – 2006 CLICK-THROUGH

248.   XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

249.   XpertUniverse contends that the 2006 Click-Through Agreement is void and unenforceable.  However, if found valid and enforceable, in whole or in part, the 2006 Click-Through Agreement required Cisco not to use or disclose the confidential information of XpertUniverse.

250.   Cisco materially breached the terms of the 2006 Click-Through Agreement at least by reason of its use and/or disclosure of XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies in connection with Cisco's development and sale of competing products, as well as by reason of its filing of the Cisco '333 Patent Application, the Cisco '960 Patent Application and the Cisco '318 Patent Application, and by reason of its unauthorized sharing of XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies with the third party consultant.

251.   XpertUniverse has performed all conditions to be performed on its part under the 2005 Click-Through Agreement.

252.   XpertUniverse has suffered damages resulting from Cisco's breach of the 2006 Click-Through Agreement, including, but not limited to, actual, compensatory and incidental damages, lost profits, customers, potential investors and business goodwill, and misuse of XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies.

## COUNT XIII

### RESCISSION UNDER CALIFORNIA CIVIL CODE §§ 1565-1590, 1688-1693

253.     XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

254.     Cisco fraudulently induced XpertUniverse to disclose its trade secrets and confidential information, all the while intending to appropriate the same for its own use and benefit.

255.     On the one hand, Cisco was requiring XpertUniverse to execute the 2005 and 2006 Click-through Agreements requiring each party to respect and protect the confidential information of the other, while on the other hand Cisco was filing patent applications based on the trade secrets, confidential information, concepts, know-how, and strategies of XpertUniverse, and was also sharing XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies with a third party consultant that had been specifically retained to help Cisco develop an offering for Cisco's use and benefit that was based on XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies.

256.     During the time when Cisco was intentionally and willfully misappropriating XpertUniverse's intellectual property, it was simultaneously and fraudulently inducing XpertUniverse to fully disclose all aspects of its intellectual property by, *inter alia*:

> a)   falsely promising to promote XpertUniverse and its products/services to Cisco's worldwide customer base;
>
> b)   falsely offering to confer the designation of "Solutions Plus" to XpertUniverse so that XpertUniverse's products/services will be expedited and given preferential treatment at Cisco, only to withdraw its offer once XpertUniverse had disclosed all of its valuable intellectual property to Cisco;
>
> c)   falsely offering to share in all revenue streams resulting from the sales and marketing of products/services using XpertUniverse's intellectual

property, all the while planning to misappropriate XpertUniverse's intellectual property for its own use and benefit;

d) conducting due diligence on XpertUniverse through Cisco's internal venture operations, to invest and/or acquire XpertUniverse, and when rebuffed deciding to misappropriate XpertUniverse's intellectual property for its own use and benefit;

e) utilizing XpertUniverse personnel for Cisco-sponsored trade shows to promote and market XpertUniverse's technology and products as a joint offering, all the while planning to misappropriate XpertUniverse's intellectual property for its own use and benefit.

257.   Cisco fraudulently concealed from XpertUniverse the fact that it had filed patent applications based on the trade secrets, confidential information, concepts, know-how, and strategies of XpertUniverse.  Cisco had exclusive knowledge of the fact that it had filed these patent applications, and actively concealed its filing of the patent applications from XpertUniverse.

258.   Cisco fraudulently concealed from XpertUniverse the fact that it had retained a third party consultant to assist in the development of an offering for Cisco's use and benefit that was based on XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies.  Cisco had exclusive knowledge of the fact that it had retained the consultant, and actively concealed the fact that it had retained the consultant and shared XpertUniverse's intellectual property with the consultant from XpertUniverse.

259.   Cisco knew or should have known that it was not authorized to file patent applications based on XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies.  Cisco also knew or should have known that it was not authorized to share XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies with the third party consultant.

260.   Cisco had exclusive knowledge that it was actively breaching its contractual and common law duties to maintain XpertUniverse's information confidential and not to misuse XpertUniverse's information for its own benefit.  Cisco fraudulently and actively concealed its misappropriation and misuse of XpertUniverse's information from XpertUniverse.

261.   Cisco's conduct and actions during the two and a half year period the parties were collaborating, as described herein, were all intended to create a false security in the mind of XpertUniverse that Cisco would respect and protect XpertUniverse's intellectual property in order to induce XpertUniverse to disclose the same to Cisco.

262.   Cisco induced XpertUniverse into clicking through the 2005 and 2006 Click-Through Agreements under the pretence that the Click-Through Agreements were necessary for XpertUniverse to continue its relationship with Cisco, and that without the Click-Through Agreements XpertUniverse would not be able to continue to partner with Cisco for the purpose of developing and selling products and services for the mutual benefit of both XpertUniverse and Cisco.

263.   Cisco's intent in inducing XpertUniverse to click-through the 2005 and 2006 Click-Through Agreements was, however, an attempt to limit its liability for misappropriating XpertUniverse's valuable intellectual property by including provisions in the 2005 and 2006 Click-Through Agreements that narrowed the scope of what type of information would be kept confidential and an attempt to limit Cisco's liability for breach of its confidentiality obligations.

264.   XpertUniverse had no opportunity to negotiate or modify the provisions of the 2005 and 2006 Click-Through Agreements.  Employees of XpertUniverse were led to believe that they must accept the 2005 and 2006 Click-Through Agreements or Cisco would sever its relationship with XpertUniverse.  To the extent the 2005 and 2006 Click-Through Agreements

are interpreted to narrow the scope of what information must be kept confidential and/or is protectable, or interpreted to limit Cisco's liability for misappropriation and numerous intentional torts pled herein, Cisco has mislead XpertUniverse to its prejudice by entering into the 2005 and 2006 Click-Through Agreements.

265.    The foregoing acts of Cisco, including its misrepresentations to XpertUniverse, its concealment of the facts of Cisco's misappropriation, its false promises to maintain the confidentiality of XpertUniverse's information and other acts intended to deceive XpertUniverse into providing its valuable intellectual property to Cisco for Cisco's commercial gain at the expense and detriment of XpertUniverse, amount to actual fraud within the meaning of California Civil Code §1572.

266.    Cisco's fraud is also constructive fraud within the meaning of California Civil Code §1573 because Cisco owed a duty of confidence under common law and/or under the NDA

██████████████████████████████████████████████████

██████████████████████████████████████████████████.

In breach of Cisco's duty, as set forth above Cisco induced XpertUniverse into clicking through the 2005 and 2006 Click-Through Agreements in an attempt to limit its liability for misappropriating XpertUniverse's valuable intellectual property. To the extent the 2005 and 2006 Click-Through Agreements are interpreted to limit Cisco's liability for Cisco's misappropriation and numerous other intentional torts pled herein and to narrow the scope of what information Cisco is obligated to keep confidential, XpertUniverse has been prejudiced as a direct result of Cisco's breach of its duty to XpertUniverse.

267.    XpertUniverse justifiably relied on Cisco's false representations and assurances that it would maintain XpertUniverse's information as confidential and has been harmed as a result of Cisco's intentional and fraudulent conduct.

268.    Due to Cisco's actual and/or constructive fraud in connection with the 2005 and 2006 Click-Through Agreements, under California Civil Code §1689, XpertUniverse has a right to rescind the 2005 and 2006 Click-Through Agreements and seeks such rescission by this action.

269.    XpertUniverse also has suffered damages resulting from Cisco's fraud in connection with the 2005 and 2006 Click-Through Agreements, including, but not limited to, actual, compensatory and incidental damages.

**COUNT XIV**

**COMMON LAW UNFAIR COMPETITION**

270.    XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

271.    XpertUniverse had a reasonable expectation of having a successful business relationship with Cisco. Cisco defeated XpertUniverse's legitimate expectations and wrongfully interfered with the business relationship by misappropriating XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies, and misappropriating XpertUniverse's common law trademark and the goodwill associated therewith, all of which caused and continues to cause harm to XpertUniverse.

272.    Cisco's acts of unfair competition include:

a)  Cisco's misappropriation of XpertUniverse's EXPERT ON DEMAND mark and the goodwill associated therewith;

b)  Cisco's misappropriation of XpertUniverse's patent rights;

56

c) Cisco's acts of reverse passing off;

d) Cisco's use of the EXPERT ON DEMAND mark in connection with Cisco's call center and TelePresence offerings in a manner that it likely to cause confusion or to deceive the public as to whether there is an affiliation, connection or association of EXPERT ON DEMAND and XpertUniverse with Cisco;

273.   The foregoing acts of Cisco constitute unfair competition under the common law of the State of California.

274.   Cisco's acts have caused irreparable injury and damage to XpertUniverse for which XpertUniverse has no adequate remedy at law.

275.   Unless preliminarily and permanently enjoined by this Court, Cisco will continue its acts of unfair competition to XpertUniverse's irreparable harm.

## COUNT XV

## UNFAIR COMPETITION UNDER CALIFORNIA CIVIL CODE §§ 17200-17209

276.   XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

277.   XpertUniverse had a reasonable expectation of having a successful business relationship with Cisco. Cisco defeated XpertUniverse's legitimate expectations and wrongfully interfered with the business relationship by misappropriating XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies, and misappropriating XpertUniverse's common law trademark and the goodwill associated therewith, all of which caused and continues to cause harm to XpertUniverse.

278.   Cisco's acts of unfair competition include:

a) Cisco's misappropriation of XpertUniverse's EXPERT ON DEMAND mark and the goodwill associated therewith;

b) Cisco's misappropriation of XpertUniverse's patent rights;

c) Cisco's acts of reverse passing off;

d) Cisco's use of the EXPERT ON DEMAND mark in connection with Cisco's call center and TelePresence offerings in a manner that it likely to cause confusion or to deceive the public as to whether there is an affiliation, connection or association of EXPERT ON DEMAND and XpertUniverse with Cisco;

279.    The foregoing acts of Cisco constitute unfair competition under the California Civil Code, §§ 17200-17209.

280.    Cisco's acts have caused irreparable injury and damage to XpertUniverse for which XpertUniverse has no adequate remedy at law.

281.    Unless preliminarily and permanently enjoined by this Court, Cisco will continue its acts of unfair competition to XpertUniverse's irreparable harm.

## COUNT XVI

### COMMON LAW QUASI CONTRACT UNJUST ENRICHMENT

282.    XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

283.    On information and belief, Cisco has been enriched by reason of its unauthorized use of XpertUniverse's trade secrets, confidential information, concepts, know-how, and strategies in its products and in its promotion, marketing and sales of such products, and its unauthorized use of XpertUniverse's common law mark "Expert On Demand" in identifying, marketing, promoting and selling its product and services.

284.    Cisco has not compensated XpertUniverse for its unauthorized use of XpertUniverse's trade secrets, confidential information, concepts, know-how, strategies, and mark, nor is there any justification for Cisco's unauthorized use of the same.   There is no adequate remedy at law for Cisco's unauthorized use of XpertUniverse's trade secrets, confidential information, and mark.

285.   By reason of all the foregoing, XpertUniverse is being damaged by Cisco's willful use of XpertUniverse's trade secrets, confidential information, concepts, know-how, strategies, and the Expert On Demand mark and will continue to be damaged unless Cisco is enjoined from using the same.

286.   Cisco's acts have caused irreparable injury and damage to XpertUniverse for which XpertUniverse has no adequate remedy at law.

287.   Unless preliminarily and permanently enjoined by this Court, Cisco will continue its willful use of XpertUniverse's trade secrets, confidential information, concepts, know-how, strategies, as well as the "Expert On Demand" mark, to XpertUniverse's irreparable harm.

## COUNT XVII

### CONVERSION

288.   XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

289.   XpertUniverse provided Cisco with written documents and other materials, including without limitation technical development documents, schematics, sales and marketing materials and other related written business plans embodying XpertUniverse's intellectual property, with the understanding that Cisco was not to disclose the information or materials to others or use the information or materials without XpertUniverse's permission.

290.   Cisco wrongfully retained and/or provided this information and material to others as part of a scheme to deprive XpertUniverse of its intellectual property.

291.   Cisco's wrongful retention, use and/or disclosure of XpertUniverse's information and materials allowed Cisco to gain profit from the use of the information and materials, and Cisco was unjustly enriched at the expense of XpertUniverse.

292.    XpertUniverse had and continues to have a property interest in its intellectual property relating to its XpertSHARE platform and Expert On Demand service offering.  Cisco misappropriated that intellectual property in developing its own offerings, as described above, which are based on, and incorporate, XpertUniverse's trade secrets, confidential information, concepts, know-how, strategies, and the "Expert On Demand" mark.

293.    XpertUniverse had and continues to have a property interest in its trade secrets, confidential information, concepts, know-how, strategies, and the "Expert On Demand" mark. Cisco misappropriated XpertUniverse's trade secrets and confidential information in connection with its filing of the Cisco '333 Patent Application, the Cisco '960 Patent Application and the Cisco '318 Patent Application, which are each based on and/or incorporate XpertUniverse's trade secrets, confidential information, concepts and know-how.

294.    The foregoing acts of Cisco constitute conversion under the common law of the State of California.

295.    Cisco's acts have caused irreparable injury and damage to XpertUniverse for which XpertUniverse has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff XpertUniverse respectfully requests this Court enter a judgment against Cisco as follows:

A.      For judgment that Cisco has infringed and continues to infringe one or more claims of the '709 Patent under 35 U.S.C. § 271;

B.      For judgment that Cisco's infringement of the '709 Patent has been, and continues to be willful;

C.     For judgment that Cisco has infringed and continues to infringe one or more claims of the '903 Patent under 35 U.S.C. § 271;

D.     For judgment that Cisco's infringement of the '903 Patent has been, and continues to be willful;

E.     For judgment that Cisco has misappropriated the trade secrets of XpertUniverse in violation of California's Uniform Trade Secrets Act;

F.     For judgment that Cisco has materially breached its obligations under the August 2, 2004 Mutual Non-Disclosure Agreement;

G.     For judgment that Cisco has materially breached its obligations under the 2005 Click-Through Agreement, to the extent such Agreement is valid and enforceable;

H.     For judgment that Cisco has materially breached its obligations under the 2006 Click-Through Agreement, to the extent such Agreement is valid and enforceable;

I.     For judgment that Cisco has committed acts of unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a);

J.     For judgment that Cisco has infringed XpertUniverse's mark in violation of the common law of California;

K.     For judgment that Cisco has committed acts of fraud, deceit, misappropriation, breach of confidence, unfair competition and conversion, and that Cisco has been unjustly enriched, under the common law of California;

L.     For a preliminary and permanent injunction against Cisco its officers, directors, agents, servants, employees, successors and assigns, and all persons in privity or in concert with them,

(i) From making, using, selling, offering to sell, and/or importing any products that infringe the '709 patent;

(ii) From making, using, selling, offering to sell, and/or importing any products that infringe the '903 patent;

(iii) From any further disclosure or use of XpertUniverse's technology, trade secrets or confidential information and from developing or offering any products that incorporate the trade secrets, confidential information or any other intellectual property of XpertUniverse;

(iv) From making statements to consumers and members of the public that mislead or have a tendency to mislead consumers and members of the trade to believe that Cisco is the innovator and originator of the technology and platform encompassed by the trade secrets and confidential information of XpertUniverse or covered under the claims of the '709 Patent or the '903 Patent;

(v) From using the "Expert On Demand" mark or any trade name or mark similar thereto;

(vi) From using, affixing, offering for sale, selling, advertising, promoting, or rendering goods or services with the Expert On Demand mark or any other trade name or mark similar thereto;

(vii) From any further prosecution of the Cisco '333 Patent Application, the Cisco 960 Patent Application and the Cisco '318 Patent Application, or any other patent application filed by or on behalf of Cisco that is based in whole or in part on XpertUniverse's technology, trade secrets or confidential information or any other intellectual property of XpertUniverse;

M.     For a mandatory injunction in the form of corrective advertising whereby Cisco shall take all steps necessary, to be approved by the Court, including the issuance of a press

release and statements on Cisco's web site and marketing materials, alerting and communicating to consumers and members of the trade that it is XpertUniverse that is the innovator of the technology and platform encompassed by the trade secrets and confidential information of XpertUniverse and covered under the claims of the '709 Patent and the '903 Patent, not Cisco;

N.      That Cisco and any entity owned, in whole or in part by Cisco, be ordered that all catalogs, signs, displays, labels, brochures, advertising and promotional material bearing XpertUniverse's "Expert On Demand" mark or other similar terms in Cisco's possession or subject to its control or direction shall be delivered to the Clerk of the Court for maintenance during the pendency of this action and for destruction upon entry of a Final Judgment.

O.      Pursuant to 35 U.S.C. § 284, for an award of damages adequate to compensate XpertUniverse for Cisco's patent infringement, but in no event less than a reasonable royalty together with prejudgment interest;

P.      For trebling of any and all damages awarded to XpertUniverse by reason of Cisco's willful, wanton and deliberate acts of infringement of the '709 Patent, pursuant to 35 U.S.C. § 284;

Q.      For trebling of any and all damages awarded to XpertUniverse by reason of Cisco's willful, wanton and deliberate acts of infringement of the '903 Patent, pursuant to 35 U.S.C. § 284;

R.      For judgment that the case is exceptional under 35 U.S.C. § 285 and that the Court award XpertUniverse its attorney's fees and costs in preparing for and pursuing this action;

S.      For an award of damages by reason of Cisco's misappropriation of the trade secrets and confidential information of XpertUniverse, including, but not limited to, the actual

losses suffered by XpertUniverse and the amount by which Cisco has been unjustly enriched due to its misappropriation;

T.    For an award of exemplary damages and attorney's fees by reason of Cisco's willful and malicious misappropriation of the trade secrets and confidential information of XpertUniverse;

U.    For an award of damages for the profits of Cisco and for the direct and compensatory damages sustained by XpertUniverse as a result of Cisco's material breach of the NDA, the 2005 Click-Through Agreement and/or the 2006 Click-Through Agreement;

V.    For a declaratory judgment that the 2005 Click-Through Agreement and the 2006 Click-Through Agreement are unenforceable, in whole or in part due to fraud on the part of Cisco.

W.    For rescission of the 2005 Click-Through Agreement and the 2006 Click-Through Agreement, and consequential damages resulting therefrom;

X.    For an award of damages, pursuant to the Lanham Act, including corrective advertising to purge the effects of Cisco's unauthorized use of the Expert On Demand mark.

Y.    For an award of damages resulting from Cisco's infringement of XpertUniverse's common law trademark rights, including, but not limited to, an award of Cisco's profits and/or XpertUniverse's damages;

Z.    For an award of damages resulting from Cisco's fraud, deceit, breach of confidence, unfair competition and conversion;

AA.    Ordering Cisco to transfer ownership of the converted property, including the Cisco '333 Patent Application, the Cisco 960 Patent Application and the Cisco '318 Patent Application, and any other Cisco patent application based on the confidential or trade secret

information of XpertUniverse, to XpertUniverse, and ordering Cisco and all of the inventors listed on such patent applications to execute any and all necessary documents to effectuate such a transfer of ownership to XpertUniverse;

BB.    For a monetary award disgorging Cisco of ill-gotten gains resulting from its unjust enrichment at the expense of XpertUniverse in an amount to be proven at trial;

CC.    For an award of XpertUniverse's actual damages and punitive damages to be proven at trial;

DD.    That Cisco and any entity owned, in whole or in part by Cisco, be ordered to report to the Court in writing under oath with a copy to counsel for XpertUniverse within 30 days of service of notice of any Orders setting forth in detail the manner and form in which Cisco has complied with any order issued hereunder;

EE.    For an award of pre-judgment and post-judgment interest and costs, as appropriate, and an award of XpertUniverse's fees, costs, expenses and disbursements in this action, including reasonable attorney's fees; and

FF.    For such other and further relief both in law and equity to which XpertUniverse is entitled.

## DEMAND FOR JURY TRIAL

Plaintiff XpertUniverse hereby demands a trial by jury for all issues triable to a jury.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Joseph Diamante                                By:  /s/ Philip A. Rovner
STROOCK & STROOCK & LAVAN LLP                       Philip A. Rovner (#3215)
180 Maiden Lane                                     Hercules Plaza
New York, NY 10038                                  P.O. Box 951
(212) 806-5400                                      Wilmington, DE  19899
                                                    (302) 984-6000
                                                    provner@potteranderson.com
Dated:  January 25, 2010
Public Version:  February 1, 2010

                                               *Attorney for Plaintiff XpertUniverse, Inc.*