# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

XPERTUNIVERSE, INC.,                    )
                                         )        Civil Action No.  09-157 (RGA)
      Plaintiff,                       )
                                         )
    vs.                               )        **JURY TRIAL DEMANDED**
                                         )
                                         )        **PUBLIC VERSION**
CISCO SYSTEMS, INC.,                     )
                                         )
      Defendant.                       )


## DECLARATION OF PROF. ILLAH R. NOURBAKHSH, PH.D.
## IN SUPPORT OF XPERTUNIVERSE'S OPPOSITION
## TO CISCO'S MOTION FOR SUMMARY JUDGMENT

OF COUNSEL:

Joseph Diamante
Kenneth L. Stein
Charles E. Cantine
Jason M. Sobel
B. Clayton McCraw
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038
(212) 806-5400

Dated: January 15, 2013
Public Version: January 23, 2013

Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE  19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

*Attorneys for Plaintiff XpertUniverse, Inc.*

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| XPERTUNIVERSE, INC., | ) | |
| | ) | **Civil Action No. 09-157 (RGA)** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **JURY TRIAL DEMANDED** |
| | ) | **PUBLIC VERSION** |
| CISCO SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF PROF. ILLAH R. NOURBAKHSH, PH.D. IN SUPPORT OF XPERTUNIVERSE'S OPPOSITION TO CISCO'S MOTION FOR SUMMARY JUDGMENT

1.      In Cisco's opening brief in support of motions for summary judgment, the arguments consistently mis-characterize the nature and value of the XU trade secrets and patents. Throughout these documents, Cisco argues that (1) the trade secrets lack detail and are general concepts rather than specific secrets; (2) the general trade secret concepts are or were well-known in the industry; (3) the trade secrets were disclosed in XU's patent applications and software, and that XU has admitted this; and (4) that my deliberate opinion is weak because I "map" Cisco product functionality in a general manner to the trade secrets. I strongly disagree with all four basic arguments and, in the first portion of this document, I detail how Cisco is mis-characterizing the value of the XU trade secrets by portraying them grossly inaccurately, and by incorrectly representing the precision and meaning of my language.

2.      To support the weight of my conclusions on this matter, I wish first to explain how my specific background in corporate contact center software development and marketing provides the right background for an accurate, informed opinion on this precise topic. In numerous documents, Cisco suggests that my opinions are based only on the documents reviewed (Cisco

1

brief, page 13: "*Dr. Nourbakhsh did not analyze XU's trade secrets in the light of any other existing products or available public information*"), failing to recognize the significance of my business and technical background. Cisco's statement, quoted above, is false because I have carefully considered each XU trade secret in light of my detailed knowledge about the state of the art at the time in question. I further have reviewed Dr. Forys' opinions in regards to the trade secrets and, as I have explained in prior documentation, I disagree with his conclusions regarding the obviousness of XU trade secrets, and I detail the precise nature of innovativeness in each trade secret below.

3.      During the exact time period in question for the lawsuit, I was co-founder of Blue Pumpkin Software, a company dedicated to software installed in contact centers internationally. My position at Blue Pumpkin included CTO, product manager and product development manager, and Chief Scientist.  My work at Blue Pumpkin continued during my professorship at Carnegie Mellon University, and in 2001 I took a one-year sabbatical from Carnegie Mellon to develop and release an all-new product for Blue Pumpkin full-time.  My activities at Blue Pumpkin included background interviews of Fortune 500-owned and small enterprise contact center managers, direct evaluation and observation in contact centers, broad literature review of contact center software and direct participation in national contact center conferences.  All these experiences form the basis of my understanding of the overall state of the art and marketing needs in the contact center space.

4.      Furthermore, in 2001 and 2002, I personally led pricing surveys, functionality surveys and used the results of these analyses to author, personally, Marketing Requirements documents and Production Specification Requirements documents. I led the software engineering of the resulting system, including personally writing C, C++ and Java code, and managed the quality

2

assurance and release scheduling process. I developed training materials for contact centers, personally installed the software in contact centers in Boston, Kansas City, San Francisco and elsewhere, and managed customer relationships. I personally organized, led and evaluated pricing sensitivity surveys with contact centers nationally. All these activities provide me with a rich understanding of the value of specific algorithms in contact center operations, and the value of contact center functionality in the eyes of management across diverse types of corporations.

5.     Furthermore, I made considered decisions for Blue Pumpkin regarding intellectual property protection and, in particular, was responsible for the company's strategy for protecting its intellectual property through patent and trade secret protection and using patent and trade secrets in complementary, strategic ways. I am an author on approximately 6 awarded patents just in this space, with more than a half dozen other patents stemming from my other work, and helped to write these patents, and I decided how to create the correct Intellectual Capital for the company by using patents.

6.     It is the combination of the above experiences that provides me with a deep understanding of the contact center space at the time in question and provides me with an underlying understanding of the value and requirements of patents and trade secrets. This is the experience that I bring to bear in answering questions regarding the XU patents and trade secrets and their significance. And it is with this background in mind that I strongly disagree with Cisco's characterizations of XU's trade secrets, as detailed below.

7.     Cisco states, using similar but not identical wording throughout documents, that 'mapping' general concepts well known in an industry to a product is insufficient to show use of a trade secret because this does not identify or clearly refer to trade secret material. This statement, true or not, is inapplicable to the present issue because I disagree strongly with

Cisco's characterization of generality leveled at the XU trade secrets; the trade secrets are definitely not "general concepts," nor were they "well known in the industry" during the time frame in question, as I explain in detail below.

8.      Furthermore Cisco suggests that my analysis of misappropriation operates at a vague, functional level: "Dr. Nourbakhsh "maps" trade secret number 2 to Cisco's Quad product because he finds that the product enables seekers to find experts" (Cisco brief p. 11) and they characterize this as a "fatal flaw." (Cisco brief p.11). I disagree both with their characterization and this conclusion. My analysis and mapping makes use of my ability to identify clear correlations between the exact information embodied by a trade secret and the exact same information being extant in a Cisco product. When I state that a trade secret maps to a Cisco product, I am stating that at the precise computational level, the Cisco product is using exactly the information disclosed by the trade secret. Rather than being a weak association based on a singular functional notion, as Cisco implies, this is a very strong association appropriate to my expert task of evaluating the ways in which XU trade secrets are being used in Cisco's products.

9.      Cisco also states that the trade secrets fail to have sufficient specificity because several trade secrets may use the word 'algorithm' without identifying a specific mathematical algorithm (Cisco brief, p. 10). As is clear in my deposition testimony, where Cisco's counsel also asked about this issue and received my direct answer, and in my prior reports, the XU trade secrets that reference algorithms provide specific detail that makes the trade secrets have significant value over what was known at the time. The algorithms, in many cases, are not the trade secret- it is a far more sophisticated implementation that is captured by the trade secret than, for instance, whether linear subtraction or linear weighted subtraction is used as the matching algorithm, as I detail below.

4

10.     To best elucidate the specificity and specific value of the trade secrets, I present below a discussion of each trade secret individually, explaining as precisely as possible how it differs from the state of the art at the time and presents nonobvious technology with real value.

11.     Before proceeding with each trade secret, one at a time, let me restate my professional opinion based on my study of this case and my understanding of the background of this field, in context at the time of this dispute: the XU trade secrets are sufficiently specific to have significant business value over the state of the art at the time; the trade secrets embody information that was not known at the time in the industry; XU has *not* admitted in any documentation I have reviewed that the patents, products or product demonstrations have disclosed the trade secrets or destroyed their value, contradicting Cisco's statements to the contrary (Cisco brief, pp. 14, 22). Finally, my opinions in mapping trade secrets to Cisco products identify cases where the exact trade secret is used in Cisco products computationally precisely, not in some approximate manner.

**Trade Secret Specificity and Value Summaries**







7











12













18







21







24













30

















Executed on __15__ January, 2013, in Pittsburgh, Pennsylvania.

_____
Professor Illah R. Nourbakhsh, Ph.D.

38

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that, on January 23, 2013, the within document was electronically filed with the Clerk of the Court using CM-ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

*/s/ Philip A. Rovner*
Philip A. Rovner (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com

1084361