```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                 IN AND FOR THE DISTRICT OF DELAWARE

 3                            - - -

 4
       XPERTUNIVERSE, INC.,          :   CIVIL ACTION
 5                                    :
                      Plaintiff,     :
 6                                    :
             vs.                      :
 7                                    :
       CISCO SYSTEMS, INC.,          :
 8                                    :
                      Defendant.     :   NO. 09-157 (RGA)
 9

10                            - - -

11                           Wilmington, Delaware
                             Friday, March, 2013
12                           1:33 o'clock, p.m.

13                            - - -

14     BEFORE:  HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

15                            - - -

16     APPEARANCES:

17               POTTER, ANDERSON & CORROON LLP
                 BY:  PHILIP A. ROVNER, ESQ.
18

19                      -and-

20

21

22

23

24                           Valerie J. Gunning
                             Official Court Reporter
25
```

```
 1
                    STROOCK & STROOCK & LAVAN
 2                  BY:  CHARLES E. CANTINE, ESQ. And
                         JASON SOBEL, ESQ.
 3                       (New York, New York)

 4
                         Counsel for Plaintiff
 5


 6
                    MORRIS, NICHOLS, ARSHT & TUNNELL LLP
 7                  BY: JACK B. BLUMENFELD, ESQ. And
                        JENNIFER YING, ESQ.
 8

 9                          -and-

10
                    MORGAN, LEWIS & BOCKIUS
11                  BY:  BRETT M. SCHUMAN, ESQ. And
                         RYAN L. SCHER, ESQ.
12                       (San Francisco, California)

13                          -and-

14

15                  MORGAN, LEWIS & BOCKIUS
                    BY:  KELL M. DAMSGAARD, ESQ.
16                       (Philadelphia, Pennsylvania)

17
                         Counsel for Defendants
18

19                          -   -   -

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2

 3               (Proceedings commenced in the courtroom,

 4      beginning at 1:33 p.m.)

 5

 6               THE COURT:  All right.  Good afternoon,

 7      everyone.  Please be seated.

 8               All right.  So we're here, I guess, for the

 9      usual agenda items to which Mr. Blumenfeld wanted to add

10      one, but let's get with the main point here, which is

11      Dr. Nourbakhsh, the Daubert.

12               I take it probably Mr. McCraw and Mr. Cantine,

13      you're going to call him for his testimony?

14               MR. CANTINE:  Mr. Sobel is, your Honor.

15               THE COURT:  Mr. Sobel.  Sorry.  Sorry.  Yes.

16      Mr. Sobel.  Go ahead.

17               MR. SOBEL:  All right.  I call Dr. Illih

18      Nourbakhsh, who we are tendering as an expert in the

19      contacts industry.

20                    PLAINTIFF'S TESTIMONY

21               ... ILLIH R. NOURBAKHSH, having been

22          duly sworn as a witness, was examined and

23          testified as follows ...

24               THE COURT:  Good afternoon, Doctor.

25               THE WITNESS:  Good afternoon.
```

```
 1                    THE COURT:  Mr. Sobel?

 2                    MR. SOBEL:  Yes, your Honor.

 3                    THE COURT:  You may proceed.

 4                    MR. SOBEL:  I want to mark some exhibits,

 5     Plaintiff's Daubert Hearing Exhibits 1, 2 and 3.

 6                    THE COURT:  All right.  What are they?

 7                    MR. SOBEL:  The first, Exhibit 1 is the expert

 8     report of Professor Nourbakhsh.

 9                    THE COURT:  All right.

10                    MR. SOBEL:  And I have two copies for the Court.

11                    Exhibit 2 is the rebuttal report of Professor

12     Nourbakhsh.

13                    And Exhibit 3 is the declaration of Professor

14     Nourbakhsh, dated January 15th, 2003 --  2013.  Pardon me.

15                    (Mr. Sobel handed exhibits to the Court.)

16                    THE COURT:  All right.  And they're admitted for

17     the purposes of this hearing.

18                    (Plaintiff's Daubert Hearing Exhibit No. 1, 2

19     and 3 were admitted into evidence.)

20                    MR. SOBEL:  May I provide them to the witness,

21     your Honor?

22                    THE COURT:  I'm sorry?  Okay.  Yes.

23                    (Mr. Sobel handed exhibits to the witness.)

24                         DIRECT EXAMINATION

25     BY MR. SOBEL:
```

Nourbakhsh - direct

1    Q.    Dr. Nourbakhsh, before you, can you identify the

2    documents that you have in front of you?

3    A.    The documents are what you stated they are.

4    Q.    Okay.

5    A.    My expert report, my rebuttal report, and the

6    declaration I prepared afterwards.

7    Q.    Did you prepare those?

8    A.    I did.

9    Q.    Okay.  And those would reflect all your opinions?

10   A.    They are all my opinions, yes.

11   Q.    Okay.  Dr. Nourbakhsh, can you tell us what degrees

12   you currently hold?

13   A.    I have a Bachelor's degree, a Master's degree, and a

14   doctoral degree in Computer Science from Stanford

15   University.

16   Q.    Okay.  And since completing your doctoral degree from

17   Stanford, what have you been doing?

18   A.    After I finished my doctoral degree, actually doing my

19   doctoral degree, I started a company call Blue Pumpkin

20   Software with some associates and, and I chose having that

21   company and being a Professor at Carnegie Mellon University

22   for the next several years.  I continue to be a Professor at

23   Carnegie Mellon now.

24   Q.    And you're a Professor in Computer Science at Carnegie

25   Mellon?

Nourbakhsh - direct

1    A.    That's correct.

2    Q.    Have you taught any classes, undergraduate, graduate

3    level at Carnegie Mellon?

4    A.    Yes.  I teach undergraduate/Master's/Ph.D level

5    classes in areas such as computer science, artificial

6    intelligence, systems engineering, principles of human

7    machine and human interaction and ethics technology.

8    Q.    Okay.  And what's ethics technology?

9    A.    I teach a class where we look at the American code for

10   engineering ethics and trying to understand what it means

11   for engineers to behave ethically in designing new systems

12   and in deploying those systems to the public.

13   Q.    Okay.  And in connection with your lecturing, can you

14   tell us some of the subjects that you've lectured on while

15   at Carnegie Mellon?

16   A.    Sure.  The subjects that I lectured on range from the

17   software end of planning and scheduling optimization to what

18   systems engineering is about, which is really how you put

19   together complex systems in lots of small parts and prove

20   properties about the system as a whole all the way to human

21   machine interaction, where we design systems that are

22   designed to interact with people in the usual effective ways

23   so they want to do their job better.

24   Q.    And in paragraph 4 of your initial report, that's

25   Exhibit 1, does that reflect, accurately reflect some of the

1    other subjects you've lectured on?

2    A.    Yes.  In artificial intelligence, we cover subjects

3    such as ontology, knowledge systems, knowledge mapping

4    systems, machine learning, and signal processing.

5    Q.    Okay.

6    A.    All of those fall under the rubric of artificial

7    intelligence in my field.

8    Q.    And you've also performed research and development in

9    the areas relating to the contact center industry?

10   A.    Yes.  The recent development I've done for the contact

11   center area is primarily because of the company that I

12   founded and my positions in that company led me to develop

13   IP for the company and develop products that we then

14   marketed to contact centers for major corporations around

15   the world.

16   Q.    Okay.  I want to go into Blue Pumpkin in a minute.

17   Let's just cover a few more things.

18         If you will turn to Exhibit B of your initial

19   expert report, can you identify that document for us?

20   A.    That's my curriculum vitae.

21   Q.    Okay.  And it lists your professional activities, your

22   speaking engagements, your publications and the patents that

23   you have in your name; is that correct?

24   A.    That's correct.

25   Q.    Okay.

Nourbakhsh - direct

1    A.    Among other things.

2              So I see from your curriculum vitae, you have a

3    total of 13 United States patents.  Do any of them relate to

4    any of the technology in this case?

5    A.    None of them relate directly to the technology that

6    I've been studying in terms of XpertUniverse and the Cisco

7    case, but I think about half of them relate to technology in

8    the contact center space in general.

9    Q.    Okay.  So about half of them relate to the contact

10   center industry; is that right?

11   A.    Yes.  And specifically to software for the contact

12   center industry that enables the contact center to run more

13   efficiently and in a way that's better for the employees and

14   the managers.

15   Q.    All right.  And that industry is the industry that the

16   XpertUniverse technology falls into; is that right?

17   A.    That's correct.  The way I've looked at the

18   XpertUniverse technology and application, it's the same

19   general area as the patents that I hold, yes.

20   Q.    Okay.  Now, out of the -- your publications, have you

21   published in the contact center industry field?

22   A.    I have.  I've published several articles in some major

23   trade rags and journals in the contact center space as well

24   regarding the technologies we worked on and the innovations

25   we had at Blue Pumpkin.

Nourbakhsh - direct

1    Q.    Okay.  Let's move on and talk about Blue Pumpkin.  You

2    mentioned that a couple times, that you founded Blue

3    Pumpkin.  I think you said co-founded.

4              Did you co-found it?

5    A.    Yes.  There were three of us who were friends and we

6    co-founded it together.

7    Q.    Okay.  And what was your role with Blue Pumpkin?

8    A.    Early in the startup company, you do everything, so

9    you're presenting to venture capitalists, raising money and

10   working on financials for the company.

11             Because I was a technologically oriented person,

12   I also was responsible early on in developing a vision and

13   strategy on what the needs for the contact center were, so I

14   organized relationships with a lot of contact centers in the

15   San Francisco Bay area and elsewhere in the U.S.

16             And I worked on everything from sort of

17   technological analysis.  We go from needs to solutions, what

18   do contact centers needs, how do they tick today, what kind

19   of software do they use, and then from that we tried to

20   derive understandings of what's the new software that they

21   need.

22             Developing the software was something that was

23   under my umbrella.  I was responsible for managing the

24   market requirement document and writing process for a couple

25   of major products that we had, and then doing pricing

Nourbakhsh - direct

1    surveys with customers, to understand how much they should

2    cost to be worth buying.  And then doing pilot testing with

3    customers, pilots that we had, doing training, writing

4    manuals, and interviewing afterwards to see if it's really

5    useful, and then at some point handing it out to marketing

6    and sales to see if we could sell on a larger scale.

7    Q.    Okay.  So I will ask you a couple followup questions

8    on that.  Thank you.

9          So Blue Pumpkin, when they were in the business

10   of developing software for the contact center, is that what

11   you are saying?

12   A.    That's correct.

13   Q.    Okay.  And that was in the United States and elsewhere

14   as well?

15   A.    It was international.

16   Q.    Okay.

17   A.    I think we had sales easily in the thousands all over

18   the world.

19   Q.    Okay.  And you were chief scientist and chief

20   technology officer at Blue Pumpkin?

21   A.    Yes.  I started off as chief technology officer.  Once

22   I became a professor, you can't be a director of a company

23   when you are a professor in the U.S. by some state laws, so

24   I became chief scientists and played an advisory role.

25   Q.    All right.

Nourbakhsh - direct

1    A.    And later actually to more fully integrate some more

2    software, I actually went on sabbatical from Carnegie Mellon

3    to go back to Blue Pumpkin and play a product management

4    role.

5    Q.    All right.  And why was it necessary to take a

6    sabbatical from Carnegie Mellon and to work full-time for

7    Blue Pumpkin?

8    A.    Well, my friends, the co-founders asked me if I would

9    be willing to, and I was happy to do it because there was a

10   new niche on the marketplace that had to do with contact

11   center software that helps them really think about hiring

12   and strategies for contact centers over a five to ten-year

13   period of time.  Nobody had software for that.

14            So I went back and did an ethics analysis of my

15   contact centers for that reason, designed a product, put a

16   team together and we turned that into a product.

17   Q.    Okay.

18   A.    As it turned into a product and matured, then I went

19   back to Carnegie Mellon.

20   Q.    Okay.  And so in connection with that development

21   effort for, what you described for Blue Pumpkin, did you

22   manage that development effort?

23   A.    Yes, I managed the information gathering part of it,

24   the design of the software itself, and I was sort of the

25   main interface to the customers, to the contact centers.

Nourbakhsh - direct

1    Q.    Okay.

2    A.    So I was willing to fly out, talk to them, get to know

3    them, understand their needs, et cetera.

4    Q.    Okay.  So I just want to talk a little bit more about

5    your work.  You mentioned understanding the need for the

6    contact centers.

7          How did you seek, how did you do that?

8    A.    I physically visited contact centers, everything from

9    the San Francisco Chronicle Contact Center to a couple of

10   contact centers in the Midwest that do -- they were like

11   much newer.  They were little startup airlines that we had

12   in the early 2000s, to places like John Hancock, so major

13   insurance companies.

14         I studied them by talking to the floor managers,

15   talking to individual operators, talking to the Vice

16   Presidents in the companies, and understanding what -- how

17   were contact centers actually thinking about planning and

18   dealing with incoming calls today and what's hard for them

19   to do in terms of planning, staffing, and planning how to

20   connect skilled staff.

21         That was right when skill-based scheduling had

22   become a very hot topic, the idea that your contact center

23   personnel don't all know the same things, and you need check

24   fundamental new ways to connect people with different skills

25   to the incoming calls.  And as you see your needs, how can

1     you make sure you staff up so that no particular need is

2     waiting too long.

3                 And so that's the kind of basic software

4     problem we were trying to solve there.

5     Q.    Okay.  And I just want to step back for a second.

6                 When did you start the project, what year for

7     Blue Pumpkin, when you worked at Blue Pumpkin?

8     A.    Well, we founded Blue Pumpkin in something like 1996.

9     Q.    Okay.

10    A.    This particular major software effort I started in

11    roughly 1999, and it went all the way through 2001/2002.  My

12    sabbatical was in there for about a year, inside of that

13    quantum of time.

14    Q.    And did you continue on working with Blue Pumpkin for

15    years after that as well?

16    A.    I did.  A year-and-a-half or so later, after I went

17    back to Carnegie Mellon, Blue Pumpkin was acquired by

18    Witness Systems, and Witness Systems in turn made me chief

19    scientist, or a similar title to that.  And I worked with

20    them on their IP technology, on their IP strategy.

21                So one of the things were trade secrets one, of

22    the things would be patents within Witness Systems, which

23    also marketed a whole lot of systems to call centers.

24    Q.    Okay.  And what year was that, that you were hired by

25    Witness Systems when they took over Blue Pumpkin?

Nourbakhsh - direct

```
 1    A.     I was hired right as Blue Pumpkin was sold to Witness.

 2    I can't remember the year that was.  I'm going to guess in

 3    the 2002/2003 time frame.  I stayed with Witness for about

 4    two to three years.

 5    Q.     If you need to refresh your recollection by looking at

 6    the C.V., feel free to do so.

 7    A.     Sure.  2007.  That means Witness was probably buying

 8    Blue Pumpkin around 2005, and I spent something like three

 9    years there playing the chief scientist role.

10    Q.     So you were working in the industry from about,

11    contact center industry from about what years to what

12    years?

13    A.     1996 is when we started working in the industry, so

14    '96 to 2007.

15    Q.     Okay.  Thank you.  Sorry to go out of order here.

16           You were getting into before interviewing

17    contact centers and various industries, I believe you

18    mentioned insurance industry.  What are some of the other

19    industries that you had direct, directly interviewed

20    people?

21    A.     I think we did something with a casino because

22    Las Vegas and Reno were not far away.

23    Q.     All right.

24    A.     We did software services.  I don't remember if it was

25    Microsoft or a competitor to Microsoft at that time.  And,
```

1    yeah, we did insurance, for sure.  We did airline flight

2    scheduling, where you call to make a reservation.

3              And I can't remember the full breadth of

4    industries.  We ended up, I ended up personally visiting

5    something like half a dozen, two-dozen contact centers

6    repeatedly to really understand the process from their

7    point of view, but then I would visit the vice president's

8    offices to understand what makes them decide to buy

9    software.

10             So what are the qualities that a piece of

11   software has to have in the call center that is under

12   there -- for them to feel it's worth their while to buy the

13   software.

14   Q.    Okay.  And so did you do any surveys of the contact

15   center industry in connection with the development effort

16   for Blue Pumpkin?

17   A.    Yes.  I had been teaching about surveys at Carnegie

18   Mellon, so it came sort of naturally, that when I went back,

19   we did paper surveys and phone surveys with a number larger,

20   so I went to the sales force at Blue Pumpkin and used them

21   to introduce me to the contact centers that were already

22   buying our software or that were potential leads.  And I did

23   phone surveys with a number of them.  Then I followed up

24   with paper surveys, and that's how we did the pricing

25   surveys, the functionality surveys.  You have them talk

Nourbakhsh - direct

1    about what are the functionalities they need most.  You have

2    them prioritize it on the list so you can understand what

3    their view of value is or function.

4    Q.    So in doing the functionality surveys, what knowledge

5    did that give you about what was available in the industry

6    during the time you worked for Blue Pumpkin?

7    A.    Well, what we learned at the time, which was

8    interesting, is that they were being very reactive.  Contact

9    centers were hiring and firing fast, depending.

10           So Macy's would hire a whole lot more people

11   just in time for Christmas and Thanksgiving, and then they

12   would fire them.  It was very counterproductive.  It was

13   costing them more money than they were making.

14           They didn't know what to do to get call times

15   down.  What I mean is once somebody calls in, make them wait

16   less time before they get to the answer they're looking for.

17   That was a big source of concern and anxiety in the

18   industry.

19           And so this idea of skill-based scheduling was

20   tricky because they didn't know, well, if we have some

21   operators who speak French and some who speak French and

22   Spanish, and this one knows how to operate the center,

23   and this one knows about software apps, how many each do

24   we need at what time of the day, given the callings patterns

25   of the people calling that have different inquiries coming

1    in.

2            There was a lot of anxiety back then around the

3    question of multi-media.  Should the software be a thin

4    client?  Should it be something that runs in the cloud

5    somehow off of our computer?  Should we be somehow using the

6    cellphone that I have, should we be doing a chat with them

7    or going right back to the telephone?

8            So there was underlying technological change we

9    were seeing in our whole social world in terms of

10   communication devices.  And at the same time there was this

11   question of skills and expertise and the idea you can't just

12   hire a whole lot of people that have exactly the same set of

13   skills.  Obviously, this notion that I got back then made

14   this case interesting because this is also about skills and

15   expertise.

16   Q.    And what did you do with the survey results after

17   collecting them?

18   A.    We used them to design the best software we could

19   imagine offering, and then we designed the software and then

20   we did actual, what do you call them, I forget the name for

21   it, but we draw out pictures of the screens and show it to

22   the potential customers, and say if we had a -- storyboards

23   storyboards.  That's what it's called.

24            So you show them like you would at a movie

25   storyboards that would show frames, what it would look like

1    if you were using software and to solve your problem.  That

2    will help us understand in designing a piece of software

3    that was useful for them.

4              We went down this question of seasonality.  Can

5    we help people understand the expertise, the kinds of

6    employees they have in the contact center, and then hire

7    that.  And thinking about training and how you can hire

8    people now that have a certain set of skills, but you can

9    actually schedule each of their work schedules so that they

10   that are going to gain what sort of skills they need by

11   Christmastime.

12             You hire them by March, and by then you have the

13   people you need, you bring them up from inside.  They are

14   not going to be hired and fired.  They're going to be loyal

15   members of the organization.

16   Q.   In connection with that effort, you mentioned that in

17   addition to interviewing and surveys, that you also had

18   direct observation of the contact centers that you went and

19   visited; is that right?

20   A.   Right.  As I said, I went to contact centers.  I

21   visited with them.  I also go to sort of the CFOs and I

22   visit offices to understand what their purchasing behavior

23   is, what do they need to make a decision to buy our

24   software.

25   Q.   And did you gain personal knowledge of contact

Nourbakhsh - direct

1    center's functionality of the ones you visited?

2    A.    Absolutely, yes.  There's a huge diversity of contact

3    centers, but I learned what makes them tick and I learned

4    what is similar and what's diverse about them.  So I learned

5    what the key components of contact centers are that are more

6    or less fixed across contact centers.

7    Q.    And did you learn about the functionality that they

8    had at the contact centers that you visited?

9    A.    Yes.  I learned specifically what they were and I was

10   able to extract the contact centers that I wasn't visiting

11   because I got enough of a sense to extrapolate the contact

12   center industry in general.

13   Q.    Now, even with respect to the contact centers you

14   didn't visit, did you do surveys of other contact centers?

15   A.    Yes.  The telephone surveys we did were the biggest

16   group.  I probably telephone surveyed 50 contact centers

17   just based on introductions from my sales team at Blue

18   Pumpkin, and then a smaller group were paper surveys, and a

19   smaller group were the ones I ended up visiting, and a

20   smaller group were the ones we visited and installed

21   software and followed up.  Then we do pricing surveys with

22   the software, a bigger group.  It's kind of an hourglass

23   shape.

24   Q.    Did you attend any conferences related to the contact

25   center industry?

Nourbakhsh - direct

1    A.    Yes.  Probably from '97 or '96 until 2003 or so I

2    visited one or two major industrial conferences in the

3    contact center software space in the U.S.

4    Q.    And were there any -- were those -- you went to major

5    ones.  Is that what your testimony is?

6    A.    Yes.  We went to the biggest ones because that's where

7    you see what your competitors are doing and that's where you

8    get to talk to your future customers.

9    Q.    Okay.  And at the time you were working for Blue

10   Pumpkin, did you review industry literature in connection

11   with the development effort?

12   A.    Sure.  We did constant research.  There was a standard

13   set of journals and magazines in the contact center space

14   and I kept abreast by reading them.

15   Q.    What was your role with respect to the software

16   engineering of the product that you, during the sabbatical

17   that you took that you were working on?

18   A.    My role was to manage that whole project, so the

19   reason I went back to be able to do that while all the rest

20   of Blue Pumpkin's managers kept doing what they were already

21   doing.

22          So I did what you call the marketing

23   requirements, documents, which sort of specifies exactly

24   what the requirements are from marketing point of view that

25   you need in the software, and then I wrote the product

Nourbakhsh - direct

1    requirements document, the functional document, that

2    specifies functionally how is it going to work screen by

3    screen, pull-down menu by pull-down menu item.

4             Then I put a team together and we did the

5    architecture specification, which says what's the memory

6    structure, what kind of databases are you going to be using,

7    what are the different databases called, et cetera.

8             And then I worked with people that that worked

9    hand in hand with me, the actual software developers, to

10   make the software and to share code and debug it.

11   Q.    Did you write any code?

12   A.    Yes.

13   Q.    Okay.

14            MR. SOBEL:  May I approach the witness, your

15   Honor?

16            THE COURT:  Yes.

17            MR. SOBEL:  Hand him a bottle of water.

18            THE WITNESS:  Thank you.  You read my mind.

19   BY MR. SOBEL:

20   Q.    And who is in charge of Blue Pumpkin's intellectual

21   property decisions?

22   A.    Everyone at Blue Pumpkin is in charge, but I laid out

23   a strategy for how we decide what to patent, how we deal

24   with disclosures inside the company, and how we decide what

25   makes it on the patent side and what remains as a trade

Nourbakhsh - direct

1      secret.

2      Q.     All right.

3      A.     So I started that process.  I also did that kind of

4      strategy for Witness Systems following its acquisition.

5      Q.     Okay.  As part of your work in this case, were you

6      asked to perform an analysis of XpertUniverse's trade

7      secrets and whether they qualified as a trade secret?

8      A.     Yes.  That was one of the things I did for this case,

9      correct.

10     Q.     And the definition for your use of -- for what a trade

11     secret is, is that the one in your report at paragraph 30?

12     A.     Yes.

13     Q.     Okay.

14     A.     That's correct.

15     Q.     And can you tell me how much knowledge and experience

16     that you gained while at Blue Pumpkin later, whether it

17     formed your opinions as to whether or not XpertUniverse's

18     trade secrets qualified as trade secrets?

19     A.     The experience that I had before is in such a nearly

20     identical area of inquiry, which has to do with how contact

21     centers think about inquiries and dealing with inquiries and

22     what kind of software they have available to them, the

23     closest software available, that that knowledge allows me to

24     understand, once I understand what the trade secrets are,

25     whether they're novel, whether they are something that

Nourbakhsh - direct

1    simply didn't exist at the time.  Were there competing

2    products that had it or was it just a nonexistent feature

3    idea?

4                Whether they are of value, that is to say, if I

5    were to do an imaginary new survey with those folks that I

6    talked to at the CFO and VP offices, when I describe the

7    feature that this provides and explain how this wold provide

8    ROI, they say, okay.  Here's my credit card.  I want to buy

9    that.

10               And so my experience really allows me to

11   understand what is it that's special about the trade

12   secrets, if anything, and is the thing special about it

13   something that truly wasn't available at the time and the

14   real value in the industry if it had been available at the

15   time.

16   Q.    Did your experience at Blue Pumpkin also inform you as

17   to what was generally known in the industry during that time

18   frame?

19   A.    That's right.  We spoke to many companies and

20   collaborated with many contact centers and the folks that

21   were in charge of contact centers of major organizations.

22               So I understood what was available.  I

23   understood the space of possibilities and so I can judge

24   this against the space of possibilities that I knew at that

25   point in time.

Nourbakhsh - direct

1    Q.    All right.  And how does that time period relate to

2    the time period that was relevant to XpertUniverse?

3    A.    From the discussions that I've had and from what I

4    understand to be the dates of the interactions between XU

5    and Cisco, it actually works pretty well.  The knowledge

6    that I have for the very early 2000s ends up to mesh with

7    exactly the point in time where we're talking about this

8    question of whether these trade secrets had real value at

9    that point in time and that contact space.

10            So I think the dates sort of -- well, not

11   luck, you guys looked for an expert that would have the

12   right dates in their entire history.  But they line up

13   well.

14   Q.    And so I guess the gist of what you are saying, you

15   were able to determine how the trade secrets were different

16   from then what was generally known; is that right?

17   A.    That's correct.  I'm able to make that determination,

18   which allows me to write my reports.  And I'm able to

19   elucidate on that verbally and explain what was going on

20   back then is different from what the cases offers and the

21   patents offer.

22   Q.    So in addition to your expertise, you're also basing

23   your opinion on the personal knowledge and experience that

24   you gained to determine whether XpertUniverse's trade

25   secrets qualified as trade secrets.  Is that what you are

1    saying?

2    A.    Yes.  My opinions are, my opinions are fed by my

3    rational expertise in the sense of taking the documents in

4    front of me and assessing them as a logical person that has

5    background, but they -- opinions also are formulated from my

6    recollection, expertise of what was going on in the industry

7    at that point in time.

8          So those two things together, sort of rational

9    decision-making plus actual experience, that's what makes me

10   confident of the opinions that I have.

11   Q.    Just to be clear, when you say rational

12   decision-making, you mean with rational decision-making

13   in -- with the experience that you have?  Is that what you

14   are saying?

15   A.    Yes, with the technical knowledge I have.

16   Q.    Okay.

17   A.    My job requires the technical analysis, but also

18   recollection what was happening at that point in time and to

19   bridge those two kinds of knowledge together.

20   Q.    All right.  So let's get to the trade secrets.  You

21   were asked -- were you given a list of XpertUniverse's trade

22   secrets?

23   A.    I was.

24   Q.    And who gave you that list?

25   A.    Counsel gave me the list originally.

Nourbakhsh - direct

1   Q.    All right.  Let me mark for the record Plaintiff's

2   Exhibit Daubert 4.

3               May I approach?

4               THE COURT:  Yes.

5               (Plaintiff's Daubert Exhibit No. 4 was marked

6   for identification.)

7               THE COURT:  Why don't you keep the original.

8               MR. SOBEL:  Approach the witness?

9               THE COURT:  All right.  Right.  So this will be

10  admitted.

11              (Plaintiff's Daubert Exhibit No. 4 was admitted

12  into evidence.)

13              THE COURT:  It is the second response to

14  Interrogatory No. 12.

15              (Mr. Sobel handed the exhibit to the witness.)

16  BY MR. SOBEL:

17  Q.    Was this the list of trade secrets that you evaluated,

18  Dr. Nourbakhsh?

19  A.    Yes, this is the list that I evaluated.

20  Q.    Okay.  At a high level, you're offering opinions

21  regarding these trade secrets?

22  A.    Yes, I am.

23  Q.    Okay.  At a high level, what are those opinions?

24  A.    It's the diversity of trade secrets.  At a high level,

25  my opinion is the trade secrets, once I come to understand

Nourbakhsh - direct

1    them, are both not obvious, didn't exist in that time frame,

2    and have real economic value.

3    Q.    All right.  And how about with respect to whether

4    Cisco used the trade secrets?  Are you offering an opinion

5    on that?

6    A.    Yes, I'm offering an opinion on that, too.

7    Q.    Okay.  And how about whether Cisco disclosed certain

8    of the trade secrets in certain patent applications?  Are

9    you offering an opinion on that?

10   A.    Yes.  I can't remember the number offhand, it's in

11   my report, but for a patent, and also for patent

12   applications from Cisco, I read those, whether they have

13   trade secrets, and I identified specific trade seek results

14   through that.

15   Q.    Okay.  So let's talk about the first part.  How do you

16   determine that the 46 -- well, just for the record, the 46

17   on Exhibit 4; is that right?

18   A.    Yes.

19   Q.    Okay.  How did you determine for the record that the

20   46 trade secrets were actually trade secrets once you

21   received the list?  What did you do first?

22   A.    The first thing I did is to read the list.  The second

23   thing I did was to talk to, I believe it was John Steinhoff

24   and Victor Friedman, to ask questions I have about the trade

25   secrets and make sure I understand exactly what they mean by

Nourbakhsh - direct

1    the trade secrets.

2              In talking to them, in reading the list and then

3    in thinking about the trade secrets, I came to an

4    understanding of what they represent, what each trade secret

5    means in terms of its core functionality, if it's special,

6    and then I was able to take that, what I considered the

7    special core functionality and compare that to what I

8    remembered in the industry in the early 2000s.

9    Q.    All right.  And did you, from reading the list, did

10   you understand, did you understand what the trade secrets

11   are, are alleged, were alleged to be?

12   A.    Yes.  I have a reasonable formulation for every trade

13   secret in the list, yes.

14   Q.    Okay.  Now, in determining whether each of those trade

15   secrets were, is your opinion, qualify as trade secrets, did

16   you seek to determine whether they were generally known to

17   the public or the contact center industry?

18   A.    Yes.  Once I understood what the trade secret

19   embodied, what each one embodied, the next question I asked

20   had to do with whether they were novel and unknown at the

21   time.  And that's something that I looked at trade secret by

22   trade secret, again, accessing my memory about what I know

23   about the contact center in that time period.

24   Q.    Okay.  And --

25              THE COURT:  Actually, Doctor, when you say

                                    Nourbakhsh - direct

1        "unknown at the time," what time are you talking about?

2               THE WITNESS:  Roughly, 2000 until 2006.

3    BY MR. SOBEL:

4    Q.    And how did you make that determination about whether

5    it was available in the industry at the time?

6    A.    I used my prior experiences in the industry.  I

7    essentially had to enter a time machine, think about what

8    existed, all the software that I knew was being used in

9    contact centers, the functionality the software had and

10   whether the functionality is being prescribed in the trade

11   secrets is functionality that existed or didn't exist.

12   Q.    Okay.  Just so the record is clear, when you say "time

13   machine," you are using the phrase --

14   A.    It's a metaphor.

15   Q.    Okay.  I want to make sure the record is clear.  All

16   right.

17              MR. SOBEL:  All right.  Let me introduce -- I

18   will mark for the record Plaintiff's Daubert Hearing 5, 6

19   and 7.  No. 5 is U.S. Patent 7,366,709.

20              No. 6 is U.S. Patent 7,499,903.

21              And No. 7 is U.S. Patent Application, it's

22   Publication No. 2002/0013836.

23              THE COURT:  Yes.

24              And for the purposes of this hearing, they're

25   admitted.

Nourbakhsh - direct

1              (Plaintiff's Daubert Hearing Exhibit No. 5, 6

2       and 7 were marked for identification.)

3              (Mr. Sobel handed exhibits to the Court and to

4       the witness.)

5       BY MR. SOBEL:

6       Q.    Did you review XpertUniverse's patents and patent

7       applications to determine whether they published any of

8       their trade secrets in them?

9       A.    Yes.

10      Q.    Okay.  And the exhibits you have before you, 5, 6 and

11      7, are those the patent and patent applications of

12      XpertUniverse that you reviewed?

13      A.    Yes.

14      Q.    All right.  Okay.  And you said that you determined

15      each of those trade secrets had value.  Did you seek to

16      determine whether they had economic value?

17      A.    Yes.  Did I seek to determine if they had economic

18      value?  Yes.  In thinking about contact centers at the time,

19      the question that was fundamental to whether the trade

20      secret has inherent value was whether, if the trade secret's

21      knowledge had been put in software, that software would in

22      return have a real ROI for the contact center or the

23      organization that houses the contact center.

24      Q.    Okay.  I'm sorry.  I just want to get back, make sure

25      something was clear in the record.

Nourbakhsh - direct

1              Now, you reviewed the Exhibits 5, 6 and 7.  And

2    what is your opinion as to whether any of the trade secrets

3    on Exhibit 4 were disclosed in the, those exhibits which

4    were the XU patents and the patent application?

5    A.    My opinion is the trade secrets were not disclosed

6    by -- by Exhibits 5, 6 and 7, no.

7    Q.    Okay.  All right.  Did you look at any third-party

8    technology not of Cisco or not of XpertUniverse and

9    determine whether -- in forming your opinions concerning

10   trade secrets?

11   A.    Yes.  I looked at the technology for the sake of trade

12   secrets and patents, but as described in my expert report, I

13   looked at, I believe it's called Expert Contact by Genesys.

14   I looked at K-World by KPMG.  And those are two examples of

15   technology I looked at just to understand what was attempted

16   at the same general point in time.

17   Q.    Okay.  And why did you -- how did -- why did you

18   choose to take a look at Expert Contact by Genesys?

19   A.    Well, Genesys is a major company that we knew all

20   about back then.  Deposition, or maybe it was called

21   testimony of Richard Barton, I believe it was, was made

22   available to me.  And so in reading that, I got to know a

23   lot of contact.  And he was I believe in charge of Expert

24   Contact's end of life period.  So he was able to be very

25   forthright about what its shortcomings were.  A very useful

1    thing.

2    Q.    And how did that analysis inform your opinions

3    regarding value of the trade secrets?

4    A.    It reinforced the fact that I believe there was need

5    in the contact center space for software that made it easier

6    for seekers to be able to get to experts.  But it also

7    reinforced to me that the particular innovations of the

8    trade secrets as I understand the trade secret documents

9    were not implemented in the Expert Contact software.

10   Q.    Okay.  And you mentioned K-WORLD by KPMG, I believe.

11   Why did you choose to look at that?

12   A.    Mike Cirillo was made available to me for an

13   interview, so that I could at length talk to him.  And he

14   was a gentleman who was, I think, called chief knowledge

15   officer at KPMG.

16         KPMG was a very major corporation back then, and

17   so to me it was really interesting to see how they were

18   trying to develop ontologies that made it easier to connect

19   to expert organization across through sub organizational

20   boundaries.  So to me that was really a great example

21   of a contemporaneous attempt to solve the same kind of

22   problems that I believe XU has very good solutions for.

23   Q.    And how did, in analyzing the K-World product, how did

24   that inform your opinions regarding the trade secrets?

25   A.    Well, it made it clear to me that the trade secrets

1    have value because numerous times in our conversation,

2    Mr. Cirillo talked about the functionality that he needed.

3    For instance, to deal with presence indication correctly and

4    to be able to channel calls to the expert properly, to be

5    able to more automatically create -- that he was able to do.

6           And in each of those cases I was available to

7    see that there were trade secrets that were actually

8    directly talking about the issues that he lacked in his

9    attempts to innovate with K-World.

10   Q.   And so was K-World a software, was it an attempt to

11   find correct expertise in connecting the seekers are

12   experts?

13   A.   Yes.  K-World was sort of an intracompany attempt to

14   make sure that all the expertise across KPMG's large

15   offices, something like 100 or 180 offices are able to reach

16   expertise anywhere else, which is largely the same problem

17   as any seeker trying to reach expertise.

18   Q.   The basic need at K-World was attempting to address,

19   is that the same basic need that the Cisco's Expert Advisor,

20   expert on other products were attempting to address?

21   A.   Well, it depends.  At some level, yes, they're all the

22   same in the sense they are trying to connect seekers to

23   experts.  K-World was trying to do it within one large

24   organization.  It has lots of sub-organizational boundaries

25   and differences in language.

1          With Expert Advisor and with Expert, I would say

2     it was more about connecting seekers from the outside who

3     were customers, let's say, to a Macy's or a bank, and

4     connecting those customers to expertise within an

5     organization.

6     Q.   And do you have an opinion about whether or not the

7     trade secrets of XpertUniverse were subject to reasonable

8     efforts to maintain secrecy?

9     A.   I do have an opinion about that, yes.

10    Q.   Okay.  And what's your opinion?

11    A.   My opinion is that XpertUniverse exerted reasonable

12    efforts to maintain secrecy in that I reviewed the NDA that

13    XpertUniverse and Cisco signed, which is very similar to the

14    standard practices that we at Blue Pumpkin would have with

15    all of our partners as well.

16    Q.   And did you speak to XU about its practices of sharing

17    information with third parties besides Cisco?

18    A.   Yes.  I asked XU about whether they had everybody

19    sign the NDA to who they exposed trade secrets, and they

20    said, yes, they had everybody sign the NDA.  We had talked

21    about -- which, again, it is similar to what we would have

22    done at Blue Pumpkin as well.

23    Q.   In the contact center industry, it's your opinion

24    that's a reasonable effort to maintain secrecy?

25    A.   Yes.  I think in the software industry in general, but

Nourbakhsh - direct

1    certainly in the contact center industry, that's what we

2    did.  That's what our partners did with us what we would go

3    and talk with other partners.  That's the general behavior

4    that we saw.  You talk about the fact that you're going to

5    have an NDA and you sign a document and then you move

6    forward with the understanding that you are now protecting

7    each other's rights.

8    Q.    Okay.  You said that's what you did before.  You mean

9    what you did in connection with your work in trying to

10   protect Blue Pumpkin's intellectual property?

11   A.    That's correct.

12   Q.    Okay.  And when you're at Blue Pumpkin, did you think

13   that was a reasonable step to protect the secrecy of Blue

14   Pumpkin's information?

15   A.    Absolutely.  You have to trust your partners.  You

16   have to have a formality that lets you put that trust in

17   place, and you have to trust your partner beyond that so you

18   could do good work together.  And that's exactly what we did

19   and it's commonplace in the industry.

20   Q.    Okay.  And you've signed an NDA before?

21   A.    Yes.

22   Q.    For yourself, personally?

23   A.    Yes.

24   Q.    And you took those confidentiality obligations

25   seriously?

Nourbakhsh - direct

1     A.     Absolutely, I did.

2     Q.     All right.  And did you keep the information that you

3     promised to keep secret a secret?

4     A.     Yes, I did.

5     Q.     All right.  And you knew you were obliged by those

6     obligations not to disclose the information?

7     A.     That's correct.

8     Q.     Okay.  So in your experience in the context under

9     industry, when someone enters into an DA with another party,

10    it's reasonable to expect the information you shared will be

11    kept secret?

12    A.     Oh, that's the whole point, yes.

13    Q.     All right.  I want to walk you -- well, actually,

14    before I get into some of the specific trade secrets, could

15    you tell the Court with respect to all the trade secrets,

16    why is this all important?  Can you give us -- put it

17    together for us?

18    A.     Sure.  So one way to think about this is what do the

19    trade secrets provide and with what do the patents provide,

20    and each one provides a different sort of thing.  It's

21    clever in a way.

22           The patents provide a very sophisticated

23    taxonomy, kind of knowledge structure for how you maintain

24    information about expertise in a way that is portable.  So

25    you can swap in and out new kinds of experts who have

Nourbakhsh - direct

1    skills, but by foundationing it all, having a concrete

2    foundation basically of underlying criteria.

3              So patents on one side give you this really good

4    knowledge structure, the '903 patent.  You would access the

5    knowledge structure.  How do I access categories in

6    interactive ways?  So that's where the patents are strong.

7    They're about ontology knowledge and making knowledge

8    flexible.  That's important, by the way, because if you are

9    going to blow out of a contact center into experts that are

10   not in the contact center, you're going to deal with

11   organizational boundaries in the company.  And the problem

12   is they're going to have different languages, they're going

13   to have information issues with some people some of the tie

14   and they have other jobs.

15             And so you have to be able to cross a whole lot

16   of barriers and challenges that you never would have to deal

17   with originally when you just are a contact center.  So

18   that's the patent side.

19             The trade secret side is interesting because

20   it's a number of techniques.  When you decide that you are

21   going to take that seeker's call in, the question that they

22   have and connect it to an expert anywhere in the company and

23   make that as flexible as possible, you run into a bunch of

24   different instances of headwind and, to me, the trade

25   secrets are interesting because they deal with lots of

Nourbakhsh - direct

1     different aspects of headwind.

2                One piece of headwind is using a metaphor

3     like a time machine, but one piece of headwind is the

4     question of these guys have full-time jobs.  How do I

5     motivate them to actually care to answer the call?  And

6     that's what one or two of the trade secrets is about.

7                One of them is how do I deal with present

8     information when they are not locked into the contact center

9     system, so how do I do presence any way?

10               Another headwind is, how do I take these people

11    who are outside the contact center and come up with simple

12    taxonomies that will allow them to patch into it without

13    going to necessarily the extreme effort that you would

14    take to create one consistent taxonomy inside the contact

15    center.

16               There are many of these.  The point to me in my

17    eye when I look at the trade secrets is each of them solves

18    a little problem that you are going to have.  It's kind of a

19    big problem, but each of them makes it easier to lubricate

20    this process of getting from the seeker to an expert outside

21    the contact center.

22               So that means to me that the trade secrets on

23    the one hand and the patent on the other hand, neither one

24    needs the other one, but if you have them both, it's

25    certainly a better organizational system than if you had

Nourbakhsh - direct

1    only one and not the other.  But neither one really depends

2    on the other one.  And I think I started to ramble some.  I

3    will stop now.

4    Q.    That's okay.

5          So I gather what you are saying is that the

6    trade secrets, there are problems or hurdles that have to

7    be overcome in deciding a collaboration system; is that

8    right?

9    A.    That's right.  So I will give you another example

10   that's kind of interesting.  If you are going to deal with

11   experts that are outside the contact center, you have to

12   make profiles for them, but you might suddenly be importing

13   thousands of experts and the normal techniques to use in a

14   contact center to create a database is a waste of time.  You

15   just think databases in the company as a whole already have

16   a lot of information about their expertise and their

17   expertise can change over time and those existing databases

18   might track that.

19         So one or two of the trade secrets is about this

20   issue of how you import data or have a processing system

21   that imports the data properly so that you can scale up and

22   bring all these big experts in without just retyping it all

23   the way you would inside the contact center.  So that's a

24   tool, right?  It's a tool that makes it easier to imagine

25   authentically connecting to experts inside the company

Nourbakhsh - direct

1    rather than just staying on your wall garden of the contact

2    center.

3    Q.    What has changed now for present day in viewing these

4    trade secrets that might have someone view differently from,

5    you know, the time period of early to mid-2000s?

6    A.    Well, we're much more sophisticated about databases.

7    We're much more sophisticated about data mining.  There are

8    a ton of ideas in the trade secrets that are pioneering in

9    that time frame because you didn't have proper cross-

10   organizational databases that had common languages, so

11   that's why you would need taxonomy.

12             We didn't have really good days back then to do

13   data mining and understand how, by looking at messages, we

14   can start to understand expertise of the people behind the

15   messages.

16             What has changed is software is becoming

17   much more, not just ubiquitous, but ubiquitous in an

18   enterprise-wide sense than it was then.  The contact center,

19   you've got to remember, was a walled garden.  It was a place

20   where you had contact center software, you would put it just

21   there.

22                  And so it was sort of verboten to imagine

23   the idea you are going to take this contact center software

24   and reach out to people outside the contact center.  The

25   contact center wanted to own their people.  Even when we

Nourbakhsh - direct

1    tried to schedule training sections, we got huge pushback

2    from the managers at the contact center.  They didn't want

3    to give up their guy for training even though that would

4    make him more able to deal with inquiries coming in.

5              So it wasn't exactly the dark ages, but it's

6    hard to use today's mindset and understand how very

7    different the world was back then in terms of software that

8    was cross enterprise and ontologically very, very flexible

9    so you could deal with lots of knowledge all the time.

10   Q.    Let me go into a couple.  Let's go into a couple

11   specific trade secrets so we can, you know, explain what

12   they are.

13             If you have, I believe it's Exhibit 4, that's

14   the list of trade secrets in front of you?

15   A.    Yes.

16   Q.    If you could turn to No. 45.  And perhaps you

17   can just explain what it is and what the problem is it

18   solves.

19   A.    It's an interesting one because it's, again, problem

20   solving on the issue that the expert is not a full-time call

21   answerer or contact answerer in the contact center.

22             So trade secret 45 opens up this whole idea

23   that, first of all, you're going to have some way of

24   identifying lots of information and its relevance to the

25   business problem.  In this case, it mentions things like

Nourbakhsh - direct

1    provisions and business rules.

2              But, second, and I think if you kind of jump

3    down to sections 7 and 8, it does something really, really

4    smart that we weren't doing back then at Blue Pumpkin, we

5    weren't thinking about back then, which is, if you are going

6    to reach out to these experts that outside the contact

7    center, you can't assume they're just going to take the

8    call, and you can't just use monetary compensation to do it.

9    What you want to do is make sure that they have access to a

10   software system, the information that connects to them, so

11   that when the seeker's inquiry comes in, they can learn so

12   much about the situation that they can in realtime make a

13   decision about whether their expertise is appropriate and

14   whether it's good for the company, whether they'll volunteer

15   to take the call.

16             So steps 7 and 8, once you've done the clearly

17   required things about identifying an expert are doing

18   something novel, which is reaching out, providing

19   information outside the walls of the contact center and then

20   asking directly, do you want to take the call, are you able

21   to take the call right now, getting an answer and having the

22   logic to deal with that properly, whether they say yes or

23   no.

24   Q.    And could you tell us a little bit about, turn to

25   No. 16.  Take a look at that and review it and then let us

Nourbakhsh - direct

1    know.

2    A.    Let me read it first.

3          (Pause while witness reviewed exhibit.)

4          THE WITNESS:  Yes.  16 makes a really good point

5    about the fact that this is not about knowledge management.

6    We had some companies back then that were just starting to

7    deal with knowledge management, trying to take all the

8    knowledge of the company and put it in one common database,

9    and they were having a lot of trouble because they were

10   going to, they were attempting to unify all the information

11   in a way that's archival, capture the knowledge and

12   information so, for example, when somebody leaves, it's

13   still got the knowledge.

14         What 16 said is interesting because it's saying

15   the taxonomy you're trying to create for this seeker expert

16   connection that goes beyond the contact center isn't the

17   same as that standard knowledge management technique we were

18   trying in the early 2000s to archive information about the

19   company.  Instead, what we've got to do is understand what

20   are the areas in terms of inquiry that are going to come in

21   that we have to route out to the experts.

22             So in a sense it said there's a simpler

23   version of taxonomy we can do than full-blown knowledge

24   management systems that lack to solve the problem.

25   Q.    And if you can take a look at the next one, No. 17 --

Nourbakhsh - direct

1    A.    Yes.

2    Q.    -- on the trade secret list, group 4, and take a read

3    over that.

4    A.    Same thing?

5    Q.    And explain what that is.

6          (Pause while witness reviewed exhibit.)

7          THE WITNESS:  17 is identifying the fact that

8    once you have a taxonomy, once you have the thing that we

9    just talked about from No. 16, you also have to have some

10   kind of interactive interface that lets you allow the

11   selections in realtime to get to the point where you have a

12   narrow enough identification of the inquiry type that you

13   have to be able to farm it out in order to determine what

14   expert can deal with it.

15          It's an absolutely necessary functionality no

16   matter how you're going to read out the contact center, in

17   my opinion.  And that kind of interactive interface that

18   narrows the possibilities down specifically so you can

19   reach experts outside the contact center from the seekers

20   point of view, that's something from that point in time was

21   novel.

22   Q.    And if you can turn to number 37, and I think it's on

23   page 12 of the list.  And if you can take a look over that

24   and explain what that is, the problem it solves.

25   A.    Let me read it.  Now I've got it.

Nourbakhsh - direct

1              (Pause while witness reviewed exhibit.)

2              THE WITNESS:  So telepresence was very new in

3    the early 2000s.  The idea that you can connect people and

4    really make video conferencing work was new.

5              AT&T had tried some experiments with video

6    phones that had been a disaster in the early eighties and

7    nineties.  It started to catch up because bandwidth caught

8    up.

9              The interesting point was telepresence was

10   really point to point.  The idea is you know who you want to

11   contact.  You dial in their unique I.D. in some fashion and

12   you contact them.  What it wasn't about, and that's what

13   this allows you to do, is to highjack that existing

14   technology of telepresence and say we can do something

15   better with telepresence.  We can take telepresence and

16   combine it with the correct ontology and interactive

17   foundation system.  And now you are not going to reach the

18   one person you know you can reach, like a videophone chat.

19   Instead, you're going to use telepresence as a vehicle for

20   communication, but who you are communicating with is going

21   to get decided by the other trade secrets.

22             So to me what is interesting about 37 is they're

23   saying, here's a novel way of combining this new idea which

24   is breaking out the contact centers with another new idea

25   that's already out in the marketplace.  It's right there to

Nourbakhsh - direct

1    wait for being conjoined to it.  That's an example

2    specifically of telepresence, which is the example that's

3    given here.  But that to me provides particular power for

4    Cisco, because they were in a space where telepresence was

5    so important and something they could offer as a high value

6    product.

7    Q.    And trade secret No. 6.  We'll do two more.  If you

8    can look at --

9    A.    You are not doing these in order, are you?

10   Q.    Sorry.

11   A.    That's okay.

12   Q.    Page 3.  If you can take a look at that and explain

13   what it is and the problem that it will overcome in the

14   contact center space.

15           (Pause while witness reviewed exhibit.)

16           THE WITNESS:  Yes.  We talked a little bit about

17   this with another trade secret, but here we're saying,

18   again, thinking through the details, if you are actually

19   going to have experts out at the contact centers deal with

20   these calls, they have to be able to refuse the request, but

21   to refuse the request, they have to have some kind of prior

22   knowledge of their schedule and they have to have

23   information about the request so they can decide when it's

24   appropriate to refuse and when it isn't.

25           It really has another interesting idea, which is

Nourbakhsh - direct

1    the managers should also be able to veto.  So it makes sense

2    for managers to also have control over the expert's

3    willingness to provide help or not at certain points in

4    time.

5              And it talked about control over ability of

6    reporting.  To me, control over availability of reporting

7    is very important both from the manager's point of view and

8    from that expert's point of view, because it makes it more

9    feasible to imagine opening up the floodgates and letting

10   the experts receive some of the calls.

11   Q.   Just finally, one more.  It's a longer one, but on

12   page 10 starts trade secret 36.

13             What can you tell us about that one and what the

14   problem it solves?  Tell us what it is.

15   A.   Give me a second to read it, please.

16   Q.   Sure.

17             (Pause while witness reviewed exhibit.)

18             THE WITNESS:  So to understand this trade

19   secret, I'm going to respond to the first part first.

20             I actually talked to folks at XU to understand

21   this process they went through in terms of verticals.

22             The issue is reaching experts throughout,

23   breaking out of the context reaching experts throughout the

24   organization are especially useful in certain organizations.

25   I think this became apparent to XU early on because they

Nourbakhsh - direct

1     decided, where should we apply this?  There's certain places

2     where it's no-brainers where it has technical value if you

3     can get the detail right.  One of those, for example, is

4     retail.  So the idea when you are shopping for anything, you

5     can reach experts who can convince you that you are shopping

6     for the right thing, you should buy it, is very clinical for

7     the organization.

8            Another example is banking, as they pointed out

9     as well, because there are so many different services that

10    banks offer and it's hard to staff a bank up to have all of

11    those people representing those services in-house.

12           The last thing you want to do is lose a

13    potential customer because they're going to switch to

14    another bank because they can't get access to the

15    information they need right away.

16           So you can cut your costs if you can reach those

17    experts wherever they are.  The beginning part is all this

18    about this issue of identifying verticals and understanding

19    how this is particularly useful for the verticals.

20    Q.   Now, after you have an understanding of the trade

21    secrets, you said you formed opinions as to whether Cisco

22    used the trade secrets; is that right?

23    A.   I didn't form that opinion until after I read all the

24    Cisco documentation.

25    Q.   Just so it's clear for the Court, when you use the

Nourbakhsh - direct

1    word "map" in your report, what did you mean?

2    A.    The word "map" is a computational term that I use.

3    One of the ways that I want to understand usage of the trade

4    secrets is to see, is a product that Cisco has, when I

5    evaluate the product with the architectural diagram, the

6    code, the user's manual, the demonstration guide, is it

7    doing absolutely everything the trade secret says?

8          The word "map" means is it computationally

9    identical?  So is it the case that the functionality that's

10   key in the trade secret is exactly being used in the

11   product?  So when I use the word "map," what I mean is, is

12   that trade secret in use in the product?  And I do it from a

13   computational point of view because I'm looking at this

14   technically.  That's my job.

15   Q.    All right.  And how did you go about determining

16   whether Cisco used the trade secrets?  What did you do?

17   A.    Well, I did the same thing for the trade secrets and

18   the patents in terms of my process.  And what I mean by

19   process is, let's see.  I started by going to the law firm

20   that hired me, Stroock, and we have an extremely large

21   number of boxes with everything that Cisco had sent over.

22   This is a multi-path process.

23          The first thing I did, I went through every

24   single piece of paper Cisco had sent over, paper by paper,

25   making the decision as to whether it's relevant or not.  I

1    had already read the patents carefully.  I already read the

2    trade secrets.  I talked to the XU folks so I could

3    understand them.

4              I went through this very, very large amount of

5    paper to understand what is each piece of paper that's

6    actually relevant to this.  We took every relevant piece of

7    paper that I ended up with and shipped them all to

8    Pittsburgh, Pennsylvania, where I live, and then I did a

9    two-pass thing with those, which is basically took a pen out

10   and read through all of those one by one and read through

11   every piece of what I had determined that was probably

12   relevant to determine if it is definitely relevant.  If it

13   is, I circled things, whether it's the architectural

14   diagrams or in the source code or in the users's manuals.

15   And I literally marked up those physical documents and

16   marked them up by referencing and cross-indexing to trade

17   secrets in patents that I thought they were relevant for.

18             I did that for all those documents.  Then I went

19   back to the beginning again, opened my computer and did it

20   again, but this time I did a giant Excel sheet that

21   cross-indexed for me every Bates number, and for every Bates

22   number, every patent or trade secret, and for each patent,

23   every sub-element of each element of each claim that I felt

24   was directly relevant to what I was reading in the Cisco

25   documents.

Nourbakhsh - direct

1            So it takes multiple passes like that because

2     I'm forming for each product that Cisco has an understanding

3     of how the product works in my head from this jigsaw puzzle

4     of pieces.  I've got the configuration I've got in front of

5     me.  I've got the marketing requirements documents from

6     Cisco.  I've got slide sets that they used internally to try

7     and convince folks to sell the product.

8            It's by looking at all of those and taking bits

9     and pieces from each one that's relevant that you make a

10    coherent picture.

11           So I did that Excel sheet for all of these

12    products and trade secrets, and that's why you'll find Excel

13    charts in my first report.  Those are literally snippets of

14    my master Excel sheet for each product, for each claim and

15    each trade secret.  Those aren't exhaustive because as I

16    wrote the report, I found more evidence, but they are good

17    additional documents that show you the diversity of sources

18    that I used in trying to justify my opinion.

19           MR. SOBEL:  Your Honor, I would like to walk

20    through an example of, you know, some of the documents he

21    used to demonstrate his methodology for showing that the, as

22    to why one of the trade secrets was used in connection with

23    a Cisco product.  I just need some time to enter these

24    documents in.

25           These first set of documents are the ones he

Nourbakhsh - direct

1    relied on for Expert Advisor.

2                THE COURT:  How much more time do you expect to

3    use altogether?

4                MR. SOBEL:  Well, I planned ongoing through an

5    example of that trade secret and then showing also how he

6    used the same process for at least one other product and

7    then to establish his methodology for how he arrived at his

8    opinions.

9                THE COURT:  And that's how long?

10               MR. SOBEL:  Probably a half-an-hour it will

11   take.

12               THE COURT:  I'm sorry.  What you want to go

13   through is to show, in regards to the trade secrets, the

14   things you say you want to do next, what is it you want to

15   show?

16               MR. SOBEL:  Well, his methodology for his -- for

17   arriving at the opinion that Cisco used a trade secret in

18   connection with a product offering.

19               THE COURT:  In other words, sort of a mapping

20   thing?

21               MR. SOBEL:  Yes.  Yes.  Yes.

22               THE COURT:  No, I'm just not sure if that's the

23   best use of your time.  I mean, the briefing is going to

24   identify the certain number of issues.

25               I think I understand what he has just said,

                       Nourbakhsh - direct

1    which I thought I understood actually before he just said

2    it, which is that he had something in the world, 146, and

3    he's looking at a Cisco product and he sees what he says is

4    computationally, which I take to mean more or less the same

5    thing in Cisco products.

6                    Is that what you mean by map?

7                    THE WITNESS:  That's right.

8                    THE COURT:  So I've got that.

9                    What is it now?  What I'm trying to figure out

10   is what is it you want to show me in addition to that?

11                   MR. SOBEL:  Well, you know, essentially

12   demonstrate, you know, where he found instead of just walk

13   through one example of, you know, some of the --

14                   THE COURT:  All right:  If you think it's

15   important, go ahead and do it.

16                   MR. SOBEL:  My understanding, your Honor, is

17   we're here for his qualifications.

18                   THE COURT:  Yes.  I thought the qualifications

19   were pretty much not really at issue.

20                   MR. SOBEL:  Well, the only point on the

21   qualifications is that, you know, under Kumho following

22   Daubert, the case law and its progeny supports that in

23   certain cases, an expert's personal knowledge and experience

24   can be an indicia of his reliability in the case.

25                   THE COURT:  Well, I wouldn't say it exactly like

 1    that, but, yes, he can have knowledge as to something other

 2    than the total academic field in which he teaches.

 3              MR. SOBEL:  I'm suggesting that his personal

 4    knowledge and observations is indicia of reliability in this

 5    case because the methodology requires someone who was, had

 6    knowledge at a certain time and comparing the trade secrets

 7    in that context letter.

 8              And under Kumho, you know, there's no set, you

 9    know, set of factors for assessing the reliability and

10    methodology, and I believe that and its progeny supports

11    that in certain cases, and I think this is the perfect

12    appropriate case, the personal knowledge and experience of

13    the expert is important and is a factor in determining the

14    reliability of methodology.

15              THE COURT:  All right.  Like I said, it's your

16    time.

17              MR. SOBEL:  All right.  But as far as the --

18    okay.  I mean, Cisco raised some issues in their briefing

19    and, you know, after looking at it carefully, most of the

20    issues that they seem to be raising or criticisms go to,

21    in my mind -- they are fair points for cross-examination,

22    but --

23              THE COURT:  I've read the briefs.  Do you

24    want to ask him some questions about them or are you saying

25    you don't think you need to ask him any questions about

Nourbakhsh - direct

1     them?

2                MR. SOBEL:  Well, I don't think that -- I mean,

3     if the Court is concerned with one of them, I mean, we can

4     go through every single one of them, of these criticisms,

5     but a lot of them are really just cross-examination points

6     and I don't think they go to methodologies.  But if the

7     Court would like us to address an issue, obviously, you

8     know, that's what we are here for.

9                THE COURT:  Well, I think one thing I would like

10    you to address is the qualification in the fifth on his

11    secondary considerations and nonobviousness.

12               MR. SOBEL:  Okay.  Okay.  I think Cisco's

13    criticism, I just want to make sure I understand what your

14    question is so we don't go off field and waste time.

15               But their criticisms seem to be that it exceeds

16    the scope of his expertise because he, to determine the

17    factors required by secondary consideration, long-felt need

18    and --

19               THE COURT:  Right.  See, long-felt need

20    seems to be something that is probably not exceeding his

21    expertise.

22               MR. SOBEL:  Okay.  So which in particular?

23               THE COURT:  I'd like to hear about commercial

24    success.

25               MR. SOBEL:  Okay.  Okay.

```
1    BY MR. SOBEL:

2    Q.    So, Dr. Nourbakhsh, in your Honor I think it's

3    Exhibit 2, you issued a rebuttal report; correct?

4    A.    Yes.

5    Q.    Why did you prepare that, aside from being asked?

6    What was that rebuttal report, what did it show?  What was

7    it addressing?

8    A.    Well, the rebuttal report is large.  I think you're

9    probably asking me about just the secondary considerations

10   section, which is pages 2 through 9.

11   Q.    Right.  Okay.

12   A.    And the idea here was counsel explained to me the

13   secondary considerations and these headings, these concepts

14   under which you could construe secondary considerations.

15   And so for each of these, I thought about mining it

16   vis-a-vis how -- what I know about XU's products and the

17   relationship they have with other companies, what IBM said

18   about XU, can lead me to conclusions about these.

19   Q.    Okay.

20   A.    I can walk you through them one by one.

21   Q.    Well, I guess basically if we can address the Court's

22   concern about commercial success and why those opinions are

23   informed by your experience and knowledge in the contact

24   center industry.

25   A.    Well, my experience in the contact center industry was
```

1    in many cases about working with other companies.  Blue

2    Pumpkin's job was to get not just resellers or OEMs, but

3    core relationships with other companies, like large networks

4    that we would be able to work with long-term.

5              So the idea to me carries a lot of weight about

6    what another company will say about your product.  And so to

7    me, learning in this case about the fact that IBM, for

8    instance, was interested, and I think I remember reading an

9    e-mail where somebody at IBM said a really positive thing

10   about XU's technology.

11             So learning about, for instance, IBM's response

12   to seeing XU's technology was an important data point for

13   me, just because I know what it's like --

14             THE COURT:  I'm sorry, Dr. Nourbakhsh.  When

15   you say IBM saw XU's technology, what specifically did IBM

16   see?

17             THE WITNESS:  I don't recall the complete

18   e-mail, but I think that they talked to XU.  And the e-mail

19   that I saw was I think between one IBM employee and another

20   one in the document, talking about how valuable this would

21   be, how available the XU technology would be.  But I can't

22   talk about the technology they saw.

23             THE COURT:  All right.  And commercial success,

24   what is the basis for your conclusion that commercial

25   success supports the idea that the XU patents were

1      nonobvious or the invention and the patents were nonobvious?

2                     THE WITNESS:  The -- my basis is the idea that

3      major companies believed at the time that using the

4      technology XU had, which I infer to mean the patents, would

5      make products that are commercial successes.  So it's a

6      third-party opinion about the commercial success you can

7      achieve with the patent technology.

8                     THE COURT:  So your commercial success opinion,

9      is it actually based on any actual commercial success?

10                    THE WITNESS:  Correct.

11                    THE COURT:  And in terms of the praise part of

12     your report, is any of the praise directed to the two XU

13     patents.

14                    THE WITNESS:  Let me go to the next and check

15     what I wrote.

16                    So when I talked with Mr. Turillo, one aspect of

17     praise we talked about was about presence and connecting,

18     which is -- which goes to the trade secrets, not the

19     patents.

20                    Another aspects of what he talked about

21     was the idea behind the flexible ontology, which I believe

22     is something that very specifically goes towards XU's

23     patents.

24                    THE COURT:  All right.  So, but in the rule of

25     praise, Mr. Turillo is not exactly an outsider.  Is there

1    some praise in the industry you're aware of besides

2    Mr. Turillo?

3              THE WITNESS:  Let me see if I reference anything

4    else.  I mean, I'm aware of IBM's praise and I talk about

5    that.

6              THE COURT:  That's from one IBM employee to

7    someone else?

8              THE WITNESS:  It was also a PowerPoint

9    presentation, I believe, that IBM made.  I don't know if it

10   was an intellectual property presentation or to outside

11   parties.  Anyway, they talk in a chart about the power of

12   XU's technologies.  Again, I don't know if that was

13   specifically to the patents or to the trade secrets.

14             THE COURT:  All right.  I'm sorry to interrupt.

15   You go ahead.

16             MR. SOBEL:  Okay.

17             THE WITNESS:  Can I add one other bit to that?

18             THE COURT:  Go ahead.

19             THE WITNESS:  Paragraph 43, I also mentioned

20   some information from Philonenko, who was at Cisco.

21   BY MR. SOBEL:

22   Q.   Okay.  All right.  Let me take you through some

23   questions here.

24             In determining what to look at to determine

25   whether the Cisco accused products met each limitation of

1    the claims at issue, you testified you selected certain

2    documents; is that correct?

3    A.    That's correct.

4    Q.    Okay.  Why did you select those documents in

5    particular?

6            THE COURT:  Actually, I think I know what you

7    are doing, Mr. Sobel, which is fine.  Why don't we just

8    assume that you sort of laid a prima facie case, they looked

9    at the right documents, and we'll let the cross-examination

10   see if there's anything wrong with that --

11           MR. SOBEL:  Okay.

12           THE COURT:  -- assumption.

13           MR. SOBEL:  Fair enough.

14           Just give me a moment.

15           (Pause while counsel conferred.)

16           THE COURT:  And I would say the same thing, too,

17   on the question of functionality as used by the indirect or

18   by the direct infringers.  You know, the question of whether

19   they necessarily were using optional features.

20           MR. SOBEL:  All right.  Then I just want to

21   touch on a couple points to make sure we have a clear

22   record.

23   BY MR. SOBEL:

24   Q.    You opined as to whether Cisco's patents or patent

25   applications disclosed XpertUniverse trade secrets?

1    A.    That's correct, I did so.

2    Q.    All right.  And how did you go about doing that

3    analysis?

4    A.    I read Cisco's patents and patent applications with

5    care, and applied the same understanding to that as I had

6    applied to all of the products that they disclosed.

7              MR. SOBEL:  Okay, your Honor.  To move this

8    along, we're going to tender Dr. Nourbakhsh as an expert in

9    the contact center industry and based on all of the, you

10   know, opinions that he used, that he issued in his reports.

11   And I guess I will just reserve the additional time I have

12   to address any --

13             THE COURT:  That's probably a good idea.  Do you

14   want a few minutes before we start, Mr. Schuman?

15             MR. SCHUMAN:  Yes, your Honor.  A short break

16   would be great.

17             THE COURT:  Okay.  Let's take a short break.

18             And, Dr. Nourbakhsh, get some water, so we'll be

19   back in ten minutes.  Okay?

20             THE WITNESS:  Very well.

21             (Short recess taken.)

22                        -  -  -

23             (Proceedings resumed after the short recess.)

24             THE COURT:  All right.  Please be seated.

25             Dr. Nourbakhsh, please resume the stand.  Mr.

Nourbakhsh - direct

1    Schuman?

2                MR. SCHUMAN:  Thank you, your Honor.

3                Your Honor, I, too, have some documents for my

4    examination.  Unfortunately, there's some duplication.  For

5    example, a copy of Dr. Nourakhsh's reports, but I have a

6    binder.  I would like to put it in front of the witness.

7                THE COURT:  I certainly don't object.

8                Dr. Nourbakhsh, you're going to be given some

9    different and some not so different stuff, but that's the

10   way we do these things.

11               Go ahead.

12               (Mr. Schuman handed binders handed to the Court

13   and to the witness.)

14               MR. SCHUMAN:  Are we ready to begin?

15               THE COURT:  I'm sorry.  Go ahead.

16                         CROSS-EXAMINATION

17   BY MR. SCHUMAN:

18   Q.    Good afternoon, Dr. Nourbakhsh.

19   A.    Good afternoon.

20   Q.    Dr. Nourbakhsh, prior to this case, have you ever been

21   retained as an XpertUniverse before for purposes of

22   litigation?

23   A.    No.

24   Q.    And I take it you're getting paid for your time here

25   today; right, sir?

1    A.    That's correct.

2    Q.    $500 an hour; right?

3    A.    It's $350 an hour for normal time, $500 an hour for

4    trial time and deposition time.

5    Q.    Thank you.

6          Among your opinions, Dr. Nourbakhsh, is that

7    Cisco's Expert Advisor product infringes XU's two patents

8    and also misappropriates its trade secrets; is that

9    correct?

10   A.    I have to look at the document to remind myself which

11   trade secrets, but, yes, a subset of the trade secrets and

12   two patents, yes.

13   Q.    Have you ever used Expert Advisor, Dr. Nourbakhsh?

14   A.    No.

15   Q.    Did you ever inspect a working copy of Expert

16   Advisor?

17   A.    No.

18   Q.    Have you ever examined the source code for Expert

19   Advisor?

20   A.    I have to refresh my recollection by looking at the

21   documents.  I've looked at an accidental markup database

22   called source code card on all of them.

23   Q.    It's your testimony, sir, that you've reviewed source

24   code for Expert Advisor?

25   A.    I don't remember if Expert Advisor is one of the ones

1        that I've seen Excel documents or databases for.  I don't

2        recall.

3        Q.    Is it your testimony that you reviewed source code for

4        any of the accused Cisco products in this case?

5        A.    I have reviewed XML data or database codes, which is a

6        from source code for some of the products, yes.

7        Q.    Which products, Dr. Nourbakhsh?

8        A.    That's what I can't recall.

9        Q.    Have you talked about -- strike that.

10              Did do any analysis with regards to any of the

11       customer deployments of Expert Advisor?

12       A.    I -- let's think about that.  Let me refer to my first

13       expert report.

14       Q.    Sure.  It's tab 1 in the binder I just handed you, Dr.

15       Nourbakhsh, or you can refer to your other copy.

16       A.    That's fine.

17              So you want to know whether I analyzed customer

18       implementation of Expert Advisor?

19       Q.    Yes.

20              (Pause.)

21              THE WITNESS:  I looked at industry specific

22       applications with Expert Advisor for retail and retail

23       banking, but not a particular customer, no.

24       BY MR. SCHUMAN:

25       Q.    Do you know who any of the customers for Expert

Nourbakhsh - cross

```
1    Advisor are, Dr. Nourbakhsh?

2    A.    Not offhand, no.

3    Q.    Do you know if they're in the United States or if

4    they're outside of the United States?

5    A.    I don't know the answer to that.

6    Q.    You've also offered the opinion, Dr. Nourbakhsh, that

7    Cisco's Virtual Expert Management product infringes both of

8    XU's asserted patents and also misappropriates XU's trade

9    secrets; is that correct?

10   A.    Correct.  Again, my recollection is that it is a very

11   vague set of the trade secrets.

12   Q.    Have you ever used Virtual Expert Management, Dr.

13   Nourbakhsh?

14   A.    No.

15   Q.    Have you ever inspect a copy of Virtual Expert

16   Management, Dr. Nourbakhsh?

17   A.    I have not.

18   Q.    Do you know whether a working copy of Virtual Expert

19   Management ever existed?

20   A.    I would have to review all of the literature that I

21   read from Cisco.  The roadmaps that I saw, depending on how

22   you are going to carefully define the word working copy,

23   indicate existing versions of it created for specific

24   industry verticals.  So that leads me to believe that there

25   were working copies of it, absolutely.
```

Nourbakhsh - cross

1    Q.    But you've never inspected a working copy; is that

2    correct?

3    A.    Correct.

4    Q.    Did you ever examine source code for Virtual Expert

5    Management, Dr. Nourbakhsh?

6    A.    That's the same answer to your prior question.  I

7    don't recall which of the products I looked at the Excel

8    market language for, the database calls and the source code

9    for.

10   Q.    Did you analyze any customer deployments or uses of

11   the Cisco Virtual Expert Management product?

12   A.    I think the same answer I gave before.  I looked at

13   the specific verticals, which is retail and retail banking.

14   I did not look at a single expert on it.

15   Q.    I take it, Dr. Nourbakhsh, you also have the opinion

16   that Cisco's RemoteXpert product infringes XU's '903

17   patent and also misappropriates its trade secrets; is that

18   correct?

19   A.    That's correct.  Again, we have to look at the

20   documentation to see which trade secrets I have the opinion

21   it supports.

22   Q.    Have you ever used RemoteXpert, Dr. Nourbakhsh?

23   A.    No.

24   Q.    Have you ever inspected a working copy of RemoteXpert,

25   Dr. Nourbakhsh?

Nourbakhsh - cross

1    A.    I've witnessed working copies on Internet videos, but

2    I have not witnessed it in person, no.

3    Q.    You are referring to Internet video demonstrations?

4    A.    I'm referring to videos played on the computer.

5    Q.    Things that you can download from the Internet?

6    A.    Correct.

7    Q.    The You Tube video, for example?

8    A.    That's an example.

9    Q.    Would you consider that a working copy of the

10   product?

11   A.    Would I consider the video a working copy?  No.  The

12   video is a representation of somebody using the product.

13   Q.    Thank you.

14         Did you ever examine any source code for

15   RemoteXpert, Dr. Nourbakhsh?

16   A.    The same question that I answered before.  I have to

17   look at the source documentation to remember which products

18   I looked at the database and calls for.

19   Q.    You don't have the specific recollection as you sit

20   here today of reviewing source code for RemoteXpert, do

21   you?

22   A.    Actually, RemoteXpert is one of the products where I

23   definitely did look at the database calls, because it was

24   in looking at the database calls that I reached my

25   conclusions.

```
 1    Q.    And it's your testimony that the database calls

 2    in the user manuals you reviewed for RemoteXpert is source

 3    code?

 4    A.    Absolutely, yes.

 5    Q.    Did you perform any analysis of any customer

 6    deployments of RemoteXpert during the course of your work on

 7    this case?

 8    A.    Once again, I'm aware of customer deployments, but I

 9    didn't analyze customer deployments to understand whether

10    the infringement was --

11    Q.    Did you do any analysis of the deployment of

12    RemoteXpert at Home Depot during the course of your work on

13    this case?

14    A.    I did analysis in the cognitive sense I took into

15    consideration that that is one of the deployments of the

16    product, yes.

17    Q.    And what documents did you review to inform yourself

18    regarding how Home Depot is using Cisco's RemoteXpert

19    product?

20    A.    I can't recall, but I believe there were slides sent

21    from Cisco that I reviewed that mentioned it and talked

22    about it.  The slide sets, I think that was the principal

23    way I saw it in presentations made within Cisco.

24    Q.    Did you see anything in those documents you just

25    referred to that indicate that Home Depot has deployed
```

1    RemoteXpert in a way that supports multi-lingual support to

2    users of that product?

3    A.   I didn't see the specificity in the documents that

4    would lead me to understand which language it uses in

5    general, but I'm aware of Home Depot's operations in the

6    country and understand the language and support in general,

7    sure.

8    Q.   You've also offered the opinion that Cisco's Pulse

9    product infringes XU's '709 patent and also misappropriates

10   XU's trade secrets; is that correct?

11   A.   Again, the subject of trade secrets, I don't remember

12   my conclusion on the '903 product.  We would have to look

13   for the sheets on that as well.

14   Q.   At a minimum, you've offered the opinion that Pulse

15   infringes the '709 patent and an also misappropriates some

16   subset of XU's trade secret?

17   A.   I want to be absolutely sure that if I say yes, that's

18   true, so let's just really quickly check what I said about

19   Pulse.

20            The Pulse agreement, I start on paragraph 177.

21   It's the '903 patent and the '709 and a number of trade

22   secrets, yes.

23   Q.   I will just represent to you that Pulse is no longer

24   accused of infringing the '903 patent.  So my question was,

25   do I have it correct, you hold the opinion that Pulse

1    infringes the '709 patent as well as misappropriates some

2    subset of XU's trade secrets?

3    A.    That's correct.

4    Q.    Have you ever used Pulse, Dr. Nourbakhsh?

5    A.    I have not.

6    Q.    Have you ever inspected a working copy of Pulse?

7    A.    I believe no.

8    Q.    Do you know who the customers are for Pulse?

9    A.    Not without research.

10   Q.    So I take it from that answer, then, that you've never

11   performed any analysis of how any customer is actually using

12   the Pulse product.  Is that a fair understanding?

13   A.    I think the fair understanding is that my

14   understanding of how customers would use Pulse is based on

15   the documentation I've read.

16   Q.    And that's it; right?

17   A.    Not based on talking to a customer.

18   Q.    Did you review any source code for Cisco's Pulse

19   product, Dr. Nourbakhsh?

20   A.    It's the same answer I gave to the prior question

21   about source code.  I do remember what expert XML calls, but

22   I don't remember for Pulse whether I looked at the source

23   code that ended up being relevant or not.

24   Q.    What is a user guide, Dr. Nourbakhsh, in the context

25   of software?

1    A.    It's something that helps the end user understand how

2    to use the product.

3    Q.    And what is an admin guide or administrators guide?

4    A.    It's something that helps the, I hate to use the same

5    word again, that people that are configuring the product for

6    the use of the end user understand how to configure it

7    properly for use.

8    Q.    And do you know whether Cisco created user guides and

9    admin guides for its Pulse product?

10   A.    Yes, it did.

11   Q.    And in the course of developing your opinions in this

12   case, did you review the user guide and the admin guide for

13   Pulse?

14   A.    I reviewed them after we had this same conversation at

15   a deposition, because you reminded me that I had looked at

16   them when I looked at the deposition of, I believe it was

17   Mr. Ganew (phonetic) maybe, because they were exhibits to

18   that and I had forgotten about them until you placed them in

19   front of me.

20   Q.    So it's your testimony, then, today, Dr. Nourbakhsh,

21   that you had, in fact, reviewed the user guide and the

22   admin guide for Pulse prior to forming your opinions about

23   Pulse?

24   A.    No.  I formed opinions about Pulse, and then I

25   reviewed the deposition of Mr. Ganew and saw the attachments

Nourbakhsh - cross

1    and reviewed them and they didn't change my opinion that I

2    already formed about Pulse.

3    Q.    Your testimony here today is you reviewed the user

4    guide and admin guide for Pulse prior to your deposition?

5    A.    I looked at them prior to my deposition.  I reviewed

6    them more carefully following my deposition after we had the

7    same discussion.

8    Q.    Let's listen to a portion of your deposition expert

9    where we had this discussion.

10            (Deposition excerpt played as follows.)

11            "Question:  Did you review, Dr Nourbakhsh,

12        either the published user guide or the published admin

13        guide for Pulse in connection with your analysis of

14        the Pulse product?

15            "Answer:  In the beginning of the section,

16        I lift all of the documents that I reviewed.  Shall we

17        review that?

18            "Question:  Whatever helps you answer my

19        question.

20            "Answer:  What are the two types of

21        documents you're looking for?

22            "Question:  The published user guide and the

23        published admin guide for Pulse.

24            "Answer:  No.

25            "Question:  Why not?

Nourbakhsh - cross

1          "Mr. Stein:  Objection.

2          "Answer:  I reviewed everything that I was

3      able to identify in the boxes of documents sent over.

4      So this paragraph represents everything that I

5      reviewed.

6              "My proposition for why I wouldn't have

7      reviewed a document that sounds relevant is that it

8      wasn't in the boxes that I went through.

9          "Mr. Schuman:  You can you mark that as the next

10     exhibit, please.

11         "Mr. Steinhoff:  Is this the Bates number?

12         "Mr. Schuman:  This particular document does

13     not.  I will represent to you this particular document

14     was produced.

15         (Whereupon Deposition Exhibit No. 327 was marked

16  for identification.)

17         "Mr. Schuman:  I will just represent on the

18     record that this document is publicly available on

19     Cisco's website.

20         "By Mr. Schuman:

21         "Question:  So, Dr. Nourbakhsh, turn for me,

22     please, to page 2-5.  Do you see at the bottom of 2-5

23     it says Pulse locator search interface?

24         "Answer:  Yes.

25         "Question:  It says the Pulse locator search

1           interface appears in all pages of the Cisco Pulse

2           graphical user interface.  Figure 2-5 shows this

3           interface in the home page.  And then if you turn to

4           the next page, do you see figure 2-5?

5               "Answer:  Yes.

6               "Question:  Do you recall seeing that figure in

7           Dr. Forys' rebuttal report?

8               "Answer:  I don't recall if I saw an exact

9           duplicate, but it looks familiar, yes.

10              "Question:  Identify for me, please, the inquiry

11          criteria that are depicted on this figure 2-5.

12              "Mr. Steinhoff:  Objection.

13              "Answer:  To identify inquiry criteria and

14          values on this page, I need to do a contextual

15          understanding of this document that I'm seeing for the

16           first time right now.  I have to understand the

17          document so that I can then consistently apply my

18          interpretation of the patent to it."

19              (End of deposition excerpt.)

20  BY MR. SCHUMAN:

21  Q.   Dr. Nourbakhsh, you also have offered the opinion in

22  this case that Cisco's Quad product misappropriates some

23  subset of XU's trade secrets; is that correct?

24  A.   That's correct.

25  Q.   Have you ever used Quad?

1    A.    No.

2    Q.    Have you ever inspected a working copy of Quad?

3    A.    No.

4    Q.    Have you ever examined the source code for Quad?

5    A.    Same answer as before.  It depends on what pieces of

6    source code I've used in my various documents by Cisco.

7    Q.    Have you done any examination of any customer

8    deployments of Cisco's Quad product?

9    A.    Let me remind myself of the document I looked at on

10   Quad and see if I talked about this.

11          (Pause.)

12          THE WITNESS:  I would have to look -- there's

13   one document I looked at, which is the case study

14   collateral.  I would have to look at that in detail to see

15   if that's a specific case study or vertical case study.

16   BY MR. SCHUMAN:

17   Q.    As you sit here today, Dr. Nourbakhsh, do you have a

18   specific recollection of who the Quad customers are?

19   A.    No.  Without looking at my writing, I don't have a

20   recollection of the names of customers.

21   Q.    You also offered the opinion, Dr. Nourbakhsh, that

22   Cisco's SOAR program misappropriates XU's trade secrets;

23   right?

24   A.    That's correct.

25   Q.    Have you ever used SOAR?

Nourbakhsh - cross

1    A.    No.

2    Q.    Have you ever inspected a working copy of SOAR?

3    A.    No.

4    Q.    Have you ever examined any source code for SOAR?

5    A.    Same answer that I've given before to that same

6    question on the other products.

7    Q.    Is it a fair summary of your testimony that your

8    analysis of the accused Cisco products is based on the

9    documents in those boxes that were provided to you by XU's

10   counsel in this case?

11   A.    Partial.  Not a fair exhaustive summary.  It's based

12   on the boxes and based on my prior knowledge about what

13   existed, and that prior knowledge helps me to take the

14   documents and the boxes and use them to formulate an

15   understanding of how the Cisco products work.

16   Q.    Fair enough.

17         Dr Nourbakhsh, I didn't mean to suggest that you

18   didn't bring your expertise to bear on it, but with respect

19   to specifically how the Cisco accused products operate, do

20   we agree that your understanding of those products was based

21   exclusively on the materials in those boxes that you

22   received from Stroock?

23   A.    That's correct.

24   Q.    During Mr. Sobel's examination, do you recall some

25   questions regarding a Genesys product called Expert Contact?

Nourbakhsh - cross

1    Do you remember that?

2    A.    I do.

3    Q.    I think you testified that that was one of the other

4    technologies you looked at in connection with your work in

5    this case; right?

6    A.    I think the question was did I consider other

7    products, and I said that Expert Contact is a product that I

8    considered by reading the transcript of an interview with, I

9    think Dr. -- Mr. Barton.

10   Q.    Have you ever used Expert Contact, Dr. Nourbakhsh?

11   A.    No.

12   Q.    Did you review any code for Expert Contact in

13   connection with your work in this case?

14   A.    No.

15   Q.    Did you review any of the published user guides or

16   other manuals regarding Genesys' Expert Contact product in

17   connection with your work in this case?

18   A.    I may have when I looked at the original Forys

19   report or rebuttal report.  One of the tricky issues here

20   is I looked carefully at all the exhibits Forys and

21   Chatterjee provided, and to try to lend support to their

22   arguments about why, for instance, Expert Contact might

23   include trade secrets, they sometimes included these

24   documents.

25              So I'd be remiss in saying no, no I didn't

Nourbakhsh - cross

1    review them directly, but I read those reports and reviewed

2    all of the exhibits in those reports, and in so doing may

3    have seen the kind of documents you're talking about.

4    Q.    Let's focus just on your opinions, your affirmative

5    infringement and misappropriation opinions as expressed in

6    your opening expert report.

7          We agree that you address Genesys' Expert

8    Contact product in that report; right?

9    A.    Yes.  It talks specifically about Mr. Barton's

10   transcript vis-a-vis Expert Contact in that report.

11   Q.    And your opinion that you express in your report,

12   paragraph 55, is that Genesys' Expert Contact technology

13   had shortcomings that are overcome by XU's technology;

14   right?

15   A.    The first line is that it had limitations and

16   shortcomings that caused it to be an incomplete solution for

17   the contact center space, which does not have anything to do

18   with XU in particular.

19          Then I think I present five limitations to which

20   Dr. Forys responded.

21   Q.    And those opinions in paragraph 55, those were

22   formed based on your analysis of Mr. Barton's deposition

23   testimony?

24   A.    That's correct.

25   Q.    And those opinions were not based on any analysis of

```
 1     any of the published documents or other materials regarding

 2     Expert Contact; is that correct?

 3     A.    When I read Mr. Barton's deposition, which was

 4     thorough precisely because he was in charge of the

 5     end-of-life process for the product, had I felt like I

 6     needed more information, I would have looked at it.  I

 7     certainly felt I understood enough about the product to come

 8     up with these specific conclusions about what it was

 9     missing.

10     Q.    Based solely on your review of his deposition

11     testimony; is that correct?

12     A.    That's correct.

13     Q.    In your -- in your report, Dr. Nourbakhsh, and also in

14     the examination by Mr. Sobel, do you recall some discussion

15     of something called K-World; right?

16     A.    That's right.

17     Q.    And you compared K-World to some of XpertUniverse's

18     trade secrets and the asserted patents in this case in your

19     report; right?

20     A.    I think "compare" is a strong world.  I don't compare

21     K-World to the trade secrets.  I compare it to the problem

22     that was facing contact centers in this case, the idea of

23     connecting to anywhere.

24     Q.    Other than your conversations with Mr. Mike Turillo,

25     did you do anything to for yourself regarding what K-World
```

Nourbakhsh - cross

1    was?

2    A.    No, and the reasons for that are the same as I

3    provided in the case of Expert Contact.  He was able to

4    provide his technical details with me on my interview with

5    him and using managerial guidance to me.  So I felt like I

6    had everything I needed to understand those limitations.

7    Q.    So therefore your opinions as expressed in your report

8    regarding K-World were based on your expertise as well as

9    your conversation with Mr. Turillo; is that right?

10   A.    That's correct.

11   Q.    And during the course of forming the opinions you

12   express in your report regarding K-World, you did not review

13   any documents regarding K-World; is that right?

14   A.    I don't recall doing so, no.

15   Q.    Did you take any notes during your conversation with

16   Mr. Turillo, Dr. Nourbakhsh?

17   A.    Yes.

18   Q.    Do you still have those notes?

19   A.    I don't know.  They would have been in a flat text

20   file.  That's usually how I take notes on my computer.

21   Q.    Other than your consideration of K-World and

22   Expert Contact, you didn't analyze XU's technology for its

23   trade secrets in light of any other specific products, did

24   you?

25   A.    I analyzed XU's technologies in light of every product

1     that I was aware of in the early 2000s.  I didn't do it with

2     respect to one particular products, but rather to the

3     experience and knowledge I had about what was state of the

4     art in the time in question.

5              I also analyzed it in view of the products,

6     large number of which were presented after that first report

7     by Mr. Forys.

8     Q.    So, Dr. Nourbakhsh, in your binder -- in your binder,

9     Dr. Nourbakhsh, at tab 3 is your deposition transcript.

10    Turn for me, please, to page 207.

11    A.    Tab 3?

12    Q.    Tab 3.

13    A.    Okay.  I'm on 207.

14    Q.    Starting at line 2, I asked you the same question at

15    your deposition:

16             "And that's your opinion -- your opinion, but my

17    question was specific.  Did you perform any specific

18    analysis of these trade secrets in relation to any other

19    specific products other than K-World and Genesys Expert

20    Contact?

21             No."

22             Dr. Nourbakhsh, you would agree with me that a

23    number of the patent claims in this case that you believe

24    are infringed by the Cisco accused products are method

25    claims; right?

Nourbakhsh - cross

1    A.    They're of multiple types, correct, and some of them

2    are method claims, yes.

3    Q.    And you're aware that in order to infringe a method

4    claim, each step of the claim must be practiced in the

5    United States; is that right?

6    A.    I understand that, yes.

7    Q.    You understand that if a product had never been used

8    in a way that meets all of the elements of a method claim,

9    the method claim is not infringed; right?

10   A.    I understand that, yes.

11   Q.    Let's talk about Pulse.  It's your opinion, Dr.

12   Nourbakhsh, that Cisco's Pulse product infringes claims 1

13   through 3 and 5 of the XU '709 patent; is that right?

14   A.    Let's go to Pulse and the documents, if I may.  Do you

15   have paragraph numbers I should go to or should I just find

16   it?

17   Q.    I believe my question was just asking you if it's your

18   opinion that Cisco's Pulse product infringes claims 1

19   through 3 and 5 of the '709 product.  That's your opinion;

20   right?

21   A.    I understand the question.  You are giving me specific

22   numbers and my recollection isn't good enough to know the

23   precise numbers of all the claims for all the products, so I

24   have to go and check if you want me to validate and verify

25   what I wrote and believe.

Nourbakhsh - cross

1    Q.    Go ahead.

2    A.    Thank you.

3          (Pause.)

4          THE WITNESS:  And I apologize.  Remind me if you

5    are talking about the '903 patent or '703 patent.

6    BY MR. SCHUMAN:

7    Q.    I'm asking about your opinion regarding the alleged

8    infringement of the '709 product by Cisco's Pulse product.

9    A.    '709.  Very well.

10         So claim 1, yes, I do, have an opinion for claim

11   1, that's correct.

12         Yes, claim 3 is the next one that I have an

13   opinion on, and then claim 5.  1, 3 and 5.

14   Q.    And claim 1 is an independent claim; right?

15   A.    It was an independent claim, yes.

16   Q.    And claim 5 is an independent claim; right?

17   A.    Correct.

18   Q.    And the other claims that you just mentioned are

19   dependent claims; right?

20   A.    Claim 3 is a dependent claim, yes.

21   Q.    Dr. Nourbakhsh, and it's your opinion that Cisco's

22   Pulse product meets all of the elements of claim 1 and claim

23   5 of the '709 patent; right?

24   A.    My opinion is that Pulse literally infringes on claims

25   1, 3 and 5, yes.

1    Q.    And so the second to last element, Dr. Nourbakhsh, of

2    claim 1 of the '709 patent is designating a parameter that

3    indicates a source from which inquiry criteria values are

4    received; right?

5    A.    That's correct.

6    Q.    And it's your opinion that that element is found in

7    Cisco Pulse because of the block diagram you found in the

8    document entitled query engine; right?

9    A.    In the paragraph, I identified the federator and the

10   index management system as items in the system that together

11   point to the inquiry criteria values, yes.

12   Q.    But the only document -- and those are found in the

13   query engine document; right, Dr. Nourbakhsh?

14   A.    That is the reference that I used for that, yes.

15   Q.    And have you since seen, since you formed these

16   opinions, Dr. Nourbakhsh, the declaration of Mr. Sateesh

17   Gaddam from Cisco?

18   A.    Yes.  He explained that the query engine as written in

19   the document was not implemented, that rather the thing that

20   was implemented in its lieu has but one index.

21   Q.    So you would agree with me, then, that the document

22   you cite here in Exhibit 205 was a document generated during

23   the course of the development process of the product; is

24   that right?

25   A.    I think the likeliest explanation for that disconnect

Nourbakhsh - cross

1    is that this document doesn't reflect the exact way the

2    query engine was designed for some specific version of the

3    query engine that the gentleman is speaking of, yes.  It was

4    a mismatch.  Whether that means some version of Pulse had

5    multiple indices versus one indices, I don't know.  What I

6    do know is that it doesn't matter whether you have one

7    indices or multiple indices.

8                So when I saw his comment, that did not strike

9    me as something that ruins the case that I'm making for this

10   element.

11   Q.   The fact that the document that you rely on as the

12   basis for your opinion as to this element does not reflect

13   the final product does not change your opinion regarding

14   infringement.

15               Is that your testimony, Dr. Nourbakhsh?

16   A.   My testimony is that his specific testimony in saying

17   it didn't have multiple indices explicitly is opening the

18   door for the notion that it had one index.  And whether you

19   have multiple indices or one index, the fact of the matter

20   is, if you are going to point to inquiry criteria values in

21   a database system, you have a pointer, and that pointer has

22   to reside somewhere.

23               I was identifying the federator because that was

24   an obvious place where there is clearly an index to that

25   pointer.

Nourbakhsh - cross

1    Q.    And you found the federator that you are referring to

2    in that testimony in the query engine document that you cite

3    in paragraph 205 of your report; is that right?

4    A.    That's correct.

5    Q.    Let's talk about RemoteXpert.

6          It's your opinion that RemoteXpert infringes

7    XU's asserted '903 patent; right?

8    A.    That's correct.

9    Q.    And it's your opinion that -- let's put some claim

10   language up on the screen.  This might be easier for

11   everyone.

12         I have up on the screen, Dr. Nourbakhsh, a

13   portion of the language of claim 1 of the '903 patent.

14         You would agree with me that the first element

15   after the preamble, providing an inquiry-type computer

16   database populated with a first layer of predetermined

17   semantically expressed inquiry types organized from an

18   underlying plurality of criteria groupings that are humanly

19   understandable descriptors is one of the elements of novelty

20   of this patent, in your opinion.

21                Right?

22   A.    That's correct.

23   Q.    And in your opinion expressed in your report, you

24   identified something called expert types from an expert type

25   table as the inquiry types; right?

Nourbakhsh - cross

1    A.    Yes.  If I recall, there's a Rev ED table in the Rev

2    database.  Skill and expert types.  And I was able to show

3    that expertise skills and expert types, if I recall

4    correctly, actually represent underlying criteria and layers

5    of inquiry.

6    Q.    And I think you just mentioned this, but you would

7    agree with me that we have to identify in order to find

8    literal infringement both something called inquiry types as

9    well as an underlying plurality of criteria groupings;

10   right?

11   A.    Absolutely.  What yu have to do with the novelty of

12   the patent and the way RemoteXpert does it, you have an

13   underlying structure of inquiry.  I can't remember if it's

14   expertise skills or expert types of underlying foundation.

15   And then the other one is easier to change and it points to

16   it so that you have flexibility at the high level.

17   Q.    RemoteXpert, what you have found in your opinion to

18   meet the limitation underlying plurality of criteria

19   groupings is what you called expertise skills; is that

20   right?

21   A.    I have to look, because it's easy to confuse the

22   expertise skills with expert types.

23   Q.    And --

24   A.    Let me take a look.

25   Q.    If you could take a look at paragraph 130 of your

1    report and if I've misled you, you can look wherever you'd

2    like.

3                (Pause.)

4                THE WITNESS:  Okay.  I think I've got it.

5                I think it was expert skills that are the

6    underlying criteria and I believe expert skills or expertise

7    skills, that's right, and expert types are a form of layers

8    of inquiry.

9                I realize it's odd because they use the word

10   "expert" in RemoteXpert to refer to something that really

11   should be called inquiry, but in looking at the code and how

12   the XML markup assigns values to the buttons in figure 22

13   and elsewhere, it becomes clear the word "expert" really

14   means inquiry in this case.

15   BY MR. SCHUMAN:

16   Q.    Right.  So in your opinion, the table you are looking

17   at, when it talks about expert types, in your opinion it is

18   really talking about what the patent calls inquiry types,

19   and when it talks about expertise, skills, in the

20   documentation you reviewed, that's actually the underlying

21   plurality of the criteria grouping in the patent?  Have I

22   got your opinion right?

23   A.    Well, each expertise skill is -- the way expertise

24   skills are laid out in the code, group of expertise skills

25   is a, yes, criteria grouping.  Underlying criteria grouping,

1      that's correct.

2   Q.    I'm sorry.  What code are you referring to in that

3   answer, Dr. Nourbakhsh?

4   A.    When I looked at the way that the buttons on the

5   screen are presented as an interface to the user, or

6   accessing information about what to present to the user,

7   presenting types of inquiries to the user to choose between,

8   that's the code that I'm talking about.

9   Q.    Oh, so you weren't talking about source code in your

10   prior answer?

11   A.    That is source code.

12   Q.    Your review of the -- the screen, the graphical user

13   interface?

14   A.    XML markup that commands the system to go to a

15   database and find values, paint buttons on the screen and

16   provide values in those buttons that are semantically

17   important.  That is actually source code.  That is code

18   that's going to tell you what to do.

19   Q.    Dr. Nourbakhsh, in paragraph 130 of your report for

20   the expertise skills that you identify as meeting the

21   limitation underlying plurality of criteria groupings, you

22   cite a document 382951.

23          Do you see that?

24   A.    Yes.

25   Q.    And you agree with me that that is the basis for your

1      finding expertise skills in RemoteXpert to meet this

2      limitation of the claim?

3      A.    That's a basis.  I don't recall without reviewing the

4      documents whether I had multiple documents relating to that

5      conclusion or not.

6      Q.    So, Dr. Nourbakhsh, in the binder I handed you is

7      actually the document that you cite there.  It's the, yes,

8      it's the big document in the front flap.

9      A.    The native data dump.

10     Q.    Right.  You call this a data dump in your report, is

11     that right, in paragraph 130?

12     A.    Yes.

13     Q.    Dr. Nourbakhsh, isn't this one of those customer

14     surveys that you were describing in your prior testimony

15     with Mr. Sobel?

16     A.    The providence of this is not something I can say with

17     certainty.  What I can say is that this is identifying

18     specific features that are solution requirements.

19            The topic says solution requirements.  A survey

20     is typically a form that a customer fills out.  A solution

21     requirement document is much later in the process.  It's at

22     the point where you're deciding what the functionality is

23     that you probably must have.  That's why it's a very useful

24     document to look at.

25     Q.    And you say much later in the process, Dr. Nourbakhsh,

Nourbakhsh - cross

```
1    Wouldn't you agree with me that a solutions requirements
2    document like this document we're looking at is created
3    prior to any architecting of the product?
4    A.    A solutions requirement document is absolutely a
5    living document.  Its initial creation dates can be early,
6    but it ends up having critical value throughout the software
7    processing and QA processing.  Even at QA, you use it to
8    check the functionality and the comments against the
9    functionality the software has for quality assurance, to
10   ensure that the right functions actually exist before you
11   send it out for customers to try.
12   Q.    You would agree with me, wouldn't you, that every
13   requirement listed in a customer survey document like this
14   does not get implemented in the final product?
15   A.    This is not a customer survey document.  Again, a
16   customer survey document is a -- either a form that a
17   customer is filling out or a report on a customer's survey
18   results.  This is a roll-up of all of the requirements,
19   functionality that the product is going to have.
20   Q.    Including the functionality identified in the document
21   as optional or highly desirable, is it your testimony that
22   all of the functionality identified as optional or highly
23   desirable would be necessarily implemented in the final
24   product?
25   A.    No, no, that's not my testimony.
```

Nourbakhsh - cross

1    Q.    And is it your testimony, Dr. Nourbakhsh, that all of

2    the functionality identified in this document was actually

3    implemented in the RemoteXpert product?

4    A.    No, that's not my testimony.

5    Q.    All right.  Dr. Nourbakhsh, in any of the documents

6    that you reviewed describing the final RemoteXpert product,

7    did you see any reference at all to this document, Cisco

8    382951?

9    A.    I didn't evaluate the amount of cross-indexing of

10   internal Cisco documents to one another.  I evaluated the

11   concepts in documents, where the final documents that I

12   looked at for, in this case, RemoteXpert indexing or linking

13   to the concept, the functions or features that are in this

14   document, yes, absolutely.

15   Q.    And you saw these specific expertise skills identified

16   in the final RemoteXpert products?

17   A.    I would have to look through the rest of my

18   RemoteXpert analysis to remind myself what database is

19   contained in the skills.  What I do recall is in the later

20   elements of this claim, that there's a place where we were

21   relate the expert skills, the actual expert skill sets to

22   these skills to the underlying criteria pretext.

23          So I believe elsewhere in this I did go through

24   the effort of understanding the relationship of expertise

25   skills to expert types, yes.

```
 1    Q.    In the second element in this claim, Dr. Nourbakhsh,

 2    associating in a database one or more other layers of

 3    inquiry types with the underlying criteria groupings, the

 4    one or more other layers of inquiry types having a

 5    one-to-one correspondence with the first layer of

 6    predetermined semantically expressed inquiry types.

 7              In your opinion, Dr. Nourbakhsh, that's another

 8    one of the elements of novelty of this patent; is that

 9    right?

10    A.    That's correct.

11    Q.    And it's your opinion, Dr. Nourbakhsh, that

12    RemoteXpert has multiple layers of inquiry types because it

13    provides multi-lingual support; right?

14    A.    Let me remind myself by looking at paragraph 131.

15    Excuse me.

16              (Pause.)

17              THE WITNESS:  Yes.

18    BY MR. SCHUMAN:

19    Q.    You would agree with me that there are multiple

20    different ways to implement multi-lingual support in a

21    software product?

22    A.    In different software products, yes.

23    Q.    And what specific documentation did you review in this

24    case, Dr. Nourbakhsh, to inform yourself as to how

25    RemoteXpert implements multi-lingual support?
```

Nourbakhsh - cross

1      A.     It's precisely what I wrote in 131.  The fact that I

2      understood the database architecture of RemoteXpert as I

3      have written here led me to understand that in the case of

4      RemoteXpert, in order to have multi-lingual support, that is

5      to say in order to be able to have different inquiry types

6      labeled in different languages, they needed to have in the

7      database different instances of what they call expert types.

8      Therefore, the way that they would have to implement it,

9      precisely because of the way of the buttons on the screen

10     and provide text for those buttons is one of the ways you

11     end up requiring different inquiry-type layers.

12     Q.     What RemoteXpert database did you analyze, Dr.

13     Nourbakhsh, in connection with your work in this case?

14     A.     I recall a table called RESC_DB, which is a database

15     table associated with one of the RemoteXpert databases.

16     Q.     Any other bases for your opinion, Dr. Nourbakhsh, that

17     RemoteXpert implements multi-lingual support with multiple

18     layers in an inquiry-type database?

19     A.     My basis for that is all the documents that I

20     reviewed that are listed in paragraph 128, which told me

21     what the database architectural format of RemoteXpert is,

22     and therefore how it needs to implement multi-lingual

23     support.

24     Q.     Claim 1 is a method claim.  Is that correct, Dr.

25     Nourbakhsh?

Nourbakhsh - cross

1    A.    Yes.   Correct.

2    Q.    And I think we covered this, but you're not aware of

3    any RemoteXpert customer actually using multi-lingual

4    support in its deployment of RemoteXpert, are you?

5    A.    I have every reason to presume that any company that

6    generally provides access to customers in multi-lingual

7    fashion will certainly do so when they are trying to connect

8    experts to customers.  They are not going to do a single

9    language in that one case.

10   Q.    Let's talk about Expert Advisor.  Your opinion is that

11   Expert Advisor infringes -- among your other opinions, you

12   hold the opinion that Expert Advisor infringes the asserted

13   claims of the '709 patent; is that correct?

14   A.    I'm just going to the Expert Advisor section.

15              (Pause.)

16              THE WITNESS:  All right.  I'm there.  '709

17   patent and '903 patent and number of trade secrets, yes.

18   BY MR. SCHUMAN:

19   Q.    Let's talk just a little bit about your opinion that

20   it infringes the '709 patent, Dr. Nourbakhsh.

21              Therefore, in your opinion, the Expert Advisor

22   product includes the claims interactive problem definition

23   page; is that right?

24   A.    Correct.

25   Q.    And you understand that the Court has construed the

1      term interactive problem definition page to be an

2      interactive graphical user interface; right?

3      A.     Correct.

4      Q.     And you've never tried to access Expert Advisor from

5      an interactive graphical user interface, have you?

6      A.     I've never tried to access Expert Advisor in any way

7      personally, but, rather, have read the UCC-UCCE

8      documentation and all the Virtual Expert Management

9      documentation, all of which makes use of Expert Advisor.

10     Q.     You mentioned Virtual Expert Management, Dr.

11     Nourbakhsh.

12            You understand that Cisco sold Expert Advisor

13     and Virtual Expert Management separately; right?

14     A.     I understand marketing.  However, for the purposes of

15     technically understanding products, I also understand that

16     it does not make technical sense for me to value them

17     separately when it's obvious from all the documentation

18     I've read that Virtual Expert Management's core engine is

19     Expert Advisor, just like Expert Advisor is a core part of

20     an enterprise.

21            You can't divorce these products from one

22     another.  And from a marketing point of view, you can talk

23     about how you sell them and what monikers they you use, but

24     as far as I'm concerned, I have to evaluate them together

25     because they form a cohesive functionality.

Nourbakhsh - cross

1    Q.    There were customers for Expert Advisor; right?

2    A.    I don't understand the question.

3    Q.    You're aware that there are customers for Cisco's

4    Expert Advisor product; right?

5    A.    Yes.

6    Q.    And there are no customers for Cisco's Virtual Expert

7    Management product; right?

8    A.    Again, to answer the territory of understanding and

9    defining the word "customer."  Whether something was piloted

10   and therefore it was never paid for or it was given to

11   somebody free as a bundle is irrelevant to my analysis of

12   the fact that it infringes in terms of functionality it has

13   and the way it is used.

14   Q.    Dr. Nourbakhsh, when we addressed this at your

15   deposition, this is Page 135 of your deposition transcript,

16   line 16.  You can turn to it.  It's Exhibit 3 in your

17   binder, at tab 3.

18   A.    Say it again, the page number and all of that.

19   Q.    Page 135, line 16.

20   A.    Yes.

21   Q.    I asked you:

22           "Are you aware that Expert Advisor was released

23   by Cisco and actually sold separately from Virtual Expert

24   Management?"

25           You said, "Yes."

Nourbakhsh - cross

1                And, Dr. Nourbakhsh, among the other documents

2      that you reviewed in this case, I think on your list

3      attached to your report, your opening report, was the

4      deposition of Cisco's Mike Lepore.

5                Do you remember reviewing his testimony?

6      A.    I do, yes.

7      Q.    And do you remember some testimony -- and who is

8      Mr. Lepore, if you remember, Dr. Nourbakhsh?

9      A.    I don't remember that.  I'm sorry.  I have to review

10     that to find out.

11     Q.    Mr. Lepore was Cisco's 30(b)(6) witness on Expert

12     Advisor and also one of the lead architects on Expert

13     Advisor.  And I would like to show you an excerpt from his

14     deposition testimony.

15               Dr. Nourbakhsh, when Mr. Lepore was deposed as a

16     30(b)(6) witness, he was asked by XU's counsel:

17               "So my question is, would the front end for a

18     system like this be limited to an IVR system?"

19               I want to just stop there.  What's your

20     understanding of an IVR system?

21     A.    It's an interactive voice routing system.  Push 1 for

22     sales, 2 for marketing, et cetera.

23     Q.    You would agree with me an IVR system is not an

24     interactive graphical user interface?

25     A.    Not by the definition of this Court for this

Nourbakhsh - cross

1    limitation, no.

2    Q.    Your interpretation of interactive graphical user

3    interface would include a telephone dial-up system?

4    A.    No.  I said no.

5    Q.    Okay.  So when Mr. Lepore was deposed, he was asked,

6    would the front end system like this be limited to an IVR

7    system?  There was some question and answer.  And then his

8    answer is:  The front end for Expert Advisor is limited not

9    only to IVR, it's limited to customer voice portal, I

10   believe.  We had a bunch of features that are not available

11   if you used a different IVR and I think we may have actually

12   restricted it only to CVP.

13        Did you review that testimony before offering

14   your opinion that Cisco's Expert Advisor product infringes

15   the limitation of the '709 patent, claim 1, requiring an

16   interactive graphical user interface?

17   A.    I reviewed this and I think I explicitly referred to

18   this in, I think in my rebuttal write-up, because I pointed

19   out that, in fact, he said this, and yet when I look at

20   Virtual Expert Management, it's very clear to me that

21   Virtual Expert Management bundles in a way that includes a

22   graphical interface.

23        And therefore I need to take all the documents I

24   have and make a decision, even though what he's saying is

25   inconsistent with the documents that show me that a PE

1     includes Expert Advisor.

2     Q.     How about for what's called the standalone version of

3     Expert Advisor, Dr. Nourbakhsh?  So those customers who

4     purchased Expert Advisor without Virtual Expert Management,

5     you would agree with me that an IVR system, the front end

6     for that deployment of Expert Advisor does not include an

7     interactive graphical user interface.

8              Would you agree with that?

9     A.     When I started the analysis in this case, I assumed

10    indeed what was being represented by Cisco, there was this

11    concept for the standalone advisor product, but the more

12    I've learned, the more I've seen thinks like contact center

13    enterprise, including bundling in Expert Advisor, the less

14    I'm willing to make a bet on the idea that Expert Advisor is

15    a standalone product per se.

16             I believe it's heavily bundled.  I believe it's

17    heavily bundled into UCCE, and therefore I'm of the opinion

18    that if we're going to see whether there is some animal

19    called Expert Advisor that never has a graphical user

20    interface, we're going to have to dig into whether UCCE ever

21    allows somebody to use Expert Advisor in a way where IVR is

22    the only interface in, and I'm doubtful that's the case.

23    It's highly unlikely.

24    Q.     Highly unlikely, but you have not actually done any

25    analysis of any of the actual customer deployments of Expert

1    Advisor, have you?

2    A.    That's correct.

3    Q.    I want to go back to Pulse for one minute, Dr.

4    Nourbakhsh.  We're going back to the '709 patent now.

5    That's your opinion that Pulse infringes the '709 patent.

6              We talked about the claim limitation for the

7    '709 patent earlier designating go a parameter that

8    indicates a source from which inquiry criteria values are

9    received.  I want to talk about a different one of the

10   limitations in the '709 patent, claim 1.

11   A.    Hold on one second while I get to Pulse.

12   Q.    Sure.

13   A.    So I can read the claim.

14   Q.    Sure.

15             (Pause.)

16             MR. SOBEL:  Your Honor, it seems like a lot of

17   the questions that are going on here really go to the weight

18   of testimony, talking about, you know, whether this is more

19   valuable than this piece and not really to the methodology

20   that Dr. Nourbakhsh used to determine infringement.

21             THE COURT:  All right.  Well, thank you.

22             THE WITNESS:  I'm getting there.  Okay.

23   BY MR. SCHUMAN:

24   Q.    Paragraph 201 of your report, Dr. Nourbakhsh.

25   A.    201.  Okay.  Ou said the '709 patent; correct?

Nourbakhsh - cross

1    Q.    Correct.

2    A.    All right.

3    Q.    So one of the elements, Dr. Nourbakhsh, that you

4    believe is met by the Cisco Pulse product is pre-selecting

5    prior to receiving an inquiry from a second member of the

6    organization the quantity of inquiry criteria and values in

7    accordance with a predetermined context.

8           And it's your opinion that that is one of the

9    elements of novelty of the '709 patent; right?

10   A.    Yes.  I remember that element as I read it.

11   Q.    And in paragraph 201 of your report, Dr. Nourbakhsh,

12   it's your opinion that that element is found in the black

13   list concept of Cisco Pulse; right?

14   A.    That's one of the ways it's found, yes.  I don't

15   remember if I mentioned this paragraph, the white list.

16   Yes, the black list is definitely an example where that's

17   found.

18   Q.    And you can take a look at paragraph 201 for me, Dr.

19   Nourbakhsh, and confirm that black list is the only list

20   referenced in paragraph 201 of your report.

21   A.    Actually, paragraph 201 says a typical example is

22   demonstrated with vocabulary builder, which is interesting

23   because vocabulary builder is basically making sure that

24   your vocabulary, just like we talked about trade secrets,

25   the vocabulary serves different people differently.  So

1    managers use different things from regular experts.

2              White list and black list are two ways of doing

3    that.  I believe if I recall correctly, Pulse also, when you

4    log in as a manager or a high level member of the

5    organization, you're going to get more access of vocabulary

6    than you would get, so the black list does not apply to you,

7    for example.

8    Q.    Can you just please explain for the Court what a black

9    list is.

10   A.    A black list is a selection of words that at the same

11   time says, don't show these words and therefore do show all

12   other words, for example.  For example, maybe at the VP

13   level, you have a top secret project with the property of

14   defense.  The VPs know about it and it's okay to talk about

15   military grade munitions.

16             If you those put military grade munitions on the

17   black list and explain you don't want level 1 experts to see

18   that word, then when seekers come in and try to connect to

19   experts, they're never going to get connected to somebody or

20   see words that relate to military grade munitions unless

21   they have the right authorization for that.

22             So black list helps discriminate what you do see

23   and you don't see.

24   Q.    And a white list, Dr. Nourbakhsh?

25   A.    Is the exact same thing, complementary, meaning that

1    you should definitely see.

2    Q.    We spoke over each other.  Say that again.  A white

3    list is?

4    A.    It's complementary to the black list.  It can be a

5    list of things that you definitely do want to see, for

6    instance.

7    Q.    So the black list terms are not displayed; is that

8    right?

9    A.    No.  The black list defines what is and isn't

10   displayed.  The black list terms are an identification of

11   the words, not the display.  The black list's purpose is to

12   decide what to display and not to display.

13   Q.    And you understand that black list functionality and

14   Pulse is optional functionality, don't you?

15   A.    I would have to review Pulse again, but the fact that

16   an administrator guide says you can create as many black

17   lists as you want means that they're going to use it in the

18   that way it's programmed for the industry.

19             Again, the part of this whole thing comes

20   because we're requesting organizational boundaries, and

21   therefore we're going to be in a situation where it's

22   exciting for a manager to have as many words as possible in

23   a system and be able to organize them so that the right

24   people can see the right words.

25   Q.    The Pulse administrator guide we talked about before,

Nourbakhsh - cross

1      this is one of those documents that may or may not have been

2      in the box of documents you received from Stroock.  This is

3      Exhibit 75 to the declaration in support of this motion

4      we're here about today.

5                  This is an excerpt from the Pulse user guide,

6      sorry, from the Pulse administrator guide.  While having a

7      Pulse vocabulary uploaded to the system upon deployment of

8      Cisco Pulse is mandatory, the creation of a restricted

9      vocabulary and the timing of its deployment are up to the

10     discretion of the organization.

11                 You agree that the restrictive vocabulary is the

12     black list?

13     A.    Yes.  Likely we're talking about the exact same

14     thing.

15     Q.    Right.  And so the Pulse Administrator Guide says the

16     restricted vocabulary or the black list is optional, I'm

17     sorry, discretionary with the organization that's deploying

18     Pulse; right?

19     A.    It has to be at the discretion of the organization

20     because the whole point is, the organization is going to

21     want to do all the firewall on its own.  It makes perfect

22     sense to say to the organization it's up to their discretion

23     to decide how to formulate the vocabulary.

24     Q.    And I may have asked you this earlier, but you have

25     not done any analysis of how any specific customer for Cisco

Nourbakhsh - cross

1      Pulse has deployed Pulse, have you?

2      A.    Again, I have to review the slide set from Cisco.  In

3      many of the slide sets that I reviewed from Cisco, they were

4      about convincing managers at Cisco why your product is a

5      good idea and should sell it.

6            In many other cases, the slides that I was

7      looking were evaluations of how it would be used by some

8      pilot, showing off how well it works and therefore how

9      valuable it is to the company.

10           I had to review slide sets I reviewed for Pulse

11     to see whether in this particular case Pulse is one of the

12     products I saw real customers being shown off as excellent

13     users.

14     Q.    Dr. Nourbakhsh, when I asked you this question at your

15     deposition, I said, do you know whether the black list is a

16     mandatory or optional functionality of Pulse?

17           You said, I do not know.

18           I said, do you know whether any user of the

19     Pulse product has used the black list functionality that you

20     identified of satisfying this element of the claim in your

21     report?

22           Answer:  I do not know.

23           Let's turn to the trade secret opinions.  I'm

24     almost out of time.

25           I just want to make sure one thing is clear.  I

1      think we've heard quite a bit about your mapping

2      methodology.  I just want to ask you the starting place for

3      that mapping exercise was the list of XU's trade secrets

4      that was provided to you by Stroock.  This is Daubert

5      Exhibit 4; right?

6      A.    That's correct.

7      Q.    Do you have Daubert Exhibit 4 in front of you?

8      A.    Yes.

9      Q.    Turn for me, please, to item No. 18.

10     A.    I'm there.

11     Q.    Do you see No. 18?

12     A.    I do.

13     Q.    Do you see there are some specific Bates numbered

14     documents identified there?

15     A.    I do.

16     Q.    And did you review any of those documents in the

17     course of your preparation of your opinions in this

18     case?

19     A.    I'd have to refer to my report to see if I -- if I

20     opined on trade secret 18 or not.

21     Q.    You would agree with me, Dr. Nourbakhsh, that if you

22     had, in fact, reviewed any of those documents identified by

23     Bates number in Item No. 18, they would then be identified

24     on your list of documents reviewed, I believe that's

25     Exhibit A, to your initial report and also another exhibit

1      to your rebuttal report?

2      A.    Yes.   I agree that if these are any of the documents

3      that I looked at and generate an opinion based on in my

4      report, I would reference them, correct.

5      Q.    And just so the record is clear, it's Exhibit A to

6      your opening report is your list of documents considered;

7      right?

8            And I'm not going to ask you, Dr. Nourbakhsh, to

9      take the time right now.   I will represent to you that none

10     of these Bates numbered documents are listed on Exhibit A

11     there, and I will further represent to you that they're not

12     listed on the similar exhibit to your rebuttal report.

13           So would it be fair to conclude, then, that none

14     of these specific documents were reviewed by you during the

15     course of your preparation of your misappropriation

16     opinions?

17     A.    The best way to answer that question, which obviously

18     I need the exercise, so to speak, is to look at the trade

19     secret rows that I have my call sheets.

20           If 18 is blank, then I didn't attempt to

21     validate or verify trade secret 18 in each of those

22     products.   If it isn't blank, then those specific documents

23     I did use in view of that.

24           What I can tell you is that when I went through

25     the boxes and boxes of Cisco, when I was reducing it to the

Nourbakhsh - cross

1       boxes that would be sent to me in Pittsburgh, there were a

2       number of documents that had different Bates numbers and

3       were the exact same document.  They were users guides like

4       that.  Of course, there are also documents that had

5       different Bates numbers that were different versions, but

6       there are also absolutely identical documents that had

7       different Bates numbers.

8               So I definitely cannot just agree that I never

9       looked at these documents without looking at the documents

10      because it's entirely conceivable that one, the ones I

11      referenced here are the same document, different Bates

12      number.  I saw that in the boxes that came over.

13      Q.    Your opening report, Dr. Nourbakhsh, Daubert

14      Exhibit 1, Exhibit A to that report, that's all the

15      documents that you reviewed in connection with the

16      formulation of the opinion in Daubert Exhibit A; right?

17      A.    Correct.

18      Q.    And I have the same question for you, Dr. Nourbakhsh,

19      regarding item number 33 on XU's trade secret list.  There

20      are some specific documents identified there by Bates

21      number.

22      A.    Yes.

23      Q.    And you would agree with me that if those specific

24      documents were reviewed by you in the course of your

25      formation of your misappropriation opinions, they would then

1     be identified on your list of documents considered Exhibit A

2     to your opening report, which is Daubert Exhibit 1?

3     A.    Or a document would be identified there that had a

4     different Bates number.  I'm just saying don't match on

5     Bates number, match on the content.

6              MR. SCHUMAN:  Your Honor, can I approach?

7              THE COURT:  Yes.

8              MR. SCHUMAN:  This is the same exact binder that

9     we used on Wednesday at the summary judgment hearing.  I

10    just want to show these documents to Dr. Nourbakhsh and

11    see if he has -- I want to show the documents to Dr.

12    Nourbakhsh.

13             THE COURT:  So maybe, I'm not sure XU brought

14    their copies with them.

15             MR. SCHUMAN:  I have a copy.

16             (Mr. Schuman handed binders to the Court and to

17    the witness.)

18             THE COURT:  I take it, Mr. Schuman, you're

19    almost done?

20             MR. SCHUMAN:  I am, your Honor.

21    BY MR. SCHUMAN:

22    Q.    Dr. Nourbakhsh, the first document in the binder I

23    just handed you, you recognize that document; right?

24    A.    This is the NDA, I believe.  Yes.  This is the NDA

25    between XU and Cisco Systems.

Nourbakhsh - cross

1    Q.    And you testified, you testified earlier that you

2    reviewed that document prior to preparing your opinions in

3    this case?

4    A.    That's correct.

5    Q.    Dr. Nourbakhsh, did you review any other NDAs between

6    XpertUniverse and any other company during the course of

7    your work on this case?

8    A.    I don't recall if I read any other NDAs.  I think it's

9    likely that this is the only NDA I looked at in detail

10    because I was curious about this NDAs contents.  I do recall

11    talking to both Mr. Fateman and Mr. Steinhoff about their

12    practices to see if they, in fact, ensured that everybody to

13    whom they provided information about it the signed an NDA

14    and they said yes.

15    Q.    But you -- the only NDA you actually reviewed in

16    connection with forming your opinions in this case is the

17    one in front of you now, the NDA between XU and Cisco;

18    right?

19    A.    This is the NDA that I reviewed in detail, yes.

20    Q.    And are you suggesting that you reviewed any other

21    NDAs between XpertUniverse and any other company in the

22    course of forming your opinions in this case?

23    A.    I'm suggesting that I may have seen other NDAs, but I

24    believe this is the only one I read in detail.

25    Q.    Dr. Nourbakhsh, when we took your deposition in this

Nourbakhsh - cross

1    case, I asked you about NDAs and I said -- this is at Page 2

2    '08, line 5:

3                "Did you review any other XpertUniverse" --

4    strike that.

5                "Did you review any other NDAs to which

6    XpertUniverse was a party other than the NDA between Cisco

7    and XpertUniverse?

8                "Answer:  I did not."

9                Dr. Nourbakhsh, we can skip tabs, the next two

10   tabs in this binder.

11               THE COURT:  I'm sorry.  He didn't respond to

12   your last question, I don't think.

13               THE WITNESS:  I'm sorry.  I think you're trying

14   to somehow trap me and it's not true.

15               What you just asked me was, did I review any

16   other NDAs, and I said this is the only one I looked at in

17   detail.

18               You said did you see any other NDAs, and I

19   said -- I said something very close to, this is the only one

20   I read in detail.  Then you read me back from my deposition

21   with you, this is the only one you looked at in detail?  I

22   said no, I didn't review any others.

23               If your intention is to show that I secretly

24   reviewed NDAs and then lied about it, I don't have any

25   reason to misrepresent my looking at NDAs.

1           The important point is, did XU take appropriate

2      measures to maintain and preserve the confidentiality of

3      their trade secrets which were their valuable, you know,

4      part of their set of products, the set to evaluate the

5      company, and I did what I needed to do to ensure myself

6      that that question would be asked before proceeding with the

7      case.

8      BY MR. SCHUMAN:

9      Q.   And I wasn't actually trying to suggest what you just

10     said.  I was just simply clarifying the record regarding

11     what NDAs you reviewed in connection with your work in this

12     case.

13           Dr. Nourbakhsh, there are some other documents

14     in this binder.  You can skip the next two.  Those are

15     contracts.

16           And I have the same question for you regarding

17     each of the remaining nine documents in this binder, which

18     is, did you review them in the course of your work in this

19     case?

20     A.   Can you give me a tab number to go to?

21     Q.   Sure.  Tab No. 23.

22     A.   The e-mail; right?

23     Q.   The document at tab 23.

24     A.   Oh, yes.  I do remember seeing this e-mail, yes.

25     Q.   And why is this e-mail not listed on Exhibit, on the

1    documents considered list in your reports?

2    A.    I don't know.  I remember this idea of somebody

3    writing to Ken and saying it was great meeting with you.

4    Q.    Okay.  And turn to the next one for me, Dr.

5    Nourbakhsh.

6    A.    26?

7    Q.    Yes, 26.  This document, Dr. Nourbakhsh, I'm going to

8    represent to you that none of these documents are identified

9    on either of your documents considered list.

10           Did you review the tab, the document at tab 26

11   in connection with your work in this case, your opinions in

12   this case?

13   A.    I remember it was a great meeting with you guys

14   yesterday text on the document under the prior tab.  I don't

15   remember the space Ken and Vinnie.  So it looks unlikely

16   that I reviewed this one.

17   Q.    Tab 27, Dr. Nourbakhsh, the same questions.  This

18   document is not listed on any of your documents considered

19   list.

20           Did you analyze this document in connection with

21   forming your opinions in this case?

22   A.    Are we talking about the e-mail or the attachment or

23   both together?

24   Q.    The whole document.

25   A.    Because in some cases the figures look familiar, but

1   the providence of the figures could be in other documents,

2   you understand.

3            I don't think I reviewed this precise e-mail

4   with the attachments as labeled tab 27, no.

5   Q.   How about the same question regarding the document at

6   31, tab 31?  Did you review the documents here in connection

7   with the forming of your opinions?  And I will represent to

8   you that this document is not listed on your documents

9   considered list either.

10  A.   This one looks familiar.  The architectural diagram

11  looks familiar, which the notes afterwards.

12  Q.   But if you actually considered it in forming your

13  opinions in this case, it would be listed on your documents

14  considered list; right?

15  A.   Yes.

16  Q.   And the same question regarding tab 32, Dr.

17  Nourbakhsh.  Did you review this document in connection

18  with forming your opinions in this case?  I will represent

19  to you that this is not on your documents considered list

20  either.

21  A.   No, I didn't review this one.

22  Q.   The same question regarding the next document, Dr.

23  Nourbakhsh, the one at tab 35.  I will represent to you this

24  document is not on your documents considered list.

25            Did you review and analyze this document in

Nourbakhsh - cross

1     connection with forming your opinions in this case?

2     A.    No.  This document does not look familiar.  Oh, yes,

3     it does, sorry.  I just went to the second page.  The e-mail

4     wasn't looking familiar, but product function overview

5     looked very familiar.

6             So I'm guessing at least terms of this document

7     are identified perhaps by some other Bates number in some

8     other documentation that I've seen.

9     Q.    How about tab 36, Dr. Nourbakhsh?  I will represent to

10    you this is another document that is not on your documents

11    considered list.

12            Did you review this document in connection with

13    forming your opinions in this case?

14    A.    I remember seeing the phrase "all documents are

15    covered under NDA."  I'm not sure it's this document or

16    another one.  And the reason I remember that phrase is

17    because it reminds me of how we did business and the idea

18    you have an NDA in place and from time to time you mention

19    the DNA.

20            So I don't know this document or another

21    document, but I do remember some document that I've seen

22    that mentions the NDA as this one does.

23    Q.    How about No. 39, Dr. Nourbakhsh?  This document is

24    another one that's not listed on any of your documents

25    considered list.

1           Do you recall reviewing this document in

2    connection with forming your opinions in this case?

3    A.    I don't recall seeing this document, no.

4    Q.    The last one, Dr. Nourbakhsh.

5           At tab 106, do you recall reviewing this

6    document in connection with forming your opinions in this

7    case?  I will represent to you that this is not on either of

8    your documents considered list.

9    A.    Is the last one is one page e-mail; is that correct?

10   Q.    One page e-mail, Dr. Nourbakhsh.  And your binder,

11   does your binder include the attachments?

12   A.    Oh, so the --

13   Q.    Yes.  That's the document, Dr. Nourbakhsh.

14   A.    Not the last page.  I see.  I see.  Let me take a

15   look.

16   Q.    My question to you, so the record is clear, my

17   question to you, the entire document, beginning at

18   Bates Number Cisco 307179, an e-mail with PowerPoint

19   attachments.

20          My question to you, my representation to you is

21   this document is not identified on your documents considered

22   list.  My question to you is whether you considered this

23   document in the course of forming your opinions in this

24   case.

25   A.    The slide set, in particular, the area on Bates

Nourbakhsh - cross

```
1    7181, prospects and the slide on Bates 7183 that talks

2    about Cisco/IBM banking refresh look familiar, so in some

3    slide set or presentation that I have reviewed, I have

4    seen these slides.  However, I'm not assured that I saw it

5    in this exact format as an e-mail attachment, in other

6    words.

7              MR. SCHUMAN:  Just one more minute, your Honor.

8              THE COURT:  All right.

9    BY MR. SCHUMAN:

10   Q.    Dr. Nourbakhsh, in the course of your work in this

11   case, you came up with a scale and purported to value

12   XpertUniverse's, the trade secrets list on the XpertUniverse

13   trade secret list?

14   A.    That's right.

15   Q.    And you communicated your valuing of those trade

16   secrets to XpertUniverse's other expert, Mr. Braddock;

17   right?

18   A.    Well, I communicated them to -- to counsel and they

19   passed it on to Braddock, I believe.  I think that's the way

20   it was used.

21   Q.    So did you -- you didn't actually communicate

22   directly with Mr. Braddock regarding your ranking of

23   the trade secrets, your valuations of the trade

24   secrets?

25   A.    I think I always endeavored to have my communication
```

1    be with counsel and then they act like a facilitator.  If I

2    got that wrong, then that's a surprise to me.

3    Q.    So turn, Dr. Nourbakhsh, in the big binder I gave you

4    when we started today, tab 8 is Mr. Braddock's report, the

5    big binder.

6    A.    I'm going there.

7    Q.    Okay.  Tab 8 is Mr. Braddock's report.  And if you go

8    all the way towards the end, just like your report, his

9    report has exhibits.

10   A.    Yes.

11   Q.    Exhibit 5?

12   A.    Yes.

13   Q.    Have you ever seen this document before, Exhibit 5 to

14   Mr. Braddock's report?

15   A.    I believe this is the same thing you showed me at

16   deposition, isn't it?

17   Q.    Was that the first time you ever saw the document?

18   A.    It's the first time that I saw this finished document,

19   yes.

20   Q.    Okay.  And the third column from the right, it says,

21   value allocation.

22          Do you see that?

23   A.    Yes.

24   Q.    And there's a footnote?  And if you go to the bottom

25   of the next page, the footnote says, value allocation was

Nourbakhsh - cross

1    provided by Illih R. Nourbakhsh, Ph.D.

2    A.    That's right.

3    Q.    So does this column accurately represent, Dr.

4    Nourbakhsh, the valuations that you came up with for

5    XpertUniverse's trade secrets?

6    A.    Yes.  Mr. Braddock and company asked for some way of

7    understanding trade secrets, and I decided to do that by

8    essentially rank ordering and storing the importance of the

9    trade secrets on a 0 to 10 scale, and I passed that on back.

10   And I believe they used that to construct this table.

11   Q.    Ten being the highest, of course, and zero being the

12   lowest?

13   A.    Yes.

14   Q.    And, Dr. Nourbakhsh, tell me in the court what your

15   valuation was for trade secret number 40.  Can you find that

16   on this document?

17   A.    It was nine.

18   Q.    Nine out of ten?

19   A.    That's correct.

20         MR. SCHUMAN:  I don't have any other questions

21   for Dr. Nourbakhsh.

22         Thank you, your Honor.

23         THE COURT:  Mr. Sobel, you have a few minutes to

24   address whatever you would like to address.  In fact, take

25   as much time as you need.

1          MR. SOBEL:  Okay.

2                     REDIRECT EXAMINATION

3     BY MR. SOBEL:

4     Q.    Dr Nourbakhsh, Mr. Schuman asked you a series of

5     questions about, I believe it went in this fashion.  Did

6     you inspect the final product of, for example, Expert

7     Advisor?  Did you inspect a working copy of Expert

8     Advisor?

9                     Did you use a copy of, a working copy of Expert

10    Advisor?  And he asked those same questions for several of

11    the products.

12                    Do you recall that?

13    A.    Oh, of course, yes.

14    Q.    Okay.  Are you aware that XpertUniverse asked Cisco

15    for copies of the accused products in this case?

16    A.    I dimly recall that, yes.

17    Q.    Are you aware that Cisco never produced working

18    copies, working copies of the accused products in this

19    case?

20    A.    I remember that conversation with counsel, yes.

21    Q.    And in that same fashion, that same series of

22    questions regarding each of the products, Mr. Schuman asked

23    you about customer deployments.

24                    Are you aware whether XpertUniverse asked for

25    information regarding customer deployments of Cisco and

1    Cisco did not produce it?

2    A.    Yes.  We had that discussion several times as well.

3    We wanted to know who was using it and had difficulty

4    getting that information, and that seems to be a constantly

5    changing story.

6    Q.    All right.  Now, let me ask you a question.  In your

7    expert opinion, is it necessary to use a product, working

8    copy of a product to render the opinion, the opinions that

9    you've given in this case?

10   A.    The opinions that I'm giving in this case need me to

11   understand the product.  The question is, how can you best

12   understand how the product works internally so you can match

13   it to things like trade secrets or patents.  It's a

14   diversity of documentation from the database e-mail to the

15   marketing requirement documents to the feature lists to the

16   actual architectural specifications to the user's manual, of

17   course, but much more importantly, the administration

18   manual.

19        No one product, documents, will tell you

20   everything about it because you have to pick and choose

21   everything you like about it.  Using a product can be

22   useful, but if you get to use a product and all you see is

23   the screen and you interact with the mouse, you certainly

24   won't know what the database is, you won't know what the

25   back end is like.

Nourbakhsh - redirect

1            Regardless of whether you use it or not, you

2    have to use the documentation, and use your documentation as

3    us clues to figure out how it actually works.

4            So I would have loved to have used the product.

5    However, I did the best research I did with the deposition I

6    had, and I didn't formulate an opinion on anything where I

7    didn't have enough information to know.  I looked for the

8    information I needed and then used what I had to write an

9    opinion.

10           So I got enough information from the documents

11   to understand in my head how the product works.

12   Q.    Okay.  And in your opinion, given your experience and

13   your knowledge and your expertise, is it reliable to rely on

14   documents that you considered in determining the

15   functionality for each of the accused products?

16   A.    Yes, absolutely.  It's a roadmap.  The whole point of

17   looking at intermediate stage documents like Expert, you

18   know, feature lists, is that you have to get into the brains

19   of the software engineers who made the product, and the

20   only way to get there is not just look at final

21   documentation.  Ideally, look at the roadmap of

22   documentation, understand how they thought it up, how they

23   sold it inside the company, what are the features they told

24   the company are valuable, because that gives you insight to

25   what the features are and whether they've talked about it,

Nourbakhsh - redirect

1      and then how they actually implemented it.

2               You have to look at everything over time to get

3      the best possible view of the product.

4      Q.    Now, Mr. Schuman suggested, I don't know if you caught

5      it, that perhaps the documents that you were given were

6      selected by Stroock and sent to you.  But can you clarify

7      for the record how you --

8      A.    Yes.  He said sent by Stroock twice and that's not

9      fair.  I -- I sat in the offices of Stroock and they brought

10     box upon box of everything they had collected from Cisco,

11     and it was a very large number of boxes.  I spent an entire

12     day doing just this and I went through everything, making

13     two piles, things that are relevant, things that are very

14     relevant.  Even things in the relevant pile I had 12

15     different versions of the same manual, six different Bates

16     numbers of the same object.

17              So I had to go through those and decide which

18     ones of them am I going to take with me.  All of those boxes

19     you shipped that to me in Pittsburgh.  I'm the one that made

20     the choices from the boxes that you had to what actually

21     went to Pittsburgh with me.

22     Q.    Okay.  Now, Mr. Schuman asked you some questions and I

23     think he showed you a videotape from your deposition about,

24     he was talking about the product Pulse and he was talking

25     about a user guide and administrative guide and we had some

Nourbakhsh - redirect

 1    back and forth there.

 2              I just want to clarify the record because he

 3    was -- he asked you a question, you know, whether you had

 4    reviewed this.

 5              And can you explain whether or not you -- well,

 6    let me ask you this.  At the time at the deposition, did you

 7    recognize the user guide and administrative guide that he

 8    put in front of you?

 9    A.    I didn't recognize them at the time of the deposition.

10    Mr. Schuman was presenting, he wasn't letting me look at my

11    write-up, so I couldn't refer to my write-up for the first

12    two depositions.  I was supposed to do it from memory.

13              He presented me with the document that had the

14    appendices in it but wouldn't let me look through it.  He

15    went through certain pages quickly.  I didn't have a chance

16    to recognize anything in terms of context, except when I

17    said let me look for context.  The truth of the matter as it

18    stands is that the Pulse opinion that I have depends on the

19    things that I referenced.

20              It is true that the exhibit on a separate

21    testimony that I looked at include the user's manual

22    guide.  It is true therefore that I saw it.  It's also

23    true that after the deposition I went back and realized,

24    my goodness, what he showed me was exactly what he was

25    asking me about.  And I read them carefully and I was happy

1    to see in reading them, it didn't change my opinion about

2    Pulse.  That's the end of the story in terms of those two

3    documents.

4              I then remind you that the user's guide and

5    administrative guide are important, but I have a very large

6    number of documents in my Pulse section that I refer to.

7    And there was enough documentation of a variety of kinds for

8    me to draw a reasonable conclusion.

9    Q.    And nothing in those guides contradicted anything

10   regarding your opinion; right?

11   A.    That's correct.

12            (Pause.)

13   BY MR. SOBEL:

14   Q.    Now, let me put in front of you a document that was

15   Bates labeled 382951, Spreadsheet.

16   A.    Yes.

17   Q.    And Mr. Schuman asked you quite lengthy questions

18   about this.  I just want to clarify the record.

19            This isn't the only document that you relied on

20   to form your opinion; right?

21   A.    Of course not.  It's one of many.

22   Q.    All right.  And before when you were talking about

23   what was the most important documentation regarding the

24   functionality of the product to determine the functionality,

25   did you have that documentation from RemoteXpert?

Nourbakhsh - redirect

1    A.    Yes.  I had everything that I needed from RemoteXpert.

2              If I recall correctly, RemoteXpert was a really

3    good one.  We had a whole list of documents that helped me

4    understand functionality.

5    Q.    I think you clarified this, but, you know, Mr. Schuman

6    was asking you questions about, and he showed you

7    Mr. Lepore's testimony, and -- well, let me ask.

8              All right.  And he said at the end of his

9    testimony, he said he had a bunch of features that are not

10   available to use the different IBR.  I think we may have

11   restricted it only to CVP.

12             Now, again, when you took that testimony into

13   account and comparing that with what you reviewed, did

14   you see anything in that testimony that changes your

15   opinion?

16   A.    I explicitly took that into account.  I even

17   referenced it in one of my remote reports.  It is a

18   troubling piece of testimony.  It suggests that a specific

19   kind of IBR was used as a divider.

20             My response is that there's a semantic game

21   going on here, that there's a way to thing about Expert

22   Advisor and the standalone thing with IBR only, but all the

23   documentation I saw from Expert Management and all the

24   documentation I've seen for UCCE, which is their backbone

25   product, suggests that Expert Advisor is built into it, part

1    and parcel with it.  So in my opinion, I have to discount

2    that testimony in light of everything else I saw leading me

3    to believe there's a graphical interface at the time of the

4    report for Expert Advisor in those cases.

5    Q.    Okay.  I will ask you a product of the limitation

6    patent, the unique numerical routing identifier.  Does using

7    a product establish whether or not it was using a unique

8    numerical routing identifier?

9    A.    I don't think I understand the question.

10   Q.    Okay.  Do you remember the line of testimony about the

11   unique routing identifier?

12   A.    Yes.  Okay.

13   Q.    My question is, does using the end product tell us

14   whether the end product uses a unique numerical routing

15   identifier?

16   A.    If a product is usable, it has to have some type of

17   identifier in the case of that particular element that you

18   are talking about.  The element requires a way for the

19   computer system to get to the inquiry types.  So that means

20   somewhere there has to be an index that points to the

21   inquiry types, balance of the inquiry types.  That's a fact

22   of matter in computer science.  You can't guess where it is.

23   You have to have a directory that tells you where to go.  In

24   that sense, any product that's usable has that.

25   Q.    And where would you look to determine whether that is

1     the case?  How do you determine that?

2     A.    I would look in database calls, in tables.  I would

3     look in -- in any markup language that's used when you're

4     presenting things to the screen because that's a nice place

5     where they have to go get the values to stick on the screen

6     for you.

7     Q.    And you don't need to use the product to determine

8     whether the product is using the unique numerical routing

9     identifier?

10    A.    I don't need to use the product.  I simply need access

11    to information about the product.

12    Q.    Okay.  Mr. Schuman asked you a bunch of questions when

13    he was going through the limitations.  I don't know if you

14    caught it, but he was asking you about limitation.

15          He said, is this a novel element.  And I just

16    wanted to -- when you were agreeing with him, were you

17    agreeing with him that that was an element of the

18    limitation, or were you making a separate opinion that just

19    that one element, you know, made the whole patent, the whole

20    claim novel?

21          THE COURT:  I don't think that was actually --

22    if that was in the question, it's irrelevant to me.

23          MR. SOBEL:  Okay.  I just wanted to make sure it

24    doesn't come back later.

25          (Pause.)

Nourbakhsh - redirect

1    BY MR. SOBEL:

2    Q.    I just wanted to also clarify for the record, do you

3    remember Mr. Schuman showing you some testimony from your

4    deposition?  It was in the context of Virtual Expert

5    Management and Expert Advisor, and he asked you -- he read

6    from your deposition.

7    A.    Yes.

8    Q.    He read a you a point on page 35, line 16.

9          Are you aware that Expert Advisor was released

10   by Cisco and actually sold separately from Virtual Expert

11   Management?

12         And then you said yes.

13         And then, you know, could you just explain, you

14   know, your understanding so that the record is clear on that

15   point?

16   A.    Yes.  Tell me the page number again so I can get to

17   it, please.

18   Q.    Page 135, line 16.

19   A.    I'm trying to figure out what tab to go to first.

20   Q.    Oh.

21   A.    There we go.  Page 135?

22   Q.    Yes.  My question is simply, is that consistent

23   with what your testimony was right before he read that to

24   you?

25   A.    Yes.  I'm -- I'm trying to be consistent.  It is the

Nourbakhsh - redirect

1    case that there was a thing by Cisco called Expert Advisor.

2    My concern is that I believe architecturally from what I've

3    seen about Virtual Expert Management and UCCE, that,

4    in fact, Expert Advisor is really part of a larger product.

5    And so one can say things like, oh, we don't sell it.  Maybe

6    it's okay to say that because you're not really selling it,

7    you're selling this other package that happens to include

8    Expert Advisor.

9              So I think it's a game of language.  Do I

10   believe that Expert Advisor and Virtual Experiment

11   Management are important in this case?  Yes.

12   Q.    Okay.  Just a final -- I just want to make clear

13   whether you felt that you had all of the information and

14   documentation necessary for you to, as an expert, render the

15   opinions that you did in your reports on product.

16   A.    Yes, but my reports are, as I said this before,

17   they're the opinions that I feel good about supporting and

18   believing in given all the documentation I had.

19             I didn't propose any opinions that I had factual

20   support for, therefore the opinion is wavering.  Those are

21   not the opinions I provided.

22             If you look in the Excel sheets, you'll see on

23   every single product, I didn't go through and say bang,

24   bang, bang, bang, every product is hitting every trade

25   secret.  It's real opinion.  I've actually gone and looked

1    for support on everything and I only rendered the opinion I

2    truly believed in.

3              MR. SOBEL:  Thank you, Dr Nourbakhsh.

4              THE COURT:  All right.  Thank you, Mr. Sobel.

5              Dr. Nourbakhsh, I just want to make sure that I

6    understand, which is, is it your opinion that Home Depot

7    uses RemoteXpert in such a way that Home Depot infringes

8    claim 1 of the '903 patent?

9              THE WITNESS:  Yes.  What they are doing causes

10   them to infringe it, yes.

11             THE COURT:  All right.  Okay.

12             All right.  Thank you.  You may step down.

13             THE WITNESS:  Thank you.

14             (Witness excused.)

15             THE COURT:  All right.  Why don't we do this.

16   Why don't I just hear, since it's your motion, Mr. Schuman,

17   do you want to spend three or four minutes and tell me what

18   you think you have proved here, if anything?

19             And then, Mr. Sobel, I will give you a chance to

20   respond to what he says.

21             MR. SCHUMAN:  I think what we established here,

22   your Honor, is far methodology, contrary to the objection we

23   heard.

24             With respect to the trade secret opinion, Dr.

25   Nourbakhsh started from what we have contended is an

1    improper list of concepts, high level concepts, and

2    purported to map them to documentation he received regarding

3    Cisco's products.  I will not repeat the argument we had the

4    other day regarding all the problems with the list, but

5    obviously the starting place from our perspective for that

6    entire analysis is improper.

7           There's one other very fundamental problem with

8    his mapping analysis, which I think was very clearly stated

9    today during the testimony.

10          Dr. Nourbakhsh is essentially claim charting

11   these trade secrets to the products.  There's a fundamental

12   difference here between patents and trade secrets.

13          Patents you can chart that way.  All you have to

14   do, as your Honor said the other day, is strict liability.

15   All you have to do is find those claim elements in the

16   patent claims in the products and you've got patent

17   infringement.  Not so for trade secrets.

18          Mapping or claim charting a language in a

19   document like XU's trade secret disclosure to functionality

20   you can find in the documents doesn't even get you to first

21   base for trade secret misappropriation because you have to

22   find evidence that the defendant actually used their, the

23   trade secrets in some way that violates the trade secret

24   statute.

25          THE COURT:  Well, maybe it doesn't get you to

Nourbakhsh - redirect

1    first base, but it gets you away from home plate, doesn't

2    it?

3                MR. SCHUMAN:  That's a little metaphysical for

4    me, but it might get you past home plate, but it doesn't

5    get you to first base, your Honor, because of the case

6    law we cited in our Daubert motion, including Agency

7    Solutions versus Trizetto Group, and Sovaco (phonetic)

8    versus Intel.

9                For purposes of California's trade secret law,

10   the mere fact that some product, accused product embodies a

11   trade secret, even if you accept the mapping analysis.

12               THE COURT:  But that's the thing.  That's the

13   reason why I say it gets you somewhere because if it

14   embodies the trade secret, then you get these other things

15   used, disclosed, whatever.

16               MR. SCHUMAN:  Right.  And this is briefed, but

17   did not come up during the testimony today that I

18   actually -- the deposition was clarification between mapping

19   and use.

20               And I asked Dr. Nourbakhsh at his deposition,

21   it's in the briefing, in all of your analysis of these

22   documents, from the initial development document to the end,

23   did you find any reference to any XpertUniverse documents?

24   And the answer was no.

25               And I think what we established here today also

Nourbakhsh - redirect

1    is that with respect to the nine documents that we, Cisco,

2    would agree were marked confidential and transmitted by XU

3    to Cisco, none of those documents are the basis for Dr.

4    Nourakhsh's opinions, and there is no evidence, your Honor,

5    that any of those documents or any of the confidential

6    information that might be embodied in those documents were

7    used in the development of any of these products.

8              That's my summation with respect to the trade

9    secret opinions.

10             With respect to the patent opinions, I think

11   there are a couple of problems.  I obviously think that the

12   level of analysis here, reviewing pieces -- I think actually

13   Dr. Nourbakhsh said it better than I could.  A diversity of

14   materials.

15             And what Dr. Nourbakhsh did is for certain

16   elements he would refer to -- let me take a half a step

17   back.  I think we all appreciate that the development of

18   software product can be a long process and different

19   documents are created along the way.

20             And every document that is created along the

21   way from that beginning customer survey that Dr. Nourbakhsh

22   referred to, whether we agree or disagree that the document

23   that I showed Dr. Nourbakhsh is such a customer survey,

24   we have at the front end of the development process a

25   set of expectations, what would we want this product to

1    include.

2              And then what the development process does is

3    they come up with something called a functional

4    specification, again, a high level description of what we

5    want this product to do.

6              And then the real work begins in terms of

7    reducing that to actual software, and anywhere along the

8    spectrum there ideas get raised and ideas get dropped out.

9    It's like making a movie, your Honor.  You shoot 200 hours

10   or more of film and most of it winds up on the cutting room

11   floor because the movie you wind up with has to be two

12   hours.

13             It's the same thing with a software development

14   process, your Honor, and the fundamental methodological

15   problem with Dr. Nourakhsh's analysis, and I think we've

16   established this, is that for at least one element, and I

17   think that's sufficient for purposes of our motion, but for

18   at least one element of each of these patent opinions, we've

19   identified some document that he relied on that does not

20   reflect the functionality of the final product.

21             He's not looking at the movie, which is the only

22   thing that can infringe -- you know, my metaphor breaks down

23   a little bit, but it's the final movie is the thing that is

24   accused of patent infringement.

25             And what he has effectively done is created

1    products that don't even exist because the actual release

2    product and the product that's used by the customers is not

3    the one that includes that query engine that he relies on

4    solely, according to his report for purposes of meeting one

5    of the elements of the claim.

6              So our position is that with respect to the

7    patent opinion, it's a methodological flaw.

8              And the last point is with regard to indirect

9    infringement, and I think we also establish, your Honor, I

10   think this is absolutely clear on the record, that his

11   indirect infringement opinions are wholly conclusory.  G.E.

12   versus Joiner, ipse dixit on an expert is not sufficient

13   evidence to overcome a Daubert motion.

14             In each of his indirect infringement opinions,

15   your Honor, this is paragraphs 96, 111, 146, and 208 of

16   Dr. Nourakhsh's opening report, they are verbatim the

17   same.

18             In my opinion, any customer using this product

19   is going to infringe, is going to be the direct infringers.

20   That's my interpretation.  It's a longer paragraph.  Each

21   one of those paragraphs says the same thing.  As we heard

22   today, without any analysis whatsoever of how any customer

23   actually deploys a product and notwithstanding Dr.

24   Nourakhsh's conclusory opinion, these are software products

25   with lots of optional functionality.  A black list is

Nourbakhsh - redirect

1    clearly optional functionality and that is the sole basis

2    for his opinion that one of the other elements of the '709

3    patent is met with respect to Pulse.

4              And, your Honor you can't do that.  You can't do

5    that.  You can't speculate as to how the direct infringer

6    will use the product.  This is not the same thing as not

7    being able to actually identify the direct infringer, this

8    is configurable, optional technology in a software product,

9    and you have to know how the direct infringer is actually

10   using it in order to have an indirect infringement claim

11   against the manufacturer, provider of the software, and

12   that's the Mirror World versus Apple case, among many

13   others.

14             THE COURT:  If I were to agree with you on that,

15   would that mean that there would still be direct

16   infringement claims here for let's say SOAR.  Right?

17             MR. SCHUMAN:  There are no patent claims against

18   SOAR, your Honor.

19             THE COURT:  Is that right?

20             MR. SCHUMAN:  Yes.

21             THE COURT:  Okay.  All right.  Thank you.

22   Actually, then, are there direct infringement claims?

23             MR. SCHUMAN:  There are direct infringement

24   claims, yes.  And so the point I was just making, your

25   Honor, is with respect to the indirect infringement

1    theories, in my opinion there's -- those all have to go

2    because there's no -- I take that back.  Sorry.

3              The argument I was just making was specifically

4    with regard to the indirect infringement theories.

5              THE COURT:  Right.

6              MR. SCHUMAN:  And also, your Honor, and this is

7    explained in our brief, method claims as well.  Method

8    claims, you have to find a user that actually practices all

9    the steps.

10             THE COURT:  That's why I asked about SOAR.  I

11   thought the actual claims, that Cisco practiced the steps.

12   But if SOAR is not accused --

13             MR. SCHUMAN:  SOAR is not accused of patent

14   infringement.  I think your Honor is referring to the fact

15   in the opposition brief here, there was a statement that,

16   well, at a minimum we have direct infringement because Cisco

17   must have practiced these inventions in the course of

18   developing the product, but there is no evidence on that,

19   your Honor.  There was no discovery conducted, and, of

20   course, that wouldn't lead to any significant damages.  It

21   is a theoretical possibility that in the R&D process,

22   somebody can infringe a method claim.

23             THE COURT:  But all the -- I mean, the $2

24   million in sales of these various products, they were all

25   sales that would lead to these other people doing -- I mean,

1    would lead to indirect infringement claims?

2         MR. SCHUMAN:  Correct, your Honor.  That is

3    absolutely correct.  And with respect to Virtual Expert

4    Management, there are zero sales.

5         With respect to Expert Advisor, this was

6    suggested by my questions, but the evidence is actually in

7    the record.  I think that's about $300,000 in sales and over

8    50 percent of them were outside the U.S., to customers in

9    Australia, Mexico and elsewhere, and that raises a whole

10   other set of issues with regard to damages.

11        Pulse is the other product that's accused.

12   Those were all discontinued products, by the way, your

13   Honor.

14        THE COURT:  Right.  Right.  Right.  I remember.

15        MR. SCHUMAN:  Okay?

16        THE COURT:  Okay.

17        MR. SCHUMAN:  Thank you, your Honor.

18        THE COURT:  All right.  Mr. Sobel?

19        MR. SOBEL:  One thing I agree with Mr. Schuman

20   on is there a fundamental difference between a trade secret

21   and misappropriation case and a patent case and the

22   difference lies in what it means to use a trade secret.

23        Use has a very -- the operative definition of

24   use for the California Trade Secret Act comes from the third

25   restatement of unfair competition, Section 40, Comment C.

Nourbakhsh - redirect

1    And I will read to you from there.

2               It says there's no technical limitations on the

3    nature of the conduct that constitutes use of a trade

4    secret.  As a general matter, any exploitation of a trade

5    secret that is likely to result in injury to the trade

6    secret owner or enrichment defendant is use.

7               It goes on and says, thus, marketing goods and

8    body of the trade secret, employing the trade secret in

9    manufacturing or production, relying on the trade secret to

10   assist or accelerate research or development or soliciting

11   customers for the use of information that is a trade secret

12   all constitute use.

13              And it further importantly says, the

14   unauthorized use need not extend to every aspect or feature

15   of a trade secret.  Use of any substantial portion is

16   sufficient subject to the act or liability.

17              And it also goes on to demonstrate that, you

18   know, showing similarities between the trade secret and what

19   the -- what the other party has done is enough for the jury

20   to conclude that there was a use of a trade secret.

21              This is a very different standard than we have

22   in patent law where you have to have the product has to

23   embody every limitation of the patent.  The standard for use

24   of the trade secret is very minimal.  If they used it in

25   development of the product, that is a use under the Trade

1    Secret Act.

2            The cases that they cited you to in their briefs

3    are completely inapposite here.  The first one he mentioned

4    was Agency Solutions.  The issue in the Agency Solutions

5    case was a preliminary injunction because the person who

6    wanted the preliminary injunction wanted -- allegedly had a

7    trade secret and they wanted to control dissemination of a

8    product.  They didn't want the product out.  And they were

9    making that allegation based on the fact that they can

10   control that product because they had a trade secret.

11           And so the question before the Court was not

12   whether there was really a use under -- under the definition

13   of use, but really limited to whether that product that was

14   going -- that they sought to control would disclose the

15   trade secret to, by being out in the market, to the public.

16           So that was a very different -- very different

17   issue.  And, by the way, that case also cites to the

18   restatement, acknowledging that it is the operative

19   definition of use, which makes sense, because the California

20   Trade Secret Act, when it was enacted, didn't provide a

21   separate definition for use, and it didn't supplant what

22   was the definition of use from the -- before that, the

23   common law from California.  And the case -- another case

24   confirming that more recently is the PNC, Inc. V. Kadeshia,

25   93 California Recorder, 2D.663.

Nourbakhsh - redirect

1          The other case was Savaco.  And what the Court

2     said in Savaco was -- this is what they analogized it to.

3     They said if I order a piece of pie at a restaurant and I

4     eat that pie, just because that pie might have been made

5     with a trade secret formula, me, the eater, the customer at

6     the diner, I have not used the trade secret.

7          And that was the issue there because it was a

8     question of, I believe Intel, but I don't have it in front

9     of me.  I think it was Intel, but, in any case, a party

10    got software, and the question was, the software was

11    developed with the trade secret, and where the party who

12    received that, so if it was using that software, like the

13    person at the diner eating the pie, were they using the

14    trade secret.  So these cases have no applicability here.

15         And it dovetails with the point.  Now, I will

16    make the point again that we requested access to the end

17    product and Cisco said no in discovery.  So they didn't

18    provide us those products.  But for the trade secret, it

19    doesn't even matter.  We'll get to the patents in a second,

20    because you only need to show that it was used at some point

21    in the process of development.  You don't need to show that

22    it was used in the end product to demonstrate the use of a

23    trade secret.

24         So if they relied on it in the research and

25    development, it helped accelerate the development, that's

1    sufficient to constitute use.

2              Now, on the mapping, I really don't understand

3    the controversy on the mapping.  It's clear from his

4    opinion, his report, that he -- his opinion is Cisco used

5    the trade secrets and that's the whole exercise on the map.

6    He confirmed that as far back as I think early December, and

7    I think it's clear what he did there.

8              Now, what Mr. Schuman said with those nine

9    documents, that's a little bit of a different issue.

10             See, Dr. Nourakhsh's testimony starts from the

11   point of there are trade secrets and says, can you -- can

12   you look at Cisco and the documentation, the evidence they

13   provide in discovery, to determine in your opinion whether

14   it was used, and in the case of the patents, whether it was

15   disclosed.  But there are separate witnesses whose job it

16   is to establish that they shared the trade secret with

17   Cisco.

18             THE COURT:  No.  That's kind of I imagine Dr.

19   Nourakhsh's testimony complementing other testimony.

20             MR. SOBEL:  Right.  So it's not that he was

21   saying he was there in these meetings and he saw the e-mail

22   at the time and he tracked, you know, that Cisco -- he's

23   coming in saying, where is the evidence?  And he's making an

24   opinion as an expert that, you know, this is the evidence

25   where it turns up.

Nourbakhsh - redirect

1               And why that's important is because, again,

2       under the restatement, although -- I'm quoting.  Although

3       the trade secret owner -- this is from the definition of

4       use.  Although the trade secret owner bears the burden of

5       proving unauthorized use, proof of the defendant's knowledge

6       of the trade secret together with substantial similarities

7       between the parties' products or processes may justify an

8       inference of use by the defendant.

9               So that's setting forth that you show the

10      similarities, you show their knowledge, and that a jury can

11      conclude based on the evidence, that's sufficient evidence

12      to conclude misappropriation.  Okay.

13              So going to the patents, again, they make this

14      point with not using the final product.  I'm not going to

15      restate the fact that they have not provided that even

16      though it was requested.

17              I'm sorry.  I did restate that.  But the point

18      here is that Dr. Nourbakhsh is an expert.

19              THE COURT:  By the way, I mean, whatever

20      happens, the jury is not going to hear, we didn't get what

21      we wanted.  Right?

22              MR. SOBEL:  Right.

23              THE COURT:  Right?  Okay.  I am just making

24      sure.

25              MR. SOBEL:  It makes the point that, you know,

Nourbakhsh - redirect

1     you don't give it to him and then you criticize him for not

2     looking at it.

3              THE COURT:  No, no, no.  I don't think that's

4     actually right either.  I mean, you look at it as he has

5     what he has.  That's kind of just given.  How we got there,

6     that's kind of in the black box.  We don't care about that

7     anymore.

8              So he has what he has.  Here's what he has.  You

9     know, a proper methodology to use what he has and, in some

10    sense, you know, I would say is, you know, how reliable is

11    it?  That's what you are getting at.

12             MR. SOBEL:  That's exactly right.  And the point

13    is here that Dr. Nourbakhsh is an expert in this field, and

14    he -- he testified under oath as an expert.  He considers

15    the documentation that he relies on for his opinion is

16    reliable to determine the functionality of those end

17    products and is the most reliable pieces of evidence.

18             THE COURT:  I didn't hear him say it was the

19    most reliable.

20             MR. SOBEL:  Well, I have to look at the gist of

21    what I got from that --

22             THE COURT:  I mean because you would agree that

23    most reliable of the Home Depot question would be to go to

24    Home Depot and check out whatever is actually in use there,

25    including getting into the back operations.  I mean, I'm not

1      saying this was something that could have done, but if you

2      really wanted to know what Home Depot was doing, that's what

3      you would do.  Right?

4              MR. SOBEL:  Let me just confer.

5              (Pause.)

6              MR. SOBEL:  Okay.  I think the point is that in

7      certain cases, you know, what you are saying, you know,

8      might be true, but if you heard his testimony, what he said

9      was that you don't need to know whether certain things are

10     going on in the product or if the product requires

11     necessarily using these limitations.  You don't need to look

12     at Home Depot when you look at the product and you see that

13     that is what the product is doing.

14             THE COURT:  Well, and so Mr. Schuman asked about

15     black list.  You asked about unique rooting numerical

16     identifiers, which maybe I dozed off, I hadn't heard him

17     bring up.  You know, I mean I think if the issue is there

18     are some things which would seem clear that if you didn't

19     have them -- whatever package of stuff is being sold, that

20     if you didn't have that functionality, then you wouldn't

21     have the product.  There are other things that seem a little

22     bit more optional to whether it can be useful.

23             I mean, Home Depot, I may have gotten my

24     products mixed up here, but Home Depot may not have the same

25     kinds of needs as the U.S. military in terms of having a

1    black list.  I mean, you know, we've got hammers, we've got

2    nails.  I'm not sure that you can't have the lowest clerk on

3    the floor know that.

4              MR. SOBEL:  Well, I mean, I heard his testimony

5    as he was -- he's looking at the products, and the products,

6    where they are ultimately end up in the customers' hands.

7    They are the same products that he has evaluated in his

8    opinion, reliable documentation for what is the end

9    functionality in the product.

10             THE COURT:  Well, no.  That would be why his

11   opinion would carry some weight, is if he says, you know --

12   if he says everything that I looked at I can tell what the

13   bank or insurance company, Home Depot was given, you know,

14   that seems to me that's exactly what an expert could say.

15             You know, the Cisco objection is, well, some of

16   the stuff he looked at was not the final version of even our

17   stuff and so that's perhaps an issue.

18             But then the other Cisco objection, which is --

19   you know, whether he looked at the right stuff or not, that

20   does seem like an argument for a jury.  Whether -- whether

21   you can infer from -- and, to some extent, I think whether

22   an expert can say, and I do accept obviously that he is

23   quite an expert in this field -- whether an expert can say a

24   particular product, you know -- you know, I have an iPhone

25   that has an airplane mode.  I buy the iPhone and the

```
1    airplane mode infringes some patent.  It probably does.  Who

2    knows?

3              But I can turn it off, and if I turn it off,

4    I've still got a perfectly good iPhone, and I'm not --

5    you know, it's a method patent.  I'm not infringing the

6    method patents.

7              MR. SOBEL:  Yes.

8              THE COURT:  And maybe the iPhone, which was a

9    completely different field from what Dr. Nourbakhsh is

10   talking about.  You know, I don't know.  I would be inclined

11   to believe that if Apple sells a million of these things and

12   they all have airplane mode, they probably have some basis

13   for letting people actually use it, you know.  And I gather

14   to some extent that's what Dr. Nourbakhsh is saying in a

15   much smaller set of customers, that they've got customer

16   charts, you know, solution requirements where people want

17   this stuff.  Then when they get it, they're going to use it.

18             MR. SOBEL:  I mean, I think -- well, I mean you

19   have to ask him this question, first off.  But what I did

20   hear him say, a number of things, is that while it is

21   circumstantial evidence --

22             THE COURT:  I think that's definitely

23   circumstantial.

24             MR. SOBEL:  And, by the way, the Federal

25   Circuit, they say it in the Mirror World case that Mr.
```

1      Schuman cited to you, says circumstantial evidence is

2      sufficient.

3                  THE COURT:  I'm going to tell the jury that from

4      the first get-go.

5                  MR. SOBEL:  Excuse me?

6                  THE COURT:  I'm going to tell the jury that.

7                  MR. SOBEL:  You know, so if the evidence he puts

8      forth is it's circumstantial, I looked at this and this is

9      necessarily going to happen, you know.  And it's his opinion

10     then, that's sufficient for the jury, that's useful for the

11     jury to hear, because it is one of the questions that they

12     have to answer.

13                 And they're capable of cross-examining him and

14     bringing out the points of, well, he doesn't have the direct

15     evidence of this or doesn't have the direct evidence, so all

16     he has is that.  That's a perfectly fair point for

17     cross-examination.

18                 THE COURT:  Well, no, and you're right, and I

19     guess the thing I'm going to have to think about a little

20     bit is just, you know, there's a minimum threshold to get to

21     before things get to be cross-examination questions, and so

22     I think I understand what the issue is there.

23                 What else do you have?

24                 MR. SOBEL:  Just give me one moment, your Honor.

25     Thank you.

```
 1                    (Pause.)

 2                    MR. SOBEL:  I will just confer with my

 3      co-counsel.

 4                    That's it.  Thank you.

 5                    THE COURT:  All right.  Okay.  Well, I will take

 6      that under advisement.  I know it's late, but there are a

 7      couple other things that we need to talk about.

 8                    Just following up, okay.  A couple things.

 9                    The motion to amend that you have to include the

10      concealment theory on the fraud, I looked at the pretrial

11      order.  Both sides have set out as a factual dispute.  I

12      don't think there's any prejudice to Cisco going forward

13      with that, so I'm going to let you -- we're going to deem it

14      amended to include that fraud theory.

15                    On the unconscionability, when I was talking

16      about that on Wednesday, I asked you about that.  The first

17      time I asked you about it, Mr. Cantine said I have a bench

18      memo, and later on he said, no, I don't, which means that we

19      didn't actually hit the ball very much because I still don't

20      know the answer to the question of whether I have everything

21      I need in order to decide that.

22                    MR. SOBEL:  I will address it, your Honor.

23                    I think --

24                    THE COURT:  Do I have everything I need to

25      decide that?
```

1          MR. SOBEL:  Yes.

2          THE COURT:  Yes.  Okay.  Thank you.

3          All right.  So the other two things that I've

4     got here, one is just kind of generally the scheduling

5     issues, and the other is this letter that I got from

6     Mr. Blumenfeld, I guess, this morning, which is Docket Item

7     610, which says -- since Mr. Blumenfeld is not here, Ms.

8     Scher is not here, Mr. McCraw is not here, I'm kind of

9     imagining the basis for an intelligent discussion of that

10    letter is probably not present in the courtroom?

11         MR. SCHUMAN:  Your Honor, I'm able to discuss

12    it, and actually the reason why we filed a declaration is to

13    try to advance intelligent discussion rather than having a

14    bunch of attorneys talking about metadata fields and things

15    like that, but I will defer discussion on that until

16    Tuesday, when we'll be back here on the issues that that

17    pertains to.

18         THE COURT:  I was wondering why Ms. Scher and

19    Mr. McCraw weren't here is because they've talked to each

20    other about the topic.

21         MR. SCHUMAN:  They've talked to each other quite

22    a bit about the topic.  We thought there was an agreement

23    regarding the particular metadata fields that would need to

24    be provided in order for us to ascertain whether these

25    documents are what they purport to be, and the declaration

1    you received is that we did not receive that metadata.

2                    THE COURT:  No.  I saw that, and so I actually

3    read that as being -- and I will give you a chance, Mr.

4    Cantine, if you want to say something.

5                    I actually thought that Ms. Scher and Mr. McCraw

6    had understood each other, which I still think the evidence

7    seems to me that they did.  But that what I was wondering,

8    which I couldn't tell from the affidavit or declaration, was

9    whether having, in essence, discovery of these things were

10   not to Cisco's satisfaction, whether there had been, you

11   know, discussion, or whether, in fact, you all were at an

12   impasse.

13                   MR. CANTINE:  I think, your Honor, let me speak

14   to that.

15                   MR. SCHUMAN:  I think we're at an impasse.

16   There was a lot of discussion.

17                   THE COURT:  Let Mr. Cantine have a chance

18   here.

19                   MR. CANTINE:  Thank you.  Appreciate that.

20                   I'm not so sure we're at an impasse.  I saw a

21   12-page letter was filed this morning.  I didn't really have

22   time to read it.  The agreement was we're going to give them

23   some sort of metadata.  My understanding is we gave them the

24   metadata.  We gave it to them twice and they are saying it's

25   not there.

Nourbakhsh - redirect

```
 1                THE COURT:  All right.  Well, I guess we're not

 2      going to get far here.  I'm sorry.  I didn't mean that the

 3      way it sounded, Mr. Cantine.

 4                What I was wondering is, the metadata issue is

 5      in relation to these 52 e-mails.  Right?

 6                MR. CANTINE:  I think it's for everything,

 7      what they're asking for, the documents and the e-mail.  I

 8      think it's more for the documents, if I understand it

 9      correctly.

10                THE COURT:  Well, there was an attachment to the

11      declaration that included an Excel spreadsheet that had 52

12      listed --

13                MR. CANTINE:  Those would be the documents.

14      Remember we had 52 documents?

15                THE COURT:  Documents, not e-mails.

16                MR. CANTINE:  Correct.

17                THE COURT:  Okay.  Okay.  And the representation

18      is that, Mr. Cantine, your team, and perhaps your expert,

19      whose name I can't quite recall --

20                MR. CANTINE:  Mr. Harris.  Mr. Harris.

21                THE COURT:  Harris were saying here's the 52

22      documents he recovered.

23                MR. CANTINE:  The 52 documents he found --

24                THE COURT:  Found.

25                MR. CANTINE:  -- which we think are the same
```

1     ones they've been looking for.

2                    THE COURT:  And so I understand generally why

3     people want metadata with various things.  But why is it --

4     and I understand there may be an agreement between the

5     parties here.

6                    But, Mr. Schuman, what is it that the metadata

7     here does for you?

8                    MR. SCHUMAN:  The metadata shows whether the

9     documents that they produced actually came from

10    Mr. Friedman's computer or not.

11                   THE COURT:  Well, I'm taking Mr. Cantine and his

12    team's word that it does, in fact, come from the computer.

13    Right?

14                   MR. CANTINE:  I can't believe I'm hearing this,

15    yes.  Mr. Harris took them from the image of Mr. Friedman's

16    computer.  To suggest they came from somewhere else is a

17    little crazy.

18                   THE COURT:  Yes.  So, you know, I don't mean

19    to -- you know, I was trying when I did that order to

20    advance the ball.  We're all trying to advance the ball one

21    way or another, but trying to advance the ball as to whether

22    there was something important that had disappeared.  And

23    I've got -- but for that purpose, I don't care whether it

24    has metadata or not, because Mr. Cantine is saying this is

25    what he recovered, these 52 things.

1            I guess when you or your team was talking about

2       metadata the other day, I thought maybe that was going to

3       help you match that up against stuff you already had even

4       though in the order I kind of imagine that it's a new -- if

5       it was stuff he already had, he was going to supply the

6       Bates numbers on -- kind of a 20th Century person here.

7            And so other than questioning -- I don't know a

8       nice way to put this, but other than questioning the

9       veracity that these are the 52 documents, is there any other

10      reason why the week before trial we have to be arguing about

11      the metadata?

12           MR. SCHUMAN:  Well, there is, your Honor,

13      because you've asked us a couple of times now whether

14      there's a, quote, "smoking gun" in there.

15           THE COURT:  I have.

16           MR. SCHUMAN:  And I have politely deferred a

17      couple of times because before I represent to the Court

18      there are a couple of smoking guns, one of which is alluded

19      to in the declaration of the pile, we need the metadata for

20      who actually authored the documents.

21           So your Honor has made an in limine ruling on a

22      couple of documents that there was a dispute whether they

23      were authorized by Mr. Friedman or not.  I know your Honor

24      remembers that.

25           There's another document in the file that is to

1    Mr. Friedman from a count.  The metadata we have so far

2    shows it was written by Alex Friedman.  He's the author.

3    But we don't have the other metadata fields, your Honor, to

4    permit us to make the proper conclusion with regard to what

5    this document really is.

6              By the way, this is a document that was part of

7    the Court-ordered production.  We don't know where it came

8    from, why it wasn't produced before.  We have limited

9    metadata that suggests it's another problematical document

10   that we may want to use at trial that was never produced

11   before.

12             THE COURT:  Well, okay.  So I understand the

13   general level that you just said.  And you said it was a

14   document from Alan Friedman, so I take it it is some

15   relative of Victor Friedman.

16             MR. SCHUMAN:  Purporting be to be from Cohen

17   Hospital.

18             THE COURT:  I'm sorry.  What?

19             MR. SCHUMAN:  Purporting to be from a hospital,

20   I think a children's hospital, discussing XU's patents,

21   intellectual property, technology, but yet the limited

22   metadata we have, your Honor, I want to be clear here, shows

23   that it was written by Alex Friedman.  It's addressed to

24   Victor Friedman.

25             We would like the metadata that we believe the

1     attorney agreed on to help us figure out what that document

2     really is.

3                   The other document, your Honor, is addressed in

4     this declaration.

5                   THE COURT:  So I've looked at the declaration.

6     I couldn't understand the point.  And that's not to say

7     there isn't a point, but it needs to be explained to me

8     better.

9                   MR. SCHUMAN:  We have --

10                  THE COURT:  I didn't get it.

11                  MR. SCHUMAN:  We have a claim in this case, your

12    Honor, the 102(b) defense and one of counterclaims

13    specifically is based on the pre-critical date, offers to

14    sell, KnowledgeSHARE.

15                  And your Honor heard argument the other day on

16    the motion to exclude Dr. Chatterjee.  Part of the argument

17    was Dr. Chatterjee can't know what XU product was being

18    offered to Allstate.

19                  Prior to the supplemental production we just

20    got, your Honor, we had Allstate presentations.  What we

21    just got without complete metadata is an Allstate

22    presentation that embedded in hidden text says,

23    KnowledgeSHARE platform.

24                  The date of it is before the critical date.

25    This was the subject of our terminating sanctions motion,

1    your Honor.  102(b) is one of our defenses with respect to

2    the patents in this case.  Your Honor knows that that is one

3    of our primary invalidity defenses.

4            We've been seeking documents.  We've been

5    hearing that Cisco cannot prove what the product was that XU

6    was selling or offering to sell to Allstate prior to the

7    critical date, and now we get a document with incomplete

8    metadata that says KnowledgeSHARE platform right in it.  We

9    have a KnowledgeSHARE user manual.  Dr. Chatterjee reviewed

10   the KnowledgeSHARE code.

11           We think this document is incredibly

12   significant, but the metadata is incomplete, your Honor, and

13   before we can make further requests like to amend our

14   exhibit list, maybe we might want to present this to a jury,

15   we need the rest of the metadata.

16           But these documents -- this document was never

17   produced before.

18           MR. CANTINE:  Can I speak to that, your Honor?

19           THE COURT:  All right.  Go ahead.

20           MR. CANTINE:  Number one, I would suggest that

21   before we have any more argument, that they identify exactly

22   which smoking guns they're going to contend are smoking guns

23   so we can advance this.

24           We had an agreement with them on what kind of

25   metadata we were going to produce from day one in this case.

1      We gave them that.  They asked for more.  We gave them more.

2      I mean, when is this going to end?  They've got everything

3      they need.  I don't know about some hidden field in some

4      document.  But we gave them -- everything that you required

5      us to give them, we gave them and more.

6              THE COURT:  Well, I did think that one of the

7      things I saw in this declaration or affidavit was something,

8      it was at the end of these paragraphs 11, 12, 13, where it

9      said like in paragraph 12, it says, for the two example

10     records above, we accept the source folder information as

11     provided due to the e-mail difficulty in extracting them.

12              And then the next one, it goes to another

13     e-mail.  It seems to say the opposite, but I'm not sure --

14     I'm not sure what conclusion to draw from that.

15              And I guess the other thing I didn't really

16     understand about the -- does the supplemental production

17     document that's on page 3 of this declaration, the two sides

18     of the page, they were just the same document one side has

19     the, quote, hidden content, and the other side does not.

20              MR. SCHUMAN:  The document on the left, your

21     Honor, if you look at the very top, the Bates number XU

22     supplemental production, Supp.

23              THE COURT:  Yes?

24              MR. SCHUMAN:  That's from their supplemental

25     production made in response to the Court's order.

Nourbakhsh - redirect

1           The document on the right side of the page, the

2    data on the right side of the page XU78631, that's the

3    earlier version of the presentation that was produced.

4    And so what is being depicted here is a difference between

5    what was produced before and what was just produced in

6    response to the Court's order.

7           THE COURT:  And so, okay.  And --

8           MR. SCHUMAN:  And to answer the Court's

9    question, the difference between 12 and 13 is that for some

10   of the e-mails, certain metadata was provided.  For others,

11   it wasn't.  So what we're asking for in 12, there's certain

12   metadata here, although what the declaration says is that

13   the file name is not an actual file name.

14           In 13, for e-mail records where Mr. Friedman

15   composed and sent or received e-mails, this shows the

16   metadata that was provided.

17           And in the two examples above, XU provided

18   neither a valid e-mail container, file name in the file name

19   field, nor did they provide a valid e-mail folder in the

20   folder field.

21           The point, your Honor is that in our motion for

22   terminating sanctions, we identified files by name.  These

23   are the files by name that Ms. Phillips identified had been

24   completed from his computer, and I understood the Court's

25   order to be saying produce those files.

1           THE COURT:  Right.

2           MR. SCHUMAN:  Without the file name, we can't

3    know whether was being produced is the file name that we

4    identified in the -- in our motion.  We still cannot figure

5    out based on what we have to date whether the files that

6    were the subject of our motion and that we understood the

7    Court to be ordering to be produced are what we have.

8           MR. CANTINE:  Your Honor, it's difficult to

9    respond to something that came in at noon before a 1:30

10   hearing.  But what my people tell me, all right, is that we

11   gave them all the metadata.  So to suggest that we're

12   somehow picking and choosing out metadata for this file

13   but not giving it up for that file is crazy.  You hit a

14   button, you give them the metadata, and we've given them

15   that twice.

16          THE COURT:  All right.  I understand your

17   position.

18          Mr. Schuman, you know, I hate to appear too

19   stupid, but what is there that should convince me that there

20   are file names that they are not giving to you?  I mean,

21   it's impossible for it to exist without a file name because

22   I thought part of the problem here was some of these things

23   had been harmed in transit.

24          MR. SCHUMAN:  Meaning harmed in being destroyed

25   and being recovered, however they were recovered.

1            MR. CANTINE:  Oh, my God.

2            MR. SCHUMAN:  Well, no.  That was the testimony

3    we heard on Monday, that in the course of trying to recover

4    things, sometimes they're corrupted.

5            THE COURT:  Right.

6            MR. SCHUMAN:  That's my point, which is I don't

7    know, and I don't hear the representation being made that,

8    in fact, for each of the files, what we're not -- what we

9    don't have is because it does not exist.  We have not heard

10   that from XU.

11           THE COURT:  Well --

12           MR. SCHUMAN:  And I appreciate --

13           THE COURT:  I'm going to say you just heard from

14   Mr. Cantine, though I'm quite sure that that is one step

15   removed from attorney argument, my people tell me.

16           MR. SCHUMAN:  So that's my point.

17           MR. CANTINE:  It was an honest representation,

18   your Honor.

19           MR. SCHUMAN:  So I agree I think they should

20   have an opportunity to either respond to this letter or for

21   counsel to confer a little bit more, but we filed this

22   declaration to try and advance the ball, to specify what it

23   is we don't have.

24           THE COURT:  Okay.  And, believe me, I'm not

25   being critical, and I also, of course, am not criticizing

```
 1        Mr. Cantine's not being able to respond more fully to

 2    something that happened at noon.  Fortunately, there's a

 3    whole great big weekend to argue about this.

 4             And so I better understand why you're interested

 5    in it, Mr. Schuman, so I appreciate that.  I imagine Mr.

 6    Cantine probably already did understand.

 7             So why don't you all talk to each other over the

 8    weekend, and if you can't come to some appreciation of each

 9    other's positions, you know, maybe Mr. Cantine, if push

10    comes to shove, maybe you ought to see if you can't get

11    Mr. Harris to file something in response.

12             MR. CANTINE:  Very well, your Honor.

13             MR. SCHUMAN:  Thank you, your Honor.

14             THE COURT:  All right.  So that leaves the issue

15    of scheduling.

16             MR. CANTINE:  I had one other issue I wanted to

17    address, your Honor, very briefly.

18             THE COURT:  All right.

19             MR. CANTINE:  I'm not going to reargue

20    RemoteXpert and fraud and Expert Advisor and all of the

21    discovery we didn't get, but we did make -- we followed your

22    Honor's scheduling order procedures and we filed a letter

23    and then we had some oral argument.  And I want to make sure

24    I preserve my appellate record here.

25             THE COURT:  Sure.  Okay.
```

Nourbakhsh - redirect

1                MR. CANTINE:  So out of an abundance of caution,

2      because some of the appellate courts require a formal motion

3      to compel be denied, in order to preserve that on appeal and

4      there's some dispute between --

5                THE COURT:  If you want to file a motion to

6      compel, that's fine.

7                MR. CANTINE:  Thank you.  I would like that

8      opportunity.

9                And then the last two issues, which I'm sure

10     you're getting to is Mr. Braddock and the trial date.

11               THE COURT:  Right.  So I've had some further

12     thoughts of one kind or another, but on Wednesday, you all

13     were going to think about it.

14               And, Mr. Cantine, you're the plaintiff, too.

15     What is your current view?

16               MR. CANTINE:  In terms of your proposal, trying

17     a patent case first, while we appreciate the offer, we're

18     going to respectfully decline on that.

19               THE COURT:  All right.  Anything else?

20               MR. CANTINE:  Not from me, your Honor.

21               THE COURT:  Okay.  Mr. Schuman, what do you have

22     to say?

23               MR. SCHUMAN:  I think we need to know when

24     Mr. Braddock is going to be here for the Daubert hearing.  I

25     think we've been going at this long enough.  We have

1    obviously serious questions with regard to challenging Mr.

2    Braddock's opinion.  Whether it's just a patent trial or

3    not -- if it is just a patent trial, your Honor,

4    Mr. Braddock has an opinion about that, that's the subject

5    of our Daubert motion.

6              THE COURT:  Yes.

7              MR. SCHUMAN:  And before we talk about whether

8    there will be just a patent trial or when, I think we need

9    to know when Mr. Braddock is finally going to show up for

10   this Daubert hearing.

11             THE COURT:  Well, here's the thing, as I'm

12   pretty sure from what Mr. Cantine said before is that the

13   time proposed is next Friday, and as it happens, I have

14   moved something off of my schedule so I could hear from him

15   on next Friday afternoon.

16             And so I have a second proposal, which is this.

17   I will schedule the time -- I have to check my calendar

18   here, but I will schedule the time, assuming that everybody

19   is agreeable, for Mr. Braddock to be here on Friday

20   afternoon.  It may be by that time that, hopefully before

21   then, we'll have some decision on some of these issues that

22   are still open, which may narrow the scope of the dispute

23   some.

24             But the thing is, it seems to me unlikely that

25   I'm really going to be excited about making some final

1    decision about Mr. Braddock on Friday afternoon.  So what I

2    was thinking is that the backup plan I had in mind was,

3    because I didn't sense a warm, fuzzy reaction to let's do

4    the patent trial first, was maybe just bifurcating damages

5    and just trying the liability portion.

6              MR. SCHUMAN:  I would like to talk to Cisco

7    about that, your Honor.  I think under these circumstances,

8    given how long this case has been pending and given all the

9    work that has been done, I think two trials under

10   circumstances where at least we believe there shouldn't be

11   any, but if there's one, there should be one trial.

12             The other problem here, your Honor, is the fact

13   that the pendency of this lawsuit places a cloud over those

14   products that are actually still on the market, which is

15   very few of the products in this case.  But as your Honor

16   knows, discovery was conducted here of certain Cisco

17   customers, and the business unit at Cisco is very anxious

18   about the resolution of this case with respect to its

19   ability to market and sell these products.

20             So we're fully prepared to go to trial on all

21   issues and resolve them.

22             THE COURT:  But the liability would take care of

23   that issue.

24             MR. SCHUMAN:  Well, it might, your Honor, but I

25   also -- well, another idea, and I don't know if this would

1    help your Honor with the problem that you were describing,

2    but I mean one thing we could do, I heard Mr. Cantine ask

3    for a one or two-week continuance.

4           This trial was originally scheduled to go for

5    two weeks, I believe, and if a one-week continuance, if we

6    had Mr. Braddock on Friday, the 8th of next week, perhaps a

7    one-week continuance of the trial date would work.

8           THE COURT:  Well, it would only work if it

9    was then a five-day trial, because I've got somebody else

10   that --

11          MR. SCHUMAN:  I understand, your Honor.  What

12   I'd like to do, if it's okay, is go back and confer with my

13   client before I can respond to that proposal.

14          THE COURT:  That's fine.  And part of it is, if

15   we did do that, I don't think it would actually alter the

16   preparation so much.  But, in any event, then Mr. Cantine,

17   maybe you want to think about it, too.

18          MR. CANTINE:  I certainly want to think about it

19   and confer with my client.

20          I guess I have one question.  This kind of next

21   trial.  If we did the one-week delay, you said we could get

22   five days in before you had another trial.  Do you know how

23   long that trial is going to be?

24          THE COURT:  Well, that trial is supposed to last

25   four days and then I have a trial in another case that

Nourbakhsh - redirect

1    starts the following Monday, and I believe the four-day

2    trial, I believe that's Easter week.

3         MR. CANTINE:  It's coming up on a lot of

4    holidays.

5         THE COURT:  Yes.  So I think that's actually a

6    four-day week, and I'm hazy on that right now.  But the

7    following week I have another trial that I've already bumped

8    once.

9         MR. CANTINE:  And so if we're talking about, it

10   sounds to me like Mr. Schuman is willing to bump it a week

11   as long as we can keep it together, you know, if we move

12   both of those, or just go after them, are we talking three

13   weeks?

14        THE COURT:  I don't understand what you mean, go

15   after them.

16        MR. CANTINE:  You said you had the two trials

17   coming up, right, after us.

18        THE COURT:  Well, I've got other things, but

19   those were the -- and my impression was, it's nice of Mr.

20   Schuman to say start the trial the following week, but my

21   impression was that he does have Cisco people coming in from

22   all over the world or something, so that, in fact, I don't

23   think he's exactly saying let's go for a month delay.

24        MR. CANTINE:  I appreciate your considering this

25   and I appreciate Cisco's willingness to consider it as well.

1      I just think it's going to be very difficult, like you said,

2      having Mr. Braddock Friday afternoon going to trial on

3      Monday.

4              THE COURT:  Well, see, the other thing is, I'm

5      also wondering about this, which is, you know, I read the

6      briefing on damages.  You know, Mr. Braddock has the

7      opinion, if I recall correctly, that Cisco would pay $30

8      million for two patents, for licensing the two patents for

9      which they sold $2 million worth of products.

10             That is a hard starting place to, like, start

11     and say, yes, that sounds like a logical thing.  So, you

12     know, part of the reason why I wanted the hearing on Dr.

13     Nourbakhsh and Mr. Braddock is I thought there were issues

14     that weren't so easily just resolved by reading the briefs,

15     I believe as there were with Cisco's experts, where you were

16     talking about discrete things.

17             And so part of what I'm wondering is, you know,

18     if I do say, you know, Mr. Braddock's damages testimony is

19     going to be limited to, you know, this as opposed to this,

20     and then I'm also partly wondering, you know, summary

21     judgment motion knocked out this or that, there's going to

22     be a lot of scrambling around to have Braddock conform his

23     testimony to whatever he's allowed to testify about and

24     whatever is left in the case.

25             And so that's, to some extent, what I'm -- and I

1          guess one of the questions I have was that at some point,

2      Cisco said a reasonable royalty analysis was three to

3      five percent of sales and, you know, I hadn't read

4      Mr. Braddock's report.

5                  If it turned out to be that's what he was

6      testifying in the patent world, would there be an objection

7      that's not in his report?

8                  MR. CANTINE:  I'm not prepared to answer that

9      right now.

10                 THE COURT:  No, no, no.  I wasn't looking at

11     you.

12                 MR. CANTINE:  All right.

13                 THE COURT:  I was looking at him.

14                 MR. SCHUMAN:  Your Honor, Mr. Braddock

15     identifies two licensing agreements that he thinks are

16     comparable, and I think that was where you get the three to

17     five percent number from his report, which when we addressed

18     his opinions, we didn't take issue with that.  Our expert

19     did not take --

20                 THE COURT:  All right.

21                 MR. SCHUMAN:  But those three to five percent of

22     sales, of course, is not where Mr. Braddock ends up.  He

23     ends up with that larger number based on something called

24     K-World.

25                 THE COURT:  Well, no, no, but that's where there

Nourbakhsh - redirect

1    are methodological issues and reliability issues.

2                MR. SCHUMAN:  Right.  I don't think we -- I

3    think we have not taken a contrary position that if there

4    was infringement, there was liability, and if the products

5    had sold anything, because some have a three to

6    five percent, we did not take issue with that as a

7    reasonable rate.

8                THE COURT:  All right.  Well, that's helpful,

9    because what I would be concerned about is we're having a

10   trial on damages and you have no damages testimony.  But

11   it's kind of sounds like you will have some, if you don't

12   have everything.  I mean, maybe you'll have everything.  If

13   you don't have everything, you will have some.

14               All right.  I guess we'll resume this discussion

15   on Tuesday.  And --

16               MR. CANTINE:  I'm sorry, your Honor.  Can you

17   get me a time for Friday afternoon?

18               THE COURT:  Oh, yes.  Thank you.  Thank you.

19   Let me see here.  Yes.  How about -- sorry to do this.  How

20   about 2:00 o'clock?

21               MR. CANTINE:  That's fine with us, your Honor.

22               MR. SCHUMAN:  That's fine with us, your Honor.

23               THE COURT:  All right.  2:00 o'clock.

24               All right.  Anything else for today?

25               MR. CANTINE:  Not from me.

Nourbakhsh - redirect

1              MR. SCHUMAN:  No, your Honor.

2              THE COURT:  All right.  Well, thank you.  We'll

3     be in recess.  I will see you all on Tuesday.

4              And, Mr. Cantine, if you need to file a

5     declaration or affidavit, try to do it by the close of

6     business Monday, okay, on the metadata?

7              MR. CANTINE:  Yes.  Will do.  Thank you.

8              THE COURT:  All right.

9              (Counsel respond, "Thank you, your Honor.")

10             (Court recessed at 5:33 p.m.)

11                          -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Nourbakhsh - redirect

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25