```
1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                               - - -

4

     XPERTUNIVERSE, INC.,            :    CIVIL ACTION
5                                    :
                    Plaintiff,       :
6                                    :
          vs.                        :
7                                    :
     CISCO SYSTEMS, INC.,            :
8                                    :
                    Defendant.       :    NO. 09-157 (RGA)
9

10                              - - -

11                             Wilmington, Delaware
                               Tuesday, March 5, 2013
12                             9:04 o'clock, a.m.

13                              - - -

14   BEFORE:  HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

15                              - - -

16   APPEARANCES:

17            POTTER, ANDERSON & CORROON LLP
              BY:  PHILIP A. ROVNER, ESQ.
18

19                      -and-

20

21

22

23

24                             Valerie J. Gunning
                               Leonard A. Dibbs
25                             Official Court Reporters
```

```
 1    APPEARANCES (Continued):

 2
                 STROOCK & STROOCK & LAVAN
 3               BY:  CHARLES E. CANTINE, ESQ.
                      (New York, New York)
 4

 5                   Counsel for Plaintiff

 6

 7               MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                 BY:  JACK B. BLUMENFELD, ESQ. and
 8                    JENNIFER YING, ESQ.

 9
                         -and-
10

11               MORGAN, LEWIS & BOCKIUS
                 BY:  BRETT M. SCHUMAN, ESQ. and
12                    ESTHER RO, ESQ.
                      (San Francisco, California)
13

14                       -and-

15
                 MORGAN, LEWIS & BOCKIUS
16               BY:  KELL M. DAMSGAARD, ESQ.
                      (Philadelphia, Pennsylvania)
17

18                   Counsel for Defendant

19                       -   -   -

20

21

22

23

24

25                   P R O C E E D I N G S
```

Mason - direct

1

2              (Proceedings commenced in the courtroom,

3      beginning at 9:04 a.m.)

4

5              THE COURT:  Good morning.  And please be seated.

6              MR. CANTINE:  Good morning.

7              MR. ROVNER:  Good morning.

8              THE COURT:  So I imagine, unless someone tells

9      me something else, that the first order of business this

10     morning is to hear Mr. Mason?

11             MR. CANTINE:  That's right.

12             THE COURT:  All right.  Mr. Cantine?

13             MR. CANTINE:  Good morning, your Honor.  I'd

14     like to call Mr. Rick Mason to the stand, please.

15                  PLAINTIFF'S TESTIMONY

16             ... RICHARD WIDDER MASON, having been

17             duly sworn as a witness, was examined and

18             testified as follows...

19             THE COURT:  Mr. Cantine?

20             MR. CANTINE:  Thank you, your Honor.

21                  DIRECT EXAMINATION

22     BY MR. CANTINE:

23     Q.    Mr. Mason, have you ever testified in court before?

24     A.    No, I have not.

25     Q.    Okay.  Can you tell the Judge what it is you do for a

Mason - direct

1    living?

2    A.    I have a computer consulting business, databases,

3    programming, build computer apps for the iPhone and the

4    Android.

5    Q.    And where did you go to college?

6    A.    I went to Queens College, undergraduate, and I have

7    graduate work done at Rochester Institute of Technology,

8    when I worked for Xerox up in Rochester, New York.

9    Q.    And what was your degree in?

10   A.    Computer science.

11   Q.    And what year was that?

12   A.    That would have been 1973.

13   Q.    And could you please generally just tell us about your

14   work experience before XpertUniverse?

15   A.    I first started working at Xerox Corporation,

16   programming, operating systems, built special fax machines

17   for Xerox, and then worked for the Xerox retail marketing

18   office and build back end applications, financial systems

19   for Xerox.  Worked for the corporate headquarters at Xerox

20   as the director of the computer division there.

21          And then from there I went to SoftScript

22   International, which is a barcode, two dimensional barcoding

23   company, where we developed a unique type of optical scanner

24   and a way to print barcodes.

25          From SoftScript International I went to Comtex

Mason - direct

1    Scientific, a news and information refinery, where we

2    provided news to the Bloombergs and the stock markets, and

3    we analyzed news feeds from around the world and provided

4    tem to the stock market area.  Got deeply involved in

5    America Online at that time.

6              From Comtex I went to Ogelvy & Mather, where

7    I was Vice President of the Ogelvy & Mather Marketing

8    Department.  And we put American Express online for the

9    first -- it was the first time American Express actually

10   went online.  It was one of the largest online initiatives

11   and that was done in the early nineties, just after the web,

12   or the Internet became viable.

13             We did that through America Online and worked on

14   providing getting American Express' back end data systems

15   down in Phoenix, Arizona, making it possible that people

16   could look at their bill online.

17             From there I left Ogelvy & Mather and started

18   another computer consulting firm called Blink Online

19   Publishing, at which time I became -- we developed websites,

20   did database programming, much of what I'm doing again

21   today.  Did a lot of training work specifically in the

22   computer science areas and went to -- one of our big clients

23   was Computer Generated Solutions, which led into the

24   business of working with XpertUniverse.

25   Q.    Okay.  And when did you start with XpertUniverse?

Mason - direct

1    A.    That would have been the end of 1999, 2000.

2    Q.    Okay.  And what was your title when you started?

3    A.    I'm pretty sure it was director of technology.

4    Q.    And what were your responsibilities as director of

5    technology?

6    A.    Well, we built algorithms.  We did design work.  I

7    managed the computer systems, put together the back end

8    computer room, built actually the network room with all the

9    computers, set up the desktops.

10              I was responsible for all backups at the company

11   and all policies relating to the -- all policies relating to

12   backups and developing our, what today would be called cloud

13   services.  We had a document server we called QuickPlace and

14   I was responsible for working with IBM and installing that

15   in our computer room.

16   Q.    And how long did you work at XpertUniverse?

17   A.    I worked technically on salary through the end of

18   2006, and considered -- and continued consulting some time

19   into 2007.

20   Q.    And during your tenure at XpertUniverse, did you have

21   an opportunity to work with Mr. Friedman, Victor Friedman?

22   A.    Yes.  I would say almost on a daily basis.

23   Q.    And based on your experience of working with him and

24   your background, did you consider him a savvy computer

25   user?

Mason - direct

1    A.    Not really.  He understood computers, like most people

2    would today who would carry around an iPad or their

3    computer, but I would not call him particularly savvy when

4    it came to the technology of computers.

5    Q.    Okay.  And you indicated you were involved in backup

6    of computer systems at XpertUniverse; is that correct?

7    A.    Yes.

8    Q.    Okay.  And you had personal knowledge of the backup

9    systems during the time you were there; right?

10   A.    I did.

11   Q.    And what was the practice when it came to backups at

12   XpertUniverse?

13   A.    Well, from the get-go, when we started the company, we

14   decided procedurally -- we had a number of architects.  We

15   decided that all of our business data would be stored in our

16   document server, which was called QuickPlace.  And we

17   initiated tape backups every evening, rotating tapes on a

18   Monday, Tuesday, Wednesday, a daily schedule.

19           On Thursdays, I believe we did a full, or a

20   weekly backup, and we would take the tapes.  They were

21   stored in a fireproof safe or in the network room, and then

22   once a week typically Victor would take one of the tapes

23   home with him so he would have it off-site in case of a

24   fire.

25           We also during that time as our Lotus Notes

Mason - direct

1    expanded for e-mail, we added a CVS server for our

2    programmers.  That's a source code version control system,

3    CVS.  We decided we were, as we were backing up that, we

4    needed larger tapes, so we bought a larger tape drive.  We

5    had two different tape drives actually backing up on a daily

6    basis.

7    Q.    Okay.  You created a slide to kind of depict the

8    network?

9    A.    I did.

10              MR. CANTINE:  Before we do that, your Honor, may

11   I?

12              THE COURT:  Sure, yes.

13              (Mr. Cantine handed slides to the Court.)

14              MR. CANTINE:  May I give one to the witness,

15   too?

16              THE COURT:  Yes.

17              (Mr. Cantine handed slides to the witness.)

18              MR. CANTINE:  We can go to the next one.

19   BY MR. CANTINE:

20   Q.    Okay.  So it's a little hard to see on the screen, but

21   it's page 2 in your booklet.

22              What does this depict, sir?

23   A.    Okay.  This would be the, I'm sorry, the network

24   topology of our office.  It would -- that dotted line is

25   loosely -- I actually developed this chart and put it out

Mason - direct

1      there.

2                  The left side shows the corporate management.

3      The right side supposedly is developers and architects.  The

4      only inference you could really draw from that is that

5      everyone was connected through a network backup, so when

6      they came to work, on their desktops or computer systems, we

7      were connected to the network.

8                  Programmers on the right side were typically

9      connected to the CVS, system where they did their source

10     code work for the day.  They would download the source code,

11     they would operate on a local computer, they would upload

12     any changes to the source code on the CVS system.

13                 The Lotus Notes e-mail system was common to

14     everyone.  Everyone used Lotus Notes for their e-mail.  Any

15     other e-mail systems were only for personal use.  It was

16     accepted practice in the company that everything went

17     through Lotus Notes from a business standpoint.

18                 The QuickPlace document repository was available

19     for everyone.  Anyone that operated on their computer and

20     wrote a business document would always, when it was

21     completed or when it was completed and ready to be passed

22     around, it would both be e-mailed and be stored in the

23     QuickPlace document server, and the document server would

24     automatically send an e-mail to the recipients, telling them

25     a new document was there, and you could probably -- should

Mason - direct

1    be able to see that in the Lotus Notes e-mail.  Everything

2    was connected through Lotus Notes.

3              The common network directories over on the left

4    side there, that was used pretty extensively by the

5    corporate management.  Anyone was able to use the common LAN

6    directory to put data up on there.  We had our accounting

7    system there.  And most of the corporate management, which

8    included not only Victor, Elizabeth Eiss, our president, Abe

9    Zelkin, the head of the technology department, David

10   Rutberg, who was I guess chief operations officer, but it

11   also included a few of the people that, like our chief, what

12   we called our librarian, and it included the secretary who

13   managed the financial operations.

14   Q.    Okay.  So just to make sure we understand this,

15   essentially, there were kind of three repositories, as I

16   would call it.  You have QuickPlace, CVS, and then Lotus

17   Notes e-mail; is that right?

18   A.    That is -- the three repositories were actually CVS,

19   which was the version of the system for source code.

20   QuickPlace document directory, where every business document

21   went by practice.  Everyone used QuickPlace.  The common

22   network directories were used extensively by the corporate

23   management.  They may not have been used as much by the

24   programmers and the developers because they were downloading

25   things into their own special environments on their

Mason - direct

1    computers in order to do their programming code.  And then

2    when they completed, they would upload to CVS.  That's why

3    the dotted line was there, to show the corporate management

4    extensively used the network directory specifically.

5               Then below that, the idea is that all of those

6    repositories and/or network drives were backed up.  We had

7    two different tape systems.  One was a 4 millimeter DAC.  I

8    believe it was a Sony tape drive system, but it didn't

9    matter.  We probably had a couple over the years, and the

10   Formula Meter DAC tapes were good for I think 20 gigabytes

11   uncompressed, if I remember.

12              The Lotus Notes became pretty extensively --

13   extensive in size, along with the network directories that

14   our corporate management was using, so we ended up getting a

15   hundred gigabyte uncompressed.  It was a special larger tape

16   drive known as an Ultrum type of drive.  I can't remember

17   the brand we actually bought for that.

18              And these were all operated under a software

19   control program, which is now owned by Computer Associates,

20   called Arc Serve.  It may have a different name today.

21   Q.   All right.  And when did XpertUniverse start doing

22   backups?

23   A.   We started, I started doing backups from -- within

24   weeks of setting up the company, back in late -- in early

25   2000.  Late 1999, early 2000.

Mason - direct

1    Q.    And during the time you were at XpertUniverse, did

2    they ever stop doing backups?

3    A.    Well, I was there, and even when I came in at the

4    beginning of 2007, I had trained -- I had shown whoever was

5    there how to actually make the tape backups and I understood

6    they were being done.

7    Q.    Okay.  And you described how the backup tapes were

8    stored.  Some were saved.  Some would go off-site on the

9    weekend to make sure you had two sets at any one time, one

10   off-site, one on site; is that right?

11   A.    The off-site tapes would typically be the full backup

12   system sets.  We did a full backup once a week.  We did

13   incrementals during the week, as I recall.  And we would

14   take the full backup, which probably happened on a Thursday

15   night so somebody could take it home on the weekend on a

16   Friday.

17   Q.    And all of the source code was put into this CVS

18   repository; is that correct?

19   A.    All source code that the programmers worked on went

20   into CVS, yes.

21   Q.    And you described that as some sort of revision

22   control?  Is that what you said?

23   A.    It's a version control system, pretty common today.

24   CVS is still used.  There are competitors to CVS.  It's an

25   open source code version control system.

Mason - direct

1   Q.    And XpertUniverse used CVS the entire time that you

2   were there to store the source code; right?

3   A.    From the time we started any kind of computer

4   programming development, we used CVS, yes.

5   Q.    Okay.  The other one you mentioned was QuickPlace;

6   right?  What was that?

7   A.    QuickPlace was a documentary repository, similar to a

8   document repository in cloud you might use today.  It was an

9   IBM product that allowed us to upload documents from

10  anywhere, whether we were at home or whether we were at the

11  office.

12          All documents, any business documents went to

13  QuickPlace, and we shared our documents using QuickPlace.

14  It automatically sent out an e-mail to anyone on the

15  receiving list.

16  Q.    So if you uploaded something to QuickPlace and you had

17  set this up previously, you would get an e-mail ping back

18  saying it was received by QuickPlace?

19  A.    That is correct.

20  Q.    Okay.  And how were the individual computers backed

21  up?

22  A.    Well, if we look at the chart, all the corporate

23  management had their, what we'll call their document

24  directories, and as I've now, having looked at some of the

25  backup tapes, we actually had what you would like to call

Mason - direct

1    the desktops, what you see on the computer screen.  We

2    actually pulled them off of their computer systems and

3    actually backed them up onto tape.

4              We also, if they were also connected to the

5    network drive, we also backed up the network drive.  And I

6    saw those on the backup tapes.

7              From the -- some of the developers and the

8    architects, a lot of the programmers, we did not actually

9    pull the data off of think desktop computers.  What we did

10   is by understanding, they either uploaded their information

11   to CVS or any business documents that were completed would

12   have been put into QuickPlace.  But the off-serve system

13   itself didn't dynamically go into a developer or a

14   programmer desktop.

15   Q.   And how do you know that all these developers and

16   architects were saving their documents to this QuickPlace

17   directory?

18   A.   Well, it was policy in the company that all documents

19   went into QuickPlace, all source code went into CVS.  That

20   would have been their job.  By policy, everyone used

21   QuickPlace.

22   Q.   Okay.  And were there any computers that were not

23   connected to the network?

24   A.   Not to my knowledge, no.

25   Q.   And so just so we're clear, if someone had saved a

Mason - direct

1    document locally on their computer, would this have been

2    backed up?

3    A.    In the -- it's possible to create a directory in a

4    computer that wouldn't have been backed up.  It's my

5    understanding, if that was done it was that somebody was

6    doing a document of their kid's party.  I am very active in

7    the Boy Scouts, would have written a document for my Boy

8    Scout troop.  It is unlikely, well, one I would have put it

9    into QuickPlace; and, two, it's unlikely that it would have

10   been backed up.

11   Q.    But it's all -- it's your testimony -- I'm sorry.  Go

12   ahead.

13   A.    But I'd like to state that any business document,

14   nonpersonal, it's my understanding that everyone put

15   something into either QuickPlace or the network drive for

16   back up or it went to CVS.

17   Q.    And -- go ahead.  Sorry.

18   A.    On the chart, you'll see the FTP site.  That's for

19   file transfer protocol.  That's actually more like a

20   drop box connection.  It was used really for transferring

21   large files that couldn't go through e-mail back and forth,

22   but anything that went in there would have had to have been

23   backed up, would have been in either the CVS and/or

24   QuickPlace.

25   Q.    And how do you know that some other architect or

Mason - direct

1    developer actually was saving their documents to

2    QuickPlace?

3    A.    We would have, an e-mail would have been generated and

4    sent out to the appropriate architect who was responsible

5    for that.

6    Q.    And who are the architects at XpertUniverse, the

7    primary architects when you were there?

8    A.    The primary architects besides myself, Jim Nevin,

9    James Nevin, John Steinhoff, Theo Faro, a woman named Karen

10   Bartlett, I believe, and Abe Zelkin was our vice president

11   of technology.

12   Q.    Okay.  And just go to the next slide, please.

13             Is this another slide you created, sir?

14   A.    Yes, I did.

15   Q.    Okay.  And it's a little hard to read on the screen,

16   but essentially you -- at the time you started in roughly

17   August 1999 to the time you left in some time mid-2000,

18   XpertUniverse was employing this backup procedure, as you've

19   described today; is that correct?

20   A.    That is correct.

21   Q.    And so any of the data that was on the desktops or in

22   these various repositories would have been captured in those

23   backup tapes as of the time you left --

24   A.    Yes.

25   Q.    -- in mid-2007?

Mason - direct

1    A.    Yes.

2    Q.    All right.  And then the company essentially shut down

3    at that point?

4    A.    XU materially stopped all work as far as I know when I

5    was there.  Theo Faro had completed her work towards the end

6    of 2006, and I knew of no more business work that was done

7    after that point in time, sometime in the beginning to

8    mid-2007.

9    Q.    And essentially, then, those desktops, as far as you

10   understand, would have been just unplugged?

11   A.    Either unplugged or sitting there, not being used.

12   Q.    Okay.  And then I believe Mr. Friedman testified that

13   he moved his office some time in roughly December 2010?

14   A.    He did.  He told me that, yes.  I was not involved in

15   that.

16   Q.    And based on your knowledge of what was going on at

17   XpertUniverse during the relevant time and being in charge

18   of the backup procedures, you know, do you think any of the

19   relevant business data would have been lost or not captured

20   on those backup tapes?

21   A.    I can't see how we would have missed it.  I personally

22   had a procedure in place every three to four, we would

23   actually take sample backup tapes and we would restore data,

24   having seen backup tapes go bad, to verify that they were

25   operational.

Mason - direct

1              Given the backup procedures, I think everything

2      from a business standpoint would have been backed up on

3      those tapes.

4              MR. CANTINE:  Thank you very much.

5              THE COURT:  Mr. Schuman?

6              MR. SCHUMAN:  Thank you, your Honor.

7                         CROSS-EXAMINATION

8      BY MR. SCHUMAN:

9      Q.    Good morning, Mr. Mason.

10     A.    Good morning.

11     Q.    My name is Brett Schuman and I represent Cisco.

12              Mr. Mason, you have a -- currently, you're

13     on a consulting agreement with XpertUniverse; is that

14     correct?

15     A.    Yes.

16     Q.    You're being paid for your time here today; is that

17     correct?

18     A.    I am, yes.

19     Q.    And I think you said in response to Mr. Cantine's

20     questions, you were employed by XpertUniverse from

21     approximately late 1999, early 2000, until the end of 2006;

22     is that correct?

23     A.    That's correct.

24     Q.    Your title is director of technology; right?

25     A.    Yes.

Mason - cross

1    Q.      And when you were employed by XpertUniverse, used both

2    a desktop computer and a laptop computer; correct?

3    A.      That is correct.

4    Q.      And when you left XpertUniverse, you took the laptop

5    computer with you, didn't you?

6    A.      I did.

7    Q.      And I think you testified at your deposition, you

8    repurposed that laptop for your daughter's use; right?

9    A.      I did.

10   Q.      And as part of repurposing that laptop, you

11   reformatted the hard drive; right?

12   A.      I would have, yes.

13   Q.      Did you take any steps to preserve any XU data on that

14   laptop before you repurposed it for your daughter?

15   A.      Any data that would have been XU-oriented would

16   have been in QuickPlace and I would have uploaded anything

17   there.

18   Q.      But when you repurposed the laptop for your daughter,

19   did you do anything specific with respect to any XU data

20   that would have been on the laptop's hard drive at that

21   time?

22   A.      Well, any documents that would have been there, I did

23   do regular backups in my own laptop and I did provide some

24   documents that I had there to -- to Stroock.

25   Q.      What happened to your desktop computer, Mr. Mason?

Mason - cross

1    A.    That was left on my desk at XpertUniverse.

2    Q.    You are the administrator for -- strike that.

3          Mr. Cantine asked you some questions regarding

4    something called QuickPlace.

5          Do you remember that?

6    A.    Yes.

7    Q.    And you were the administrator at XpertUniverse for

8    the QuickPlace depository; right?

9    A.    That's correct.

10   Q.    And I think you said QuickPlace is where every

11   business document went; is that right?

12   A.    Yes.

13   Q.    And that would include technical documents regarding

14   XU's technology, such as design documents, those kinds of

15   documents would go to QuickPlace; right?

16   A.    That's correct.

17   Q.    And functional specifications are also documents that

18   would have been stored in QuickPlace; is that correct?

19   A.    Yes.

20   Q.    Documents regarding the development of the inventions

21   in XU's patents would have been stored in QuickPlace;

22   right?

23   A.    Yes.

24   Q.    And also documents regarding XU's work on the project

25   with Cisco, those documents would have been stored in

Mason - cross

1    QuickPlace; right?

2    A.    Yes.

3    Q.    QuickPlace is no longer accessible, is it?

4    A.    QuickPlace is not accessible now, no.

5    Q.    But when it was running, whether it was accessible,

6    Mr. Mason, you testified that QuickPlace was being backed up

7    regularly; is that right?

8    A.    Yes.

9    Q.    And in the course of your work with XU for purposes of

10   this litigation, you've reviewed some of those backup tapes;

11   right?

12   A.    Correct.

13   Q.    And in connection with your review of those backup

14   tapes, you didn't find any of the backups for QuickPlace,

15   did you?

16   A.    That's not correct.  I did find QuickPlace backup

17   tapes.  They are encrypted.  There are hundreds of megabytes

18   of backup data that QuickPlace -- the QuickPlace of the year

19   2000/2001, is quite different than the -- IBM has

20   discontinued the use of QuickPlace, so creating a QuickPlace

21   environment to restore the tapes is extremely difficult.

22   We worked with IBM and we're having difficulty doing that.

23   Q.    Do you recall when you were deposed in this case being

24   asked questions regarding whether any backup tapes were

25   found for QuickPlace?

Mason - cross

1    A.    I do recall that, yes.

2    Q.    And at page 149 of your deposition transcript, lines

3    10 to 11:

4              "Question:  Why not?

5              "Answer:  We haven't found any backups for

6    QuickPlace."

7              So is it your testimony today, Mr. Mason, that

8    since your deposition, some backup tapes for the QuickPlace

9    directly have been found?

10   A.    That is correct.

11   Q.    And is it also your testimony, Mr. Mason, that those

12   backup tapes are encrypted?

13   A.    They're -- they appear to be indecipherable with data,

14   so I would have to say using my best judgment, they are

15   encrypted.

16   Q.    So then isn't it a true statement, Mr. Mason, that as

17   part of this litigation, there has been no data pulled from

18   the backup tapes for QuickPlace for purposes of this case;

19   isn't that correct?

20   A.    Well, I provided that information to Stroock, but I

21   have not actually seen data, something in readable format.

22   Q.    As part of your work on the backup tapes in this case,

23   isn't it a true statement that no data has been pulled from

24   the backup tapes for the QuickPlace directly?

25   A.    Well, to be clear, data the was pulled, but it was in

1    encrypted format.

2    Q.    And I think your testimony was it's indecipherable; is

3    that correct?

4    A.    As far as I could see, yes.

5    Q.    Your testimony was that the backup tapes created by

6    XpertUniverse included certain folders on certain users'

7    desktop computers; right?

8    A.    Yes.

9    Q.    Do you recall preparing a declaration in connection

10   with this motion that we're here on today, Cisco's motion

11   for terminating sanctions, Mr. Mason?

12   A.    I remember a declaration.  I have that in front of me.

13            MR. SCHUMAN:  Your Honor, I have copies of

14   Mr. Mason's declaration.  May I approach?

15            THE COURT:  Yes, you may.

16            (Mr. Schuman handed documents to the Court and

17   to the witness.)

18   BY MR. SCHUMAN:

19   Q.    Do you recognize your declaration, Mr. Mason?

20   A.    Yes.

21   Q.    You wrote the declaration; right?

22   A.    I did.

23   Q.    In paragraph 12 of your declaration, Mr. Mason, you

24   talk about Mr. Rutberg's desktop folder.

25            Do you see that?

Mason - cross

1   A.    Yes.

2   Q.    And you say, by way of example, Mr. Rutberg's desktop

3   folder and various related folders were captured by the

4   backup process described above and found on the backup

5   tapes.

6   A.    That's correct.

7   Q.    Which -- which local folders from Mr. Rutberg's

8   desktop computer were you referring to that were found in

9   the backup tapes?

10  A.    I was referring to the actual desktop that you would

11  see on your computer screen, when you were back at the icon

12  level on a computer.  They were actually pulled, and I also

13  noticed a document directory.

14  Q.    And is that all of the local directories that would

15  have been on Mr. Rutberg's computer, Mr. Mason?

16  A.    There may have been others, but they would all be

17  under the basic document directory structure.  I don't

18  recall exactly which directories were there.

19  Q.    Mr. Cantine put a graphic up on the screen and you

20  had -- that you had created where there was a line, and on

21  the left-hand side you had management and on the right-hand

22  side you had developers?

23  A.    Correct.

24  Q.    Which side was Mr. Rutberg on?

25  A.    He would have been on the left side, the corporate

Mason - cross

1    manager.

2    Q.    And you found those directories that you just

3    testified to on the backup tapes for Mr. Rutberg's desktop

4    computer; right?

5    A.    Yes, I did.

6    Q.    In connection with your work in this case, did you

7    find any such directories for Mr. Steinhoff on any of the

8    backup tapes?

9    A.    Mr. Steinhoff?  No.  That would have been -- no.

10   Q.    And that's because Mr. Steinhoff was on the right-hand

11   side of that dotted line on your graphic; is that correct?

12   A.    That is right.  That's correct.

13   Q.    And your testimony earlier for Mr. Cantine was, if you

14   were on the right-hand side of that line, the Arc Serve

15   software did not automatically back up the local drives on

16   those computers; is that right?

17   A.    That is correct.

18   Q.    And Mr. Steinhoff -- therefore, Mr. Steinhoff's

19   computer was not being backed up, the local directories were

20   not being backed up; is that correct?

21   A.    That's correct.

22   Q.    Mr. Steinhoff is one of the named inventors on both of

23   the XU patents in this case, isn't he?

24   A.    Yes, he is.

25   Q.    Mr. Mason, as part of your review of the backup tapes

Mason - cross

1      in this case, did you find any of the local directories for

2      your desktop computer on those tapes?

3      A.     No.

4      Q.     And that's because you were on the right-hand side of

5      this dotted line as well; is that right?

6      A.     That is correct.

7      Q.     And you, sir, are a named inventor on both of XU's

8      patents in this case, aren't you?

9      A.     Yes, I am.

10     Q.     How about Mr. Nevin?  In your review of the backup

11     tapes, did you find any of the local drive directories for

12     Mr. Mason on these backup tapes?  I'm sorry.  Strike that.

13     I misspoke.

14            Mr. Nevin.  In your review of the backup tapes,

15     did you find any of the local directories for Mr. Nevin's

16     computer on the tapes?

17     A.     No.

18     Q.     That's because Mr. Nevin is on the right-hand side of

19     this dotted line in your graphic; is that correct?

20     A.     That's correct.

21     Q.     Mr. Nevin is a named inventor on both of the XU

22     patents in this case; right?

23     A.     Yes, he is.

24     Q.     How about Mr. Zelkin?  Did you find any local backups

25     for his computer on these backup tapes?

Mason - cross

1   A.   Yes.

2   Q.   Which ones?

3   A.   His desktop directory and other document folders.

4   Q.   Which side of the line, your dotted line, was

5   Mr. Zelkin on?

6   A.   I put Mr. Zelkin on the left side, the corporate

7   management.

8   Q.   His title was CTO; right?

9   A.   Yes, or Vice President of Technology.  I'm not sure.

10  Q.   Which side of the line was Mr. Alex Merker on, going

11  back to your graphic?

12  A.   Alex Merker would have been on the left side,

13  corporate management.

14  Q.   Did you find any back ups on the backup tapes of

15  Mr. Merker's local directories?

16  A.   Yes.

17  Q.   Which ones?

18  A.   His document directories.  I can't speak specifically

19  which ones.  I would have to have a directory structure in

20  front of me, but most of his computer was backed up.  The

21  documents were backed up.

22  Q.   How about Ms. Faro?  In your review of the backup

23  tapes, did you find any backups for her local directories?

24  A.   Yes, I did.

25  Q.   And which directories?

Mason - cross

1    A.     They were also her document directories from a

2    desktop.

3    Q.     Mr. Mason, you personally stored documents regarding

4    the XU '903 patent, one of the two patents-in-suit.   You

5    personally stored documents regarding the development of the

6    invention and that patent both on your desktop as well as on

7    QuickPlace; right?

8    A.     That would be correct.

9    Q.     And you also personally stored documents regarding the

10   development of the invention of the '709 patent, the other

11   patent in this case, on both your local -- your desktop

12   computer as well as on QuickPlace; right?

13   A.     Yes.

14           MR. SCHUMAN:   I don't have any other questions.

15   Thank you, Mr. Mason.

16                    REDIRECT EXAMINATION

17   BY MR. CANTINE:

18   Q.     Mr. Mason, Mr. Schuman was just asking you some

19   questions about whether Mr. Steinhoff, whether you found his

20   local directory on backup tapes; right?

21   A.     Yes.

22   Q.     Was it Mr. Steinhoff's practice to save all business

23   records into the QuickPlace repository?

24   A.     Absolutely.

25   Q.     Was it your practice to save all business records into

Mason - redirect

1    the QuickPlace repository?

2    A.    Absolutely.

3    Q.    Was it Mr. Nevin's practice to save all business

4    documents to the QuickPlace repository?

5    A.    Yes, absolutely.

6    Q.    Mr. Schuman just asked you some questions about

7    whether you personally stored documents related to the two

8    patents on both your desktop and the -- and QuickPlace;

9    right?

10   A.    Yes.

11   Q.    Were any of the documents you stored on your desktop,

12   if they were important business documents, would have ended

13   up on QuickPlace?

14   A.    Every one would have been put into QuickPlace.

15   Q.    Would that be the same for Mr. Steinhoff, Mr. Zelkin,

16   and the others?

17   A.    I absolutely believe that, yes.

18            MR. CANTINE:  No further questions.  Thank you,

19   your Honor.

20            THE COURT:  Are the questions about laptops

21   germane to anything here?

22            MR. CANTINE:  That is not an issue that has been

23   raised before, your Honor.

24            THE COURT:  Okay.  I didn't think it had been.

25   Is it germane to anything?

Mason - redirect

1              MR. SCHUMAN:  I think the focus is on the

2    desktops, your Honor, and Mr. Mason obviously is one of the

3    few XU employees who had both a laptop and a desktop, and so

4    I asked a few questions about the laptop.

5              THE COURT:  The only reach I'm asking is, it

6    seemed to me that the laptop questions were going somewhere,

7    but they didn't get to wherever it was they were going,

8    so I'm just wondering, before Mr. Mason goes away, but

9    what I'm hearing is, they weren't really intended to go

10   anywhere.

11             MR. SCHUMAN:  Let me clarify, your Honor.

12             Our focus is on the desktops, and I think we

13   established a few things here, which I'm happy to summarize

14   when we're done.

15             THE COURT:  All right.  Well, I'm just trying to

16   figure out --

17             MR. SCHUMAN:  With the laptops, though --

18             THE COURT:  Yes?

19             MR. SCHUMAN:  -- a few XU employees had laptops.

20   My understanding it was not company policy.  Mr. Mason is

21   one of those employees, and Mr. Mason had a laptop that he

22   used for XU business work, and when he repurposed it for his

23   daughter, my understanding -- and you just heard Mr. Mason's

24   testimony -- is that there was no effort to recover XU data

25   on there before the hard drive was cleaned.

Mason - redirect

1              I interpreted Mr. Mason's testimony, but we all

2    heard it to be that there was no need to do that because

3    anything on that computer would have been backed up to this

4    QuickPlace.

5              THE COURT:  All right.  And Mr. Mason, I guess

6    that's the only point I was interested in, is whatever you

7    had on your laptop that was business related, was there some

8    procedure that you followed or that was company policy or

9    resulted in the business information data, however you want

10   to call it, being preserved on essentially on the backup

11   tapes?

12             THE WITNESS:  Yes.  Anything I had done on the

13   laptop would have been up uploaded to QuickPlace.  Could

14   have done it from home or in the office.  And I would have

15   either gone to QuickPlace or CVS and then would have been

16   backed up on the backup tapes.

17             THE COURT:  So basically it was company policy

18   that whoever had laptops, they were supposed to be doing --

19   well, let me just step back.

20             My understanding is essentially if you are on

21   the management side of the dotted line, things get put onto

22   QuickPlace and other -- essentially, a computer is drawing

23   these things and saving them.

24             If you were on the right-hand side, the

25   architect side, it's more a question of, did you follow

Mason - redirect

1    company policy and upload these things.

2              All right.  I think I understood what you said.

3    All right.  Thanks, Mr. Schuman.

4              All right.  Well, and just so I have it on the

5    top of my head now -- actually, let me just ask.

6              So in terms of business information documents,

7    source code, is there anything that was done using the

8    computer in XpertUniverse's business that would not have

9    made its way eventually into the backup tapes?

10             THE WITNESS:  I don't believe that's -- that it

11   would have been possible procedurally.  Everyone uploaded to

12   the, one of the document repositories.

13             THE COURT:  So maybe a different way of saying

14   it is, if people followed what you understood to be the

15   company's policies, everything business concern would have

16   been preserved on the backup tapes?

17             THE WITNESS:  Yes, I would agree with that.

18             THE COURT:  And so then the only question is, or

19   a question, but as it turns out, some of what was saved on

20   the backup tapes seemed not to be retrievable into a humanly

21   understandable form today?

22             THE WITNESS:  Yes.

23             THE COURT:  All right.  All right.  Unless there

24   are any questions from either of you, Mr. Mason, thank you

25   very much.

1                    THE WITNESS:  Thank you.

2                    (Witness excused.)

3                    THE COURT:  All right.  Mr. Schuman, do you want

4      to take a minute and tell me what you think is important

5      about what Mr. Mason just said.

6                    MR. SCHUMAN:  Yes, your Honor.  I think we just

7      figured out the, perceived on our part inconsistency between

8      what Mr. Mason said in his deposition and when he said in

9      his declaration in opposition to this motion for a whole

10     slew of XpertUniverse employees, including all of the

11     inventors on the patents-in-suit.  Their desktop computers

12     were not being backed up, including Mr. Mason, including

13     Mr. Steinhoff, including Mr. Nevin.  The only one who is a

14     named inventor on these patents is the CTO, Mr. Zelkin, who,

15     as I understand it from Mr. Mason, he puts him on the

16     left-hand side of the line.

17                   The reason why QuickPlace is significant, your

18     Honor, and I think the fundamental disconnect between the

19     two sides on this point, XpertUniverse believes the fact

20     that everything was being backed up to QuickPlace makes it

21     irrelevant that these desktop computers were destroyed

22     without imaging them.  The problem, your Honor, is that we

23     have doggedly pursued discovery from the QuickPlace

24     directory since we learned of it in the very first

25     deposition in this case, and what we have been consistently

1    told is what you heard Mr. Mason say today.  They're not

2    able to recover any of the data that was stored to

3    QuickPlace, so the fact that XpertUniverse had a policy of

4    regularly storing data, business data, technical data,

5    functional specifications, documents regarding the

6    development of the patents in this case, documents regarding

7    XU's purported trade secrets -- the fact that all of those

8    documents were stored on QuickPlace as well as on local

9    desktops, QuickPlace is irrelevant, your Honor.  It's done.

10   We didn't get any discovery from QuickPlace and Mr. Mason

11   has confirmed that on the stand.

12             When XpertUniverse destroyed those desktop

13   computers well after this litigation was filed, QuickPlace

14   was inaccessible.  The only other location for the data from

15   the inventors on the patents in this suit was on their

16   desktops.

17             Mr. Friedman -- can we put up the first slide?

18   We have just a few slides in summary.

19             Mr. Friedman testified at his deposition -- this

20   was the very first deposition in the case:

21             When did you move offices?

22             December of 2010.

23             So in December of 2010, XpertUniverse got rid of

24   old laptops and desktops that it had?

25             Not laptops, a few desktops.

1          A few desktops?

2          Yes.

3          Approximately how many?  I would say five, six,

4     to the best of my recollection.

5          Do you recall which employees used those?

6          John Steinhoff, David Rutberg, maybe Alex

7     Merken.

8          I think Mr. Friedman didn't remember all of the

9     names, but I think from the testimony, Mr. Mason, of course,

10    used the desktop.  Mr. Mason is on the right-hand side of

11    that line.  His desktop is gone.  Mr. Friedman couldn't

12    remember his name, and I am going to make the argument, make

13    the assertion that based on all the evidence, Mr. Mason's

14    desktop was another one of the desktops that was discarded

15    after the filing of this case.

16         Mr. Mason testified today he said in his

17    deposition, he had notes, memoranda, functional specs,

18    design specs, other documents regarding the development of

19    XU's technology, including the patents, on his desktop and

20    on QuickPlace.

21         QuickPlace is gone.  His desktop was destroyed

22    after the case was filed.  Along with Mr. Steinhoff, who is

23    a named inventor and on XU's witness list, his desktop,

24    Mr. Friedman acknowledges, was destroyed.  And we now know

25    from Mr. Mason's testimony, his desktop was not being backed

1    up, your Honor, and so anything that he stored in QuickPlace

2    is accessible and has not been produced in this litigation,

3    and his desktop is gone.

4                THE COURT:  I'm sorry.  When you say his desktop

5    was not being backed up, what when you mean is it's not

6    being backed up on that.  Correct?

7                MR. SCHUMAN:  Correct.  There is a backup

8    procedure and what was being stored on these backup tapes

9    was this Arc Service software that they had that Mr. Mason

10   testified to would go onto the network computers, they're

11   all on a network, and would, for lack of a better work, suck

12   the data off of the document directories, but only for those

13   employees on the left-hand side of Mr. Mason's line.  Those

14   are the business types.  That's Victor Friedman, that's Ms.

15   Eiss.

16               THE COURT:  Right, right.

17               MR. SCHUMAN:  This is a patent case, among other

18   things, and none of the technology folks, none of the

19   developers, none of the architects, none of the named

20   inventors other than Mr. Zelkin, none of their computers

21   were being backed up.  And I think the evidence establishes

22   that data was lost because QuickPlace, where they were

23   supposed to, as a matter of company policy, store this stuff

24   as well, is inaccessible to a human, as your Honor put it.

25   There's no discovery from QuickPlace in this case.  That's

1    the simplest way to put it.

2              And after this case was filed, a year-and-a-half

3    after this indication was filed, they should not have

4    destroyed the only accessible source of that data, the hard

5    drives of the inventors, Mason, Nevin, Steinhoff.

6              I have a few other slides which are more on the

7    overall motion, your Honor, but you asked me just to

8    summarize what I think we established with Mr. Mason, and I

9    think it's significant.

10             THE COURT:  Well, actually, if I can just ask

11   Mr. Mason another question.

12             Mr. Mason, you're still under oath.  Okay?

13             MR. MASON:  Yes.

14             THE COURT:  You don't have to -- when did you

15   first learn that the materials that you were looking for on

16   QuickPlace were indecipherable?

17             MR. MASON:  A couple months ago, a few months

18   ago, when I got the QuickPlace tapes.

19             THE COURT:  Were you involved before then in

20   trying to find what was on these backup tapes?

21             MR. MASON:  Yes.

22             THE COURT:  How long have you been involved in

23   trying to find what is on the backup tapes?

24             MR. MASON:  Probably close to a year.

25             THE COURT:  All right.  But before that,

```
 1    whoever was looking at the backup tapes was somebody other
 2    than you?
 3              MR. MASON:  Yes, I think Stroock had a company
 4    going through backup tapes.
 5              THE COURT:  Okay.  All right.  Well, I'm just
 6    interested in what you know.  So -- all right.  Thank you.
 7              I'm sorry.  Go ahead, Mr. Schuman.
 8              MR. SCHUMAN:  Your Honor, I have two more slides
 9    to summarize the entirety of the terminating sanctions
10    motion, but if you just want to hear about Mr. Mason, I can
11    hold those.
12              THE COURT:  Well, why don't you finish up and
13    then Mr. Cantine can address everything at once.
14              MR. SCHUMAN:  These are a few of the places in
15    the record and also from Mr. Mason's deposition just
16    establishing the kinds of materials that were stored on
17    these desktop computers that were destroyed after the filing
18    of the case.
19              Daily documents, that's from Mr. Rutberg, and
20    that's in the record at DI 295, draft documents were saved
21    to the desktops.  Architectural documents, all support,
22    development, business, presentation documents, et cetera,
23    were saved on David's machine.  That's David Rutberg.
24              Visio, which are drawings, these are the
25    drawings of algorithms and flow charts and things, Visio and
```

1    Microsoft Word automatically created a file locally on the

2    screen first, which were then put into QuickPlace.

3           My understanding is the way the QuickPlace

4    program works, it creates a little agent on your desktop.

5    It stores it first there and then it transfers it up to

6    QuickPlace, and that's how things are stored on QuickPlace.

7           Again, with QuickPlace inaccessible and the

8    desktops destroyed, we've lost the only two places where

9    documents and drawings regarding the development of the

10   inventions in this case would have been accessible.

11          Notes from meetings discussing the invention

12   claimed in the '903 patent.

13          Visio documents, he also said notes regarding

14   the invention claimed in the '709 patent.  Those are right

15   out of Mr. Mason's deposition.  He forthrightly acknowledged

16   it on the stand today, so his deposition is largely

17   superseded.

18          There are -- I think Mr. Mason's declaration is

19   truthful to a point, and I think sometimes the phrase a half

20   truth is a whole lie is appropriate here because it is a

21   true statement that Mr. Rutberg, who was on the left-hand

22   side of that line, had his desktop being backed up.

23          And there have been some documents in discovery

24   from Mr. Rutberg's desktop.  But what was not stated in

25   Mr. Mason's declaration, and what I think we learned here

1    today, that there's a whole group of other employees whose

2    desktops were not being backed up, were not found on those

3    tapes, and that's why we don't have that evidence.  And

4    those are the very computers who we know, or I think we can

5    figure out whose computers were destroyed.

6              Steinhoff --

7              THE COURT:  I mean, his testimony was not that

8    they were not being backed up.  It was that they were being

9    backed up.

10             MR. SCHUMAN:  His testimony was that the

11   automatic software that backed up the local documents'

12   directories, the subject of his declaration, paragraphs 9

13   through 12, Arc Serve software by Computer Associates, these

14   would backup the local drives.  That's what he says in

15   paragraph 11.

16             And in paragraph 12, he says, by way of example,

17   Mr. Rutberg's desktop folder was being backed up.

18             This is all about this Arc Serve software that

19   backed up the local document directories, my documents,

20   desktop.  That software, what was not stated in this

21   declaration, but what Mr. Mason just said on the stand, that

22   software was not applied to any of the developers on the

23   right-hand side of that dotted line.  The testimony is that

24   those folks, as a matter of company policy, were also

25   expected to store those documents in QuickPlace, and that

1    Mr. Mason himself complied with that policy.  But, your

2    Honor, QuickPlace is gone.

3              THE COURT:  No, no, no, no.  But I mean, in

4    other words, there's maybe -- probably depending on how you

5    look at it, multiple issues here, but one of them is, is I

6    think, more or less, did XU's business documents get stored

7    on backup tapes.

8              And what I'm hearing is, some of them may have

9    been done automatically, but even to the extent it's not

10   done automatically, that's a matter of company policy it

11   gets done.  That's what I think Mr. Mason said today.

12             MR. SCHUMAN:  As a matter of company policy, he

13   said that they were all supposed to store things to

14   QuickPlace, and that Mr. Mason did that and he understands

15   Mr. Steinhoff did that.  I think that was the point of

16   Mr. Cantine's followup examination.

17             THE COURT:  Right.

18             MR. SCHUMAN:  But that directory --

19             THE COURT:  But then the second issue is, okay.

20   So that's a good procedure, results in preservation of the

21   company's records, and then there's a second issue, which

22   is, depending on whether it perhaps is, oops, what's on the

23   backup tapes, you know, is it there if you can't understand

24   what it says?  I mean, apparently, it's there, but either

25   because -- I don't know -- code has changed in six or

1    eight years, or IBM sold its computer business, or for some

2    reason or another, no one now can retrieve it.

3              MR. SCHUMAN:  I would state that, I agree with

4    your Honor, that there are two issues.  First, what was

5    being backed up and, second, what is accessible for purposes

6    of this litigation for backup.

7              THE COURT:  Right.

8              MR. SCHUMAN:  Those are the two issues.  I agree

9    with you.

10             On the first issue, what we were told in

11   response to our motion is that, generally, everything was

12   being automatically backed up through this Arc Serve

13   program, and what we've figured out is that is not the case

14   for the employees that I would submit matter most in a

15   patent case, in a trade secret case, which is that the

16   architects, they were not being backed up.  As a matter of

17   company policy, we are told the evidence is from Mr. Mason

18   that they were backing, they were encouraged to store things

19   on QuickPlace.

20             With respect to -- and then the second issue I

21   think, as your Honor said it, and what can we get from those

22   backups?  And I would submit, your Honor, that's where the

23   real prejudice is here.

24             Those backup tapes -- and Mr. Mason, what he

25   said today is consistent with his deposition testimony, that

```
 1    in about December of 2011, he was asked to look at these

 2    backup tapes by Mr. Friedman.

 3                   That's too late, your Honor.  This case was

 4    filed in March of 2009 and that process should have happened

 5    then and XpertUniverse should have known then what was on

 6    these backup tapes.  And certainly when Mr. Friedman wanted

 7    to destroy five, six, the testimony is actually up to ten,

 8    but what we have in his deposition is five to six, including

 9    Mr. Steinhoff and including most likely Mr. Mason's

10    computers, a year-and-a-half after the case was filed,

11    December 2010, they should not have done that.

12                   All of this should have happened when the case

13    was filed, your Honor.  We should have known whether

14    QuickPlace was accessible to get that data.  That data is

15    gone.  In discovery, we did not get any memos, we did not

16    get any notes regarding the development of these inventions

17    or claimed trade secrets.  They're not there.  And that's

18    because QuickPlace is inaccessible and has been, and they

19    should have figured that out sooner and they should have

20    figured it out before they knowingly destroyed the desktop

21    computers of the named inventors in this case.

22                   THE COURT:  All right.  Thank you.

23                   MR. SCHUMAN:  Thank you, your Honor.

24                   MR. CANTINE:  I think to suggest Mr. Mason or

25    anyone else has been less than fully truthful is stepping
```

1    over the line.  He got up there and told us exactly what

2    happened.

3                    THE COURT:  I credit -- you know, I'm not sure

4    that it will make any difference one way or the other, but I

5    accept what Mr. Mason said today as being truthful.

6                    MR. CANTINE:  Thank you.

7                    And, your Honor, there are the two questions,

8    like you said.  Were the business records being backed up?

9                    THE COURT:  Actually, I'm sorry, Mr. Cantine.  I

10   just have a few questions.

11                   Do we know, Mr. Schuman pointed to an excerpt

12   from maybe Mr. Friedman's deposition as saying here are the

13   two computers that were destroyed.  Do we actually know

14   whose desktops were destroyed?

15                   MR. CANTINE:  He was less than clear about it.

16   I mean, he couldn't remember the number.

17                   THE COURT:  Right.  I got that.

18                   MR. CANTINE:  And he certainly wasn't, I

19   don't think, sure which ones.  I don't know if they were

20   labeled.

21                   Mr. Mason could maybe tell us whether it had

22   Steinhoff, Mason, whatever on the computer itself, but I

23   don't know how he would have known that they all looked the

24   same, which one was which.  But he threw out a couple names.

25   One was Mr. Rutberg and one was perhaps Mr. Steinhoff, but

1    it's certainly less than clear as to whether or not he was

2    simply guessing at that point.

3                 THE COURT:  Well, let me ask because sometimes

4    you can figure these things out circumstantially.

5                 Were there a bunch of other desktops that were

6    not destroyed or were these the last remaining desktops?

7                 MR. CANTINE:  I believe those were the last

8    remaining because, again, remember he was moving offices, so

9    he just got rid of all the nonworking ones that had been

10   collecting dust for many years.

11                THE COURT:  And do we know?  How many desktops

12   did XU have at its peak?

13                MR. CANTINE:  I don't know that information

14   right now, your Honor.

15                THE COURT:  I mean, I guess what I'm -- you

16   know, I hear about CTOs and COOs and CEOs and inventors, but

17   I don't actually really have much of an idea that there were

18   ten people and everybody was a chief, or there were 400

19   people and this was the high level skill.

20                MR. CANTINE:  Mr. Mason could probably tell

21   you, but my recollection is at its height, XpertUniverse had

22   somewhere, about maybe 20 employees.  There's the core group

23   of the architects and developers.  We kind of had the

24   corporate management side with probably four or five people

25   and you had a lot of other developers and worker bees, if

1    you will, that kind of came and went along over the years.

2              THE COURT:  Well, so I'm guess, maybe the point

3    is this happened back in 2007 or 2008, so therefore it

4    does not seem to indicate the same things, but I guess if we

5    had those desktops today, at some point, they are all

6    destroyed.

7              MR. CANTINE:  Right.

8              THE COURT:  The issue here is some survived the

9    onset of litigation and so therefore there's a different

10   issue that's implicated.

11             MR. CANTINE:  Correct.  If he had thrown out all

12   the desktops and all the laptops the day the company shut

13   down in 2007, there's no issue there because he didn't have

14   any expectation of suit at that point.  But, yes, a handful

15   survived that date, that critical date, if you will, and

16   then were discarded.

17             But I think the testimony we heard today was

18   unequivocal.  All business records were backed up.  And the

19   issue we're facing is essentially, you know, did

20   Mr. Friedman have reason to believe that all the data that

21   was on those desktops was backed up at the time he threw

22   them out, and it was unequivocally the company policy to

23   back everything up to the tapes.

24             You know, would I recommend he throw the

25   desktops out?  No.  But --

```
1              THE COURT:  I'm pretty sure you didn't.

2              MR. CANTINE:  Yes.  But that's what we're left

3    with.  And the question is, was the information, number

4    one, right, as you said?  Did the business records get

5    backed up?  The testimony is they did.  All -- it's the

6    company policy he was there from day one, Mr. Mason was

7    there from day one.

8              The architects collectively, they had to work

9    together.  They were all working on the same solution.

10   They needed all those documents to be in the same place and

11   they could all get access to them, and that same was

12   QuickPlace.

13             The second issue, whether we can now get the

14   data off those tapes is a completely different issue, you

15   know.  That didn't come up until Mr. Friedman's deposition,

16   where I would remind the Court, he volunteered the fact that

17   he threw these things out.  You know, that just came out of

18   left field.  I mean, he literally volunteered it.

19             So that's what the whole issue --

20             THE COURT:  I'm sorry, Mr. Cantine.  When was

21   this deposition, roughly speaking?

22             MR. CANTINE:  I believe it was in December.

23             MR. SCHUMAN:  December of 2011, your Honor.

24             MR. CANTINE:  2011.

25             THE COURT:  All right.  So that's kind of
```

1    consistent with Mr. Mason about a year ago being asked to

2    start looking at these backup tapes?

3              MR. CANTINE:  Right.

4              THE COURT:  All of a sudden now, there's an

5    issue.

6              MR. CANTINE:  There's an issue, so we say, okay.

7    Let's go find the backup tapes and see if we can get the

8    data off of them and we tried.  Believe me, Mr. Mason spent

9    a lot of time calling up his old colleagues from IBM to try

10   to get this QuickPlace up and running and just never was

11   able to do it.  But to suggest we should have on day one

12   gone to these backup tapes and figured out whether the data

13   was accessible is a stretch, at best.

14             And I hear Mr. Schuman now arguing that the real

15   prejudice is that we can't get the data off the backup

16   tapes.  But that's not why we're here.  That's not what

17   their motion was about.  Their motion was about some

18   destruction of evidence, and I mean we've spent more time on

19   this issue than we did on summary judgment.  And I think

20   we've had -- obviously, it needs to come to an end.  Right?

21   We didn't have any obligation to look at those backup tapes

22   before this whole issue was raised in December of 2011.

23             I can go on with what we've learned.  I want

24   to explain to you the declarations we filed yesterday, and

25   maybe --

1          THE COURT:  Well, we can talk about them in a

2     second, but let's just assume that this is the factual

3     scenario.  In June, or December of 2010, when Mr. Friedman

4     is closing the office or moving the office, whatever it is

5     he's doing, he decides no point in moving computers that are

6     old and have no value.  So he -- and being aware of whatever

7     level of savvyness he has as to what the corporate policy

8     was, being aware that the backup tapes exist somewhere, he

9     says no big deal and throws them out.

10          And then it turns out that some of the

11     computers, you don't know who they belonged to.  They

12     belonged to somebody at XU.  Some of their computers, it

13     seems, and I'm not actually sure Mr. Friedman knows this,

14     but it seems like he knew who two of them belonged to or

15     something.

16          So then after they are thrown out a year later,

17     you hear about it, Mr. Schuman hears about it, everybody

18     hears about it, and so there's an effort made to go back

19     and, you know, no harm here, because all the information is

20     somewhere else.  And it turns out that the assumption that

21     all of the information is somewhere else is wrong because,

22     you know, for whatever reason, it cannot be retrieved

23     anymore.

24          Assuming that's the factual scenario, it seems

25     reasonable to conclude that documents that would have been

1    reviewed or potential responses to discovery have been lost.

2              MR. CANTINE:  No.  Well, let me -- let me -- two

3    things.

4              Number one, the documents that were on the

5    backup tapes are not destroyed in a sense.  They are just --

6    we now know they are in inaccessible due to issues with the

7    QuickPlace.

8              THE COURT:  Is there something more than a

9    metaphysical distinction there?

10             MR. CANTINE:  Well, the first question is was it

11   reasonable for Mr. Friedman to three the computers out

12   because he thought all the data was on the backup tapes, and

13   clearly, that's what he thought.

14             THE COURT:  Right now I'm saying I will give him

15   credit for that.

16             MR. CANTINE:  Okay.  We find out a year later or

17   how many months later, okay.  We find the backup tapes.

18   Unfortunately, we can't get the data off of that due to no

19   fault of our own.  It's reasonably inaccessible under the

20   Federal Rules, and you really don't have an obligation to

21   try to get information that is not reasonably accessible off

22   of these types of backup tapes.

23             Now, the question is, were there data -- was

24   there data on these desktops at the time they were

25   discarded?  And we don't know that, but under what Mr. Mason

1    has told us is that everything that was on the desktops

2    ended up in QuickPlace.  All right?  Or in some other

3    repository.  Mr. Rutberg -- he found documents from

4    Mr. Rutberg's desktop and we produced those.

5              THE COURT:  And I'm assuming it's the case, tell

6    me if there is something wrong with this assumption, that if

7    the desktops had not been destroyed, documents that might

8    have been copied into QuickPlace that would be inaccessible

9    there would not be inaccessible on the hard drives or

10   whatever.

11             MR. CANTINE:  They may or may not be, but they

12   may not have been there, because once you save it to

13   QuickPlace, you delete it off your desktop.

14             The testimony was certain people may have worked

15   on drafts on their local drive, but once it was done, it

16   went to the repository, so that everybody could get access

17   to it.  There wouldn't be any reason to save the earlier

18   drafts.  Otherwise, your desktop just gets loaded up like

19   mine does.  Right?

20             THE COURT:  Well, I was going to say, most

21   people don't regularly delete everything once it goes to a

22   library.

23             MR. CANTINE:  But when they are working

24   collectively, there was revision control, document control.

25   It was important to track all of this stuff and which

1    version they were working on at the time, and so that I

2    think, and Mr. Mason can tell you what his practice was at

3    least with respect to that.  But there's no evidence that

4    there was any data on those desktops at the time that they

5    were thrown away.

6              THE COURT:  Well, there's no evidence because

7    they were destroyed.

8              MR. CANTINE:  I know.  But the counter evidence

9    that anything of importance would have been on the backup

10   tapes and unfortunately now they're inaccessible.  But let

11   me stop.

12             And what Mr. Friedman -- the only two

13   individuals I believe he identified as possibly those backup

14   tapes or the desktops came from was Mr. Steinhoff and

15   Mr. Rutberg.

16             Mr. Mason told you he did find documents on the

17   backup tapes from Mr. Rutberg's desktop computer and those

18   were produced to Cisco.  So the only one we know or we

19   suspect that was thrown out that we don't know about is

20   Mr. Steinhoff.

21             THE COURT:  I can't recall, but wasn't

22   Mr. Rutberg, wasn't he somebody that was on the left-hand

23   side of the dotted line?

24             MR. CANTINE:  Correct.

25             THE COURT:  Okay.

1            MR. CANTINE:  So that's consistent with

2    Mr. Mason's testimony, that the computer would have reached

3    in and grabbed the documents off his desktop, and that's why

4    we're able to find them on the backup tapes.

5            THE COURT:  Because when the computer grabs them

6    off the desktop, they are saved somewhere, that ends up in a

7    different space than the QuickPlace --

8            MR. CANTINE:  I've believe that's correct, your

9    Honor, because now you don't have to go through QuickPlace

10   to get to that document.  It's just saved on the tape under

11   some folder in Mr. Rutberg's name, I believe is how it would

12   work.

13           THE COURT:  All right.  All right.  What else?

14           Before going to the bigger issues, is there

15   anything else you want to say about the Mason testimony

16   or these six or half a dozen, more or less, desktop

17   computers.

18           MR. CANTINE:  No.  I think I said everything,

19   that the company practice was to save it.  There's no

20   evidence that they did not follow that practice.  And this

21   issue about whether or not the data was accessible or not

22   didn't come up until much later, and there was certainly no

23   bad faith in -- we did everything we could to try to get

24   that data off those backup tapes and unfortunately, weren't

25   able to.

```
 1              THE COURT:  The "we," so Mr. Cantine's good

 2   faith and bad faith really isn't an issue here.  All

 3   right.  If you're done, I have one or two more questions for

 4   Mr. Schuman.

 5              MR. CANTINE:  Okay.

 6              MR. SCHUMAN:  Yes, your Honor?

 7              THE COURT:  So do you think there's any evidence

 8   of bad faith?

 9              MR. SCHUMAN:  Well, I do, your Honor.  I think

10   that all of this should have taken place when the case was

11   filed, if not before.  If the shoe were on the other foot,

12   we would be in big trouble.

13              When we received notice of this case, Cisco did

14   a lit hold.  We did images of all the computers.

15              THE COURT:  Well, the question here is not

16   really who had a better policy.  I mean, is there -- what's

17   your evidence that there's any bad faith?  Just the fact

18   that it happened?

19              MR. SCHUMAN:  The evidence of bad faith with

20   respect to the desktop computers, your Honor?

21              THE COURT:  Yes.

22              MR. SCHUMAN:  I think the knowledge as the CEO

23   of the company very personally involved in this litigation,

24   knowing that there is pending litigation, destroying those

25   computers, should not have happened.  And I think that's bad
```

1    faith.   The inventor computers should not have been

2    destroyed.

3                   THE COURT:   When you say the inventor computers,

4    but other than Steinhoff and Rutberg, you're just guessing.

5    Right?

6                   MR. SCHUMAN:   Mr. Friedman could not tell us

7    the names of the other desktops that were destroyed, but we

8    know from the production we got that we did not get any

9    backups of any desktops for Mason or Nevin or the other

10   inventors.

11                  THE COURT:   But they could have been destroyed

12   somewhere before 2010?

13                  MR. SCHUMAN:   That is possible, your Honor.

14   Those computers could have been destroyed earlier.   And I

15   think, your Honor --

16                  THE COURT:   So basically, though, your evidence

17   of bad faith is Friedman decided to destroy these computers.

18   He knew about the litigation hold from his first

19   conversations with the attorneys at Stroock.   And he hadn't

20   checked to make sure that whatever was on these computers

21   was also on the backup tapes?

22                  MR. SCHUMAN:   I think that's a fair summary of

23   the bad faith piece of it with respect to these computers.

24                  THE COURT:   Okay.

25                  MR. SCHUMAN:   And prejudice, your Honor is

1    focusing just on bad faith.  I think prejudice is a separate

2    question and what we do about prejudice.

3              THE COURT:  Well, I was just focusing on bad

4    faith because while I have not studied it, my impression is

5    that when you're considering a motion like this and just

6    generally the loss or potential loss of evidence, there's a

7    wide range of things you are supposed to consider, including

8    bad faith and whatever.  That obviously prejudices something

9    else.

10              MR. SCHUMAN:  Right.  Obviously, we moved for

11   terminating sanctions, and since we filed that motion, new

12   evidence has developed regarding, for example, the destroyed

13   files from Mr. Friedman's computer.  Some of those have been

14   recovered.  We received a supplemental production of some of

15   those.

16              I actually think the evidence hasn't changed.  I

17   think it's clarified and firmly supports our position with

18   respect to these destroyed computers, which was the

19   centerpiece of our motion.  But your Honor is right, other

20   than terminating sanctions, which I do think bad faith is a

21   requirement for terminating sanctions, the prejudice from

22   the post-litigation destruction of evidence can be addressed

23   in other ways, including by things like adverse inferences.

24   I do think bad faith is a prerequisite to a terminating

25   sanction.

1          THE COURT:  All right.  Okay.  All right.  Well,

2     so I guess, unless Mr. Cantine, you want to say anything

3     more about that topic, we can go on to the more -- the other

4     thing that I got all the declarations about last night at

5     5:00 o'clock.  And I read them.

6          I really have only one concern, which was --

7     well, let me keep my concern to myself.  What do you have to

8     say?

9          MR. CANTINE:  So just to explain what we did, we

10    provided you Mr. McCraw's declaration to memorialize the

11    understanding or the agreement that we have with Cisco on

12    the metadata.  I gave you the Lofley declaration, which is

13    from our litigation support person saying that she gave the

14    metadata in accordance with the agreement, and then we have

15    Mr. Harris' declaration, which is probably the more

16    important of the three.

17         THE COURT:  Well, I mean, I took from them

18    generally speaking that the sum total of these declarations

19    is, in terms of metadata, we've given them everything we can

20    give.

21         MR. CANTINE:  That's correct.  And part of the,

22    I think the disconnect here, perhaps, maybe, or the issue

23    is, when Mr. Harris recovered, whatever term you want to

24    use, the data off Mr. Friedman's computer, the e-mails and

25    the documents that were the subject of this motion, we did

1    it in what he calls a forensic manner rather than a way you

2    would grab documents off an image for purposes of a document

3    production.  And so the data that he gave us came from the

4    manner in which he got the data off the image, and that's

5    all the metadata we provided to them.

6          To get, I think, what they are really after

7    would require going back to square one and processing

8    that data in a manner in which you would do for a

9    typical document collection as opposed to only forensic

10   examination.  So if there's a disconnect in terms of the

11   metadata we provided them, I think that's where it falls.

12   But we have given them all the metadata that we were able

13   to get from the data, from the records in the manner in

14   which they were provided to us for Mr. Harris.  I hope that

15   makes sense.

16          THE COURT:  Well, it makes just enough sense

17   so I can reach a conclusion so that I got your point that

18   you've done what you could have done.  But I guess one of

19   the questions I would have is, I may have misinterpreted

20   what you just said, or are you saying that if a different

21   approach had been taken to this, you know, you treat it

22   more like a discovery obligation as opposed to whatever

23   it is, that some of this metadata would have been

24   recovered?

25          MR. CANTINE:  I don't want to go that far.  It

1    may have been.  There may have been additional metadata that

2    we could have gathered if we had done this in a typical

3    document collection and production type of thing, but this

4    started out as a forensic examination where they alleged all

5    these documents and e-mails had been deleted, and

6    Mr. Harris, our expert, said, well, no, they hadn't been

7    deleted.  Here they all are.  And he grabbed them off the

8    image for us and we produced them.

9              THE COURT:  Well, and it started off partly

10   because I had the -- you know, because there was a

11   disconnect and I was trying to get -- to make sure that the

12   disconnect wasn't just lack of information exchange, and

13   which is the reason why I asked you to produce these things

14   that your expert was saying he recovered and their expert

15   had not.

16             Am I correct in thinking that both Ms. Phillips

17   and Mr. Harris were starting from the same point?

18             MR. CANTINE:  Exactly.  They each had the

19   exact same image of Mr. Friedman's computer, which raises

20   another issue.  All right.  They have access to that

21   metadata because they are looking at the same image that

22   Mr. Harris is.  This whole argument about they can't figure

23   out the source file or the filing or whatever, you know,

24   they want us to do what they could have done themselves.

25   It's there.

1                    THE COURT:  Well, and so that does get into the

2          actual question I had, which is, Mr. Harris' affidavit or

3          declaration basically said, I think, that where they had a

4          file identified, and let's say it was, you know, Phil Rovner

5          bracket one dot something or other, that he then went and

6          got -- looked on the computer and got Phil Rovner dot

7          something or other.  And I thought what I had interpreted

8          originally when this came up was that he had recovered Phil

9          Rovner bracket one dot something or other.

10                    And part of the claim was from Cisco was that,

11         well, we can't match that with something that we were

12         produced in discovery.  And so I gathered Mr. Harris

13         recovered Phil Rovner dot something or other and said, so,

14         here.  This is to prove it's there.  And it would be the

15         same as the bracket one version.

16                    And I guess while I understand, I think,

17         perfectly well that if you have a file that's named Phil

18         Rovner dot something or other and you create a new one, you

19         download a new one, and it's going to put the bracket one

20         in, it does not seem to me that it follows that after you

21         create it, you now have on your computer Phil Rovner dot

22         something and Phil Rovner bracket one dot something, that

23         you can't go forward with one or the other of them and it

24         will keep the same name, but it will now be a different

25         version.

1          Do you understand what I'm saying?

2          MR. CANTINE:  I think I understand and I think I

3     know where this issue is coming from, and let me explain it

4     to you this way.  And I think if you go back and look at

5     what Mr. Harris said in some of his earlier declarations and

6     certainly what he said when he was here on the stand, it

7     becomes a little clearer.

8          The way Mr. Friedman accessed his documents is

9     not necessarily the way, you know, certainly I access mine,

10    maybe you access yours.  He wasn't simply going into his

11    hard drive and double-clicking on a document and opening it

12    up.  His documents were stored someplace else, at another

13    repository, and he would use Internet Explorer to open up,

14    let's say, a Word document.

15          THE COURT:  Right.

16          MR. CANTINE:  Phil Rovner doc.  And so that Phil

17    Rovner doc is sitting over there in this repository.  He

18    migrates to it through Internet Explorer, double clicks and

19    opens it.  Internet Explorer then opens that document and

20    saves it with a temporary name.  That's where the bracketed

21    one comes from.

22          THE COURT:  Right.

23          MR. CANTINE:  And that temporary file is

24    temporarily stored in a temporary folder.  That bracketed

25    one document is saved there temporarily.  He reads the

1    document, does whatever he does with it, and then closes it,

2    and closes out of Internet Explorer.

3              Internet Explorer then empties that folder, that

4    temporary folder, so that Phil Rovner bracketed one doc no

5    longer exists.  It was a temporary file that the computer

6    stored there while you were looking at it, but when you

7    closed out of Internet Explorer, that document went away.

8              So Mr. Harris cannot go back and recover what

9    the bracketed one was.  He explained those are all temporary

10   files.  Internet Explorer was set up to delete those

11   temporary files when you closed out.  Otherwise, the

12   computer gets bogged down with all these temporary files.

13             What he did was, he went to the hard drive and

14   said, well, where's that Phil Rovner doc?  And that's what

15   we pulled up and provided to Cisco.

16             And based on the manner in which Mr. Friedman

17   used his computer and the bracketed one and all of his

18   experience, he's saying those are the same.  That temporary

19   file with the bracketed one would have been that one.

20   They're the same.  And that's what we provided them.

21             THE COURT:  Okay.  Then maybe I misread the,

22   the document or affidavit somewhere along the way, because

23   what I thought he was saying was that he recovered the

24   temporary file.

25             MR. CANTINE:  No.

1          THE COURT:  Not that he had matched it to some

2    other file --

3          MR. CANTINE:  No.

4          THE COURT:  -- basically by just removing the

5    bracket.

6          MR. CANTINE:  No.  What he recovered was the

7    underlying source file, the Phil Rovner doc.  And he's

8    saying based on the manner in which Mr. Friedman used his

9    computer and the way Internet Explorer was set up, you know,

10   and based on all my experience, it's my opinion that this

11   Phil Rovner doc here I found on the hard drive was the same

12   one that had that bracketed one around it that was a

13   temporary file that was deleted automatically by the

14   computer.

15         THE COURT:  Okay.

16         MR. CANTINE:  I'm sorry.  I guess we could have

17   tried to make that clearer.

18         THE COURT:  Well, you know, maybe I will go back

19   and --

20         MR. CANTINE:  Okay.

21         THE COURT:  -- look at it.  But I did -- I had

22   been under the impression that he was essentially recovering

23   deleted files, not fully non-deleted files and saying it's

24   the same as a deleted file.

25         MR. CANTINE:  That's what he did for the

1    documents.  He said, because those -- the bracketed number

2    ones, and their expert, Mr. Phillips, agreed with me on

3    this.  They are just not there anymore.  They're gone.  But

4    based on all the evidence and the circumstances and how he

5    used his computer, it's reasonable to conclude that this

6    temporary file with the bracketed one is the same as the

7    underlying source file I found on the computer.  And so

8    that's what we provided.

9                THE COURT:  All right.  So what else do you want

10   to say?

11               MR. CANTINE:  And just with regard to this

12   latest declaration, you know, I think there are a couple

13   points I want to make.

14               Number one, they argue about these two Allstate

15   presentations and some alleged hidden data.

16               THE COURT:  Right.

17               MR. CANTINE:  Mr. Harris, I would say rather

18   emphatically, says --

19               THE COURT:  Well, emphatically, but not actually

20   comprehensively to me.

21               MR. CANTINE:  Okay.  Let me see if we can help

22   you there.

23               THE COURT:  I mean, where he said the hidden

24   data refers to file titles or column headers or something, I

25   didn't -- I saw he wrote it, but I didn't understand --

1                    MR. CANTINE:  Okay.

2                    THE COURT:  -- maybe I didn't spend enough time

3        looking at it, but I couldn't actually figure out what he

4        was talking about.

5                    MR. CANTINE:  I think if you look at -- that

6        will keep running, but if you look at page 4 in the booklet

7        I gave you, this is a printout.

8                    THE COURT:  Oh, page 4 of the booklet today?

9                    MR. CANTINE:  Yes.

10                   THE COURT:  Okay.  Hold on a minute.

11                   (Pause.)

12                   MR. CANTINE:  So the --

13                   THE COURT:  I'm sorry.  Just one second.

14                   MR. CANTINE:  Okay.

15                   THE COURT:  Scope of the backup tapes?

16                   MR. CANTINE:  You're looking at Cisco's.

17                   THE COURT:  Oh, sorry, sorry.  I've got it open.

18       Right.  Okay.  Thank you, Mr. Cantine.

19                   MR. CANTINE:  Okay.  So what Mr. Harris is

20       saying, Cisco makes the assertion, or Mr. Feagley, I

21       believe, makes the assertion that there was some hidden data

22       in this file, and what Mr. Harris explains is that alleged

23       hidden data are is the three column headers you see on this

24       chart.  One is Organization's Client, KnowledgeSHARE

25       Platform and Organization on the right.

1              THE COURT:  Okay.

2              MR. CANTINE:  Those are the three headers.

3         So the bottom line is it's not hidden.  This is

4    a printout.  You can see it.  It says Organization's Client,

5    KnowledgeSHARE Platform and Organization.  Those are the

6    columns that Cisco is asserting are somehow hidden and here

7    they are in the actual presentation.

8              The bottom line is what Mr. Harris says is that

9    the two Allstate presentations, which are the subject of

10   Mr. Friedman's declaration, are identical in content and the

11   metadata is identical.

12             So to suggest that there's some hidden field and

13   that this is some smoking gun I think is flatly refuted by

14   Mr. Harris.  I mean, it's not hidden.  It says it right

15   there.

16             THE COURT:  Hold on just one minute.

17             MR. CANTINE:  Okay.

18             (Pause.)

19             THE COURT:  All right.  Well, I see the thing

20   that was in the Feagley declaration for Slide No. 16, the

21   words do match the headings of these three columns.

22             MR. CANTINE:  And for the record, this is

23   discussed at paragraph 12 of Mr. Harris' declaration, your

24   Honor.

25             THE COURT:  All right.  Hold on just a second.

1    All right.

2              MR. CANTINE:  Okay.  And so we also provided you

3    a slide in the booklet there, I think it's on page 6 of --

4    again, this is Cisco's assertion that there's somehow

5    something different in this Allstate presentation that we

6    recently provided them than what we had originally provided

7    them in discovery.

8              And on the left-hand side is a copy of the same

9    page 16 from our original production, and on the right is

10   that same page, 16, from the supplemental production.

11             THE COURT:  And your point is it's identical on

12   both sides?

13             MR. CANTINE:  Correct.

14             THE COURT:  All right.  That point I understand.

15             MR. CANTINE:  Okay.  Thank you.

16             And, again, there's no hidden data that somehow

17   this smoking gun, this later produced document, Mr. Harris I

18   think establishes, like I said, emphatically that's just not

19   true.  The content and the metadata are identical between

20   the two documents, so no smoking gun.

21             Mr. Feagley, in his declaration -- again,

22   Mr. Feagley is an in-house person at Cisco.  We don't really

23   know what his credentials are.  He has been working in this

24   area I guess for a number of years, but I would suggest he

25   does not have the same level of knowledge as Mr. Harris, and

1    so Mr. Harris has addressed all the points he has raised.

2                    The arguments at paragraphs 10 to 13 of the

3    Feagley declaration --

4                    THE COURT:  Well, actually, you said he's Cisco.

5    But he's actually Morgan Lewis.

6                    MR. CANTINE:  Did I say Cisco?  I meant Morgan

7    Lewis.

8                    THE COURT:  But your point about his expertise

9    remains the same.

10                   MR. CANTINE:  Thank you, your Honor.

11                   To sum up, Mr. Harris confirms, there was some

12   suggestion the last time we were here, there was a

13   suggestion in the Feagley declaration that somehow these

14   documents that we produced, that Stroock produced in

15   response to your order, came from somewhere else.  That they

16   weren't -- didn't come from -- like we were trying to slip

17   one in.

18                   THE COURT:  I thought I indicated at the last

19   hearing that I wouldn't be concerned about that.

20                   MR. CANTINE:  No, no, and I appreciate that, but

21   it's a serious allegation, it's a serious assertion.

22   They're essentially arguing that Stroock, my firm, myself,

23   is manipulating data.  And I can tell you, we take that

24   accusation very seriously, your Honor.

25                   THE COURT:  As well you should.

1          MR. CANTINE:  And we spent a lot of time and a

2     lot of meetings over the last few days talking to people

3     internally about those.

4          But hopefully, to put it to rest, Mr. Harris

5     confirms in his declaration that every one of the files we

6     produced to Cisco came from Mr. Friedman's computer.  Cisco

7     can see the source of those documents for themselves.  And

8     he addresses all of the points raised in the Feagley

9     declaration in his recently filed declaration, and I would

10    suggest that this assertion of a smoking gun with regard to

11    this Allstate presentation just is hollow.

12         THE COURT:  All right.  So I will hear from

13    Mr. Schuman as to whether or not he has got a smoking gun,

14    and if so, what it is.  Okay?

15         MR. CANTINE:  Thank you.

16         THE COURT:  All right, Mr. Schuman.

17         MR. SCHUMAN:  Your Honor, I think you hit it on

18    the head.  We were not casting aspersions or making

19    suggestions or allegations against Mr. Cantine.  The reason

20    why we have been pursuing the metadata is because what has

21    happened here is we identified specific deleted files,

22    including files that have these bracketed numbers, which

23    Ms. Phillips testified in her declaration and here on the

24    stand last Monday means they either are or could be

25    different versions of the document.

```
1              And what we have gotten back in response is, to
2     use your example, not, here is Phil Rovner paren one dot
3     doc, which is the deleted file we identified in our motion.
4     What we got back is Phil Rovner dot doc with a lot of
5     explanation that this is really is the same document.
6              We acknowledged in our moving papers on this
7     motion back in October that for 24 of the 35 specifically
8     identified files, we were able to find other similar file
9     names in the production, including for the Allstate
10    presentation.  But what we did not find was Allstate 03,
11    0603 bracket one dot doc.  That's the file we've been
12    searching for.  That's the file that I think your Honor
13    correctly hit it on the head, they claim --
14             THE COURT:  So that kind of -- because one of
15    the things that frustrated me at the beginning was, I've got
16    Ms. Phillips on the one hand and Mr. Harris on the other
17    hand, people who I regard as being -- who have enough common
18    background that they ought to be able to come to the same
19    conclusion about something, and so I couldn't really figure
20    out why they couldn't.  But now it's making more sense to me
21    because Ms. Phillips was saying, I can't find the bracket
22    one version, and I thought Mr. Harris was saying I can't
23    find the bracket one version, but that's not what Mr. Harris
24    was saying.
25             MR. SCHUMAN:  That is not what Mr. Harris is
```

1    saying.  And, furthermore, Mr. Harris is saying that the

2    bracketed one version always necessarily must be an

3    Internet, temporary Internet file from Mr. Friedman viewing

4    this document over the Internet, and Ms. Harris said on the

5    stand here last Monday that that is not always the case.

6         So there are these specifically identified files

7    and Mr. Harris has not recovered those files.  He has argued

8    he has recovered those files and identified similar file

9    names, but that does not really get us much beyond where we

10   were when we filed this motion because for most of the files

11   we identified as having been deleted, we acknowledge that

12   there were similarly named files elsewhere in the

13   production.

14        THE COURT:  Right.  And that is part of the

15   reason why I asked Mr. Cantine to produce some of these

16   things to you, was because the fact that you couldn't find

17   similarly named files.  Never mind.  Yes.

18        MR. SCHUMAN:  So the files identified in our

19   motion are gone for good is what I understand the record

20   evidence to be.  However, Mr. Harris and the XU side has

21   said, well, we have these other files, and based on these

22   pictures, they're the same.

23        I don't want to get too in the woods.  I will

24   respond to any question the Court has, of course, but the

25   pictures you're looking at on the screen, those are what

1    they have access to, which is the native PowerPoint itself.

2    These are PowerPoint presentations to Allstate.

3              What we get in discovery is not that.  What we

4    get is a TIFF image, a picture along with metadata.  The

5    metadata for the version of the Allstate presentation in the

6    supplemental production, the one on the right, is different

7    in several respects from the one on the left.

8              THE COURT:  Is this the, what's on page 6 of

9    Mr. Harris' declaration?  Is that the -- this is the

10   application level metadata?

11             MR. SCHUMAN:  Correct.

12             THE COURT:  Is that --

13             MR. SCHUMAN:  And if you go, your Honor, to

14   paragraph 9 of Mr. Feagley's declaration, which Harris is

15   responding to, you know, this is a picture of the metadata

16   fields as we received them and they're different.  The file

17   size is different.  The size of the file is different.  And

18   in the one on the left from the supplemental production, as

19   I think we've already exhaustively covered here, it has this

20   hid -- hid content field.

21             THE COURT:  Well, leaving aside -- well, first

22   off, I guess the hidden content view, is there -- you have

23   Mr. Cantine and his expert have said this is no big deal.

24   It's less than no big deal.  It's no deal at all.

25             Is there something wrong with what the expert,

1    Mr. Harris, is saying to me about what the stark hidden

2    content means?

3              MR. SCHUMAN:  There is, because the starting

4    point for that comment is that the one on the right is

5    actually the one that we identified in our motion.  In other

6    words, it goes back to the first point we were just

7    discussing, your Honor.  The bracket, the Allstate

8    presentation bracket one is the file we've been searching

9    for all this time, and what we're looking at here, on the

10   left, is what they've produced earlier, and on the right is

11   what Mr. Harris tells us is, or must be Allstate

12   presentation bracket one, but that's not actually what it

13   is.

14             THE COURT:  So you actually -- what you are

15   saying is, you actually expect these two to be the same

16   because basically what Mr. Harris has retrieved is a file

17   with the identical name to presumably what had -- I mean, he

18   has basically just retrieved it a second time.

19             MR. SCHUMAN:  Correct.  And the part that I

20   don't understand, and I appreciate the lawyer's job is to

21   help the Court, but the part I don't understand is how if

22   all Mr. Friedman was doing was accessing these documents

23   through the Internet, where he didn't actually have a big

24   store of documents on his computer, I don't understand what

25   files Mr. Harris is recovering from that hard drive,

1    Mr. Friedman's hard drive.

2           Again, this is the reason why -- because if the

3    point is, your Honor, as Mr. Cantine said, Victor Friedman

4    used his computer differently than the rest of us.  He used

5    it to access documents stored elsewhere on another computer

6    of his or on some other database, wherever they were, then

7    what you would expect to see on his hard drive is only a big

8    cache of these temporary Internet files because, according

9    to XU and Mr. Harris, he's just viewing them, and when he

10   exits his browser, they are all automatically deleted.

11          Okay.  I understand that.  If that's the

12   representation that's how Mr. Friedman was using his

13   computer, then one would not expect to find any of these

14   files from Mr. Friedman's hard drive that they are

15   retrieving and saying, ah, that's the same as that Phil

16   Rovner one bracket dot dot.

17          So this is the reason why, your Honor, we've

18   bothered the Court with these declarations and have been

19   pursuing this metadata, because we don't know what the file

20   on the right -- we don't know whether the file on the right

21   and after all this work on this motion by the Court and the

22   parties -- these are not the files that we listed in our

23   motion.  That's the problem.  Those files are gone for good

24   and I think you heard Mr. Cantine say that today.  Those

25   files are gone for good.

```
 1                    XU and Mr. Harris would have you believe those
 2    are just temporary Internet cache files that, of course,
 3    they're gone for good.  They can never be recovered.  And
 4    what we're getting are pieces of information like, here's
 5    the file name, and I'm going to tell you based on my opinion
 6    that this is the same as the file that you identified in
 7    your motion.  That's the part we have trouble with.
 8                    THE COURT:  Well, as I recall -- I don't recall
 9    entirely, but basically the list of files that you couldn't
10    match up, they all had a bracket one or a bracket two with
11    the name.  Right?
12                    MR. SCHUMAN:  All 35 of the files had version
13    numbers in them like that, yes.
14                    THE COURT:  All right.
15                    MR. SCHUMAN:  Some had bracket two, some had
16    bracket one.  In some instances, we had a file name with a
17    bracket one and then a file name with a bracket two.
18                    THE COURT:  Right.
19                    MR. SCHUMAN:  Different versions.
20                    THE COURT:  Well, different names.
21                    MR. SCHUMAN:  Different file names.
22                    THE COURT:  Right.
23                    MR. SCHUMAN:  Which -- yes.
24                    THE COURT:  I mean, and it seems almost
25    inconceivable to me that those files, the 35 of them, were
```

1    not -- wait a second.  I put in a lot of negatives here.

2            I think those 35 files, I mean, it seems to me

3    almost a certainty that they were created in the manner that

4    XU has said that they've been created, which is Mr. Friedman

5    pulling things from the Internet or using the Internet

6    Explorer, somehow or other getting documents from somewhere

7    else, because nobody in their right mind, if they are naming

8    the file themselves, puts the bracket one in there.  That's

9    something that, you know, happens automatically.

10           MR. SCHUMAN:  When you open a file and you edit

11   it and you save it, there's already a file name saved there

12   and you save over it, that's when it adds the bracket one,

13   bracket two.  That was Ms. Phillips' testimony on Monday.

14           So wherever he's accessing them from, and

15   obviously your Honor is free to accept the testimony that he

16   was accessing these all from the Internet, I actually don't

17   think it's correct that every file he has was coming from

18   the Internet when we're looking at his office desktop.  But

19   be that as it may, when you go edit and go hit save for a

20   file, if there's already a file name there, you're right.

21   You or I don't personally add bracket one or bracket two.

22   We might add some other notation to indicate to ourselves

23   it's a different document.  The system does that.

24           And that's why these files with these bracketed

25   numbers per Ms. Phillips' testimony may very well be

```
 1    different versions.  And I don't want to complicate this
 2    further.  If it's in the declarations, you can also figure
 3    out whether there are different contents or things like
 4    hashtags.
 5                  THE COURT:  Well, since they're gone, you don't
 6    have them.
 7                  MR. SCHUMAN:  What she does, she looks at two
 8    other files I think that aren't gone and says, look, these
 9    are two files on Mr. Friedman's computer with the same file
10    names.  They have different hashtags.  They're different.
11    Right.  We can't compare --
12                  THE COURT:  Wouldn't they have -- would they
13    have different hashtags just because they have different
14    names?
15                  MR. SCHUMAN:  I think they might have different
16    hashtags if they have different content.
17                  The point of hashtags is, the reason you would
18    turn to hashtags for something like this is, if they have
19    the same name, and then you can look and see that they have
20    different hashtags and you know they're different.
21                  THE COURT:  But having the files be named
22    differently so --
23                  MR. SCHUMAN:  You may not need to resort to
24    hashtagging if the files have different names unless you
25    get into this argument like we're having here, which is,
```

1    what is the significance of these little bracketed numbers?

2    We're saying they are different versions or could be

3    produced to us, the versions.

4         They say those versions are gone for good, or

5    we're going to give you something else that we think is the

6    actual document you're looking for.

7         THE COURT:  Well, there is something to be said

8    for giving -- I mean, for one thing, and I don't know.  I

9    can't remember now, but to the extent they give you

10    something that has the same number without the bracket one

11    and it's Mrs., or Mr. Friedman's favorite lasagne recipe,

12    the fact that you don't have a bracket one version probably

13    isn't too important?

14         MR. SCHUMAN:  I would agree with you a hundred

15    percent, your Honor, but the 35 files we identified,

16    Mr. Friedman's favorite lasagne recipe along with some other

17    files were not the focus of our motion.  Those were also

18    deleted and gone for good.

19         What we identified in our motion, there were 35

20    files which, by virtue of their file names, suggest

21    relevance to this litigation.

22         THE COURT:  Well, and so you know what the -- so

23    let's assume that for the sake of argument, that you're

24    right, that there could be, unless you assume there is,

25    another version that is slightly different that now is not

1    retrievable, or it's gone.

2            Are any of the ones, the 35 files that you have

3    on such a hot topic that the fact that some, you know,

4    iteration of it is gone makes a difference?

5            Do you understand what I'm trying to ask?

6            MR. SCHUMAN:  If your Honor is asking again

7    about what are the smoking guns here, is that the question?

8            THE COURT:  Well, actually, I guess the way I

9    was asking was slightly different.  But, yes, let's actually

10   just go with smoking guns.

11           MR. SCHUMAN:  Well, the way I would answer that

12   question, your Honor, is we've asked Mr. Cantine's firm to

13   stipulate that we can amend our trial list with a number of

14   these documents from the supplemental production.  What is

15   the smoking gun?  You might have a different view and the

16   jury might have a different view and we might have a

17   different view.

18           You know, I mentioned a couple of documents when

19   we were here on Friday, this one being one of them.  Mr.

20   Cantine has come in and given you a demonstration that to

21   the naked eye, these appear to be the same.

22           We also have this document from Cohen's

23   Hospital, which they produced in their supplemental

24   production, which from all the metadata we have, which I

25   understand we've got all we're probably going to get now,

1    the author of that document is Alex Friedman, and we want to

2    add some of these documents to our exhibit list.  And

3    somebody will decide whether they're smoking guns or whether

4    they are really irrelevant.

5              THE COURT:  So just tell me, because I can't

6    even begin to figure it out.  If the author of, what, the

7    PowerPoint is Alex Friedman?

8              MR. SCHUMAN:  No.  The two documents I mentioned

9    on Friday.

10             THE COURT:  I can't remember them now.

11             MR. SCHUMAN:  One of them was this PowerPoint,

12   and Mr. Cantine has come in and given you a demonstration of

13   how these really are the same.

14             The second document, separate document, your

15   Honor, on the spreadsheet that they attached to the papers

16   that they filed at 5:00 o'clock yesterday --

17             THE COURT:  Yes?

18             MR. SCHUMAN:  -- there's a spreadsheet.  It's an

19   attachment to, I believe --

20             THE COURT:  Mr. Rovner's letter?

21             MR. SCHUMAN:  It's certainly an attachment to

22   the letter.  It's one of the declarations.  It's Exhibit A

23   to one of the declarations.  I apologize.

24             THE COURT:  Which item is it?

25             MR. SCHUMAN:  It was just attached to

```
 1    Mr. Rovner's letter, your Honor, the spreadsheet attached to
 2    Mr. Rovner's letter, Exhibit A to the letter.
 3              THE COURT:  And --
 4              MR. SCHUMAN:  Summary of originals.
 5              THE COURT:  Right.  I've got it.
 6              MR. SCHUMAN:  Okay.
 7              THE COURT:  Which item?
 8              MR. SCHUMAN:  The item I'm referring to on here,
 9    your Honor, is item 11, Cohen's Children Hospital, 411.11
10    doc.  That document was produced for the first time as part
11    of their supplemental production, and on its face it appears
12    to be a letter from to Mr. Friedman to Cohen's Children's
13    Hospital, talking about things like XU's great technologies
14    and also talking about XU's patent.
15              The custodian of that document -- I'm sorry --
16    the author of that document is Alex Friedman, Victor
17    Friedman's son.
18              THE COURT:  So the basic theory here is, and I'm
19    sorry.  Did this document appear on -- okay.  Strike that
20    question.
21              I take it that document, is that document on
22    XU's witness list?
23              MR. SCHUMAN:  It is not, and it was produced
24    after the pretrial order was filed, where the parties made
25    their exhibit list.
```

```
 1              THE COURT:  Okay.  And so your theory here is
 2    that essentially Victor Friedman is busy creating evidence
 3    that he could use to show, you know, maybe some secondary
 4    considerations of nonobviousness or something?
 5              MR. SCHUMAN:  Well, we have another letter which
 6    we've already covered and I think there's more than one
 7    example of that kind of behavior, yes.
 8              THE COURT:  But I mean, but basically, that's
 9    the reason you want to, why you would be willing to add it
10    to your witness list is, essentially, false evidence.
11              MR. SCHUMAN:  Correct.
12              THE COURT:  Okay.
13              MR. SCHUMAN:  And it's a little late in the game
14    to be getting this.  We would be taking some risk in front
15    of a jury confronting Mr. Friedman with a piece of evidence
16    that we did not have during the course of discovery, but I
17    think that's a decision for the trial team to make.  But for
18    present purposes, some of these documents that were produced
19    for the first time of this spreadsheet, your Honor, that you
20    have in front of you, which they have produced in response
21    to the Court's order.  Saying these are the files that are
22    similar to the one that the Court ordered us to produce.
23              For 30 of the 54 files on here, there is no file
24    from their prior production, so 30 of them, there's nothing
25    in that column from the second to the right.  These are new
```

1    documents that we got for the first time in response to our

2    motion for terminating sanctions and in response to the

3    Court's order that they produce these documents.

4         So we've been through those documents and

5    several of them we'd like to add to our exhibit list.  That

6    shouldn't be controversial, your Honor.  And, you know, as

7    to what is a smoking gun and what's not, I think that's a

8    separate issue.

9         THE COURT:  Okay.  Anything else?

10        MR. SCHUMAN:  The only thing I will add, your

11   Honor, I appreciate the Court's time on this motion.  This

12   was a serious motion and was not filed lightly.

13        I do think we established the destruction of

14   relevant evidence, both with these files and also with

15   Mr. Mason's testimony today.

16        The other piece of our motion relates to the

17   testimony regarding the evidence being preserved.  I think a

18   fundamental issue here was the lack of a sufficient

19   litigation hold when the case was filed.  And this should

20   not have happened and we should not be here on the eve of

21   trial getting supplemental productions based on what a

22   forensic consultant was able to recover and tell us are like

23   the files that were destroyed.

24        These computers never should have been

25   destroyed, and certainly the backup tapes should have been

1    checked when they contemplated bringing the case.  They are

2    the plaintiff.  They prepared to bring this case.

3    Mr. Friedman testified that he first decided or contemplated

4    litigation in September of 2008, and they filed the case in

5    March of 2009.  It's approximately six months, maybe five

6    months.

7              Nothing was done to take steps to preserve

8    evidence here until these computers were destroyed in

9    December of 2010, and I think the record is very clear from

10   Mr. Mason's testimony, it wasn't until December of 2011,

11   after we first learned about these destroyed computers at a

12   deposition, that they first went and looked at the backup

13   tapes.

14             So I think we've established several different

15   ways in several different areas that relevant files had been

16   destroyed, computers with relevant information have been

17   lost.  And the prejudice based on the names of the files, I

18   think the case law says that's all we have to do.  We can't

19   know what the content of these files were.  We can't know

20   exactly what documents were on the computers that were

21   destroyed that shouldn't have been.

22             I think your Honor is correct, that the subject

23   of bad faith requires -- it's a heavy finding, I appreciate

24   that, and a high burden.  And I submit that we've met it,

25   but I appreciate the Court's comments, both prior to today

```
 1    and today, and that's why there are other ways to deal with

 2    this other than a terminating sanction.

 3              We're certainly entitled to an adverse inference

 4    with respect to the files here that might be relevant to our

 5    102(b) defense.  The Allstate presentation we're talking

 6    about, this is all about pre-critical date offers to sell to

 7    Allstate the patented inventions.

 8              So --

 9              THE COURT:  I was just trying to think ahead

10    here as to the possibilities.  I can't remember now.  Is

11    there -- I presume that if one gives some kind of

12    instruction about an adverse inference because of evidence

13    being not preserved, that it probably has to be fairly

14    tailored to the specific circumstances.

15              If I thought that were the appropriate thing to

16    do here, what would you -- what would you imagine me telling

17    the jury?  And I guess, was there an instruction in the

18    300-odd pages that were submitted that actually had some

19    kind of form on this.

20              MR. SCHUMAN:  There was not.

21              THE COURT:  Okay.

22              MR. SCHUMAN:  And I would agree with your Honor,

23    that it would need to be tailored.  I certainly would like

24    to -- I would like to work on a draft instruction and we

25    would submit it.
```

1           I can't expect that we'll get much agreement on

2      the form of an instruction, but I would agree with your

3      Honor, that the instruction has to be tailored to what we've

4      been able to show regarding the evidence that was -- the

5      file names, for example.

6           And I think, as I've said, I think they relate

7      to more, but they definitely relate to the patent case and

8      they relate to the 102(b) defense, and so therefore the

9      adverse inference instruction would be tailored to and would

10     come in the set of instructions regarding what we have to

11     show, our burden of proof as the, you know, clear and

12     convincing evidence burden of proof for the defendant on

13     102(b).  And we've certainly heard enough in this case that

14     they don't think we can't meet that burden.  I think the

15     adverse inference instruction would be tailored to that.

16           THE COURT:  Well, can you, and I will let

17     you pick your own time, but it would be -- it might be

18     helpful -- I mean, could you submit to me what you would

19     think you, what you have in mind as to what, as best you can

20     right now, not necessarily holding you to it a hundred

21     percent, but what you think such an instruction would look

22     like based on what you think you could prove?

23           MR. SCHUMAN:  Can we submit that by close of

24     business tomorrow?

25           THE COURT:  Sure.

```
 1              MR. SCHUMAN:  We'll do that.

 2              THE COURT:  All right.

 3              MR. SCHUMAN:  Thank you, your Honor.

 4              THE COURT:  All right.  Mr. Cantine?

 5              MR. CANTINE:  I hear a lot of argument, your

 6    Honor.  I just don't hear a lot of substance.  All right.  I

 7    mean, let's remember where we started, 3,077 content files.

 8    Manual defrag.  I don't hear Mr. Schuman arguing those two

 9    points anymore.  They walked off that one, you know, in our

10    first brief.

11              Their own expert admitted that 3,022 of those

12    things were just system files or temporary Internet files.

13    I think we established with Mr. Harris that no manual defrag

14    was run, and even if it had been run, as your Honor

15    established with the questioning, defrag was running

16    automatically on the computer every Wednesday night.  That's

17    what Ms. Phillips told us.  Defrag is not a wiping program.

18    It does not delete anything.  It rearranges data.

19              And so all that would have been rearranged is

20    the data that had changed from Wednesday at 3:00 in the

21    morning or whatever it is to the following Monday, when the

22    image was taken.

23              So this whole defrag thing that they came out of

24    the box with is a nonissue, and I think they've failed to

25    establish any manual starting of that defrag.  I think
```

1    Mr. Harris knocked that one out of the park in four

2    different ways.

3              And Mr. Schuman is right in one respect.  All

4    right?  These documents, these bracketed one documents, they

5    don't exist.  They're gone.  There's no dispute about that.

6    They were temporary Internet files, temporary files.

7              Now, Ms. Phillips may argue that there are other

8    ways to create a bracketed one, but Mr. Harris looked at the

9    way and the manner in which Mr. Friedman used his computer,

10   the fact that he was using Internet Explorer.  As you said,

11   no one is going to save a document and put in those little

12   bracketed number ones or a bracketed number two.  That's

13   just not how you are going to save it.

14             So based on all the evidence, this was

15   automatically created by Internet Explorer, saved in that

16   temporary file and then deleted automatically.  Okay?

17             I want to -- two points on that.  Rule, Federal

18   Rule of Civil Procedure Rule 37(e), failure to provide

19   electronically stored information.

20             Absent exceptional circumstances, a Court may

21   not impose sanctions under these rules on a party for

22   failing to provide electronically stored information lost as

23   a result of the routine good faith operation of electronic

24   information system.  Okay?

25             THE COURT:  And I certainly agree that that

1    would apply if there -- if the computers had been destroyed

2    in 2007 and the backup tapes were now not recoverable --

3                    MR. CANTINE:  No, but we're talking here about

4    these temporary files and Mr. Friedman's computer --

5                    THE COURT:  Okay.

6                    MR. CANTINE:  -- that they allege were deleted.

7                    THE COURT:  Okay.  Sorry.  I appreciate you

8    bringing me back to what we are actually talking about.

9                    MR. CANTINE:  Okay.  Thank you.

10                   So I think it's undisputed that all of those

11   documents, the document names with the brackets were

12   temporary files.

13                   I'd also like to, if I may, your Honor, provide

14   the Court with a copy of the default standard for discovery,

15   including discovery of electronically stored information.

16                   THE COURT:  That's all right.  I've got that.

17                   MR. CANTINE:  Okay.  So these became part of the

18   local rules here in Delaware, I believe, on December 8th,

19   2011.

20                   THE COURT:  I believe so.

21                   MR. CANTINE:  I'm not suggesting that they

22   control in our case, but I think they are informative.

23                   Schedule A lists the type of information that

24   you have no duty to preserve.  Number 2 on that list

25   includes temporary files.  Number 3 on that list includes

1    temporary Internet files.

2            The point I'm trying to make, your Honor, is all

3    3,077 files that they identified in their opening brief were

4    temporary files created in the ordinary course of

5    Mr. Friedman using his computer.  These temporary files were

6    all deleted by the computer automatically in a good faith

7    normal operation.

8            Under Federal Rule 37(e), which is the safe

9    harbor provision, it was intended to cover situations

10   exactly like these.

11           You didn't hear any argument or evidence from

12   the other side that would in any way suggest that

13   Mr. Friedman was supposed to turn off the automatically

14   running defrag program.  You heard Mr. Harris talk about how

15   he never heard that happening.  In no way would any normal

16   document collection have even attempted to recover or

17   preserve these temporary Internet files.  These temporary

18   Internet files were created by the computer itself in its

19   normal operation.  There's nothing wrong there.  And 37(e)

20   as well as the Delaware rules establish conclusively,

21   there's no duty to preserve those.

22           You know, the first time I read their brief,

23   your Honor, there were 3,077 files deleted, manual defrag

24   run.  Extraordinary misconduct is what they argued.  False

25   testimony, misrepresentations to the Court, failure to

1    issue a litigation hold, refusal to comply with the Judge's

2    order, your order.  That was squarely on my shoulders.

3    Right?

4              They characterize it as the perfect storm of

5    intentional destruction.  Those are their words.  They said

6    it was staggered, the extent of the destruction.  I mean, I

7    read it.  I said, oh, this doesn't sound good, but it didn't

8    sound right either.

9              And I think we've established conclusively with

10   Mr. Harris and all the argument we hear, it's just not

11   there.  One hundred percent of those documents that they

12   allege, the 3,077 were these temporary files deleted

13   automatically by the computer in its normal operation.  They

14   cannot prove a single document was manually deleted.  Their

15   own expert admitted it.

16             And we have the e-mails.  And we've -- we went

17   back and we found every one of them and we've produced them.

18   They've had all this information for, I don't know, what, a

19   few weeks now?  A couple weeks, a week, whatever it is.

20   They've got an army of people, guaranteed, back in

21   San Francisco pouring overall this stuff.  And the two

22   smoking guns we have are a presentation with the identical

23   content and this Cohen Children's Hospital letter.  Do you

24   know when that was written?  2011.

25             THE COURT:  Yes.  I kind of gathered it was

1    written April of 2011.

2              MR. CANTINE:  And they are now suggesting that

3    this was -- again, I'm trying not to throw names.  I said

4    the other day that I thought the other side was being

5    disingenuous and you called me out on it as you should, and

6    I apologize, but they're throwing a lot of bombs here.  This

7    Cohen's Children's Hospital now, this letter, they're

8    claiming it's false evidence.  But think about that, Judge.

9    False evidence that we never produced.

10             THE COURT:  Well, that's the reason why I

11   stopped asking questions, because I credit you with more

12   sense than necessarily the plaintiffs have, so you never

13   know about these things.

14             MR. CANTINE:  But to suggest they're now going

15   to put it on their exhibit list when it never saw the light

16   of day, that it's planted?  I mean, they'll stop at nothing.

17             THE COURT:  And just as a matter of curiosity,

18   do we have this April 11th or April letter?  Does one of you

19   have it with you?

20             MR. CANTINE:  The Cohen's Hospital letter?

21             THE COURT:  Yes.

22             MR. CANTINE:  I don't know if it was in their

23   declaration, Mr. Feagley's declaration.  I don't remember.

24   I don't think I have a copy of it with me.

25             THE COURT:  All right.

1          MR. CANTINE:  Okay.  So let's -- clearly, I

2     think the opening brief and the 3,077 number was designed to

3     grab everybody's attention.

4          THE COURT:  Well, you know, I have not been a

5     Judge that long, but I'm pretty sure this is the first

6     time I've ever seen a motion with the title that this one

7     had.

8          MR. CANTINE:  Right.  But, you know, so they

9     come out of the gate with all these accusations and then

10    they just walk away from them, like it never happened.

11         I don't hear Mr. Schuman up here talking about

12    3,077 documents.  I don't hear him talking about manual

13    defrag.  They just --

14         THE COURT:  All right.  Well, I mean, partly,

15    I'm glad he wasn't just because we kind of covered that

16    topic.

17         MR. CANTINE:  I'm just suggesting, your Honor,

18    those are serious allegations and they require serious

19    consideration before they're made in court.  And I don't

20    think that happened here.

21         No reasonable forensic expert would ever

22    characterize those 3,000 documents as content files.  So we

23    are left with 55 files that had some user generated content,

24    the only possible documents that could in any way be

25    relevant to their claims or defenses.

1          And we went back, and Mr. Harris was able to

2     identify 52 of them.  Not the same ones with the brackets,

3     but the ones that we think, based on all the evidence and

4     his review of the record, matched up.  And we provided

5     those.

6          And I can't stress enough, your Honor, that the

7     manner in which those temporary files were created, the

8     manner in which those temporary files were deleted, it's

9     undisputed that the rules do not require preservation of

10    those temporary files.  That's the safe harbor provision.

11    We were under no obligation, Mr. Friedman was under no

12    obligation to turn off this recommended setting of Internet

13    Explorer.

14          THE COURT:  I think I got your point on that.

15          MR. CANTINE:  All right.  Thank you.

16          So let's talk about bad faith.  Again, I think

17    one of Cisco's leading arguments on this bad faith when they

18    came out of the gate was manual defrag.  I don't hear them

19    making that argument anymore.

20          THE COURT:  Well, you know, that's something

21    that maybe the manual defrag, if it occurred, didn't cause a

22    lot of damage, so to speak, because the defrag is going on

23    all the time.  But if I thought that, in fact, it was a

24    manual defrag by -- and maybe that would be a stretch even

25    here, but by a non-savvy computer user, you know, the night

1    before you turn it over, it might indicate something about

2    intent.

3              MR. CANTINE:  Possibly, but I think on the

4    evidence and the record we have here, I think we've

5    established we've proved the negative essentially, that

6    we've proved it was not manually run.  It was simply the

7    computer doing it, whatever it was set up to do

8    automatically, for which they don't contend it was improper

9    in any way.

10             Let's talk about the e-mails.  All right?  So

11   they identified 447 e-mails as having been deleted.  All of

12   those e-mails have been accounted for.  All of those e-mails

13   have been turned over.

14             Among those 447, and you don't hear any

15   counterargument from Cisco in this regard, roughly 190 of

16   them were pure spam.  115 were personal.  I think about 80

17   of them had already been produced.  About 80 of them were

18   drafts that had never been sent, never saw the light of day.

19   We've produced all of those to them.

20             THE COURT:  What you are saying right there,

21   Mr. Cantine, in other words, I don't remember seeing that in

22   writing.  I mean, I'm just wondering, was that something

23   that was actually, that kind of characterization, because I

24   remember sort of looking and seeing that there were lots of

25   things, you know, you got a fax, spam.  I mean, there were a

1    lot of things that seemed to me to be on their face

2    inconsequential and now I can't even remember.  Were all

3    400-odd, were they all from 2008 also?

4                MR. CANTINE:  All the e-mails?  No.

5                THE COURT:  No, no, no.  That was the

6    double-deleted.

7                MR. CANTINE:  Yes.

8                THE COURT:  I'm trying to keep things straight.

9    The e-mails from random times.

10               MR. CANTINE:  Correct.

11               THE COURT:  Okay.

12               MR. CANTINE:  All right.  And, so, yes, we've

13   made that assertion, kind of putting those numbers in those

14   various buckets of the spam, personal and the like.  They've

15   got them.  There's not a counterargument.

16               THE COURT:  No.  I am just wondering, is there

17   actually in the record, I suppose you just tell me right

18   here, is there someplace where they're characterized?

19               MR. CANTINE:  In our brief, they are.

20               THE COURT:  Okay.

21               MR. CANTINE:  We made those same -- put them in

22   the same kind of buckets in the brief.  I have not heard any

23   kind of counterargument.

24               THE COURT:  When you say brief, which brief?

25               MR. CANTINE:   I suppose it would be our

1    opposition to their opening motion.  I think that's all we

2    got on this one motion.

3                 THE COURT:  Okay.  All right.  So that would

4    have been back in January, December?

5                 MR. CANTINE:  Yes.

6                 THE COURT:  All right.

7                 MR. CANTINE:  One other point I did want to make

8    on those.  Your Honor, in his order, had asked for -- I'm

9    sorry.  So we get to the double-deleted; right?  There are

10   62 of them.

11                THE COURT:  Right.

12                MR. CANTINE:  And we've --

13                THE COURT:  They don't concern me.

14                MR. CANTINE:  Okay.  We went back and found --

15   maybe to answer one of the questions you raise in your

16   order, you want to know how many of those were obviously

17   non-pertinent, and I realize we never told you the answer.

18   We've asserted that 12 of those 62 are obviously not

19   pertinent and I have not heard any argument to the contrary

20   from the other side.

21                The litigation hold, I think we've covered.  I

22   think your Honor has all you need on that.

23                I don't want to leave some of the other things

24   hanging.  They accused us, Stroock, again, essentially, of

25   defying the Court's order for providing more explanation on

```
 1    this Thea Faro letter.  We have given you all we know.

 2    That's part of the brief.

 3                THE COURT:  Yes.  I'm not concerned about that.

 4                MR. CANTINE:  Okay.  And so let's go to the last

 5    one.  Right?

 6                Even if you -- I don't think there has been

 7    any, anything bad happening, but they've asked for

 8    terminating sanctions.  Right?  That's what they think.  I

 9    don't think they had any alternative in their brief.

10                We produced more than 250,000 documents,

11    700,000 pages in this litigation, from us.  We've gotten

12    less from them.  The ones that, you know, if you think --

13    you would think there would be a lot more coming from their

14    side when you've got six or seven accused products.  But we

15    produced more than that.  And so we're ow talking about

16    whether or not there are a couple of documents that didn't

17    get produced.

18                They are claiming that there are 30 documents

19    or something, or there's a handful of documents that are in

20    the -- that we since produced that they never got before.

21    And you know why?  It's because those documents were

22    reviewed by us and they were deemed nonresponsive.  So they

23    weren't produced originally because they're meaningless, but

24    since we're ordered to produce them now, we produced them

25    now.
```

```
 1              Mr. Schuman puts a great spin on that, doesn't

 2   he?  New stuff we've never seen before.  Yes, because it

 3   wasn't responsive.  But we had to turn it over in response

 4   to your order, which we did.

 5              I think XpertUniverse has been very candid, your

 6   Honor.  Mr. Friedman testified that he threw those computers

 7   out.  All right?  He told them.  He told them when the image

 8   was made of his computer.  He told them what he was doing

 9   with his computer.  I don't think there's any evidence of

10   bad faith.

11              And to suggest that this is a smoking gun and

12   this 2011 letter to Cohen's Hospital, the two smoking guns,

13   that is what we're -- you know, two hearings and a ton of

14   expert declarations is what it's all distilled to.

15              I don't think any sanctions are appropriate,

16   your Honor, but certainly not terminating sanctioning in

17   this record.  Thank you.

18              THE COURT:  All right.  Thank you, Mr. Cantine.

19              All right.  So I guess the record and the

20   argument on the motion for terminating sanctions, other than

21   the jury instruction you're going to submit tomorrow by

22   5:00, is closed.  Right?

23              MR. SCHUMAN:  Yes, your Honor.

24              THE COURT:  All right.  All right.  In terms

25   of -- is there anything else on the agenda for either of you
```

1    this morning?

2              MR. CANTINE:  Just if we had any update on

3    whether we're going forward on Monday.

4              THE COURT:  I am planning on going forward on

5    Monday.  I'm hopeful that by the end of tomorrow I will be

6    able to tell you what we're going forward on.

7              I had thrown out the idea on Friday about

8    whether or not it would make sense to bifurcate damages.  I

9    didn't detect a lot of warm fuzzy feelings coming from back

10   either side on that proposal, but I think you did say more

11   or less you had to talk with the client.

12             MR. CANTINE:  I can report, again, we appreciate

13   the offer, but that's not something we're interested in

14   doing.

15             THE COURT:  All right.  Mr. Schuman, are you in

16   the same camp there?

17             MR. SCHUMAN:  Yes, your Honor.

18             THE COURT:  Okay.  All right.  So realistically

19   what I have in mind is picking the jury next Monday.  What

20   I'm sort of thinking is that maybe it would make sense -- I

21   don't normally like to do this, but normally it would make

22   sense if we start the testimony on Tuesday or start the

23   openings on Tuesday.

24             MR. CANTINE:  That's fine with us, your Honor.

25             THE COURT:  I'm not surprised to hear you say

1    that.  And the kind of schedule that I imagine is that we

2    would have trial on Tuesday, Wednesday, Friday, then into

3    next week.  There's something else that's happening on

4    Thursday, so I think that's just going to be an off day for

5    this case.

6              And so that's what I'm planning, how I am

7    imagining the proceeding.  And that will give some -- and,

8    of course, we've got Mr. Bratic coming in Friday afternoon,

9    and obviously I'm deciding what to do about his testimony.

10   It would be an extremely high priority once I've heard from

11   him.

12             Is there anything else?

13             MR. CANTINE:  Nothing from me, your Honor.

14             THE COURT:  Hold on a minute.  Is there anything

15   else that either of you wants to talk about this morning?

16             MR. SCHUMAN:  No, your Honor.

17             THE COURT:  Mr. Cantine?

18             MR. CANTINE:  No.  I'm good.  Thanks.

19             THE COURT:  All right.  Well, thank you.

20             And I guess I will hear from Mr. Schuman by the

21   end of tomorrow.  And if nothing else, I will see you all on

22   Friday afternoon.  All right?

23             MR. CANTINE:  Thank you.

24             THE COURT:  And for Friday afternoon, two

25   things, really, one of which is, I think we're starting at

1    2:00, I think.

2              MR. CANTINE:  Correct.

3              THE COURT:  I'd like to limit it to two hours,

4    maximum.

5              And in terms of Mr. Bratic's qualifications,

6    unless there's something particularly pertinent to this,

7    let's just give me his resume and get into, you know, why

8    his method of calculation is reliable.

9              MR. CANTINE:  Understood, your Honor.

10             THE COURT:  All right?

11             MR. CANTINE:  Thank you.

12             THE COURT:  All right.  Well, thank you.  We'll

13   stand in recess.

14             (Court recessed at 11:24 a.m.)

15                        -  -  -

16

17

18

19

20

21

22

23

24

25