IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| XPERTUNIVERSE, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 09-157-RGA |
| | : | |
| CISCO SYSTEMS, INC., | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

Philip A. Rovner, Esq., Potter Anderson & Corroon LLP, Wilmington, DE; Charles E. Cantine, Esq. (argued), Jason M. Sobel, Esq. (argued), Stroock & Stroock & Lavan LLP, New York, NY, Attorneys for Plaintiff.

Jack B. Blumenfeld, Esq., Jennifer Ying, Esq., Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE; Kell M. Damsgaard, Esq. (argued), Philadelphia, PA, Brett M. Schuman, Esq. (argued), Ryan Scher, Esq. (argued), San Francisco, CA, Morgan, Lewis & Bockius LLP, Attorneys for Defendant.

March 8, 2013

ANDREWS, U.S. DISTRICT JUDGE:

Presently before the Court are Defendant's Motions for Partial Summary Judgment (D.I. 297, 300, 303, 306, 311, 315, 318, 320, 327, and 328) and associated briefing (D.I. 495, 521, 537, 570) and declarations.[1]  The Court had the benefit of oral argument on February 27, 2013. (D.I. 611). Over the course of briefing these Motions, the issues for partial summary judgment appear to have shifted from the accused product framework outlined in the Motions to the following issues: 1) XU's trade secret misappropriation claim; 2) XU's breach of contract claims; 3) XU's rescission and fraud-based claims; 4) XU's claims for patent infringement; 5) XU's claims relating to the phrase "expert on demand"; and 6) the preemptive or supersessive effect of XU's California Unfair Trade Secrets Act claim.[2]  For the reasons set forth herein, partial summary judgment is **GRANTED** on Issue 1; **GRANTED IN PART** on Issue 2; **GRANTED IN PART** on Issue 3; **GRANTED IN PART** on Issue 4; **GRANTED** on Issue 5; and **GRANTED IN PART** on Issue 6.

---

[1] Citations herein to Defendant's Schuman Declaration (Schuman Decl.) refer to the numbered exhibits found consecutively at D.I. 498-505, and citations to Defendant's Scher Declaration (Scher Decl.) refer to the numbered exhibits found at D.I. 538. Citations herein to Plaintiff's McCraw Declaration (McCraw Decl.) refer to the numbered exhibits found consecutively at D.I. 523 and 527-532.

[2] For example, Cisco's Motion at D.I. 328 is directed toward all of XU's claims targeting Cisco's Telepresence Expert On Demand product, whereas its brief is directed toward XU's attempt to claim intellectual property in XU's "expert on demand" phrase and notes that XU has dropped several of its other claims against Telepresence Expert On Demand. (D.I. 495 at 36 n.24). The Court asks Cisco to submit a proposed order deciding its motions consistently with the rulings herein, and asks XU to advise the Court and Cisco which claims they plan to proceed upon.

1

## DISCUSSION

### A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

FED.R.CIV.P. 56(a). The moving party has the initial burden of proving the absence of a

genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477

U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding,

and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a

reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d

177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The burden on the moving party may be discharged by pointing out to the district court that there

is an absence of evidence supporting the nonmoving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue

for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986);

*Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving

party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to

particular parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other

materials; or (B) showing that the materials cited [by the opposing party] do not establish the

absence ... of a genuine dispute ...." FED.R.CIV.P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view

the evidence in the light most favorable to the nonmoving party and draw all reasonable

inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247–49; *see Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

## B. Decision

The parties agree that XU's state law claims are governed by California law. (Schuman Decl. Ex. 6, §10.0; Ex. 7, §12.5; Ex. 8, §9.5). In light of the looming trial date and to expedite a decision on these issues, the Court presumes familiarity with the background of the case and the parties' arguments, and will only recite them here as necessary to explain the Court's rulings.

### 1) *XU's trade secret misappropriation claim (Count V)*

Upon consideration of Cisco's Motions for partial summary judgment (D.I. 303, 306, 311, 315, 320, 327), all of which relate in part to Count V of the Fourth Amended Complaint (D.I. 82) ("Misappropriation of Trade Secrets Under the California Uniform Trade Secrets Act"), the Court will grant the Motions to the extent they relate to Count V. Although a host of grounds are raised by Cisco in support of its motions, the basis for decision is that the identification of the trade secrets is insufficient to create a triable factual issue, and even if any trade secrets were sufficiently described, XU has failed to create a genuine issue of material fact to show Cisco misappropriated any sufficiently described trade secret.

3

California law sets forth the definition of a trade secret:

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code § 3426.1(d).³ It further sets forth the definition of trade secret misappropriation:

---

3

The definition of "trade secret" contains a reasonable departure from the Restatement of Torts (First) definition which required that a trade secret be "continuously used in one's business." The broader definition in the Act extends protection to a plaintiff who has not yet had an opportunity or acquired the means to put a trade secret to use. The definition includes information that has commercial value from a negative viewpoint, for example the results of lengthy and expensive research which proves that a certain process will *not* work could be of great value to a competitor.

*Cf. Telex Corp. v. IBM Corp.*, 510 F.2d 894 (CA10, 1975) per curiam, cert. dismissed 423 U.S. 802 (1975) (liability imposed for developmental cost savings with respect to product not marketed). Because a trade secret need not be exclusive to confer a competitive advantage, different independent developers can acquire rights in the same trade secret.

The words "method, technique" are intended to include the concept of "know-how."

The language "not being generally known to the public or to other persons" does not require that information be generally known to the public for trade secret rights to be lost. If the principal person who can obtain economic benefit from information is aware of it, there is no trade secret. A method of casting metal, for example, may be unknown to the general public but readily known within the foundry industry.

The phrase "and not being readily ascertainable by proper means by" was included in this section as originally proposed by the National Conference of Commissioners on Uniform State Laws. It was removed from the section in favor of the phrase "the public or to." This change was made because the original

4

"Misappropriation" means:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(A) Used improper means to acquire knowledge of the trade secret; or

(B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:

(i) Derived from or through a person who had utilized improper means to acquire it;

(ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or

_____

language was viewed as ambiguous in the definition of a trade secret. However, the assertion that a matter is readily ascertainable by proper means remains available as a defense to a claim of misappropriation.

Information is readily ascertainable if it is available in trade journals, reference books, or published materials. Often, the nature of a product lends itself to being readily copied as soon as it is available on the market. On the other hand, if reverse engineering is lengthy and expensive, a person who discovers the trade secret through reverse engineering can have a trade secret in the information obtained from reverse engineering.

Finally, reasonable efforts to maintain secrecy have been held to include advising employees of the existence of a trade secret, limiting access to a trade secret on "need to know basis," and controlling plant access. On the other hand, public disclosure of information through display, trade journal publications, advertising, or other carelessness can preclude protection.

The efforts required to maintain secrecy are those "reasonable under the circumstances." The courts do not require that extreme and unduly expensive procedures be taken to protect trade secrets against flagrant industrial espionage. *See E.I. du Pont de Nemours & Co., Inc. v. Christopher*, supra. It follows that reasonable use of a trade secret including controlled disclosure to employees and licensees is consistent with the requirement of relative secrecy.

Cal. Civ. Code § 3426.1 Legislative History, [84 S.J. 13883].

5

limit its use; or

(iii) Derived from or through a person who owed a duty to the person seeking
relief to maintain its secrecy or limit its use; or

(C) Before a material change of his or her position, knew or had reason to know
that it was a trade secret and that knowledge of it had been acquired by accident or
mistake.

Cal. Civ. Code § 3426.1(b). "Improper means" includes "theft, bribery, misrepresentation,

breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic

or other means. Reverse engineering or independent derivation alone shall not be considered

improper means." *Id.* § 3426.1(a).

(a) A complainant may recover damages for the actual loss caused by
misappropriation. A complainant also may recover for the unjust enrichment
caused by misappropriation that is not taken into account in computing damages
for actual loss.

(b) If neither damages nor unjust enrichment caused by misappropriation are
provable, the court may order payment of a reasonable royalty for no longer than
the period of time the use could have been prohibited.

(c) If willful and malicious misappropriation exists, the court may award
exemplary damages in an amount not exceeding twice any award made under
subdivision (a) or (b).

*Id.* § 3426.3.

"It is critical to any CUTSA cause of action . . . that the information claimed to have been

misappropriated be clearly identified. Accordingly, a California trade secrets plaintiff must . . .

identify the trade secret with reasonable particularity." *Silvaco Data Sys. v. Intel Corp.*, 184 Cal.

App. 4th 210, 221 (Cal. Ct. App. 2010) (citing Code Civ. Proc. § 2019.210). Although the

parties disagree about the gloss put on this by California cases, the cases cited by the parties in

their briefs are generally consistent. The cases provide that a trade secret consists of information,

6

not ideas; a trade secret is actual, not theoretical; a trade secret is specific, not general.[4] For example, a description of a software methodology implementing "features, functions, and characteristics of the design and operation" characterizes the "underlying design" and not the information therein or related source code, and fails to describe a trade secret with sufficient particularity. *Silvaco Data Sys.*, 184 Cal. App. 4th at 221-22. Descriptions must clearly refer to tangible trade secret material, not an overall system that potentially qualifies for trade secret protection. *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1167 (9th Cir. 1998). Narratives that explain the nature of the information in very general terms are insufficient. *Agency Solutions.com, LLC v. Trizetto Group*, 819 F.Supp.2d 1001, 1012 (E.D. Cal. 2011). Cases from other jurisdictions are also helpful: descriptions that "effectively assert[] that all information or about [the plaintiff's] software is a trade secret," by describing the "methods and processes underlying and the inter-relationships among various features making up [the plaintiff's] software package," are too broad. *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002).

Against this backdrop, XU has strained to describe its supposed trade secrets in a manner that makes a plausible case that it had trade secrets. Cisco complained about XU's earlier identifications. (Schuman Decl. Ex. 70; D.I. 183). The Court ordered that XU supplement its identifications. (Schuman Decl. Ex. 205). XU did so on or about June 4, 2012, in its Supplemental Response to Interrogatory No. 12. (Schuman Decl. Ex. 71). Cisco objected that

---

[4] XU's citation of *Mattel, Inc. v. MGA Entertainment, Inc.*, 782 F.Supp.2d 911 (C.D. Ca. 2011), for the proposition that a "concept" can constitute a trade secret does not dilute the requirement that the concept be described with sufficient particularity. (D.I. 521 at 21 n.16); *see Mattel*, 782 F.Supp.2d at 960 (addressing a trade secret "concept" including the group name, doll names, "doll designs, fashions, themes, and marketing slogans").

these responses were insufficient. (D.I. 215). XU stated that it could not improve upon these responses. (Schuman Decl. Ex. 12). The Court indicated that it had doubts about the sufficiency of the responses, but did not think a discovery dispute was the appropriate place to resolve those doubts. (Schuman Decl. Ex. 12).

The Court resolves those doubts here. All but two of XU's 46 asserted trade secrets mirror the methodology implementing certain features discarded in *Silvaco*, and the narratives discarded in *Agency Solutions.com*. None of XU's descriptions designate any information or identify any source code; they are very general recitations of processes implementing equally general features, structures, design considerations, and platforms.[4] The fact that Dr. Forys found public examples he thought fell within XU's broad descriptions does not make those descriptions sufficiently particular. The only descriptions with sufficient specificity are numbers 18 and 33, which refer to specific architecture diagrams and system and logic diagrams that contain the information underlying the narratives.[5]

Trade secret numbers 18 and 33 clear Cisco's first hurdle, but not the second. XU has provided no evidence to show Cisco misappropriated those trade secrets. "It is the plaintiff's

---

[4] The breadth and generality of the trade secret descriptions was exemplified during a discovery dispute when XU's counsel claimed that video conferencing between two bank branches would be covered by its trade secrets. (D.I. 598 at 5-6). As another example, at oral argument, XU's counsel could not explain how trade secret 40 differed from a typical phone call to an insurance company. (D.I. 611 at 84-90).

[5] This is not to say that reference to such a diagram is necessary to describe a trade secret with sufficient particularity. Rather, the diagrams rescue XU's prose descriptions, which would otherwise be insufficient.

The video and documents XU introduced at argument to show embodiments of trade secret descriptions 36 and 37, but did not reference in its opposition, do not make up for the deficiencies in XU's trade secret descriptions. (D.I. 161 at 94-95, 114-19).

8

burden to show improper use as part of its prima facie case." *Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1669 (Cal. Ct. App. 2003). XU has provided no evidence that Cisco used any purported trade secret, much less numbers 18 and 33. XU's expert, Dr. Nourbakhsh, broadly states that he finds functions of trade secrets 18 and 33 "embodied" in Cisco projects, but does not identify any of the information in XU's cited diagrams "embodied" in any Cisco project. (D.I. 521 at 26-27); (McCraw Decl. Ex. 97, ¶¶ 124, 157, 224). Such "embodiment" falls short of evidence that Cisco misappropriated trade secrets 18 and 33 under the CUTSA's definition in § 3426.1, particularly in light of Cisco's otherwise undisputed evidence that it developed Pulse, Quad, VEM/Remote Expert, SOAR, and Expert Advisor without the use of any XU trade secrets. (D.I. 495 at 15-17).[6]

In sum, XU has failed to adequately describe all but two trade secrets, and failed to create a genuine issue of material fact that it had any trade secrets that Cisco misappropriated.

2) *XU's breach of contract claims (Counts IX, X, XI).*

Upon consideration of Cisco's motion for partial summary judgment with respect to Counts IX, X, XI, and VI, (D.I. 318), the Court will grant the motion in part.[7]

The parties agree on the law governing the breach of contract claims. *See Wall Street Network, Ltd. v. New York Times Co.*, 164 Cal. App. 4th 1171, 1178 (Cal. Ct. App. 2008). The three governing agreements each provided explicit direction to XU as to what type of information would be shared and how to designate documents and information confidential. The 2004

---

[6] As set forth at D.I. 604, the Declaration of Leni Selvaggio cited in this section of Cisco's brief has been stricken. It has not been considered here.

[7] This decision is independent of the Court's decision on XU's claim to rescind these same contracts.

9

Nondisclosure Agreement provided XU would share "Product Information," mark written documents containing confidential information, and identify any orally conveyed confidential information as confidential at the time of disclosure with confirmation in writing. (Schuman Decl. Ex. 6, §§1.0, 2.0). XU employees understood this requirement. (Schuman Decl. Ex. 67). The NDA provided it could only be modified by a writing signed by both parties. (Schuman Decl. Ex. 6). The 2005 Technology Developer Program Partner Agreement ("CTDPA") provided XU would share a subset of technical and business information related to XU's products and services and provide any confidential information only in written form, designated as Confidential Information (unless XU sought and obtained written approval to deviate from these requirements). (Schuman Decl. Ex. 7, § 11.2). The 2006 CTDPA provided XU would share technical and business information related to its products and business information, with the same designation and approval requirements as the 2005 CTDPA. (Schuman Decl. Ex. 8, §5.1.1).

The parties agree that Cisco showed some XU documents to a third party consultant, SBT Advisors. *See* (Schuman Decl. Ex. 142-44, Ex. 182 at 271:9-25). The parties agree XU did not mark these documents as confidential.[8] *See* (Schuman Decl. Ex. 142-44). XU fails to create a genuine issue of material fact that Cisco "knew or should have known these documents to be proprietary" based on a "course of conduct" between the parties, such that Cisco showing those unmarked XU documents would breach one or more of the contracts.[9] XU relies on its Eiss

---

[8] The documents appear to be general marketing pieces.

[9] It is not clear from the record which contract(s) XU presently asserts Cisco breached by showing XU documents to SBT Advisors. This interaction is alleged in all three breach of contract counts of the Fourth Amended Complaint. (D.I. 82).

10

Declaration and Mason Declaration to generally describe "an intention of confidentiality" and Cisco's reassurance that "confidentiality of all sensitive information exchanged was being maintained," but the Mason Declaration also states that "[a]t no point in time" "throughout 2005 and 2006" "did anyone at Cisco or XU explicitly state or suggest that the terms of the confidentiality agreement had changed in any way." (D.I. 524, ¶¶ 9-10; D.I. 522, ¶¶ 14-18). XU also relies on a May 2005 email from Cisco's Ken Jordan asking XU for technical documents and noting, "All documents are covered under NDA." (McCraw Decl. Ex. 36).

This meager and unspecific record does not show any course of dealing deviating from the requirements of the NDA (which required a signed writing to change) or the CTDPAs to positively identify confidential information. The Mason Declaration indicates the parties adhered to the agreements' terms; the Declarations and Jordan email show the parties' intentions to protect XU's confidentiality, but do not change the mechanism for doing so provided in the agreements. Cisco has demonstrated that there is no genuine issue of material fact that it breached any contract by showing the three XU documents to the third party consultant.

The parties agree that XU gave Cisco nine documents designated as confidential under these agreements.[10] (Schuman Decl. Ex. 23, 26, 27, 31, 32, 35, 36, 39, 106). XU first argues that Cisco used XU confidential information in two patent applications, relying on Dr. Nourbakhsh's opinion. (D.I. 521) (citing McCraw Decl. Ex. 97, ¶¶ 263-72; D.I. 528, ¶ 92). XU also relies on Dr. Nourbakhsh's opinion to argue that Cisco used information from marked XU documents in its products. (D.I. 521 at 16) (citing D.I. 528, ¶¶ 58-82). The majority of Dr. Nourbakhsh's

---

[10] The briefing does not provide which agreement covers which document(s), and XU's claim for rescission seems to invoke a dispute on that point. *See* Section 3, *infra*.

11

opinion addresses "trade secrets;" as explained *supra*, XU's trade secret claims fail, and Dr. Nourbakhsh's trade secret opinion does not support any breach of contract.[11] Dr. Nourbakhsh opines only that Cisco used two of the nine documents XU designated as confidential, identified as CISCO3996 (Schuman Decl. Ex. 23) and CISCO13900 (Schuman Decl. Ex. 35), in one patent application, No. 11/772,318 (Schuman Decl. 150). (D.I. 528, ¶ 92). Dr. Nourbakhsh opines that the "basic mechanism" in Cisco's patent application No. 11/772,318 "is exactly the information XU provided" in those two confidential documents. *Id.*

As far as Cisco's use of any of the nine documents in any of its patents or products, XU demonstrates a genuine issue of material fact only with regard to whether Cisco used CISCO3996 and CISCO13900 in application no. 11/772,318 in breach of contract. Otherwise, Cisco has demonstrated the absence of any genuine issue of material fact, particularly with regard to the breach element of XU's breach of contract claims, and its motion is accordingly granted in part.

---

[11] In paragraph 92 of his Declaration, Dr. Nourbakhsh first opines that Cisco application 11/772,318 uses 17 XU trade secrets. "Secondly," he opines, "there is considerable evidence that XU's confidential information is also disclosed by Cisco in this patent application. Specifically, XU transmitted confidential and proprietary information . . . in confidential documents CISCO3996 and CISCO13900." Dr. Nourbakhsh went on to quote parts of the application, then concluded "the basic mechanism disclosed in the present application . . . is exactly the information XU provided, confidentially to Cisco in CISCO3996 and CISCO13900." (D.I. 528, ¶ 92). Dr. Nourbakhsh's analysis of the two documents is confined to XU's breach of contract claim. Dr. Nourbakhsh does not opine that the two documents conveyed any XU trade secrets to Cisco.

### 3) XU's rescission and fraud-based claims (Counts III, IV, XII)

Cisco moved for partial summary judgment on Counts III (common law fraud), IV (deceit under California Civil Code §§ 1709, 1710),[12] and XII (rescission). (D.I. 297, D.I. 495 at 20-21). XU's theories appear to be: 1) Cisco fraudulently induced XU to enter into the CTDPAs by misrepresenting each of them as a mere formality, and by tying the CTDPAs to participation in Solutions Plus; 2) Cisco concealed from XU that it was denied entry into Solutions Plus; and 3) the CDTPAs are unconscionable.[13] (D.I. 521 at 9-13).

Cisco's Motion is granted with regard to XU's theory of fraudulent inducement based on the CTDPAs being formalities. This theory requires XU to prove, *inter alia*, actual and justifiable reliance by a preponderance of the evidence. *Liodas v. Sahadi*, 19 Cal.3d 278, 291 (1977); *Orient Handel v. United States Fid. & Guar. Co.*, 192 Cal. App. 3d 684, 693 (Cal. App. 1987). XU has submitted no evidence that it was reasonable for Eiss and Zelkin to rely on a characterization of the CTDPAs as formalities. *See* (McCraw Decl. Ex. 7 at 275-76, Ex. 9 at 182-86). To the contrary, the terms of the CTDPAs themselves make it unreasonable to rely on a characterization as a formality. They are multiple pages long, and explain they are to permit

---

[12] The parties appear to regard Counts III and IV as being redundant of each other, as they submitted the same jury instructions for both counts. (D.I. 579, pp. 115-36).

[13] At oral argument, XU explained the Court need only reach the rescission claim if the Court determines that the CTDPAs, with their limitations of liability, "are somehow operable contracts and govern the proceedings of what happened." (D.I. 611 at 13-17). The briefing on Cisco's Motion provides no basis for the Court to determine whether the CTDPAs are "operable" and govern the exchanges of information at issue here. *See id.* at 13 (providing XU stated this argument in the pretrial order). The Court evaluates XU's rescission claim only in the context of Cisco's Motion.

13

XU's participation in the Cisco Technology Developer Program and that they supersede the parties' prior agreements. (Schuman Decl. Exs. 7, 8).

Cisco's Motion is also granted with regard to XU's theory that XU was fraudulently induced to enter into the CTDPAs via a misrepresentation that XU would be able to participate in Cisco's Solutions Plus program. XU's only evidence underlying this theory is an internal Cisco email dated March 24, 2005, evaluating a draft term sheet with XU without mentioning either CDTPA or Solutions Plus. (McCraw Decl. Ex. 30). This falls far short of creating any genuine issue of material fact that Cisco was misrepresenting anything about Solutions Plus to XU in order to ensnare XU in a CDTPA. To the contrary, the evidence shows the CTDPA progressed the parties' relationship beyond a mere NDA and toward integration of XU's work with Cisco's. (Schuman Decl. Ex. 8 at CISCO00227789, CISCO002277893; Ex. 199 at 10).

While XU has failed to create a genuine issue of material fact that any misrepresentation about Solutions Plus was used to fraudulently induce XU to enter into the CDTPAs, XU has shown a genuine issue of material fact with regard to whether Cisco concealed XU's status in the Solutions Plus program, generally. XU's theory is that Cisco rejected XU from Solutions Plus on April 19, 2006, based on an internal Cisco Solutions Plus Governance Council email dated April 25, 2006, subject line "4/19 GS+ Governance Council Meeting Notes," providing:

Topic: Xpert Universe . . .
Outcome: Denied; appeared as niche product. Governance Council did not see horizontal revenue pull through, suggested BU should OEM or acquire

(McCraw Decl., Ex. 40, at CISCO00038318). Cisco points to internal Cisco emails showing efforts to try to get XU into the program in May 2006 and October 2006. (Schuman Decl. Exs.

14

220, 221; McCraw Decl. Ex. 43). XU asserts Cisco did not tell XU about this decision, while Cisco asserts it told XU about the denial as evidenced by XU efforts to overcome the "objections" to its participation as of July 12, 2006. (Scher Decl. Ex. 10). XU points to contemporaneous Cisco documents referring to XU as a competitor; Cisco argues that collaboration between different companies does not mean they are not still competitors. (McCraw Decl. Exs. 61, 62; DTX 108). XU asserts Cisco finally told XU that it could not participate in Solutions Plus in January 2007. (D.I. 521 at 11) (citing McCraw Decl. Ex. 1 at 50, Ex. 74).

This record presents a few genuine issues of material fact regarding whether Cisco concealed XU's status with regard to Solutions Plus. Did Cisco deny XU from Solutions Plus with finality in April 2006, and conceal the finality of that decision from XU for a period of months, or were there only objections in April 2006 that XU could overcome? What did Cisco communicate to XU about Solutions Plus, and when? Cisco's motion is denied with regard to concealment of XU's status in Solutions Plus.

Finally, Cisco's motion is granted as to XU's theory that the CDTPAs are unconscionable.[14] "Under California law, courts may refuse to enforce any contract found 'to have been unconscionable at the time it was made,' or may 'limit the application of any unconscionable clause.' Cal. Civ.Code Ann. § 1670.5(a). A finding of unconscionability requires a procedural and a substantive element, the former focusing on oppression or surprise

---

[14] The Court permitted XU to amend its pleadings to include this theory. (D.I. 612 at 151). The parties agree that rescission based on unconscionability is a matter for the Court to determine on the merits based on the summary judgment briefing, if summary judgment itself is denied. (D.I. 611 at 5-6; D.I. 612 at 151-52).

15

due to unequal bargaining power, the latter on overly harsh or one-sided results." *AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740, 1746 (2011) (internal quotation and citation omitted).[15] XU's only evidence of procedural unconscionability is Eiss's testimony of "how things frequently were with Cisco, we would get an invitation to participate in something, and you need to do this, this, this, and this to make it happen, and we are in a short time frame, so just get it done" and her speculation as to how that would have informed Zelkin's decision to commit XU to the 2006 CDTPA. (McCraw Decl. Ex. 9 at 197). This fails to show XU was oppressed or surprised by unequal bargaining power. The CDTPAs fall far short of the traditional concept of a contract of adhesion: the agreements are between commercial entities, and XU has not shown that Cisco's bargaining power vastly outweighs XU's or that XU could not negotiate any terms of the CDTPA. *See Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1004-5 (9th Cir. 2010).

As for substantive unconscionability, XU argues, without relying on any record evidence, that the CTDPAs allow Cisco to develop competing products, limited liability to $3 million, and narrowed the definition of confidential information from the NDA. (D.I. 521 at 13). In fact, these rights and limitations were all mutual. (Schuman Decl. Ex. 7, §§ 9.0, 11.1-11.4, 11.8; Ex. 8, §§ 5.1, 5.5, 7.0).

In sum, Cisco's motion is granted as to XU's rescission claim (Count XII) and granted as to XU's fraudulent inducement theory of fraud and deceit (Counts III and IV), but denied as to XU's theory of concealment regarding Solutions Plus underlying Counts III and IV.

---

[15] XU argues for rescission based on unconscionability, but the remedy for unconscionability is the Court's refusal to enforce the contract. *See* Cal. Civ. Code §§ 1670.5, 1689.

16

### 4) *XU's claims for patent infringement (Counts I and II)*

Cisco's Motion for Partial Summary Judgment No. 2 for Invalidity of U.S. Patent Nos. 7,366,709 and 7,499,903 Based On 35 U.S.C. § 102(b) (Counts I & II) (D.I. 300) is denied. Cisco has not shown the absence of a genuine issue of material fact with regard to, *inter alia*, whether the specific versions of the XU products that were demonstrated or offered for sale embodied the patented inventions at the time they were demonstrated or offered for sale.

Cisco's Motion for Partial Summary Judgment No. 4 Relating to Cisco's Expert Advisor Product (D.I. 306), No. 5 Relating to Cisco's Pulse Product (D.I. 311), and No. 8 Relating to Cisco's Virtual Management / Remote Expert Product ("Virtual Expert") (D.I. 327) are granted in part, as to XU's claims of indirect infringement under Counts I and II. XU's only basis for demonstrating indirect infringement is Dr. Nourbakhsh's opinion that "any Cisco customer" "will" use "the methodology recited by the [asserted] method claims." (D.I. 521 at 30 (citing Nourbkhsh Report, ¶¶ 96, 111, 146, 197, 208)). The Court has deemed that exact opinion unreliable; it cannot serve to maintain XU's claims of indirect infringement on summary judgment. (D.I. 632 at 5).

The remainder of Cisco's Motions (D.I. 306, 311, 327) regarding Counts I and II are denied. Cisco has not shown the absence of a genuine issue of material fact.

### 5) *XU's claims relating to the phrase "expert on demand"*

Cisco's Motion (D.I. 328) is granted to the extent any XU claim relies on XU's claim of a protectable interest in the phrase "expert on demand." XU has not shown that Expert on Demand is a protectable phrase under either the Lanham Act or California state law.

17

It is undisputed that XU has not registered "expert on demand" as a trademark. XU bears the burden of proof as to validity and protectability of the unregistered phrase for which it claims trademark protection. *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.,* 419 F.3d 925, 926 (9th Cir. 2005) (addressing both Lanham Act and California state law claims); *E.T. Browne Drug Co. v. Cococare Prods., Inc.,* 538 F.3d 185, 191 (3d Cir. 2008) (addressing a Lanham Act claim).

The first step in the analysis here is to determine, as a question of fact, whether the potential trademark is inherently distinctive, or whether it is descriptive and therefore secondary meaning must be shown. *See Yellow Cab,* 419 F.3d at 927; *Zobmondo Entertainment, LLC v. Falls Media, LLC,* 602 F.3d 1108, 1113 (9th Cir. 2010); *cf. E.T. Browne,* 538 F.3d at 191-92. XU is pursuing the theories that "expert on demand" is protectable as both inherently distinctive and as descriptive with secondary meaning. (D.I. 611 at 133). XU has not submitted any evidence that creates a genuine issue of material fact that "expert on demand" is inherently distinctive. XU relies on testimony by its own CEO (Friedman) and President (Eiss) describing their motivations and intentions for the phrase. (McCraw Decl. Ex. 103 at 167-68; Ex. 9 at 136). Such self-serving testimony by the trademark holder does not meet XU's burden on summary judgment. *Self-Realization Fellowship Church v. Ananda Church of Self-Realization,* 59 F.3d 902, 910 (9th Cir. 1995); *Filipino Yellow Pages, Inc. v. Asian Journal Publs., Inc.,* 198 F.3d 1143, 1152 (9th Cir. 1999); *cf. Citizens Financial Group, Inc. v. Citizens Nat'l Bank of Evans City,* 383 F.3d 110, 122 (3d Cir. 2004). XU relies on an abandoned trademark application by a different entity to argue the phrase is distinctive. (McCraw Decl. Ex. 102).

This falls far short of actual registration and does not show the USPTO's opinion on the phrase as filed by any entity, much less XU.

The next step in the analysis is to determine, as a question of fact, whether "expert on demand" is a descriptive mark that can receive trademark protection because it has acquired distinctiveness by establishing secondary meaning in the marketplace. *Yellow Cab Co.*, 419 F.3d at 926; *E.T. Browne*, 538 F.3d at 191-92. The test to determine whether "expert on demand" has secondary meaning as required for XU's Lanham Act claim includes:

(1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and, (11) actual confusion.

*See E.T. Browne*, 538 F.3d at 199. XU submits evidence that it argues shows Cisco copied XU's use of the phrase. (McCraw Decl. Ex. 65 at XU-0082626, Ex. 109, 110, 115); (D.I. 524, ¶ 13). XU's evidence shows only that Cisco saw XU materials with the phrase. Cisco's evidence shows Cisco came up with the phrase independently. (Schuman Decl. Ex. 193 at 59-61, 92-94; Ex. 166).

As for the other ten factors, XU used "expert on demand" to describe a version of XpertSHARE from 2004-2007. (Schuman Decl. Ex. 169, Ex. 182 at 188; D.I. 525, ¶ 24; McCraw Decl. 103 at 165, 167-68). Because XU had no customers and never sold a product, it has no evidence of sales or advertising leading to buyer association, customer surveys, customer testimony, number of sales, or number of customers. (Schuman Decl. Ex. 182 at 185, 212). Other companies were using the same phrase to describe similar products. (Schuman Decl. Exs. 173, 213). On balance, XU has only shown evidence of nonexclusive use of the phrase for three

19

years, without ever having a product or customers. In other words, XU has no evidence that it ever used the term in the public marketplace or in front of consumers, while other companies did use it. XU has failed to produce sufficient evidence to create a genuine issue of material fact with regard to secondary meaning, and therefore that "expert on demand" is a protectible descriptive phrase, for its Lanham Act claim. Cisco's motion is granted on that claim.

To evaluate the phrase's secondary meaning in XU's California state law claims, the finder of fact considers: (1) whether actual purchasers of the product bearing the claimed trademark associate the trademark with the producer, (2) the degree and manner of advertising under the claimed trademark, (3) the length and manner of use of the claimed trademark, and (4) whether use of the claimed trademark has been exclusive. *See Yellow Cab Co.*, 419 F.3d at 930. As explained, there are no actual purchasers, XU used the phrase for three years without a product, and XU's use was not exclusive. XU has failed to produce sufficient evidence to create a genuine issue of material fact with regard to secondary meaning for its California claims asserting "expert on demand"; Cisco's motion is granted on those claims.

With regard to Count XVI (Conversion), Cisco points out that "intangible intellectual property cannot be subject to conversion as a matter of law." *See Innospan Corp. v. Intuit, Inc.*, 2011 WL 856265, *3 (N.D. Cal. 2011). Cisco's motion is granted with regard to Count XVI.

*6) The preemptive or supersessive effect of XU's California Unfair Trade Secrets Act claim*

Cisco argues in its brief for partial summary judgment on Counts III (common law fraud), IV (deceit), VI (breach of confidence), XV (common law quasi contract unjust enrichment), XIII (common law unfair competition), XIV (unfair competition under the

20

California Civil Code), and XVI (conversion) to the extent they are based on the same nucleus of facts as XU's California Uniform Trade Secrets Act claim (Count V). (D.I. 495 at 38-39, in support of D.I. 303, 318); *see Silvaco Data Systems v. Intel Corp.*, 184 Cal.App.4th 210, 232-36 (Cal. App. 2010) (interpreting Cal. Civil Code § 3426.7, subds. (a) and (b), and holding "CUTSA provides the exclusive civil remedy for conduct falling within its terms, so as to supersede other civil remedies based upon misappropriation of a trade secret").

XU does not contest that CUTSA preempts other claims based on trade secret misappropriation. Instead, XU identifies bases for these counts other than trade secret misappropriation: alleged concealment of Solutions Plus status (Counts III and IV), "hiding XU's 'competitor' status from XU, falsely preventing XU from working with other partners, and presenting XU's technology to potential customers without including XU" (Counts XIII and XIV), unjust enrichment with a "head start" after alleged concealment of Solutions Plus status (Count XV), and misappropriation of business opportunities as opposed to confidential information (Count XVI). (D.I. 521 at 38-39).

These asserted grounds for relief are not what XU originally pled. *See* (D.I. 82). The Court granted XU's request to amend its pleadings of Counts III and IV to include XU's concealment theory, and that theory is not preempted. (D.I. 612 at 151). XU did not request to amend its pleadings for Counts XIII, XIV, XV, or XVI. In fact, a month after XU proffered these new theories in opposition to summary judgment, XU repeated its original misappropriation theories in the pretrial order. *See* (D.I. 580, Ex. 2 at 38-43; Ex. 6 at 17-24; Ex. 7 at 18-21). XU's new theories in opposition to summary judgment are untimely and not supported by any record evidence; it is unclear what "business opportunities" XU is even

21

alleging. One reasonable conclusion is that XU proposed these new theories to survive

summary judgment, as opposed to in response to the natural course of litigation and discovery.

They will not serve to save Counts XIII, XIV, XV, or XVI from being superseded by XU's

CUTSA claim (Count V).[16]  Cisco's motion is granted on Counts XIII, XIV, XV, and XVI.

XU argues that its breach of confidence claim (Count VI), "expressly based on theft of

non-trade secret, but otherwise protectable, confidential and proprietary information," is not

preempted under CUTSA.  (D.I. 521 at 40). The argument that CUTSA "was not intended to

preempt common law … claims based on the taking of information that, though not a trade

secret, was nonetheless of value to the claimant" was "emphatically reject[ed]" in *Silvaco Data

Systems*. 184 Cal. App. 4th at 239 n.22.

> On the contrary, a prime purpose of the law was to sweep away the adopting
> states' bewildering web of rules and rationales and replace it with a uniform set of
> principles for determining when one is—and is not—liable for acquiring,
> disclosing, or using "information ... of value." (*See* [Cal. Civ. Code] § 3426.8.)
> Central to the effort was the act's definition of a trade secret. (*See* [Cal. Civ. Code]
> § 3426.1, subd. (d).) Information that does not fit this definition, and is not
> otherwise made property by some provision of positive law, belongs to no one,
> and cannot be converted or stolen. … Permitting the … claim to proceed on a
> contrary rationale . . . [would] create[]a new category of intellectual property far
> beyond the contemplation of the Act, subsuming its definition of "trade secret"
> and effectively obliterating the uniform system it seeks to generate.

---

[16] The practical effect of this decision is nearly imperceptible.  XU's claims that Cisco
misappropriated its trade secrets, confidential information, and "expert on demand" phrase are
disposed of herein (with the exception of a breach of contract claim based on two documents
marked confidential), so the preempted portions of these claims fail on their merits anyway.  XU
has the opportunity to prove its Solutions Plus theories in Counts III and IV; it is difficult to see
what advantage XU would gain by repackaging those theories as unfair competition claims in
Counts XIII (common law unfair competition) and XIV (unfair competition under the California
Civil Code), particularly where Count XIV is an equitable claim to be determined by the Court in
any case. *See Openwave Sys., Inc. v. Myriad France S.A.S.*, 2011 WL 2580991, *2 (N.D. Cal.
Jun. 29, 2011); (D.I. 580 at 14-15).

*Id.*

Cisco's Motions (D.I. 303, 318) are granted for Counts VI, XIII, XIV, XV, and XVI, and granted in part for Counts III and IV to the extent they depend on misappropriation or theft of any trade secrets or other information of value.[17]

## CONCLUSION

For the reasons stated herein, Cisco's motions for partial summary judgment are granted in part for the following Counts: Counts I and II in part, because XU has no admissible evidence of indirect infringement; Counts III and IV in part, as XU has shown a genuine issue of material fact only with regard to whether Cisco concealed XU's status in the Solutions Plus program; Count V, because XU has failed to adequately describe all but two of its trade secrets with particularity and to create a genuine issue of material fact to show Cisco misappropriated any trade secrets; Count VI, because it is mutually exclusive with a breach of contract claim and because and because it is superseded by XU's CUTSA claim; Counts VII and VIII because XU has failed to create a genuine issue of material fact to show "expert on demand" is a protectable phrase; Counts IX, X, and XI in part, as XU has shown a genuine issue of material fact only with regard to whether Cisco used two specific XU documents in one Cisco patent application; Count XII, because XU has not shown fraudulent inducement or

_____

[17] Cisco also argues for partial summary judgment on Count VI on the basis that there cannot be a valid, express contract and an implied contract existing at the same time. *See Wal-Noon Corp. v. Hill*, 45 Cal. App. 3d 605, 613 (Cal. Ct. App. 1975). XU argues its breach of confidence claim is "mutually exclusive with a claim for breach of contract," citing *Berkla v. Corel Corp.*, but appears to misapprehend what the Ninth Circuit meant by "mutually exclusive:" "California courts have made clear that these two causes of action are mutually exclusive: There cannot be a valid, express contract and an implied contract, each embracing the same subject matter, existing at the same time." 302 F.3d 909, 918 (9th Cir. 2002) (citing *Wal-Noon Corp.*). Cisco's motion is granted for Count VI on this basis as well.

23

unconscionability; Counts XIII, XIV, XV, and XVI because they are superseded by XU's

CUTSA claim (Count V), and Count XVI because intangible intellectual property cannot be

subject to conversion.

An appropriate order will follow.