IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| XPERTUNIVERSE, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 09-157-RGA |
| | : | |
| CISCO SYSTEMS, INC., | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM ORDER

Before the Court is Defendant's Motion to Exclude the Expert Testimony of [Plaintiff's

Expert Witness], Walter Bratic. (D.I. 382). It is fully briefed (D.I. 383, 401, 419). Mr. Bratic

testified, subject to cross-examination, about his opinions on March 8, 2013.

Defendant's motion is a *Daubert* motion. Federal Rule of Evidence 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training,
or education may testify in the form of an opinion or otherwise if: (a) the expert's
scientific, technical, or other specialized knowledge will help the trier of fact to
understand the evidence or to determine a fact in issue; (b) the testimony is based
on sufficient facts or data; (c) the testimony is the product of reliable principles
and methods; and (d) the expert has reliably applied the principles and methods to
the facts of the case.

The Court of Appeals has explained:

Rule 702 embodies a trilogy of restrictions on expert testimony: qualification,
reliability and fit. Qualification refers to the requirement that the witness possess
specialized expertise. We have interpreted this requirement liberally, holding that
"a broad range of knowledge, skills, and training qualify an expert." Secondly, the
testimony must be reliable; it "must be based on the 'methods and procedures of
science' rather than on 'subjective belief or unsupported speculation'; the expert
must have 'good grounds' for his or her belief. In sum, *Daubert* holds that an
inquiry into the reliability of scientific evidence under Rule 702 requires a
determination as to its scientific validity." Finally, Rule 702 requires that the

1

expert testimony must fit the issues in the case. In other words, the expert's
testimony must be relevant for the purposes of the case and must assist the trier of
fact. The Supreme Court explained in *Daubert* that "Rule 702's 'helpfulness'
standard requires a valid scientific connection to the pertinent inquiry as a
precondition to admissibility."

By means of a so-called "*Daubert* hearing," the district court acts as a gatekeeper,
preventing opinion testimony that does not meet the requirements of qualification,
reliability and fit from reaching the jury. *See Daubert* ("Faced with a proffer of
expert scientific testimony, then, the trial judge must determine at the outset,
pursuant to Rule 104(a) [of the Federal Rules of Evidence] whether the expert is
proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact
to understand or determine a fact in issue.").

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404-05 (3d Cir. 2003).

Bratic's opinions necessarily evolved after the Court's Memorandum Opinion on Cisco's

motions for summary judgment, issued after the parties briefed Cisco's Motion. (D.I. 634). The

Court addresses Bratic's opinions as it understands them based on Bratic's testimony on March

8, 2013, and takes them in turn by XU's remaining causes of action.

*1. Fraud*

Bratic provides two alternative damages figures for Cisco's alleged fraudulent

concealment of XU's status in Cisco's Solutions Plus program from April, 2006, to January,

2007. The first figure, $70 million, is XU's "lost business value" based on comparing what

Bratic opines was XU's value before Cisco's alleged concealment, to XU's value after it found

out it was not admitted into Solutions Plus and went out of business.

Bratic applies what he calls a "but-for damages model" as a stand-in for causation. (Tr.

44-47; D.I. 384-1, Ex. 2 at 186-87). He assumes Cisco's alleged concealment caused XU to lose

its entire value. (D.I. 384-1, Ex. 2 at 186-87). His but-for model "look[s] at what the value of

the company was on or about the time of bad acts and then you look at what the value of the

2

company was after the bad acts occurred, or in this case, the alleged concealment, to see what the

impact was on the company. And you look at those two and you determine what the difference

is, and that's the loss." (Tr. 44). Bratic's testimony must be limited to this comparison of XU's

value at two different times on either side of an alleged fraud. He may not opine on what he has

only assumed: that the alleged fraud caused any decrease in XU's value. Causation is a factual

issue on which Bratic has not offered any helpful expert testimony. XU must prove causation

through fact testimony.

The rest of Cisco's challenges to Bratic's $70 million lost business value raise factual

questions for the jury rather than *Daubert* issues for the Court. These factual questions include

whether Bratic's but-for causation model meets the standard of proof over evidence indicating

other sources of XU's financial troubles such as emails from upset investors; whether Bratic

correctly understood XU and Cisco's partnership or relationship; whether Bratic's valuation

based on the third party reports meets the standard of proof over evidence showing lower

valuations; and whether the facts Bratic obtained in his interviews are contradicted by record

evidence.[1] (D.I. 383 at 4-11). Bratic may testify as to his lost value opinion.

Bratic's alternate figure is XU's "lost investment in development related to XU's

technology," comprising nearly all of XU's expenditures from inception to closing the doors and

totaling $38.5 million. This opinion that fraudulent concealment of XU's status in Solutions Plus

from April, 2006, to January, 2007, damaged XU to an amount equal to or greater than all its

---

[1] The only other *Daubert* issue is whether calculating XU's value based on third party
reports (*i.e.*, by Standard & Poor's or Duff & Phelps) is a reliable method for calculating a
company's value. While I have my doubts about this, Bratic's testimony that experts in the field
of company valuation rely on such reports (Tr. 56-60) is uncontradicted.

3

expenditures from 1999 to 2008 does not fit the fraud issue. Bratic's original opinion attributed nearly all of XU's expenditures to its intellectual property and set those expenditures as a "floor for damages related to Cisco's alleged fraud, breach of confidence and/or conversion since there are no damages related to XU's lost business operations." (D.I. 499, Ex. 46, ¶¶ 78-79). Bratic has not explained why nearly all of XU's expenditures over its lifetime are relevant to the claim of concealment regarding Solutions Plus, even as he acknowledges XU "expended a lot of money" "ramping up for the Solutions Plus program" without quantifying how much money was spent specifically trying to prepare for Solutions Plus. *See* (D.I. 401 at 13; Tr. at 119-20). In short, Bratic does not explain why it is proper to base damages from a ten-month concealment on all of a company's expenses over nine years of operation. Offering such a broadly based damages conclusion for such a narrow claim, without explaining why it is proper, does not fit the legal issue and is not helpful. Bratic may not testify as to his opinion that Cisco's alleged concealment about Solutions Plus must cost Cisco at least XU's lost investment, quantified as $38.5 million.

### 2. *Patent Infringement*

Bratic opines that based on a hypothetical negotiation between Cisco and XU as of the earliest alleged infringement, Cisco would have paid XU a lump sum of $32.5 million in exchange for a license to the two patents in suit. Bratic opines that Cisco would have paid XU 50% of the $65 million he believes KPMG invested to develop KWorld, KPMG's internal knowledge management system Bratic opines is a proxy for XU's technology. (D.I. 499, Ex. 46, ¶¶ 164-65).

4

Cisco makes several objections to this opinion. The primary basis for decision is the opinion's faulty basis for recommending a lump sum. Bratic's hypothetical negotiation opinion is governed by the factors set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970). Under that framework, Bratic used two license agreements he considered comparable and found they establish a royalty range of 3-5%. (D.I. 499, Ex. 46, ¶ 139). Both of those licenses employ a running royalty.

"Subsumed within [the second *Georgia-Pacific*] factor is the question of whether the licensor and licensee would have agreed to a lump-sum payment or instead to a running royalty based on ongoing sales or usage. Significant differences exist between a running royalty license and a lump-sum license." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1326 (Fed. Cir. 2009). Lump sum licenses favor licensees who plan to use the technology frequently, and remove the risk of underreporting and avoid ongoing administrative burdens of monitoring usage. *See id.* "For a jury to use a running-royalty agreement as a basis to award lump-sum damages, however, some basis for comparison must exist in the evidence presented to the jury." *Id.* at 1330.

The products accused of patent infringement totaled around $937,000 in sales. (Tr. 154-55). Applying a 3-5% royalty rate to this base results in total damages between $38,962 and $64,938.[2] (D.I. 383 at 20 n.9). Bratic provides no basis for comparison between these amounts and his $32 million amount. Nor does he provide any explanation as to how the two running royalty agreements are probative of his $32 million lump sum payment. Nor does he provide any

---

[2] As noted, some products are accused of infringing both patents. (D.I. 383 at 20 n.9).

expectation of how often the patented technology would be used by consumers.[3] *See Lucent Techs.*, 580 F.3d at 1327. In fact, the parties at the hypothetical negotiation would be aware that XU never sold a single product and Cisco's sales have totaled less than $1 million. (Tr. 154-55, 171-72). Bratic's numerous methodological flaws are thrown into sharp relief by his conclusion: $32 million in a lump sum royalty on $937,000 in sales of accused products simply makes no sense.

Bratic's only explanation for his lump sum payment is the "vision selling strategy implemented by Cisco and the significant convoyed sales generated from the sale of Accused Products." (D.I. 499, Ex. 46,¶ 157-58). Bratic's sole basis for quantifying this "vision selling strategy" and convoyed sales is the testimony of Gerald Hayden regarding the sales of hardware based on XU's technology, and purported convoyed sales data from Latin America. *Id.* The Court has already determined that this information lacks foundation and fails to show the Latin American sales are in fact convoyed sales, and that Hayden's testimony is conclusory and not probative. (D.I. 608 at 3). Further, even as Bratic depends on the "vision selling strategy" and convoyed sales to justify a lump sum, he does not provide any logical link between these grounds and his conclusion that the lump sum should be 50% of KPMG's KWorld development costs; it is hard to see what that link could be. *See* (D.I. 499, Ex. 46,¶ 157-58). Bratic's opinion that the parties would have realized that the appropriate royalty structure for rights to the patents in suit would have been a lump sum royalty is not based on sufficient data or information.

Bratic's reasonable royalty opinion is also based on insufficient information regarding KWorld. Bratic's information about KWorld was based entirely on the deposition and interview

---

[3] XU seems to misread *Lucent Technologies*. *See* (D.I. 401 at 19).

of Michael Turillo, who worked on KWorld at KPMG and who was an equity investor in XU. (D.I. 384-1, Ex. 2 at 59, 217; Tr. 24-26). This is not sufficient data to support the $65 million starting figure. Further, Turillo testified that "KPMG spent 22 million to develop the system, 10 million to construct and populate the knowledge taxonomy, and finally 34 million for change management and advocacy," meaning implementation. (Tr. 163-64). At most, Turillo's single data point provided to Bratic is that KPMG spent $22 million on development.

### 3.  Breach of Contract

Bratic opines for the first time that Cisco's alleged use and disclosure of two confidential XU documents, identified as CISCO3996 and CISCO13900, in the '277 and '833 patent applications in breach of contract, resulted in $7.3 to $12.3 million of damages. (Tr. 78-90). Bratic reached this conclusion via a number of steps, each of which will be assessed in turn. *See id.*

1. Dr. Nourbakhsh identified fifteen pieces of confidential information in the two documents and described them in narrative form.

Dr. Nourbakhsh has provided no basis for these identifications or descriptions. His description of the confidential information in the documents to date has been very general: that "XU transmitted confidential and proprietary information concerning expert choice for expert-seeker aid" and "the basic mechanism . . . depends upon informal experts that may or may not be willing to provide help." (D.I. 528, ¶ 92). The Court has no idea how Dr. Nourbakhsh determined what parts of the documents were confidential, what parts of the documents underlie his narratives, or how he determined XU had held them as confidential. There is no basis to determine the reliability of Dr. Nourbakhsh's identifications, whether performing such

7

identifications is within his technical expertise, or whether his identifications are based on

sufficient facts or data.  These narratives fail Rule 702 at every turn.

     2.     For each of the fifteen pieces of confidential information, Dr. Nourbakhsh
               opined as to whether or not they had been published.

     The conclusion of whether or not each piece of information was published is not broken

down by whether it was published in the '277 application or the '833 application.  The Court

denied Cisco's motion for summary judgment on breach of contract "only with regard to whether

Cisco used CISCO3996 and CISCO13900 in application no. 11/722,318 in breach of contract."

(D.I. 634 at 12).  The Court understands that XU refers to application no. 11/722,318 as "the

'833 application," as its publication number is US 2009/0012833 A1.  XU does not have any

breach of contract claim proceeding on the '277 application, and the '277 applications and '833

applications have different inventors and specifications.  (Tr. at 102-03).  Therefore, the opinion

as to whether the confidential information was published is impermissible because it does not fit

the breach of contract claim remaining in the case.  This fit issue pervades the entire damages

opinion.

     3.     For each published piece of confidential information, Dr. Nourbakhsh assigned
               a value on a scale of one to ten, and opined as to the percentage of the value
               remaining after Cisco's alleged publication of the confidential information.

     Like Dr. Nourbakhsh's identifications of the confidential information, there is no basis to

determine the reliability of Dr. Nourbakhsh's valuations and percentages, or whether the

valuations and percentages are based on sufficient facts or data.

     4.     Bratic multiplied each piece of published information's value by the percentage
               to create a "remaining value" figure for each published piece of confidential
               information. Bratic totaled the "remaining values" for each published piece of
               confidential information and found it comprised 18.97% of the total value for

> all the confidential information he and Dr. Nourbakhsh had derived before the
> breach of contract claim was narrowed on summary judgment.

This manner of apportioning damages to a specific alleged misconduct does not appear to

be based on sufficient facts.

5.    a) *KWorld Proxy:* Bratic determined that KPMG invested $65 million in
      developing KWorld. Bratic multiplied his 18.97% figure by KPMG's $65
      million development cost to conclude the publication of XU's confidential
      information in CISCO3996 and CISCO13900 caused $12,330,500 in damage to
      XU.

As explained, Bratic does not have sufficient data to support the $65 million cost to

develop KWorld. Further, Bratic does not provide that the confidential information at issue was

relevant in any way to KWorld; his opinion based on KWorld as a proxy suffers from a lack of

fit. *Cf.* (D.I. 384-1 Ex. 7, 230-231; Ex. 2 at 30) (providing Dr. Nourbakhsh's opinion that no XU

purported trade secret or patent was found in the KWorld product).

> b) *XU's Investment in Technology:* Bratic applied his 18.97% figure by XU's
> $38.5 million in total expenditures over the life of the company to conclude the
> publication of XU's confidential information in CISCO3996 and CISCO13900
> caused $7,303,450 in damage to XU.

Just as Bratic's use of XU's $38.5 million in total expenditures failed for lack of fit to the

fraudulent concealment issue, it also fails for lack of fit to the alleged disclosure of confidential

information found in two documents. Bratic does not explain why a disclosure of 18.97% of the

value of XU's confidential information means Cisco should pay 18.97% of all of XU's

expenditures.[4]

---

[4] The Court notes that the patent application's cover sheet states it was published on
January 8, 2009 – two years after Cisco's alleged concealment of Solutions Plus. Bratic's
opinion that a January 2009 disclosure of confidential XU information caused millions of dollars
of damages to XU seems inconsistent with his opinion that XU had no value in January 2007.
Maybe there is an explanation, but it is not readily apparent.

In sum, each step of Bratic's damages opinion regarding the publication of XU's confidential information in CISCO3996 and CISCO13900 in application no. 11/722,318 in breach of contract introduces a violation of Rule 702. The opinion as a whole is unreliable, is based on insufficient facts and data, and does not fit the legal issue. It is based on opinions from Dr. Nourbakhsh that are unreliable, are not based on sufficient facts and data, are not within his expertise, and do not fit the legal issue. Bratic's damages opinion on XU's breach of contract claim is not permitted.

In sum, it is **ORDERED** that Defendant's Motion (D.I. 382) is **GRANTED IN PART**. Bratic may not opine that Cisco's alleged concealment caused XU to lose its entire value, that XU's "lost investment in development related to XU's technology" comprises a floor for damages for XU's fraud claim, that a hypothetical negotiation between the parties would have concluded in a lump sum of \$32.5 million for XU's patent infringement claim, or that XU suffered any damages on XU's breach of contract claim.

Entered this 11th day of March, 2013.

United States District Judge

10