IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


XpertUniverse, INC.,        ) Trial Volume 7
                            )
            Plaintiff,      )
                            ) C.A. No. 09-157 (RGA)
v.                          )
                            )
                            )
CISCO SYSTEMS, INC.,        )
                            )
            Defendant.      )


                    Wednesday, March 20, 2013
                    9:08 a.m.


                    844 King Street
                    Wilmington, Delaware


BEFORE:  THE HONORABLE RICHARD G. ANDREWS
         United States District Court Judge


APPEARANCES:


        POTTER ANDERSON & CORROON, LLP
        BY:  PHILIP A. ROVNER, ESQ.

             -and-

        STROOCK & STROOCK & LAVAN
        BY:  CHARLES E. CANTINE, ESQ.
        BY:  JASON SOBEL, ESQ.
        BY:  CLAYTON McCRAW, ESQ.

                    Counsel for the Plaintiffs

APPEARANCES CONTINUED:


                 MORRIS NICHOLS ARSHT & TUNNELL, LLP
                 BY:  JACK B. BLUMENFELD, ESQ.

5                       -and-

                 MORGAN LEWIS & BOCKIUS, LLP
                 BY:  BRETT M. SCHUMAN, ESQ.
                  BY:  KELL M. DAMSGAARD, ESQ.

                      Counsel for the Plaintiffs



10




15




20

21

22

23

24

(Proceedings commenced at 9:08 a.m.)

THE COURT:  Good morning, everyone.
Please be seated.

(Counsel respond, "Good morning.")

5        THE COURT:  So what's on your minds?

MR. SCHUMAN:  Good morning, your
Honor.

THE COURT:  Good morning.

MR. SCHUMAN:  I think before we get
10   to, I know jury instructions and the verdict
form, there are still some issues there, a couple
of issues.

We want to move a couple of the
deposition excerpt exhibits in evidence.  I don't
15   think there is any written objection.
Mr. Sinclitico is going to handle that.

There's also one, I think one
remaining dispute regarding some deposition
excerpts that XpertUniverse would like to play as
20   part of its rebuttal case and we had made

21

22

23

24

THE COURT:  All right.

MR. SINCLITICO:  Good morning, your

Honor.

THE COURT:  Good morning,

5    Mr. Sinclitico.

MR. SINCLITICO:  The first issue

that we'll address is the deposition testimony

that XU is attempting to play in its rebuttal

case, and that's from Faro, one of the developers

10    from XpertUniverse.

I have copies of the excerpts they

have designated --

THE COURT:  All right.

MR. SINCLITICO:  -- absent the

15    highlighting that our previous copies have had.

There are no counterdesignations.  We're just

objecting to it in its entirety.

THE COURT:  I got it.  I understand

that.

20    MR. SINCLITICO:  And the issue, your

21

22

23

24

same thing.

The issue, your Honor, that's addressed in the testimony is that of integration between XpertUniverse's product and the Cisco

5    product.

Our position is that rebuttal, the rebuttal case should be limited to new theories that were brought up for the first time in defendant's case-in-chief.

10    THE COURT:  All right.  I got that.

MR. SINCLITICO:  Okay.  And all of these issues were brought up not only in their opening, but in XU's affirmative case, and it seems to be an attempt to just get the last word

15    on this question of whether XU had completed integrated product.

THE COURT:  All right.

(Pause.)

THE COURT:  All right.  Mr. Cantine,

20    Mr. Sobel, what about the claim that this should

21    have been part of your case if you wanted it in?

22    MR. SOBEL:  Yes.  This is a rebuttal

23    to Abe Zelkin's testimony that they brought.  You

24    might recall, they played two separate disjointed

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

clips.  One was a clip, which he said nothing was
--

        THE COURT:  Right.  The second one
was about his resumé.

5        MR. SOBEL:  Because they want to
establish that his date that he was there through
the whole time that the integration was going on,
and they used --

        THE COURT:  Was it like July 2006?

10        MR. SOBEL:  What did you say?

        THE COURT:  Was it July 2006 when he
left?

        MR. SOBEL:  2007.

        THE COURT:  Oh, okay.

15        MR. SOBEL:  But in the first clip,
they had some conclusory testimony that this
wasn't complete.  But if you see in Ms. Faro's
transcript, she had direct personal knowledge.
She was working on it and testing it.

20        And so they want to bring in a

21  conclusory statement, and now we have a rebuttal

22  to that saying, this is the person with the

23  actual direct knowledge.

24        THE COURT:  Well, let me ask you

this.  Was there any testimony during your

case-in-chief that integration was completed some

time in 2006?

                 MR. SOBEL:  Yes.

5             THE COURT:  From whom?

                 MR. SOBEL:  Well --

                 MR. CANTINE:  Victor Friedman,

Elizabeth Eiss and John Steinhoff.  Maybe not

Steinhoff.

10           MR. SOBEL:  Yes.  At least two or

three witnesses.

                 THE COURT:  Probably not

Mr. Steinhoff because he left before.

                 MR. CANTINE:  I don't think he

15       testified at that.  Sorry.

                 MR. SOBEL:  No.

                 THE COURT:  All right.  I'm going to

exclude it.  I mean, basically, when the issue

was raised in your case-in-chief, that's the time

20       to put in the detailed evidence if you want it or

21       not.  So I'm going to exclude that.

22              What's the other issue,

23       Mr. Sinclitico?

24              MR. SINCLITICO:  The other issue,

your Honor, is just moving in some of the

exhibits that were authenticated in the

deposition read-ins from yesterday.

THE COURT:  Okay.

5          MR. SINCLITICO:  The first one is

Defendant's Exhibit 827, which was the linked in

bio from Abraham Zelkin.

MR. CANTINE:  We're going to object

to that.  What they are trying to establish is

10     that Mr. Zelkin stayed there through whatever,

2007.  The truth is, he was in a business

development role for his last eight, nine months

while he was there.

THE COURT:  Well, the truth is, I

15     don't care -- you know, I hate to have this on

the record, but I don't actually care what the

truth is.  You know, it's what the evidence is

that's important.

MR. CANTINE:  Well, that's exactly

20     why we want to put in Ms. Faro.  They're going to

21     suggest he was the chief technology developer and

22     he was there until sometime in 2007 and his

23     testimony was the integration was never complete.

24     That's why they want to put it in.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

```
                    THE COURT:  Right.

                    MR. CANTINE:  That is why they want

          to put it in.

                    THE COURT:  I understand why they

 5        want to put it in.

                    MR. CANTINE:  That's why we want Ms.

          Faro.

                    THE COURT:  And so your objection is

          what?

10                  MR. CANTINE:  I think it's

          prejudicial.  It's confusing the jury on an

          issue, an important issue.  And if they want to

          put that in, I think we ought to have Ms. Faro's

          testimony in.

15                  THE COURT:  All right.  I got you on

          that point.  And if the objection is Rule 403, I

          don't think it's, whatever prejudicial value it

          has substantially outweighs its probative value,

          so that's overruled.

20                  Anything else, Mr. Sinclitico?


21                  MR. SINCLITICO:  Yes, your Honor.

22        The various e-mails that were authenticated

23        during the deposition testimony from Mr. Turillo

24        that was read yesterday.  We can go through them
```

one by one.

        THE COURT:  Is there an objection?
You didn't talk to Mr. Cantine about this?

        MR. CANTINE:  Are you just talking

5   about Turillo e-mails?

        MR. SINCLITICO:  Yes, the Turillo
e-mails that were authenticated in the testimony.

        MR. CANTINE:  There's no objection.

        THE COURT:  All right.  Why don't

10  you just put on the record what they are.

        MR. SINCLITICO:  That is Defendant's
Exhibit 524, Defendant's Exhibit 523, Defendant's
516, Defendant's 515, Defendant's 511,
Defendant's 505, Defendant's 362, Defendant's

15  500, Defendant's 520, and Plaintiff's 717.

        THE COURT:  All right.  And just
give -- and, Mr. Cantine, I take it, having heard
the numbers, there's still no objection?

        MR. CANTINE:  I will accept his

20  representation that they are all the e-mails,

21  your Honor.

22        THE COURT:  All right.  So they are

23  admitted.

24       (Exhibits admitted into evidence.)

Anything else?

MR. SINCLITICO:  No, your Honor.

THE COURT:  All right.  Mr. Cantine,

Mr. Sobel, is there anything else you want to

5    bring up right now?

MR. SOBEL:  I think the only

outstanding issue was the punitive damages, jury

instruction.

THE COURT:  All right.  Well, before

10   I get to that, I didn't get anything -- I mean, I

got Mr. Rovner's e-mail.  I got Mr. Blumenfeld's

e-mail.  And do we have a working version of the

verdict form?

MR. SOBEL:  We sent a copy of our

15   proposed verdict form, but I have not seen their

edited.

THE COURT:  All right.  So here's

what I think about the issues that I actually

think are outstanding in relation to the jury

20   instructions, and actually, let me ask.  Is there

21   a revised set of jury instructions floating

22   around?

23   MR. SOBEL:  Yes.

24   THE COURT:  What you are handing up,

Mr. Sobel, is that -- what's the status of these

in terms of --

MR. SOBEL:  The status is that last

night I sent out a version that was incomplete

5       and didn't have your instructions.  I realized

that this morning when I woke up.  I sent it out

to them and just gave them a printed copy.  And

that -- so they have not confirmed, you know,

that that is --

10      THE COURT:  All right.  I just want

to keep that moving along.

Okay.  So as I recall, I think there

were actually about four issues that were

outstanding about the jury instructions, and here

15      is what I think about them.

In terms of the punitive damages for

the fraud claim, that's not going to the jury.

There's basically, I agree with what

Mr. Rovner said, the letter was a question of

20      fact and whether or not somebody is a managing

21      agent, but you've got to put in enough evidence

22      from which someone could actually draw that

23      conclusion, and what was shown during the

24      plaintiff's case gave essentially no insight at

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

all as to how things actually worked at Cisco and

what authority Mr. Hernandez had, and I think the

case that Mr. Blumenfeld cited, robe BEE versus

McKesson corporation, 47 Cal, 4686, 2009, says,

5    when talking about a managing agent, that it's

talking about people that have, it says

discretionary authority over corporate policy,

it's talking about formal policies that affect

the substantial portion of the company and that

10    are the type likely to come to the attention of

corporate leadership.

        There's just no showing that Mr.

Hernandez was that sort of person, and so

therefore I'm not going to let that go to the

15    jury.

        In terms of willfulness, I was

aware, but I did appreciate having cited the

recent Federal Circuit case that I think does

stand for the proposition that ultimately I have

20    to decide the objective part of the willfulness

21    test.

22        And basically, based on everything

23    that has been put into evidence in this case in

24    terms of the accused products, there is not clear

and convincing evidence that Cisco acted despite

a high likelihood that its actions infringe a

valid or enforceable patent.

I don't think -- I think that

5    applies to both patents, and I also think that

that if the jury got to the subjective part of

the test, that there's no evidence -- there's not

sufficient evidence in the record to let any

reasonable jury to find that Cisco actually knew

10   or should have known that its actions constituted

an unjustifiably high risk of infringement as to

the validity of an enforceability patent, so I'm

not going to let that go to the jury.

In terms of method claims, I will

15   grant judgment for Cisco against XpertUniverse of

noninfringement on the claims that were in the

case when the trial began, as stated in the

pretrial order.

And at some later time, Cisco can

20   submit some form, a part of judgment or

21   something, but clearly they were in the case

22   until XpertUniverse made the decision, you know,

23   circumstances are on the record not to go forward

24   with testimony on those.  And so I think there is

a failure of proof, and so I'm going to grant

judgment on those.

And on the invalidity claims, I

don't think that any -- that the jury could find

5    either anticipation or obviousness on any of the

claims other than claim 5 or claim 12, so I'm not

going to let that go to the jury either.

And I think that that resolved the

various issues that are outstanding in terms of

10   what's going to the jury, and I trust that people

who are working on the jury instructions behind

the scenes will start making the changes to

reflect that.

I guess one other thing is, there is

15   not much time left.  I don't know.  Did the

parties gets what the current status of the

timekeeping is?

MR. CANTINE:  We did, your Honor.

THE COURT:  And XpertUniverse's has

20   husbanded its time a little bit better, so you

21   actually have 30 extra minutes over what Cisco

22   has.  And so I just want to make sure you're

23   aware of what the time situation is.

24   So I will try to look at the jury

instructions.  I did notice when I was looking at

them last night, there were a couple places where

there were sort of conforming changes that I had

overlooked, partly because I had actually decided

5      how I was going to rule on some of these things

yet.

But I'm hopeful that there's

somebody on each side who can actually start

proofreading the jury instructions while we're

10     having testimony this morning so that those kind

of things can be taught and resolved without a

whole lot of effort.

Anything else?

MR. CANTINE:  Just on the punitives,

15     your Honor, I just want to make sure.  We think

whether Mr. Hernandez is a managing agent is a

question of fact that the jury should decide.  My

concern is what happens if the appellate court

says you got it wrong and we have to come back

20     and do it all over again.  The jury is here.

21     They heard all the evidence.  Why not let them

22     decide it.  Then we can decide it post-trial.  It

23     just seems like a safer approach.

24                   We're going to have to come back and

do it all over again if the appellate court says

you've got it wrong.

THE COURT:  Well, you know, I can't

say there isn't some attractiveness to that sort

5   of proposition.

MR. CANTINE:  If they come back with

nothing, then no harm, no foul.

THE COURT:  And I guess what I'd say

is, when I have a doubt, I will do what you

10   asked, but, you know, this probably isn't going

to sound very good.  But I just think it would be

wrong to send this to the jury.

MR. CANTINE:  I mean -- I understand

your --

15   THE COURT:  What you say is a

reasonable suggestion, but, you know, but I don't

think it's the -- I don't think it's the right

thing to do here.

MR. CANTINE:  All right.  I just

20   want to make sure our objection is on the record.

21   Thank you.

22   THE COURT:  Thank you, Mr. Cantine.

23   All right.  Anything else?

24   MR. ROVNER:  Your Honor, I just

Wanted to hand up the proposed order on claim

construction that you had asked for.

　　　　　THE COURT:  Oh, yes.  Thank you.

All right.  So if you can take the word proposed

5　　out of it.

　　　　　MR. ROVNER:  Yes, your Honor.  It

was proposed until you said it was not proposed.

　　　　　THE COURT:  Yes, yes.  You know, I

spend a lot of times crossing out the word

10　　"proposed" on things.  I think it would be easier

if you just to submit it and say, this is the

order we'd like.

　　　　　If there's no objection from Cisco,

which I assume there probably isn't going to be,

15　　if we can just get that word "proposed" deleted,

because it would look better.

　　　　　MR. ROVNER:  That's fine.  We'll get

copies when we need it.

　　　　　THE COURT:  All right.  Thank you

20　　for taking care of that, Mr. Rovner.

21　　　　　　　　Anything else?  All right.  We'll

22　　take a couple-minute break.  Okay?

23　　　　　　　　(Short recess taken.)

24

THE CLERK:  All rise.

THE COURT:  All right.  Please be
seated.

We're ready to bring the jury in;
5   right?  All right.

Please bring in the jury.

(Jury entering the courtroom at 9:37
a.m.)

THE COURT:  Good morning, ladies and
10   gentlemen.  I believe we're ready to proceed.

Mr. Schuman.

MR. SCHUMAN:  Thank you, Your Honor,
good morning.

Cisco calls Mike Wagner.
15   THE COURT:  All right.

THE CLERK:  Good morning, sir.  Do
you want to swear or affirm?

THE WITNESS:  Swear.

THE CLERK:  Please state and spell
20   your full name for the record.

21   THE WITNESS:  Michael Joseph Wagner.

22   Last name spelled W-A-G-N-E-R.

23   THE CLERK:  Please place your left

24   hand on the Bible and raise your right hand.

Do you solemnly swear that the
testimony you are about to give to the Court and
the jury in the case now pending will be the
truth, the whole truth and nothing but the truth,
5    so help you God?

THE WITNESS:  I do.

MICHAEL JOSEPH WAGNER,

the witness herein, having first

been duly sworn on oath, was examined and

10    testified as follows:

THE COURT:  Mr. Schuman.  Mr.
Damsgaard.

MR. DAMSGAARD:  Sometimes I wish I
were Mr. Schuman, Your Honor.

15                DIRECT EXAMINATION

BY MR. DAMSGAARD:

Q.  Good morning, sir.

A.  Good morning, Mr. Damsgaard.

Q.  Would you please tell us your name and

20    occupation?

21    A.  Michael Joseph Wagner.  I'm a management

22    consultant that specializes in valuation of

23    intellectual property.

24    Q.  And what was your assignment in this case?

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

A.  To address the damages issues if the jury

finds liability either on the patent infringement

claim or the fraudulent concealment claim.

Q.  Can you tell us your educational

5    background?

A.  I have a Bachelor of Science in

engineering, which I received from Santa Clara

University in 1969.  I have a Master's in

business administration, which I received from

10    UCLA in 1971.

And I have a Jurist Doctorate degree

from Loyola University, School of Law in Los

Angeles in 1975.

Q.  What's your work history?

15    A.  I've been doing what I'm doing today for

36 years and I've worked with four firms during

that time period.  The firm I was with the

longest and where I started my career was

Pricewaterhouse, which at that time was one of

20    the big eight accounting firms where I became a

21    CPA as well.

22    And I was in their management

23    consulting department.  The last seven and a half

24    years, I was a partner in that firm.

Then I joined a firm called Putnam

Hayes & Bartlett, which is a Boston,

Massachusetts based consulting firm formed by

three Harvard business professors.  I was with

5    them for ten years as a managing director.

I then joined Charles River

Associates, another Boston-based consulting firm

that -- actually it's publicly traded as it has

over 600 professionals.  I was a managing

10   director of that firm for seven years.

And most recently, I'm with a small

firm in Silicon Valley called Economics

Incorporated.  And I'm doing the same work I've

been doing for the last 36 years with them.

15   Q.  Thank you.  Tell the jury what

professional licenses or certifications you have

or have had.

A.  Currently I am an active license as a

certified public accountant in the State of

20   California.  Formally I was also a CPA in the

21   states of Oregon, Washington and Hawaii.

22   I'm a certified management

23   consultant.  I also have Certificate Number 23,

24   which is a certificate in financial forensics by

the American Institute of Public Accountants.

Now, there's over 5,000 CPAs that hold that credential.  My credential is so low because I was on the Inaugural Committee.

5          I was asked to help form the standards in order to get that type of credential from the NAIPA.

I'm also a licensed attorney in the State of California.

10     Q.  Have you written any books in your area of expertise?

A.  I have.  I have contributions to three books.

One, which is the Litigation

15     Services Handbook.  I was approached by the publisher to write the book.

I became the founding editor of that book, and it is now in its Fifth Edition.  It's been in existence for over 20 years.

20          It's considered one of the leading

21     books in my area of expertise, which is financial

22     analysis in matters that are in dispute.  I also

23     wrote two chapters of two valuation books.

24     Q.  When you say valuations, you are talking

about business valuations?

A.  Business valuation books.  And then beyond that, I have 26 other articles I've written for professional journals.

5      Q.  Has the Litigation Services Handbook gained any special recognition?

A.  It has.  The Federal Judicial Center, which is an organization that helps make the Judicial Center or the system better in the

10      United States has a publication called Treatise on Scientific Evidence.  It's guidance to federal judges as to how to treat scientific evidence in the courtroom.

There is a chapter on economic

15      damages.  And in that chapter, there's a bibliography for further resources to a federal judge.  My one book is one of only five references in that chapter.

Q.  Have you done any lecturing or teaching?

20      A.  Yes.  Over my career, I've frequently

21      taught in the area of how to calculate damages on

22      a commercial basis to both CPAs and financial

23      experts and also attorneys around the country.

24      Q.  Have you been qualified and testified as

an expert witness in any lawsuits?

    A.  Yes.  Prior to this trial, I've testified
as an expert witness 128 times.  Thirty-one times
in patent infringement matters.

5    Q.  When you've testified, have you been on
behalf of the plaintiff or on behalf of the
defendant?

    A.  Both.  And it's fairly evenly split.

        Either I'm calculating damages for a
10  plaintiff in a case or responding to a
plaintiff's damage claim for the defendant.

        MR. DAMSGAARD:  Your Honor, we would
tender Mr. Wagner as an expert in business
valuation, financial analysis and commercial and
15  patent damages.

        MR. CANTINE:  No objection.

        THE COURT:  All right.  You may
proceed.

        MR. DAMSGAARD:  Thank you.

20  BY MR. DAMSGAARD:

21    Q.  Mr. Wagner, let's consider the claim by

22  XpertUniverse against Cisco for fraudulent

23  concealment.  Have you formed an opinion

24  regarding damages with respect to the fraudulent

concealment action?

    A.  Yes.

    Q.  What is that opinion?

    A.  That I do not believe that XpertUniverse

5   has proven there's any damages for the alleged

fraudulent concealment and --

           MR. CANTINE:  Objection, Your Honor.

           THE COURT:  I'm going to strike that

answer.

10         And Mr. Damsgaard, ask him a

different question, so you get a different

answer.

           MR. DAMSGAARD:  Sure.

           THE COURT:  Members of the Jury,

15   ignore what he started to say there.

BY MR. DAMSGAARD:

    Q.  Have you seen any evidence of harm or

damage in the work you've done?

    A.  No.

20    Q.  So, is your damage number zero?

21    A.  For that alleged claim, yes.

22    Q.  And why do you say that?

23    A.  That my job is -- as a damage expert is to

24   determine what would have happened but for the

alleged fraudulent concealment and to see if the

financial condition of XpertUniverse would be any

different than it actually was.  And based on the

evidence that I've seen, I don't think it would

5    be any different.

And the major reason for that is

that at that period of time when the alleged

concealment was supposed to have occurred between

April of 2006 and January of 2007, XpertUniverse

10   was not able to develop a product.  They had no

customers.

MR. CANTINE:  Objection, Your Honor.

He's talking to causation.

THE COURT:  I'm going to sustain the

15   objection, but you can ask a question a slightly

different way.

BY MR. DAMSGAARD:

Q.  Okay.  Mr. Wagner, when you looked at the

valuation of the company at the time, how does

20   that play into your opinion that the damages

21   would be zero?

22       A.  Well, first off, I've seen no valuation of

23   the company at that time that is presented as

24   evidence in this case.  So that doesn't give me

any information as to what the value of the

company was in April of 2006.

    Q.  So what factors have you looked at to make

that determination?

5      A.  Well, some of the factors I looked at were

the documents that Mr. Bratic used to come up

with his opinion.

    Q.  You were going to mention some of the

factors about no products, no sales, those types

10    of things that you were about to testify to that

go into the valuation that you're presenting

here.

           MR. CANTINE:  Objection, Your Honor.

Leading.

15          THE COURT:  I'm not going to sustain

that.  Go with a follow-up question that's not

leading.  I think that's just introductory.

           THE WITNESS:  Yes.  The value of the

company is based on what is happening at the

20    company, what the opportunities are in the

21    marketplace and how it's able to execute in the

22    marketplace.

23  BY MR. DAMSGAARD:

24      Q.  And what is your view on what that is?

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

A.   Well, what I saw, based on the evidence,
is that there was no product that was developed
by this company.  They were trying to develop a
software product, that it was not going well.

5           That there were cash flow problems
before the alleged concealment occurred.  They're
laying off the developers they needed to finish
the work before the alleged concealment occurred.

            That the development they're doing
10    was based on public source software, which is not
the way you want to design a product if you want
to have protection going forward from others
copying your work.

            There was apparently mismanagement
15    problems within the company.  And I don't see
that this company is going to be successful
regardless of any alleged concealment.

            Also, what you really have to
calculate is the difference this company's worth,
20    whether in the SolutionsPlus program at Cisco or

21    the Technology Developer Program.  They were
22    still offered and was in a program at Cisco.
23           And I've seen no evidence that
24    there's any difference in value between those two

programs to a developer.

Q.   Have you reviewed the work or testimony of
XpertUniverse's damage expert in this case, Mr.
Walter Bratic?

5        A.   I read his report.  I read his deposition.

And although I was not here, I read
the transcript from Monday's trial as to his
trial testimony for the jury.

Q.   Do you agree with Mr. Bratic's opinion
10    that were expressed in this courtroom?

A.   I don't agree with either of his
calculation for damages for patent infringement
or his damages for alleged concealment.

Q.   With respect to his alleged damages for
15    the fraudulent concealment claim, what is your
disagreement with Mr. Bratic?

A.   The only two piece of information he used
to inform his opinion was a February 7th, 2005
report by Standard & Poor's and an October 2006
20    report by Dr. Duff & Phelps.  I don't believe

21    either of those documents provide sufficient

22    evidence to arrive at a value of Xpert Universe

23    in April of 2006.

24        Q.   Okay.  Let's focus, first, on the February

2005 market assessment of S & P.  What's the

basis for your belief that that isn't a reliable

indicator of damages?

A.  Well, first off, your question was

5   improper.  It wasn't October of 2005.  It was

February 7th, 2005.

Q.  Thank you for correcting me.

A.  There's two main reasons.  First, it is --

it was just a preliminary draft for discussion

10   purposes only.  It was not a finalized document.

Second, it was in no way a business

valuation.  In fact, in the document there was

actually no projections of income costs, any

success.  There was nothing that makes it

15   anything like a business valuation.

And then the third reason, it's 15

months before the date that Mr. Bratic should be

trying to determine the value of XpertUniverse.

And if you believe their case, nine months can

20   make all the difference in the world to a

21   company.

22   Fifteen months in a technology

23   company, particularly a start-up company, is

24   going to dramatically change in value.  And based

on all the problems they experienced between

February 2005 and April 2006, the company clearly

is not being measured properly by using valuation

15 months earlier.

5              It's like the analogy that Mr.

Bratic gave you to explain valuation that as a

particular date, a house may have a certain

value.  But if after that, something happens like

building train tracks next to it decreases the

10  value.

               The same thing happened here in this

case.  And he did not take any of those factors

into consideration in his work.

     Q.  You mentioned that it was a preliminary

15  draft.  What's the significance to you of the

fact that the document was a preliminary draft?

     A.  That they haven't completed their work.

And as they state in their documents, if they

complete their work, their opinions or what they

20  say may be materially different than what's in

21  the preliminary draft.

22       Q.  Let's turn to the second document, the

23  Duff & Phelps October 2006 document.  Why do you

24  believe that document is not a reliable indicator

of damages?

A.  Well, again, it's a preliminary draft for

discussion purposes.  It doesn't even have a date

to it.

5               It just says October, 2006.  They

haven't even finalized the date of when that

document's prepared.

It was for internal planning

purposes only.  There are restrictions of letting

10    XpertUniverse show this to any third party

without the written permission of Duff & Phelps.

They knew this wasn't work that was

completed and they didn't want their name

associated with anyone else other than the person

15    who was paying for the work.  So clearly this is

not something they would stand up and say, This

is the value of the company.

Q.  And why would you say that it's not a

business valuation?

20    A.  Well, again, this document had a little

21    more information like a business valuation than

22    the Standard & Poor's analysis, which was just a

23    market opportunity assessment.  This did have

24    three approaches that are used to value a

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

company, but it was not a complete valuating by

an independent party.

The crucial information in the

document that came up, all of their indications

5      of value was internal projections done by

XpertUniverse management, which was not tested in

any way by Duff & Phelps.

Q.  Now, let's talk a little bit about

management projections.  Did they play a role in

10     the Duff & Phelps' document?

A.  They were the foundation of all of the

valuation methods.  This is a projection from

2006 around the date of the document out through

2010, five years later.  It's actually what the

15     company would look like in 2010 is what is the

basis for all of the additional work in the

report.

Q.  Just so we're clear, can you just explain

exactly what you mean by management projections?

20     A.  Management projections, what they did is

21     they didn't forecast the total picture of the

22     company.  They forecasted a very limited, what I

23     will call, income statement.  They forecasted the

24     revenues, their costs and what I would call

modified cash flow.  It wasn't complete cash

flow.

            But they didn't model the balance

sheets.  They don't model cash flow statements or

5    statements of stockholders equity, what a

financial picture would look like.

        Q.  Where did the projections come from?

        A.  They just came from internal management at

XpertUniverse.  I don't know.

10            I have not seen what the basis for

the projections were.  There's no information in

this document that explains that.

        Q.  Did you determine whether or not Duff &

Phelps had done anything to validate its

15   management projections?

        A.  Well, just looking at the four corners of

the document, there's no indication that they did

anything except for just accept these

projections.  And they even stated that these are

20   management projections.  And if management cannot

21   achieve these projections, the value they

22   indicated would be very different than what is

23   reflected in the document.

24        Q.  Having looked through the testimony and

work of Mr. Bratic, did he verify any of the

assumptions in the report?

    A.  He did, but not the crucial ones.

    Q.  What do you mean by that?

5    A.  Well, again, the foundation for this whole

analysis is these projections, this five-year

projection.  What Mr. Bratic did was then from

those projections, Duff & Phelps went out to

public sources to get yardsticks, multiples of

10   the revenues that was reflected to come up with a

value.

        He tested to make sure that when

Duff & Phelps collected information about Cisco,

which was one of the comparable companies, that

15   they properly recorded the right revenue number

and the market capitalization.

        So he verified what I would say is

the peripheral parts of the document, but not the

key parts.

20    Q.  Why are the management projections so key

21  to the analysis?

22    A.  Because it's a house of cards.  If that

23  crumbles, if that's not right, the value is going

24  to change dramatically even if the multiples

don't change.

Q. Did we prepare a demonstrative to sort of visualize this a little bit?

A. You did.

5        Q. Can you explain to the jury what that visualization is?

A. Well, the left-hand side is a picture of a house and the foundation of these management projections. And then the work -- that work, Duff & Phelps are all the X's above. They're multiples using transactions in the marketplace, which they believed by using comparable companies or just capitalization multiples based on a publicly-traded company.

15        But those X's, if you have no foundation, it's going to crumble. It means nothing.

And that's the right-hand side.

Q. Now, have you seen any evidence that indicates to you that there was a probability that XU would not achieve its management projections set forth in the document?

A. Yes.

Q. And what is that?

A.  Well, again, if you look at their history

of their lack of success of developing a product

after seven years of effort.  Spending much money

which seemed to have not been fruitful.  Cash

5    flow problems every month.  Laying off their work

force.

Clearly not meeting their timing for

the development effort tells me they're not going

to meet some projection on sales and customers

10   where they've never done anything in that area.

So I would not blindly accept those as realistic

projections.

Q.  Did you see any indication that Duff &

Phelps was made aware of the operational and the

15   financial issues that were occurring at

XpertUniverse?

A.  There's no discussion of that type of

information I've just described in their report.

Q.  Was there anything in the Duff & Phelps'

20   report which indicated that Duff & Phelps

21   assessed the value of XpertUniverse's technology?

22       A.  No, nothing.

23       Q.  Did you see any more technical problems,

24   for lack of a better word, with the Duff & Phelps

analysis?

A.  Even though Duff & Phelps is a well-known valuation firm, not all their work is perfect. And there are some significant technical

5   problems, even the work they did on those multiples.

Q.  And what were some of the things that you identified as --

A.  Well, I won't go through all of them.

10   Some of the significant ones are the discount rate.

I told you that actually the foundation basis for all these valuations isn't what was happening in the company in 2006.  It's

15   what they projected happening five years later in 2010.

When you calculate value in the future to figure out what it is worth today, you have to discount that back to what the present

20   value, using an appropriate risk, adjusted

21   discount rate to reflect whether that projection

22   is going to happen or not.

23          The discount rates that Duff &

24   Phelps used are really discount rates were more

what I would call second seed financing companies
that already have a product.  They're starting to
be successful and you need more money to grow the
company.

5            This is a start-up company.  Even
though it's been in existence for seven years,
they don't even have a product yet.

            In discount rates for that type of
company are what's called venture capitalist
10   rate, and it's more than double what was used in
this projection.  So that dramatically overstated
the value that they had.

            Another problem they had is that all
these yardsticks they used were large publicly
15   traded companies, companies like Cisco.  Many of
the companies were billion-dollar-a-year-in-sales
companies.  Publicly traded on the stock
exchanges.

            You have to make two types of
20   adjustments if you use that as a yardstick for a

21   small privately-held company who has zero
22   revenues.  And those are -- if you invest in
23   Cisco, you can get in and out of that investment
24   immediately by just telling your broker to sell

their stock.

If you invest in XpertUniverse, it's
not liquids.  There's no market for coming to buy
your ownership in that company.  So there has to

5   be a discount reflected.  Duff & Phelps did not
discount in their analysis.

And, also, large companies that are
diversified that have all kinds of products,
they're less risky.  So there's also a discount

10   if you're consolidating your risk in one small
area of technology versus a broad range of
technology.  And there's no discount for that
either in this report.

Q.  If XpertUniverse actually had value, what

15   would you expect to occur after Cisco decided not
to go forward with the SolutionsPlus?

A.  If XpertUniverse had really valuable
technology, which they had been spending seven
years developing, then Cisco is not a monopolist.

20   They're not the only player in this marketplace.

21   There are other very large successful companies

22   that are trying to be in this space and compete

23   in the space.

24   If there's really valuable

Technology, they would have picked it up, but now

someone would have licensed XpertUniverse's

patents, someone would try to buy the technology

from them.  Someone would have picked up a

5    partnership agreement and said, for a few million

dollars, you can accord it to my product and

there's this huge revenue, billions of dollars of

revenue opportunity, someone would have done it.

The market has spoken.  No one has

10   done that up until today.

Q.  You have seen the letter that Mr.

Hernandez sent to XpertUniverse in January of

2007?

A.  I did.

15   Q.  And that's where he advised XpertUniverse

that he wasn't going to proceed with the

SolutionsPlus, but they would be willing to

proceed with the developer technology partnership

agreement?

20   A.  That's what that document said.

21   Q.  Do you have a view on whether the evidence

22   shows that one program from an economic point of

23   view would be better or worse for XpertUniverse?

24   A.  The only evidence that I've seen is the

testimony of Mr. Hernandez, that some companies

actually do better than the technology developer

program, because it's co-marketed.

The company who has the technology also helps the

5   marketing for that product and someone who really

developed the product often are the best people

to sell it.  So that's still a wonderful program

and many companies take part in that program at

Cisco.  Very few actually do the SolutionsPlus

10   program.

Q.  Thank you.

Let's turn very briefly to the other

claim that's asserted against Cisco in this case,

and that would be the patent claim.

15   Do you have an opinion with respect

to damages for that claim?

A.  I do.

Q.  What is it?

A.  Assuming that the jury finds that the

20   patents are valid and infringed, that I believe

21   the reasonable royalty rate should be a rate for

22   each of the patents-in-suit.  And the reason I

23   say that is that there shouldn't really be just

24   one hypothetical negotiation.  There really

should be two.

These patents have nothing to do
with each other.  They are not in the same
family.  They teach very different things.
5    They're actually executed in different products
at Cisco, so I think if you decide to award the
royalty rate, you should have a separate royalty
rate for the '709 patent and a different royalty
rate for the '903 patent.

10    Q.  Do you have an opinion as to what those
royalty rates should be?

A.  I do.  And I think the royalty rate for
the '709 patent should be two-and-a-half percent,
and the royalty rate for the '903 patent should

15    be three percent.

Q.  And what's your basis for that opinion and
selecting those royalty rates?

A.  Well, actually, Mr. Bratic and I did very
a similar analysis and actually there's in

20    agreement here.  I think the starting point used

21    was appropriate, the Teletech Aspen license

22    agreement.

23    And then I did the Georgia-Pacific

24    analysis, but came to very different conclusions

on a number of them.  And the biggest one

probably is GP factor number three, the nature

and scope of the license.

        The Teletech agreement was what's

5    called a naked patent license, no other rights.

It actually gave more patents, ten, than what's

at issue here, two, but also gave finished

product software to Aspen.

        So clearly that has more value than

10   just getting ideas of how to do something, and

you have to execute and develop your own

software.

        So there's a lot more value in my

starting point than what is going to be the

15   hypothetical license here.  So that is a downward

impact from the five-percent starting rate.

        I also found Factor 7, 8, 9, 10, 11

and 12 also go down, the first one being GP

Factor No. 8, because that looks at the

20   commercial success and the profitability of the

21   product incorporating the invention, and here

22   Cisco did not do well with this product.

23        After three years of effort, they

24   sold a total of $900,000 of product that practice

these claims, and they lost a lot of money doing

so.  So, again, it's not a vehicle where they're

earning lots of profits which they can share with

XpertUniverse.

5        Q.  Okay.  We'll put the slide up.

         Applying the royalty rates that you had,

which was two-and-a-half percent and three

percent, what is your damage figure for the

patent claim?

10       A.  Well, my number of royalty rate is

different than Mr. Bratic's because I told you,

the Pulse product is only practiced by the '709

patent.  The RemoteXpert product is only

apparently accused of infringing the '903 patent.

15  But Expert Advisor infringes both.  So actually,

I think it's additive.

            In my world, the rate for Expert

Advisor is actually higher than Mr. Bratic's.

Five-and-a-half percent because you add the two

20  together.  But if you look at the mat events

21  separately I have a royalty base of $618,531 for

22  the '709 patent.

23       Q.  And that's the sales of the accused

24  product?

          A.  That's the total sales of the accused

product.  Multiplying that by my two-and-a-half

percent royalty rate would be damages of $15,463.

          For the '903 patent, the royalty

5    base is $680,215.  Applying a three percent

royalty rate to that, it gives $20,406.

          MR. DAMSGAARD:  Thank you,

Mr. Wagner.  I have no further questions.

          THE COURT:  Mr. Cantine?

10                CROSS-EXAMINATION

BY MR. CANTINE:

          Q.  Good morning, Mr. Wagner.  How are you?

          A.  Good morning, Mr. Cantine.  I'm fine.  I

hope you are well.  I know you're tired.

15    Q.  Well, not too bad.

          Let's see if we can clear up a

couple things.

          So if I understand your testimony,

the damages for fraud are zero?

20    A.  Correct.

21        Q.  In your opinion.  And you agree, I

22   believe, with Mr. Bratic, the way to measure

23   damages for a fraud claim is you take the value

24   of the company before the fraud and the value of

the company after the fraud, and you calculate

the difference?

A.  Yes, as long as you take into

consideration other things that impact the value

5    besides the alleged legal violation.

Q.  Okay.  So but we can call that the but-for

value?

A.  We can.

Q.  Or but-for damages?

10   A.  Yes.

Q.  Okay.  And so is it your opinion, then,

that in April of 2006, XpertUniverse had no

value?

A.  They may have had some value, but I don't

15   know what that is.

Q.  You didn't calculate that?

A.  No.

Q.  But you say they had, at some point, no

value?

20   A.  Well, no value -- their value didn't

21   change as a result of the alleged legal

22   violation.  At some time they have no value, they

23   went out of business, but that was due to other

24   factors.

Q.  Okay?

A.  And even then they still had some value if these patents had any value.

Q.  So did they have value before April 2006?

5       A.  They probably had some value.

Q.  But you don't know what the number is?

A.  No.

Q.  But you looked at the S&P, what do you want to call it, a valuation, a document, a

10      report?

A.  What it's actually called, a market opportunity assessment.

Q.  Okay.  You reviewed that in detail?

A.  I did.

15      Q.  What did S&P say was the market value opportunity for XpertUniverse in 2005?

A.  I think that they had a range of 110 to 225 million based on certain market segments.

MR. DAMSGAARD:  Objection.

20              THE COURT:  I'm going to overrule

21      that.

22      BY MR. CANTINE:

23      Q.  And you reviewed that document detail?

24              MR. DAMSGAARD:  A limiting

instruction?

    MR. CANTINE:  The limited

instruction, your Honor, was for our expert when

he was relying on it.

5     THE COURT:  That's not actually the

point.

    Members of the Jury, you recall that

when there was testimony during Mr. Bratic's, or

when Mr. Bratic testified, and the same rules

10 apply here, that there's some evidence that is

admissible for a limited purpose.  And so the

limited purpose here, whether it's for Mr. Bratic

or for Mr. Wagner, is to evaluate their opinions.

But the purpose you cannot use it for is to

15 establish the value of XpertUniverse at the time.

    You may proceed.

    MR. CANTINE:  Thank you, your Honor.

BY MR. CANTINE:

  Q.  So the S&P valuation was between 110 and

20 225 million.  Is that what you said?

21    MR. DAMSGAARD:  Okay.

22    THE COURT:  Mr. Cantine, can we have

23 a sidebar, please.

24    (Sidebar conference held out of the

hearing of the jury as follows.)

          THE COURT:  You mentioned the number

once.  You already did.  Don't mention it again.

All right?

5           MR. CANTINE:  Can I do the Duff &

Phelps one?

          THE COURT:  You can do it once.

          MR. CANTINE:  Thank you.

          (End of sidebar conference.)

10  BY MR. CANTINE:

     Q.  Sorry.  All right.  So you looked at is

the S&P valuation.  You had some criticisms of

it?

     A.  You keep calling it a valuation. It was

15  not a valuation.  I did look at that document.

     Q.  Okay.  And we had this discussion at your

deposition; right?  I'm trying to make sure I put

the right label on it so we can get past that.

     A.  We did talk about this in my deposition.

20     Q.  The other one you considered was the Duff

21  & Phelps business valuation?

22     A.  Indication of value range, or indicated

23  value range.

24     Q.  Let me write that down.

Okay.  So you considered the

indicated Duff & Phelps value range as part of

your analysis in this case?

A.  Yes, to understand and to comment upon

5    Mr. Bratic's work.

Q.  And that one was from 2006; is that right?

A.  October of 2006.

Q.  October of 2006.  And what did Duff &

Phelps find as the indicated value range of

10    XpertUniverse in October 2006?

A.  The numbers they reported were between 70

and 100 million.

THE COURT:  And, Members of the

Jury, again, the testimony here that you just

15    heard is offered for the limited purpose of

evaluating Mr. Wagner's testimony and it's not

offered for the purpose, you can't use it for the

purpose to determine XpertUniverse's value at a

particular point in time.

20             MR. CANTINE:  Thank you, your Honor.

21    BY MR. CANTINE:

22       Q.  Now, I think you testified in your direct

23    that in April 2006, XpertUniverse had other

24    opportunities; right?

A.  They clearly did.

Q.  And I just want to make sure I'm clear.
Was it your understanding that XpertUniverse was
a member of the technology developer program or

5    not?

A.  Based on the documents I've seen, the
answer is yes, they had a signed agreement with
Cisco at that point in time.

Q.  And you understand they had to have a

10   finished product to be part of that program;
right?

A.  Well, not to be part of the program.  To
be actually executing under the program.  You can
be part of a program and not doing anything.

15   Q.  Well --

A.  Yes, that's true.

Q.  Mr. Hernandez was here.  Did you read his
testimony?  He was here yesterday.

A.  I didn't read it.  I was here.  I heard

20   it.

21   Q.  He said you had to have a product to be in

22   that program, didn't he?

23   A.  I think he fault vehemently they were

24   still a part of the program.  He said yes, for us

to sell it, we can't sell vapor wear.  You have

to give us the product and we'll go out and sell

it.

Q.  Is it your opinion that XpertUniverse had

5    nothing but vaporware?

A.  Based on what I've heard in this record,

yes, they had no finished product.

Q.  Is that how you equate finished product

equals vaporware?

10    A.  That's the common term used in Silicon

Valley.

Q.  Really?

A.  Yes.

Q.  Were you here for Mr. Koeppel's testimony?

15    A.  No.

Q.  Do you know who Mr. Koeppel was?

A.  I think I was told me had something to do

with Citigroup.

Q.  He was a senior executive at Citigroup and

20    they did their due diligence on the XpertUniverse

21    technology and they found it wasn't -- did you

22    read that testimony?

23    A.  No.  That is inconsistent with them -- why

24    wouldn't they have used it if it wasn't

vaporware?

Q.  They actually felt it was a benefit that they didn't have finished product.  Did you read that testimony?

5      A.  I think that I that understood they wanted customized to them, which would be to their benefit and not the benefit of XpertUniverse, because they then they would have to go out develop a custom product for everyone else.

10     Q.  I didn't ask you if you it was a benefit for XpertUniverse.  I said Citibank found that it was a benefit that defendant's product was not finished.  That's what Mr. Koeppel told this jury.

15     A.  That's true, and I apologize for my answer.

Q.  And did you consider Ms. Eiss' testimony and Mr. Steinhoff's testimony that they saw no value to XpertUniverse in being in the technology

20  developer program?

21     A.  No.

22     Q.  You didn't see that testimony?

23     A.  I did not.

24     Q.  Now, you were retained as an expert; is

that right?

    A.  I was.

    Q.  And you prepared a report?

    A.  I actually prepared two reports, yes.

5    Q.  Well, we're only here to talk about one of

them; right?

    A.  My 156 report appeared on October 1st,

2012.

    Q.  You're very good with numbers.

10    A.  That's why I'm an accountant.

    Q.  All right.  And it's your goal as an

expert to look for the truth; right?

    A.  I think that's my role to serve the Court,

yes.

15    Q.  And to try to get as much information as

you can in order to make that determination?

    A.  Yes.  As I told you at my deposition, I'm

a fact-based witness.  And that's all I can do is

reach opinions based on the facts that I have and

20    I've got all the relevant facts.

21    Q.  And you want to keep an open mind as you

22   look at those facts, don't you?

23    A.  I do.

24    Q.  But you didn't talk to anyone at Cisco

prior to filing your rebuttal report, did you?

A.   I did not.

Q.   And you didn't interview anyone at
XpertUniverse either, did you?

5       A.   I don't think you would let me, but, no, I
did not.

Q.   And you understand that the Governance
Council denied XpertUniverse entry into the
SolutionsPlus program in April 2006; is that
10   right?

A.   That's what I understand.

Q.   Now, I know you have some criticisms of
the particular Duff & Phelps and S&P documents,
it's called.  How is that?

15       A.   That's fair, and I do.

Q.   But you would agree with me that it's
standard practice for folks like yourself and
Mr. Bratic to rely on those types of reports in
forming opinions?

20       A.   I agree with that.  I have no problem with

21   him actually using that as a basis, or one basis

22   for his opinion.

23       Q.   And you recently did that in another case

24   you testified in, the Wellogix case.

Do you remember that?

A.  I do and I do.

Q.  Thank you.  And I think we agreed at the

start, that this whole but-for methodology is an

5       accepted practice for folks like yourself and

Mr. Wagner, I'm sorry, Mr. Bratic?

A.  It is.

Q.  I apologize.

A.  No problem.

10      Q.  And in that Wellogix case we were talking

about, you used an independent valuation report

in forming your opinion as to the value of

Wellogix in that case; right?

A.  I did.

15      Q.  And Wellogix was the plaintiff in that

case?

A.  Yes, under a trade secret claim.

Q.  But there's no difference between a trade

secret claim and a fraud claim as it relates to

20      the but-for methodology; is that right?

21      A.  As far as methodology, there's no

22      difference.

23      Q.  And the valuation that you relied on in

24      that case, much of the information was provided

by management to form the value in that

valuation; is that right?

    A.  That's true.

    Q.  And that's standard practice, most of

5    these companies like Duff & Phelps and Standard &

Poor's have to rely on information provided by

management, don't they?

    A.  I agree with that.

    Q.  And it would be very unusual, wouldn't it,

10    for them not to rely on information provided by

management?

    A.  That is often a source of important

information for them to consider      in reaching

their conclusions.  I agree with that.

15    Q.  Now, I think you testified earlier that,

or you said to me today, right, that

XpertUniverse didn't have any products or

revenues?

    A.  That's my understanding.  Well, revenue

20    from a product.  They had consulting revenue.

21    Q.  And is it your opinion that if a company

22    does not have revenues, they have no value?

23    A.  No, that's not my opinion given certain

24    facts.

Q.  Is it your opinion that a product, a

company that does not have a product has no

value?

A.  No.  Given certain facts, they -- it could

5  be significant value.

Q.  And would you agree that sales don't

necessarily equal value?

A.  I clearly agree with that.

Q.  In your rebuttal report, sir, did you do

10  any kind of analysis as to XpertUniverse's cash

flows or where XpertUniverse got its money from

and what it did with its money?

A.  I considered the information.  I wouldn't

say I analyzed it.

15  Q.  Did you analyze why XpertUniverse was able

to raise $4 million in 2006 from investors?

A.  No.

Q.  Did you ever ask signals company, anyone

from Cisco why they bought five companies for

20  $312 million in 2004 when none of those companies

21  had any sales?

22  A.  How could I ask that question, other than

23  no when you've already asked me if I talked to

24  anyone at Cisco.  No, I did not.

MR. CANTINE:  Thank you very much,

sir.  I appreciate your time.

THE WITNESS:  You're welcome.

BY MR. DAMSGAARD:

5      Q.  A couple very quick questions, sir.

Counsel mentioned the Wellogix --

A.  Wellogix.

Q.  -- Wellogix case.  Is that analogous to

this case?

10     A.  No.  And a very different fact situation

than here.

Q.  Secondly, it indicated that some agreement

that the company could have value if it hadn't

yet had sales.  What would the circumstances be

15  in such a situation?

A.  Well, that's actually very common in

startup companies in technology, is that it takes

them time to develop their product and get it

right and get the market to accept what they've

20  done as value.  But what makes those companies

21  valuable is if there is truly valuable technology

22  that has been developed.

23           Where I come from in Silicon Valley

24  is littered with companies that had great ideas,

that had lots of financial backing.  Some of them

even refer to market, but then could not execute.

Just because you spend a lot of

money does not necessarily mean you'll be

5    successful, but if you have spent a lot of money

and you really do have a great idea that you can

protect in the marketplace and prove in the

marketplace that it has value, there can be

significant value on a company that has never had

10   a sale.

Q.  And do they do due diligence before they

spend money on a company like that?

A.  Generally, people do.

Q.  And in this circumstance, was that -- that

15   paradigm applied to XpertUniverse?

A.  I have not seen the information or

evidence that what they actually developed was

needed in the marketplace, desired by the

marketplace, or anyone would pay good money for

20   it.


21   Q.  And do you understand that they showed

22   this technology to lots and lots of companies for

23   the last eight or nine years?

24   A.  That's my understanding.

Q.  And has anybody licensed it, purchased it,

anything like that?

A.  Not as of 2013.

Q.  In your view, has the market spoken on the

5    value of that technology?

A.  That's my judgment.

MR. DAMSGAARD:  No further

questions.

THE COURT:  All right.  Thank you,

10   Mr. Wagner.  You may step down.

THE WITNESS:  Thank you, your Honor.

(Witness excused.)

MR. SCHUMAN:  Your Honor, Cisco

rests.

15   THE COURT:  All right.  Thank you,

Mr. Schuman.

Mr. Cantine or Mr. Sobel?

MR. CANTINE:  Can we have a brief

sidebar, your Honor?

20   THE COURT:  Yes.

21   (Sidebar conference held out of the

22   hearing of the jury as follows.)

23   THE COURT:  All right.  What's up?

24   MR. CANTINE:  Just in terms of

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

directed verdict, I assume you want, not want us

to do it in front of the jury?

THE COURT:  No.

MR. CANTINE:  I just want to put on

5    the record.  I'm sorry.  Rule 50.  So we're going

to move for Rule 50 motion based on infringement,

validity I think you already got rid of.

MR. SOBEL:  No.  Validity of claim

five in the '709 patent.

10    MR. CANTINE:  The remaining validity

claims.  We don't think their expert connected

the dots, let's say.  The last time I checked,

motivation to combine doesn't -- making something

crisper does not satisfy the motivation to

15    combine, the relevant case law.  And I think we

-- I'm sorry.  And public use and on-sale bar.  I

don't think they've established, other than

establishing that the source code was in -- was

written, they have not tied it to any product or

20    demonstration that it was on sale or public use.

21    THE COURT:  All right.  All the

22    invalidity objections I will take under

23    advisement.

24    Did you say you had an infringement

Motion?

                MR. CANTINE:  They had a

counterclaim on noninfringement.

                THE COURT:  Just the same thing as

5    your claim of infringement.  I'm not going to

grant that.

                MR. CANTINE:  Okay.

                THE COURT:  All right?

                MR. CANTINE:  Thank you.

10              THE COURT:  And then I presume,

depending on the verdict, or even not depending

on the verdict, everybody is going to be able to

renew these motions after trial?

                MR. CANTINE:  I guess we can talk

15   about that later in terms of timing.

                THE COURT:  Yes.  This is not a good

time now.

                All right.  So you've got Dr.

Nourbakhsh?

20              MR. SOBEL:  We have a short read- in

21   of David Rutberg, John Steinhoff and Dr.

22   Nourbakhsh.

23              MR. CANTINE:  We told you about

24   Steinhoff.

                    Hawkins Reporting Service
            715 N. King Street - Wilmington, Delaware  19801

MR. SCHUMAN:  We didn't get any

disclosure that you were playing Rutberg.  We

thought it was Faro and we objected and the Court

sustained my objection.

5            MR. CANTINE:  My understanding is we

told you about Rutberg.

             MR. SOBEL:  It's a less than a

one- minute clip that says that he's not an

inventor.

10           THE COURT:  Why don't you do this.

Why don't you give them the one-minute clip and

maybe we won't need to get into whether it was

disclosed or not, but give them whatever you have

marked and meanwhile call Dr. Nourbakhsh,

15  Mr. Steinhoff.

             MR. BLUMENFELD:  Your Honor, on the

Steinhoff issue, they did send us an e-mail a

couple nights ago saying that they might call him

in rebuttal, but when we were standing here

20  yesterday afternoon and you asked what they were

21  going to do today, they said they had one

22  deposition and Dr. Nourbakhsh.

23           We assumed they weren't calling Dr.

24  Steinhoff based on -- Mr. Steinhoff, sorry, based

on that statement.  So --

          MR. CANTINE:  I'm sorry if there was

a misunderstanding.

          MR. SOBEL:  We were just trying to

5   get a --

          THE COURT:  You know, I was looking

for my own purposes, I was looking more for the

general flow of things.  I take it you knew

roughly what you thought at one point.  Maybe you

10  stopped as of yesterday.  But you knew what,

generally, why he was being called on rebuttal.

          MR. BLUMENFELD:  No, we were not

told anything about why he was being told on

rebuttal.

15          MR. CANTINE:  I'm not so sure we

were obligated to tell him what he was going to

testify about.

          THE COURT:  Why don't you tell me

right now.  What generally is he testifying

20  about?

21          MR. SOBEL:  He can testify to the

22  fact that the inventions of the '709 patent were

23  never offered for sale.

24          MR. SCHUMAN:  I think he said that.

MR. CANTINE:  It's direct rebuttal

to Chatterjee.

THE COURT:  Well, I will allow that,

and -- I'm going to allow that.

5          MR. BLUMENFELD:  I think he already

said that in their case-in-chief.

MR. SCHUMAN:  My point was that was

his testimony during the case-in-chief, so it's

clearly cumulative.

10          MR. CANTINE:  It's our time.

THE COURT:  Well, I'm going to allow

it because, I mean, it may be -- he could be more

focused now, I think, and normally, that would be

something that would be proper for rebuttal case.

15    So I'm going to allow that.

All right.  So give me the Rutberg

transcript.  Put Mr. Steinhoff and Dr. Nourbakhsh

on and, if we need to, we can get back to

Mr. Rutberg.

20          (End of side bar conference.)

21          THE COURT:  We're going to take a

22    ten-minute break.

23          (The jury was excused for a short

24    recess.)

THE COURT:  All right.  Why don't

you see, talk to each other about the Rutberg

thing.  I will come back in a few minutes and

we'll see where we stand.

5            (Short recess taken.)

                    -  -  -

            (Proceedings ruled after the short

recess.)

            THE COURT:  All right.  By the way

10   things are going, there's probably an issue about

Mr. Rutberg?

            MR. SCHUMAN:  No.

            THE COURT:  Okay.  So we're ready to

flow seamlessly to the end of the testimony?

15           MR. SOBEL:  I hope so.

            THE COURT:  All right.  Let's get

the jury in.

            (The jury entered the courtroom and

took their seats in the box.)

20           THE COURT:  All right.  Members of

21   the Jury, welcome back.  We're ready to proceed.

22           Mr. Sobel?

23           MR. SOBEL:  Okay.  We call

24   Mr. Steinhoff.

                    ... JOHN STEINHOFF, having been duly

          sworn as a witness, was examined and testified as

          follows ...

                         DIRECT EXAMINATION

     5    BY MR. SOBEL:

               Q.  Could you please re-introduce your to the

          jury?

               A.  I am John Steinhoff.

               Q.  All right.  And could you remind everyone

    10    about what your role was at XpertUniverse?

               A.  I was director of technology and architect

          from October 2001 to about July of 2007.

               Q.  And you testified earlier at trial that

          when you arrived at the company, the company was

    15    called Homework 911; right?

               A.  Yes.

               Q.  Okay.  And you also testified, told the

          jury that you were one of the inventors of the

          patents-in-suit; is that right?

    20         A.  Correct.


    21         Q.  Okay.  Did the Homework 911 platform

    22    implement the claimed inventions of the '709 and

    23    '903 patents?

    24         A.  No.

Q.  And how do you know that?

A.  Well, we developed it, but also there was

no need for the patents at that time, or the

subject of the patents.  The problem definition

5    process in Homework 911 was really very simple.

Q.  Were you involved in any demonstrations of

XpertUniverse's technology that it was developing

--

A.  I was involved, yes.

10   Q.  Okay.  What was your involvement?

A.  Primarily the role that I had was just to

make sure the environment was up and solid.

Q.  The demo environment?

A.  The demo environment.

15   Q.  Okay.  And could you explain the demo

environment and how it's created in 2003?

A.  Sure.  Shortly after we switched from

being focused on a -- a homework help service out

to kids to a corporate environment, where we were

20   trying to provide an expert location

21   collaboration-type one, we did, we took the

22   existing technology.

23           We did what we called a facelift, to

24   make it look like a corporate environment as

opposed to something designed for kids.

And we then took that environment,
copied it over into a separate standalone
environment just for use in demos, so that we had
5    a solid for demos.

Q.  And did that demo environment contain the
inventions of the '709 and '903 patents?

A.  No.

Q.  Was the intention of the demo environment
10   at that time to demonstrate the invention
described in the patents?

A.  No.

Q.  What was the intention of the demo
environment in 2003?

15   A.  The focus was on showing people what a
collaboration environment would look like, what
an interaction with an expert would look like.

So it was -- it was very much
focused on getting into a session with an expert
20   and seeing how that interaction would work using

21   all the different tools.

22       Q.  Did the demos explain how the software

23   worked?

24       A.  Not really.  It was really more a matter

of trying to give people a sense of what we were

talking about when we sat through a collaboration

environment with an expert, how that would look,

how that would feel, give them a sense of how

5     they might use it in their business.

      Q.  And in 2004 and 2005, did the demo

environment that XpertUniverse used change?

      A.  We tried to keep it frozen in place, so

that it didn't get disrupted, didn't break, but

10    we did make one major change toward the end of

2004, 2005, to incorporate use of a tool from IBM

called Web Seer, that it basically --

applications existed within a Web Seer

environment, so the interface looked different,

15    but it was really the same demo system under

covers, but it existed within this Web Seer

environment.  So we did create that.  That was a

-- a change.

      Q.  And in any of the changes that you just

20    described, did the demo environment  implement

21    the inventions of the patents?

22       A.  No.

23       Q.  Did the demo environment at any time

24    during the period 2002 to 2005 ever contain code

                Hawkins Reporting Service
        715 N. King Street - Wilmington, Delaware  19801

to support the inventions of the patents?

        A.  No.

        Q.  Okay.  Was any other demo environment used

for demos?

5       A.  Not to my knowledge, no.

        Q.  Okay.  And you had knowledge also of the

integration that XpertUniverse was doing to

integrate the Cisco router into its XpertSHARE

platform; is that right?

10      A.  Yes.

        Q.  Okay.  Did XU complete that integration

work?

                MR. BLUMENFELD:  Objection, your

Honor.

15              THE COURT:  Sustained.

                MR. SOBEL:  Thank you, Mr.

Steinhoff.

                THE COURT:  Mr. Steinhoff, wait a

second.

20              THE WITNESS:  Oh, I'm sorry.  Of

 21   course.

 22                    CROSS-EXAMINATION

 23   BY MR. BLUMENFELD:

 24       Q.  Mr. Steinhoff, are you aware that your

                Hawkins Reporting Service
        715 N. King Street - Wilmington, Delaware  19801

testimony about whether the inventions of your

patent were used in XpertUniverse's platform is

contrary to the testimony of two of your

co-inventors?

5        A.  I did not say that the contents of the --

of the patents were not in any version.  I said

they weren't in the demo version.  It was a

separate environment.

         Q.  So you're not saying that they weren't

10   used in XpertUniverse products, but only in the

demo versions of those products; is that correct?

         A.  I'm saying that we had working -- we were

working on versions of the system actively in

development, continually.  We separated off a

15   demo version of the system that we did not touch,

but that we were actively developing code in

other environments.  And we were, in fact, trying

to connect.

         Q.  You were trying to sell the actual

20   versions, not the demos; is that correct?

21       A.  As far as I know, we didn't have a --

22   well, we did not have a final version that we

23   could go out and market as a finished product.

24            MR. BLUMENFELD:  Thank you.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

                    MR. SOBEL:  No questions.

                    THE COURT:  All right.

        Mr. Steinhoff, you may step down now.  Thank you.

                    THE WITNESS:  Okay.

 5                  (Witness excused.)

                    MR. SOBEL:  Now we have a very brief

        video clip of the deposition testimony of David

        Rutberg.

                    THE COURT:  All right.

10                  (Videotaped deposition of David

        Rutberg was played as follows.)

           Q.  And you've reviewed the two patents being

        asserted against Cisco in this action; is that

        correct?

15         A.  Correct.

           Q.  And do you feel that you're an inventor of

        either of those patents?

           A.  No.

                    (Videotape stopped.)

20                  MR. CANTINE:  Sorry.  Slight

21      technical difficulty.  We're going to try that

22      one again.

23                  THE COURT:  All right.  Not a

24      problem.

                    Hawkins Reporting Service
              715 N. King Street - Wilmington, Delaware  19801

(Videotape resumed.)

Q.  Now, you've reviewed the two patents being

asserted against Cisco in this action; correct?

A.  Correct.

5        Q.  And do you feel that you're an inventor on

either of those patents?

A.  No.

(End of videotaped excerpt.)

MR. SOBEL:  And now we have -- we'd

10   like to call Dr. Nourbakhsh.

THE COURT:  All right.

... PROFESSOR NOURBAKSH, having been

duly sworn as a witness, was examined and

testified further as follows...

15        THE COURT:  Dr. Nourbakhsh, you may

take the stand.  Since you were already sworn

once in this case, you remain sworn for this

testimony.

THE WITNESS:  I understand, your

20   Honor.

21                 DIRECT EXAMINATION

22   BY MR. SOBEL:

23        Q.  Good morning, Professor Nourbaksh.

24        A.  Good morning.

Q.  You were here yesterday when Drs.

Chatterjee and Forrest talked about their

opinions on, well, actually, Dr. Chatterjee on

his opinions about source code he reviewed and

5    Dr. Forrest's opinions on validity of the

patents; is that correct?

A.  Yes, I was here.

Q.  Okay.  So let's talk about Dr.

Chatterjee's opinions on source code and the '903

10   patent.  He was trying to suggest that the source

code that he reviewed, you know, showed the part

of the claimed invention.

Could we go to D of that.  Okay.

And could you explain the issues for

15   the jury here about what was wrong with Dr.

Chatterjee's testimony.

A.  Sure.  I'm happy to explain that.  Dr.

Chatterjee was trying to find source code in

various files that XU had to try and identify

20   elements within the patents and show that these

21   elements were implemented in the computer code

22   that XU wrote.

23             I was obviously paying careful

24   attention to the actual computer code, to see if

I agreed with his conclusions about the actual
computer code.  And there's some examples.

For instance, this was with a really
important element.  This is the one that really
5   talks about the idea that you have different ways
of asking questions, and that they relate to an
underlying criteria, so that you have some
commonality and that's what makes the '903
patent, add flexibility to your system.

10       Unfortunately, what he has listed are just
a set of subject areas, like math and algebra.
There are no underlying criteria, there are no
multiple layers, and there's certainly no
organization of layers of criteria.  And the
15   reason he does not list that is that there aren't
any underlying criteria in the XU system, so he
wasn't able to find opinions hat showed that.

Q.  Let's go to the next slide.  What was
wrong with his opinion about this piece of source
20   code?

21       A.  So what he was showing with this piece of
22   source code is the fact that you can have skills.
23   You can have people with skills.  Yes, you can
24   have people with skills and that's something that

you often do in any skill based system where you

have to have experts, where you can contact

center agents.

         The problem is the example shows no

5   underlying criteria.  I realize it says criteria

I.D. on the bottom, but that's actually just the

type of question, it's not underlying criteria,

and he does not show any skill set database

connected to that underlying database because

10   there is none to show.

     Q.  Okay.  Let's go to the next slide.  Okay.

         Was there a flaw in concluding that

the source code showed this element?

     A.  Dr. Chatterjee was using these pieces of

15   computer code to try and explain that there's a

unique routing identifier in the skill set

database to inquiry type.  In other words, is

there a connection between the skills that people

have and the kinds of questions that people can

20   ask.

21         Now, the problem is what he ended up

22   showing actually does not point to the kinds of

23   questions people asked, just to the skills they

24   have.  So he ended up showing the wrong table on

the screen.

Q.  And let's go to the next slide, Dave, if
you could.

A.  This is a really important element.  If
5     you will recall when I talked about, and this is
a typo, it should be "server," not "sever."

        The idea behind this was, this was
sort of a home run, it's where the system
actually allows somebody to make a question, to
10    say, okay, this is the topic that I'm interested
in, and the system is going to go figure out what
expert can help them.  Right?

        So the computer code has to save,
tell me your question.  It has to go figure out,
15    who should help them.  And then it will connect
them up.  That's the whole point of the patent.

        But, unfortunately, the example that
he has here, what you are seeing down below where
it says create child's, all it's doing is
20    creating a set of questions.  It's never showing

21    how people are interactively using the system.

22    It's never showing how the system is able to go

23    and figure out what expert knows anything about

24    those topics.  And it's never showing how you are

able to connect the two of them together.

So it's really an incomplete piece
of source code that does not demonstrate any of
that.

5      Q.  All right.  Let's take a look at the '709
patent.  Let's go to claim 5.  Let's start at
Element D.  We'll go through this quickly,
hopefully.

So if you can talk about, you were
10     Lear for his testimony about this element.  Is
there a flaw in code that he relied on?

A.  This is a really important flaw, actually,
in what Dr. Chatterjee was doing, with due
respect to Dr. Chatterjee.  The whole point of
15     the '709 patent, I will talk about this again, is
to make it possible for the administrator to
configure the system up, so that it's asking you
the right questions interactively to figure out
your problem and connect you to the right expert.

20     So it's really important, this one.

21     The first member of the organization is the
22     administrator.  But what he's showing isn't any
23     code that shows any administrative window that
24     would allow the administrator at the company,

Wherever they are, to actually decide what the

questions are and what the relation slip of the

questions and values are to present to somebody.

What he's showing instead is just a

5   bunch ever hard coded specific examples.

Language arts, mathematics, in code, which does

not make any sense.  The database should be

empty, and then when you buy it, you should put

in mathematics and language using code that helps

10   you do that.

The reason that this is all he can

show is because this system is what we call

canned.  It's built into it specific examples

that they use for demonstrations.  So there is no

15   configuration window for him to put here and

show.

Q.  Okay.  And the next element, is there any

evidence in the code that he relied    on here to

tell the jury about that element E    is --

20   A.  One of the interesting things about

21   Element E that we talked about last week is that

22   '709 is really powerful in this patent, because

23   I'm not going to get the same set of questions

24   and choices as Mr. Sobel.

So the idea is to customize it so I
get the right questions and choices for who I am,
whether I'm a gold cardholder or not.  And Sobel
gets the same kind of choices that are
5    appropriate to him.

            But the code that he's showing is
putting a little scroll down window on the screen
to choose from with no relationship to who is
going to ask the question.  That could
10   demonstrate the system does not have the ability
to do any of the pre-selected criteria set by the
first member that we're talking about.

        Again, the code actually is useful in
showing that it does not do precisely that
15   function.

        Q.  All right.  And let's skip ahead to G.
How about this?  You were here for an opinion on
this.  Did you agree with it?

        A.  Read this one.  Database is practice
20   parameter, a course from which inquiry values are

21   retrieved.  The problem is all it's doing is
22   writing on the screen.  He has never actually
23   identified any parameter that shows you how you
24   look up in the database for the parameter the

source from which you get the values people are

selecting.

Again, this is about the idea that

to make selections, you have to know where those

5    selections are so you can hook them up to the

expert.

What this code is doing is actually

putting things in the database on top and at the

bottom it's simply writing down stuff on the

10   screen.  It's not showing how the system knows

where the selections are at all.

Q.  All right.  Let's do one more.

Let's go to H of the '709 patent.

You were here for this.

15   Did you agree with what he was

saying when he was talking about Element H?

A.  No, I didn't agree.  This was sort of the

home run.  The '709, it was the last element in

the '709 where everything happens.

20   And, again, in the '709 case, the

21   interesting bit here was that the person who's

22   using the system to try an explain what their

23   question is is being responsive to something that

24   is an administrator set up for them to do.  In

fact, instead of showing computer codes that

shows how the administrator can set that up

within the human context.

        All that Dr. Chatterjee has done is

5    show two different examples here.  One is with

coaching and one is with courses.

        These are simply pre-canned examples

for demonstration that you can choose between.

They don't demonstrate the administrator can set

10    it up.  And they don't demonstrate that you can

interactively use it.

    Q.  Okay.  And when XpertUniverse received Dr.

Chatterjee's report, they sent it to you to give

your opinion about what his conclusions were?

15    A.  Yes.  I did detailed evaluation of the

whole report.

    Q.  And did you agree with him that that

report implemented the claimed invention of the

'709 and '903 patent?

20    A.  No.  It does not implement those patents

21  at all.

22    Q.  We just talked about some of those; right?

23    A.  That's correct.

24    Q.  Now, turning to Dr. Forys' testimony, you

were here in the courtroom when Dr. Forys

testified; right?

    A.  Yes.  I was here yesterday as Wilmington.

    Q.  Okay.  You've went through some of the

5  patents he claimed are prior art and that's why

the patents were invalid.

          Did you have a problem with his

methodology that he used?

    A.  Well, there's some -- there's some issues.

10  Again, with due respect to Dr. Forys, the

challenge is that he was being very general in

saying, Well, all these things were already done

before.  And when you're looking at the patent,

what really matters is to look at the specifics,

15  what is in the description of the patents.

          He's talking about:  Does that, in

fact, disclose the specific invention in the

claims of the '903 and the '709?  So one aspect

that I think is a big problem is that he's being

20  very generic kind of using large brush strokes

 21  instead of talking about specifics.

 22          More importantly, I think there's

 23  two major types of mistakes, if you will, that

 24  he's making throughout his analysis.

One of those is with respect to the
'903 patent.  He seems to be thinking that
skills-based routing, what people -- some people
call competently-based routing is basically the
5    same as the '903 patent.

So if I can find any patents that
somehow route questions to people who have
skills.  I've shown that the '903 patent is no
good.  And nothing could be further from the
10   truth.

The '903 patent isn't about a
specific routing protocol at all.  It's about how
you're storing information about the questions
and in a flexible way.

15   The '709 patent, he's doing as a
similar thing.  He seems to be thinking that any
patent he finds that has fields that you fill out
that helps you identify questions, that's the
'709 patent.  And, of course, there's many
20   systems that have fields that you have fill out

21   online.

22   There even have been from the
23   2000's.  Interesting bit with the '709 patent is
24   the idea that an administrator can set it up.

You can have the values and choices, and that the

values and choices and inquiries are going to be

able to be customized to you.  So that it helps

you efficiently fill out formalities in the right

5       way, so you can ask the right question.

Q.  Okay.  Let's take a look at some of the

patents that he said, you know, rendered the

patents invalid.

MR. SOBEL:  Can you go to DX-67,

10      David?  We heard about this one yesterday

Venkantesh.  Do you agree with his opinion that

Venkantesh invalidates both patents?

A.  Not at all.  Venkantesh is not really

relevant to these patents for one specific

15      reason.  Venkantesh was all about the idea of

setting up an organization, so you have an

organization with some other organizations.

You have a reasonable way to think

about all the different departments in your

20      company.  The problem is it has no underlying

21      criteria.  It doesn't disclose anything about the

22      idea of flexibly maintaining information relating

23      it to other like criteria with multiple layers.

24      And that's exactly the innovation

that makes the '903 patent so exciting to me.

Q.  Okay.  And how about the '709 patent?

A.  The '709 patent is even less relevant to

Venkantesh because, again, Venkantesh is really

5    about this idea that you're dividing up your

organization, so that you can have different

questions go to different parts of the

organization.

MR. SOBEL:  Okay.  And let's look at

10   DX-68, David.

BY MR. SOBEL:

Q.  And this was discussed.  You discussed

this one.

Did you agree with him on his

15   opinion on Gabriel?

A.  Gabriel is very similar.  It doesn't have

inquiry criteria.

It also doesn't have layers.  I am

sorry.

20   When I say very similar, I mean,

21   very similar to Venkantesh, not to the '709

22   patent.  It's a queuing system.

23   It doesn't have any inquiry-type

24   layers.  They certainly don't relate to any

underlying criteria and it doesn't have any way

for a manager to flexibly make changes to those.

And so Gabriel is not relevant to

the '709 or the '903 patent.

5      Q.  The next one he talked about was DX-56 and

that was Sassin; right?

You were here when he talked about

that.  Did you agree with his opinion about

Sassin?

10      A.  No, I don't.  It's actually interesting.

The Sassin patent is about something

called Decision Treatise.  If you've ever done

tree identification and you decides does it have

cones or not?  Yes, it has cones.  Does it have

15   two or other three needles?

Okay.  It's a red pine.  That idea

of going through.  And if then this patent is

about the very clear idea of why you're using one

of those decisions, tree-making decisions about

20   where you are stopping, staying, going away,

21   coming back later and resuming it.

22              That's what this patent is about.

23   It has nothing to do with the '893 or the '709

24   patents.

Q.  Okay.  And let's talk about DX-49 that was

Chauhan.

You were here when he talked about

that, Dr. Forys.  Did you agree with his opinion

5    about Chauhan as it relates to the

patents-in-suit?

A.  No.  We're not seeing Chauhan, but that's

okay.  The Chauhan patent was basically about the

idea --

10   Q.  That's DX-49.

A.  Maybe we just don't have the front page

for it.  The Chauhan patent is basically about

the idea that people express their question just

by texting, typing it in.  And then get an answer

15   from an expert.

It's Ask.com.  Its an interesting

patent because that's a really useful thing to

do, but it doesn't relate to the data

representation we are talking about for the '903

20   or to the interactive way of expressing the

21   question like we do with the '709.  So it's not

22   relevant, either.

23       Q.  All right.  And he also talked about

24   DX-477 and that was Sollenberger.

Do you agree with his opinion about

that?

A.  The Sollenberger patent is also

irrelevant.  I don't agree with his opinion.

5       It's about the idea that a company

sometimes doesn't want their people, their

employees to do searches on the internet.  So can

we create a microscopic version of the internet

called an intranet inside the company, so they

10   can do their searches in a walled garden rather

than outside in the main internet.

        That's all the Sollenberger patent

is about.  As you can surmise, that's not

relevant to either of the patents in question.

15   Q.  Okay.  And the last patent, you mentioned

was DX-65.  This was Judkins.  And I believe you

talked about this already.

        But you said earlier that the

problem was that Dr. Forys interpreted that

20   anything that was skills-based routing, you know,

21   that means that if skills-based routing has

22   some -- you invalidate the patent.

23       Does this example of the problem

24   with --

THE COURT:  Mr. Sobel, I'm sorry.

Mr. Schuman's about to object.

Could you ask a slightly less

leading question?

5             MR. SOBEL:  Sure.

BY MR. SOBEL:

Q.  Can you explain why you disagreed with

Dr. Forys' opinion on about this patent?

A.  I'm happy to do so.  It does say

10  skills-based routing method.  I see why you

started saying skills-based routing.

Judkins' patent is, indeed, about

skills-based routing about the idea that if you

are asking questions in the system and you have

15  people with many different mixes of skills, you

have specialized ways to get to the right expert

as quickly as possible.  Usually this is asking

somebody in a contact center.

It was a really interesting topic.

20  But, again, it's not relevant to what we're

21  talking about, which is how you maintain the

22  knowledge in the system and how you have people

23  ask their questions.

24             Skills-based routing, in general,

has been around.  There's many, many patents on

it, and none of them show information that would

invalidate the '903 or the '709 patent.

Q.  Okay.  And, in your opinion, do the

5   claimed inventions of the '709 or '903 patent

satisfy a long-felt need in the contact center

industry?

A.  Yes.  I was in the contact center

industry.  And in being in that industry and

10   understanding what the needs are, we often work

with people who needed part-time experts to come

into the contact center to work.  And, boy, would

this help because we wouldn't have to take those

people, rip them out and cut people in the

15   contact center for two exact hours a day.  They

could do sort of both jobs at once, so it was

really nice.

Q.  So, again, that was, you testified earlier

in the trial, your time at Blue Pumpkin and then

20   Witness from what years?

21      A.  1996 is when we started Blue Pumpkin and I

22   worked with Witness up until, I think, 2006.

23      Q.  Okay.  All right.

24           Now, let's talk about

noninfringement -- the infringement for a moment.

Now, I understand you were teaching classes on

Monday, but did you have an opportunity to review

Monday's trial transcript of Mr. Satish Gannu

5      that talked about Pulse and Mr. Lepore who talked

about Expert Advisor?

A.  Yes, after I finished teaching, I read the

entire transcript for the day Monday night.

Q.  Okay.  You know Mr. Gannu, he testified

10     about certain things about Pulse.

Did that change your opinion in any

way?

MR. SCHUMAN:  Your Honor, can we

have a side-bar?

15                THE COURT:  All right.

(Beginning of conference held at

side-bar:)

MR. SCHUMAN:  First of all, I think

this is Mr. Sobel reiterating the testimony that

20     we heard in Court.  But more importantly, Your

21     Honor, I think it's beyond the scope of his

22     rebuttal.  They were disclosing Mr. Nourbakhsh,

23     in my understanding and Mr. Steinhoff to address

24     the validity, not to talk about noninfringement

again.

        THE COURT:  Well, Mr. Sobel?

        MR. SOBEL:  Yeah.  They -- first of
all, we didn't limit our disclosure when we said

5   Dr. Nourbakhsh and saying he's only going to
testify about invalidity.  We just identified him
as our rebuttal case.  And they have a
counterclaim that they didn't infringe.

        MR. SCHUMAN:  So --

10        THE COURT:  Well, I think the
counterclaim that they didn't infringe is just a
mirror image of your claim that they did
infringe.  So I don't think that's actually
introducing anything new.

15        And so, but just because -- so, I
don't know if that helps you.  But the question
seems is -- but just because you have presented
evidence on infringement during your case in
chief doesn't necessarily mean you can't present

20   rebuttal evidence now.

21        So what is it you're proffering that

22   he's going to present?

23        MR. SOBEL:  Well, he's going to --

24   they put on certain evidence of Dr. Forys and

he's going to explain why that evidence does not

or, you know, rebut his opinion.

            THE COURT:  Well, Dr. Forys, he

wasn't about infringement, was he?

5           MR. SOBEL:  Yeah.  I think he said

it doesn't infringe.  He said that that doesn't

include elements -- this doesn't include that

element.

            MR. SCHUMAN:  He did, Your Honor.

10           THE COURT:  So --

            MR. SCHUMAN:  If this is in some way

rebuttal to Dr. Forys.  But the way this question

started, were you in court listening to Dr. --

            THE COURT:  Tell me what Mr. Gannu

15     said that we're going to hear in trial next and

Mr. Lepore.  And I don't think that's proper

rebuttal even though they have a counterclaim.

            They say it's on their counterclaim

for noninfringement.  I guess what I'm wondering

20     is:  What exactly these witnesses said?

21           You know, it's funny.  I would have

22     tended to look at it the other way around, which

23     is they knew what Dr. Forys was going to say.  So

24     that's stuff that could have been addressed in

their case in chief.  What Mr. Gannu or Mr.

Lepore and Mr. Dry were going to say, I can't

remember, but I think some of these people

weren't deposed.  Right?

5                    MR. CANTINE:  Certainly Mr. Dry.

                     MR. SCHUMAN:  Two or three were

deposed and they did know what they were going to

say.  And they addressed that in their case in

chief.

10                   Mr. Dry was not deposed at their

decision.  But who was deposed was Mr. Slamecka

who was their 30(b)6.  In other words, he was

hemmed in by what Mr. Slamecka said.

                     So they knew what the testimony was

15    going to be about Remote Expert as well.  This

was all addressed in the case in chief.

                     THE COURT:  Mr. Sobel.

                     MR. SOBEL:  What Mr. Slamecka didn't

know anything about, he wasn't even an engineer

20    on -- Slamecka they put on as a 30(b)6.  I

21    flagged this issue at the beginning of the case.

22                   THE COURT:  All right.  So I think

23    Mr. Dry might be in a slightly different

24    position.

What about those other two?

MR. SOBEL:  Well, I mean, they

brought out stuff that, I mean, thinking about

what Gannu testified about.  You know, they came

5   in and raised things that, you know, were new

and, you know, it wasn't something that Dr. Forys

relied on in his report.

And they just came in and they're

going to try to tie that into their closing

10   presumably that it doesn't infringe.  But that's

not what these two people say.

THE COURT:  What is it that you

expect Dr. Nourbakhsh to say?

MR. SOBEL:  That what he heard from

15   those witnesses confirms his opinion.  The fact

that he heard from those witnesses doesn't

discount his opinion.

MR. SCHUMAN:  Last point, Your

Honor.  If any of these witnesses we're talking

20   about had changed what they said in their

21   deposition months, if not years ago, we would

22   have heard that on cross-examination.

23   So, Dr. Forys -- I'm sorry,

24   Dr. Nourbakhsh, Mr. Sobel, they've all had the

benefit of in substance exactly what the witness

has said on the stand.  Yesterday this is before

the rebuttal case.

THE COURT:  All right.  Well, here's

5    what I think.  I haven't heard, from what you

just said, Mr. Sobel what he's going to say about

Mr. Lepore and --

MR. SCHUMAN:  Gannu.

THE COURT:  -- Mr. Gannu.  Thank

10   you.

You know, it sounds to me like your

proffer is that he's going to say, Yeah.  I heard

what they said.  It doesn't change my opinion.

MR. SOBEL:  I think he's going to

15   say more than that.  I think he's going to say

specifically, you know, what their -- what it is,

you know, not just going to make a conclusion

statement.

THE COURT:  So what it is, that's

20   what I was trying to get from you.  What is it

21   he's going to say?

22               MR. SOBEL:  Oh, I think that -- I'm

23   not the expert, but let me think.  I think one of

24   the things he's going to say is what Gannu said

about the clicking, the left clicking and the

right clicking, why that confirms his opinion.

And that what Gannu said about the

index, why that confirms his opinion.  And that

5    what Mr. Lepore said about the calls does not

have -- is not -- you know, does not contradict

anything that he had said.

THE COURT:  All right.  Well, I

mean, those people testified as fact witnesses.

10    And so I don't think you really -- I

don't think that's -- I don't really think that's

proper rebuttal.  If you've got a question for

him about Mr. Dry, I will allow that because you

were hearing from the inventor I think -- not the

15    inventor, but the engineer who designed it is

different from him, the 30(b)6.

And if you've got something that

he's going to say about that, you can go ahead

and ask him.

20    MR. SOBEL:  Okay.  How about Dr. Forys?

21    THE COURT:  Well, what is it that

22    he's going to say about Dr. Forys that you think

23    he should have -- I mean, I think that should

24    have been covered in your case in chief.

MR. SOBEL:  I have to -- I'm not
sure because I don't really know, standing here,
exactly what it is.  But Dr. Forys' testimony --

THE COURT:  But you're pretty sure

5   he's going to say that Dr. Forys was wrong?

MR. SOBEL:  That's the general gist.
Right.

THE COURT:  All right.  Well, then
I'm not going to let him testify about that.

10   MR. SOBEL:  Okay.

THE COURT:  So you can ask him the
question about Mr. Dry.

MR. SCHUMAN:  Just the last thing
about Mr. Dry.  I'm going to have to get up if

15   he's offering new opinions that are beyond the
scope of what he said in his opinion.  If there's
some brand new opinion that we are going to have
an objection, I won't ask for side-bar.  He can't
offer new opinions at this stage of the game.

20   THE COURT:  All right.

21   (Conclusion of conference held at

22   side-bar.)

23   BY MR. SOBEL:

24   Q.  All right.  So you were in the courtroom

yesterday when Mr. Dry talked to about Remote

Expert; right?

    A.  Yes, I was.

    Q.  Okay.  And did Mr. Dry verify your

5    opinions regarding whether Remote Expert

infringed the '903 patent?

    A.  Yes.  His descriptions were useful.  In

fact, they reinforced my opinions.

    Q.  Okay.  And your opinion regarding -- can

10    you tell us which of your opinions in your

report, you know, Mr. Dry verified?

    A.  Sure.  What Mr. Dry did was he talked a

little bit about how the system actually works.

In the case of Home Depot, for instance, one of

15    the important parts of the '903 patent, you can

kind of imagine is that big paragraph in the

middle.

           The element that's all about the

idea that you have two or more in gray type

20    layers.  You can ask multiple questions and that

21    they're associated with an underlying criteria.

22    And one of the things that Mr. Dry talked about,

23    you'll recall at first, was that there's one big

24    orange button.

And you press the button and you get

to a kitchen -- kitchen person.  But kind of fast

forward further in his testimony, he talked about

the fact that there's actually two buttons,

5    because there's a help button as well.

And then he showed a screen that had

six buttons.  And those six buttons were for, I

think, for banking.  I think he was -- for

financial banking services, which those six

10   possible kinds of questions you can ask.

And then he went on to say actually

the way different Home Depots are using it.  You

will recall he talked about hitting the button.

You can have lots of buttons.

15   Some can be hidden.  Some can be

shown.  And different Home Depots can share the

same side of the business.  They hide them and

they show them.

That was really near the end.  Then

20   he said that those are really great pieces of

21   evidence about the idea that you can have

22   multiple kinds of layers and you can just choose

23   which layers to show.

24   He also talked about the fact that

Remote Expert has multilingual capability.  And

he said that not only does it have multilingual

capability, but it's really easy to add a new

language because you simply have to change some

5    specific codes relating to a button.

And that's a great reinforcement

because, in fact, the whole point of the '903

patent is to make it easy to add layers by having

everything else -- not have to change everything

10   every time you add something new.  And so that

reinforces what I believe as well because you can

have multiple layers.

The other thing he talked about is

counsel took him through the -- I think it was

15   the expert type table, the database table,

explaining what's in that table.  And what he

described to be in the table resonated with what

I believe, which is that the table had a column

in which you have a sort of trunk line for the

20   kind of people who can help.  So it's identifying

21   the experts.

22             It has a call line for the button,

23   explaining what the picture is and what the

24   question is.  So that's where you're defining the

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

particular inquiry type.  The people you can see.

And the ID number for that row.  A unique ID.

So, now he did say that.  I disagree

with that as well.

5          He said, We don't have an ID that

routes a question to an expert.  And I disagree

with that because, in fact, as he talked about

that table, that row, has an ID number because

the people and it has the question.  It's all

10    there.

And from the ID to the question to

the people that can handle that call.  And by my

interpretation that successfully fulfills that

second to last element in that claim, which is

15    that you have that parameter.

MR. SOBEL; okay.  Thank you, Dr.

Nourbakhsh.

THE COURT:  All right.  Any

cross-examination?

20          MR. SCHUMAN:  I have no questions

21    for you at this time, Dr. Nourbakhsh.

22          THE COURT:  All right.

23          Mr. Nourbakhsh, you can step down.

24          MR. CANTINE:  I'm pleased to

announce that the plaintiffs rest.

    THE COURT:  And Mr. Schuman, I

assume there's nothing more from the defendant?

    MR. SCHUMAN:  Nothing more other

5  than a couple things we should discuss at

side-bar, Your Honor.

    THE COURT:  All right.  Ladies and

gentlemen of the jury, so the evidence part of

the case is over.  There is what judges and

10  lawyers like to refer to as housekeeping matters

to be taken care of part of which is at some

point this afternoon I'm going to be instructing

you on the law that you're going to apply.  Not

to scare you or anything, but this is the volume

15  that I'm working from right now.  It's about

three-quarters of an inch thick.

    And in order to help you follow

along, we're going to have a copy for each of you

of the instructions and so there's certain, among

20  other things, chopping it down, but also, just

21  matters that are legal issues I have to resolve

22  and to get it into a kind of a final format.

23    So we've been working on this, you

24  know, outside of your presence as the trial goes

along.  But it's hard to get to the final version
until the evidence is done.

5

10

15

20

So, we need to work on that and one
or two other things.  And so what I'm thinking is
what I'd like to do is to send you back to the
jury room and basically declare until at least
one o'clock to be your very long lunch hour.  I'm
not sure whether we'll be ready to go at one
o'clock or not, but what I'd like to do is for
you to be -- you know, for you to be ready to go
and we'll -- I'm optimistic that, in fact, we can
be ready to go then, but I'm not positive.

And the only other thing I would say
is that when we do so, basically the three main
chunks left of the -- there's some little bits
and pieces, but there's me reading to you the
instructions, and there's a main closing argument
by both the plaintiff and the defendant.

Those are the three big chunks of
time that are left.  And so we'll be wanting to

21   take little breaks in between them, too, because

22   it's very important, obviously, as it has been

23   through the whole trial that you listen.

24            And it's just hard to listen to

people talk for, you know, a long period of time.

So we try to give them breaks so you can stretch

and, you know, give it your full undivided

attention.

5           You know, you've been a great jury

so far in giving your attention.  But we try to

put you in the best position to keep that up.

So why don't we take the jury out

and we'll hopefully see you at one o'clock.

10          (Jury leaving the courtroom at 11:13

a.m.)

THE COURT:  All right.  Be seated,

please.

Mr. Schuman, what did you want to

15  take up outside the presence of the jury?

MR. SCHUMAN:  Well, Your Honor, we

have a Rule 50 motion on our invalidity

counterclaims.  That's Counts I, II, III, IV and

V with respect to the two remaining claims for

20  infringement in the two patents.

21          And we think that we, in our case,

22  established clear and convincing evidence and

23  that the patents are invalid.  And in the

24  rebuttal case we heard here today, they did not

do anything to take away from that evidentiary

presentation we made.

Nothing Dr. Nourbakhsh said by way

of supporting criticisms of Dr. Chatterjee.  The

5    evidence is in the record, Your Honor.  We'll

connect the dots in closing if we need to, but

for purposes of this motion, the defendant's

exhibits that were admitted through Mr. Friedman

regarding the Allstate presentation is an offer

10   to sale the KnowledgeSHARE platform in March of

2003, which is a month before the critical date.

And Dr. Chatterjee has established that the code

for the offer that they were making

KnowledgeSHARE, the product, the unfinished

15   product.

But, nevertheless, for purposes of

102(b), you don't have to have a finished

product.  They were clearly offering

KnowledgeSHARE for sale to Allstate a month

20   before the critical date.

21   And we've established through

22   inventor testimony that the patents were in that

23   product.  And, obviously, Dr. Chatterjee very

24   precisely went through the codes.

So that's our judgment.

As a matter of law, on the

invalidity Counterclaims I, II, III, IV and V, we

also renew our motion for judgment, as a matter

5    of law with respect to XU's case in chief.  That

would be the remaining concealment claim and, of

course, our noninfringement with respect to the

two remaining claims and the four remaining

products.

10    It's important that I make sure I

didn't miss anything.

THE COURT:  All right.

MR. SCHUMAN:  Thank you, Your Honor.

THE COURT:  All right.  I'll take

15   that under advisement.

So is there anything else before we

talk about the jury instructions?

All right.  So I had a little bit

chance to go through what I had gotten this

20   morning.  Obviously, the cover page, you know,

21   that will just be boiled down to jury

22   instructions.

23    I know it's difficult and I see

24   you've been doing so far, but the instructions

we've deleted, you know, make sure they get taken

out of the Table of Contents.

On 3.00, the Preponderance of the

Evidence and the second paragraph about what

5   Cisco has to prove, that's now out of the case.

So that needs to come out of the jury

instruction.

Right.  And when I say right, Mr.

Rovner, I'm sort of talking to you.  Well, who is

10   it that going to make sure that these things get

done; right?

MR. ROVNER:  Well, I'll do my best,

Your Honor.  I think we're all in this together,

so...

15   THE COURT:  Well, yeah.  Yeah.

But you're the point man.

MR. ROVNER:  Okay.

THE COURT:  Okay.  So particularly,

Mr. Rovner, if you don't understand what I say,

20   speak up.

21   Oh, and just as a general matter,

22   can we, on the next version, also take out all

23   the citations to authority?

24   MR. SCHUMAN:  Yes.

                    MR. ROVNER:  Yes.

                    THE COURT:  So on 4.0, Page 6, the

          second paragraph where it says, The only claims

          that require clear and convincing evidence are

 5        punitive damages for concealment, willful

          infringement aspects of patent invalidity.  I was

          thinking probably that ought to read now, The

          only claims require clear and convincing evidence

          are patent invalidity.

10                  Not a big deal, but Page 25 is

          blank.  Anything I can do to thin the pile for

          the jury will be appreciated, I'm sure.

                    So Page 27, willful infringement,

          that's going to be removed?

15                  MR. SCHUMAN:  Your Honor, the blank

          Page 25, that was where we had the paragraph and

          then the claim definitions, the Markman rules.

                    THE COURT:  Oh, so that's going to

          be replaced?

20                  MR. SCHUMAN:  Right.  I think that

21        yesterday we discussed the introductory paragraph

22        staying in.

23                  THE COURT:  Right.  Right.

24                  Sorry.  Okay.

                    Hawkins Reporting Service
              715 N. King Street - Wilmington, Delaware  19801

That's great.  Yes.  Thank you.

Glad you pointed that out.

MR. SOBEL:  Can we clarify what you

mean by that?

5          THE COURT:  There was an instruction

that said, you know, essentially it's two pages

long, most of which was here's what these terms

mean.  But there's a first paragraph that says,

you know, you have to follow what I say these

10     terms mean.

And so that paragraph should, in

substance, stay in there.

MR. SOBEL:  Okay.

THE COURT:  So Page 32,

15     Anticipation, we need to conform the second

paragraph to say Claim 5 in the '709 patent,

Claim 12 in the '903 patent.

Are the parties satisfied with

Paragraph 2 on Page 32, the one that starts

20     XpertUniverse has lost its right if the claimed

21     invention was already patented anywhere in the

22     world by XpertUniverse or anyone else?

23          MR. SOBEL:  I think the -- just

24     strike the first four words and start if the

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

claimed invention.

        MS. WALSH:  I don't know that that makes sense.  I don't know if that makes sense.

        I don't know if that makes sense

5  because that section, I think, is referring to 102(b) under loss of right.  And so that's consistent with the statute and the jury instructions, the model instructions since it's one year prior to the filing date.

10        THE COURT:  All right.  Well, I guess one thing we could -- if we're not doing anything else, we want to remove the claim about if it was patented anywhere in the world by XpertUniverse.  There's no evidence that

15  XpertUniverse patented it.

        MS. WALSH:  Yes, Your Honor.

        THE COURT:  All right.  The paragraph 14.7 about the level of ordinary skill, there's actually no expert testimony about what

20  the level of ordinary skill is, is there?

21        MR. CANTINE:  I don't believe there

22  was, Your Honor.

23        MS. WALSH:  No, Your Honor.

24        THE COURT:  All right.  Just an

Observation.

On 15.2, which is reasonable royalty and then it says definition, you know, definition doesn't -- that may be right out of the jury

5   instructions, but that doesn't really seem like the right word.

Could we just put like factors to consider instead of definition, something like that?

10   MR. SOBEL:  Factors to consider is fine with us.

MS. WALSH:  Yes, Your Honor.

THE COURT:  Okay.  And the fraudulent concealment of punitive damages at

15   Page 49, that comes out.  So that's what I've got.

Is there anything -- I know everybody's working hard on these things.  Is there anything else that anybody else wants to

20   bring up?

21   MR. CANTINE:  I guess, obviously, we

22   need to get the verdict form.

23   THE COURT:  No.  No.  I meant just

24   on the jury instructions.

MR. CANTINE:  Did you guys have

comments on anything else?

MR. SCHUMAN:  I think those are all

the issues on the jury instructions.

5            THE COURT:  All right.

MR. SCHUMAN:  Obviously, we'd just

like to see a final version.

THE COURT:  Right.  Here's what I'd

like is whenever it's hot off the presses, I

10     think, Mr. Rovner, you've got the final version

or whoever.  But I'm assuming it is Mr. Rovner.

Get it to Cisco as soon as you can

so that they can read it.  And if you think it's

the final version, send it to me, too, so we'll

15     be reading it hopefully or we'll be having lunch,

one or the other.

But hopefully we'll be reading it.

And I will try to get back to you.

Obviously, if Cisco gets back and

20     says they don't see any problems -- hopefully I'm

21     not going to see any problems.  But I would like

22     to just -- you know, I hate to be reading the

23     instructions and see things and say, Where did

24     that come from?  Okay.

So, are we clear on how we're going

forward there?

MR. ROVNER: Yes.  I think that once

we get out of here, I am probably going to run

5      back to my office.  We'll coordinate.  We can

probably can get it turned around by 12:30,

quarter of 1:00.

THE COURT:  That would be great.

MR. ROVNER:  It would be tough for

10     the 1:00 o'clock deadline.

THE COURT:  Well, deadlines help,

but I understand.  You know, it's important that

we get it right.  Deadlines are important, but

more important here to get it right.

15     All right.  So the verdict form.

How are we doing on that?

MR. SOBEL:  We received their

comments and we have to look at it.

THE COURT:  Okay.  Ms. Walsh, are

20     you the verdict form commenter?

21     MS. WALSH:  Yes.

22     THE COURT:  All right.  Are the

23     comments extensive or -- and I don't mean this in

24     a derogatory way.  Are they nit-picking?

MS. WALSH:  No.  We broke out the --
we broke out the infringement claims by product.
Yes or no for Expert Advisor.

THE COURT:  I kinds of think you've
5    got to do that.

MR. SOBEL:  I just have not had a
chance to look at it.

THE COURT:  Right.  Because time is
running out.  What else?

10    MS. WALSH:  And then we conformed to
the orders on infringement.

THE COURT:  You've got to do that.

MS. WALSH:  And then there's a
change in language on the damages portion, what
15    damages do you find XpertUniverse has proven by a
preponderance of the evidence.  That's all.

THE COURT:  All right.  Well, I
can't tell about the last one.

Why don't, Mr. Sobel, you read it,
20    and you and Ms. Walsh stay in close

21    communication, and if you can't work something

22    out, you know, e-mail me.  Okay?

23    MS. WALSH:  Okay.

24    MR. SOBEL:  Okay.

THE COURT:  All right.  So we're

heading in a good position here.  You know, and

if we're not ready to go at 1:00 o'clock, we're

not going to go at 1:00 o'clock.  But I wanted to

5    make sure that if we fall back a little, there's

still time to get these things in this afternoon.

Okay?

MR. CANTINE:  You're going to read

the jury instructions after closing?

10    THE COURT:  No.  No.  I would like

to read basically all but the last two or

three pages or four.  I would think all things

considered, that would take about a half-an-hour,

maybe 40 minutes.

15    MR. CANTINE:  Okay.  And it would be

the case that I would break for ten minutes.

However long it takes me, I'm going to break for

ten minutes to give them a chance to wake up for

you.  When you are done, I will give them a

20    ten-minute break and give them a chance to wake

21    up for you.

22    And I may or may not, depending on

23    what time it is, and various random factors, give

24    you, you know, a few minutes to think about what

you're going to say in rebuttal.  But don't count

on that.  Okay?

          MR. CANTINE:  Understood.

          THE COURT:  And -- okay?

5          MR. CANTINE:  Thank you.

          MR. SCHUMAN:  Thank you, your Honor.

          MR. ROVNER:  I'm just going to hand

up the order on claim construction with out

proposed in there.

10         THE COURT:  Okay.  I think they are

a nice round number, 11 topics (handing documents

to the Court).

          THE COURT:  All right.  I'm going to

sign it each individually.

15         MR. SCHUMAN:  Two housekeeping

matters.  Is there a way to get a count on the

time so we know how much time we each have

foreclosing?  We know approximately, but maybe to

the minute at this point is important.

20         THE COURT:  Yes.

21         MR. SCHUMAN:  Also, I think there

22  has been some cocoa ordination about the trial

23  exhibits, the binders, and how we mechanically do

24  that.  Can we address that with somebody for a

few minutes?

DEPUTY CLERK:  Kristen is going to

come back in a few minutes.  I've been in

communication with her and the support staff.

5          MR. SCHUMAN:  Thank you.

THE COURT:  All right.  So I'm

signing this order on claim interpretation and I

guess we'll make, I think we need to make our own

copies so it has my signature on it, or we can

10   make ten copies.  Okay?

All right.  So I will be checking my

e-mail.  Thank you very much.

(Recess taken.)

-  -  -

15          (Proceedings commenced in the

courtroom, beginning at 1:40 p.m.)

THE COURT:  All right.  Well, thank

you everyone for working and getting these jury

instructions.

20          Is there anything I need to discuss

21   before I bring in the jury?

22          MR. SOBEL:  We had had that sidebar

23   at the end there.  That our Rule 50 motion was

24   clear, that we believe that the defendant has

improved their case on invalidity of claim five

of the '709 patent, claim 12 of the '903 patent.

They have not claimed it has been on sale nor

anticipated, nor obvious, and no other basis

5   under 35 U.S.C. --

THE COURT:  Right.  I think we got

that.

By the way, the verdict form.

MR. CANTINE:  I think it's still

10   being negotiated, your Honor.

THE COURT:  All right.  Well, you

can continue to negotiate it.  Can you -- but

once we finish, it looks like the jury

instructions, any disputes that are still there,

15   I'm going to resolve.  Okay?

All right.  And so, Mr. Cantine,

you're just getting ready, but I'm going to be

reading for the next 30 minutes.

MR. CANTINE:  Oh, are you?  Do you

20   want me to turn it back?  I will sit down.

21   THE COURT:  Okay.

22   MR. CANTINE:  Thanks.

23   MR. SCHUMAN:  Real briefly, your

24   Honor, I notice I have 35 minutes left.  I

thought that, I'm just wondering whether that

sidebar there at the end was counted against us

because I objected or whether it was split in

some way because we sort of counted, I had maybe

5    about 40, 42 minutes left.

(Pause.)

THE COURT:  All right.  So how much

time do you need?  40 minutes?

MR. SCHUMAN:  45 minutes would be

10   ideal, but I will take 40.

THE COURT:  Why don't you take 40.

You know, I'm pretty new at this and it occurs to

me that the better way to do this is to actually

set a time limit on the actual testimony rather

15   than including the arguments because it's easy

enough to just cut off the testimony if you reach

a time limit and it's hard to say.  But I do

appreciate that Mr. Cantine has used his time

very wisely, so he has his full hour.

20        I think 40 minutes.  Did I just say

21   40?

22        MR. SCHUMAN:  You said 40.

23        MR. ROVNER:  Yes, your Honor.

24        THE COURT:  Can you do justice to

your case in 40 minutes?

           MR. SCHUMAN:  I will do my about

read his testimony very best.  40, 45 minutes,

your Honor.  I have a timekeeper here who is

5    going to pass me a note and I will do my best to

finish.

           THE COURT:  Okay.  All right.  Okay.

Anything else?  All right.  Let's bring the jury

in.

10           And the order that I signed?

           MR. CANTINE:  We have a copy.

           THE COURT:  Yes.  I'm just

wondering.  So the idea is, there's a book they

have, which each of them has that has patents in

15    it.

           MR. CANTINE:  The juror notebooks

with the two patents, yes.

           THE COURT:  Okay.  All right.

           (Jury entering the courtroom at 1:44

20    p.m.)

21           THE COURT:  And Mr. Rovner, do you

22    have copies of the jury instructions?

23           MR. ROVNER:  I gave ten to Nicole.

24           THE COURT:  You all may be seated.

Welcome back, Members of the Jury.

We have completed the jury
instructions, I believe.

THE JURY:  Sorry.

5          THE COURT:  And I believe we'll

copies of the jury instructions to hand out in

just a second.  Can we hand them out?

All right.  Ladies and Gentlemen of

the Jury, I am about to read you these jury

10    instructions.  You all know how each of you

individually best hears information and retains

it.

So some of you may want to just

listen to me, some of you may want to read along.

15    You know that's up to you.  You will have the

written jury instructions that you can refer back

to in the jury room.

All right.

Now, that you have heard the

20    evidence and the arguments, it is my duty to

21    instruct you about the applicable law.  It is

22    your duty to follow the law as I will state it.

23          You must apply the law to the facts

24    as you find them from the evidence in the case.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

Do not single out one instruction as stating law,

but consider the instructions as a whole.  Do not

be concerned about the wisdom of any rule of law

stated by me.  You must follow and apply the law.

5          Nothing I say in these instructions

indicates that I have any opinion about the

facts.  You, not I, have the duty to determine

the facts.

          You must perform your duties as

10    jurors without bias or prejudice to any party.

The law does not permit you to be controlled by

sympathy, prejudice or public opinion.  All

parties expect that you will carefully and

impartially consider all the evidence.  Follow

15    the law as it is now being given to you and reach

a just verdict regardless of the consequences.

          The evidence from which you are to

find the facts consists of the following:

          One:  The testimony of the

20    witnesses;

21          And two:  Documents and other things

22    received as exhibits.

23          The following things are not

24    evidence:  Statements, arguments and questions of

the lawyers for the parties in the case,

objections by lawyers, any testimony I told you

to disregard, and anything you saw or heard or

you may see or hear about this case outside the

5    courtroom.

You must make your decision based

only on the evidence that you saw and heard in

Court.  Do not let rumors, suspicions or anything

else you may have seen or heard outside the court

10   influence your decision in any way.

You should use your common sense in

weighing the evidence.  Consider it in light of

your everyday experience with people and events

and give it whatever weight you believe it

15   deserves.  If your experience tells you that

certain evidence reasonably leads to a

conclusion, you are free to reach that

conclusion.

There are rules that control what

20   can be received into evidence.  When a lawyer

21   asks a question or offered an exhibit into

22   evidence and a lawyer on the other side thought

23   it was not permitted by the Rules of Evidence,

24   that lawyer may have objected.  This simply means

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

the lawyer requested that I make a decision on a
particular rule of evidence.

You should not be influenced by the
fact that an objection was made.  Objections to

5    questions are not evidence.

Lawyers have an obligation to their
clients to make objections where they believe the
evidence being offered is improper under the
Rules of Evidence.  You should not be influenced

10   by the objection or by the Court's ruling on it.

If the objection was sustained,
ignore that question.  If it was overruled, treat
the answer like any other.

If you were and you were instructed

15   that some item of evidence was received for a
limited purpose only you must follow that
instruction.

Also, if certain testimony or other
evidence was ordered struck from the record or

20   you were instructed to disregard the evidence, do

21   not consider any testimony or other evidence that

22   was struck or excluded.  Do not speculate about

23   what a witness might have said or what an exhibit

24   might have shown.

XpertUniverse has the burden in this
civil case to prove every essential element of
the claims for patent infringement and fraudulent
concealment by a preponderance of the evidence.

5    If XpertUniverse should fail to establish any
essential element of a claim by a preponderance
of the evidence, you should find for Cisco as to
that claim.

Established by preponderance of the

10   evidence means evidence which, as a whole, shows
that the facts sought to be proved is more
probable than not.  In other words, preponderance
of the evidence means such evidence as when
considered and compared with the evidence opposed
to it, or such evidence has more convincing force

15   to it, or such evidence has more convincing force
and produces, in your mind, belief that what is
sought to be proved is more likely true than not
true.

To say it differently, if you were

20   to put the evidence favorable to XpertUniverse

21   and the evidence favorable to Cisco on opposite

22   sides of the scales, XpertUniverse would have to

23   make the scales tip somewhat on its side in order

24   to prevail on the claim.  The standard does not

require proof to an absolute certainty since

proof to an absolute certainty is seldom possible

in any case.

In determining whether any fact at

5   issue has been proved by a preponderance of the

evidence, unless otherwise instructed, you may

consider the testimony of all witnesses

regardless of who may have called them, and all

exhibits received into evidence, regardless of

10  who may have produced them.

Cisco has the burden of establishing

the essential elements of the affirmative

defenses, namely invalidity of the patents.  You

may have heard the term proof beyond a reasonable

15  doubt.  That is a stricter standard applicable in

criminal cases.

It does not apply in civil cases

such as this.  You should, therefore, put it out

of your minds.

20  The certain counterclaims, which I

21  will discuss later, namely the invalidity, the

22  patent claims, require proof by clear and

23  convincing evidence.  Clear and convincing

24  evidence is evidence that produces in your mind a

firm belief or conviction that the allegations
sought to be proved by the evidence are true.

Clear and convincing evidence
involves a higher degree of persuasion that is
5   necessary to be the preponderance of the evidence
standard.  The standard does not require proof to
an absolute certainty since proof to an absolute
certainty is seldom possible in any case.

The only claims that require clear
10  and convincing evidence are patent invalidity,
including anticipation and obviousness.  All of
the remaining claims that XpertUniverse claims
are to be proved under the preponderance of the
evidence standard.

15  Now, generally speaking, there are
two types of evidence presented during a trial.
Direct evidence and circumstantial evidence.

Direct evidence is testimony of a
person who asserts a claim to have actual
20  knowledge of a fact such as an eyewitness.

21  Indirect or circumstantial evidence
22  is proof of a chain of facts and circumstances
23  indicating the existence or nonexistence of a
24  fact.  The law generally makes no distinction

between the weight or value to be given to either

direct or circumstantial evidence.

A greater degree of certainty is not

required of circumstantial evidence.  You should

5    consider both kinds of evidence, and you're

required to find the facts in accordance with the

preponderance of the evidence of all of the

evidence in the case, both direct and

circumstantial.

10    You are to decide how much weight to

give any evidence.  If your experience tells you

certain evidence reasonably leads to a

conclusion, you are free to reach that

conclusion.

15    In deciding what the facts are, you

may have to decide what testimony you believe and

what testimony you do not believe.  You are the

sole judges of the credibility of the witnesses.

Credibility means whether a witness

20    is worthy of belief.  You may believe everything

21    a witness said, or only part of it or none of it.

22    In deciding what to believe, you may

23    consider a number of factors, including the

24    following:  The opportunity and the ability of

the witness to see, or hear or know the things

the witness testifies to.

The quality of the witness'

understanding and memory.

5          The witness' manner while

testifying.

Whether the witness has an interest

in the outcome of the case or any motive, bias or

prejudice.

10          Whether the witness was contradicted

by anything the witness said or wrote before

trial or by other evidence.

How reasonable the witness'

testimony is when considered in light of the

15     other evidence you believe, and any other factors

that bear on believability.

The weight of the evidence to prove

a fact does not necessarily depend on the number

of witnesses who testify, but what is more

20     important is how believable the witnesses were

21     and how much weight you think the testimony

22     deserves.

23          You have heard testimony containing

24     opinions from witnesses.  In weighing this

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

opinion testimony, you may consider the witness'

qualifications, the reasons for their opinions,

and the reliability of the information supporting

those opinions, as well as the factors I've

5    previously mentioned for weighing the testimony

of any other witness. The opinion testimony

should receive whatever weight and credit, if

any, you think appropriate, given all the other

evidence in the case.

10              In deciding whether to decide to

rely on an opinion of a witness, you may consider

any bias that the witness may have, including any

bias that may arise from evidence that the

witness has been or will be paid for reviewing

15    the case and testifying or from evidence that the

witness testifies regularly and makes a large

portion of his or her income from testifying in

Court.

              You, as I have said, are the sole

20    judges of the credibility of the witnesses and

21    the weight their testimony deserves.  You may be

22    guided by the appearance and the conduct of a

23    witness or by the manner in which a witness

24    testified, or by the character of the testimony

given, or by evidence contrary to the testimony.

You should carefully examine all the testimony given, the circumstances under which each witness has testified, and every manner in

5   evidence tending to show whether a witness is worthy of belief.  Consider each witness' intelligence, motive and state of mind and the demeanor or manner while testifying.

Consider the witness' ability to

10  observe the matters as to which the witness has testified and whether the witness impressed you as having an accurate recollection of these matters.

Also, consider any relation each

15  witness may have with either side of the case, the manner in which witness might be affected by the verdict and the extent to which the testimony of each witness is either supported or contradicted by other evidence in the case.

20  Inconsistencies or discrepancies in

21  the testimony of a witness or between the

22  testimony of different witnesses may or may not

23  cause you to discredit such testimony.  Two or

24  more persons seeing an event may see or hear it

differently.

In weighing the effect of the discrepancy always consider whether it pertains to a matter of importance or an unimportant

5    detail and whether the discrepancy results from innocent error or intentional falsehood.  After making your own judgment, you will give the testimony of each witness such weight, if any, that you think they may think it deserves.

10    In short, you may accept or reject the testimony of any witness in whole or in part.

In addition, the weight of the evidence is not necessarily determined by the number of witnesses testifying to the existence

15    or nonexistence of any fact.  You may find that the testimony of a small number of witnesses as to any fact is more credible than the testimony of a large number of witnesses to the contrary.

During the trial, certain testimony

20    has been presented by way of deposition.  The

21    deposition consisted of sworn recorded answers to

22    questions asked of the witness in advance of the

23    trial by attorneys for the parties to the case.

24    The testimony of a witness who, for some reason,

was not present to testify from the witness stand

may be presented in writing under oath or on a

videotape.  Such testimony is entitled to the

same consideration.  It is to be judged as to

5    credibility and weighed and otherwise considered

by you, insofar as possible, in this same manner

as if the witness had been present and had

testified from the witness stand.

A witness may be discredited or

10   impeached by contradictory evidence or by

evidence that at some other time the witness has

said or done something, or has failed to do or

say something, that is inconsistent with the

witness' present testimony.  A witness may be

15   discredited or impeached by evidence that the

character of the witness for truthfulness is bad.

If you believe any witness has been

impeached and thus discredited, you may give the

testimony of that witness such credibility, if

20   any, as you think it deserves.  If a witness is

21   shown knowingly to have testified falsely about

22   any material matter, you have a right to distrust

23   such witness' other testimony, and you may reject

24   all its testimony of that witness or give it such

credibility as you may think it deserves.

An act or omission is knowingly done if it was done voluntarily and intentionally and not because of a mistake, or accident or other

5   innocent reason.

Evidence that at some other time, while not under oath, a witness who is not a party to this action has said or done something inconsistent with the witness' testimony at the

10  trial may be considered for the sole purpose of judging the credibility of the witness.  However, such evidence may never be considered as evidence of proof of the truth of any such statement.

Where the witness is a party to the

15  case and by such statement or other conduct omits some fact or facts against the witness' interest, then such statement or other conduct, if knowingly made or done, may be considered as evidence of the truth of the fact or facts so

20  admitted by such party as well as for the purpose

21  of judging credibility of the party as a witness.

22  An act or omission is knowingly done

23  if it was down voluntarily and intentionally and

24  not because of a mistake, or accident or other

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

innocent reason.

Now, I'm going to go to the law that relates to the actual claims in this case. XpertUniverse claims that it was harmed because

5    Cisco concealed that XpertUniverse was denied admittance into the SolutionsPlus partner program from April 2006 to January 2007.

To establish this claim, XpertUniverse must prove the following six

10   elements:  The first -- there's four alternatives -- that Cisco disclosed some facts to XpertUniverse, but intentionally failed to disclose another important fact, making the disclosure deceptive;

15   Or that Cisco intentionally failed to disclose an important fact that was known only to it and that XpertUniverse could not have discovered;

Or that Cisco and XpertUniverse were

20   partners and Cisco intentionally failed to

21   disclose an important fact to XpertUniverse;.

22   Or that Cisco actively concealed an

23   important fact from XpertUniverse or prevented it

24   from discovering that fact.

You should find this first element
has been proved if you find that XpertUniverse
has proven any one of those four.  The other five
elements that are part of fraudulent concealment,

5    two, that XpertUniverse did not know of the
concealed fact; three, that Cisco intended to
deceive XpertUniverse by concealing the fact;
four, that XpertUniverse reasonably relied on
Cisco's deception; five, that XpertUniverse was

10   harmed; and six, that Cisco's concealment was a
substantial factor in causing XpertUniverse's
harm.

A fact is important if it would
influence a reasonable person's judgment or

15   conduct.

XpertUniverse relied on Cisco's
concealment if the concealment caused
XpertUniverse to either; one, forego other
business opportunities or continue working with

20   Cisco; and two, if it would probably not have

21   done so without such concealment.

22              It is not necessary for a

23   concealment to be the only reason for

24   XpertUniverse's conduct.  It is enough if the

concealment substantially influenced

XpertUniverse's choice, even if it was not the

only reason for the conduct.

            You must determine the

5   reasonableness of XpertUniverse's reliance by

taking into account its knowledge and experience.

If you decide that XpertUniverse has proved its

concealment claim against Cisco, you must also

decide how much money will reasonably compensate

10  XpertUniverse for the harm.  This compensation is

called damages.

            The amount of damages must include

an award for all harm that Cisco was a

substantial factor in causing, even if the

15  particular harm could not have been anticipated.

            XpertUniverse must prove the amount

of its damages. However, XpertUniverse does not

have to prove the exact amount of damages that

will provide reasonable compensation of the harm.

20  You must not speculate or guess in awarding

21  damages.

22              Turning to patent infringement.

23  XpertUniverse claims that Cisco infringed Claim 5

24  of XpertUniverse's United States Patent Number

7,3667,709, the '709 patent, and Claim 12 of the
7,499,903 or the '903 patent.

In order to prove direct
infringement, XpertUniverse must prove by a
5   preponderance of the evidence that is more likely
than not that Cisco made, used, sold offered for
sale within or imported into the United States a
product, system, process or method that meets all
the requirements of a claim and did so without
10   permission of XpertUniverse during the time the
'903 and '709 patents were enforced.

You must compare Cisco's accused
products, system, processes and methods with each
and every one of the requirements of a claim to
15   determine whether all the requirements of that
claim are met.

You must determine separately for
each asserted claim whether or not there is
infringement.  Before you can decide many of the
20   issues or patent issues in this case, you will

21   need to understand the role of patent claims.

22         The patent claims are the numbered

23   sentences at the end of each patent.  The claims

24   are important because it is the words of the

claims that define what the patent covers.

The figures and text and the rest of
the patent describe a description and/or examples
of the invention and provide a context for the
5    claims.  But it is the claims that define the
breadth of the patents coverage.

Each claim is effectively treated as
if it were a separate patent and each claim may
cover more or less than another claim.
10   Therefore, what a patent covers depends, in turn,
on what each of the claims covers.

You will first need to understand
what each claim covers in order to decide whether
or not there is infringement of the claim and to
15   decide whether or not the claim is invalid.  The
law says it is my role to define the terms of the
claims and it is your role to apply my
definitions to the issues that you are asked to
decide in this case.

20       Therefore, I have determined the

21   meaning of the claims and I will provide to you
22   my definition of certain claim terms.  You'll get
23   a copy in the binder with the two patents.
24           You must accept my definition of

these words in the claims as being correct.  It

is your job to take these definitions and apply

them to the issues that you are deciding,

including the issues of infringement and

5     validity.

I will now explain how a claim

defines what it covers.  A claim sets forth in

words a set of requirements.  Each claim sets

forth the requirements in a single sentence.

10          If a device or method satisfies each

of these requirements, then it is covered by the

claim.  There can be several claims in a patent.

Each claim may be narrower or broader than

another claim by setting forth more or fewer

15    requirements.

The coverage of a patent is asserted

claim by claim.  In patent law, the requirements

of a claim are often referred to as claim

elements or claim limitations.

20          When a thing such as a product or a

21    process meets all the requirements of the claim,

22    the claim is said to cover that thing and that

23    thing is said to fall within the scope of that

24    claim.  In other words, the claim covers a

product or a process where each of the claim

elements or limitations is present in that

product or process.

Sometimes words in the patent claim

5    are difficult to understand.  And, therefore, it

is difficult to understand what requirements

these words impose.

It is my job to explain to you the

meaning of the words in the claims and the

10   requirements these words impose.  And as I just

instructed you, there are certain specific terms

that I have defined, and you are to apply the

definitions that will be provided to you.

By understanding the meaning of the

15   words of the claim and by understanding that the

words in the claim set forth the requirements a

product or process must meet in order to be

covered by that claim, you will be able to

understand the scope of the coverage for each

20   claim.

21   Once you understand what each claim

22   covers, then you are prepared to decide the

23   issues that you will be asked to decide such as

24   infringement and invalidity.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

As I've mentioned, I will provide
you with an order explaining to you the meaning
of some of the words in the claims in this case.
The order will explain some of the requirements
5    of the claims.

As I've previously instructed you,
you must accept my definition of these words in
the claims as correct.  For any words in the
claim for which I have not provided you with
10   definitions, you should apply their common
meaning.

You should not take my definition of
the language of the claims as an indication that
I have a view regarding how you should decide the
15   issues that you are being asked to decide such as
infringement and invalidity.  These issues are
yours to decide.

The beginning or preamble of certain
claims use the word comprising.  Comprising means
20   including or containing, but not limited to.

21        That is, if you decide that an
22   accused product or the use of an accused product
23   includes all the requirements or steps in that
24   claim, the claim is infringed.  For example, a

claim to a table comprising of a tabletop, legs

and glue would be infringed by a table that

included a tabletop, legs and glue, even if the

table also included wheels on the table's legs.

5          Patent invalidity is a defense to

patent infringement.  Even though the United

States Patent & Trademark Office examiner has

allowed the claims in the patent, you have the

ultimate responsibility for deciding whether the

10    claims of the patent are valid.

          I will now instruct you on the

invalidity issues you should consider as you

consider these issues.  Remember, that Cisco

bears the burden of proving that it is highly

15    probable that the claims of XpertUniverse's

patents are invalid.

          In making your determination as to

whether a patent claim is valid or invalid, you

must consider each patent in each of the claims

20    of the patent separately and individually, as you

21    did when considering whether the claim was

22    infringed or not.  If the evidence is clear and

23    convincing that a claim, in a given patent, fails

24    to meet the essential requirements of the patent

laws, then that patent claim is invalid.

However, if you find that one or more claims of a patent fail to meet the essential requirements of the patent laws, it

5   does not necessarily mean that the remaining claims of that patent are also deficient or invalid.

I think you've heard the term prior art.  Prior art may include items that were

10   publicly known or that had been used or offered for sale, publications or patents that disclose the claimed invention or elements of the claimed invention.  To be prior art, the item or reference must have been made, known, used,

15   published or patented before April 2, 2004 for the '709 patent or January 24, 2005 for the '903 patent.

For the claim to be invalid, because it is not new, Cisco must show that all the

20   requirements of that claim were present in a

21   single, previous device or method that was known

22   of, used or described in a single previous

23   printed publication or patent.

24   We call these things anticipating

prior art.  To anticipate the invention, the

prior art does not have to use the same words as

the claim, but all the requirements of the claim

must have been disclosed, either stated expressly

5    or implied to a person having ordinary skill in

the art and the technology of the invention.  So

that looking at that one reference, that person

could make and use the claimed invention.

In order for someone to be entitled

10   to a patent, the invention must actually be new

and the inventor must not have lost his or her

rights by delaying the filing of an application

claiming the invention. In general, inventions

are new when the identical product system,

15   process or method had not been made, used or

disclosed before.  Anticipation must be

determined on a claim-by-claim basis.

Cisco contends that Claim 5 of the

'709 patent and Claim 12 of the '903 patent are

20   invalid because the claimed inventions are

21   anticipated, or because XpertUniverse lost the

22   right to obtain a patent.  Cisco must convince

23   you of this by clear and convincing evidence that

24   the evidence highly probably demonstrates that

the claims are invalid.

Here is a list of ways that Cisco
can show that the patent claim was not new or
that the patentee lost the right to claim, to

5    patent the claims:  One, an invention is not new
if it was known to or used by others in the
United States before April 2, 2004 for the '709
patent or before January 24, 2005 for the '903
patent.  And an invention is known when the

10   information about it was reasonably accessible to
the public on that date.

Two, XpertUniverse has lost its
right that its claimed invention was already
patented anywhere in the world by anyone else

15   more than a year before April 2, 2004, which is
the effective filing date of the application for
the '709 or more than a year before January 24,
2005, which is the effective filing date of the
application for the '903 patent.

20          An invention was patented by another

21   if the other patent describes the same invention

22   claimed by XpertUniverse to a person having

23   ordinary skill in the technology.

24          Three, XpertUniverse has lost its

right if the claimed invention was publicly used,

sold, or offered for sale in the United States

more than one year before April 2, 2004 for the

'709 patent or more than one year before January

5    24, 2005 for the '903 patent. An invention was

publicly used when it was either accessible to

the public or commercially exploited.  An

invention was sold or offered for sale when it

was offered commercially and what was offered was

10   ready to be patented.  That is, a description to

one having ordinary skill in the field of the

technology could have made and used the claimed

invention even if it was not yet reduced to

practice.

15            Four, an invention is not new if it

was described in the published patent application

filed by another in the United States before

April 2, 2004 for the '709 patent or before

January 24, 2005 for the '903 patent.

20            And five, an invention is not new if

21   the claimed invention was described in a patent

22   granted on an application for patent by another

23   filed in the United States and the application

24   was filed before April 2, 2004 for the '709

patent or before January 24, 2005 for the '903
patent.

Now, even though an invention may
not have been identically disclosed or described
5   before it was made by an inventor, in order to be
patentable, the invention must also not have been
obvious to a person of ordinary skill in the
field of technology of the patent at the time the
invention was made.  Cisco may establish that a
10  patent claim is invalid by showing by clear and
convincing evidence that the claimed invention
would have been obvious to persons having
ordinary skill in the art at the time the
invention was made in the field of expert
15  location collaboration technology.

In determining whether a claimed
invention is obvious, you must consider the level
of ordinary skill in the field of expert location
collaboration technology that someone would have
20  at the time the claimed invention was made, the

21  scope and content of the prior art and any

22  differences between the prior art and the claimed

23  invention.

24        Keep in mind that the existence of

each and every element of the claimed invention

in the prior art does not necessarily prove

obviousness.  Most, if not all, inventions rely

on building blocks of prior art.

5                    In considering whether a claimed

invention is obvious, you may, but are not

required to find obviousness if you find that at

the time of the claimed invention, there was a

reason that would have prompted a person having

10   ordinary skill in the field of expert location

and collaboration technology to combine the known

elements in a way the claimed invention does,

taking into account such factors as whether the

claimed invention was merely the predictable

15   result of using prior art elements according to

their known functions, whether the claimed

invention provides an obvious solution to a known

problem in the relevant field, whether the prior

art teaches or suggests a desirability to combine

20   elements claimed in the invention, whether the

21   prior art teaches a way from combining the

22   elements in the claimed invention, whether it

23   would have been obvious to try the combination of

24   elements such as when there is a design need or

market pressure to solve a problem, there are a

finite number of identified predictable

solutions, and whether the change resulted more

from design incentives or other market forces.

5          To find that prior art rendered the

invention obvious, you must find that the prior

art provided a reasonable expectation of success.

Obvious to try is not sufficient in unpredictable

technologies.

10          In determining whether the claimed

invention is obvious, consider each claim

separately.  Do not use hindsight.

          That is, consider only what was

known at the time of the invention.  In making

15   these assessments, you should take into account

any objective evidence sometimes called secondary

considerations that may have existed at the time

of the invention, and afterwards that may shed

light on the obviousness or not of the claimed

20   invention, such as:

21          whether the invention was

22   commercially successful as a result of the merits

23   of the claimed invention (rather than the result

24   of the design need or market pressure,

advertising or similar activities;.

Whether the invention satisfied a

long-felt need;

Whether others had tried and failed

5    to make the invention;

Whether others invented the

invention in roughly the same time;

Whether others copied the

invention;

10    Whether there were changes or

related technologies or market needs

contemporaneous with the invention;

Whether the invention achieved

unexpected results;

15    Whether others in the field praised

the invention;

Whether persons having ordinary

skill in the art in the invention expressed

surprise or disbelief regarding the invention;

20    Whether others sought or obtained

21    rights to the patent from the patentholder;

22    And whether the inventor proceeded

23    contrary to accepted wisdom in the field.

24    The presence or absence of any of

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

these factors is not necessarily determinative.

In considering whether the claimed invention was obvious, you must first determine the scope and content of the prior art.  The scope and content

5   of prior art in deciding whether the invention was obvious includes prior art in the same field as the claimed invention, regardless of the problem addressed by the item of reference.  And prior art from different fields that a person of

10   ordinary skill in the art using common sense might combine, if familiar, so as to solve the problem by fitting together the pieces of a puzzle.

When a party attacking the validity

15   of a patent relies on prior art, which was specifically considered by the examiner during the prosecution of the application leading to the issuance of the patent, that party bears the burden of overcoming the deference due a

20   qualified government agency, official presumed to

21   have performed his or her job.

22                In deciding what the level of

23   ordinary skill in the field of call center

24   technology is, you should consider all the

evidence introduced at trial including, but not
limited to the levels of education, experience of
the inventor and other persons actively working
in the field, the types of problems encountered

5    in the field, prior art solutions to those
problems, rapidity within which innovations are
made and sophistication of the technology.

          If you find that Cisco infringed
Claim 5 of the '709 patent or Claim 12 of the

10    '903 patent, you must then consider what amount
of damages to award to XpertUniverse.

          I will now instruct you about the
measure of damages.  By instructing you on
damages, I am not suggesting which party should

15    win this case on any issue.

          The damages you award must be
adequate to compensate XpertUniverse for the
infringement.  They are not meant to punish an
infringer.  Your damages awards, if you reach

20    this issue, should put XpertUniverse in

21    approximately the same financial position that it
22    would have been in had the infringement not
23    occurred.

24          XpertUniverse has the burden to

establish the amount of damages by a

preponderance of the evidence.  In other words,

you should award only those damages that

XpertUniverse establishes that it more likely

5    than not suffered.

In this case, XpertUniverse seeks a

reasonable royalty.  A reasonable royalty is

defined as the amount of money XpertUniverse and

Cisco would have agreed upon as a fee for use of

10   the invention at the time prior to when

infringement began.

I'll give you more detailed

instructions regarding damages shortly.  Note,

however, that XpertUniverse is entitled to

15   recover no less than a reasonable royalty for

each infringing sale or use.

Now, if you said, fine, that

XpertUniverse has established infringement,

XpertUniverse is entitled at least -- to at least

20   a reasonable royalty to compensate it for that

21   infringement.  You must award XpertUniverse a

22   reasonable royalty for all infringing sales.

23   A royalty is a payment made to a

24   patentholder in exchange for the right to make,

use or sell the claimed invention.  A reasonable

royalty is the amount of royalty payment that

XpertUniverse and Cisco would have agreed to in a

hypothetical negotiation taking place at a time

5        prior to when the infringement first began.

In considering this hypothetical

negotiation, you should focus on what the

expectations of XpertUniverse and Cisco would

have been had they entered into an agreement at

10       that time and had they acted reasonably in their

negotiations.

In determining this, you must assume

that both parties believed the patent was valid

and infringed, and XpertUniverse were willing to

15       enter into an agreement.  A reasonable royalty

you determine must be a royalty that would have

resulted from the hypothetical negotiation and

not simply a royalty either party would have

preferred.

20       Evidence of things that happened after

21   the infringement first began can be considered in

22   evaluating the reasonable royalty only to the

23   extent that the evidence aids in assessing what

24   royalty would have resulted from the hypothetical

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

negotiation.

Although the evidence of the actual

profits of the alleged infringer made may be used

to determine the anticipated profit at the time

5    of the hypothetical negotiation, the royalty may

not be limited or increased based on the actual

profits the alleged infringer made.

In determining the reasonable

royalty, you should consider all the facts known

10   and available to the parties at the time the

infringement began.  Some of the kinds of factors

that you may consider in making your

determination are, the royalties received by the

patentee for the licensing of the patent-in-suit

15   providing or tending to prove and establish

royalty.

The rates paid by the licensee for

the use of other patents comparable to the

patents-in-suit.  The nature and scope of the

20   license as exclusive or non-exclusive or as

21   restricted or non-restricted in terms of

22   territory or with respect to whom the

23   manufactured product may be sold.

24             The licensor's established policy

and marking program to maintain his or her patent

monopoly by not licensing others, use the

invention or by granting licenses under special

conditions to design to preserve that monopoly.

5              The commercial relationship between

the licensor and the licensee, such as whether

they are competitors in the same territory, the

same line of business, or whether they are

inventor and promoter.

10             The effect of selling the patented

specialty and promoting sales of other products

of the licensee and existing value of the

invention to the licensor (an) as a generator of

sales of its non-patented items and the extent of

15   such derivative or convoyed sales.

               The duration of the patent and the

term of the license, the established

profitability of the product made under the

patents, its commercial success, and its current

20   popularity.  The utility and advantages of the

21   patented property under the old modes or devices,

22   if any, that had been used for working out

23   similar results.  The nature of the patented

24   invention, the character of the commercial

embodiment of it as owed and produced by the

licensor and the benefits to those who have used

the invention.  The extent to which an infringer

has made use of the invention and any evidence

5    probative of the value of that use.  The portion

of the profit or of the selling price that may be

customary in a particular business or in

comparable business to allow for the use or of

the invention or analogous inventions.  The

10   portion of the realizable profits that should be

credited to the invention as distinguished from

non-patented elements, the manufacturing process,

business risks, or significant features or

improvements added by the infringer.

15          The opinion and testimony of

qualified experts, the amount that a licensor

such as the patentee and the licensee, such as

the infringer, would have agreed upon at the time

the infringement began if both had been

20   reasonably and voluntarily trying to reach an

21   agreement.  That is, the amount which approved

22   licensee who desired as a business proposition to

23   obtain a license to manufacture and sell a

24   particular article embodying the patented

invention would have been willing to may the

royalty and yet be able to make a reasonable

profit and which amount would have been

acceptable by approved patentee who is willing to

5    grant a license.

No one factor is dispositive and you

did and should consider the evidence that has

been presented to you in this case on each of

these factors.  You may also consider any other

10   factors which, in your mind, would increase or

decrease the royalty the infringer would have

been willing to pay and the patent holder would

have been willing to accept, acting as normally

prudent businesspeople.

15   The final factor establishes the

framework which you should use in determining the

reasonable royalty.  That is, the payment that

would have resulted from a negotiation between

the patentholder and the infringer and taking

20   place in the time prior to when the infringement

21   began. (In)

22   In determining the amount of

23   damages, you must determine when the damages

24   began.  If you find that the '709 or '903 patents

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

were granted before the infringing activity

began, damages should be calculated as of the

date you determine that the infringement began.

        If you find that the '709 or '903

5    patents were granted after the infringing

activity began, damages should be calculated as

of the date the patent issued.

        I have about three more pages.  I'm

going to give -- they have to do with your

10   deliberations.  I'm going to give them to you

after the attorneys have done their closing

argument.

        So I appreciate your attention

during the last 45 minutes.  We're going to take

15   a short break so you can get re-invigorated for

the closing arguments.  So I'd like to get you

back here in about ten minutes.  All right?  Can

we take the jury out, please.

        (The jury was excused for a short

20   recess.)

21         THE COURT:  It's amazing to me when

22   you actually read them how much redundancy

23   remains within.

24         Are there any objections to the

instructions as read?

    MR. CANTINE:  Not from the

plaintiffs, your Honor.

    MR. SCHUMAN:  No, your Honor.

5    THE COURT:  All right.  Do we have

wherever we are with this jury verdict or verdict

form, I guess?

    MR. SOBEL:  I think we do.  We

agreed to some things.  We have a few things that

10 we have not agreed on

    THE COURT:  Well, time has run out.

    MR. SOBEL:  Yes.

    THE COURT:  So let's have them.

    MR. SOBEL:  Well, I will give you a

15 clean red line and perhaps we can just go through

it and tell you the things we've agreed to and

the things that are still --

    THE COURT:  You know, particularly,

Mr. Cantine, if you like want to leave --

20    MR. CANTINE:  Thank you, your Honor.

21    THE COURT:  And, Mr. Schuman, you,

22 too, if you want.

23    MR. SCHUMAN:  Thank you, your Honor.

24    THE COURT:  We'll resolve the case

Without you.

   MR. SOBEL:  So the first page --

   THE COURT:  Just hold on a second,

Mr. Sobel.  I appreciate what you're citing.

5   All right.  I see what number two

is.  Who has got the underlined version?

   MR. SOBEL:  So our version was the

one that was stricken by Cisco.

   THE COURT:  Okay.  So,

10 Mr. Blumenfeld, why is the underlined version

different than the stricken version?

   MR. BLUMENFELD:  Because like every

other question in the verdict sheet, we think

that it ought to include that XpertUniverse has

15 met its burden of proof on the damages issue.

   THE COURT:  That's the issue,

whether burden of proof should be in there?

   MR. BLUMENFELD:  That's the main

issue.  We put the burden of proof in there.

20 They just said essentially how much money.

21   THE COURT:  I agree.  I think it

22 ought to be consistent and I do see preponderance

23 of the evidence, preponderance of the evidence,

24 clear and convincing evidence.

   Hawkins Reporting Service
  715 N. King Street - Wilmington, Delaware  19801

MR. SOBEL:  I just want to make one

point.  We think that it's repeating the burden

from the elements of the claim already prove that

you require by a preponderance that harm has

5  occurred as a result of the fraud.  So to put --

THE COURT:  But you do have to prove

the loss by a preponderance of the evidence;

right?

MR. SOBEL:  Well, in the element of

10  the claim, you have to prove that it was a --

that the concealment was -- that XpertUniverse

was harmed by a preponderance of the evidence,

and that the concealment was --

THE COURT:  All right.  Okay.  All

15  right.  We'll go the with underlined version that

has preponderance of the evidence.

Okay.

MR. SOBEL:  Our position was that we

wanted the part that does not have preponderance.

20  THE COURT:  Right.  I understand.

21  Sorry.  I meant -- I'm ruling for what

22  Mr. Blumenfeld said.

23  MR. SOBEL:  I just wanted to make

24  sure I understand something.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

THE COURT:  Yes.  Okay.

Infringement of the patents, but I thought

virtual --

MR. SOBEL:  Virtual Expert

5    Management, we -- we removed it from the damages

portion because it was, based on their

representation, the Virtual Expert Management had

no sales.  We think there has been evidence at

trial that proved that Virtual Expert Management

10    does infringe because it's -- it uses Expert

Advisor.

THE COURT:  Yes.  Mr. Blumenfeld?

MR. BLUMENFELD:  And my

understanding of the evidence that they put in

15    was that Dr. Nourbakhsh testified that Expert

Advisor and Virtual Expert Management were used

together and that was the basis for his

infringement, but it was never a separate Virtual

Expert Management infringes.

20    THE COURT:  Well, my recollection

21    is, I thought in the plaintiff's case, yes, there

22    was no mention of Virtual Expert Management.  I

23    thought the testimony --

24    MR. SOBEL:  Actually --

THE COURT:  I thought Mr. Bratic,

for example, said, you know, RemoteXpert, Pulse

and Expert Advisor.

MR. SOBEL:  There was no damages of

5      virtual expert -- the representation was they had

no sales (zcheck check.

THE COURT:  Right.  Right.  Okay.

But I guess I don't remember --

MR. SOBEL:  And so you might

10     remember, there was an issue at the trial whether

they're still selling actually Virtual Expert

Management and, you know, we've alleged that it's

infringed and we think there's evidence that

supports a finding in the record and that's why

15     we put it in the verdict.

THE COURT:  Well, did Dr. Nourbakhsh

say during his testimony that Virtual Expert

Management infringed the patent, because I don't

think he did.

20         MR. SOBEL:  Well, right, but during

21     the --

22         THE COURT:  Okay.  All right.  That

23     right is enough.  I'm not going to ask      him

24     about something that he didn't opine infringed.

MR. SOBEL:  All right.

THE COURT:  So I see that probably

takes care of question number two there, too.

MR. BLUMENFELD:  On C, your Honor, I

5    think -- I don't know which version you have, but

I think we've agreed that there will be four

questions and the anticipation question will say,

is invalid due to anticipation.  The obviousness

question will say, is invalid because.

10    THE COURT:  All right.  Mr. -- so

Expert Advisor, Mr. Sobel?

MR. SOBEL:  Okay.  And we just come

to the end, which is the --

THE COURT:  All right.  So,

15    Mr. Sobel, you heard, I understand, you know,

you're trying to do two things at once, but you

heard what Mr. Blumenfeld said.

MR. SOBEL:  About our agreement?

Yes.

20    THE COURT:  All right.  Okay. Just

21    checking.

22    MR. SOBEL:  Yes.

23    THE COURT:  So the last one is

24    damages for Cisco's patent infringement.  Okay.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

Wait.  Right.  So we got the preponderance of the

evidence.

                  MR. BLUMENFELD:  Same issue as with

the first question.

5                 THE COURT:  Okay.  So, yes.  So I I

must be consistent there.

                  MR. SOBEL:  When you have

infringement, you should recover.  You know --

                  THE COURT:  I'm sorry.  What are you

10   saying?

                  MR. SOBEL:  When there is

infringement, we're entitled to recover.

                  THE COURT:  Yes.

                  MR. SOBEL:  Right?

15                THE COURT:  Right.

                  MR. BLUMENFELD:  Right.  I think you

just told the jury that question here is   how

much have they proved that they should recover.

                  THE COURT:  Right.

20                MR. SOBEL:  Okay.  All right.  So

21   we're keeping --

22                THE COURT:  Yes.  Let's go with the

23   underlined version.  So get rid of Virtual Expert

24   Management.

So, Mr. Rovner, are you with us?  I

assume you're the -- I like the idea of one

throat to choke.

MR. DAMSGAARD:  A new phrase is

5    born.

MR. SOBEL:  I will coordinate

with --

THE COURT:  Okay.

MR. ROVNER:  I was just going to say

10   in the instructions you just read, it does not

say damages by a preponderance of the evidence,

so I think by putting that in, it's going to be

inconsistent.

MR. BLUMENFELD:  I thought you said

15   they had to prove all elements of their case by a

preponderance of the evidence.

THE COURT:  Well, I would have

thought that I did, too, but --

MR. ROVNER:  But I don't think in

20   the damages section it says preponderance of the

21   evidence, and I think -- well, I believe that's

22   for a good reason.

23        THE COURT:  XpertUniverse has the

24   burden to establish the amount of its damages by

a preponderance of the evidence, page 34.

MR. ROVNER:  That's what I said.

Okay.  If that's in there, then I missed it.  I

stand corrected.

5          MR. SOBEL:  On VR ^ section ^ sex

13, it says, we must prove the amount of damages.

XpertUniverse does not have to prove the exact

amount of damages.

THE COURT:  Well, right, but that

10   does not mean -- you have the preponderance, you

have to prove damages.  I mean, you know, they're

going to be able to round off.  It's not

$69,146,391, it's 70 million.

MR. SOBEL:  Okay.

15          MR. BLUMENFELD:  Your Honor, one

last question.  I think we have everything done.

One last question.  What would you like the title

to be?  Just jury verdict form?

THE COURT:  Yes.  That would be

20   good.

21          MR. SOBEL:  Okay.

22          THE COURT:  Or, actually, just --

23          MR. BLUMENFELD:  Verdict form?

24          THE COURT:  Jury verdict.

MR. BLUMENFELD:  Jury verdict?

MR. SOBEL:  Jury verdict.

THE COURT:  Jury verdict form.

Let's spend a lot of billable hours working on

5    this.

Okay.  So we got that under way.

And hopefully at the next break, after Mr.

Cantine is finished, we'll have -- there will be

a clean copy.  Right?

10    MR. ROVNER:  Yes, that's fine.

THE COURT:  Okay.  Let me just -- I

you, you know, I've got about -- I'm just going

to go out for two or three minutes.  Okay?

MR. SOBEL:  Yes.

15    THE COURT:  Thank you.

(Short recess taken.)

-  -  -

(Proceedings resumed after the short

recess.)

20    THE COURT:  Are you prepared, Mr.

21    Cantine?

22    MR. CANTINE:  I am.

23    THE COURT:  All right.  Let's go get

24    the jury.

(The jury entered the courtroom and
took their seats in the box.)

THE COURT:  Members of the Jury,
welcome back.

5          Everyone be seated.  Mr. Cantine?

MR. CANTINE:  May it please the
Court.  Well, we're almost over.  I want to thank
you for your patience.  I want to thank you for
your diligence.  You've been a very attentive
10     jury.  I couldn't ask for anything more.

I also want to thank you on behalf
of my client, XpertUniverse and Victor Friedman.
You met them.  You met him.  It has been an honor
representing him.  It has been a long road, but
15     we're finally here.  And this is   part of
something important.  This is still   one of the
only few places in the world where a small
company like XpertUniverse can bring its claim
against a much bigger competitor, like Cisco.

20          And we've been together for about a

21     week-and-a-half and you heard a lot of testimony.

22     You've seen a lot of evidence.  My job is to try

23     to connect the dots for you a little bit here.

24          I want to go back over what I told

you in the opening, what I promised you was going
to come in, and I want to show you that we proved
our case.

Now, XpertUniverse was built on

5    vision.  You heard that from Mr. Friedman.  You
heard it from Ms. Eiss.  You heard it from John
Steinhoff.  They started out trying to do
something in the education market.  They wanted
to help kids, but, unfortunately, the money

10   wasn't there, so they had to switch to the
corporate side.

And they developed technology.  They
developed technology that companies like Cisco
didn't have, valuable technology.  And Cisco came

15   knocking on our door.

Now, it wasn't because -- it wasn't
out of goodness of their hearts.  All right.
It's because they wanted something.  They wanted
the technology my client had developed.  They

20   wanted to make money with     it.


21         As Mr. Hernandez himself told you

22   yesterday, Cisco saw the XpertUniverse technology

23   as a driver of revenue.  It was going to make

24   Cisco money.

So who came knocking on that door?

Do you remember the name Laurent Philonenko?  He

was the former CEO of Genesys.  He was the one

that convinced XpertUniverse to abandon Genesys

5    and come work with Cisco.  And he was the head of

Cisco's Call Center Business Unit, the CCBU.

You've seen that acronym a lot.  He was the boss.

That's what Mr. Hernandez called him yesterday.

And Cisco told you during opening

10    statements, they told you Mr. Philonenko was

going to be here.  They said Mr. Laurent

Philonenko, you will hear from him.  He will be

here at trial.  But he never showed up, did he?

Laurent Philonenko, head of the CCBU.  Mr.

15    Hernandez's boss.  Someone copied on a lot of the

e-mails you've seen.  Never showed up in the

last-week-and-a-half.

Now, maybe he has got a good reason.

I don't know.  But he never came here to

20    Wilmington to tell you what happened and what

21    happened on his watch.

22    Now, you heard from Mr. Friedman.

23    He talked about that first meeting, that phone

24    call, the flying out to San Francisco to meet

with Mr. Philonenko, and how Mr. Philonenko

promised him that he would support the

partnership.  And Mr. Friedman trusted

Mr. Philonenko.  He believed in him.  And the

5   parties signed that nondisclosure agreement.  We

showed you that, that secrecy agreement that I

talked about in the opening.

             And XpertUniverse and Cisco worked

together for two-and-a-half years.  There was no

10   dispute about that, two-and-a-half years.

             Now, you heard a lot of argument

from Cisco suggesting, we had nothing of value.

Vaporware, it was all made up.  And I asked you

when we were here a week-and-a-half ago to use

15   your common sense.  Does it make any sense to you

that a company Cisco's size, one of the largest

technology companies in the world, would come

work with XpertUniverse for two-and-a-half years

if they had nothing to offer?  It just does not

20   make any sense.

21             What also doesn't make any sense is

22   why were they so worried that we were going to go

23   back and work with Genesys?  Remember, Genesys

24   was their big competitor, but they didn't want us

going back to work for Genesys.  Why?  Because we
had something of value.  They had something of
value that Genesys might use to their detriment.

Now, Mr. Friedman and Mr. Steinhoff,

5      they told you all about how the original platform
was built on that Genesys component, that router
thing.  You heard a lot about that.  And they
told you about how that Genesys-based integration
was built and done, how they are weeks away from

10     going to market with Genesys.  They had that
product finished.  But Mr. Philonenko, he's the
one that convinced him to say, no, don't work
with Genesys.  Come work with me over at Cisco.
We're bigger.  We're better.  I will take care of

15     you.

Now, they promised Mr. Philonenko
would come here and tell you what happened, but
he didn't show up.  Instead, we got Mr.
Hernandez.

20         So what did we learn from him

21     yesterday?  There are two important things I want
22     you to remember, a few things we learned from Mr.
23     Hernandez yesterday.  They're very important.
24         Number one, he finally admitted that

he never told XpertUniverse about the denial of

SolutionsPlus in April of 2006.  And another

important thing.  He finally admitted that the

Governance Council still never went back and

5    voted again on XpertUniverse, not once.  They

voted in April of 2006, outcome denied.  That

Governance Council never met again as it relates

to XpertUniverse.  That's what Mr. Hernandez told

us yesterday.

10              Now, he told you about all of these

times he allegedly went back to try to convince

Carl WEES see to get XpertUniverse into that

program, but, again, he admitted here, yesterday,

that Governance Council never met again for

15   XpertUniverse.

              So why didn't anybody tell

XpertUniverse about this denial?  Why didn't

anybody tell XpertUniverse the Governance Council

never went back and met again?  Because they did

20   not want XpertUniverse to go back and work with

21   Genesys.  It's as simple as that.  That's what

22   all the evidence has shown.

23              Mr. Philonenko, he came from

24   Genesys.  He knew what Genesys had.  He knew what

Genesys was capable of.  And Cisco was willing to

do anything to keep my client from going back and

working with Genesys, their big competitor.  And

that directive came from Mr. Philonenko early on

5    in the relationship.              I'm going to

show you PTX-428.  That's Plaintiff's

Exhibit 428.  And you're going to have all of

these exhibits back with you in the jury room,

but I will try to walk you through them quickly.

10            And this is an e-mail, March 2005,

Laurent Philonenko to Ken Jordan, John Hernandez

and others.

And what does he say?  He says, at

this juncture, the most important is to show

15   something and get Genesys out of the picture.

The most important, get Genesys out of the

picture.

Cisco wanted us for themselves and

if they couldn't have it, they didn't want

20   anybody else to have it either.  And the

21   companies work together for two-and-a-half years

22   and the evidence has shown, my client finished

23   that integration.  They finished it in November

24   of 2006.  That's what Mr. Friedman told you and

that's what Ms. Eiss told you.

Now let's take a look at all the
people XpertUniverse dealt with over that
two-and-a-half year period.  These are all the
5   people that are copied on the various e-mails
you've been seeing over the last-week-and-a-half.
Not a single one of them, not a single one ever
stepped up to the plate and told my client they
had been denied SolutionsPlus back in April of
10   2006.  Not a single one stepped up to the plate
and said, oh, and by the way, that Governance
Council, they never met again.  They never even
considered any application for XpertUniverse.

But before we get to them, let's
15   talk about some of the people we did hear from.
Remember Carl WEES see.  He's the one that sat on
the Governance Council.  He was one of the ones I
told you in the beginning was one of the most
important people in this case.  But Cisco didn't
20   bring him here to Wilmington either, but we

21   showed you his deposition testimony.  And I don't
22   know if you remember, but we asked him, we asked
23   him specifically, knowing what you know now, do
24   you think someone should have told XpertUniverse?

Do you think you should have told XpertUniverse?

Let's hear what he has to say.

(Videotaped deposition excerpt played
as follows.)

5          "Question:  So would you expect it
to be an important consideration for a small
company trying to partner with Cisco to to be
given entry into the SolutionsPlus program?

"Answer:  Many companies probably
10   thought it was a benefit to be in that program.

"Question:  So it would have been
important to XpertUniverse, too, right?

"Answer:  I would assume.  I just
don't know.

15          "Question:  If you were in
XpertUniverse's position, would you want to
know the outcome of that Governance Council
meeting?

"Answer:  Yes."

20          (End of videotaped deposition

21   excerpt).

22          MR. CANTINE:  I agree with him.  I

23   would have wanted to know.  Put yourself in

24   XpertUniverse's shoes.  Wouldn't you have wanted

to know, too?

It's about doing the right thing,
right, when no one is looking.  That's what we
talked about a week-and-a-half ago.

5          Now, you also heard from Mr.
Hernandez yesterday about how he allegedly kept
going back to Mr. WEES see, trying to convince
him to get XpertUniverse into that SolutionsPlus
program.  And I don't know if you remember, but
10    he talked about two things.  He talked about
Citibank and Fed-Ex.  Those were the two big
quote, unquote "lighthouse accounts" he kept
talking about and how he kept going back to
Mr. WEES EE on those, trying to get XpertUniverse
15    over the finish line.  Let's see what Mr. WEES EE
had to say about that.

(Videotaped deposition excerpt
played as follows.)

"Question:  So we've handed you what
20    we marked as Plaintiff's Exhibit 181.  Please

21    take a moment to review that.

22          Answer:  Okay.

23          "Question:  And this is an e-mail

24    you received from Mr. Hernandez on October 4th,

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

2006, correct?

      "Answer:  It's dated that, yes.

      "Question:  You don't have any reach

to believe you didn't receive it, do you?

5      "Answer:  No.

      "Question:  And the subject begins

XpertUniverse.  So this is an e-mail from Mr.

Hernandez to you about six after XpertUniverse

had been denied SolutionsPlus, right?

10      "Answer:  Yes.  Well, six months

after the meeting took place.

      "Question:  Okay.  So this is

roughly six months later, Mr. Hernandez is -- is

coming back to you with regard to XpertUniverse,

15  right?

      "Answer:  Yes.

      "Question:  Okay.  And this says,

Carl, unfortunately, we did not get a chance to

finish AIG conversation on XU last week.  You had

20  indicated your biggest concern was around

21  near-term and long-term plans in this space.  Do

22  you see that?

23      "Answer:  Yes.

24      "Question:  Mr. Hernandez continues,

our intentions are as follows:

Number one, use XU for routing into the

enterprise and building skill set taxonomies

outside the call center over the next few years,

5    i.e., Citi, AIG, IBM, Fed-Ex.

           Do you see that?

           "Answer:  Yes, I do.

           "Question:  Do you recall any

discussions with Mr. Hernandez with regard to

10    Citibank, AIG, IBM or Fed-Ex?

           "Answer:  No, I do not.

           (End of videotape deposition

excerpt.)

           MR. CANTINE:  He couldn't even

15    remember.  I mean, Mr. Hernandez was in here

yesterday, touting about how he went back to Carl

WOOEZ all those times about Citibank, about

Fed-Ex.  Mr. WOOEZ, he couldn't even remember.

           Now, we also had Mr. Bilanji

20    Sundara.  He's another one I told you was one of

21    the most important witnesses in this case.  He's

22    the one that made the presentation to the

23    Governance Council on behalf of XpertUniverse,

24    but he didn't come here either to tell us his

side of the story, but we have his video as well.

And I want to remind you what he had
to say.  When we asked him whether or not he told
XpertUniverse about the denial, he said he could
5    only tell them if his manager said it was okay.
And his manager never did.

Let's play that one, please, Dave.

(Videotaped deposition excerpt
played as follows.)

10    "Question:  After reading this
e-mail, did you inform XU that they had been
rejected by the Governance Council?

"Answer:  No, I did not.

"Question:  Did you ever inform XU
15    that they had been rejected by the Governance
Council?

"Answer:  No.

"Question:  Why not?

"Answer:  Because I did not receive
20    any specific instructions from my manager.

21    "Question:  Did you want to tell XU
22    about the decision?

23    "Answer:  Only if my manager had
24    instructed me to do so.

"Question:  Were you ambivalent
otherwise?

"Answer:  Without a specific
direction, I would not have gone and informed XU.

5      "Question:  Do you think the fact
that they had been rejected by the Governance
Council would have been important information to
XU?

"Answer:  Again, I was not -- I
10   mean, it was a decision made in a council, and
without the instructions from my manager or the
entire chain of Cisco management, I would not
have gone ahead and informed XU by myself.

"It could have been an important
15   answer for XU, but I would not have informed them
without, you know, getting the proper directions
from my manager.

"Question:  And what makes you it
that it could have been an important piece of
20   information for XU?

21      "Answer:  I guess they were
22   cooperating with us in the SolutionsPlus
23   agreement and the fact that it was a denial from
24   the Governance Council would perhaps have been an

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

important thing to know about."

(End of videotaped deposition

excerpt).

MR. CANTINE:  Now, those are Cisco's

5    own witnesses.  You have Mr. WOOEZ EE, the head

of the Governance Council saying, if I was in

XU's shoes, I would want to know.  You've got

Mr. Sundara.  He knew it to XpertUniverse.

That's what he just told you there.  But they

10   never said anything, did they?

Now, Mr. Hernandez was here

yesterday.  He was also suggesting that if the

Governance Council denied an application, it was

no big deal.  He could just take it back to them

15   again.

Well, we also asked Mr. Sundara

about that.  And he was the one responsible for

making the presentation to the Governance

Council.  So he knew what was happening in those

20   types of situations.

21             Let me show you what he had to say.

22             "Question:  In the SolutionsPlus

23   approval process, if a product is rejected by the

24   Governance Council, does that mean that no

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

further work will be conducted with regard to
that product?

"Answer:  Looking at the flow chart,
that was my assumption.

5          Right?  So Mr. Hernandez is saying,
oh, we just keep looping back, looping back.
Well, Mr. Sundara, he was the one in charge of
it.  He's saying that's not the way it worked.

Now, you've seen a lot of e-mails
10  among many Cisco employees ESHGS where they
started calling XpertUniverse a competitor.  And
Mr. Hernandez, he had an explanation for that,
too, yesterday, didn't he?  He said, I don't
remember ever calling him a competitor.  All
15  those people must be wrong.  All those people on
those e-mails that are attributing it to him and
him calling XpertUniverse a XET torques they must
all be wrong.

I don't know if you remember Mr. HAD
20  even.  You saw him on video deposition.  Let's

21  take a look at what he had to say about that.

22          (Videotaped deposition played as

23  follows).

24          "Question:  All right.  We were

discussing earlier how when you found out from

Mr. Hernandez that CCBU was developing competing

product.  What was -- answer:  No, I don't

believe -- I don't believe I said that.

5          "Question:  Okay.  What did you say

about that?

          "Answer:  He answer:  He said -- as

I recall his exact words is XpertUniverse is a

competing -- is a competitor, and we have filed

10     some patents or patent -- I don't remember if it

was singular or plural -- and we'll be

introducing some new features and functions in

the future, or words to that effect.

          (End of video clip).

15          MR. CANTINE:  Another Cisco

employee.  You heard it from him.

          Now, again, it's common sense.  If

XpertUniverse did not have anything of value, why

didn't Cisco simply tell them about the denial?

20     Just tell them.  You've been denied.  Go make

21     your own decision.  Right?

22          It's a big company; right?  They're

23     big boys.  They can handle it.  But they never

24     told him.  They DNTS give him that opportunity to

make their own decision.  They keep coming in

here saying, we've got nothing of value.  Do you

remember Mr. Cop PEL?  He was the former Citibank

executive that came in and testified here.  He

5    was an independent guy.  He had no skin in this

game, none at all.

He came down here on his own dime

from New York because LEE wanted to tell you what

happened.  He wanted to hell you his story about

10   his involvement with XpertUniverse.  And this is

a gentleman with 20 years of experience at

Citibank.  He was the senior vice president and

chief information officer of the global consumer

group.  That's a $15 billion a year business.

15   And he told you, he did.  He told you.  Citibank

did their own due diligence on XpertUniverse.  A

deep dive, I think he called it.

And he told you about how impressed

he was, about how impressed he and his colleagues

20   were about the XpertUniverse technology.  And he

21   told you about how he thought that technology

22   would provide Citibank an opportunity to

23   distinguish itself from its competitors.  And,

24   again, Cisco has been making a whole S T I N K

about some allegation that we didn't have a

finished product.  You've heard that over and

over.  But do you remember what Mr. Cop PEL said

about that?  He didn't care.  Not only did he not

5    care, he thought it was a benefit.  Why would I

want to buy some finished product from

XpertUniverse, so they could go sell it to

everybody else?  I'm happy.  That was a good

thing it wasn't finished because we could tailor

10   it to our needs.

Citibank could tailor it to their

needs and distinguish TLEMSZ from their

competitors.  So he viewed that as a benefit.

He also talked about the fact that

15   he didn't care whether or not XpertUniverse

partnered with IBM or Cisco, whether they had a

Genesys router, Cisco router.  He didn't care.

He just wanted the technology.  And why is that

important?  Because XpertUniverse had options.

20   They didn't have to partner with these guys.

21   They had been told the truth back in April 2006

22   (if they), they could have partnered with IBM and

23   they could have gone in and been in business with

24   Citibank.  That's what Mr. Cop PEL told you.

Again, he has got no stake in this.

He came down here on his own to tell you that.

And XpertUniverse had a lot of

options.  Can we put that slide up, Dave?

5          This is what the evidence has shown.

If they had simply told him the truth Xper in

April of 2006, could have partnered with IBM,

could have partnered with FLEN necessity JIS, or

they could have taken that Genesys based platform

10    and gone shopping it around to others.

Mr. Wagner was here this morning.

That's Cisco's own damages expert.  He agr with

me.  And he agreed with me that XpertUniverse had

options back in April 2006.

15          And Citibank wasn't the only one

that saw value in XpertUniverse's technology.

You heard from both Mr. Friedman and Mr. Bratic,

our damages expert, about how IBM did its own

diligence.  They did their due diligence on

20    didtUniverse as well.


21          Remember what they talked about?

22    They talked about the fact that IBM considered

23    giving XpertUniverse a $20 million St $20 million

24    for one year's standstill, they called it,

essentially.  They wanted that exclusive right

for a year, IBM did.  They considered paying EK

PERT universe 20 million bucks for one year.

Let's talk about the patents.  The

5   patents -- they're the pillar of the company.

Mr. Steinhoff was here.  He described for you

what they're all about, what they were trying to

do, what they were trying to solve.  I thought he

did a pretty good job.

10   And then you heard from Dr.

Nourbakhsh.  I mean, this is a gentleman plan

with Bachelor's, Master's and Ph.D. from Stanford

University in computer science.  Apparently, the

professor at KARN necessity GEE melon.  And he

15   also explained to you the technology.  And he

told you about how those patents were infringed.

He told you how the patent, the products that

Cisco came out with, had they infringed

XpertUniverse's patents.  (How they) and it all

20   began with this first one, Expert Advisor.

21   That's the first product that Cisco came out

22   with.

23   Do you remember those code names,

24   Samba.  Code name TA ^ repair ^ rare row.  It was

those secret names Cisco was using internally to

talk about this product that became Expert

Advisor.

And you remember this name Ken

5   Jordan.  Mr. Jordan was one of the lead

architects on that Expert Advisor product, on

Cisco's Expert Advisor product.  It's the same

Ken Jordan that spent 70 percent of his time with

XpertUniverse.  Do you remember that's what Mr.

10  Lepore told us?  It's the same Ken Jordan that

was the main go between between XpertUniverse and

Cisco.  The same Ken Jordan that received all

that information from XpertUniverse and posted it

on that life link inside Cisco's website so that

15  everybody could get access to it.

The same Ken Jordan that ended up as

the named inventor on two Cisco patent

applications that were filed right at the same

time we thought were our partner when they were

20  our partner.

21          And what product were those two

22  patents intended to cover?  You heard it from Mr.

23  Jordan himself:  Expert Advisor.  And Expert

24  Advisor led to, you heard about Virtual Expert

Management and Remote Expert.  Essentially every

one of those products is infected with

XpertUniverse information that came through Ken

Jordan.

5              Now, Cisco's coming in here and

talking about Pulse.  They're like pulse like it

came from another universe, that Mr. Jordan

didn't have anything to do with Pulse.

               They are acting like it came from a

10      different company.  It's all one company.

               They never told us how many people

had access to that Livelink.  They said they

couldn't figure it out.

               Now, the validity of the patents,

15      the judge instructed you on the law.  It gets a

little deep.

               But at bottom, I mean, Cisco coming

in here telling you, Hey, we're trying to sell

you snow in the winter.  It's all about common

20      sense.

21              During the two and a half years we

22      worked together, there's not one email they ever

23      showed you saying, Hey, your technology is

24      worthless.  But that's what they're doing with

the patents.  They want you to come in here and

just cancel them.  Get rid of them.  They're not

worth the paper they're printed on.  That's what

they're telling you.

5              But it's a common sense.  There's no

evidence in the record they ever said that

before, not before this litigation.  IBM thought

XpertUniverse's technology was important.

               Citibank thought it was important.

10     Important and valuable.

               But now under the light of

litigation, Cisco just comes in here and says,

Yeah, just cancel those things.  They're

worthless.  They're old.  They're known.

15             Think back to what Mr. Koeppel told

you.  All right.  The independent guy.

               He saw a lot of value in that

technology.  He told you about how Citibank

Citigroup, whatever you want to call them, they

20     saw tremendous value in XpertUniverse's

21     technology.

22             And he told you about all the due

23     diligence that Citibank did and how important --

24     he told you himself how important that whole

SolutionsPlus thing was to him.  Remember when he

talked about one big neck to choke?  Right.

He knew he was getting in bed with

XpertUniverse, which is a small company, so he

5    wanted a big partner by their side.  He didn't

care if it was Cisco or IBM.

But he saw value there.  And he

thought he knew -- he told you how important that

SolutionsPlus arrangement was to him even because

10   it indicated to him a level of trust.  A

partnership.

And he also told you about a

conversation he had with John Hernandez.

Mr. Hernandez told him, Don't worry.

15   XpertUniverse is our partner.  We've got no

intentions of coming out with anything on our

own.  We're joined at the hip.

And the timing is critical.

Remember, Cisco denies SolutionsPlus in April of

20   2006.  Citibank pilot came later.

21           Cisco had to stall XpertUniverse

22   because it was critical to them to keep Genesys

23   out of Citibank.  We'll look at those emails

24   again, I promise you.  We'll try to go quick

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

through them.

But let's go back.  Now, like I said

in the beginning, all the evidence, all the

evidence we're going to look at, all the evidence

5     of concealment, all the evidence of fraud comes

from their own records.

Now, Mr. Hernandez was here trying

to explain away a few of them yesterday, but he

can't talk -- he can't talk his way out of all of

10    them.  Let's take a look at them again.

This is the first one.  This is the

quid pro pro that we talked about.  Right.

This is the deal with Mr. Hernandez

to XpertUniverse December 17th, 2005.  Remove

15    Genesys and we'll move on SolutionsPlus.  That's

the deal.

Ms. Eiss told you about it.

Mr. Hernandez told you about it.

Remember Ms. Eiss talked to you

20    about how this conversation -- it's right before

21    the holidays.  She was going through Newark

22    Airport, got the call from John, John Hernandez.

23    Dropped everything.  Took the call, the call

24    they've been waiting for.

                    She told you she immediately called

            Mr. Friedman and how excited they were and how

            they put all their resources behind us based on

            this representations, based on this promise,

     5      based on the trust.

                    But we'll -- go to the next one,

            please, David.

                    We know now that at least one

            presentation was made to the Governance Council.

    10      Mr. Sundara told us about that.

                    But here's the outcome:  I mean,

            it's pretty simple.  It says, Outcome denied.

                    It doesn't say outcome questions.

            It doesn't say outcome concerns.  It says outcome

    15      denied.

                    Next one, please.  We've got a week

            later Mr. Sundara, the one that made the

            presentation, writing to his boss, Ross Daniels.

                    You've seen this one before.  What

    20      am I supposed to do?  I've got weekly meetings

    21      with these guys at XpertUniverse.  That's what

    22      he's saying.

    23              But look at the last bullet item he

    24      said.  He said, Okay.  Look, we've denied them

SolutionsPlus.  What are we going to do now?

There's the risk of Genesys buying out

XpertUniverse, and then we've lost everything.

You have Mr. Philonenko worrying

5    about Genesys back in March 2005.  You've got Mr.

Sundara reporting up the chain here, May of 2006,

What about Genesys?  What are we going to do

about Genesys?  If we don't do something with

XpertUniverse, what's going to happen with

10   Genesys?

Next one, please.

So you'll see this one come up.

We're going to start keeping track of everybody

that is on these emails for you.

15   Next one, please.

So, Mr. Daniels, he responds.  He

forwards Mr. Sundara's email off to his boss,

John Hernandez.  And he says, Any thoughts?

Remember, he's got to respond to

20   Balaji Sundara, but he's reporting up the chain

21   to his boss saying, What am I supposed to do?

22   Any thoughts?

23   Right now everything's sort of

24   hanging in the wind.  XpertUniverse still does

not know about last week's decision.

Still does not know.  Why not?

A week's gone by.  How come nobody's told them?

5       So it's their own record.  They know we don't know.

Doesn't say, Oh, we told them about some concerns.  We told them about some questions.  Saying nobody told them about the

10      denial.

Mr. Hernandez responds -- next one, please, Dave.  Oh, there you go.

Well, Mr. Hernandez, what is his response?  He says he spoke to Rob DePinto.  He's

15      that big Citibank guy, works for Cisco, but he's in charge of the Citibank accounts.

So Mr. Hernandez -- again, remember, they're all worrying about Genesys getting into Citibank.  So Mr. Hernandez responds, I spoke to

20      Rob.  Obviously, Rob DePinto wasn't happy about

21      it.

22          It says, I'm going to leave it up to

23      him.  If he can get the business from Citi, all

24      the better.  I could go either way, he says.

He was in here yesterday telling us about how he was such a champion.  And here he's saying, I could go either way.

But Mr. DePinto, he agreed to tell
5     no one about this; right?  What does that mean?

Mr. DePinto said he understood that meant tell no one about the denial.  Don't tell XpertUniverse about the denial of SolutionsPlus.

And he got Mr. Daniels.  He responds
10    to Mr. Hernandez that same day.

He says, Okay.  Thanks.  Thank you very much.  I'll tell Mr. Sundara just to stall XpertUniverse, move them along slowly, stall as needed.

15    Meanwhile, XpertUniverse is pouring its heart out, spending its money, trying to do the integration.

Stall them.  Don't tell them.

There's no record of Mr. Hernandez
20    writing back to Mr. Daniels saying, Don't do

21    that.  That would be wrong.  That's not how Cisco

22    treats its partners.  There's no evidence of

23    that.

24    Now, let's go to June.  We're a

month later.

Mr. DePinto starts again, the
Citibank thing is heating up.  The pilot.  And
what does he write?  I don't want them to use
5    Genesys as the back end engine on this pilot.

Again, over Genesys -- concern over
Genesys.  We've got to keep Genesys out of
Citibank.

Now, this is three months after
10   they've been denied.  Three months after the
April 2006 denial.  They haven't told us.  They
haven't told anybody from XpertUniverse.  But
they're real worried about that Genesys still
getting into Citi.

15   Let's go to the next one, please,
David.

Now, we fast forward.  Now, we're
into October.  This is five months after they're
denied.

20   We've got Mr. Bartell.  We've got to

21   read these from the bottom up; right?

22   And he writes, So CCBU, that's

23   Mr. Hernandez, Mr. Philonenko, that's their

24   business unit, they're not executing on

SolutionsPlus.  He writes basically, that's

interesting to me because Elizabeth Eiss thinks

they are.  She still thinks they're moving ahead.

This is five months later.

5                I'm sorry, what are we?  May, June,

July, August, September, October, six months.

This is Cisco's own people saying we haven't told

them yet.

                 Whereas Mr. Grove responds, Okay.  I

10    don't think we want to broadcast that to

XpertUniverse, meaning don't go telling them we

haven't told them.

                 Mr. Bartell right back, again, we

don't want to announce what we're doing with

15    XpertUniverse.  It's all about stalling.  Don't

tell them the truth.

                 And the list grows; right?

                 So October 10th, Soufiane Houri,

this is more stalling.  It says, We're not

20    actively working with XU.  We also haven't told

21    them we stopped working.

22                I mean, come on.  This is how you

23    treat your partners?

24                We're in October 2006.

                 Hawkins Reporting Service
        715 N. King Street - Wilmington, Delaware  19801

XpertUniverse is pouring its heart and its money

out trying to finish the integration.  They're

about a month away, by the way, and what does

this say?  This is Cisco's own people saying,

5    We're not really working with them.  And by the

way, we haven't gotten around to telling them

yet, either.

And then at the bottom, what does it

say?  Gee, they might even be under the

10   impression that we're going forward on

SolutionsPlus.

This is October.  So the list grows.

And we get Mr. Daniels and

Mr. Hernandez involved again.  The subject is

15   XpertUniverse.  All right.

It says, My take is we're not doing

anything, but stalling them.  They've been

stalling them since May.  This is now October.

And what have we got next?  As soon

20   as we commit to Torero, right, code name Torero,

21   we've got enough.  We've got enough of our own

22   stuff.  We don't need them anymore is what we're

23   saying.

24   So the list grows.  This is just

another one.

In May 2006, in order to keep
Genesys out of Citi, it is important we control
this roll out.  Keep Genesys out of Citi.  Isn't

5      that the theme?

But look at the bottom.  He says
significant revenue opportunity.  They see dollar
signs in that Citibank account.

But they want to keep the Genesys

10     out of there.  The Genesys out of there.

And it continues.  We've got the
next one.  There we go.

Another one, Mr. DePinto and
Mr. Hernandez.  It mentions Harvey Koeppel.

15     That's the gentleman that came down and told you
about what was going on at Citibank.

Read with what it says in the middle
there, for us to keep Genesys out of Citi, it's
important we control this technology roll out.

20     To keep Genesys out.  Keep Genesys out.

21         But don't tell XpertUniverse what's

22     going on.  Keep stalling them.  Don't tell them

23     they've been denied.

24         Go to the next one, please, Dave.

Dave Bartell never heard from him

here.  What does he say?

Ooh, this email is confidential to

Cisco until I can learn more.  Why?  Is that how

5    you treat your partners?  It's right there in red

for you.

CCBU, that's Mr. Hernandez's

business unit, considers XpertUniverse a

competitor and is only engaging with them on

10   opportunistic sales.  Oh, gee, how nice of them;

right?

Their own records calling us a

competitor when we think we're a partner.  And

we're spending all the money, and all the time

15   and all the effort finishing the integration that

they say was so important.

So the list grows.  You see it.

These are all the people that have

been copied on the various emails.  From April

20   2006 to October 2009, not one of these people

21   wrote an email, picked up the phone, nothing.

22   Stall.  Competitor.  Don't tell

23   them.  Keep Genesys out.

24   Let's go to the next one, please.

And this is where it ends.

January 2007, almost ten months later, Mr. Hernandez finally gets around to telling Victor Friedman that thanks, but no

5    thanks.  Sorry, not moving forward.

Now, I don't know if you remember. Mr. Lepore was here.  And I asked him -- remember that whole discussion about him testifying on behalf of Cisco; right?

10    He had gone back and he had scoured the records, scoured Cisco's records trying to find any indication, any record that XpertUniverse was told any time before January 2007.  He couldn't find any.  That's what the

15    evidence shows.

Denied April 2006.  First time they got around to telling us, January of 2007.

The judge has instructed you on the law.  You'll have those instructions with you.

20    Just think about that ten-month

21    denial.  Think about the fact that they knew it

22    was important.  A small company, right, pouring

23    their heart and their soul out, spending all

24    their treasure.  They knew it was important.

Put yourself in XpertUniverse's
shoes.  How would you feel?  Wouldn't you have
wanted to know?  Wouldn't you have wanted to know
that you'd been denied SolutionsPlus, declared a
5    competitor, been stalled?

Wouldn't it have been the right
thing?  Remember, we talked about doing the right
thing when nobody's looking?  Did Cisco do the
right thing?  I don't think so.

10    XpertUniverse deserved to know so
that they could make their own decisions about
what they wanted to do.  If they wanted to tell
them in April 2006 you've been denied, they could
have decided on their own, okay, I'll stick with

15    you guys, or I'm going to go off and work with
IBM.  Thank you very much.  Or I'm going to go
work with Genesys.  But they didn't give them
that chance.

Okay.  They made that decision for

20    us and that wasn't their right.  That's just

21    wrong.  And it's fraud.

22    Now, let's talk briefly about some

23    of Cisco's defenses.  They told you we had no

24    product.  That's not true.

They told you we never finished the
integration.  That's not true.

Victor Friedman told you that.
Elizabeth Eiss told you that.

5          Their favorite piece of evidence is
two, three emails from this guy, Mike Turillo.
That's all they've shown you.

And you heard about Mr. Turillo.
You saw a little bit of his deposition testimony.

10          He was a part-time kind of business
development guy that came into the office once
for an hour every three months.  It's what Mr.
Friedman told you.  He wasn't involved in the
technology.

15          He didn't know what was going on
under the covers.  He didn't work with the
architect and the engineers, the Steinhoffs of
the world.  He came in the office like a fire
cracker once every three months for a couple

20     hours.

21          I mean, their favorite e-mail,
22     right, you've seen that one.  Remember, that was
23     the one that was written at two in the morning.
24     They never want to show you the bottom part of

that e-mail, but we did, where he says, well,
maybe this is all wrong.  Maybe I got it all
wrong, let's talk about it tomorrow.

In the two or three e-mails they
5   keep showing you, take a look at the dates of
them when you get back there.  They're all in
like a two, three-week window.

I showed you all the people on their
side.  The judge talked about weighing those
10   scales, right, preponderance of the evidence?
The scales tip pretty far in our favor.

The other thing I don't want to tell
you about is Mr. Turillo made an invest.  That
directed his company to make that investment
15   about two or three months after all those
e-mails.  He put another $900,000 in the company.
Does that sound like someone that was trying to
sell vaporware?

I mean, that's offensive.  In facts,
20   Mr. Turillo testified that he had no involvement

21   in valuing XpertUniverse.  Put that up, please,
22   Dave.
23   This is what he said in his sworn
24   testimony.

"Question:  Were you personally

involved in any attempts in 2006 or 2007 to value

XpertUniverse as a business?

"Answer:  No.

5          So they wanted to keep showing you

these Turillo e-mails saying, wow, he's saying

the value is so low, that XpertUniverse is miss

managed, it has got no will value.  He wasn't

around valuing the company.  You heard

10   Mr. Friedman tell you, loved him like a brother,

but he had a hot head.  He sent e-mails out at

two in the morning.  But three months later, he

invested another $900,000 in the company.

Cisco likes to claim that there's no

15   value because we had no sales.  Mr. Cop PEL, that

Citibank guy, he told you about that.  He gave

you his thoughts.  Said it didn't matter to him.

He liked the fact that XpertUniverse didn't have

any sales.  That meant he wasn't selling it to

20   his competitors.  Do you remember Dr. Chatterjee?

21   I'm losing my days.  I don't know if he was

22   yesterday or the day before or what day it is,

23   but he talked about the fact that company he

24   worked for, the time it was sold, remember he

Talked about it being sold to HP,

Hewlett-Packard?  They're a big competitor.  They

had a $45 million loss on the books at the time

that company was sold.  And Hewlett-Packard

5    bottom them for $470 million.  So don't be fooled

by the no sales equals no value argument you're

going to hear from them.

          Now let's talk quickly about that

Governance Council.  Mr. Hernandez told us

10   yesterday that the Council had concerns, had

questions.  And you heard from Ms. Eiss.  She

told you all the work she was trying to do to

overcome those questions, but she was very clear.

There's a fundamental difference between a

15   question and a denial.  It's undisputed that no

one from Cisco told anyone from XpertUniverse,

including Ms. Eiss, that the Governance Council

had denied their application in April 2006.

          Mr. Hernandez reported, he didn't

20   tell him, he didn't tell Ms. Eiss about the

21   denial.  He said they had questions.  And she

22   worked day and night preparing numerous

23   presentations to address those questions that the

24   Governance Council allegedly had.  You saw all

the e-mails.  You saw the PowerPoint

presentations.

        Mr. Hernandez, he represented to XU

that he would take all that work back, all Mrs.

5    Eiss' work, and he would go back to the

Governance Council.  That's what he told you.

But he never did.

        He kept saying he'd take another

crack, take another attack, I think was the word

10   he used, on the Governance Council, but he never

did did, because LEE told you himself yesterday,

there never was another Governance Council MEET

go for XpertUniverse.  And he testified it was

his sole discretion as the director of product

15   management to represent XpertUniverse for the

Governance Council.  He said, yes, I don't need

anybody's permission.  He said, it's just an

informal process.  But there was never a second

meeting.

20         He said, there's no schedule.  He

21   could have gone back to him at any time, but

22   there was never any other meeting.

23         He told you that the vast majority

24   of companies had multiple, multiple reviews

through the Governance Council.  But

XpertUniverse only got one, in April 2006.

He appointed him as the new product

manager when Mr. Sundara left.  You know why?  He

5    said it was an exercise in influence.  But the

Governance Council never met again.

He took it upon himself, and he

never did anything.  Despite all the work that

Elizabeth infringing activity began, damages was

10   doing at his urging, there's no evidence in the

record that any of her work was ever presented to

the Governance Council for a second vote.  But he

never told XpertUniverse any of this.  Why?  The

evidence shows Genesys.  Got to keep Genesys out

15   of Citibank.

Cisco's concealment of this

important fact led to the destruction of my

client's company.  Now, Mr. Bratic was here.  He

told you how to measure damages in a case like

20   this.  He told you about that but-for value;

21   right?  You take the will VA of the company

22   before the bad act, you compare it to the value

23   of the company after the bad act, and the

24   difference is the damage.

Mr. Wagner was here this morning.

He agreed.  He said, yes, that but for thing,

that's what I do in my work, too (HOOIFRP) FL

that's what these guys do.  It's an accepted way

5   to measure damages in a case like this.

Mr. Bratic told you about LOU he

determined the value of XpertUniverse in that

April 2006 time frame.  Mr. Wagner, their damages

expert, I mean, he came in here today and said

10   it's 0.  That's his professional opinion, that my

client was worth 0 in April 2006.  Use your

common sense.

Mr. Bratic, he told you about how he

relied on those Standard & Poor's valuation

15   reports and the Duff & Phelps valuation report

(report).  Cisco's own expert admitted that's

what these guys do.  When you try to value a

company, you use reports like this.

Mr. Bratic told you how he analyzed

20   those reports.  He checked them.  He investigated

21   them.  He tested them.  And he told you how it

22   was the best evidence he could come up with of

23   what the value was of XpertUniverse at that time.

24   And we're not going to talk the numbers, but you

heard him.

Counsel for Cisco told you in their

opening statement, pay attention to who has been

really harmed here.  I agree.

5       Cisco's actions destroyed my

company, my client's company.  And people got

emotional here.  People lost their jobs.  They

lost their dreams.

Can you put it up, Dave.

10      That's what we're asking for.  We

think the evidence shows that a fair measure of

damages is at least $70 million.  All I can ask

you to do is use your moral come pass, use your

good judgment (come PAS), use your common sense.

15  We're asking, I'm asking you on behalf of my

client to make Cisco pay for the consequences of

their acts.

I really appreciate your time.

Thank you.

20      THE COURT:  Thank you, Mr. Cantine.


21      So we're going to take a ten-minute

22  break.  Then we'll come back and Cisco will

23  present its argument.  All right?

24      (The jury was excused for a short

Recess.)

        THE COURT:  All right.  Everyone be

seated.  Hopefully, I'm just going to get the

jury verdict here.  I can see that basically it's

5   hot off the presses.

        MR. ROVNER:  We just not have had a

chance to proof it.

        THE COURT:  No, no, I understand

that.  Were you going to -- all right.  Well, I'm

10  not going to sit here while you all hold it.  I'm

going to take a recess.  Contact me when you are

done.

        (Short recess taken.)


15


        THE COURT:  I am not sure that -- we

just need the one copy.

20       MR. ROVNER:  Do you want to give

 21  each juror a verdict form?

 22       THE COURT:  I'm not -- well, okay.

 23  In any event, I know there's one that we put with

 24  a pretty blue backing --

MR. ROVNER:  In the end.

THE COURT:  -- in my memory of the
way law was practiced 30 years ago.

Okay.  Is everybody ready now?

5          MR. SCHUMAN:  Yes, Your Honor.

THE COURT:  All right.  Let's get
the jury in.

And Mr. Cantine, probably I'm just
going to -- I mean, I'll give you like 30

10      seconds, but probably just go to --

MR. CANTINE:  I've got nine minutes
left, Your Honor.

THE COURT:  What's that?

MR. CANTINE:  I have nine minutes

15      left.

THE COURT:  You get a 30-second
break.

MR. CANTINE:  Oh, all right.  I can
talk fast, but not that fast.

20          (Jury entering the courtroom at 3:48

21      p.m.)

22          THE COURT:  Ladies and gentlemen,

23      welcome back.  Everyone be seated.  We're ready

24      to proceed.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

Mr. Schuman.

MR. SCHUMAN:  Thank you, Your Honor.
Good afternoon, ladies and gentlemen.

And I can't tell you how proud I am

5    to be representing Cisco Systems every time Mr.
Cantine points at me.  This is a very good
company with great employees and great products.

And one of those employees is
Mr. Hernandez, who sat here yesterday and told

10   you the whole story, told you everything that
happened as it relates to the issues that the
jury is going to be asked to decide in this case.

In the opening statement, I did say
snippets of emails stitched together by XU's

15   counsel did not accurately represent what
actually happened between Cisco and
XpertUniverse.  And now that all the evidence has
come in, hopefully you appreciate that we showed
you what I said.

20        There's lots of white noise going on

21   in XpertUniverse's case, just like that white

22   noise you hear every time counsel goes up to the

23   side bar and the judge flips that switch.

24        There's actually some fairly narrow

issues in this case for the jury to decide.  And

the Court gave you instructions and those are

what you're going to be applying to the facts as

they relate to the issues in the case.

5            You heard a lot of names, saw a lot

of emails.  Balaji Sundara, he left Cisco on May

15th, 2006.

             We're talking about a case where

there's alleged concealment between May 2006 and

10    January 2007.  An email that he sent in May 4th,

May 5th, something he said in his deposition

right before he left, that doesn't prove

fraudulent concealment.

             Laurent Philonenko, he didn't have

15    to come because what I said in my opening

statement was he was going to tell you how he

kept pushing XpertUniverse to do that

integration.  He didn't need to come.  Ms. Eiss

said that on the stand in her testimony.

20            Furthermore, this is a concealment

21    case.  As the jury now knows, the discussions

22    here were between Mr. Hernandez and Ms. Eiss, and

23    I'm going to focus on what Mr. Hernandez and Ms.

24    Eiss said when they were in that witness box

explaining to you what actually happened here.

Mr. Koeppel, that's white noise,
also.  He didn't come in and say anything about
XpertUniverse's patents or Cisco's products.  In
5    fact, the only patent he talked about was his
own.

He thought XpertUniverse's
technology was primitive.  That was his word and
he was interested in it because he could apply
10   his patent to what they had built to date.
That's what Mr. Koeppel said.

Mr. Koeppel did not say anything
about concealment.  He mentioned SolutionsPlus.

He didn't say anything about the
15   discussions between Mr. Hernandez and Ms. Eiss as
they relate to the issue, the primary issue that
you, the jury, is going to be asked to decide.

Mr. Hayden, the clip of testimony
you saw for the second time, Mr. Hayden did not
20   say anything about the patents.  He did not say

21   anything about the accused Cisco products.  He
22   did not say anything about SolutionsPlus or
23   concealment of any decision about XpertUniverse's
24   status in SolutionsPlus.  This is all white

noise.

Let me summarize the evidence for
you on the concealment claim.  Cisco did not
conceal anything from XpertUniverse.

5          XpertUniverse, as the evidence
shows, was fully aware of its status as it
relates to SolutionsPlus from April 2006 to
January 2007.  It was not admitted to the program
at that Governance Council meeting that you've
10    heard so much about.  That is undisputed.

What is also undisputed is that
XpertUniverse knew that fact.  They knew they
were not admitted at that April 2006 meeting.

And what happened after that?  For
15    the eight or nine months, Mr. Hernandez and Ms.
Eiss worked together to try and get them
admitted.

The fact that subsequent -- the fact
that those subsequent efforts to get
20    XpertUniverse admitted to the program were

21    unsuccessful, does not establish that the denial
22    in April 2006 was final.  That's the proposition
23    that XpertUniverse is asking you to accept.
24              That all that work that occurred --

these are not alleged emails or alleged

approaches to Carl Wiese.  These are things that

Mr. Hernandez actually did.

You saw the emails.  They exist.

5    They're real.

You heard Mr. Hernandez tell the

story.  All that work building the business case

to get XpertUniverse admitted to this program

actually happened.

10    And the fact that it didn't succeed

does not mean that that April 2006 decision was

actually final.  It just so happened that those

subsequent efforts did not work.

Now, as I said, the fundamental

15    issue that a jury is going to be asked to decide

on the concealment claim, and this is jury

instruction number 12 you're going to get a

packet with the elements of what they have to

prove to show concealment.  Element Number 2,

20    XpertUniverse did not know of the concealed fact.

21    Ms. Eiss testified on the stand she knew they

22    were not admitted to this program.

23    Rick, can we put up Clip Number 1?

24    This is Ms. Eiss' testimony from

Last week.  And what you heard from John

Hernandez after he explained that it had been

submitted to the Governance Council, and you

hadn't been admitted, that he wasn't going to

5    give up and that he was going to try and get this

thing in?

Answer:  Correct.  Yeah, John was

absolutely working with us.  I never said he

wasn't.

10    I have viewed John as my partner.

And I viewed him as committed to getting this

thing done because, frankly, XpertSHARE would

help John be more successful in CCBU.

All of the emails, all of the phone

15    calls that you heard about from Ms. Eiss and from

Mr. Hernandez show you that XpertUniverse was

fully apprised not only of the fact that it was

not admitted to SolutionsPlus, but everything

Mr. Hernandez was doing to build the business

20    case to get them into SolutionsPlus.

21    July 13th -- sorry.  June 13th,

22    2006, Elizabeth Eiss sent an email to John

23    Hernandez saying, I want to get back on track

24    with our SolutionsPlus agreement.

June 14th, the very next day, John

responds immediately and tries to set up a call

with Elizabeth.  That's not somebody who's trying

to conceal anything.

5                July 6th, there was some scheduling

difficulties, as you might remember.  They were

trying to get a call together.  People weren't

available.

July 6th, 2006, Ms. Eiss, Victor

10   Friedman, they have a call and John explains on

that call what happened at the Governance

Council, and he explains what they need to do to

get this thing across the finish line.

Those are his words.  And he also

15   testified on the stand that when that call

happened, the context of that call was they

already knew they were not admitted to the

program.

Of course they knew they weren't

20   admitted.  Ms. Eiss was sending an email a month

21   earlier saying, We need to get this thing back on

22   track.

23                July of 2006, Ms. Eiss is working on

24   power-point presentations for John to take to the

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

Governance Council.  You saw those presentations.

We hear these concerns.  Getting SolutionsPlus done.  That's what those presentations that Ms. Eiss was preparing said.

5          She sent three iterations of those presentations.  And in between each of those drafts that she sent over, there were conversations between Mr. Hernandez and Ms. Eiss.

Mr. Hernandez gave her feedback,

10    gave her input.  Here's what you need to put in here to get this thing across the finish line.  He was working with her to get them into SolutionsPlus.  He was not concealing anything from her.

15          XpertUniverse in the person of Ms. Eiss knew exactly what XpertUniverse's status was.

August 31st, 2006, John tells Ms. Eiss that he has the support of the Cisco IBM

20    Alliance Team.  That is him building the business

21    case, getting key constituencies within Cisco to

22    support this, so he could go back to Carl Wiese

23    and the Governance Council and get XpertUniverse

24    across the finish line.

October 4th, you heard

Mr. Hernandez.  His focus was on Citigroup.

Citigroup was the lighthouse

account.  Citigroup was a major Cisco CCBU

5    customer.  It also happened to be somebody that

XpertUniverse was talking with.  That's why you

saw Mr. Koeppel here.

Mr. Hernandez did what good

executives do.  He saw the synergy and he said,

10   Let's make Citigroup the lighthouse account.  And

he went out to Rob DePinto, very senior person

within Cisco.

He was the owner within Cisco of

that Citigroup account to help him build that

15   business case.  That was the email that Mr.

Cantine showed you.

That was rob DePinto building --

helping Mr. Hernandez build the business case.

But then what happens in October?

20   The Citigroup pilot still hadn't happened.

21       There are delays internal to

22   Citigroup.  It has nothing to do with Cisco.  May

23   not have anything to do with XpertUniverse,

24   either.

That pilot doesn't happen.  But what

happens?  An opportunity comes across

Mr. Hernandez's desk.  FedEx needs something and

Cisco needs to find a way to -- excuse me.  Cisco

5      needs to find a way to provide that to the other

good customer, FedEx.

What does Mr. Hernandez do?  He

thinks outside the box.

He says, Wait a minute.  This may be

10     another opportunity to get XpertUniverse across

the finish line.

That one didn't work out.  FedEx.

There was a meeting.  XpertUniverse knew about

this opportunity.  No concealment.

15     There was a meeting, a call.

XpertUniverse spoke with Cisco.  Spoke with

FedEx.

Let's figure out if this is a right

fit.  This was not the right fit.

20     In the meantime, Mr. Hernandez had

21     went to Mr. Wiese.  We saw that email.  And what

22     was Mr. Wiese's response?  I can support this via

23     SolutionsPlus.

24     Mr. Hernandez is actively working to

get them into SolutionsPlus and keeping

XpertUniverse apprised all along the way.

Can we put Plaintiff's 491 up on the

screen, please, Rick?

5            Slide 3.  Can you blow up Slide 3?

As I mentioned earlier, the issue is

whether that decision in April was final.  Final

in the sense that everything that Mr. Hernandez

and Ms. Eiss were doing after the fact was

10     totally irrelevant.

XpertUniverse has no good

explanation for what those two senior executives

were doing if that was really final in April of

2006.

15            And we showed you this yesterday.

XpertUniverse objected to it its admissibility.

We showed you this yesterday.

This is the flow chart as of April

2006 for how a partner gets approved in

20     SolutionsPlus.  And right here, if the Governance

21     Council approves, you go on to Stage 3.  If the

22     Governance Council doesn't approve, you go right

23     back here to the product manager.

24            Mr. Hernandez, John Hernandez was

that product manager.  This was his

understanding.  This is a concealment case.

The next element that the jury is

going to be asked to decide is whether Cisco

5    intended to deceive XpertUniverse.

That is directly focused on Mr. John

Hernandez who was here in this courtroom

yesterday, and you heard him testify for hours.

I would submit to the jury you will ultimately

10   decide this fact.

That was not somebody who intended

to deceive.  That was somebody who understood the

process, who played a role in the creation of

this process.  And his understanding and

15   experience was that if somebody does not get

approved to SolutionsPlus by the Governance

Council, it goes back to the business unit.  It

goes back to product management.

And instead of passing that

20   responsibility down to a replacement for Balaji

21   Sundara, to Ross Daniels, any of those other

22   names you heard about, what did he do?  He put it

23   on his shoulders and he sat there in the witness

24   box and told you that.

He made it his responsibility to
work with the senior folks to try and get
XpertUniverse across the finish line.  And he did
the best job that he could.

5            With relevance to Mr. Hernandez's
intent to deceive XpertUniverse, that's the
element that the jury's going to be looking at
when you go back and do your deliberations.  Did
he intend to deceive XpertUniverse?  What did

10    John Hernandez say?

Nobody gets into SolutionsPlus on
the first try.  That's his mindset.

He says -- he testified there are
other companies who were denied SolutionsPlus and

15    then got in.  He mentioned IP trade.  He
mentioned Esna.

He has experience and he knows that
if the Governance Council doesn't let you in, you
can take another run at them.

20            He also testified that in some

21    instances, the objections are so significant, you

22    make the decision not to go back to the

23    Governance Council.  But that's not what he did

24    here.

He thought he could build a business
case to get them into SolutionsPlus.  And in good
faith, he did everything he could to try and get
them in.

5          He immediately developed his plan.
The plan focused on Citigroup.

Within a week, May 3rd, 2006 is that
first email.  John Hernandez, I spoke to Rob
DePinto and he was not the pleased.

10          That's within a week of him finding
out about the decision.  And he took it on his
shoulders and he built the business case.

He worked throughout the summer,
spring and summer of 2006 to build a business

15   case.  He worked with Carl Wiese to try and get
them approved.  And he almost, almost got it
across the finish line.

Why didn't he get it across the
finish line?  It has nothing to do with Cisco.

20   It has nothing to do with the lack of effort or

21   fraudulent intent on the part of Mr. Hernandez.

22          Citigroup cancelled the pilot.

23   That's all this is about.

24          His business case was focused on

this major lighthouse account.  Citigroup.

Citigroup cancelled the pilot.  He ran out of

gas.

    There were no more lighthouse

5 accounts left.  He tried for almost a year.

    Now, Ms. Eiss said -- Ms. Eiss was

on the stand, and I thought it was a particularly

important moment when my partner, Mr. Damsgaard

asked her, confronted her with the fact that this

10 case is basically about accusing John Hernandez

of fraud.

    And let's put up clip two and see

what Ms. Eiss said about that.

    Do you understand he's accused of

15 fraud in this case?

    Answer:  I'm not going to touch on

that.  What I'm going to say is that the

SolutionsPlus contract, which was vital to our

company, was always in progress and John was

20 supporting that.  We -- I was never told that we

21 were denied the SolutionsPlus product until

22 January of 2007.

23    So, I, in good faith, and I believed

24 in good faith with John Hernandez -- I can't

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

speak for what happened behind the scenes because

I wasn't privy to that.  But, to my face, John

and I, other people at Cisco were working to that

end as well.

5            Ms. Eiss could not bring herself to

tell you that John Hernandez committed fraud.  In

order for you to find fraud, you have to find an

intent to deceive.  And I would submit there's no

evidence that John Hernandez intended to deceive

10   XpertUniverse.

             There were a lot of documents that

came in as trials do.  Some of them came in with

Ms. Eiss.  Some of them were published with John

Hernandez.

15            You don't have to write this down,

but after you go back there and you start your

deliberations, you're entitled to see these

exhibits.  So I have some numbers in

chronological order that tell the story of

20   exactly what happened between XpertUniverse and

21   Cisco.

22            Plaintiff's 38.

23            Defendant's 457.

24            Defendant's 576.

Defendant's 575.

Defendant's 573.

Defendant's 435.

Defendant's 456.

5                Defendant's 433.

Defendant's 432.

Defendant's 373.

Defendant's 455.

Defendant's 579.

10               Plaintiff's 477.

Plaintiff's 478.

And Plaintiff's 41.

In chronological order, those tell

the story of what happened between John Hernandez

15  and Elizabeth Eiss with respect to SolutionsPlus

what I say is not evidence.  What Mr. Cantine

says is not evidence.

The evidence is what you heard from

the witnesses and what's in those documents.  And

20  if there's any doubt in your mind as to whether

21  Cisco or John Hernandez committed fraud, you can

22  refer back to any of those documents.

23                Two of the other elements that

24  XpertUniverse has to prove to your satisfaction

in order to establish fraud by concealment is

that the denial of SolutionsPlus were -- the

concealment of the denial of SolutionsPlus for

those months caused damages to XpertUniverse.

5          And as I said to you in the opening

statement, XpertUniverse died a natural death.

Cisco did not cause XpertUniverse to fail in any

way.

           Nothing Cisco did caused them to

10   fail.  But most certainly, the denial of

admission to the SolutionsPlus partner program or

the concealment, alleged concealment of that

denial for a number of months did not cause them

to fail.

15          Remember, SolutionsPlus was a

three-month pilot program.  And to the extent

XpertUniverse wants to say that draft contract

didn't apply to them, it was also determinable at

will by Cisco.

20          And that was in the power point that

21   Ms. Eiss testified did apply to them, and this

22   was also in the draft contract.  And there's

23   very, very good reasons for that.

24          This is not a big company taking

advantage of a small company.  This is a big

company putting a small company's product on its

part list.

          And that company has to take a risk

5    in putting that part on its part list.  And it

also is entitled to take it off its part list.

          For purposes of this litigation,

XpertUniverse is putting way more emphasis on

this three-month pilot program, putting way more

10   emphasis on the consequences of getting into the

program, and putting way more emphasis on the

consequences of not getting into the program than

it is due.

          Getting into SolutionsPlus meant

15   nothing if you did not have a product for Cisco

to sell.  And we know that XpertUniverse did not

have a product to sell.

          Can we put up clip three, please?

This is Mr. Steinhoff, one of the directors of

20   technology.

21          "Question:  And as you said,

22   XpertUniverse never completed a product to be

23   sold; is that right?

24          "Answer:  Yes.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

"Question:  And you left in 2007;

right?

"Answer:  Yes.

"Question:  In July?

5            "Answer:  Yes.

"Question:  And at that time,

XpertUniverse still had no finished product;

right?

"Answer:  That's correct."

10           I'm not going to go into a semantic

distinction of what a finished product is and it

isn't, but there was no product that Cisco could

have put on its price list if XpertUniverse had

been admitted to this SolutionsPlus program.

15           Mr. Hernandez also explained to you

very clearly and directly what it means to be a

SolutionsPlus partner.  There are SolutionsPlus

partners that get admitted to this program

through this process we looked at, and they get

20  no money.  Cisco can't sell their products, and

21  they get removed from SolutionsPlus.

22           And then they go into this other

23  partner program called the Technology Developer

24  Program and do just fine.  There's no guaranteed

revenue for being a SolutionsPlus partner.

And, in fact, Mr. Hernandez gave you

examples of companies that have done far better

as members of this Technology Developer Program

5    for which XpertUniverse claims has no value to

it.

He mentioned Variant and Aquion,

other companies that were technology developer

partners and made lots of money having that Cisco

10   stamp of approval.  XpertUniverse was admitted to

that program, and the only reason it didn't have

value to XpertUniverse is because they never

completed a product.

None of these partner programs are

15   going to have value to you if there's no product

that you can sell.

I want to talk for just a minute

about this integration.  We've heard a lot about

Genesys.  We've heard a lot about how Genesys was

20   a competitor of Cisco.

21           That's not in dispute here.  This

22   isn't about competition.

23           XpertUniverse was building a product

24   on the Genesys platform.  Cisco thought the

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

technology looked interesting.  You've heard that

from a number of witnesses.

It's also undisputed.  And they

wanted XpertUniverse to build a version that was

5    a Cisco version.

Mr. Friedman testified under oath

that that integration was done in November 2006.

Really?  Where is it?  We haven't seen a single

document, not a single one.

10   In all the emails, all the product

manuals, all the flow charts of all the arrows,

you haven't seen a single piece of evidence that

that integration was complete.

I mean, their favorite e-mail,

15   right, you've seen that one.  Remember, that was

the one that was written at two in the morning.

They never want to show you the bottom part of

that e-mail, but we did, where he says, well,

maybe this is all wrong.  Maybe I got it all

20   wrong, let's talk about it tomorrow.

21   In the two or three e-mails they

22   keep showing you, take a look at the dates of

23   them when you get back there.  They're all in

24   like a two, three-week window.

          I showed you all the people on their

      side.  The judge talked about weighing those

      scales, right, preponderance of the evidence?

      The scales tip pretty far in our favor.

 5          The other thing I don't want to tell

      you about is Mr. Turillo made an invest.  That

      directed his company to make that investment

      about two or three months after all those

      e-mails.  He put another $900,000 in the company.

10    Does that sound like someone that was trying to

      sell vaporware?

          I mean, that's offensive.  In facts,

      Mr. Turillo testified that he had no involvement

      in valuing XpertUniverse.  Put that up, please,

15    Dave.

          This is what he said in his sworn

      testimony.

          "Question:  Were you personally

      involved in any attempts in 2006 or 2007 to value

20    XpertUniverse as a business?

21          "Answer:  No.

22          So they wanted to keep showing you

23    these Turillo e-mails saying, wow, he's saying

24    the value is so low, that XpertUniverse is miss

managed, it has got no will value.  He wasn't

around valuing the company.  You heard

Mr. Friedman tell you, loved him like a brother,

but he had a hot head.  He sent e-mails out at

5   two in the morning.  But three months later, he

invested another $900,000 in the company.

Cisco likes to claim that there's no

value because we had no sales.  Mr. Cop PEL, that

Citibank guy, he told you about that.  He gave

10   you his thoughts.  Said it didn't matter to him.

He liked the fact that XpertUniverse didn't have

any sales.  That meant he wasn't selling it to

his competitors.  Do you remember Dr. Chatterjee?

I'm losing my days.  I don't know if he was

15   yesterday or the day before or what day it is,

but he talked about the fact that company he

worked for, the time it was sold, remember he

talked about it being sold to HP,

Hewlett-Packard?  They're a big competitor.  They

20   had a $45 million loss on the books at the time

21   that company was sold.  And Hewlett-Packard

22   bottom them for $470 million.  So don't be fooled

23   by the no sales equals no value argument you're

24   going to hear from them.

Now let's talk quickly about that
Governance Council.  Mr. Hernandez told us
yesterday that the Council had concerns, had
questions.  And you heard from Ms. Eiss.  She
5    told you all the work she was trying to do to
overcome those questions, but she was very clear.
There's a fundamental difference between a
question and a denial.  It's undisputed that no
one from Cisco told anyone from XpertUniverse,
10    including Ms. Eiss, that the Governance Council
had denied their application in April 2006.

Mr. Hernandez reported, he didn't
tell him, he didn't tell Ms. Eiss about the
denial.  He said they had questions.  And she
15    worked day and night preparing numerous
presentations to address those questions that the
Governance Council allegedly had.  You saw all
the e-mails.  You saw the PowerPoint
presentations.

20    Mr. Hernandez, he represented to XU

21    that he would take all that work back, all Mrs.
22    Eiss' work, and he would go back to the
23    Governance Council.  That's what he told you.
24    But he never did.

He kept saying he'd take another

crack, take another attack, I think was the word

he used, on the Governance Council, but he never

did did, because LEE told you himself yesterday,

5    there never was another Governance Council MEET

go for XpertUniverse.  And he testified it was

his sole discretion as the director of product

management to represent XpertUniverse for the

Governance Council.  He said, yes, I don't need

10   anybody's permission.  He said, it's just an

informal process.  But there was never a second

meeting.

He said, there's no schedule.  He

could have gone back to him at any time, but

15   there was never any other meeting.

He told you that the vast majority

of companies had multiple, multiple reviews

through the Governance Council.  But

XpertUniverse only got one, in April 2006.

20   He appointed him as the new product

21   manager when Mr. Sundara left.  You know why?  He

22   said it was an exercise in influence.  But the

23   Governance Council never met again.

24   He took it upon himself, and he

never did anything.  Despite all the work that
Elizabeth infringing activity began, damages was
doing at his urging, there's no evidence in the
record that any of her work was ever presented to
5    the Governance Council for a second vote.  But he
never told XpertUniverse any of this.  Why?  The
evidence shows Genesys.  Got to keep Genesys out
of Citibank.

Cisco's concealment of this
10   important fact led to the destruction of my
client's company.  Now, Mr. Bratic was here.  He
told you how to measure damages in a case like
this.  He told you about that but-for value;
right?  You take the will VA of the company
15   before the bad act, you compare it to the value
of the company after the bad act, and the
difference is the damage.

Mr. Wagner was here this morning.
He agreed.  He said, yes, that but for thing,
20   that's what I do in my work, too (HOOIFRP) FL

21   that's what these guys do.  It's an accepted way
22   to measure damages in a case like this.
23   Mr. Bratic told you about LOU he
24   determined the value of XpertUniverse in that

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

April 2006 time frame.  Mr. Wagner, their damages

expert, I mean, he came in here today and said

it's 0.  That's his professional opinion, that my

client was worth 0 in April 2006.  Use your

5    common sense.

Mr. Bratic, he told you about how he

relied on those Standard & Poor's valuation

reports and the Duff & Phelps valuation report

(report).  Cisco's own expert admitted that's

10    what these guys do.  When you try to value a

company, you use reports like this.

Mr. Bratic told you how he analyzed

those reports.  He checked them.  He investigated

them.  He tested them.  And he told you how it

15    was the best evidence he could come up with of

what the value was of XpertUniverse at that time.

And we're not going to talk the numbers, but you

heard him.

Counsel for Cisco told you in their

20    opening statement, pay attention to who has been

21    really harmed here.  I agree.

22    Cisco's actions destroyed my

23    company, my client's company.  And people got

24    emotional here.  People lost their jobs.  They

lost their dreams.

Can you put it up, Dave.

That's what we're asking for.  We

think the evidence shows that a fair measure of

5      damages is at least $70 million.  All I can ask

you to do is use your moral compass, use your

good judgment, use your common sense.  We're

asking, I'm asking you on behalf of my client to

make Cisco pay for the consequences of their

10     acts.

I really appreciate your time.

Thank you.

THE COURT:  Thank you, Mr. Cantine.

So we're going to take a ten-minute

15     break.  Then we'll come back and Cisco will

present its argument.  All right?

(The jury was excused for a short

recess.)

THE COURT:  All right.  Everyone be

20     seated.  Hopefully, I'm just going to get the

21     jury verdict here.  I can see that basically it's

22     hot off the presses.

23     MR. ROVNER:  We just not have had a

24     chance to proof it.

THE COURT:  No, no, I understand

that.  Were you going to -- all right.  Well, I'm

not going to sit here while you all hold it.  I'm

going to take a recess.  Contact me when you are

5    done.

(Short recess taken.)

THE CLERK:  All rise.

THE COURT:  Be seated, please.

THE COURT:  I am not sure that -- we

10   just need the one copy.

MR. ROVNER:  Do you want to give

each juror a verdict form?

THE COURT:  I'm not -- well, okay.

In any event, I know there's one that we put with

15   a pretty blue backing --

MR. ROVNER:  In the end.

THE COURT:  -- in my memory of the

way law was practiced 30 years ago.

Okay.  Is everybody ready now?

20   MR. SCHUMAN:  Yes, Your Honor.

21   THE COURT:  All right.  Let's get

22   the jury in.

23   And Mr. Cantine, probably I'm just

24   going to -- I mean, I'll give you like 30

seconds, but probably just go to --

MR. CANTINE:  I've got nine minutes

left, Your Honor.

THE COURT:  What's that?

5        MR. CANTINE:  I have nine minutes

left.

THE COURT:  You get a 30-second

break.

MR. CANTINE:  Oh, all right.  I can

10    talk fast, but not that fast.

(Jury entering the courtroom at 3:48

p.m.)

THE COURT:  Ladies and gentlemen,

welcome back.  Everyone be seated.  We're ready

15    to proceed.

Mr. Schuman.

MR. SCHUMAN:  Thank you, Your Honor.

Good afternoon, ladies and gentlemen.

And I can't tell you how proud I am

20    to be representing Cisco Systems every time Mr.

21    Cantine points at me.  This is a very good

22    company with great employees and great products.

23        And one of those employees is

24    Mr. Hernandez, who sat here yesterday and told

you the whole story, told you everything that
happened as it relates to the issues that the
jury is going to be asked to decide in this case.

In the opening statement, I did say

5    snippets of emails stitched together by XU's
counsel did not accurately represent what
actually happened between Cisco and
XpertUniverse.  And now that all the evidence has
come in, hopefully you appreciate that we showed

10   you what I said.

There's lots of white noise going on
in XpertUniverse's case, just like that white
noise you hear every time counsel goes up to the
side bar and the judge flips that switch.

15   There's actually some fairly narrow
issues in this case for the jury to decide.  And
the Court gave you instructions and those are
what you're going to be applying to the facts as
they relate to the issues in the case.

20   You heard a lot of names, saw a lot

21   of emails.  Balaji Sundara, he left Cisco on May

22   15th, 2006.

23   We're talking about a case where

24   there's alleged concealment between May 2006 and

January 2007.  An email that he sent in May 4th,

May 5th, something he said in his deposition

right before he left, that doesn't prove

fraudulent concealment.

5          Laurent Philonenko, he didn't have

to come because what I said in my opening

statement was he was going to tell you how he

kept pushing XpertUniverse to do that

integration.  He didn't need to come.  Ms. Eiss

10    said that on the stand in her testimony.

             Furthermore, this is a concealment

case.  As the jury now knows, the discussions

here were between Mr. Hernandez and Ms. Eiss, and

I'm going to focus on what Mr. Hernandez and Ms.

15    Eiss said when they were in that witness box

explaining to you what actually happened here.

             Mr. Koeppel, that's white noise,

also.  He didn't come in and say anything about

XpertUniverse's patents or Cisco's products.  In

20    fact, the only patent he talked about was his

21    own.

22             He thought XpertUniverse's

23    technology was primitive.  That was his word and

24    he was interested in it because he could apply

his patent to what they had built to date.
That's what Mr. Koeppel said.

Mr. Koeppel did not say anything
about concealment.  He mentioned SolutionsPlus.

5      He didn't say anything about the
discussions between Mr. Hernandez and Ms. Eiss as
they relate to the issue, the primary issue that
you, the jury, is going to be asked to decide.

Mr. Hayden, the clip of testimony

10     you saw for the second time, Mr. Hayden did not
say anything about the patents.  He did not say
anything about the accused Cisco products.  He
did not say anything about SolutionsPlus or
concealment of any decision about XpertUniverse's

15     status in SolutionsPlus.  This is all white
noise.

Let me summarize the evidence for
you on the concealment claim.  Cisco did not
conceal anything from XpertUniverse.

20          XpertUniverse, as the evidence

21     shows, was fully aware of its status as it
22     relates to SolutionsPlus from April 2006 to
23     January 2007.  It was not admitted to the program
24     at that Governance Council meeting that you've

heard so much about.  That is undisputed.

What is also undisputed is that
XpertUniverse knew that fact.  They knew they
were not admitted at that April 2006 meeting.

5                  And what happened after that?  For
the eight or nine months, Mr. Hernandez and Ms.
Eiss worked together to try and get them
admitted.

The fact that subsequent -- the fact
10    that those subsequent efforts to get
XpertUniverse admitted to the program were
unsuccessful, does not establish that the denial
in April 2006 was final.  That's the proposition
that XpertUniverse is asking you to accept.

15                  That all that work that occurred --
these are not alleged emails or alleged
approaches to Carl Wiese.  These are things that
Mr. Hernandez actually did.

You saw the emails.  They exist.
20    They're real.

21                  You heard Mr. Hernandez tell the
22    story.  All that work building the business case
23    to get XpertUniverse admitted to this program
24    actually happened.

And the fact that it didn't succeed
does not mean that that April 2006 decision was
actually final.  It just so happened that those
subsequent efforts did not work.

5          Now, as I said, the fundamental
issue that a jury is going to be asked to decide
on the concealment claim, and this is jury
instruction number 12 you're going to get a
packet with the elements of what they have to

10   prove to show concealment.  Element Number 2,
XpertUniverse did not know of the concealed fact.
Ms. Eiss testified on the stand she knew they
were not admitted to this program.

Rick, can we put up Clip Number 1?

15          This is Ms. Eiss' testimony from
last week.  And what you heard from John
Hernandez after he explained that it had been
submitted to the Governance Council, and you
hadn't been admitted, that he wasn't going to

20   give up and that he was going to try and get this

21   thing in?

22          Answer:  Correct.  Yeah, John was

23   absolutely working with us.  I never said he

24   wasn't.

I have viewed John as my partner.

And I viewed him as committed to getting this

thing done because, frankly, XpertSHARE would

help John be more successful in CCBU.

5          All of the emails, all of the phone

calls that you heard about from Ms. Eiss and from

Mr. Hernandez show you that XpertUniverse was

fully apprised not only of the fact that it was

not admitted to SolutionsPlus, but everything

10   Mr. Hernandez was doing to build the business

case to get them into SolutionsPlus.

July 13th -- sorry.  June 13th,

2006, Elizabeth Eiss sent an email to John

Hernandez saying, I want to get back on track

15   with our SolutionsPlus agreement.

June 14th, the very next day, John

responds immediately and tries to set up a call

with Elizabeth.  That's not somebody who's trying

to conceal anything.

20          July 6th, there was some scheduling

21   difficulties, as you might remember.  They were

22   trying to get a call together.  People weren't

23   available.

24          July 6th, 2006, Ms. Eiss, Victor

Friedman, they have a call and John explains on

that call what happened at the Governance

Council, and he explains what they need to do to

get this thing across the finish line.

5          Those are his words.  And he also

testified on the stand that when that call

happened, the context of that call was they

already knew they were not admitted to the

program.

10          Of course they knew they weren't

admitted.  Ms. Eiss was sending an email a month

earlier saying, We need to get this thing back on

track.

          July of 2006, Ms. Eiss is working on

15   power-point presentations for John to take to the

Governance Council.  You saw those presentations.

          We hear these concerns.  Getting

SolutionsPlus done.  That's what those

presentations that Ms. Eiss was preparing said.

20          She sent three iterations of those

21   presentations.  And in between each of those

22   drafts that she sent over, there were

23   conversations between Mr. Hernandez and Ms. Eiss.

24          Mr. Hernandez gave her feedback,

gave her input.  Here's what you need to put in

here to get this thing across the finish line.

He was working with her to get them into

SolutionsPlus.  He was not concealing anything

5   from her.

XpertUniverse in the person of Ms.

Eiss knew exactly what XpertUniverse's status

was.

August 31st, 2006, John tells Ms.

10   Eiss that he has the support of the Cisco IBM

Alliance Team.  That is him building the business

case, getting key constituencies within Cisco to

support this, so he could go back to Carl Wiese

and the Governance Council and get XpertUniverse

15   across the finish line.

October 4th, you heard

Mr. Hernandez.  His focus was on Citigroup.

Citigroup was the lighthouse

account.  Citigroup was a major Cisco CCBU

20   customer.  It also happened to be somebody that

21   XpertUniverse was talking with.  That's why you

22   saw Mr. Koeppel here.

23   Mr. Hernandez did what good

24   executives do.  He saw the synergy and he said,

Let's make Citigroup the lighthouse account.  And

he went out to Rob DePinto, very senior person

within Cisco.

He was the owner within Cisco of

5   that Citigroup account to help him build that

business case.  That was the email that Mr.

Cantine showed you.

That was rob DePinto building --

helping Mr. Hernandez build the business case.

10   But then what happens in October?

The Citigroup pilot still hadn't happened.

There are delays internal to

Citigroup.  It has nothing to do with Cisco.  May

not have anything to do with XpertUniverse,

15   either.

That pilot doesn't happen.  But what

happens?  An opportunity comes across

Mr. Hernandez's desk.  FedEx needs something and

Cisco needs to find a way to -- excuse me.  Cisco

20   needs to find a way to provide that to the other

21   good customer, FedEx.

22   What does Mr. Hernandez do?  He

23   thinks outside the box.

24   He says, Wait a minute.  This may be

another opportunity to get XpertUniverse across

the finish line.

             That one didn't work out.  FedEx.

There was a meeting.  XpertUniverse knew about

5    this opportunity.  No concealment.

             There was a meeting, a call.

XpertUniverse spoke with Cisco.  Spoke with

FedEx.

             Let's figure out if this is a right

10   fit.  This was not the right fit.

             In the meantime, Mr. Hernandez had

went to Mr. Wiese.  We saw that email.  And what

was Mr. Wiese's response?  I can support this via

SolutionsPlus.

15           Mr. Hernandez is actively working to

get them into SolutionsPlus and keeping

XpertUniverse apprised all along the way.

             Can we put Plaintiff's 491 up on the

screen, please, Rick?

20           Slide 3.  Can you blow up Slide 3?

21           As I mentioned earlier, the issue is

22   whether that decision in April was final.  Final

23   in the sense that everything that Mr. Hernandez

24   and Ms. Eiss were doing after the fact was

Totally irrelevant.

XpertUniverse has no good
explanation for what those two senior executives
were doing if that was really final in April of

5   2006.

And we showed you this yesterday.
XpertUniverse objected to it its admissibility.
We showed you this yesterday.

This is the flow chart as of April

10   2006 for how a partner gets approved in
SolutionsPlus.  And right here, if the Governance
Council approves, you go on to Stage 3.  If the
Governance Council doesn't approve, you go right
back here to the product manager.

15   Mr. Hernandez, John Hernandez was
that product manager.  This was his
understanding.  This is a concealment case.

The next element that the jury is
going to be asked to decide is whether Cisco

20   intended to deceive XpertUniverse.

21   That is directly focused on Mr. John

22   Hernandez who was here in this courtroom

23   yesterday, and you heard him testify for hours.

24   I would submit to the jury you will ultimately

decide this fact.

That was not somebody who intended
to deceive.  That was somebody who understood the
process, who played a role in the creation of

5   this process.  And his understanding and
experience was that if somebody does not get
approved to SolutionsPlus by the Governance
Council, it goes back to the business unit.  It
goes back to product management.

10        And instead of passing that
responsibility down to a replacement for Balaji
Sundara, to Ross Daniels, any of those other
names you heard about, what did he do?  He put it
on his shoulders and he sat there in the witness

15   box and told you that.

He made it his responsibility to
work with the senior folks to try and get
XpertUniverse across the finish line.  And he did
the best job that he could.

20        With relevance to Mr. Hernandez's

21   intent to deceive XpertUniverse, that's the

22   element that the jury's going to be looking at

23   when you go back and do your deliberations.  Did

24   he intend to deceive XpertUniverse?  What did

John Hernandez say?

Nobody gets into SolutionsPlus on the first try.  That's his mindset.

He says -- he testified there are

5    other companies who were denied SolutionsPlus and then got in.  He mentioned IP trade.  He mentioned Esna.

He has experience and he knows that if the Governance Council doesn't let you in, you

10    can take another run at them.

He also testified that in some instances, the objections are so significant, you make the decision not to go back to the Governance Council.  But that's not what he did

15    here.

He thought he could build a business case to get them into SolutionsPlus.  And in good faith, he did everything he could to try and get them in.

20    He immediately developed his plan.

21    The plan focused on Citigroup.

22    Within a week, May 3rd, 2006 is that

23    first email.  John Hernandez, I spoke to Rob

24    DePinto and he was not the pleased.

That's within a week of him finding out about the decision.  And he took it on his shoulders and he built the business case.

He worked throughout the summer,
5    spring and summer of 2006 to build a business case.  He worked with Carl Wiese to try and get them approved.  And he almost, almost got it across the finish line.

Why didn't he get it across the
10    finish line?  It has nothing to do with Cisco. It has nothing to do with the lack of effort or fraudulent intent on the part of Mr. Hernandez.

Citigroup cancelled the pilot. That's all this is about.

15    His business case was focused on this major lighthouse account.  Citigroup. Citigroup cancelled the pilot.  He ran out of gas.

There were no more lighthouse
20    accounts left.  He tried for almost a year.

21    Now, Ms. Eiss said -- Ms. Eiss was
22    on the stand, and I thought it was a particularly
23    important moment when my partner, Mr. Damsgaard
24    asked her, confronted her with the fact that this

case is basically about accusing John Hernandez
of fraud.

And let's put up clip two and see
what Ms. Eiss said about that.

5          Do you understand he's accused of
fraud in this case?

Answer:  I'm not going to touch on
that.  What I'm going to say is that the
SolutionsPlus contract, which was vital to our
10   company, was always in progress and John was
supporting that.  We -- I was never told that we
were denied the SolutionsPlus product until
January of 2007.

So, I, in good faith, and I believed
15   in good faith with John Hernandez -- I can't
speak for what happened behind the scenes because
I wasn't privy to that.  But, to my face, John
and I, other people at Cisco were working to that
end as well.

20          Ms. Eiss could not bring herself to

21   tell you that John Hernandez committed fraud.  In
22   order for you to find fraud, you have to find an
23   intent to deceive.  And I would submit there's no
24   evidence that John Hernandez intended to deceive

XpertUniverse.

There were a lot of documents that
came in as trials do.  Some of them came in with
Ms. Eiss.  Some of them were published with John
5   Hernandez.

You don't have to write this down,
but after you go back there and you start your
deliberations, you're entitled to see these
exhibits.  So I have some numbers in
10   chronological order that tell the story of
exactly what happened between XpertUniverse and
Cisco.

Plaintiff's 38.

Defendant's 457.

15            Defendant's 576.

Defendant's 575.

Defendant's 573.

Defendant's 435.

Defendant's 456.

20            Defendant's 433.

21            Defendant's 432.

22            Defendant's 373.

23            Defendant's 455.

24            Defendant's 579.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

Plaintiff's 477.

Plaintiff's 478.

And Plaintiff's 41.

In chronological order, those tell

5    the story of what happened between John Hernandez

and Elizabeth Eiss with respect to SolutionsPlus

what I say is not evidence.  What Mr. Cantine

says is not evidence.

The evidence is what you heard from

10   the witnesses and what's in those documents.  And

if there's any doubt in your mind as to whether

Cisco or John Hernandez committed fraud, you can

refer back to any of those documents.

Two of the other elements that

15   XpertUniverse has to prove to your satisfaction

in order to establish fraud by concealment is

that the denial of SolutionsPlus were -- the

concealment of the denial of SolutionsPlus for

those months caused damages to XpertUniverse.

20   And as I said to you in the opening

21   statement, XpertUniverse died a natural death.

22   Cisco did not cause XpertUniverse to fail in any

23   way.

24   Nothing Cisco did caused them to

fail.  But most certainly, the denial of

admission to the SolutionsPlus partner program or

the concealment, alleged concealment of that

denial for a number of months did not cause them

5      to fail.

Remember, SolutionsPlus was a

three-month pilot program.  And to the extent

XpertUniverse wants to say that draft contract

didn't apply to them, it was also determinable at

10     will by Cisco.

And that was in the power point that

Ms. Eiss testified did apply to them, and this

was also in the draft contract.  And there's

very, very good reasons for that.

15     This is not a big company taking

advantage of a small company.  This is a big

company putting a small company's product on its

part list.

And that company has to take a risk

20     in putting that part on its part list.  And it

21     also is entitled to take it off its part list.

22     For purposes of this litigation,

23     XpertUniverse is putting way more emphasis on

24     this three-month pilot program, putting way more

emphasis on the consequences of getting into the

program, and putting way more emphasis on the

consequences of not getting into the program than

it is due.

5              Getting into SolutionsPlus meant

nothing if you did not have a product for Cisco

to sell.  And we know that XpertUniverse did not

have a product to sell.

             Can we put up clip three, please?

10   This is Mr. Steinhoff, one of the directors of

technology.

             "Question:  And as you said,

XpertUniverse never completed a product to be

sold; is that right?

15              "Answer:  Yes.

             "Question:  And you left in 2007;

right?

             "Answer:  Yes.

             "Question:  In July?

20              "Answer:  Yes.


21              "Question:  And at that time,

22   XpertUniverse still had no finished product;

23   right?

24              "Answer:  That's correct."

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

I'm not going to go into a semantic
distinction of what a finished product is and it
isn't, but there was no product that Cisco could
have put on its price list if XpertUniverse had
5    been admitted to this SolutionsPlus program.

Mr. Hernandez also explained to you
very clearly and directly what it means to be a
SolutionsPlus partner.  There are SolutionsPlus
partners that get admitted to this program
10   through this process we looked at, and they get
no money.  Cisco can't sell their products, and
they get removed from SolutionsPlus.

And then they go into this other
partner program called the Technology Developer
15   Program and do just fine.  There's no guaranteed
revenue for being a SolutionsPlus partner.

And, in fact, Mr. Hernandez gave you
examples of companies that have done far better
as members of this Technology Developer Program
20   for which XpertUniverse claims has no value to

21   it.

22           He mentioned Variant and Aquion,

23   other companies that were technology developer

24   partners and made lots of money having that Cisco

stamp of approval.  XpertUniverse was admitted to

that program, and the only reason it didn't have

value to XpertUniverse is because they never

completed a product.

5            None of these partner programs are

going to have value to you if there's no product

that you can sell.

            I want to talk for just a minute

about this integration.  We've heard a lot about

10    Genesys.  We've heard a lot about how Genesys was

a competitor of Cisco.

            That's not in dispute here.  This

isn't about competition.

            XpertUniverse was building a product

15    on the Genesys platform.  Cisco thought the

technology looked interesting.  You've heard that

from a number of witnesses.

            It's also undisputed.  And they

wanted XpertUniverse to build a version that was

20    a Cisco version.


21            Mr. Friedman testified under oath

22    that that integration was done in November 2006.

23    Really?  Where is it?  We haven't seen a single

24    document, not a single one.

In all the emails, all the product
manuals, all the flow charts of all the arrows,
you haven't seen a single piece of evidence that
that integration was complete.

5          Let's put up Mr. Zelkin's
testimony, please.  This is clip number four.
Mr. Zelkin, you might recall, was the chief
technology officer of XpertUniverse.  He was
there until July of 2007; after this alleged
10   concealment period ended.

Let's see what Mr. Zelkin had to say
about whether they had completed the integration
of the product that potentially could have been
in SolutionsPlus.

15          (Videotape deposition clip played as
follows.)

"Question:  The last one is complete
R2B7DX Cisco, maintain ability to deliver R2B7 in
August and R2B7.5 in December, complete Cisco
20   S-plus, BI demo only, no ability to fulfill any

21   contract for software or services.

22          So was R2B7 to be the build that had

23   the integration with a Cisco product?

24          "Answer:  Yes.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

              "Question:  And R2B6 was the product

that still had the Genesys --

              "Answer:  Correct.

              "Question:  -- engine?

5              "Answer:  Yes.  Mm-hmm.

              "Question:  Did XpertUniverse ever

contemplate R2B7?

              "Answer:  If they did, it would be

after my employment.

10             "Question:  Okay.  So as of the time

you left, the Cisco integration was not

completed?

              "Answer:  No.

              (End of videotaped deposition

15   excerpt.)

             MR. SCHUMAN:  That's the chief

technology officer.  He left in July 2007 and he

said the integration was not complete.  The Court

instructed you that you are entitled to determine

20   the credibility of witnesses, and I would submit

21   to you that Mr. Friedman's credibility, that

22   XpertUniverse actual completed there integration

23   in November 2006 is squarely an issue here.

24             Chief technology officer says it was

not done when he left in July of 2007, and

obviously it could not have been complete in

November of 2006.  Other evidence that you do

have available confirms it was not done in

5    November 2006.

There was a memorandum from

Mr. David Rutberg, you remember, chief operating

officer, to Mr. Friedman in September 2006,

saying, we need 9 million more dollars to

10   complete the Cisco integration.  We all know that

that XpertUniverse did not raise 9 million more

dollars after September 2006.

And there was another memo from Ms.

Eiss in December 2006, after Mr. Friedman claims

15   the integration was complete.  And in that memo,

Ms. Eiss said dire development situation.

December 2006, dire development situation and

recommended disengaging with Cisco so as not to

do further harm to the relationship.  There was

20   no integration.  There was no product that could

21   have been in SolutionsPlus.

22          There was also no mention of

23   SolutionsPlus in any of the significant

24   correspondence that the jury has seen following

January 2007.  If this was such a big deal, this
alleged concealment from this three-month pilot
program, you would expect to see it in an e-mail.

          Mr. Friedman did not respond to John
5   Hernandez's e-mail saying we're no longer
considering are for SolutionsPlus.  That was no
claim at that time that you deceived us, that you
defrauded us.  We heard that for the first time
when this lawsuit was filed over two years later.

10          Remember, there was that forged
letter, where Mr. Friedman is blaming Mr. Zelkin
for the downfall of XpertUniverse.  The letter
was May 31st, 2007, after this alleged
concealment ended.  There's no mention in there
15   about Cisco or SolutionsPlus having anything to
do with the downfall of XpertUniverse.  That
letter said, Mr. Zelkin drove this company into
the ground.

          August 14th, 2008, there's a letter
20   to Spencer Trask, one of the companies that is

21   funding XpertUniverse, saying, you your decision
22   to stop funding us caused our business to fail.
23   That's August 14, 2008.  No mention in there of
24   Cisco or SolutionsPlus or any concealment causing

this business to fail.

Mr. Friedman testified that
XpertUniverse investors decided not to fund
XpertUniverse as a result of learning for the
5    first time in January 2007 that XpertUniverse had
not been admitted to SolutionsPlus.

Where's the investors?  No investor
testified to that.  You didn't see a single
document, not an e-mail, not a letter.  There's
10    no evidence other than Mr. Friedman's testimony
that investors stopped funding XpertUniverse when
they heard that XpertUniverse was no longer a
candidate for SolutionsPlus.  It's pretty clear
that that funding dried up when XpertUniverse was
15    still a candidate for SolutionsPlus.

And you've heard a lot about
options, vague discussion about options during
this alleged concealment period.  You've heard
about Genesys, said that was an option.  Mr.
20    Cantine stressed Genesys in his closing argument.

21    There is no reason why somebody
22    cannot be a Genesys partner and a Cisco partner
23    at the same time, and Mr. Hernandez told you that
24    yesterday and he gave you an example of a

Company, Nice, that has a product with Genesys

and a product with Cisco and you can have both.

And there's no evidence in this case, none, that

Cisco ever told XpertUniverse, you can't work

5    with Genesys if you are going to work with us.

Mr. Hernandez said yesterday that would be out of

-- that would be out of place.

    And there's no evidence that

XpertUniverse had any option that it turned down

10   during this alleged concealment period,

April 2006 to January 2007, because of this

alleged concealment.

    The other company they mentioned is

IBM.  There's no evidence of any concrete option

15   from IBM during this alleged concealment period

that XpertUniverse turned down.  You didn't hear

from anybody from -- from Genesys or IBM.  No

witnesses came in here and said, we were prepared

to partner with them, but they didn't want us

20   because they were relying on Cisco.  There's no

21   evidence of that whatsoever.

22       The only place that comes from is

23   from Mr. Friedman's testimony.  And as the Court

24   said, you're entitled to consider the credibility

of witnesses and whether they have a stake in the

litigation.

And I would submit to you that

Mr. Friedman has the biggest stake in this

5   litigation of all.  He invested $10 million in

this company and it didn't succeed.  And that's

unfortunate.  There's a lot of failed startups

out there, but it's not Cisco's fault.

There are other reasons to question

10   Mr. Friedman's credibility.  You remember one of

the big things he said was, he was trying to call

John Hernandez to tell him this integration was

complete.  I was trying to call him.  I was

trying to call him.  He wouldn't return my calls.

15   I couldn't get ahold of him.  Why didn't he send

an e-mail?  I wanted to tell him on the phone.

The evidence is that Mr. Hernandez

and Mr. Friedman talked on the phone in

January 2007, prior to getting that e-mail saying

20   you're no longer a SolutionsPlus candidate.  And

21   as Mr. Hernandez said yesterday, Victor Friedman

22   didn't tell me the integration was complete.  He

23   had the opportunity to do so and he did not and

24   that e-mail, where he tells me you're no longer a

candidate for SolutionsPlus, January 22nd, 2007,

forwarded to Laurent Philonenko, says expected

escalation, because that's what we come to expect

now from our dealings with XpertUniverse.

5          In that e-mail, he confirms the

integration is not complete.  When the

integration is complete, we'd be happy to

continue to do business with you as a technology

developer partner, that other program that many

10   other partners have done very well in.

XpertUniverse wants a really big

number here.  They put it up on the board and you

heard Mr. Bratic say it:  $70 million.  Not only

is Cisco not responsible for XpertUniverse's

15   demise, but $70 million is not the value of

XpertUniverse at any point in time.          And you

heard two different damages experts.  You heard

Mr. Bratic and then you heard Mr. Wagner, and you

heard discussion about some documents that you

20   are not going to see.  And the issue is whether

21   it's appropriate for Mr. Bratic to be relying on

22   these documents for purposes of forming his

23   opinion that this company was worth $70 million,

24   a company with no customers, no products, no

revenues.

As you heard from the
cross-examination of Mr. Bratic and also from
Mr. Wagner today, the fundamental problem with
5    what Mr. Bratic did here is those documents that
you are not going to see were based on
projections from XpertUniverse management and
nothing more.

Can we put up number 17, please,
10   Rick, the graphic.

Remember this from this morning?  It
seems like a long time ago, but it was just this
morning.  Management projections is the
foundation for everything that Duff & Phelps and
15   Standard & Poor's did.  They did not check them.
There was nothing to check.  XpertUniverse said,
this is what we think we will do by 2010.  That's
the foundation.  Everything on top, multipliers,
discount factors, comparable, all that stuff,
20   that's what Duff & Phelps added.  And that's what

21   Mr. Bratic claims he checked.  But the one thing
22   he couldn't check, because nobody could check it,
23   are the management projections that form the
24   foundation for this valuation.

XpertUniverse says, this is how well
I think I'm going to do, even though I don't have
a finished product yet.  Duff & Phelps takes
that, applies a factor it, capitalizes it, gives
5    it a discount factor and says $70 million.  It's
not the value of XpertUniverse and it's not
XpertUniverse's damages in this case, I would
submit.

I'm not going to show you the Mike
10   Turillo e-mails again.  You've seen them a couple
times now.  I don't think you need to see them
again.  But they are significant because Mike
Turillo had a lot to say about the value of
XpertUniverse at the relevant time.

15          Mr. Cantine said those e-mails are
from back in February 2006.  Think about that.
That is the time period that Mr. Bratic was
focusing on, before April 2006, pretty close in
time, before the alleged concealment began.

20          Mr. Turillo said this business might

21   not even be worth $5 million.  Mr. Bratic just
22   blindly accepted the Duff & Phelps number without
23   considering any of this other evidence.

24          One point about Mr. Turillo I would

just like to remind the jury of.  We heard from

Mr. Friedman and we heard from Mr. Cantine that

he barely ever came into the office.  He didn't

know what was really going on at XpertUniverse

5   when he was writing those e-mails.

        The video deposition clip we played

yesterday from Mr. Turillo said that in late

2005, early 2006, he was spending 90 percent of

his time at XpertUniverse and had excellent

10   transparency into the business and spoke with

Victor Friedman daily.  That's his sworn

testimony in the deposition video you saw

yesterday.

        I don't think you get to the value

15   of XpertUniverse's business or its technology

because Cisco didn't do anything to cause that

business to fail, but if you do, you need to

consider what Mr. Wagner said.

        On the question of the value of

20   XpertUniverse, the market has spoken.

21   XpertUniverse failed.  There's no doubt about

22   that.

23        The accused Cisco products, which I

24   will get to in a minute, the allegation is those

products actually use XpertUniverse's IP.  We
don't think that's right, but if it is right,
those products didn't do any better.  All the
accused products are either discounted, dead, or

5    the one product, Remote Expert, that is not dead,
was projected to do this much in revenue
(indicating) and as you heard for the last couple
of days, it had one pilot at Home Depot.

And the market, nobody knows the

10   market better than John Hernandez, and John
Hernandez told you that there had been many
companies trying to do what XpertUniverse was
trying to do here, get expert, subject matter
experts, people outside the Contact Center

15   Enterprise involved in helping solve customer
problems and nobody has been able to do it.

The reason Cisco was interested in
XpertUniverse was because they claimed they could
do it, but they couldn't and all they had was a

20   demo, and they failed.

21          I want to turn to the patent case

22   quickly.  We're almost out of time here.

23          A general comment about the patent

24   case.  I know it's hard to follow.  It's hard for

patent lawyers to follow sometimes.  But these

accused products you've heard about, Expert

Advisor, Remote Expert, Pulse, I would submit to

you that these are square pegs that do not fit in

5    the round holes of these patents.    Dr.

Nourbakhsh and XpertUniverse are trying to

squeeze products that have nothing to do with

these products into the claims.

The first patent, the '709 patent.

10    Can you put up CL6, please.

The '709 patent, remember, we showed

you all those graphical user interfaces.  The

'709 patent is about the look and feel of the

platform, a web page.  Remember Mr. Lepore came

15    down from Massachusetts to tell you about this

product.  He designed this product.  He created

it.  Nobody knows better how this product works.

Expert Advisor is a telephone call

only.  There's no graphical user interface.  It's

20    a telephone call.  It cannot possibly infringe

21    the '709 patent.  I don't need to show you the

22    hurdles.  You can knock them all down.  A

23    telephone call cannot infringe a patent that

24    requires a graphical user interface or the

presentation of something graphically to a

user.

Pulse.  You heard from Mr. Gannu,

the engineer who designed Pulse.  Cisco has no

5     burden to show you these products do not

infringe.  The Court gave you the instruction.

XpertUniverse must prove to you these products

infringe.  But we brought the engineers who

designed the accused products to explain to you

10    very clearly how they work.

Pulse is a search engine.  That's

it.  It's like Google.  You heard Mr. Gannu.

That's a search bar at the top that's like

Google.  You type in anything you want.

15    Dr. Nourbakhsh mentioned this thing

called a tag cloud.  You click on a tag.  It runs

a search.  There's nothing more to it than that.

There's not enough stuff on the interface to

infringe the patent.

20    The other patent, the '903 patent --

21    can we put up CL7, please.  Remember this,

22    complicated diagram?  I'm not going to go through

23    it now.  I don't have time.  Mr. Lepore walked

24    you through the whole thing.  This is the '903

patent applied to this.

Dr. Nourakhsh's theory is that these things over here, assignments, queues, are organized from these things over here, call

5   types.  Mr. Lepore built the product.  He explained to you, carefully demonstrated to you, there's no connection between the two whatsoever.

These things are not organized from these things, noninfringement with respect to

10  Expert Advisor on the '903 patent.

Remote Expert, we bought you Bill Dry.  It's a button that you push at Home Depot and it makes a phone call to a group of agents.

Dr. Nourbakhsh, I would submit to

15  you, when he talked up there on the witness stand about why he thinks it infringes, he did not tie anything in Remote Expert to any of the elements of claim 12 of the '903 patent.

Push the decorator button, calls a

20  phone number, gets you a group of agents.  That

21  does not infringe the patent.

22          I want to talk about invalidity very

23  briefly.  We have the burden of proof there and I

24  would submit to you that we carried that burden.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

Remember Dr. Chatterjee, he was in here.  He
looked at all that code.  You might have been
wondering, why did he do that?  Because he found
in the code that these patents were in the code
5    prior to the critical date.  XpertUniverse had
embedded these patents in their software prior to
the critical date.

          And I have to connect the dots for
you here because we didn't show them to you, but
10   the patents are invalid if prior to the critical
date, XpertUniverse was offering for sale a
product that embodied these patents.

          And I would just quickly put up on
the screen, please, Rick, Defendant's 110.
15            Defendant's 110, March 3rd, 2003.
That's before April 2nd, 2003, the critical date.

          And if we go to the second page --
third page, please, next page.  XpertUniverse,
prior to the critical date, when their inventions
20   are in their code is offering Allstate

21   KnowledgeSHARE.  That's the product that Dr.

22   Chatterjee examined.  KnowledgeSHARE embodied the

23   inventions.  KnowledgeSHARE was being offered to

24   Allstate.

Remember what Dr. Chatterjee said?

It's black and white.  It's either in the code or
it's not.  He found it in the code.  They offered
it for sale.  It does not matter that they didn't
5    actually succeed in selling it to Allstate.  We
know they didn't succeed in selling it to
anybody.  It also does not matter that it wasn't
a finished product.  The law is that if they
offer the invention in the patents for sale prior
10   to the critical date, those patents are invalid.
And I would submit to you that we have proven the
patents are invalid.

In closing, Cisco did nothing wrong
here.  It did nothing to hurt XpertUniverse.
15   XpertUniverse is just one of many failed
startups.

Cisco wanted, wanted this
relationship to work.  Why else would John
Hernandez have done all the things that he did?
20   Those are not alleged things.  Those really

21   happened.

22              Those e-mails to Carl Wiese, Senior

23   Vice President at Cisco, John put his credibility

24   on the line for XpertUniverse.  He was

disappointed it didn't work out.  He and Cisco

are doubly disappointed to find itself in this

lawsuit being accused of fraud for its efforts.

          You should not order Cisco to pay

5    any money to XpertUniverse for its business

failure that Cisco did nothing to bring about.

XpertUniverse's lawyers have done their very best

to spin a story, to connect this three-month

pilot program, SolutionsPlus, to its own business

10   failure, but I would submit the evidence is just

not there.

          This is where I ended the opening as

well.  Remember what Mr. Turillo said to

Mr. Friedman in one of those many e-mails.  He

15   said, it's okay to fool others.  I disagree with

Mr. Turillo.  It's never okay to try to fool

anybody, and it's certainly not okay to try to

fool a Court of law.

          I want to thank you for your time

20   and attention.  It was only a little over a week

21   ago, it seems like a lot longer than for me.

22   You've seen lots of evidence, lots of technical

23   information, patents, source code, and I'm sure

24   it was difficult to follow, but on behalf of my

client, Cisco, my hard-working team, I want to

thank you for your time and attention.

        THE COURT:  All right.  Thank you,

Mr. Schuman.

5        We're going to take about one

minute, which I encourage you to just stand up in

your place while Mr. Cantine gets his thoughts

together.  He's going to speak for nine minutes

or less.

10        MR. CANTINE:  Less, your Honor.

        THE COURT:  Less.  I'm going to

stand up, so, you know, you don't have to.

        (Pause.)

        MR. CANTINE:  I'm ready.

15        THE COURT:  All right.  All right,

Mr. Cantine.

        MR. CANTINE:  So I get the last

word.  That's always good.

        Now, I'm not really sure where to

20    start there.  Mr. Schuman was suggesting that Mr.

21    Hernandez was the champion, that it was somehow

22    wrong for Ms. Eiss not to throw him under the bus

23    when she got up on the stand.  But she told you

24    the truth.  She told you what she thought,

Because she thought that Mr. Hernandez was the

champion.

And Mr. Schuman is suggesting that

somehow, when Mr. Friedman responded to that

5   January 2007 e-mail, he's supposed to mention all

this concealment, all of the denial from

SolutionsPlus.  Where's the anger, he said?

Well, you know, we didn't learn

about it until we got in litigation.  We didn't

10   have all these e-mails about stalling and calling

us a competitor.  Those came out in litigation.

You know, that somehow Mr. Friedman is supposed

to mention those in his e-mail back to Mr.

Hernandez, gee, thanks for letting me know about

15   SolutionsPlus.  I guess I will find out later

about all the stalling and the competitor and

everything else.  I mean, it's ridiculous.  Use

your common sense.

And to criticize Ms. Eiss for

20   sitting up there and not knowing what she knows

21   now, to criticize her for not taking some shots

22   at Mr. Hernandez.  I think she ought to be

23   awarded.

24   They want to keep arguing this

three-month pilot program.  Did they ever show

you a signed contract?  No.  Some draft template?

They never put a signed contract in front of you.

It's meaningless.

5          They talk about this SolutionsPlus

program.  I was listening closely; right?  I'm

sorry, about that other technology program.  We

could admit you, we could deny you, we could kick

you out.  No guarantees.  It doesn't sound like a

10     great partner program to me.

They criticize the Standard & Poor's

and Duff & Phelps reports, but their own witness,

their own expert said, this is what these guys

rely on.  It was tested.  It was analyzed.  It

15     was reviewed.  It's the best evidence they had.

We're looking back.  We're trying to figure out

what the company was worth in April 2006.

Put that claim up, please.

Now, what was remarkable about the

20     closing statements, you didn't hear any remorse,

21     didn't hear any regret, didn't hear any sorrow.

22     I heard a lot of anger.  And I'm telling you, to

23     hear again that my client died a natural death,

24     use your common sense.  That's what we asked you

in the beginning.

That's what we're asking for.  You
are going to have a verdict form.  It's going to
be item number A, fraudulent concealment.  Did we
5    prove our claim?  Answer yes or no.  I want you
to write in yes.

It's going to ask you what damages
you award.  That's what we're asking for.  And on
behalf of my client, thank you for your time.  It
10   has been a long week-and-a-half, but really
appreciate it.  Thank you very much.

That's all, your Honor.

THE COURT:  Thank you, Mr. Cantine.

Members of the Jury, let me finish
15   up by explaining some things about your
deliberations in the jury room and your possible
verdicts.

Once you start deliberating, do not
talk to the jury officer or to me or to anyone
20   else except each other about the case.  If you

21   have any questions or messages, you must write
22   them down on a piece of paper, sign them, and
23   then give them to the jury officer.
24              The officer will give them to me and

I will respond as soon as I can.  I may have to

talk to the lawyers about what you have asked, so

it may take some time to get back to you.  Any

questions or messages normally should be sent to

5    me through your foreperson who, by the custom of

this Court, is Juror No. 1.

One more thing about messages.  Do

not ever write down or tell anyone how you stand

on your votes.  For example, do not write down or

10   tell anyone that you are split five to three or

six to two, and whatever your vote happens to be.

That should stay secret until you're finished.

Your verdict must represent the

considered judgment of each juror.  In order for

15   a jury to return a verdict, it is necessary that

each jury agree to the verdict.  Your verdict

must be unanimous.

It is your duty as jurors to consult

with one another and to deliberate with a view

20   towards reaching an agreement if you can do so

21   without violence to your individual judgment.

22   Each of you must decide the case for

23   yourself, but do so only after an impartial

24   consideration of the evidence with your fellow

jurors.  In the course of your deliberations, do

not hesitate to re-examine your own views and

change your opinion if convinced it is erroneous.

But do not surrender your honest conviction as to

5      the weight or effect of evidence solely because

of the opinion your fellow jurors or for the

purpose of returning a verdict.

Remember at all times that you are

not partisans, you are judges, judges of the

10     facts.  Your sole interest is to seek the truth

from the evidence in the case.

A form of verdict has been prepared

for you.  It is basically two pages of questions,

which can be answered yes or no, or in the

15     questions that involve damages, if you find

awarding damages is appropriate, then you write

in a number.  And so you will have that with you

and it basically provides the questions that you

need to answer.

20     You will take this form to the jury

21     room and when you reached unanimous agreement as

22     to your verdict, you will have your foreperson

23     fill in, date and sign the form.  Then each of

24     you will be asked to sign it also.  You will then

return to the courtroom.  My deputy will read

aloud your verdict.

It is proper for me to add the

caution that nothing said in these instructions

5   and nothing in the form of the verdict is

meant to suggest or convey in any way or manner

any intimation or hint as to what verdict I think

you should find.  What the verdict shall be is

your sole and exclusive duty and responsibility.

10   Now that all the evidence is in and

the arguments are completed, you will be free to

talk about the case in the jury room.  In fact,

it is your duty to talk with each other about the

evidence and make every reasonable effort you can

15   to reach unanimous agreement.  Talk with each

other, listen carefully and respectfully to each

other's views and keep an open mind as you listen

to what your fellow jurors have to say.

Try your best to work out your

20   differences.  Do not hesitate to change your mind

21   if you are convinced that other jurors   are

22   right and that your original position was wrong.

23   But do not ever change your mind just because

24   other jurors see things differently or just to

get the case over with.  In the end, your vote

must be exactly that, your own vote.  It is

important for you to reach unanimous agreement,

but only if you can do so honestly and in good

5  conscience.

No one will be allowed to hear your

discussions in the jury room and no record will

be made of what you say.  So you should all feel

free to speak your minds.

10  Listen carefully to what the other

jurors have to say and then decide for yourself.

During your deliberations, you must

not communicate with or provide any information

to anyone by any means about this case.  You may

15  not use any electronic device or media, such as

the telephone, a cellphone, a smart phone, an

iPhone, a Blackberry, the computer, the Internet,

any Internet service, any text or instant

messaging service, any Internet chat room, blog

20  or website -- I'm sorry, I didn't write this

21  part -- such as Facebook, MySpace, LinkedIn,

22  YouTube or Twitter -- although I didn't write it,

23  the message is very important -- to communicate

24  to anyone any information about this case or to

conduct any research about this case until I
accept your verdict.

          In other words, you cannot talk to
anyone on the phone, correspond with anyone or
5    electronically communicate with anyone about this
case.  You can only discuss the case in the jury
room with your fellow jurors during
deliberations.

          Lastly, let me finish by repeating
10   something I said to you earlier.  Nothing that I
have said or done during this trial was meant to
influence your decision in any way.  You must
decide the case yourselves based on the evidence
presented.

15          So before I send you back, because
we're going to swear the bailiff, take you back,
it is obviously late in the day.  And so what I'm
thinking is that you'll go back and get yourself
organized, but that I expect that unless you
20   unanimously decide you want to stay after

21   5:00 o'clock, that at 5:00 o'clock you'll just go
22   home and you'll come back tomorrow so that you
23   are all here by 9:30.  And until you are all
24   here, you won't discuss the case.  You'll only

discuss the case when all eight of you are here.

All right?

So can we have the bailiff sworn?

(Court Security Office sworn.)

5          THE COURT:  All right.  If you would

go with the Court Security Officer.

(The jury was excused to the jury

room.)

THE COURT:  Mr. Cantine?

10          MR. CANTINE:  I have not had a

chance to talk to my local counsel, your Honor,

but I think there are at least two things in that

closing statement that were improper.

THE COURT:  Before we do that, let's

15    just deal with the jury.

Does anybody object this is what

typically happens, that they just go home without

being brought back into court?

MR. CANTINE:  Yes.  I mean, at

20    5:00 o'clock, yes.  We don't need to see    them.

21          THE COURT:  Okay.  And that tomorrow

22    morning, they just start up again.  There's no

23    need to say good morning to them at 9:30?

24          MR. ROVNER:  That's right.

MR. CANTINE:  Yes.  I mean, do you

want us here?

THE COURT:  No, no, no, no.  As far

as I'm concerned, you can -- yeah.  The Deputy

5    Clerk will make sure.  She has many different

ways of contacting probably Mr. Rovner and Mr.

Blumenfeld, but however you want to arrange it,

just so you can be brought back.

Because if they do have a question

10   or a note, I'm going to authorize my staff to

tell you what's written in the note when she

calls to bring you over here.

MR. CANTINE:  Before we get here?

THE COURT:  Yeah.

15   MR. CANTINE:  Okay.

THE COURT:  So you can be thinking

about it.

MR. CANTINE:  Gotcha.

THE COURT:  I always hated when I

20   was a lawyer and the judge had a 30-minute head

21   start.  But so, you know, I expect you should be

22   able to get over here in ten minutes because I'm

23   not going to respond to anything without getting

24   input.

MR. CANTINE:  Right.  We're a block

away, so...

THE COURT:  Okay.  And in any event,

Cisco is all good with that?

5          MR. SCHUMAN:  Yes, Your Honor.

THE COURT:  So, Mr. Cantine, you

were saying two objectionable things.  I noticed

one.

What was the other?

10          MR. CANTINE:  That this evidence was

admitted over objection.

THE COURT:  Well, that's the one I

noticed.  What was the other?

MR. CANTINE:  The forged document.

15     There's evidence of a forged document.

THE COURT:  Well, so what is your --

MR. CANTINE:  I don't know if we

need some instruction or something.  I don't

know.

20          It's hanging out there that there's

21     forged evidence and suggesting that Mr. Friedman

22     was not all that honest on the stand.

23          I don't want the jury making the

24     wrong conclusion, Your Honor.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

THE COURT:  Well, I thought the

context was -- maybe I wasn't paying attention

sufficiently, but I thought the context was in

regards to this May 31st, 2007 document, which

5    based on the testimony, that it was on his

computer.  He denied writing it.

MR. CANTINE:  That is not evidence

of forgery.

THE COURT:  Well --

10    MR. CANTINE:  I mean, that is a

completely improper inference for the jury to be

taking back.  I didn't stand up and object

because I wanted him to finish, and now I'm being

punished twice.

15    THE COURT:  Well, all right.  I hear

your.  I hear your complaint.

Mr. Schuman.

MR. SCHUMAN:  Your Honor, I think we

established or at least established a basis for

20    me to make the closing argument to the jury that

21    that letter was forged.  We've had a lot of

22    discussion about that letter in this case.

23    I didn't publish it to the jury

24    here.  We asked Mr. Friedman on the stand, did

you write it?  He said, No.

THE COURT:  Actually, you know what.
I'm thinking it is because, of course, the idea
was it said it was coming from Zvia Faro.

5             MR. SCHUMAN:  Correct.

THE COURT:  And we know there's a
lot of evidence that she didn't actually write
it.

MR. SCHUMAN:  Correct.

10            THE COURT:  Right.  We disagree with
that as a factual basis.

MR. CANTINE:  She denied writing it.
That evidence is not here.

THE COURT:  Well, I thought that
15       actually Mr. Friedman testified to that.

MR. SCHUMAN:  He did.  He testified
that he discussed it with her and she denied
writing it.

THE COURT:  And I think he also said
20       that he believed that she did not write it.

21            MR. CANTINE:  That doesn't make it a
22       forged document.  It makes it a document that
23       nobody knows who wrote.
24            THE COURT:  Well, you know, to me,

it's not a stretch of the English language to say

that if you have something that's signed Zvia

Faro and Zvia Faro didn't write it and didn't

authorize the writing, that's a forged document.

5            MR. CANTINE:  I'm not sure.  It's

not signed.

             It's a draft.  It was never sent.

Never saw the light of day.

             That's the evidence.  It came off of

10   his computer.

             He denied writing it.  She denied

writing it.  That does not make it a forgery,

Your Honor.

             THE COURT:  All right.

15            MR. CANTINE:  That makes it an

unauthen -- unauthen -- I can't say the word.

             THE COURT:  Unauthenticated?

             MR. CANTINE:  Thank you.  That

doesn't make it a forgery.  And he's trying to

20   tie it to my client.

21            THE COURT:  Well, actually, I mean,

22   tying it to your client, I think, is perfectly

23   legitimate.

24            MR. CANTINE:  Not a forgery.

THE COURT:  Well, you know, and I

don't think -- he wasn't used -- you know, part

of the reason why I guess I didn't -- it didn't

ring a big bell with me, I didn't understand him

5    to be saying a crime was committed here.  I think

what he was saying --

MR. CANTINE:  Well, did you hear all

the credibility arguments, all the credibility

arguments he was making in his closing statement?

10    He's trying to leave the inference with the jury

that my client was not truthful on the stand and

forged this document.

THE COURT:  All right.  Well, I

understand what you're saying and I don't think

15    it was -- I don't think it was an unfair comment

on the evidence.

And I think there was an evidentiary

support for it.  So I'm going to -- you know,

your objection is noted, but I'm not going to do

20    anything about it.

21    MR. CANTINE:  All right.  What about

22    the other one?

23    THE COURT:  Well, Mr. Schuman, I

24    couldn't help but notice that you referred to it

for no good reason.  And I assume that that was

part of getting the 40 minutes done.

But what do you think about that.

MR. SCHUMAN:  Well, Your Honor, and

5    I I'm not actually clear exactly what I said

about it at this point because I was rushing.

THE COURT:  You said at 4:01, the

SolutionsPlus approval process and you put up the

diagram, let's call it Version 2 where it shows

10   the loop back.  And you said to which

XpertUniverse objected to its admissibility.  I

mean you did because --

MR. SCHUMAN:  I remember that.

THE COURT:  Mr. Cantine could spot

15   that one.

MR. SCHUMAN:  Well, and so, Your

Honor, all I can do is apologize to the Court.

If an appropriate curative instruction is

necessary, that's fine.

20   THE COURT:  Well, and I guess the

21   question is do -- all right.  I mean, do you want

22   me to give a curative instruction, Mr. Cantine?

23   MR. CANTINE:  Please.

24   THE COURT:  All right.  And how

would you like me to do that?  Call them back
now?

          MR. CANTINE:  I think that's
appropriate before they make any decision.  And I

5    think it should be attributed to counsel for
Cisco.

          THE COURT:  Well, obviously, I'm
going to tell them that I'm striking it.  I'm not
going to --

10          MR. CANTINE:  I don't want to leave
it hanging out there that one of us said it.

          THE COURT:  All right.  Well, I
think that's your choice because I do think Mr.
Schuman should not have said it clearly.  And, so

15    I guess, can we go bring the jury back in?

          You can all sit down.  Sorry.

          Of course, now you can stand back
up.

          The people in the audience, you

20    don't have to stand.

21          (Jury entering the courtroom at 4:54

22    54 p.m.)

23          THE COURT:  Members of the Jury,

24    thank you for coming back.  There is one thing

that I should have done something about, but I
didn't.

During the closing argument by Mr.
Schuman, about ten minutes into it, he mentioned
5   that he referred to an exhibit put up on the
screen and stated that XpertUniverse had objected
to its admissibility.  That was an improper
comment on the evidence.

And I've told you about the rulings
10  and objections lawyers need to do when they think
the Rules of Evidence require.  So I am striking
that remark and asking you to disregard it.

All right?

THE JURY:  Okay.

15  THE COURT:  Okay.  You can go back.
Thank you.

(Jury leaving the courtroom at 4:55
p.m.)

THE COURT:  All right.  I imagine
20  perhaps there's some work to be -- everyone sit

21  down -- that there's some work to be done with

22  the Courtroom Deputy about exhibits.  And so it's

23  probably a good time to start doing that.

24  No?  Yes?

Oh, these are all taken care of?

THE CLERK:  Yes.

THE COURT:  Okay.  Apparently it was all taken care of.  Good work on everyone's part.

5          Is anything else to do other than say goodnight?

MR. SOBEL:  Can we be heard on two minutes for the issue of punitive damages?

THE COURT:  Well, that ship has

10   sailed, but if you'd like to talk about it for two minutes, go ahead.

MR. SOBEL:  Thank you, Your Honor. We submit that there was evidence in our case in chief that those involved with the alleged

15   tortious concealment here, there's a lot of emails, and they demonstrate that people on those emails, including Mr. Hernandez were all managing agents of Cisco.  That's within the documentary evidence itself.  And it demonstrates that

20   they're managers.

21          And under the California Supreme

22   Court case that we cited to you in the letter,

23   that meets the test, which is an issue for the

24   jury.  And in the event, even though -- even if

that wasn't sufficient for our case in chief,

that seemed to be the issue that you base your

ruling on.

We've done some research and, you

5    know, I submit this is a procedural issue under

Federal Law of whether -- you know, whether the

evidence from the entire case can be considered

to support us going to the jury on punitive

damages.

10    And in my preliminary research, I

took a lack at Foster v. Nutritional Fuel

Company, in the Third Circuit case, 316, F.3d

424, 2003 which suggests that you can use

evidence from the entire case to cure any lack of

15    evidence.  In this situation, under Rule 50.

And, also, I think that, for

equitable reasons, that there would be no harm

if, after the jury came back, they were charged

on punitives because -- and if you take that --

20    if it turns out that afterwards you want to, you

21    know, deal with it on a post-trial motion as

22    opposed to some substantial prejudice in having a

23    whole new trial, I think that the scale of the

24    substantial prejudice that might occur, even if

you think that it's likely there's no basis, that
because it's such substantial prejudice and a
little harm in having the jury deciding on the
question, that it should be given to the jury.

5            THE COURT:  All right.  Well, thank
you, Mr. Sobel.

            I will look at the case you cited.
And if it causes me to have some second thoughts,
or whatever it causes me, I'll let you know.

10            Okay.  Anything else?

            All right.  Well, you know, at some
point, one side or the other is probably not
going to be very happy, so let me just thank you
all for the efforts you put into the case.

15            And, you know, I thought in
particular, except the one sentence that Mr.
Schuman said, both closing arguments were very
good by both sides.  I think you properly framed
the issues for the jury.

20            So I don't know what they'll decide,

21     but it's a good job by both sides, and

22     particularly Mr. Cantine and Mr. Schuman.

23            So, thank you.

24            MR. CANTINE:  Thank you, Your Honor.

MR. SCHUMAN:  Thank you, Your Honor.

THE CLERK:  All rise.

(Court was recessed at 4:59 p.m.)

5

10

15

20

21

22

23

24

State of Delaware)
                 )
New Castle County)


                 CERTIFICATE OF REPORTER


 5              I, Heather M. Triozzi, Certified
      Professional Reporter, Registered Professional
      Reporter, and Notary Public in the State of
      Delaware, do hereby certify that the foregoing
      record, Pages 2005 to 2354 inclusive, is a true
      and accurate record of the above-captioned
      proceedings held on March 20, 2013, in
      Wilmington.
              In witness whereof, this 20th day of
      March, 2013, at Wilmington.
10

                        Heather M. Triozzi, CSR, RPR
                        Cert. No:  184-PS
                        Exp:  Permanent




15
      DATED:  March 20, 2013




20


  21

  22

  23

  24

                  Hawkins Reporting Service
        715 N. King Street - Wilmington, Delaware  19801

5

10

15

20

21

22

23

24