IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| XPERTUNIVERSE, INC., | ) | |
| | ) | |
| Plaintiff and Counterdefendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 09-157 (RGA) |
| | ) | |
| CISCO SYSTEMS, INC., | ) | |
| | ) | |
| Defendant and Counterclaimant. | ) | |

**DEFENDANT AND COUNTERCLAIMANT CISCO SYSTEMS, INC.'S
OPENING BRIEF IN SUPPORT OF MOTION FOR JUDGMENT
AS A MATTER OF LAW UNDER RULE 50(b) AND, IN THE ALTERNATIVE,
FOR REMITTITUR OR NEW TRIAL UNDER RULE 59 (a)(1)**

OF COUNSEL:

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Kathleen M. Sullivan
Cleland B. Welton II
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Daniel H. Bromberg
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
(650) 801-5000

MORGAN, LEWIS & BOCKIUS LLP
Brett M. Schuman
One Market Street, Spear Street Tower
San Francisco, CA 94105
(415) 442-1000

Kell M. Damsgaard
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000

May 6, 2013

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com

*Attorneys for Defendant-Counterclaimant
Cisco Systems, Inc.*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................................ iii

I.      INTRODUCTION .................................................................................................... 1

II.     LEGAL STANDARDS ............................................................................................ 3

III.    CISCO IS ENTITLED TO JMOL OR NEW TRIAL ON LIABILITY FOR
        FRAUDULENT CONCEALMENT ......................................................................... 5

        A.      No Rational Jury Could Have Found That The Fact Purportedly Concealed
                By Cisco Was Material ................................................................................. 5

        B.      Alternatively, Cisco Is Entitled To A New Trial On Fraudulent
                Concealment ................................................................................................ 8

IV.     CISCO IS ENTITLED TO JMOL, OR TO REMITTITUR AND/OR NEW
        TRIAL, ON THE DAMAGES AWARDED FOR FRAUDULENT
        CONCEALMENT ................................................................................................... 8

        A.      Cisco Is Entitled To JMOL That XU Did Not Cause XU To Suffer $70
                Million In Lost Value Damages .................................................................. 8

                1.      No Reasonable Jury Could Find With Reasonable Certainty That
                        XU Lost Value ................................................................................. 10

                2.      No Reasonable Jury Could Find With Reasonable Certainty That
                        The Amount Of XU's Lost Value Was $70 Million .............................. 14

                3.      No Reasonable Jury Could Find That Cisco's Delay In Disclosing
                        The Denial Of XU's SolutionsPlus Application Caused Any Loss
                        In XU's Value ................................................................................. 19

        B.      Alternatively, The Court Should Grant Remittitur And/Or A New Trial On
                Damages For Fraudulent Concealment ........................................................ 22

                1.      Any Damages Awarded For Fraudulent Concealment Should Be
                        Remitted To $2.66 Million Or At Most $4 Million ............................... 22

                2.      Cisco Is Entitled To A New Trial On Damages For Fraudulent
                        Concealment .................................................................................... 24

V.      CISCO IS ENTITLED TO JMOL OR NEW TRIAL ON THE PATENT
        INFRINGEMENT CLAIMS .................................................................................... 27

## TABLE OF CONTENTS (cont'd)

**Page**

A.  Cisco Is Entitled To JMOL On The Remote Expert Infringement Claim ............27

B.  Cisco Is Entitled to JMOL On The Expert Advisor Infringement Claims............30

C.  Cisco Is Entitled To JMOL Based On The On-Sale Bar ....................................32

D.  Alternatively, Cisco Is Entitled To A New Trial On The Patent
    Infringement Claims .........................................................................................33

VI. CONCLUSION .........................................................................................................34

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*AlphaMed Pharms. Corp. v. Arriva Pharms., Inc.*,
    432 F. Supp. 2d 1319 (S.D. Fla. 2006),
    *aff'd*, 294 F. App'x 501 (11th Cir. 2008) .............................................. 17, 18, 19

*Bank of Am. Corp. v. Superior Court*,
    198 Cal. App. 4th 862 (2011) ........................................................... 5

*Beck v. City of Pittsburgh*,
    89 F.3d 966 (3d Cir. 1996) ............................................................... 3

*Becton, Dickinson & Co v. Tyco Healthcare Grp., L.P.*,
    616 F.3d 1249 (Fed. Cir. 2010) ...................................................... 27

*Blakey v. Cont'l Airlines, Inc.*,
    992 F. Supp. 731 (D.N.J. 1998) ...................................................... 4

*Bullen v. Chaffinch*,
    336 F. Supp. 2d 342 (D. Del. Sept. 17, 2004) ............................... 3, 4

*Cargill, Inc. v. Canbra Foods, Ltd.*,
    476 F.3d 1359 (Fed. Cir. 2007) .................................................. 32, 33

*Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*,
    350 F. Supp. 2d 582 (D. Del. 2004) ............................................... 26

*Cornell Univ. v. Hewlett-Packard Co.*,
    609 F. Supp. 2d 279 (N.D.N.Y. 2009)
    *cross-appeals dismissed*, 455 F. App'x 954 (Fed. Cir. 2010) ................. 3

*Cortez v. Trans Union, LLC*,
    617 F.3d 688 (3d Cir. 2010) ...................................................... 4, 22

*Donald M. Durkin Contracting, Inc. v. City of Newark*,
    2008 WL 952984 (D. Del. Apr. 9, 2008) ......................................... 4

*Donlin v. Philips Lighting N. Am. Corp.*,
    581 F.3d 73 (3d Cir. 2009) ............................................................. 27

*Dura Auto. Sys. Of Ind., Inc. v. CTS Corp.*,
    285 F.3d 609 (7th Cir. 2002) ......................................................... 26

*Engalla v. Permanente Med. Grp., Inc.*,
    15 Cal. 4th 951 (1997) ................................................................... 6

*Eshelman v. Agere Sys., Inc.*,
    554 F.3d 426 (3d Cir. 2009) ........................................................... 3

**TABLE OF AUTHORITIES (cont'd)**

**Page**

*Evans v. Port Auth. of N.Y. & N.J.*,
   273 F.3d 346 (3d Cir. 2001) ............................................................. 5

*Fladeboe v. Am. Isuzu Motors, Inc.*,
   150 Cal. App. 4th 42 (2007) ........................................................... 23

*Galena v. Leone*,
   638 F.3d 186 (3d Cir. 2011) ............................................................. 3

*Gasperini v. Ctr. for Humanities, Inc.*,
   518 U.S. 415 (1996) ...................................................................... 24

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ...................................................................... 27

*Goehring v. Chapman Univ.*,
   121 Cal. App. 4th 353 (2004) .................................................... 15, 20

*Gray v. Don Miller & Assocs., Inc.*,
   35 Cal. 3d 498 (1984) .................................................................... 20

*Grupe v. Glick*,
   26 Cal. 2d 680 (1945) .................................................................. 8, 9

*Hirst v. Inverness Hotel Corp.*,
   544 F.3d 221 (3d Cir. 2008) ........................................................... 27

*IPPV Enters., LLC v. Echostar Commc'ns. Corp.*,
   191 F. Supp. 2d 530 (D. Del. 2002) .............................................. 5, 22

*In re James Wilson Assocs.*,
   965 F.2d 160 (7th Cir. 1992) ......................................................... 26

*Kenly v. Ukegawa*,
   16 Cal. App. 4th 49 (1993) ............................................................ 23

*Kids' Universe v. In2Labs*,
   95 Cal. App. 4th 870 (Cal. Ct. App. 2002) ........................... 9, 10, 13, 14

*Kruse v. Bank of Am.*,
   202 Cal. App. 3d 38 (1998) ............................................................ 20

*Legendary Art, LLC v. Godard*,
   2012 WL 3550040 (E.D. Pa. Aug. 17, 2012) .................................... 26

*Lifescan, Inc. v. Home Diagnostics, Inc.*,
   103 F. Supp. 2d 345 (D. Del. 2000),
   *aff'd*, 13 Fed. App'x 940 (Fed. Cir. 2001) ........................................ 3

## TABLE OF AUTHORITIES (cont'd)

**Page**

*McMillan v. Weeks Marine, Inc.*,
478 F. Supp. 2d 651 (D. Del. 2007) ................................................................. 25

*Meteorlogic, Inc. v. KLT, Inc.*,
368 F.3d 1017 (8th Cir. 2004) ........................................................................... 26

*Mindgames, Inc. v. W. Publ'g Co.*,
218 F.3d 652 (7th Cir. 2000) ............................................................................. 14

*Minn. Mut. Life Ins. Co. v. Ensley*,
174 F.3d 977 (9th Cir. 1999) ............................................................................. 20

*Nat'l Controls Corp. v. Nat'l Semiconductor Corp.*,
833 F.2d 491 (3d Cir. 1987) .............................................................................. 12

*Oiness v. Walgreen Co.*,
88 F.3d 1025 (Fed. Cir. 1996) ........................................................................ 5, 22

*Paradox Sec. Sys. v. ADT Sec. Servs.*,
388 F. App'x 976 (Fed. Cir. 2010) ..................................................................... 28

*Parlour Enters., Inc. v. Kirin Grp., Inc.*,
152 Cal. App. 4th 281 (2007) .................................................................. 9, 12, 17

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
711 F.3d 1348 (Fed. Cir. 2013) ........................................................................... 4

*Pryer v. C.O. 3 Slavic*,
251 F.3d 448 (3d Cir. 2001) ................................................................................ 4

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000) ............................................................................................ 3

*Rohm & Haas Co. v. Brotech Corp.*,
1995 WL 17878613 (D. Del. Jun. 30, 1995),
*aff'd*, 48 F.3d 1089 (Fed. Cir. 1997) ................................................................. 28

*Sargon Enters., Inc. v. Univ. of S. Cal.*,
55 Cal. 4th 747 (2012) .............................................................................. 2, 8, 9, 14

*Serv. Emps. Int'l Union, Local 250 v. Colcord*,
160 Cal. App. 4th 362 (2008) ............................................................................ 20

*Shum v. Intel Corp.*,
630 F. Supp. 2d 1063 (N.D. Cal. 2009) ............................................................. 20

*Smith & Nephew, Inc. v. Arthrex, Inc.*,
453 F. App'x 977 (Fed. Cir. 2011) ..................................................................... 30

## TABLE OF AUTHORITIES (cont'd)

**Page**

*Sole Energy Co. v. Petrominerals Corp.*,
   128 Cal. App. 4th 212 (2005) ..........................................................................................12

*Spence v. Bd. of Educ. of Christina Sch. Dist.*,
   806 F.2d 1998 (3d Cir. 1986)...........................................................................................22

*Starceski v. Westinghouse Elec. Corp.*,
   54 F.3d 1089 (3d Cir.1995) ...............................................................................................4

*Sterling v. Redevelopment Auth. of the City of Phila.*,
   836 F. Supp. 2d 251 (E.D. Pa. 2011)...............................................................................26

*Stevens v. Parke, Davis & Co.*,
   9 Cal. 3d 51 (1973)...........................................................................................................24

*Syngenta Seeds, Inc. v. Monsanto Co.*,
   404 F. Supp. 2d 594 (D. Del. 2005),
   *aff'd*, 231 F. App'x 954 (Fed. Cir. 2007) ..........................................................................4

*TK-7 Corp. v. Estate of Barbouti*,
   993 F.2d 722 (10th Cir. 1993) ..................................................................... 17, 18, 19, 26

*Tunis Bros. Co. v. Ford Motor Co.*,
   952 F.2d 715 (3d Cir. 1991) ............................................................................................18

*Whitserve, LLC v. Computer Packages, Inc.*,
   694 F.3d 10 (Fed. Cir. 2012) ..................................................................................4, 8, 24

*Williams v. Wraxall*,
   33 Cal. App. 4th 120 (1995) ...........................................................................................20

*Woodson v. Scott Paper Co.*,
   109 F.3d 913 (3d Cir. 1997) ......................................................................................4, 24

*Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*,
   609 F.3d 1308 (Fed. Cir. 2010)...............................................................................4, 8, 24

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012) ...........................................................................................26

### Statutes and Rules

35 U.S.C. § 102(b) ....................................................................................................................32

Cal. Civ. Proc. Code § 657........................................................................................................24

Fed. R. Civ. P. 50(a)....................................................................................................................1

## TABLE OF AUTHORITIES (cont'd)

**Page**

Fed. R. Civ. P. 50(b) .......................................................................................... 1, 3, 34

Fed. R. Civ. P. 59 ...................................................................................................... 34

Fed. R. Civ. P. 59(a)(1) ........................................................................................... 1, 4

Fed. R. Evid. 702(d) ................................................................................................... 27

Fed. R. Evid. 703, advisory committee's note .......................................................... 26

### Other Authorities

1 WITKIN, SUMMARY OF CALIFORNIA LAW *Contracts* § 882 (10th ed. 2005) ............................... 9

RESTATEMENT (SECOND) OF TORTS § 538 (1977) ....................................................... 6

## I.      INTRODUCTION

Defendant Cisco Systems, Inc. ("Cisco") respectfully files this opening brief in support of its motion for judgment as a matter of law (JMOL) under Fed. R. Civ. P. 50(b) and alternatively for new trial and/or remittitur under Fed. R. Civ. P. 59(a)(1).   Cisco hereby renews and incorporates by reference its previous submissions under Fed. R. Civ. P. 50(a) (D.I. 663).

The evidence at trial was legally insufficient to show that Cisco concealed *any material fact* about the denial of the application by Plaintiff XpertUniverse, Inc. (XU) to the SolutionsPlus Program, much less that XU—a new business with a new technology that had no customers, no sales, and no finished products—suffered a jaw-dropping ***$70 million*** in lost value damages from such concealment.   This Court therefore should grant JMOL for Cisco as to either liability or damages, or both.   Alternatively, the damages should be remitted from $70 million to no more than $4 million or the case set for new trial.

*First*, XU failed to provide legally sufficient evidence that Cisco fraudulently concealed any material fact.   At trial, XU's former president Elizabeth Eiss testified that Cisco made XU aware of virtually everything that happened to XU's application for the SolutionsPlus Program: that Cisco's Governance Council considered the application in late April, that the Council did not approve the application based on several objections, and that John Hernandez (the product manager for Cisco's Customer Contact Business Unit (CCBU)) and others at Cisco were working to overcome those objections.   The only thing that XU did not learn was that the Council had termed XU's application "denied."   XU failed to show that knowing that its application had been "denied" as opposed to "not granted" would have made any difference to XU, much less the material difference that is legally required for a judgment of fraudulent concealment.

1

*Second*, even if XU had proved fraudulent concealment (which it did not), it failed to provide legally sufficient evidence at trial that it sustained $70 million in damages for lost value as a result. Under California law, which governs XU's fraudulent concealment claim, both the occurrence and the extent of lost profits or lost value must be proved with reasonable certainty. This is an especially exacting standard for a new business, as the California Supreme Court recently reaffirmed unanimously in *Sargon Enterprises, Inc. v. University of Southern California*, 55 Cal. 4th 747 (2012). *Sargon* held impermissibly speculative expert opinion testimony that a small dental implant start-up that had never earned more than $100,000 a year within ten years would have captured up to 20% of the global dental implant market and made profits of up to $1.2 billion—if only USC had completed a small clinical study. XU's damages expert Walter Bratic offered similarly speculative testimony that XU would have captured 15-30% of the market for expert location software and thus been worth $70 million—but for Cisco's supposed concealment of the fact that XU's application had "denied." Bratic's testimony fell far short of showing with reasonable certainty the occurrence, extent or causation of *any* lost value to XU, much less $70 million in lost value, and XU provided no other evidence on which a rational jury could have based such damages.

*Alternatively*, should the Court deny Cisco JMOL on fraudulent concealment liability and/or damages, the Court should remit XU's damages from $70 million to $2.66 million or at most $4 million, and/or order a new trial. The only non-speculative evidence of damages in the record was that XU spent up to $4 million on integrating its product with Cisco routers in 2006 (including approximately $2.66 million after the denial of the SolutionsPlus application) in the hope of partnering with Cisco. That evidence should place an upper boundary on the damages this Court allows to stand. In the event that XU declines remittitur to that amount, the Court

should grant new trial on the grounds that the jury's verdict was against the weight of the evidence, the damages were excessive, and the damages were tainted by Bratic's speculative and unreliable expert testimony.

*Finally*, JMOL or new trial should be granted on XU's patent infringement claims.  The conclusory testimony of its patent expert failed to establish that Cisco's products practiced all the limitations of the '903 and the '709 patents.  Moreover, the evidence showed that XU offered both inventions for sale more than a year before applying for the patents.

## II.    LEGAL STANDARDS

Under Fed. R. Civ. P. 50(b), this Court should grant a motion for JMOL if, "viewing the evidence in the light most favorable to the nonmoving party, there is no question of material fact for the jury and any verdict other than the one directed would be erroneous under the governing law." *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011) (quoting *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996)).   JMOL is thus warranted if "there is no legally sufficient evidentiary basis for a reasonable jury to find" for the non-moving party on a determinative issue. *Bullen v. Chaffinch*, 336 F. Supp. 2d 342, 346 (D. Del. Sept. 17, 2004) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000)).  "The question is not whether there is literally no evidence supporting the . . . party [against whom the motion is directed], but whether there is evidence upon which a reasonable jury could properly have found its verdict." *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 433 (3d Cir. 2009) (citation omitted).  A court therefore may enter JMOL as to liability if the plaintiff failed to prove a necessary element of its claim, *see, e.g.*, *Galena*, 638 F.3d at 208, 213; *Lifescan, Inc. v. Home Diagnostics, Inc.*, 103 F. Supp. 2d 345, 362 (D. Del. 2000), *aff'd*, 13 Fed. App'x 940 (Fed. Cir. 2001), or as to the amount of damages if the plaintiff failed to present sufficient evidence to sustain the amount, *see, e.g.*, *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 292-93 (N.D.N.Y. 2009) (Rader, J.,

by designation), *cross-appeals dismissed*, 455 F. App'x 954 (Fed. Cir. 2010); *Donald M. Durkin*

*Contracting, Inc. v. City of Newark*, 2008 WL 952984, at *3-7 (D. Del. Apr. 9, 2008).

This Court may grant a new trial under Fed. R. Civ. P. 59(a)(1), even where the verdict is

supported by substantial evidence, if the verdict is "against the clear weight of the evidence" and

thus a new trial is needed "to prevent a miscarriage of justice," *Bullen*, 336 F. Supp. 2d at 347*;*

*see also Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 453 (3d Cir. 2001), including with respect to the

amount of damages, *see Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 26 (Fed. Cir.

2012); *Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1319-20 (Fed.

Cir. 2010).   In determining whether a verdict is against the weight of the evidence, "the court

need not view the evidence in the light most favorable to the verdict winner," *Syngenta Seeds,*

*Inc. v. Monsanto Co.*, 404 F. Supp. 2d 594, 600 (D. Del. 2005), *aff'd*, 231 F. App'x 954 (Fed.

Cir. 2007), and is permitted to "consider the credibility of witnesses and to weigh the evidence,"

*Blakey v. Cont'l Airlines, Inc.*, 992 F. Supp. 731, 734 (D.N.J. 1998).

New trial also may be granted under Fed. R. Civ. P. 59(a)(1) if the Court finds that the

"(1) damages are excessive, [or] (2) substantial trial errors were made." *Bullen*, 336 F. Supp. 2d

at 347 (citing, *e.g.*, *Woodson v. Scott Paper Co.*, 109 F.3d 913, 936 (3d Cir. 1997)).

A remittitur may be offered as an alternative to a new trial "when a trial judge concludes

that a jury verdict is 'clearly unsupported' by the evidence and exceeds the amount needed to

make the plaintiff whole." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711

F.3d 1348, 1356 (Fed. Cir. 2013) (applying Third Circuit law and quoting *Starceski v.*

*Westinghouse Elec. Corp.*, 54 F.3d 1089, 1100 (3d Cir.1995)); *see also Cortez v. Trans Union,*

*LLC*, 617 F.3d 688, 715-16 (3d Cir. 2010) (remittitur is appropriate where the damages awarded

by the jury are "clearly unsupported and/or excessive") (citation omitted).   A remittitur should be

set at "the highest amount the jury could 'properly have awarded based on the relevant evidence.'" *IPPV Enters., LLC v. Echostar Commc'ns. Corp.*, 191 F. Supp. 2d 530, 573 (D. Del. 2002) (quoting *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1030 (Fed. Cir. 1996)); *accord Evans v. Port Auth. of N.Y. & N.J.*, 273 F.3d 346, 354-55 (3d Cir. 2001).

## III.   CISCO IS ENTITLED TO JMOL OR NEW TRIAL ON LIABILITY FOR FRAUDULENT CONCEALMENT

### A.   No Rational Jury Could Have Found That The Fact Purportedly Concealed By Cisco Was Material

This Court should grant JMOL that Cisco is not liable for fraudulent concealment of any material fact.  On summary judgment, the Court dismissed most of XU's fraud claims because XU failed to offer evidence sufficient to raise a genuine issue.  D.I. 634 at 13-15.  The Court found genuine issues of fact concerning only XU's fraudulent concealment claim, which XU raised after discovery in opposition to Cisco's summary judgment motion.  *See* D.I. 521 at 9-11. At trial, however, it became clear that Cisco had informed XU about the denial of its application for the SolutionsPlus Program in every respect except using the term "denied."  XU's former president Ms. Eiss admitted on cross-examination that XU knew that its application for the Program had been presented to Cisco's Governance Council, that the Council had not accepted the application based on certain objections, and that Mr. Hernandez and others at Cisco were working to overcome those objections.  Thus, the only thing concealed from XU was that Cisco's Governance Council had termed the application "denied."  *See* PTX 37 at 4.  XU did not, and could not, show that this fact was material, and therefore its fraudulent concealment claim failed as a matter of law.

To prove fraudulent concealment under California law, which governs XU's fraudulent concealment claim, *see* D.I. 634 at 3, a plaintiff must prove, *inter alia*, that the defendant "concealed or suppressed a *material* fact." *Bank of Am. Corp. v. Superior Court*, 198 Cal. App.

4th 862, 870 (2011) (emphasis added).  A fact is "material" if "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 977 (1997) (quoting RESTATEMENT (SECOND) OF TORTS § 538(2)(a) (1977)).  Thus, to prevail on its fraudulent concealment claim, XU had to prove that Cisco concealed a fact that "would influence a reasonable person's judgment or conduct."  7 Tr. 2164:5-21, 2165:10-12.

Ms. Eiss testified at trial that, by June 2006, she was aware of what had happened to XU's application to the SolutionsPlus Program, admitting that she "knew our application had been submitted to the Council . . . ," 3 Tr. 633:17-18, and that (1) XU "didn't have an approval," 3 Tr. 635:16-17; (2) the Council had raised concerns about "getting clients on board and getting market traction," 3 Tr. 635:19-20, and "training and education issues," 3 Tr. 630:19; and (3) CCBU's product manager Mr. Hernandez was seeking to overcome those objections and get XU admitted to the program, 3 Tr. 634:4-11 ("John was absolutely working with us.").  Indeed, in the months following the Governance Council's decision, Ms. Eiss worked with Mr. Hernandez "to counter the objections we've encountered from the Sales VPs and Channels team" in the Council.  DX 433, 435, 456; 6 Tr. 1768:9-1771:4, 1771:12-1772:11, 1774:21-1775:11.

This effort to overcome the initial rejection of XU's application had a realistic chance of success and in fact came close to succeeding.  Most applications for the SolutionsPlus Program go through multiple reviews, and many applications are accepted after being initially rejected.  6 Tr. 1712:14-1715:4.  To help XU succeed in this fashion, Hernandez assumed personal responsibility for XU's SolutionsPlus application after the Council denied it, so that he could champion the application to the executives on the Council who had objected to the application.  6 Tr. 1765:4-18.  Among other things, he lobbied Carl Weise, the sales executive on the Council,

and in October 2006 convinced Mr. Wiese to support XU's application.  DX 455, 579; 6 Tr. 1783:7-1791:7, 1795:9-20.  But, to overcome the Council's objections, Mr. Hernandez had to show that XU had customer support and, in particular, a "lighthouse account."  6 Tr. 1752:16-1753:8, 1754:8-1756:2.  Mr. Hernandez believed that Citibank, which signed a statement of work for an XU pilot project, would be that "lighthouse account."  *Id.*; 4 Tr. 1003:3-12.  But Citibank encountered financial difficulties and canceled the pilot project.  4 Tr. 1003:16-1004:6, 1009:17-20.  Because of this cancellation and the failure of another potential project with FedEx, Mr. Hernandez concluded that the Governance Council's objections to XU's application could not be overcome and decided not to continue to pursue the application.  6 Tr. 1797:24-1798:18.

XU asserted at trial that there is a difference between a "denial" and what it was told happened in the Governance Council, 3 Tr. 636:9-14, but failed to provide legally sufficient evidence to convince a rational jury that this difference was material.  XU did not dispute Mr. Hernandez's testimony that many companies initially denied admittance into the SolutionsPlus program are later admitted, *see* 6 Tr. 1712:14-1715:4, nor that Mr. Hernandez believed that the Council's objections to XU's application could be overcome, PTX 45; 6 Tr. 1751:3-1752:15.  XU also failed to present any evidence that, had it known that the Governance Council termed its application "denied," it would have pursued other partnering options rather than support Mr. Hernandez's efforts to have the application reconsidered.  Nor did XU present evidence that *any* company that knew that its application had been considered but not granted pending efforts to overcome objections would have acted differently upon learning that its application had been termed "denied" while those efforts continued to take place.  Accordingly, XU failed to present legally sufficient evidence that the fact supposedly concealed by Cisco was material, and therefore Cisco is entitled to JMOL on fraudulent concealment.

**B.      Alternatively, Cisco Is Entitled To A New Trial On Fraudulent Concealment**

For all the reasons set forth in Part III.B, *supra*, the jury's implied finding that XU concealed a material fact is against the great weight of the evidence.  As a consequence, if JMOL is not granted on XU's fraudulent concealment claim, a new trial on that claim is warranted.  *See Whitserve*, 694 F.3d at 26-34; *Wordtech*, 609 F.3d at 1319-22.

**IV.      CISCO IS ENTITLED TO JMOL, OR TO REMITTITUR AND/OR NEW TRIAL, ON THE DAMAGES AWARDED FOR FRAUDULENT CONCEALMENT**

**A.      Cisco Is Entitled To JMOL That XU Did Not Cause XU To Suffer $70 Million In Lost Value Damages**

Even if the verdict on fraudulent concealment liability is allowed to stand (which it should not be), this Court should grant JMOL on the $70 million awarded by the jury on the fraudulent concealment claim.  California law requires that both the occurrence and the amount of any lost profits or lost value be proven with reasonable certainty, and this standard is especially stringent with respect to a new or unestablished business like XU.  The testimony of XU's damages expert Mr. Bratic was legally insufficient under that standard.  Mr. Bratic failed to establish that XU had lost any value as a result of Cisco's supposed eight-month concealment of the fact that XU's application for the SolutionsPlus Program had been "denied"—much less that XU's capital value would have been $70 million if only Cisco had added that one word to all the other disclosures it made to XU about the status of its application.  Nor did XU provide any other evidence sufficient to satisfy California law on lost profits/lost value damages.

California law has long held that "damages for the loss of prospective profits" are recoverable only "where the evidence makes reasonably certain their occurrence and extent." *Grupe v. Glick*, 26 Cal. 2d 680, 692-93 (1945).   This rule is especially stringent as applied to new or unestablished businesses such as XU, as the California Supreme Court recently reaffirmed in *Sargon*, 55 Cal. 4th at 774.  As *Sargon* noted, when an established business claims

lost profits, the occurrence and extent of that loss "may be ascertained with reasonable certainty from the past volume of business and other provable data relevant to the probable future sales." *Id*. (quotation omitted). In contrast, when start-ups and other *unestablished* businesses are prevented from operating, there is no such evidence.

Thus, as a general matter, "'where the operation of an *unestablished* business is prevented or interrupted, damages for prospective profits that might otherwise have been made from its operation are not recoverable for the reason that their occurrence is uncertain, contingent and speculative.'" *Id*. (quoting *Grupe*, 26 Cal. 2d at 692-93) (emphasis added); *see also* 1 WITKIN, SUMMARY OF CALIFORNIA LAW *Contracts* § 882 at 969 (10th ed. 2005) ("If the anticipated profits were not to come from an established business or profession, . . . the difficulty of estimating them has generally led the courts to classify the damages as uncertain and speculative, and to deny recovery."). This is especially true where, as here, a new business is in a market that itself was unestablished. *See Kids' Universe v. In2Labs*, 95 Cal. App. 4th 870, 887 (Cal. Ct. App. 2002). This general bar to recovery of lost profits by a new or unestablished business may be overcome only in those cases "'where their nature and occurrence can be shown by evidence of reasonable reliability,'" *Sargon*, 55 Cal. 4th at 774 (quoting *Grupe*, 26 Cal. 2d at 693), and such certainty may be established "with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like," *Parlour Enters., Inc. v. Kirin Grp., Inc.*, 152 Cal. App. 4th 281, 288 (2007) (quoting *Kids' Universe*, 95 Cal. App. 4th at 884).

These precedents apply fully here. While *Grupe* and *Sargon* involved breach of contract rather than fraud claims, "the rule regarding proof of lost profits from an unestablished business applies in tort as well as contract cases," *Kids' Universe*, 95 Cal. App. 4th at 883. Moreover, lost

*value* damages (as XU claims here) are subject to the same new business rule as lost profits. *See id.* at 887-88 (rejecting evidence of lost value damages as insufficient to show with reasonable certainty that a toy retailer's unlaunched website would have led it to make future profits warranting a capital valuation of $50 million).

### 1. No Reasonable Jury Could Find With Reasonable Certainty That XU Lost Value

At trial, XU presented testimony from its damages expert Mr. Bratic concerning its lost value, but that testimony failed to establish the occurrence of that loss with the reasonable certainty required by the new business rule. Bratic adopted his valuation numbers without analysis from two reports, *see* 5 Tr. 1282:3-20, 1316:8-1317:1, that had valued XU based on projected revenues. *See* PTX 312 at 27 (estimating XU's value based on multiples of revenue projections); PTX 314 at 22, 25-26 (estimating XU's value based on multiple of revenue projections and discounted cash flow analysis). Although this Court excluded as based on "inherently speculative" projections the reports on which Mr. Bratic relied, *see* D.I. 608 at 4, Mr. Bratic pointedly declined to make any independent valuation of XU and instead relied upon the excluded reports, 5 Tr. 1282:18-1283:20. And while this Court precluded Mr. Bratic from opining that Cisco's alleged concealment of the denial of the SolutionsPlus application caused any decrease in XU's value, *see* D.I. 647 at 3, 10, XU presented none of the evidence normally required to prove an unestablished business' lost profits or lost value with reasonable certainty: no business records of similar enterprises, no surveys of potential customers or market analyses, and no market or financial data independent of Mr. Bratic's testimony.

XU sought to prove that it would have generated sales and revenues by contending that it had the "option" of partnering with Genesys or IBM instead of Cisco. 7 Tr. 2218:24-2219:11. But the evidence nowhere established that these options were anything more than mere

possibilities.  XU failed to present any testimony from Genesys or IBM that they likely would have entered into partnering arrangements with XU.  Instead, XU's former CEO Victor Friedman and former president and COO Ms. Eiss simply offered conclusory assertions that IBM and Genesys were available partnering "options."  2 Tr. 337:12-338:6; 3 Tr. 567:7-568:16.  For example, Mr. Friedman stated, without explanation, that he was "sure" Genesys "would have been delighted to walk into the Citibank opportunity," 2 Tr. 338:1-3—an opportunity that failed to materialize because of the financial difficulties and layoffs at Citibank in late 2006, *see supra* p. 7.  Ms. Eiss' testimony was similarly conclusory: she stated that she was "convinced" XU could have gone back to Genesys because XU already had built a solution with a Genesys component.  3 Tr. 568:10-12. *But see* 3 Tr. 754:12-17 (stating that XU never had a finished product) (John Steinhoff).

The evidence that XU presented of its supposed IBM option was similarly insufficient to establish lost value with reasonable certainty.  Mr. Friedman asserted without explanation that IBM was "very, very interested in working with us" and did not care about whose router XU's platform ran on.  2 Tr. 337:17-23.  Ms. Eiss testified that XU "could have gone back to IBM" because it had grown its relationship with IBM while working with Cisco and "a lot of people behind IBM were big fans of what we were doing," 3 Tr. 567:10-568:5.  But neither Mr. Friedman nor Ms. Eiss testified that IBM was *likely* to partner with it, and evidence showed that IBM never purchased anything from XU, was less supportive of XU than Cisco, and talked about but did not offer a standstill agreement in early 2006.  2 Tr. 347:15-348:22; 3 Tr. 673:24-675:4.

This evidence fails as a matter of law to establish that XU would have partnered with IBM or Genesys with the reasonable certainty required by the new business rule.  To establish lost value with reasonable certainty based on an agreement that it was prevented from making, a

new or unestablished business must prove that "an agreement was likely." *Parlour Enters.*, 152 Cal. App. 4th at 292; *cf. Sole Energy Co. v. Petrominerals Corp.*, 128 Cal. App. 4th 212, 243 (2005) (requiring more than a "speculative expectation that a potentially beneficial relationship will arise" to establish tortious interference with prospective advantage) (citation omitted). A mere expression of interest in making a purchase and even a discussion of a possible purchase does not establish lost profits or lost value with reasonable certainty. *See, e.g.*, *Nat'l Controls Corp. v. Nat'l Semiconductor Corp.*, 833 F.2d 491, 498 (3d Cir. 1987) (oral expressions of interest and inquiries about capacity insufficient); *Sole Energy*, 128 Cal. App. 4th at 243 (discussions about possible purchases insufficient). *A fortiori*, the fact that XU had good relations and mutual interests with IBM and Genesys does not establish with reasonable certainty that either IBM or Genesys would have taken the greater step of partnering with XU.

Even if XU had shown with reasonable certainty that it would have entered into some partnership with IBM or Genesys (which it did not), it still would have had to prove with reasonable certainty that the arrangement would have resulted in sales before it could establish lost value. But XU had no sales, no customers, and no finished product, 2 Tr. 351:16-352:7; 3 Tr. 571:5-573:2, 754:15-755:1, and it presented no evidence that it would have gained traction and had sales or customers if it had partnered with IBM or Genesys.[1] XU's technology was admittedly new and "parad[igm] shift[ing]." 2 Tr. 262:21; *see also* 3 Tr. 511:21-23 ("we were offering a technology that didn't really exist before"). As a consequence, XU had to persuade

---

[1]  Mr. Friedman testified at trial that Citibank was a customer of XU, *see* 2 Tr. 352:8-15, and XU presented testimony from Harvey Koeppel, the former chief information officer of Citibank's global consumer group, that Citibank was interested in XU's technology and signed a statement of work for a pilot project with XU. 4 Tr. 982-1018; *see also* 2 Tr. 328:18-329:22, 352:8-13. But, as previously noted, Citibank did not go forward with the project for financial reasons, 4 Tr. 1003:16-1004:6, 1009:11-1012:8, which doomed XU's Citibank prospects whether partnered with Cisco, IBM or Genesys.

would-be customers to "imagine how to transform their business processes so that the world could be different," 3 Tr. 511:19-512:9, *see also* 3 Tr. 595:20-596:11 ("we had to get the mind share around what XpertShare could do to change business processes and then they had to buy on to that"); 3 Tr. 610:10-12 (XU's product "involved rethinking business process"). XU failed to present any evidence that, if it had partnered with IBM or Genesys, customers would not only have imagined this transformation but also invested in it by purchasing XU's product. In short, based on the record at trial, no reasonable jury could find with reasonable certainty that XU would have had any sales if it had partnered with IBM or Genesys, much less lost any value derived from those sales. In short, XU's valuation of itself was based on sheer speculation.

The California Court of Appeal has held that far more extensive and persuasive evidence was legally insufficient to satisfy the new business rule. In *Kids' Universe*, 95 Cal. App. 870, a toy company claimed that the negligent flooding of its retail store prevented it from starting an online business in late 1997 when toy retailers first appeared on the Internet. *Id.* at 876-77. The company presented evidence that it had developed a sophisticated website, made preparations to respond to online orders, and negotiated favorable placement on a fast-growing Internet portal. *Id.* at 886-87. It also presented evidence that, by the time it recovered from the flood, placement on an Internet portal was no longer affordable, but that eToys, an on-line toy retailer that began using the same Internet portal at the same time that the company would have, enjoyed great success. *Id.* at 876, 887-88. Although acknowledging that this evidence suggested that the company's website would have been successful absent the flood, the California Court of Appeal nonetheless held that the evidence "would not allow a reasonable trier of fact to find with reasonable certainty lost net *profits* from the unlaunched Web site" because (1) the online market for toys was unestablished at the time; (2) the company had not previously made any profit on its

website and presented no evidence that the website would have been profitable with the portal; and (3) the website's success was contingent upon customers actually making purchases and doing so in sufficient quantity to make the website successful.  *Id.* at 887-88.

The evidence presented by XU at trial is similarly insufficient to show lost sales, lost profits, or lost value with reasonable certainty.  Like the toy company in *Kids' Universe*, XU was an unestablished business operating in an unestablished area; it had no record of sales, much less profitability; and its success was contingent upon customer acceptance and purchase of its products.  Indeed, XU's evidence is much weaker.  In contrast to the toy company in *Kids' Universe*, XU had no finished product; there was no established market for its new and untested technology; and it was unable to point to any similarly situated business that succeeded in selling the product.  Thus, under *Kids' Universe* and California's new business rule, XU failed to establish with the requisite reasonable certainty the occurrence of any lost revenue and, by extension, any lost value.

### 2.    No Reasonable Jury Could Find With Reasonable Certainty That The Amount Of XU's Lost Value Was $70 Million

In addition to failing to prove with reasonable certainty the occurrence of any lost value, XU also failed to prove with reasonable certainty the amount of that supposed loss.  Although the calculation of lost profits or lost value is "always speculative to some degree" and thus cannot be calculated with "absolute certainty," *Sargon*, 55 Cal. 4th at 775, California law requires the extent or amount of lost profits or value to be proven to a reasonable certainty, which means that there must be "some reasonable basis of computation," *id.* at 774 (quotation omitted); *see also Mindgames, Inc. v. W. Publ'g Co.*, 218 F.3d 652, 658 (7th Cir. 2000) (Posner, J.) ("a start-up company should not be permitted to obtain pie-in-the-sky damages upon allegations that it was snuffed out before it could begin to operate . . . capitalizing fantasized

earnings into a huge present value sought as damages"). XU failed to offer any such basis for the $70 million in lost value that the jury found in awarding damages, and its evidence of the amount of lost value was thus legally insufficient for several reasons:

*First*, XU's lost value evidence used the wrong measure of lost value. Damages for fraud are recoverable only if the plaintiff proves a "causal connection with the reliance" on the omission or misrepresentation, *Goehring v. Chapman Univ.*, 121 Cal. App. 4th 353, 364 (2004), which in this case means a causal connection with XU's reliance on its supposed belief that its SolutionsPlus application had not been denied. Thus, the proper measure of XU's lost value damages was the difference between what the company would have been worth if the "denial" had been disclosed in late April 2006, when the purported reliance began, and its value after the "denial" was disclosed in January 2007. XU's expert, however, incorrectly determined XU's value as the difference between its value with and without a partnership with Cisco.

Mr. Bratic took his valuation of XU from two reports, neither of which considered the impact on XU's value of the timing of Cisco's disclosure that the SolutionsPlus application had been denied. The Standard & Poor's report, which was issued in February 2005, PTX 312 at 1, more than a year before the denial of XU's SolutionsPlus application, estimated XU's value "*based upon a potential partnership with Cisco*." D.I. 498, Ex. 46 ¶ 72 (emphasis added). And the Duff & Phelps report, which was issued in October 2006, PTX 314 at 1, three months before the denial of the application supposedly was disclosed, assumed that XU would "implement[] a partnering model" through which "potential sales relationships . . . may be fostered," PTX 314 at 12 n.4, 17, and its valuation of XU's financial sector operations was "very close" to the Standard & Poor's valuation, 5 Tr. 1297:8-19. Accordingly, Mr. Bratic recognized at trial that

the valuations he took from the Standard & Poor's and Duff & Phelps reports assumed that XU

would partner with Cisco in the SolutionsPlus Program or at least had the prospect of doing so:

> Q.    Please explain [your damage model] to us.
>
> A.    . . . [T]he measure of damages is to look at what the value of [XU] was *at the time it was part of the SolutionsPlus program, working towards that*, comparing what happened after it was no longer part of the SolutionsPlus program.

5 Tr. 1275:24-1276:22 (emphasis added).  Thus Mr. Bratic incorrectly measured the damages to

XU *from not being in SolutionsPlus*, not the damages from Cisco's supposed disclosure that XU

had been denied admittance to the program in January 2007 rather than in April 2006.[2]

Elsewhere, Mr. Bratic asserted that his $70 million valuation assumed only that XU

would "partner or collaborate with companies, either Cisco or other companies."  5 Tr. 1255:9-

18; *see also* 5 Tr. 1276:10-14 (assuming that XU "was going forward with partners . . . whether

they be Cisco, whether they be IBM or Genesys").  But XU failed to prove with reasonable

certainty that XU would have partnered with IBM or Genesys.  *See supra* pp. 10-14.  In addition,

XU failed to present any evidence that IBM or Genesys had a partnering program similar to

Solutions Plus or that XU's revenues in a sales partnership with IBM or Genesys would have

been the same as it was projected to have in the SolutionsPlus Program.  To the contrary, the

evidence showed that Cisco was XU's preferred partner and that, even after the SolutionsPlus

application was denied, Cisco supported XU more vigorously than IBM.  DX 428; 3 Tr. 673:16-

675:4.  Thus, Mr. Bratic's assumption that XU had the same value whether it partnered with

Cisco, IBM or Genesys is based on speculation and thus fails to establish XU's value with the

reasonable certainty required by the new business rule.

---

[2]    Mr. Bratic used this measure in his expert report, because, when he submitted the report, XU was claiming that it was promised admittance to SolutionsPlus.  D.I. 82 ¶¶ 76, 145(b).  This claim was rejected at the summary judgment stage.  *See* D.I. 634, at 14.

*Second*, even if the valuations that Mr. Bratic drew from the Standard & Poor's and Duff & Phelps reports had used the right measure of damages, they were based on revenue projections that are, as this Court recognized, "inherently speculative." D.I. 608 at 4.  Both reports estimated the value of XU based on its anticipated revenues, which in turn were "based on projections provided by XUI management."  PTX 314 at 3, 12, 15; *see also* PTX 312 at 9 nn. 3-4 (noting that projections were "[b]ased on discussions with XpertUniverse Management").  Neither Standard & Poor's nor Duff & Phelps purported to have verified the projections from XU's management.  To the contrary, Standard & Poor's itself described XU management's projections as "guesstimates."  PTX 312 at 4.  The Duff & Phelps report stated that it would "assume no responsibility and make no representations with respect to the[ir] accuracy," and that its valuation was "dependent on the achievability of management's projections."  PTX 314 at 3.  Moreover, neither the reports, Mr. Bratic nor XU explained how XU's management had generated the projections used in the reports.

A valuation based on such unexplained projections cannot establish a new business's loss with reasonable certainty.  *See TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 733-34 (10th Cir. 1993) (holding lost profit calculations based on unexplained sales projections were speculative and failed to show lost profits with reasonable certainty); *AlphaMed Pharms. Corp. v. Arriva Pharms., Inc*., 432 F. Supp. 2d 1319, 1350-51 (S.D. Fla. 2006) (holding lost profits calculations by the same damages expert Mr. Bratic speculative because based on unproven assumptions in the plaintiff's business plan), *aff'd*, 294 F. App'x 501 (11th Cir. 2008); *Parlour Enters.*, 152 Cal. App. 4th at 289-90 (holding impermissibly speculative a lost profits calculation that a small ice cream restaurant would grow on a par with the national Friendly's chain, noting that the plaintiff had failed to show "how the projections were actually calculated or upon what facts they were

17

based"); *see also Tunis Bros. Co. v. Ford Motor Co*., 952 F.2d 715, 738-39 (3d Cir. 1991) ("[A] growth percentage rate determined only by the plaintiffs' speculation about the number of tractors they could sell within a given year requires the jury to speculate and thus cannot support a compensatory damages award.").

For example, in *TK-7 Corp.*, 993 F.2d 722, the plaintiff asserted that the defendant had prevented it from entering into a joint venture in Britain, and its financial expert had calculated the lost profits from that venture based on market share projections in a market survey report. *Id*. at 730-31. The expert, however, failed to explain how the market share projections in the report were generated. *Id*. at 733. Thus, applying Oklahoma's "new business rule," the Tenth Circuit held that, even though the expert attempted to corroborate the projections, his calculations were speculative and failed to prove lost profits with reasonable certainty. *Id*. at 726, 733. "In order to establish future lost profits damages with reasonable certainty, the plaintiffs at a minimum were required to present testimony fully explaining how the projection of future sales was calculated and the factors upon which it was based." *Id*. at 733

Applying the *TK-7 Corp.* decision, *AlphaMed* held the testimony of Mr. Bratic, XU's damages expert here, deficient as a matter of law. In *AlphaMed*, Mr. Bratic opined that, due to the defendant's misconduct, AlphaMed, a start-up, missed a "window of opportunity" to attract capital and went out of business. 432 F. Supp. 2d at 1330. Mr. Bratic in that case, much as here, calculated AlphaMed's lost profits based on assumptions in AlphaMed's business plan and representations of its owners. *Id*. at 1350. After trial, the district court granted JMOL, reasoning that, to satisfy its burden of proof, AlphaMed had "to prove the factual bases on which [Bratic's] assumptions rested." *Id*. at 1351. Because AlphaMed failed to do so, the court ruled that it had failed to prove lost profits with reasonable certainty and entered JMOL for defendant Arriva. *Id*.

at 1351-52. The Eleventh Circuit unanimously affirmed, based on the district court's "well-reasoned opinion." 294 F. App'x 501.

Mr. Bratic's testimony here, as in *AlphaMed*, failed to prove with reasonable certainty lost value from a supposed lost window of opportunity. Much as in *AlphaMed*, Mr. Bratic relied on client revenue projections, here filtered through the Standard & Poor's and Duff & Phelps reports. But Mr. Bratic failed to explain the basis for these projections, and XU presented no other evidence explaining them. And like the expert in *TK-7 Corp.*, Mr. Bratic attempted to corroborate some of the projections based on Cisco's projections for XU sales while partnered with Cisco, but failed to explain how these projections were generated, much less how they suggested what XU's sales would have been if XU had partnered with IBM or Genesys rather than Cisco. *See* 5 Tr. 1300:15-1305:4; PTX 469 at 16. Thus, XU failed to prove the reliability of the projections on which Mr. Bratic's valuation was predicated, and therefore failed to establish the amount of XU's loss with reasonable certainty.

### 3. No Reasonable Jury Could Find That Cisco's Delay In Disclosing The Denial Of XU's SolutionsPlus Application Caused Any Loss In XU's Value

In addition to failing to show either the occurrence or the amount of lost value with reasonable certainty and therefore failing to satisfy California's new business rule, XU failed to prove the required element of causation with respect to the lost value damages the jury awarded. This Court warned XU before and during trial that it could not rely upon Mr. Bratic to establish such causation, but instead would have to do so through fact testimony. *See* D.I. 647 at 3 ("Causation is a factual issue on which Bratic has not offered any helpful expert testimony. XU must prove causation through fact testimony."); *see also* 5 Tr. 1315:2-18, 1315:20-1316:5, 1320:3-11 (sustaining objections to testimony by Bratic concerning causation). XU did not heed these warnings, and failed to present any fact testimony establishing that Cisco's supposed delay

in disclosing the denial of the SolutionsPlus application, as distinguished from the denial itself, caused XU to suffer $70 million in damages.

Under California law, "[d]eception without resulting loss is not actionable fraud," and therefore "[t]o recover for fraud, a plaintiff must 'prove detriment proximately caused by the defendant's tortious conduct.'" *Geohring*, 121 Cal. App. 4th at 364 (quotation omitted); *see also Kruse v. Bank of Am.*, 202 Cal. App. 3d 38, 60 (1998) ("It is axiomatic that to obtain recovery for fraud, a claimant must prove, *inter alia*, that damages were sustained as a proximate [result] of the fraudulent conduct.") (citation omitted).  Accordingly, even apart from the new business rule, courts applying California law have granted JMOL when a plaintiff claiming fraud has not proved causation.  *See, e.g.*, *Shum v. Intel Corp.*, 630 F. Supp. 2d 1063, 1075 (N.D. Cal. 2009); *Kruse*, 202 Cal. App. 3d at 60-62; *Williams v. Wraxall*, 33 Cal. App. 4th 120, 132, 137 (1995); *see also Minn. Mut. Life Ins. Co. v. Ensley*, 174 F.3d 977, 982 (9th Cir. 1999) (granting summary judgment); *Gray v. Don Miller & Assocs., Inc*., 35 Cal. 3d 498, 503-04 (1984) (reversing fraud damages award where plaintiff's claimed damages were not caused by reliance on the fraud but by other non-actionable events); *Serv. Emps. Int'l Union, Local 250 v. Colcord*, 160 Cal. App. 4th 362, 375 (2008) (reversing trial court's award of damages for fraud and breach of fiduciary duty after bench trial because there was "no substantial evidence" of causation);  *Goehring*, 121 Cal. App. 4th at 365 (granting summary adjudication).

XU's theory of causation was that concealment of the "denial" of its SolutionsPlus application from late April 2006 until January 2007 caused it to fail and go out of business.  But XU did not present evidence of such a causal connection.  Far from presenting evidence that Cisco's concealment of the denial of its application caused it to go out of business, XU presented testimony that the ***denial*** itself "killed" its business.  For example, Mr. Friedman testified that,

when he told investors that XU would not participate in the SolutionsPlus Program, they were angered and that "funding dried up very quickly.  The investors that used to be there for us were all done. . . . And we slowly but surely started to wind down the company . . . ."  2 Tr. 336:1-5. Ms. Eiss similarly testified that the SolutionsPlus Program was important to XU's investors and that denial of XU's application "pretty much killed the company because we were counting on SolutionsPlus to drive revenue."  3 Tr. 532:7-23, 566:8-567:6.

Moreover, XU failed to prove that disclosure of the denial of its application had any different impact in January 2007 than it would have had in April or May 2006, shortly after the Governance Council made its decision.  Mr. Friedman and Ms. Eiss testified that XU had other "options" in April 2006, 2 Tr. 337:12-338:6; 3 Tr. 567:7-568:16, but XU failed to show that these options would have led to a partnering relationship, much less that such a relationship would have saved XU from failure and enabled XU to achieve the projected revenues that formed the basis for the $70 million valuation.  *See supra* pp. 10-14, 16.  In addition, XU failed to offer any reason why these options were available in late April 2006 but not in January 2007, thus failing to show that the supposed concealment of the denial until January 2007 affected the availability of the options.

Indeed, the evidence showed that, by April 2006, XU already had one foot in the grave. By that time, XU had been operating for seven years and had expended at least $24 million.  DX 521 at 2; 2 Tr. 351:16-18.  Nevertheless, it had not sold a single product and did not even have a finished product available for sale.  2 Tr. 351:22-352:7; 3 Tr. 571:5-573:8.  XU also could not identify any customer other than Citibank, which pursued a pilot project but in the end did not go forward with even that project.  *See supra* pp. 7, 12 n.1  Questions were being raised about XU's senior executives, product, and business model.  DX 502, 505, 507, 513, 521.  And XU was

strapped for cash and had no ability to support any clients other than Citibank.  DX 425 at 4; 3 Tr. 619:5-620:3.

In light of this record, no reasonable jury could have found that XU's demise was caused by Cisco's delay in disclosing the fact that in late April 2006 the Governance Council had termed XU's SolutionsPlus application "denied."

### B.    Alternatively, The Court Should Grant Remittitur And/Or A New Trial On Damages For Fraudulent Concealment

If the Court does not grant JMOL on the damages awarded XU on its fraudulent concealment claim, it should remit those damages or grant a new trial on damages.

### 1.    Any Damages Awarded For Fraudulent Concealment Should Be Remitted To $2.66 Million Or At Most $4 Million

"The remittitur is well established as a device employed when the trial judge finds that a decision of the jury is clearly unsupported and/or excessive."  *Cortez*, 617 F.3d at 715 (quoting *Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1998, 1201 (3d Cir. 1986); brackets omitted).  As shown in Section IV.A *supra*, the $70 million in damages awarded by the jury for fraudulent concealment is both clearly unsupported and excessive: the evidence failed to show that XU was a $70 million company or that Cisco's supposed failure to earlier disclose its "denial" of XU's application for the SolutionsPlus Program caused XU to fail, much less to lose $70 million in value.  If the Court does not grant JMOL on damages for fraudulent concealment, it should remit those damages to the "highest amount the jury could properly have awarded based on the relevant evidence."  *IPPV Enters.,* 191 F. Supp. 2d at 573 (quoting *Oiness*, 88 F.3d at 1030).

While Mr. Bratic's $70 million valuation for XU is unsupportable, and XU failed to offer any alternative method by which the jury could reasonably have calculated the company's purported lost value, the record might support up to $2.66 million or at most $4 million in

damages to which this Court could order remittitur.  As the Court recognized, D.I. 647 at 3-4, XU could have sought to recover reliance damages,[3] and the jury might have concluded that XU would have halted its efforts at integration upon hearing of the denial of the SolutionsPlus application despite Mr. Hernandez's nearly successful efforts at revisiting the issue.  The jury thus conceivably might have awarded XU the amounts its expended working on integrating its software with Cisco routers after late April 2006.  *See, e.g.*, *Fladeboe v. Am. Isuzu Motors, Inc.*, 150 Cal. App. 4th 42, 66 (2007) (noting that defrauded parties are entitled to recover "out-of-pocket damages"); *Kenly v. Ukegawa*, 16 Cal. App. 4th 49, 54-55 (1993) ("Cases involving fraud where property was not acquired have limited damages to out-of-pocket losses.").  Mr. Bratic testified that XU raised $4 million in 2006, which it spent on the integration.  5 Tr. 1311:14-22.  XU cannot claim reliance damages for any expenses incurred before the supposed concealment of the denial of the SolutionsPlus application in late April 2006, *see* D.I. 647 at 3-4, and there is no evidence of how much of the work on integrating XU's products with Cisco routers was done before April 2006.  As a result, the highest out-of-pocket damages the record might support would assume that the expenditures were evenly distributed throughout the year and attribute to the eight months from May to December two-thirds of the 2006 expenses, which is approximately $2.66 million.  In no event could the jury award reliance damages of more than

---

[3]   The Court also addressed this measure of damages with Bratic at the *Daubert* hearing. D.I. 646 at 115:24-119:12. There, Mr. Bratic confirmed that he reviewed XU's financial records to determine the amount XU spent working on the integration during the concealment period. *Id.* at 118:1-4 ("THE COURT:  So the part about how they spent money between April and October or April and January, is that based on a review of the financial records?  THE WITNESS: Yes.").

the $4 million expended in 2006.  Thus, the damages for fraudulent concealment should be remitted to $2.66 million or at most to $4 million.[4]

### 2.    Cisco Is Entitled To A New Trial On Damages For Fraudulent Concealment

If the Court grants remittitur, it should grant a new trial on the damages awarded on XU's fraudulent concealment claim contingent on XU's rejection of the remittitur.

*First*, for all the reasons set forth in Part IV.A *supra*, the jury's findings that XU lost value, that this lost value amounted to $70 million, and that XU's failure and consequent loss in value was caused by the supposed concealment of the "denial" of the SolutionsPlus application were against the great weight of the evidence.  As shown above, XU never was a $70 million company; the evidence presented by XU of its alleged loss was speculative and failed to establish either the occurrence or the amount of the loss with reasonable certainty; and XU did not go out of business or lose any value it might otherwise have had because Cisco failed to disclose that the Governance Council "denied" XU's application from late April 2006 through January 2007.  *See supra* pp. 8-22.  As a consequence, if JMOL is not granted, a new trial is warranted.  *See Whitserve*, 694 F.3d at 26-34; *Wordtech*, 609 F.3d at 1319-22.

*Second*, a new trial is warranted for the related reason that the jury's $70 million award is excessive.  *See, e.g.*, *Woodson*, 109 F.3d at 936.  A verdict is excessive if it is so large that the jury "clearly should have reached a different verdict," Cal. Civ. Proc. Code § 657, or, put another way, "the evidence does not justify the amount of the award," *Stevens v. Parke, Davis & Co.*, 9 Cal. 3d 51, 61 (1973).  *See also Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 419 (1996)

---

[4]    In addition, as explained in Cisco's brief concerning the limitation-of-liability clause in the parties' Technology Developer Program Agreements, XU's damages are subject to a $3 million cumulative cap.  The total damages on the patent infringement and fraudulent concealment claims therefore cannot exceed $3 million.

(holding that state law governs whether an award is excessive).  As just shown, that is the case here.

*Third*, a new trial is warranted because the jury's damages award was tainted by unreliable expert testimony from Mr. Bratic.  *See McMillan v. Weeks Marine, Inc.,* 478 F. Supp. 2d 651, 656-60 (D. Del. 2007) (granting a new trial on damages after concluding that the testimony and expert reports of plaintiff's damages expert should not have been admitted at trial); *see also* D.I. 389-1 (listing nine published decisions excluding or striking testimony from Bratic).

After the *Daubert* hearing, this Court expressed doubts about the reliability of Mr. Bratic's opinion concerning XU's value and in particular his use of the valuations in the Standard & Poor's and Duff & Phelps reports, *see* D.I. 647 at 3 n.1, which were excluded in part because of the speculative nature of the projections on which those valuations were predicated. *See* D.I. 608 at 4.  Nonetheless, the Court allowed Mr. Bratic to offer his opinion concerning XU's value based on his representation that it was reasonable to rely upon the reports because he had done his "own independent work and investigation on those valuation reports."  D.I. 646 at 56-60.  At trial, however, Mr. Bratic revealed just how deficient that "independent work and investigation" had been.  Although he checked most of the sources identified in the reports, 5 Tr. 1297:20-1298:16, he sought to verify the revenue projections upon which the valuations in the reports were predicated merely by comparing them to *Cisco*'s projections of XU's sales had XU been partnered with Cisco—without attempting to explain why XU's sales partnered with someone else would have been similar.  *See supra* p. 16.  These "Cisco" projections in turn were merely *XU's own projections*, provided by XU to Cisco and circulated within Cisco.  6 Tr. 1739:20-1749:3.  In addition, despite the Court's observation that these "guesstimates" were

25

"inherently speculative" and generated by parties with a "substantial motive to paint a rosy picture," D.I. 608 at 4, Mr. Bratic made no attempt to explain how the projections were generated, much less determine if they were made in a reliable fashion, which is itself grounds for rejecting his opinion as unreliable. *See, e.g.*, *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 290-93 (3d Cir. 2012) (upholding exclusion of expert opinion based upon financial projections because the expert was unfamiliar with the assumptions and methodology underlying the projections); *Meteorlogic, Inc. v. KLT, Inc.*, 368 F.3d 1017, 1019 (8th Cir. 2004) (excluding an opinion based on uncritical acceptance of a report prepared for a party as an investment-planning tool); *Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*, 350 F. Supp. 2d 582, 592 (D. Del. 2004) (excluding damages estimates based on projections in a marketing presentation when the expert failed to investigate the methodology used to generate the projections); *Sterling v. Redevelopment Auth. of the City of Phila.*, 836 F. Supp. 2d 251, 273 (E.D. Pa. 2011) (excluding expert opinion concerning lost profits because it was based on revenue projections from the plaintiff that the expert failed to investigate).

Mr. Bratic's failure to investigate the basis for the projections in the Duff & Phelps and Standard & Poor's reports also improperly foreclosed any critical examination of them at trial. Although experts may rely on hearsay, they may not act simply as a mouthpiece or conduit for hearsay. *See, e.g.*, *Dura Auto. Sys. Of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) (Posner, J.); *see also TK-7 Corp.*, 993 F.2d at 732-33; *In re James Wilson Assocs.*, 965 F.2d 160, 172-73 (7th Cir. 1992) (Posner, J.); *Legendary Art, LLC v. Godard*, 2012 WL 3550040, at *4-5 (E.D. Pa. Aug. 17, 2012). Experts are permitted to rely on hearsay "because the expert's 'validation, expertly performed and subject to cross-examination'" substitutes for cross-examination of the original declarant. *TK-7 Corp.*, 993 F.2d at 732 (quoting Fed. R. Evid. 703,

advisory committee's notes).  Mr. Bratic short-circuited such scrutiny by relying on projections in documents excluded from the record without determining how they were generated.

Finally, Mr. Bratic's testimony was unreliable and inadmissible because his valuation of XU does not "fit" this case.  *See* Fed. R. Evid. 702(d) (an expert must have "reliably applied the principles and methods to the facts of the case"); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").  As shown in Section IV.A.2 *supra,* Bratic did not calculate XU's value in light of the "denial" of the SolutionsPlus application; instead, he used valuations of XU that assumed XU was partnering or at least had the prospect of partnering with Cisco. Thus, his opinion that XU lost $70 million in value is based on the fact that XU was denied admittance to SolutionsPlus, not on any harm from the eight-month concealment of that denial.

As the jury adopted Mr. Bratic's testimony valuing XU at $70 million in awarding XU damages in that amount, the admission of his unreliable testimony was obviously prejudicial, and a new trial is warranted on this ground alone.  *See, e.g.*, *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 83 (3d Cir. 2009); *Hirst v. Inverness Hotel Corp.*, 544 F.3d 221, 228 (3d Cir. 2008).

## V.    CISCO IS ENTITLED TO JMOL OR NEW TRIAL ON THE PATENT INFRINGEMENT CLAIMS

### A.    Cisco Is Entitled To JMOL On The Remote Expert Infringement Claim

To prove direct infringement, XU had to prove that each and every limitation of the asserted claims was actually present in Cisco's accused products.  *See, e.g.*, *Becton, Dickinson & Co v. Tyco Healthcare Grp., L.P.*, 616 F.3d 1249, 1253 (Fed. Cir. 2010) ("If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law.") (citation and alteration omitted); *see also* D.I. 648 ¶¶ 4-5, 8, 10 (granting summary judgment on XU's indirect infringement claims).  XU claimed that Cisco's Remote Expert product infringed claim

12 of the '903 patent. At trial, however, the only evidence of infringement that XU presented was the testimony of an expert, Dr. Illah Nourbakhsh, and Dr. Nourbahksh's conclusory testimony failed to establish that Remote Expert practices three of the '903 patent's limitations. *See Paradox Sec. Sys. v. ADT Sec. Servs.*, 388 F. App'x 976, 982 (Fed. Cir. 2010) (affirming grant of JMOL where patentee's expert made only conclusory statements and failed to point to any structure in accused product that satisfied the claim limitation); *Rohm & Haas Co. v. Brotech Corp.*, 1995 WL 17878613, at *10 (D. Del. Jun. 30, 1995) ("blanket statement that certain accused products infringe[d] . . . is of little value absent some underlying support specific" to the claim limitation), *aff'd*, 48 F.3d 1089 (Fed. Cir. 1997).

*First*, Dr. Nourbakhsh failed to present any probative evidence that Remote Expert practices the "inquiry-type database" limitation. One of claim 12's limitations is an "inquiry-type database containing at least two layers of inquiry types, the layers of inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, wherein at least one layer of inquiry types comprises predetermined semantically-expressed inquiry types." PTX 6, col. 7:52-56. Dr. Nourbakhsh identified the expert table in Remote Expert as an inquiry-type database, 4 Tr. 1049:24-1050:5, and asserted that the table practiced the limitations for such a database, 4 Tr. 1050:11-1051:23. But with respect to the requirement that the database have "layers of inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors," all that Dr. Nourbakhsh said was that Remote Expert contains "expert types" that operate as layers of inquiry types and "expert skills" that operate as criteria groupings.[5] He did not suggest that the

---

[5] *See* 4 Tr. 1051:10-15 ("And studying Remote Expert, I find that it has multiple layers of inquiry types, these things that I mentioned called expert types, and it has underlying set of criteria groupings which in this case expressed as something called expert skills.").

expert types supposedly acting as layers of inquiry in Remote Expert are "organized from" the expert skills acting as criteria groupings, as the limitation requires. Nor could he. Undisputed testimony from William Dry, the Cisco engineer who designed Remote Expert, established that Remote Expert does not organize the expert table database: to the contrary, the database is "empty when the customer receives it" and "they must populate it." 6 Tr. 1905:1-6; *see also* 6 Tr. 1905:7-17 (describing process).

In addition to failing to show that Remote Expert has layers of inquiry organized by criteria groupings, Dr. Nourbakhsh failed to present any probative evidence that Remote Expert has multiple layers of inquiry types. This Court construed the term "inquiry types" to mean "terms that organize and identify categories of assistance requested, created prior to use and expressed using language that is humanly understandable," and the term "layer of inquiry types" to mean "a defined set of predetermined semantically expressed inquiry types." D.I. 168 at 4-5. Dr. Nourbakhsh asserted that Remote Expert's expert table "has multiple layers of inquiry types," 4 Tr. 1051:10-11, but he offered no justification for this assertion other than a vague allusion to the use of multiple languages, 4 Tr. 1050:19-1051:5. It is undisputed, however, that Remote Expert can use multiple languages by creating buttons or icons using different languages, hard-coded changes that do not practice claim 12. 4 Tr. 1169:6-1172:24; 6 Tr. 1911:11-1912:1.

*Second*, Dr. Nourbakhsh failed to offer any probative evidence that Remote Expert practices the "skill-set database" limitation. Claim 12 requires a "skill-set database containing at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping." PTX 6, col. 7:58-60. Here again, Dr. Nourbakhsh offered only a conclusory assertion. He testified that Remote Expert "has a skill set database" which contains "IDs that

relate right back to the kinds of questions people can ask in the other database table." 4 Tr. 1052:11-16. Dr. Nourbakhsh failed, however, to identify any structure in Remote Expert that constitutes the claimed "skill-set database" and, thus, failed to offer any probative evidence that Remote Expert practices the "skill-set database" limitation. *See, e.g.*, *Smith & Nephew, Inc. v. Arthrex, Inc.*, 453 F. App'x 977, 981 (Fed. Cir. 2011).

*Third*, Dr. Nourbakhsh failed to offer any probative evidence that Remote Expert practices a "unique numeric routing identifier." Claim 12 requires a "unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database." PTX 6, col. 7:61-63. At trial, Dr. Nourbakhsh pointed to two types of numbers used by Remote Expert: the IVR PN and an ID number. 4 Tr. 1052:20-1053:8; 7 Tr. 2129:19-2130:12. The IVR PN, however, is the telephone number of a group of agents able to receive calls, 6 Tr. 1907:16-1909:7, and thus does not link entries in the skill-set database and the inquiry-type database. The ID number identifies "touch interface" or button "that the customer sees," 6 Tr. 1909:23-1910:23, and thus also does not link entries in the skill-set database and the inquiry-type database either.

In short, far from proving that Remote Expert practices each and every limitation in claim 12, XU failed to present probative evidence that it practices three separate limitations.

**B.     Cisco Is Entitled to JMOL On The Expert Advisor Infringement Claims**

XU claims that another Cisco product, Expert Advisor, infringes claim 12 of the '903 patent as well as claim 5 of the '709 patent. The evidence that XU presented through Dr. Nourbakhsh falls short on these infringement claims as well.

As with Remote Expert, XU failed to present probative evidence that Expert Advisor practices the "inquiry-type database," "skill-set database," and "unique numeric routing identifier" limitations of the '903 patent. Dr. Nourbakhsh identified Expert Advisor's

assignment queue system as its "inquiry types," and its call type lists as its "criteria groupings." 4 Tr. 1060:18-1061:1, 1173:24-1175:18.  But Dr. Nourbakhsh did not, and could not, testify that Expert Advisor practiced claim 12's "layers of inquiry types organized from an underlying plurality of criteria groupings" (PTX 6, col. 7:52-53) because Expert Advisor's call-type lists do not organize layers of assignment queues.  5 Tr. 1518:4-6.  Indeed, Mike Lepore, the Cisco engineer who led the team that built Expert Advisor, testified that there was no relationship at all between the assignment queues and the call-type lists.  5 Tr. 1493:10-1494:1, 1517:16-1518:3. In addition, although Dr. Nourbakhsh asserted that expert advisor "has skill-set databases," he once again failed to identify any structure containing such a database.  4 Tr. 1062:7-22.  Dr. Nourbakhsh also asserted that Expert Advisor had a "unique numeric routing identifier" because there was a "unique connection between the skill groups and the assignment queues," but failed to identify any numeric identifier used for routing.  4 Tr. 1062:23-1063:7.

Dr. Nourbakhsh's testimony concerning the '709 patent suffered from a different shortcoming.  Claim 5 of that patent requires, among other things, a "database connected to a plurality of monitors presenting the quantity of inquiry criteria and values to the second member in an interactive manner."  PTX 2, col. 10:8-10.  Expert Advisor users, however, do not interact through monitors presenting inquiry criteria and values: "With Expert Advisor, the only way that you could get into the system, was via a phone call."  5 Tr. 1498:3-5; *see also* 5 Tr. 1498:5-1499:21, 1518:18-21; PTX 18 at 12-13.  Dr. Nourbakhsh pointed out that Cisco's Virtual Expert Management uses a graphical user interface and asserted that Virtual Expert Management is "at its core Expert Advisor," 4 Tr. 1145:21-1146:19, but XU failed to present any evidence substantiating this assertion, and Cisco presented evidence showing that it was incorrect.  PTX 18 at 12-13; 5 Tr. 1497:13-1498:15, 1499:19-21.

31

Thus, Cisco is entitled to judgment as matter of law on all of XU's patent infringement claims.

### C.      Cisco Is Entitled To JMOL Based On The On-Sale Bar

Cisco is also entitled to judgment as a matter based on the "on-sale" bar.  Under Section 102(b) of the Patent Act, an invention may not be patented if it has been "on sale" more than one year before a patent application for it was filed.  *See* 35 U.S.C. § 102(b).  An invention is considered to be "on sale" if two conditions are satisfied: "first, the claimed invention must be the subject of a commercial sale or offer for sale, and, second, it must be ready for patenting." *Cargill, Inc. v. Canbra Foods, Ltd*., 476 F.3d 1359, 1368 (Fed. Cir. 2007).  Cisco showed that both these conditions were satisfied for the inventions described in the '903 and the '709 patents more than a year before an application to patent the inventions was filed.

Specifically, Cisco showed that the application for the '903 patent was filed on January 24, 2005, and the application for the '709 patent was first filed on April 2, 2004.  3 Tr. 767:24-768:9; PTX 2 at 2; PTX 6 at 2.  Cisco also showed that in 2002 and 2003, XU (then named LearningIdeas) offered its platform to Allstate.  *See* DX 110, 538, 541.  Finally, Cisco's software expert, Dr. Sandeep Chatterjee, analyzed XU's source code, and based upon the comments and conventions in that code, determined that both claim 12 of the '903 patent and claim 5 of the '709 patent were embodied in XU's platform before April 2, 2003.  6 Tr. 1645:17-1667:1.  Thus, the inventions described in claims 12 of the '903 patent and claim 5 of the '709 patent were embodied in XU's platform and offered to Allstate for sale more than a year before the applications for those patents were filed, and the on-sale bar renders both claims invalid.

XU failed to rebut this evidence.  XU presented testimony from John Steinhoff, a former director of technology and one of the inventors named on both the '903 patent and the '709 patent, that XU did not have any finished products and that the invention was not embodied in

32

the demonstrations of its product that XU presented.  *See*  3 Tr. 714:2-5, 718:20-23, 754:18-755:5; 7 Tr. 2093:18-21, 2094:10-22.   But the on-sale bar does not require that a patent be included in a finished product or embodied in a demonstration shown to potential customers.  As noted above, it requires only that the claimed invention be "ready for patenting" and be the subject of an "offer for sale."  *Cargill*, 476 F.3d at 1368.

XU also presented testimony from Dr. Nourbakhsh disputing whether the inventions in question were embodied in XU's source code.  But two of the named inventors, Richard Mason and James Nevin, admitted that their inventions were embodied in XU's source code, *see* 5 Tr. 1576:2-15 (Richard Mason); 5 Tr. 1577:7-11 (James Nevin), and while Dr. Nourbakhsh denied that the limitations of the patents in suit were included in the portions of the source code identified by Dr. Chatterjee, his testimony was once again conclusory in nature, and he failed to explain when the elements of the inventions that the inventors had testified were included in XU's source code were added to it.  7 Tr. 2101:14-2109:18.  Thus, XU failed to raise a genuine issue concerning the application of the on-sale bar, and Cisco is entitled to JMOL under the bar on XU's patent infringement claims.

> **D.    Alternatively, Cisco Is Entitled To A New Trial On The Patent Infringement Claims**

For substantially the same reasons that Cisco is entitled to JMOL on the patent infringement claims and on the on-sale bar, a new trial is the minimum relief to which Cisco is entitled.  Even if the conclusory testimony of Dr. Nourbakhsh was somehow sufficient to support the jury's verdicts, those verdicts are against the great weight of the evidence, and a new trial is warranted.

## VI.    CONCLUSION

For the foregoing reasons, pursuant to Fed. R. Civ. P. 50(b), Cisco is entitled to judgment as a matter of law on XU's fraudulent concealment and patent infringement claims and as to the $70 million in damages awarded for fraudulent concealment.  In the alternative, pursuant to Fed. R. Civ. P. 59, any judgment on the fraudulent concealment claim should be remitted to $2.66 million and/or a new trial should be granted on the fraudulent concealment and patent infringement claims.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*
_____
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com

*Attorneys for Defendant/Counterclaimant*
*Cisco Systems, Inc.*

OF COUNSEL:

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Kathleen M. Sullivan
Cleland B. Welton II
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Daniel H. Bromberg
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
(650) 801-5000

MORGAN, LEWIS & BOCKIUS LLP
Brett M. Schuman
One Market Street, Spear Street Tower
San Francisco, CA 94105
(415) 442-1000

Kell M. Damsgaard
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000

May 6, 2013

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2013, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on May 6, 2013, upon the following in the manner indicated:

Philip A. Rovner, Esquire                                      *VIA ELECTRONIC MAIL*
Jonathan Choa, Esquire
POTTER ANDERSON & CORROON LLP
Hercules Plaza
1313 North Market Street
Wilmington, DE  19801

Stephen D. Susman, Esquire                                 *VIA ELECTRONIC MAIL*
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX  77002

Joseph Diamante, Esquire                                     *VIA ELECTRONIC MAIL*
Charles E. Cantine, Esquire
Jason M. Sobel, Esquire
Barry Clayton McCraw, Esquire
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY  10038


                                                          */s/ Jack B. Blumenfeld*
                                          _____

                                          Jack B. Blumenfeld (#1014)