**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| XPERTUNIVERSE, INC., | ) | |
| | ) | Civil Action No. 09-157-RGA |
| Plaintiff, | ) | |
| | ) | **PUBLIC VERSION** |
| v. | ) | |
| | ) | |
| | ) | |
| CISCO SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF XPERTUNIVERSE INC.'S ANSWERING BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER RULE
50(b) AND, IN THE ALTERNATIVE, FOR REMITTITUR
OR NEW TRIAL UNDER RULE 59(a)(1)**

Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE  19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

*Attorneys for Plaintiff XpertUniverse, Inc.*

OF COUNSEL:

Charles E. Cantine
Jason M. Sobel
Joseph Diamante
Kenneth L. Stein
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038
(212) 806-5400

Dated: June 5, 2013
Public Version:  June 11, 2013

# TABLE OF CONENTS

I.  SUMMARY OF ARGUMENT ........................................................................ 1

II.  STATEMENT OF RELEVANT FACTS ........................................................ 2

III.  LEGAL STANDARDS ................................................................................ 2

   A.  JMOL Standards ................................................................................ 2

   B.  New Trial Standards ......................................................................... 3

   C.  Remittitur Standards ......................................................................... 3

IV.  CISCO IS NOT ENTITLED TO JMOL OR A NEW TRIAL ON LIABILITY
     FOR FRAUDULENT CONCEALMENT .................................................... 4

   A.  There Was Substantial Evidence That Cisco Concealed A Material Fact .............. 4

V.  CISCO IS NOT ENTITLED TO JMOL, REMITTITUR, OR A NEW TRIAL ON
    THE DAMAGES AWARDED FOR FRAUDULENT CONCEALMENT ..................... 11

   A.  Cisco's Assertion That The "New Business Rule" Precedents Apply Is
       Irrelevant For Purposes of JMOL, And Was Waived For Purposes of
       Determining Whether A New Trial Is Warranted ................................................. 11

   B.  Substantial Evidence Supports The Jury's Finding That XU Lost Value,
       And That The Lost Value Was At Least $70 Million ........................................... 16

   C.  There Was Substantial Evidence That Cisco's Concealment Caused XU
       To Suffer $70 Million In Lost Value Damages .................................................... 25

   D.  Neither Remittitur Nor A New Trial Is Warranted .............................................. 27

       1.  The Jury's Damage Award Should Not Be Remitted ............................... 27

       2.  Cisco Is Not Entitled To A New Damages Trial ...................................... 28

VI.  SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S FINDING OF PATENT
     INFRINGEMENT ........................................................................................ 33

   A.  Substantial Evidence Supports The Jury's Finding That Remote Expert
       Infringes Claim 12 of the '903 ............................................................................ 34

**B.**     Substantial Evidence Supports the Jury's Finding That Expert Advisor
Infringes Both The '903 and '709 Patents ........................................................... 36

**C.**     Substantial Evidence Supports The Jury's Finding That The Inventions Of
The '903 and '709 Patents Are Valid and Not Subject to an On-Sale Bar ............ 38

**D.**     Cisco Is Not Entitled To A New Trial On The Patent Infringement Claims ......... 40

**VII.**   CONCLUSION ................................................................................................................ 40

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*AlphaMed Pharmaceuticals Corp. v. Arriva Pharmaceuticals, Inc.*,
    432 F. Supp. 2d 1319 (S.D. Fla. 2006) ............................................................................ 23, 24

*Blakely v. Continental Airlines, Inc.*,
    992 F. Supp. 731 (D.N.J. 1998) ................................................................................... 3, 4, 27

*Bullen v. Chaffinch*,
    336 F. Supp. 2d 342 (D. Del. 2004) ..................................................................................... 3

*Chemipal Ltd. v. Slim Fast Nutritional Foods, International, Inc.*,
    350 F. Supp. 2d 582 (D. Del. 2004) ................................................................................... 31

*Cortez v. Trans Union, LLC*,
    617 F.3d 688 (3d Cir. 2010) ................................................................................................ 3

*Club Car, Inc. v. Club Car (Quebec) Import, Inc.*,
    362 F.3d 775 (11th Cir. 2004) ........................................................................................... 13

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) ................................................................................................... passim

*Denton v. DaimlerChrysler Corp.*,
    645 F. Supp. 2d 1215 (N.D. Ga. 2009) .............................................................................. 13

*DePuy Inc. v. Biomedical Engineering Trust*,
    216 F. Supp. 2d 358 (D.N.J. 2001) ............................................................................... 2, 13

*Donlin v. Philips Lighting North America Corp.*,
    581 F.3d 73 (3d Cir. 2009) ................................................................................................ 33

*Engalla v. Permanente Med. Group, Inc.*,
    15 Cal. 4th 951 (1997) ......................................................................................................... 4

*Fineman v. Armstrong World Industries, Inc.*,
    980 F.2d 171 (3d Cir. 1992) ............................................................................................ 2, 3

*Grupe v. Glick*,
    26 Cal. 2d 680 (1945) ................................................................................................. 12, 14

*Gumbs v. Pueblo International, Inc.,*
    823 F.2d 768 (3d Cir.1987) ................................................................. 4

*Hirst v. Inverness Hotel Corp.,*
    544 F.3d 221 (3d Cir. 2008) ...............................................................33

*Hurley v. Atlantic City Police Department,*
    933 F. Supp. 396 (D.N.J. 1996)............................................................3

*IPPV Enterprises, LLC v. Echostar Communications, Corp.,*
    191 F. Supp. 2d 530 (D. Del. 2002) ..............................27, 28, 37, 40

*John M. Floyd & Associates, Inc. v. Ocean City Home Bank,*
    2008 WL 4534079 (D.N.J. 2008)........................................................13

*Kids Universe v. In2Labs,*
    95 Cal. App. 4th 870 (2d Dist. 2002) ....................................12, 14, 15

*Klein v. Hollings,*
    992 F.2d 1285 (3d Cir. 1993) ......................................................28, 39

*Lightning Lube, Inc. v. Witco Corp.,*
    4 F.3d 1153 (3d Cir. 1993) .................................................................2

*Meterlogic, Inc. v. KLT, Inc.,*
    368 F.3d 1017 (8th Cir. 2004) ...........................................................31

*Mosley v. Wilson,*
    102 F.3d 85 (3d Cir. 1996) ..................................................................2

*Motter v. Everest & Jennings, Inc.,*
    883 F.2d 1223 (3d Cir. 1989) .........................................................3, 27

*Oiness v Walgreen Co.,*
    88 F.3d 1025 (Fed. Cir. 1996) ...........................................................27

*Pannu v. Iolab Corp.,*
    155 F.3d 1344 (Fed. Cir. 1998) ...........................................................2

*Paradox Security Systems v. ADT Security Services, Inc.,*
    388 F. App'x 976 (Fed. Cir. 2010).....................................................33

*Parlour Enterprises, Inc. v. Kirin Group, Inc.,*
    61 Cal. Rptr. 3d 243 (2007).................................................................12

*Perkin-Elmer Corp. v. Computervision Corp.*,
732 F.2d 888 (Fed. Cir. 1984) ...............................................................................2

*Reeves v. Sanderson Plumbing Products, Inc.*,
530 U.S. 133 (2000) ...............................................................................................3

*Rohm & Haas Co. v. Brotech Corp.*,
1995 WL 1787613 (D. Del. 1995).........................................................................34

*RRK Holding Co. v. Sears Roebuck and Co.*,
563 F. Supp. 2d 832 (N.D. Ill. 2008).....................................................................13

*Sargon Enterprises, Inc. v. University of Southern California*,
55 Cal. 4th 747 (2012)......................................................................................12, 14

*Sheridan v. E.I. DuPont de Nemours and Co.*,
100 F.3d 1061 (3d Cir. 1996) .................................................................................3

*Sterling v. Redevelopment Authority of City of Philadelphia*,
836 F. Supp. 2d 251 (E.D. Pa. 2011).....................................................................32

*Telcordia Technologies, Inc. v. Cisco Systems, Inc.*,
592 F. Supp. 2d 727 (D. Del. 2009) .......................................................................2

*TK-7 Corp. v. Estate of Barbouti*,
993 F. 2d 722 (10th Cir. 1993) ..............................................................................23

*Williamson v.Consolidated Rail Corp.*,
926 F.2d 1344 (3d Cir. 1991) .................................................................................2

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012) ..................................................................................31

## RULES

Fed. R. Civ. P. 50(b)................................................................................................1

Fed. R. Civ. P. 59....................................................................................................4

Fed. R. Civ. P. 59(a)(1) ..........................................................................................1

Fed. R. Civ. P. 61..................................................................................................29

Plaintiff, XpertUniverse, Inc. ("Plaintiff" or "XU") respectfully submits this brief in opposition to Cisco Systems, Inc.'s ("Defendant" or "Cisco") Motion for Judgment as a Matter of Law ("JMOL") Under Rule 50(b) and, in the Alternative, for Remittitur or New Trial Under Rule 59(a)(1).

## I.  SUMMARY OF ARGUMENT

Substantial evidence supports the jury's verdict that Cisco committed fraud, that Cisco's fraud harmed XU, and the amount of that harm was $70 million.  Substantial evidence also supports the jury's verdict that Cisco infringed the two patents asserted by XU, and that those patents are not invalid.  The jury assessed the credibility of Cisco's witnesses and arguments, considered substantial evidence presented by XU of fraud, infringement and validity, and properly credited the testimony of XU's witnesses and arguments.  Viewed in the light most favorable to XU, the jury had substantial evidence to find in favor of XU on each issue raised in Cisco's motion, and Cisco's JMOL motion should therefore be denied.

Cisco fails to establish that the jury's verdict with regard to fraud, infringement and validity is against the "clear weight of the evidence," or that sustaining the jury's verdict would result in a "miscarriage of justice" warranting a new trial.  As for remittitur, Cisco fails to establish that this Court should reverse its previous rulings.  Namely, after substantial *Daubert* briefing, a *Daubert* hearing including direct and cross-examination testimony, followed by additional *Daubert* briefing, this Court specifically permitted Mr. Bratic to "testify as to his lost value opinion" of $70 million.  D.I. 647 at 3; D.I. 659 at 2.  On this record, Cisco fails to establish that remittitur is warranted as the jury's verdict was clearly supported by the evidence and did not exceed the maximum amount that the jury could have reasonably found under the evidence needed to make XU whole.

## II.   STATEMENT OF RELEVANT FACTS

The relevant facts are incorporated in the argument below.

## III.   LEGAL STANDARDS

### A.   JMOL Standards

To prevail on its motion for JMOL, Cisco "must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings." *Telcordia Technologies, Inc. v. Cisco Sys., Inc.*, 592 F. Supp. 2d 727, 734-35 (D. Del. 2009) (Sleet, J.) (citing *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998)). Substantial evidence has been defined as "such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind adequate to support the finding under review." *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984). The evidence should be viewed in the light most favorable to XU, giving XU the advantage of every fair and reasonable inference. *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993). In determining whether the evidence is legally sufficient, "the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version." *Id.* at 1166 (citing *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 190 (3d Cir. 1992)). Rather, the court must resolve all conflicts of evidence in favor of XU, and determine whether the record contains the "minimum quantum of evidence from which a jury might reasonably afford relief." *DePuy Inc. v. Biomedical Eng'g Trust*, 216 F. Supp. 2d 358 (D.N.J. 2001), quoting *Mosley v. Wilson*, 102 F.3d 85, 89 (3d Cir. 1996); *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir. 1991).

Although the record should be viewed as a whole, the Court "must disregard all evidence

2

favorable to [Cisco as] the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). Thus, the Court must give full credence to evidence supporting XU. *Id.*

### B.   New Trial Standards

Although a motion for a new trial under Rule 59 may be granted even if substantial evidence exists to support the jury's verdict, it should only be granted if the verdict is "against the great weight of evidence" and a new trial is needed "to prevent a miscarriage of justice." *Bullen v. Chaffinch*, 336 F. Supp. 2d 342, 347 (D. Del. Sept. 17, 2004). New trials are disfavored, however, because "[s]uch an action effects a denigration of the jury system [because] to the extent that new trials are granted the judge takes over ... the prime function of the jury as the trier of fact." *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1076 (3d Cir. 1996), (quoting *Fineman v. Armstrong World Industries, Inc.*, 980 F.2d 171, 211 (3d Cir. 1992)).

### C.   Remittitur Standards

Remittitur is a limited exception to the sanctity of jury fact-finding. Accordingly, it may only be granted when the amount of damages awarded by the jury is "clearly unsupported" or when the award is "grossly excessive." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 715-16 (3d Cir. 2010). A court, however, is obligated "to uphold the jury's award, if there exists a reasonable basis to do so ... [A] court *may not* ... reduce the award merely because it would have granted a lesser amount of damages," had it been the trier of fact. *Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir. 1989). Thus, the Court must "exercise restraint to avoid usurping the jury's primary function." *Hurley v. Atlantic City Police Dept.*, 933 F. Supp. 396, 403 (D.N.J. 1996). Under Third Circuit precedent, "a remittitur should be granted to the maximum amount that a jury could have reasonably found." *Blakely v. Continental Airlines,*

*Inc.*, 992 F. Supp. 731, 734 (D.N.J. 1998) (citing *Gumbs v. Pueblo Int'l, Inc.,* 823 F.2d 768, 773 (3d Cir. 1987)).  Accordingly, if the jury's verdict is not greater than the maximum amount that it could reasonably have found, remittitur is not appropriate.

## IV.   CISCO IS NOT ENTITLED TO JMOL OR A NEW TRIAL ON LIABILITY FOR FRAUDULENT CONCEALMENT

### A.   There Was Substantial Evidence That Cisco Concealed A Material Fact

Cisco asserts that it is entitled to JMOL, or in the alternative a new trial, on the jury's finding of liability for fraudulent concealment.  D.I. 700 at 5-8.  In support, Cisco asserts that no rational juror could have found that the concealed fact, the denial of XU's Solutions Plus application, was material.  D.I. 700 at 5.  A fact is "material" if it would influence a reasonable person's judgment or conduct.  *Engalla v. Permanente Med. Group, Inc.*, 15 Cal. 4th 951, 977-978 (1997).  Whether the concealment of the denial was a material fact is itself a question of fact that was considered by the jury and decided in XU's favor.  D.I. 658 at 30-33.  Moreover, the jury had substantial evidence on which to find that Cisco's concealment of the denial was a material fact to XU, and therefore substantial evidence supports the jury's verdict in this regard.

The jury heard evidence that Cisco's Governance Council met on or about April 19, 2006 to determine whether to admit XU into the Solutions Plus program.  Ex. 3,[1] Trial (Daniels) Tr. 903:10-904:2; Ex. 22.  The jury also heard evidence that the matter was put to a vote, and XU's application was denied on or about April 26, 2006.  Ex. 3, Trial (Wiese) Tr. 952:24-954:9; Exs. 22, 42.  The overwhelming (and undisputed) evidence establishes that Cisco concealed this fact

---

[1] Unless otherwise noted, all exhibits cited herein are attached to Omnibus Declaration of Charles E. Cantine In Support of: Plaintiff XpertUniverse Inc.'s Answering Brief In Opposition To Defendant Cisco Systems, Inc.'s Motion For Enforcement of The Parties' Agreement To Limit Liability; Plaintiff XpertUniverse Inc.'s Answering Brief In Opposition to Defendant's Motion for Judgment as a Matter of Law Under Rule 50(b) and, In The Alternative, For Remittitur or New Trial Under Rule 59(a)(1); and Plaintiff XpertUniverse Inc.'s Answering

from XU for nearly nine months.

XU's witnesses testified that no one from Cisco ever told them that the Solutions Plus application had been denied. Ex. 1, Trial (Friedman) Tr. 334:6-9; 336:20-337:20; Ex. 2, Trial (Eiss) Tr. 560:13-19; 564:23-566:12, Ex. 2, Trial (Steinhoff) Tr. 753:11-14. Not a single Cisco witness contradicted this testimony. Cisco's own documents, admitted at trial, establish that Cisco knew that XU had not been told about the denial. Ex. 23, PTX-38 ("XU still does not know about last week's decision at the Governance Council"); Ex. 29, PTX-47 ("XU might still be under the impression that we are slowly working on a S+ [Solutions Plus] avenue ..."); Ex. 28, PTX-46 ("we don't want to announce what we're doing to XU" .... "I don't think we want to broadcast that to XU" .... "Elizabeth Eiss at XU thinks CCBU is moving ahead on a Solutions+ agreement ..."). Moreover, Cisco's own witness who specifically investigated these matters during the litigation testified at trial that the first time XU was actually told about the denial was nearly nine months later, in January 2007. Ex. 4, Trial (Lepore) Tr. 1554:15-1557:13. As Cisco's expert admitted, this is a lifetime for a start-up technology company like XU. Ex. 6, Trial (Wagner) Tr. 2053:21-2055:10.

Cisco asserts that "denied" and "not admitted" is a distinction without a difference, and it argued this to the jury. Ex. 2, Trial (Eiss) Tr. 636:9-13. However, as Ms. Eiss testified, "to characterize that we knew it hadn't been approved as equal to you knew it was denied, those are two totally different things." *Id.* at 635:24-636:2. Counsel for Cisco pressed the issue further:

> Q. So we're down to you knew it was not admitted, but you think that's something different than denied at that point?
>
> A. I don't think it's something different. I know it's something different.

---

Brief In Opposition To Defendant's Motion Regarding Inequitable Conduct ("Ex."), filed herewith.

*Id.* at 636:9-13. Ms. Eiss' testimony alone was sufficient for the jury to find the denial was material.

Cisco also asserts that XU failed to present any evidence that knowing about the denial would have influenced XU's conduct. D.I. 700 at 7. Cisco simply ignores the testimony of Ms. Eiss, Mr. Friedman and Cisco's own contemporaneous documentary evidence which all demonstrate that Cisco knew XU's conduct would be influenced if it learned of the denial. *Infra.* Both Ms. Eiss and Mr. Friedman testified that had XU known about the denial, XU could have abandoned its relationship with Cisco and instead sought out a partnership with one of Cisco's competitors, such as Genesys or IBM. Ex. 2, Trial (Eiss) Tr. 567:7-568:16; Ex. 1, Trial (Friedman) Tr. 337:21-338:15. Their testimony was confirmed by the testimony of Mr. Koeppel, a former Senior Vice President and Chief Information Officer of the Global Consumer Group at Citigroup. Mr. Koeppel testified that Citigroup would have gone forward with the XU pilot regardless of whether XU had partnered with Cisco or IBM. Ex. 3, Trial (Koeppel) Tr. 1002:5-1003:2. In fact, Cisco's own expert admitted that XU "clearly" had other opportunities in April, 2006. Ex. 6, Trial (Wagner) Tr. 2075:19-22 (Q. Now, I think you testified in your direct that in April 2006, XpertUniverse had other opportunities; right? A. They clearly did.). The jury was entitled to credit this testimony in finding Cisco's concealment of the denial a material fact. But there was even more evidence the jury heard to support its verdict.

The jury heard evidence that XU's entry into the Solutions Plus program was important to XU. Ex. 2, Trial (Eiss) Tr. 537:9-19. Cisco provided XU with a presentation describing the Solutions Plus process that had been specifically tailored for XU. Ex. 18, DX-826 at XU-0068607-24. That presentation included a flowchart depicting the application process. *Id.* at XU-0068616. As XU understood it, and as the XU-specific flowchart made clear, if the

Governance Council denied XU's application then the process stopped and went no further. Ex. 2, Trial (Eiss) Tr. 544:8-19; Ex. 18 at XU-0068616. The jury also heard the Cisco employee (Balagi Sundara) who made the presentation to the Governance Council testify that, according to the flowchart that had been provided to XU, if the application was denied the process ended. Ex. 3, Trial (Sundara) Tr. 973:16-21. The jury was entitled to infer that since the process went no further, had XU known of the denial it would have pursued other opportunities. Thus, Cisco's fraud influenced XU's conduct. Those facts alone are also sufficient to support the jury's finding that the concealment of the denial was material. But there was even more evidence that the jury heard in this regard.

The jury also heard testimony from Cisco's own employees that they knew the status of XU's application into the Solutions Plus program was an important issue to XU. Ex. 5, Trial (Hernandez) Tr. 1867:8-12. Cisco's own employees, including the lead member of the Governance Council (Carl Weise, Senior Vice-President of Worldwide Collaboration Sales), also admitted that if they had been in XU's position they would have wanted to know the status of the application and that it had been denied. Ex. 3, Trial (Wiese) Tr. 956:23-957:2, Ex. 3, Trial (Sundara) Tr. 980:6-23. These facts also support materiality of the denial.

Cisco's witnesses, who the jury heard from, also testified that they purposefully did not tell XU about the denial:

> Q. And in your May 3rd, 12:48 email to Balaji, you indicated that, "Rob has agreed to tell no one about this"?
>
> A. Uh-huh.
>
> Q. Are you referring to the fact that XU was rejected from SolutionsPlus?
>
> A. Yes, that is what I am referring to.

Ex. 3, Trial (Daniels) Tr. 902:23-903:5. The fact that Cisco purposefully concealed the denial

from XU also establishes its materiality.  The jury was entitled to infer, as the evidence shows, that Cisco chose to hide this fact from XU because it knew, or believed, it would influence XU.

Cisco's own documents, admitted at trial, showed that from the very beginning of the relationship one of the "most important" issues for Cisco was to keep XU from partnering with Genesys, one of Cisco's largest competitors in the call center market.  Ex. 40, PTX-428.  That concern of Cisco's, namely keeping Genesys out, as well as its concern that XU might choose to partner with Genesys instead of Cisco, continued throughout the two and half year relationship. Exs. 13, 21, 24-32, 34, 40-41, DX416, PTX-29, PTX-37-39, PTX-41, PTX-44-48, PTX-53, PTX-57, PTX-62, PTX-460; Ex. 5, Trial (Hernandez) Tr. 1830:19-1831:8, 1832:1-1834:7, 1867:8-12.  In fact, Cisco was explicitly advised by XU very early in the relationship that if it could not reach a deal with Cisco it would return to partner with Genesys.  Ex. 41, PTX-460, Ex. 5, Trial (Hernandez) Tr. 1831:9-1833:3 ("Q.  So you knew as early as July 2005 that XpertUniverse would go with Genesys if a Cisco deal couldn't be worked out, didn't you?  A.  We did, yeah. They already had an arrangement with them.")  This concern was shared by many within Cisco, including Cisco's global account manager for Citibank, Mr. DePinto, an "influential" and "important" person at Cisco. Ex. 5, Trial (Hernandez) Tr. 1739:10-19.

> Q. So was it a concern of yours again in June 2006 that Citigroup was going to be using Genesys as the back end engine on its pilot program; right?
>
> A. Correct.

Ex. 3, Trial (DePinto) Tr. 890:19-23; Ex. 31, PTX-53.  Mr. DePinto's concern was communicated to Mr. Hernandez, the number two person in the CCBU. Ex. 24, PTX-39. ("In order for us to keep Genesys out of Citi, it is important we control this technology roll out.")  As Cisco's own documents established, Cisco was concerned that in denying XU entry into the

8

Solutions Plus program, "There is also the risk of Genesys buying out XU and then we have lost everything." Ex. 27, PTX-45. As a result, numerous Cisco employees were involved in a coordinated campaign to conceal from XU the fact that its application had been denied.

For example, about a week after the denial (May 3, 2006) Balaji Sundara, the Cisco product manager that made the presentation to the Governance Council, wrote to his boss Ross Daniels, who reported to John Hernandez. Ex. 27, PTX-45, Ex. 5, Trial (Hernandez) Tr. 1719:7-16. Mr. Sundara was concerned that XU was denied entry into the Solutions Plus program so he asked Mr. Daniels "How are we supposed to continue with XU in the near term?" Mr. Daniels forwarded Mr. Sundara's email to his boss, Mr. Hernandez, the number two person at the Call Center Business Unit, and asked Mr. Hernandez how he should respond to Mr. Sundara. He also informed Mr. Hernandez that "XU still does not know about last week's decision at the Governance Council." Ex. 23, PTX-38. Mr. Hernandez responded that he had spoken with Rob DePinto, the Citibank account manager for Cisco, and that Mr. DePinto "is not pleased" that XU had been denied Solutions Plus but that "He agreed to tell no one this." *Id.* Mr. Daniels then responded to Mr. Hernandez, saying "OK. Thanks for this. I'll have Balagi continue to move XU along slowly and stall as needed." *Id.* (emphasis added). This email exchange is just one of many where Cisco purposefully chose to conceal from XU the fact that it had been denied entry into the Solutions Plus program. There were many other exchanges that occurred months later (October, 2006) that the jury saw that also discussed the fact that Cisco was just "stalling" XU (Ex. 30), all the while knowing that XU had not been told about the outcome of the Governance Council meeting. Ex. 28, PTX-46. ("Elizabeth Eiss at XU thinks CCBU is moving ahead on a Solutions+ agreement with XU"), ("we don't want to announce what we are doing to XU"), ("I don't think we want to broadcast that to XU"); Ex. 29, PTX-47. ("we (CCBU) are not actively

working with XU. We also haven't told XU that we have stopped working with them ... XU might still be under the impression that we are slowly working on a S+ avenue"). The jury also evaluated Mr. Sundara's uncomfortable demeanor when he was questioned about the cover-up. Ex. 3, Trial (Sundara) Tr. 979:1-980:16 (testifying that he could not tell XU without specific instructions from his manager, which never came).

The jury was free to infer that due to Cisco's concern that XU would partner with Genesys, Cisco chose to purposefully conceal from XU the fact that its application had been denied and to "stall" XU as needed while Cisco built its own competing product in-house. This evidence further supports the materiality of the denial.

Cisco asserts that XU's application "had a realistic chance of success" because most Solutions Plus applications "go through multiple reviews" and that many applications "are accepted after being initially rejected." D.I. 700 at 6. That, of course, is the exact opposite of what happened with XU. The evidence at trial established that XU's application went through just one, and only one, review, not multiple reviews. Ex. 5, Trial (Hernandez) Tr. 1868:21-1869:8. The result of that one and only one review was: "denied." Ex. 22, PTX-37. As for whether Hernandez was in fact a "champion" of XU and whether he in fact lobbied Weise to overcome the Governance Council objections is irrelevant to the issue of materiality. In fact, the jury heard that Mr. Weise did not recall any conversation with Mr. Hernandez discussing further opportunities with XU. Ex. 3, Trial (Wiese) Tr. 961:24-963:13. The jury was entitled to assess the credibility of Cisco's witnesses, weigh the competing evidence, and disregard everything Hernandez said in reaching its verdict.

In sum, the jury had substantial evidence on which to find that Cisco's concealment of the denial was a material fact to XU, and therefore substantial evidence supports the jury's verdict in

10

this regard.  Cisco's motion for JMOL and a new trial on this issue, therefore, should be denied.

## V.   CISCO IS NOT ENTITLED TO JMOL, REMITTITUR, OR A NEW TRIAL ON THE DAMAGES AWARDED FOR FRAUDULENT CONCEALMENT

### A.   Cisco's Assertion That The "New Business Rule" Precedents Apply Is Irrelevant For Purposes of JMOL, And Was Waived For Purposes of Determining Whether A New Trial Is Warranted

Cisco goes to great lengths to try and establish that under California law a plaintiff must

prove damages for the loss of prospective profits with reasonable certainty and that this "rule" is

particularly "stringent" when applied to new or unestablished businesses.  D.I. 700 at 8-10.

While that may be true, it is an answer to the wrong question.  Here, the only issue for damages

was measuring the difference in the value of XU at two different points in time—before the fraud

and after the fraud.  This methodology was referred to by both Bratic and Wagner (Cisco's

damages expert) as "but-for" damages, and both Bratic and Wagner agreed that this was the

proper way to measure fraud damages in this case.  Ex. 4, Trial (Bratic) Tr. 1274:20-1277:16; Ex.

6, Trial (Wagner) Tr. 2070:18-2071:7.  This methodology was recognized by the Court as well:

> "Bratic provides two alternative damages figures for Cisco's alleged
> fraudulent concealment of XU's status in Cisco's Solutions Plus program,
> from April, 2006, to January, 2007.  The first figure, $70 million, is XU's
> 'lost business value' based on comparing what Bratic opines was XU's value
> before Cisco's alleged concealment, to XU's value after it found out it was
> not admitted into Solutions Plus and went out of business."

D.I. 647 at 2.  More importantly, after extensive *Daubert* briefing, as well as a *Daubert* hearing

with both direct and cross-examination, this Court held that Bratic "may testify as to his lost

value opinion" of $70 million, the very opinion later accepted by the jury.[2]  *Id.* at 3.

---

[2] The Court also recognized that the remaining challenges raised by Cisco with respect to Bratic's testimony, such as (i) whether there were other sources of XU's financial condition, (ii) whether Bratic correctly understood the relationship between XU and Cisco, (iii) whether Bratic's reliance on the third party valuation reports was contradicted by other evidence, and (iv) whether the facts Bratic learned during his interviews were contradicted by other evidence, were all fact issues for the jury, not *Daubert* issues for the Court.  D.I. 647 at 3.

11

The Court also considered whether Bratic could rely on the third party valuation documents (i.e., the S&P and Duff & Phelps reports) in calculating XU's value. Again, after substantial briefing and a hearing with cross-examination, this Court held that Cisco had failed to establish that Bratic's reliance on these documents was an unreliable method of calculating damages. *Id.* at 3, n.1. This was confirmed a week later, when the Court ruled that "I am not going to reverse my earlier decision that Mr. Bratic can rely upon such reports" because, according to the Court, "I think it is the type of data reasonably relied upon by valuation experts. I am going to allow Mr. Bratic to testify to his conclusions, and that one component of his analysis included contemporaneous valuation reports." D.I. 659 at 2. The Court also provided the jury with a limiting instruction each time the valuation numbers from those reports were mentioned at trial. Ex. 4, Trial (Bratic) Tr.1293:14-1294:1; 1294:18-1295:3; Ex. 6, Trial (Wagner) Tr. 2072:12-2073:12; 2075:5-16

Cisco never raised the "new business" line of cases as part of its *Daubert* briefing.[3] Rather, during the middle of trial Cisco raised, for the first time, the same arguments it now raises post-trial, namely the applicability of the "new business" line of cases to the present action. D.I. 654. This Court noted at that time, "to the extent there are new arguments or citations to new cases, it is a bit late." D.I. 659 at 2. But nevertheless, the Court was not persuaded that Cisco's argument were grounds for exclusion of other testimony.

Questions concerning the reliability, methodology or "fit" of Bratic's testimony are admissibility issues for the Court, not issues for the jury, and thus not a proper issue for JMOL

---

[3]    None of the cases Cisco cites in support of its new argument here, i.e., (i) *Grupe v. Glick*, 26 Cal.2d 680 (1945) (ii) *Sargon Enterprises, Inc. v. Univ. of S. Cal.*, 55 Cal. 4th 747 (2012)(iii) *Kids Universe v. In2Labs*, 95 Cal. App. 4th 870 (2d Dist. 2002); or (iv) *Parlour Enterprises, Inc. v. Kirin Group, Inc.*, 61 Cal. Rptr. 3d 243 (2007) were cited in Cisco's original *Daubert* briefing. D.I. 383, 386.

under Rule 50. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). For purposes of whether a new trial should be granted, Cisco's argument that Bratic applied the wrong methodology in calculating lost value damages was waived because it was not raised (or raised too late) during the *Daubert* process and because they constitute evaluating objections not raised prior to the admission of evidence.[4]   Cisco knew precisely what Bratic's damage methodology would be and also knew the evidence he intended to rely on in support of that theory. Ex. 38 at 5-6, 46-49 (Bratic's Report). Cisco challenged that methodology, and the supporting evidence. D.I. 383.   During the first *Daubert* briefing and hearing, however, Cisco never raised the arguments it now raises, and never asserted that Bratic's methodology or evidentiary support failed to satisfy the "new business" line of cases that it now cites. Under these circumstances, Cisco waived its ability to challenge Bratic's methodology post-verdict. *See, e.g., DePuy Inc. v. Biomedical Eng'g Trust*, 216 F. Supp. 2d 358, 375 (D.N.J. 2001) (finding waiver because plaintiff knew what evidence defendant was going to offer at trial, as well as its theory of damages, and was given ample opportunity to set forth any *Daubert*-type objections prior to trial); *John M. Floyd & Assocs., Inc. v. Ocean City Home Bank*, 2008 WL 4534079, at *3 (D.N.J. 2008) (finding defendant waived the issue of admissibility of expert testimony by failing to timely object), citing *Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775, 780 (11th Cir. 2004) ("A Daubert objection not raised before trial may be rejected as untimely."); *Denton v. DaimlerChrysler Corp.*, 645 F. Supp. 2d 1215, 1223 (N.D. Ga. 2009); *see also RRK Holding Co. v. Sears Roebuck and Co.*, 563 F. Supp. 2d 832, 836 (N.D. Ill. 2008) (denying JMOL on the unreliability and unreasonableness of plaintiff's damages expert because defendant had ample opportunity to challenge testimony on cross-examination and through testimony of its own

---

[4] If not waived, then the issue was considered and rejected. D.I. 659 at 2

damages expert).

Moreover, the authorities Cisco cites are inapposite. Those cases are all *lost profit* cases, not a *lost value* case such as here. Cisco seeks to confuse the issue, and in doing so invites legal error. Bratic did not testify about lost profits, but rather, as permitted by this Court, testified regarding the value of XU at given points in time. Those are fundamentally different concepts.[5] Cisco recognizes as much and makes the bald, albeit wrong, assertion that the lost profits precedents it cites "apply fully here." D.I. 700 at 9. They do not.

The primary cases Cisco relies upon (*Grupe*, *Sargon* and *Kids Universe*) each concern the proof necessary to support an award of prospective lost profits for a new or unestablished business. *Id.* From this, Cisco then asserts that "lost *value* damages (as XU claims here) are subject to the same new business rule as lost profits." D.I. 700 at 9-10 (emphasis in original). Cisco cites the *Kids Universe* case in support of this assertion. *Id. Kids Universe*, however, says no such thing.

*Kids Universe*, just like *Grupe* and *Sargon*, is another case concerning prospective lost profits. There, the plaintiff was the owner of a children's retail store located on the first floor of a building. They brought a negligence action against the lessees of the store above them, alleging a flood in the defendant's store upstairs prevented them from launching their Internet Web site at the optimal time, thus causing harm in the form of prospective lost profits. *Kids Universe*, 95 Cal. App.4th at 870. The trial court granted summary judgment to defendants, finding that the plaintiff could not establish with requisite certainty that profits would have been made from the

---

5   A house could be worth $300,000 in 2006 but only be worth $250,000 nine months later, but that does not change the fact that the value of the house in 2006 was $300,000. Cisco's own expert agreed. Ex. 6, Trial (Wagner) Tr. 2053:21-2055:10. Thus, *value* (whether of a house or a company) at a particular point in time in the past does not change based on real-world future events.

new on-line business. *Id.* at 888. The appellate court affirmed, finding plaintiff's evidence "does not suffice to raise a triable issue as to lost *profits*." *Id.* at 887 (emphasis in original). As the appellate court noted, plaintiff's evidence "would not allow a reasonable trier of fact to find with reasonable certainty lost net *profits* from the unlaunched Web site by a preponderance of the evidence." *Id.* (emphasis in original).

Contrary to Cisco's assertions, the Court in *Kids Universe* did not reject evidence of lost *value* damages. D.I. 700 at 10. Rather, the Court repeatedly found that plaintiff's evidence was insufficient to support an award of prospective lost *profits*. For example, the Court found that plaintiff's evidence did not demonstrate that the "unestablished business would have made a *profit*," that the plaintiff had "not previously operated their Web site as a *profit*-producing venture," that the Web site had only negligible revenues in the past and thus "would not support an inference there were lost prospective *profits*," and that certain "undisputed contingencies existed so as to bar the computation of potential lost *profits.*" *Kids Universe*, 95 Cal. App.4th at 887 (all emphasis in original).

In sum, *Kids Universe* is simply another in a long line of cases concerning the type of evidence necessary to support an award of prospective lost profits for a new business. Cisco's assertions notwithstanding, it simply does not stand for the proposition that the same evidence is necessary to establish "but-for" damages in a fraudulent concealment case such as here. Thus, much of Cisco's argument is a facile attempt to lead the Court down the wrong road, a road this Court already refused to go down. *See* D.I. 659. Even if the arguments Cisco failed to raise in the original *Daubert* briefing are given consideration, it is still the wrong road.

Cisco's attempt to re-argue the appropriate methodology for assessing damages in this case is <u>not</u> an issue for JMOL, and new post-trial arguments as to whether the methodology is

proper was waived for purposes of assessing the need for a new trial. As permitted by this Court, Bratic presented the jury with his opinion that XU's lost value damages were $70 million. Ex. 4, Trial (Bratic) Tr. 1224:19-1225:12. Cisco's expert agreed that this was an accepted methodology for assessing damages for fraud. Ex. 6, Trial (Wagner) Tr. 2080:24-2081:4. In fact, Wagner applied the same "but-for" methodology that Bratic applied and opined that XU's lost value damages were zero. *Id.* at 2070:18-2071:21 That was the choice presented to the jury. The jury was not tasked with weighing the reliability or admissibility of these opinions. That was, and is, the Court's role. Once admitted, the jury was entitled to assess the credibility of these expert witnesses and weigh the evidence supporting their respective opinions. The jury did its job, and it had substantial evidence on which to rely in finding not only that XU lost value, but that the value was $70 million.

## B. Substantial Evidence Supports The Jury's Finding That XU Lost Value, And That The Lost Value Was At Least $70 Million

As Cisco acknowledges, "XU presented testimony from its damages expert Mr. Bratic concerning its lost value." D.I. 700 at 10. XU agrees. Thus, there is no dispute that evidence that XU lost value was before the jury. Moreover, that evidence was substantial.

As an initial matter, Cisco's "no value" argument flies in the face of common sense, the same common sense the jury was asked to assess. The jury heard how Cisco sought out a relationship with XU, i.e., Cisco came knocking on XU's door, not the other way around, and how the parties signed a Non Disclosure Agreement and then worked together for two and a half years. The jury was asked: why would one of the largest technology companies in the world seek out a relationship with a small technology company like XU and work together with them for over two and a half years if XU did not have something of value? In addition, the jury heard how

Mr. Hernandez, the purported "champion" of XU, allegedly kept going back to Mr. Weise to try

and get XU admitted into the Solutions Plus program. Why would he do that if XU had nothing

of value to offer Cisco? From these facts alone the jury was entitled to infer that XU had value.

But the evidence of XU's value went much further and much deeper.

Bratic testified that "my opinion regarding fraud damages is that XpertUniverse has lost

business value of at least $70 million as a result of the alleged fraud and going out of business."

Ex. 4, Trial (Bratic) Tr. 1224:18-1225:12. In determining the amount of damages, Bratic focused

on XU's financial and business activities both before and after the fraud. *Id.* at 1253:7-11. As

part of the that analysis, Bratic:

- Studied the financial history of XU. *Id.* at 1253:7-1254:1
- Investigated how XU evolved over time. *Id.*
- Analyzed voluminous business records. *Id.*
- Researched the size of the potential market. *Id.*
- Looked at which companies were collaborating with XU. *Id.*
- Analyzed various business valuations prepared by S&P and Duff & Phelps, which valued XU at between $70 million and $220 million. *Id.* at 1255:1-1258:8.
- Verified, checked and determined that the projections set forth in the valuation reports were reasonable and conservative. *Id.* at 1297:20-1302:1; 1306:18-1307:2.
- Analyzed business plans prepared by, and circulated internally at, Cisco with internal projections concerning the number of ports that could be sold. *Id.* at 1259:6-20; 1302:20-1305:19.
- Reviewed XU's financial statements and tax returns. *Id.*
- Considered the fact that XU was able to raise nearly $4 million in 2006 alone. *Id.* at 1311:14-1312:9.
- Reviewed numerous internal emails among Cisco employees expressing Cisco's concern that Cisco's competitor, Genesys, would buy XU. *Id.* at 1261:22-1263:2.
- Considered Cisco's history of buying companies that have no revenue. *Id.* at 1287:8-1288:14; 1289:18-1290:5.
- Considered the fact that XU was able to raise over $38 million from investors. *Id.* at 1290:8-12

- Studied due diligence documents prepared by IBM wherein IBM considered paying XU $5 million for a one year standstill in the insurance market and $20 million for a one year standstill for all markets. *Id.* at 1307:21-1309:1

Based on Bratic's review of these and other materials, interviews with witnesses, and consideration of additional trial testimony, Bratic opined that in April, 2006, the value of XU was at least $70 million. *Id.* at 1315:20-1316:13; 1319:23-1320:2.

Bratic, however, was not the only trial witness that testified as to XU's value. The jury also heard from Harvey Koeppel, the former Senior Vice President and Chief Information Officer of the Global Consumer Group at Citigroup. Mr. Koeppel had been with Citigroup for more than 20 years, leading a $15 billion per year business operating in 54 countries and supporting more than 180 million customers, with 12,000 technology people and about 70,000 operations people under his supervision. Ex. 3, Trial (Koeppel) Tr. 984:8-985:1. Mr. Koeppel testified how he was involved with XU in mid-2005 through the summer of 2006. *Id.* at 1006:3-5. He testified how Citigroup had conducted its own "significant" due diligence of XU, including its software and code, and was "very impressed" with XU's technology. *Id.* at 935:4-936:6, 994:7-995:24. He also testified that he believed Citigroup could benefit from XU's technology, including by helping Citigroup address "application abandonment" problems, as well as in attracting and retaining new customers. *Id.* at 986:21-990:14. Mr. Koeppel also understood that XU did not have a finished product at that time, and had made no sales. *Id.* at 989:13-990:14. The jury heard how he viewed that as "a competitive advantage," not a detriment, as it would allow Citigroup to differentiate itself from its competitors. *Id.* Mr. Koeppel was asked specifically whether he believed XU had value. His answer: "absolutely." *Id.* at 1004:13-15.

The jury was also presented with Cisco's own documents and witnesses which establish that Cisco thought XU had value in 2006. For example, Mr. DePinto testified that in May 2006,

18

Cisco viewed XU's technology as a "significant revenue opportunity for Cisco." Ex. 3, Trial (DePinto) Tr. 888:11-889:13. Mr. DePinto shared his thoughts in this regard with Mr. Hernandez. Ex. 24, PTX-39 ("The long term opportunity for this [XU] technology, at Citigroup, is extremely significant."). Mr. Hernandez, Mr. Moore and others at Cisco shared Mr. DePinto's sentiment. Ex. 5, Trial (Hernandez) Tr. 1830:19-1831:4. Ex. 3, Trial (Moore) Tr. 924:22-925:19, Ex. 3, Trial (Hayden) Tr. 940:18-942:6.

Thus, the jury had substantial evidence on which to find that XU had value in April, 2006, and had substantial evidence that XU's value at that time was at least $70 million. This 2006 valuation was uncontradicted, as Cisco's expert admitted at trial that he never even attempted to determine the value of XU as of April, 2006:

> Q. Okay. And so is it your opinion, then, that in April of 2006, XpertUniverse had no value?
>
> A. They may have had some value, but I don't know what that is.
>
> Q. You didn't calculate that?
>
> A. No.

Ex. 6, Trial (Wagner) Tr. 2071:8-14. The jury also had substantial evidence that XU's value in January 2007 was zero. Friedman testified that in January 2007 he told the investors about being denied entry into Solutions Plus, how funding thereafter ceased, how he had to lay off all of the employees and how the company was forced to wind down. Ex. 1, Trial (Friedman) Tr. 336:4-16. Bratic also analyzed the value of XU in January, 2007, which was when XU finally learned that its Solutions Plus application had been denied. Ex. 4, Trial (Bratic) Tr. 1315:2-4. He testified that the value was zero, as the company had essentially gone out of business and lost all of its investors. Bratic's testimony was confirmed by Cisco's own damages expert, who agreed that XU had no value when it went out of business in 2007. Ex. 6, Trial (Wagner) Tr. 2071:8-21.

19

Thus, the jury heard substantial evidence that the value of XU in January 2007 was zero. Applying the agreed "but-for" methodology, the jury heard how the damages for fraud were therefore "at least $70 million." Ex. 4, Trial (Bratic) Tr. 1225:1-12. The jury weighed the evidence, assessed the credibility of the witnesses, and awarded XU $70 million in damages for Cisco's fraud.

Cisco's entire argument regarding whether XU lost value, and the amount of such loss, rests on the false premise that the evidence of XU's loss did not meet the "certainty required by the new business rule." D.I. 700 at 10-19. As demonstrated above, the "new business rule" line of cases are not applicable here, as this was not a case concerning damages based on prospective *lost profits*, but rather damages based on lost *value. Supra* §V.A.

Cisco also makes a number of assertions concerning the evidence presented, none of which has merit. For example, Cisco asserts that XU had to prove it would have made sales before XU "could establish lost value." D.I. 700 at 12. But this theory was flatly rejected by Mr. Koeppel (Ex. 3, Trial (Koeppel) Tr. 989:13-19, 1004:13-15) as well as Cisco's own damages expert, who testified that a company could have value even if it had no product and no sales. Ex. 6, Trial (Wagner) Tr. 2082:18-2083:5.

Cisco asserts that Bratic used the wrong data points in his analysis, arguing that Bratic "incorrectly determined XU's value as the difference between its value with and without a partnership with Cisco." D.I. 700 at 15-16. In support, Cisco cites to a snippet of Bratic's trial testimony, taken out of context, ignoring other portions where he described exactly how he went about measuring the fraud damages. For example, Bratic testified as to his understanding of the circumstances underlying the fraud allegation:

> Q. And do you have an understanding of what the allegation with respect

20

to fraud is?

A.  In this case, as I understand the allegation of fraud, is that Cisco's Governance Council, which was responsible for approving companies that come, outside companies like XpertUniverse to come into the SolutionsPlus program, denied XpertUniverse's admission into that program in late April 2006.  But that Cisco -- nobody at Cisco told XpertUniverse about that denial, refusal of entry into SolutionsPlus program until a number of months later, until January of 2007, which is about nine months later.

Ex. 4, Trial (Bratic) Tr. 1254:2-15.  Bratic also explained exactly how he went about measuring

the damages for fraud:

Q.  So why don't you go ahead and explain what this is.  This is your damage model for the fraud claim?

A.  Yes.

Q.  Please explain it to us.

A.  In damages -- damages, determination of damages, one of the ways to measure damages concerning what is called the but-for test, which is what would the value of XpertUniverse have been, what was the value of the company, and then look at what the value of the company was as a result of the alleged concealment, and you measure the difference between the two.  And that's called the but-for model in this case.

*Id.* at 1275:20-1276:9.  Bratic repeated this explanation again later.  *Id.* at 1281:18-1282:2.

Cisco's own damages expert acknowledged that this was the methodology applied by Bratic, and

this was the correct methodology to apply in this case:

Q.  In your opinion.  And you agree, I believe, with Mr. Bratic, the way to measure damages for a fraud claim is you take the value of the company before the fraud and the value of the company after the fraud, and you calculate the difference?

A.  Yes, as long as you take into consideration other things that impact the value besides the alleged legal violation.

Ex. 6, Trial (Wagner) Tr. 2070:18-2071:2.  Wagner also admitted at trial that this "but-for"

methodology was an accepted practice for financial experts such as he and Bratic. *Id.* at 2080:13-

23. Thus, there was substantial evidence that Bratic applied the correct methodology to determine damages for fraud.

Cisco also asserts that Bratic adopted his valuation numbers "without analysis" from the S&P and Duff & Phelps valuation reports. D.I. 700 at 10. Cisco simply ignores all of the testimony presented to the jury about how Bratic tested and verified the underlying data within the valuation reports. Ex. 4, Trial (Bratic) Tr. 1297:20-1302:1; 1306:18-1307:2. Cisco's own damages expert confirmed that Bratic verified aspects of the valuation reports. Ex. 6, Trial (Wagner) Tr. 2058:21-24. In fact, Wagner testified that it was "standard practice" for Bratic to rely on the S&P and Duff & Phelps valuation reports and that he had "no problem" with Bratic relying on those valuation reports:

> Q. But you would agree with me that it's standard practice for folks like yourself and Mr. Bratic to rely on those types of reports in forming opinions?
>
> A. I agree with that. I have no problem with him actually using that as a basis, or one basis for his opinion.

*Id.* at 2080:13-19. Wagner also admitted that it was "standard practice" for valuation companies, such as S&P and Duff & Phelps, to rely on information provided by management of the company they were valuing. *Id.* at 2082:1-5. Moreover, as this Court previously found, challenges to Bratic's $70 million lost business value, including his reliance on the third party reports, "raise factual issues for the jury rather than *Daubert* issues for the Court." D.I. 647 at 3. The jury was free to weigh the evidence and assess the credibility of Bratic and others, and thus those factual issues were obviously found in XU's favor. Cisco is essentially asking the Court to substitute its judgment on credibility for that of the jury, which is improper.

Cisco asserts that the valuation reports Bratic relied upon were too speculative to establish XU's lost value, citing many of the same cases it did during the *Daubert* briefing. D.I.

700 at 17-19.  These arguments were fully considered, and rejected, previously as part of the *Daubert* process, and Cisco fails to establish any compelling reason the Court should reverse its previous findings in this regard.  D.I. 647.  Moreover, and again, the cases Cisco cites are each a lost profit case, not a lost value case such as here.  Those cases are inapposite for the reasons discussed previously.  *Supra* § V.A.

Cisco cites to two new cases, *TK-7 Corp. v. Estate of Barbouti*, 993 F. 2d 722 (10th Cir. 1993) and *AlphaMed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319 (S.D. Fla. 2006), both of which are also inapposite.  In *TK-7 Corp.*, the plaintiff brought a civil conspiracy suit under Oklahoma law asserting that the defendants conspired to take over TK-7 for the purpose of illegally transporting chemicals to Libya to support a chemical weapons plant for Colonel Ghadafi.  The plaintiff claimed the alleged conspiracy caused them damages in the form of prospective lost profits from two prospective joint ventures.  *Id.* at 725.  The plaintiff retained a damages expert to calculate the amount of damages sustained by TK-7.  *Id.* at 727.  The expert relied upon a "market survey report" as the basis for his opinions concerning prospective lost profits.  *Id.* at 731-32.  The Tenth Circuit held that it was improper to admit this testimony because "there was no evidence that other experts in the field would rely on such a study and would adopt it for purposes of forming an opinion of the amount of lost profits of an unestablished business."  *Id.* at 733.

*TK-7 Corp.* is thus inapposite, because in this case, as this Court noted in its *Daubert* Opinion, "Bratic's testimony that experts in the field of company valuation rely on such reports [i.e., the S&P and Duff & Phelps reports] is uncontradicted."  D.I. 647 at 3, n.1.  Moreover, this was confirmed at trial when Cisco's own damages expert testified that it was "standard practice" to rely on such reports in forming opinions as to the value of a company and that he had "no

problem with [Bratic] using that as a basis, or one basis for his opinion." Ex. 6, Trial (Wagner) Tr. 2080:13-19.

*AlphaMed* is also easily distinguishable. In that case, like here, the Court held that the damages expert could rely on a previously prepared business plan in support of his damages opinion. *AlphaMed* at 1350-51. The Court ultimately granted JMOL against *AlphaMed*, however, because it "failed to produce sufficient evidence to establish [the defendant's] conduct caused its alleged lost profits damage." *Id.* at 1352. Thus, JMOL turned on causation, not on any alleged "unexplained projections," as Cisco asserts.

Cisco also criticizes Bratic for not conducting an independent valuation of XU. D.I. 700 at 10. But Bratic explained to the jury why he believed that was unnecessary. Specifically, Bratic testified that having analyzed and reviewed the S&P and Duff & Phelps reports, and doing his own research, he would have come to similar conclusions because S&P and Duff & Phelps "used standard appraisal practice based on known information at that time, and that to me is more informative to me as an analyst than me coming in seven, eight years after the fact and trying to recreate a valuation back in that time frame." Ex. 4, Trial (Bratic) Tr. 1282:18-1283:20.

Cisco goes to great lengths to try and establish that XU was required to prove that it would have made sales had it partnered with IBM or Genesys, again citing to the "new business" line of cases. D.I. 700 at 10-13. But that authority is inapposite to prove value, as demonstrated above. *Supra* § V.A. Whether XU would have partnered with IBM or Genesys and whether those partnerships would have resulted in actual sales is not the issue. The issue is did XU have value in April 2006, and if so, what was that value. XU need not prove that it would have made sales to establish that it had value. Clearly IBM thought XU had value, as it considered paying XU $20 million for a standstill agreement. *Id.* Tr. 1308:22-1309:1. Similarly, Citigroup

24

believed XU had value even though it had no sales. Ex. 3, Trial (Koeppel) Tr. 1004:13-15. Cisco's own damages expert agreed that a company with no product, no revenue, and no sales could still have value. Ex. 6, Trial (Wagner) Tr. 2082:18-2083:5. As discussed above, Cisco's own documents establish that Cisco itself thought XU had value even though it had no sales, as Cisco viewed XU as a potential driver of revenue and as a competitor. In addition, Cisco specifically did not tell XU about the denial of the Solutions Plus because it was concerned that XU would partner with its competitors. *Supra* p. 4.

C.   **There Was Substantial Evidence That Cisco's Concealment Caused XU To Suffer $70 Million In Lost Value Damages**

XU presented substantial evidence that Cisco's concealment caused XU harm in the amount of $70 million. As demonstrated below, the evidence established that in April 2006, XU was a viable company with valuable technology and an investor base that was committed to funding the company. The XU technology at that time was based on the Genesys routing component, and the product was essentially complete. Ex. 2, Trial (Eiss) Tr. 529:21-530:16. As a result, XU was able to raise more than $4 million during 2006. Ex. 4, Trial (Bratic) Tr. 1311:14-1312:5. Based on Cisco's representations, however, XU began modifying its technology to remove the Genesys component and replace it with a Cisco routing component, which was a major technical undertaking. Ex. 1, Trial (Friedman) Tr. 274:11-276:15; Ex. 2, Trial (Steinhoff) Tr. 752:14-753:10. The evidence also established that Cisco did not tell XU about the denial for almost nine months, a lifetime for a start-up technology company like XU. Ex. 6, Trial (Wagner) Tr. 2053:21-2055:10.

In the April 2006 timeframe, XU had already established a long standing relationship with IBM, and also had a previous relationship with Genesys, both competitors of Cisco. Ex. 2,

Trial (Eiss) Tr. 526:4-528:6; Ex. 1, Trial (Friedman) Tr. 304:7-305:11. In April 2006, the Citibank opportunity was still extant. Ex. 2, Trial (Eiss) Tr. 567:7-568:16; Ex. 1, Trial (Friedman) Tr. 337:21-338:15; Ex. 3, Trial (Koeppel) 1002:5-1003:2. Citibank did not care whether the XU solution included a Cisco-based router or a Genesys-based routing component. *Id.* at 1001:18-21; Ex. 2, Trial (Eiss) Tr. 529:14-530:16. Citibank also did not care whether XU partnered with IBM, Genesys or Cisco. Ex. 3, Trial (Koeppel) Tr. 1002:15-1003:2. Had Cisco told XU about the denial in April 2006, as it should have, XU could have sought a partnership with IBM to close the Citibank opportunity using the Genesys-based solution it had already developed, or could have partnered with IBM or Genesys for other opportunities to exploit the Genesys-based solution. Ex. 2, Trial (Eiss) Tr. 567:7-568:16; Ex. 1, Trial (Friedman) Tr. 337:21-338:15; Ex. 3, Trial (Koeppel) Tr. 1002:5-1003:2. XU also could have sought to be acquired, for example, by Genesys, which was a concern of Cisco's. Ex. 27, PTX-45. XU may have also pursued a licensing (standstill) relationship with IBM, which had considered paying XU $20 million for a one year exclusive license. Cisco's own expert admitted that XU "clearly" had other opportunities in April 2006. Ex. 6, Trial (Wagner) Tr. 2075:19-22. The jury evaluated all of the foregoing together with Cisco's own documentary evidence (that Cisco believed XU would partner with IBM and/or Genesys, Ex. 27, PTX-45) which established a high likelihood that XU would have indeed partnered with IBM and/or Genesys.

Those opportunities no longer existed, however, in January, 2007 when XU first learned about Cisco's denial. By then, XU had spent all of its resources integrating the Cisco routing component into its solution. Ex. 4, Trial (Bratic) Tr. 1261:10-21, 1265:3-17, 1272:21-1274:5; Ex. 1, Trial (Friedman) Tr. 334:10-336:16. As a result, the Genesys-based solution no longer existed. By then, the Citibank opportunity was also no longer available. Ex. 3, Trial (Koeppel)

26

Tr. 1009:11-1013:10. As a result, after learning about the denial, XU's investors abandoned the company, forcing XU to lay off all of its employees and wind down. Ex. 1, Trial (Friedman) Tr. 336:4-16. The company's value went from $70 million in April 2006 to zero. Ex. 4, Trial (Bratic) Tr. 1316:8-13. While Cisco was free to, and did, present alternative theories as to why XU went out of business, the jury was likewise free to assess the credibility of the competing witnesses and evidence. It did so in XU's favor, and while Cisco may disagree with the jury's findings in this regard, that is not a proper ground for granting judgment as a matter of law or a new trial.

### D.   Neither Remittitur Nor A New Trial Is Warranted

#### 1.   The Jury's Damage Award Should Not Be Remitted

The Court should give deference to the jury's damages award and only remit an award when "the verdict is so unreasonably high that it would be unconscionable to permit it to stand." *IPPV Enters., LLC v. Echostar Commc'ns, Corp.*, 191 F. Supp. 2d 530, 573 (D. Del. 2002). Here, the Court has already made that determination. As discussed previously, after substantial *Daubert* briefing and a *Daubert* hearing, this Court determined that a $70 million damage claim was not unreasonably high, as the Court specifically permitted Bratic to opine that XU's lost value for fraudulent concealment was $70 million. D.I. 647 at 3 ("Bratic may testify as to his lost value opinion.") Cisco, by raising the same issues now that it raised during *Daubert*, is essentially asking the Court to reverse itself. D.I. 700 at 22. The Court is obligated to uphold the jury's award if there is a reasonable basis for doing so. *Blakely*, 992 F. Supp. at 734 (quoting *Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir. 1989)). If a $70 million damage award was reasonable pre-trial, it is certainly reasonable and is not unconscionable post-trial. Thus, remittitur is not warranted.

Even if remittitur was appropriate (which it is not), the Court should remit the damages to "the highest amount the jury could 'properly have awarded based on the relevant evidence.'" *IPPV Enters.*, 191 F. Supp. 2d at 573 (quoting *Oiness v Walgreen Co.*, 88 F.3d 1025, 1030 (Fed. Cir. 1996)). In its brief, Cisco creates a new damages theory and opines that this would amount to damages ranging from $2.66 million to $4 million.[6] D.I. 700 at 22-23. But Cisco never presented this new "reliance" damages theory at trial, and Cisco fails to cite any authority that establishes the Court can base remittitur on a damage theory that neither side advanced at trial. The one case it does cite to for remittitur, *IPPV Enterprises*, essentially stands for the opposite proposition. In *IPPV Enterprises*, the Court remitted the damages because the expert used a newly concocted damages theory at trial, and based the remitted damages on the damage theory the expert had employed in his expert report. *IPPV Enterprises* at 571-72. In this case, both damages experts agreed that the proper way to measure fraud damages is to compare the value of XU before the fraud to its value after the fraud. Ex. 4, Trial (Bratic) Tr. 1275:20-1276:9; Ex. 6, Trial (Wagner) Tr. 2070:18-2071:7, 2080:24-2081:4. Both damages experts agreed that XU had no value in 2007. Ex. 4, Trial (Bratic) Tr. 1319:23-1320:2; Ex. 6, Trial (Wagner) Tr. 2071:15-21. Thus the only question was what was XU's value in April 2006. There is simply no support for Cisco's assertion that XU had a value of just $2.66 (or $4) million in April 2006.

### 2.     Cisco Is Not Entitled To A New Damages Trial

Cisco asserts that it is entitled to a new trial for three reasons, none of which has merit. First, Cisco argues that the jury's damage award is "against the great weight of evidence." D.I. 700 at 24. As demonstrated above, however, the jury's verdict is directly supported by the

---

6   Cisco then purports to limit the upper range to $3 million based on its limitation of liability argument. D.I. 700 at 24, n.3. XU incorporates herein by reference its opposition to Cisco's

28

evidence. *Supra* § V.  Moreover, when "the ground for a new trial is that the jury's verdict was against the great weight of the evidence, the court should proceed cautiously, because such a ruling would necessarily substitute the court's judgment for that of the jury." *IPPV Enters.*, 191 F. Supp. 2d at 563 (citing *Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir. 1993)).  Thus, the Federal Rules state that a Court should not order a new trial unless "substantial justice" so requires, and instruct the Court to disregard "all errors and defects that do not affect any party's substantial rights." Fed. R. Civ. P. 61.  Since the verdict is in accord with the evidence, Cisco fails to establish that a new trial on damages is warranted.

Second, Cisco asserts that a new trial is warranted because the award is excessive. D.I. 700 at 24.  As Cisco itself acknowledges, a verdict is "excessive" only if it is so large that the jury "clearly should have reached a different verdict." *Id.*  In this case, the Court specifically permitted Bratic to offer his $70 million opinion, and the jury was presented with just two damage numbers, zero (from Cisco's expert) and $70 million (from XU's expert).  Cisco's apparent post-verdict regret about its litigation strategy does not establish that the jury "clearly" should have awarded a different verdict.

Third, Cisco asserts that the verdict was "tainted by unreliable expert testimony from Mr. Bratic." *Id.* at 25.  According to Cisco, the Court only allowed Bratic to offer his $70 million opinion "based on his representation that it was reasonable to rely upon" the S&P and Duff and Phelps valuation reports because he had investigated the valuation reports. *Id.* at 25.  But that is not what Bratic said, nor was it the only reason the Court permitted Bratic to so opine.  Bratic never said the <u>only</u> reason it was reasonable to rely on the reports was because he had investigated the underlying support.  Rather, Bratic testified at the *Daubert* hearing that reliance

---

motion regarding the applicability of limitation of liability clause in the TDPA.

on these reports was reasonable because (i) each report used "standard valuation methodology" used by professionals such as Bratic and Wagner, (ii) that S&P and Duff and Phelps did their own independent assessment of the assumptions and did not just blindly rely on data provided by XU, and (iii) he compared the valuation projections to internal Cisco projections. Ex. 7 at 50:25-55:4. In addition, Cisco's own expert admitted at trial that Bratic had in fact verified aspects of the valuation reports. Ex. 6, Trial (Wagner) Tr. 2058:21-24.

Contrary to Cisco's assertions, the Court also permitted Bratic to rely on the valuation reports because "Bratic's testimony that experts in the field of company valuation rely on such reports is uncontradicted." D.I. 647 at 3 n.1. Bratic's opinion was confirmed by Cisco's own expert who admitted at trial that damages experts such as he and Bratic routinely rely on these types of valuation reports and that he had "no problem" with Bratic relying on these particular reports in this case. Ex. 6, Trial (Wagner) Tr. 2080:13-19. As this Court correctly noted, what weight the jury chose to give Bratic's opinion in light of competing evidence of lower valuations was a factual question for the jury rather than a *Daubert* issue for the Court. D.I. 647 at 3. When Cisco raised this issue again on the eve of Bratic's testimony, this Court stated that "I think it is the type of data reasonably relied upon by valuation experts. I am going to allow Mr. Bratic to testify to his conclusions, and that one component of his analysis included contemporaneous valuation reports." *Id.* at 2. Bratic's opinion was reliable pre-trial for the same reasons it is reliable post-verdict. Cisco was free to cross-examine Bratic on his reliance of the valuation reports, which it did at length. Ex. 4, Trial (Bratic) Tr. 1333:15-1354:3. Cisco was also free to have its own expert discuss the reliability of those same valuation reports, which it also did at length. *Id.*

Cisco also asserts that Bratic's reliance on the valuation reports was unreliable because he

"made no attempt to explain how the projections were generated, much less determine if they were made in a reliable fashion." D.I. 700 at 26. Cisco is again rehashing arguments it made during the *Daubert* process, and simply ignores all of Bratic's trial testimony on these points. For example, Bratic testified that he (i) independently verified the underlying market and industry information, (ii) compared the two valuation reports to each other and determined why one was larger than the other, thus "explaining" how the projections were generated, (iii) compared the port projections in each valuation with Cisco's own internal port projections, and (iv) verified that these internal Cisco projections were provided to Cisco's Governance Council. Based on his own investigation, he determined that the Duff & Phelps projections were lower than Cisco's own internal projections, and he also determined that "the projections were reasonable based on the information that was done in the actual valuations that were performed." Ex. 4, Trial (Bratic) Tr. 1296:23-1297:2. While Cisco and its expert were free to disagree with Bratic's conclusions, Bratic's methodology was reliable.

The authorities Cisco cites in support of its argument largely mirror those presented during *Daubert*, and fail for the same reasons the Court rejected their applicability then. In *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012), the district court found the expert's opinion unreliable because the expert relied on just a single page from an internal business plan. Here, of course, Bratic relied upon much more in both volume and substance. Unlike the expert in *Chemipal Ltd. v. Slim Fast Nutritional Foods, International, Inc.*, 350 F. Supp. 2d 582 (D. Del. 2004), who relied solely on a study that he did not test or compare against any other information (*id.* at 592), Bratic tested the reasonableness and critically analyzed the data upon which he relied. *Supra* p. 20. In *Meterlogic, Inc. v. KLT, Inc.*, 368 F.3d 1017 (8th Cir. 2004), the Eighth Circuit affirmed a district court's exclusion of the damages expert's opinion regarding the

31

discounted present value of a defunct company.  The court, however, did not base its decision solely on the unreliability of an investment-planning report, but also because the expert had "predicted financial results ten years into the future even though the parties' contract extended only two years and allowed for termination at any time." *Id.* at 1019.  The expert also assumed an exclusive arrangement, where the contract called for a non-exclusive agreement, assumed a 30% market share, but had no market research to support that assumption, and assumed 15% annual growth without any supporting data. *Id.*  Finally, in *Sterling v. Redevelopment Authority of City of Philadelphia*, 836 F. Supp. 2d 251 (E.D. Pa. 2011), the district court excluded the expert's testimony because the expert did not independently investigate the reasonableness of the financial projections, but rather simply accepted them without qualification or verification. *Id.* at 273.  Here, unlike the experts in the foregoing cases, Bratic did do an independent investigation of the underlying assumptions and data relied on in the valuation reports and verified the reasonableness of the port projections.

Cisco also claims that it was "foreclosed" from cross-examining Bratic about the basis for the projections.  D.I. 700 at 26.  But Cisco was free to investigate for itself the basis for the projections with its own expert.  Moreover, Bratic was cross-examined, at length, about his reliance on the valuation reports. Ex. 4, Trial (Bratic) Tr. 1333:15-1354:3.  In fact, he was asked repeatedly, and specifically, about the underlying basis for the projections. *Id.* at 1337:17-1341:13;  1343:3-1346:20;  1349:18-1354:3.  Cisco's expert also criticized the basis for projections in the Duff & Phelps reports.  He even prepared a demonstrative showing the jury he believed the Duff & Phelps report rested on an unreliable foundation. Ex. 6, Trial (Wagner) Tr. 2059:17-2060:15.  Contrary to Cisco's assertions, Bratic did not "short-circuit" any scrutiny of the projections.

Finally, Cisco asserts that Bratic's testimony did not "fit" the facts of the case, arguing that he did not calculate XU's value in light of the denial of the Solutions Plus application. D.I. 700 at 27. As demonstrated above, Cisco's argument is without merit. As permitted by this Court, Bratic opined that XU suffered damages due to Cisco's concealment in the amount of $70 million. That testimony "fit" the facts of this case. D.I. 647 and 659.

Cisco's reliance on *Donlin v. Philips Lighting North America Corp.*, 581 F.3d 73 (3d Cir. 2009) is misplaced. In *Donlin*, the Third Circuit found that the district court abused its discretion by allowing a non-expert witness to provide expert testimony, i.e., opinion testimony of a specialized and technical nature that was not within the witness' personal knowledge. *Id.* at 82-83. Similarly, in *Hirst v. Inverness Hotel Corp.*, 544 F.3d 221 (3d Cir. 2008), the Third Circuit found that the district court abused its discretion by allowing improper lay opinion testimony. *Id.* at 227-28. Here, as established above, Bratic was an admitted expert, and his opinion testimony was not improper. Cisco, therefore, fails to demonstrate that it is entitled to a new trial on damages.

## VI. SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S FINDING OF PATENT INFRINGEMENT

Cisco asserts that it is entitled to JMOL of non-infringement because Dr. Nourbakhsh's testimony was, according to Cisco, "conclusory." D.I. 700 at 27-28. Cisco is wrong. For each of Cisco's accused products, Dr. Nourbakhsh stepped through each limitation of each asserted claim and explained where that limitation was found in the accused product—precisely what he was required to do. None of the cases cited by Cisco relating to alleged "conclusory" testimony involved the level of analysis given by Dr. Nourbakhsh.[7]

---

[7] Cisco cites *Paradox Sec. System v. ADT Sec. Services*, 388 F. App'x 976, 982 (Fed. Cir. 2010), but in that case the court held that the expert's testimony was "conclusory" because he failed to

A.    **Substantial Evidence Supports The Jury's Finding That Remote Expert Infringes Claim 12 of the '903**

Cisco asserts that Dr. Nourbakhsh failed to provide sufficient evidence that Remote Expert infringes claim 12 of the '903 patent on three bases. None have merit.

*First*, Cisco asserts that Dr. Nourbakhsh "failed to present any probative evidence that Remote Expert fully meets the 'inquiry-type database' limitation," and, in particular, meets "the requirement that the database have 'layers of inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors.'" D.I. 700 at 28. Cisco is wrong. Dr. Nourbakhsh explained how that limitation is met and, in particular, that (i) the expert type table in Remote Expert is an inquiry-type database (Ex. 3, Trial (Nourbakhsh) Tr. 1050:2-3, 1162:12-1163:11, 1164:14-1166:9; Ex. 36 at CISCO00364987); (ii) the "inquiry types" in Remote Expert are "expert types" (Ex. 3, Trial (Nourbakhsh) Tr. 1051:10-13; *see also* 1166:10-14); (iii) the "criteria groupings" in Remote Expert are "expert skills" (*Id.* at 1051:13-15, 1166:15-1167:22); and (iv) the "layers of inquiry types" are, for example, "layer[s] of questions" in "different languages" (*Id.* at 1050:20-1051:5, 1167:23-1172:24, *see also* Ex. 6; Trial (Nourbakhsh) Tr. 2128:21-2129:9).   Dr. Nourbakhsh, accordingly, provided ample testimony regarding how Remote Expert meets this limitation. Cisco simply invites the Court to reweigh the evidence and assess the credibility of the witnesses—which is inappropriate in deciding a motion for JMOL.[8]

---

identify any structure in the accused devices that corresponds to the structure of a means-plus-function claim limitation, which was at issue there. That case is not applicable here, where there is no such limitation at issue. In *Rohm & Haas Co. v. Brotech Corp.*, 1995 WL 17878613, at *10 (D. Del. June 30, 1995), the expert did not provide specific testimony with respect to each claim limitation, as Dr. Nourbakhsh did here, but instead made a "blanket statement" that certain accused products infringed certain claims.

[8] Cisco's argument that Dr. Nourbakhsh "did not suggest that the expert types supposedly acting as layers of inquiry in Remote Expert are 'organized from' the expert skills acting as criteria groups" (D.I. 700 at 28-29) is a confusing non-sequitur. Dr. Nourbakhsh testified that the layers

*Second*, Cisco asserts that Dr. Nourbakhsh "failed to offer any probative evidence that Remote Expert practices the 'skill-set database' limitation," and, in particular, such a database that contains "at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping." D.I. 700 at 29. Yet, as Cisco acknowledges (D.I. 700 at 29-30), Dr. Nourbakhsh testified that Remote Expert includes "a skill set database" that "identifies very specifically IDs that relate right back to the kinds of questions people can ask in the other database table which we call expert type ...." Ex. 3, Trial (Nourbakhsh) Tr. 1052:11-17. Dr. Nourbakhsh further testified that, from the "Remote Expert documentation," "it's clear they have a skill set database which is a place where they store information of all the skills the experts have so you can route the question to the right expert." Ex. 3, Trial (Nourbakhsh) Tr. 1049:24-1050:10. That testimony was sufficient evidence for the jury to find that Remote Expert meets the "skill-set database" limitation. Notably, Cisco did not even cross-examine Dr. Nourbakhsh on this point after he clearly testified the limitation was met.

*Third*, Cisco asserts that Dr. Nourbakhsh "failed to offer any probative evidence that Remote Expert practices a 'unique numeric routing identifier.'" D.I. 700 at 30. Yet here, Dr. Nourbakhsh testified that Remote Expert's databases include numbers that connect "the skills the experts have and the inquiries." Ex. 3, Trial (Nourbakhsh) Tr. 1052:19-1053:8. And Dr.

---

of inquiry types in Remote Expert were, for example, layers of questions in different languages (Ex. 3, Trial (Nourbakhsh) Tr. 1050:20-1051:5, 1167:23-1172:24)—which is fully consistent with the claim language. Cisco's argument that the database is "empty" when the customer receives it (D.I. 700 at 29) misses the point. As Dr. Nourbakhsh testified, Remote Expert includes the tables and fields that provide the required organization. *See, e.g.* Tr. 1170:6-1171:8; 2128:21-2129:18. The customer simply fills in the required company specific information. Cisco's further argument that "Remote Expert can use multiple languages by creating buttons or icons using different languages, hard-coded changes that do not practice claim 12" (D.I. 700 at 29) is also misplaced. Cisco's point appears to be that multi-lingual support can potentially be implemented in a non-infringing manner. But Dr. Nourbakhsh testified that the specific manner in which Remote Expert provides multi-lingual support meets the relevant limitations of claim

Nourbakhsh further explained that the database table has a "call line" column that "defin[es] the particular inquiry type" and a "unique ID" for each row that identifies "the people that can handle that call" (*i.e.*, a unique numeric routing identifier). *See* Ex. 6, Trial (Nourbakhsh) Tr. 2129:10-2130:12. That testimony was sufficient evidence for the jury to find that Remote Expert meets the "unique numeric routing identifier" limitation. And again, notably, Cisco did not even cross-examine Dr. Nourbakhsh on this point after he clearly testified the limitation was met.[9]

### B.     Substantial Evidence Supports the Jury's Finding That Expert Advisor Infringes Both The '903 and '709 Patents

Cisco argues that Dr. Nourbakhsh failed to provide sufficient evidence that Remote Expert infringes claim 12 of the '903 patent and claim 5 of the '709 patent. None of Cisco's arguments have merit.

With respect to claim 12 of the '903 patent, *first*, Cisco argues that Dr. Nourbakhsh did not testify that Expert Advisor practiced claim 12's "inquiry-type database" having "layers of inquiry types organized from an underlying plurality of criteria groupings." D.I. 700 at 31. But that is incorrect. Dr. Nourbakhsh explained to the jury that Expert Advisor's assignment queue system meets the "inquiry-type database" limitation and further explained that Expert Advisor has layers of inquiry types organized from an underlying plurality of criteria groupings, in the form of "call type lists" that are associated with the assignment queues. Ex. 3, Trial (Nourbakhsh) Tr. 1060:18-1062:6, 1173:24-1176:19. Cisco argues the Dr. Nourbakhsh is incorrect, citing to the testimony of Mike Lepore, a Cisco employee. But to the extent there is

---

12. Ex. 3, Trial (Nourbakhsh) Tr. 1170:6-1171:8. Cisco, again, is simply asking the Court to reweigh that evidence—which is improper.

[9] On page 30, first full paragraph, of its Opening Brief, Cisco cites to the trial transcript at pages 1909 through 1910, which is the testimony of Mr. Dry. D.I. 700 at 30; Ex. 5, Trial (Dry) Tr. 1909-10. To the extent there are conflicts between that testimony and Dr. Nourbakhsh's testimony, the jury was entitled to credit the testimony of Dr. Nourbakhsh.

disagreement in the testimony, the jury was entitled to resolve it in Dr. Nourbakhsh's favor.

*Second*, Cisco asserts that Dr. Nourbakhsh "failed to identify any structure" in Expert Advisor corresponding to the "skill-set database." D.I. 700 at 31. But Dr. Nourbakhsh testified in connection with the "skill-set database" limitation that Expert Advisor has "very specific skill information that allows experts' skills to be clear and clearly connected to the assignment queues to the incoming questions," thus "fulfill[ing] the limitation." Ex. 3, Trial (Nourbakhsh) Tr. 1060:22-1061:3. As Dr. Nourbakhsh further explained: "in the case of Expert Advisor, it has skill set databases. The way of keeping track of all the skills that experts can have. And those skills in turn are directly directed to the assignment queues through a concept called skill groups, skill groupings." *Id.* at 1062:14-22. Thus, contrary to Cisco's assertion, Dr. Nourbakhsh had, in fact, explained to the jury how this limitation is met by Expert Advisor.

*Third*, Cisco argues that Dr. Nourbakhsh failed to offer sufficient evidence regarding the "unique numeric routing identifier" limitation. D.I. 700 at 31. But Dr. Nourbakhsh explained that this limitation is met because "the way the architecture of Expert Advisor is set up" there is "a unique connection between the skill groups and the assignment queues." Ex. 3, Trial (Nourbakhsh) Tr.. 1063:1-7. Dr. Nourbakhsh's testimony was not conclusory and was certainly sufficient for the jury to reasonably conclude that this limitation was met. Once again, notably, Cisco chose not cross examine Dr. Nourbakhsh on this issue after clear testimony that the limitation was met.

With respect to claim 5 of the '709 patent, Cisco asserts that XU did not present substantial evidence that Expert Advisor includes "a plurality of monitors presenting the quantity of inquiry criteria and values to the second member in an interactive manner," as recited in claim 5. D.I. 700 at 31. In particular, Cisco argues, in essence, that the jury could not reasonably rely

upon Dr. Nourbakhsh's testimony that Cisco's Virtual Expert Management ("VEM") uses a graphical user interface and that VEM is "at its core Expert Advisor," because "XU failed to present any evidence" substantiating that testimony. *Id.* In so doing, Cisco mischaracterizes the evidence before the jury. Dr. Nourbakhsh, in fact, testified that he "looked at documentation that we have already admitted into evidence for Virtual Expert Management ... and it says VEM, this is a quote, Virtual Expert Management is at its core Expert Advisor." Ex. 3, Trial (Nourbakhsh) Tr. 1146:7-13. Cisco knows that this testimony was correct. *See* Ex. 35 at CISCO000365136 ("Cisco Unified Expert Advisor is the core component of the Virtual Expert Management Solution."); *see also, e.g.,* Ex. 3, Trial (Nourbakhsh) Tr. 1145:21-1148:12. The jury was entitled to rely upon Dr. Nourbakhsh's testimony. Cisco, once again, asks the Court to reweigh the evidence, which is improper in considering a motion for JMOL.

**C.      Substantial Evidence Supports The Jury's Finding That The Inventions Of The '903 and '709 Patents Are Valid and Not Subject to an On-Sale Bar**

Cisco asserts that it is entitled to JMOL of invalidity of the '903 and '709 patents based on the on-sale bar, because, according to Cisco, (i) the evidence showed that XU "offered its platform to Allstate" prior to the critical date (April 2, 2003), and (ii) its expert, Dr. Chatterjee, determined from his analysis of the source code that "both claim 12 of the '903 patent and claim 5 of the '709 patent were embodied in XU's platform" before the critical date. D.I. 700 at 32. In so doing, Cisco ignores evidence before the jury, mischaracterizes other evidence, and disregards the Court's prior ruling regarding this issue. Contrary to Cisco's assertion, there was substantial evidence before the jury that XU did not offer to sell its platform to Allstate prior to the critical date and the evidence showed that the Allstate demo did not include the inventions claimed in the '903 and '709 patents. For example, John Steinhoff, XU's former director of technology,

testified that XU never offered for sale or sold a product that embodied the concepts expressed in the '709 patent (Ex. 2, Trial (Steinhoff) Tr. 718:20-23) or the concepts expressed in the '903 patent (*Id.* at 726:22-727:1). He also testified that XU's demo environment did not at any time in the period from 2002 to 2005, which would include the Allstate pilot, contain code to support the inventions of the '903 and '709 patents.   Ex. 6, Trial (Steinhoff) Tr. 2096:20-23; *see also* 2094:12-2095:5.

Moreover, contrary to Cisco's apparent assertion, Dr. Chatterjee did not present testimony establishing that the inventions of the '903 and '709 patents were in any source code for XU's platform demonstrated or offered for sale prior to the critical date—in fact, the Court precluded Dr. Chatterjee from testifying on that issue because his opinions in that regard were not reliable:

> Chatterjee may not opine that the code he analyzed was executed or implemented in a product XU demonstrated, offered for sale, or sold prior to the critical date. That opinion depends upon the inference that the code he analyzed was present in an XU product that was implemented at specific demonstrations, *e.g.*, the Allstate demonstration. ***Chatterjee has not provided any reliable basis for drawing this inference based on his expertise.***

*Id.* (emphasis added). In addition, Dr. Nourbakhsh rebutted Dr. Chatterjee's testimony regarding the source code and, therefore, the jury was not required to credit that testimony. *See* Ex. 6, Trial (Nourbakhsh) Tr. 2101:5-2109:20.   Contrary to Cisco's assertion (D.I. 700 at 33), Dr. Nourbakhsh's testimony was not conclusory, but was detailed and lengthy. *See* Ex. 6, Trial (Nourbakhsh) Tr. 2101:5-2109:20.

Cisco further asserts that Dr. Nourbakhsh's testimony was contrary to the testimony of "two of the name inventors, Richard Mason and James Nevin, [who] admitted that their inventions were embodied in XU's source code." D.I. 700 at 33. But that is simply misleading. Dr. Nourbakhsh's testimony only concerned whether the '903 and '709 inventions were in the

XU source code prior to the critical date (directly rebutting Chatterjee's testimony about specific source code) and Messrs. Mason and Nevin did not say anything to the contrary. All they said was that the patented features were at some point added to the XU source code, but they could not say when. *See* Ex. 4, Trial (Mason) Tr. 1576:2-9; Trial (Nevin) Tr. 1577:7-14.

Contrary to Cisco's assertion, Cisco did not establish by clear and convincing evidence that the inventions described in the '903 and '709 patents were either the subject of a commercial offer for sale or ready for patenting prior to the critical date. Cisco simply wants the Court to reweigh that evidence and come to a different conclusion than the jury. Again, that is improper in considering a motion for JMOL.

**D.     Cisco Is Not Entitled To A New Trial On The Patent Infringement Claims**

Cisco asserts that it is entitled to a new trial on the patent infringement claims for "substantially the same reasons that [it] is entitled to JMOL" on those claims and further asserts only that the jury's verdicts are "against the great weight of the evidence." D.I. 700 at 33. A new trial is an exceptional form of relief and there is absolutely no basis for invoking it here. Quite simply, the jury's verdict regarding infringement is in accord with the evidence and should not be disturbed. *IPPV Enters.*, 191 F. Supp. 2d at 563 (citing *Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir. 1993)) (when "the ground for a new trial is that the jury's verdict was against the great weight of the evidence, the court should proceed cautiously, because such a ruling would necessarily substitute the court's judgment for that of the jury").

**VII.   CONCLUSION**

Based on the foregoing, Cisco's Motion for JMOL, New Trial or Remittitur should be denied in all respects.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Charles E. Cantine
Jason M. Sobel
Joseph Diamante
Kenneth L. Stein
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038
(212) 806-5400

Dated:  June 5, 2013
Public Version: June 11, 2013

1110094

By: /s/ Philip A. Rovner
    Philip A. Rovner (#3215)
    Jonathan A. Choa (#5319)
    Hercules Plaza
    P.O. Box 951
    Wilmington, DE  19899
    (302) 984-6000
    provner@potteranderson.com
    jchoa@potteranderson.com

*Attorneys for Plaintiff XpertUniverse, Inc.*