IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| XPERTUNIVERSE, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 09-157-RGA |
| | : | |
| CISCO SYSTEMS, INC., | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

Philip A. Rovner, Esq., Potter Anderson & Corroon LLP, Wilmington, DE; Charles E. Cantine, Esq., Jason M. Sobel, Esq., Stroock & Stroock & Lavan LLP, New York, NY, Attorneys for Plaintiff.

Jack B. Blumenfeld, Esq., Jennifer Ying, Esq., Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE; Kathleen M. Sullivan, Esq., Cleland B. Welton II, Esq., New York, NY, Daniel H. Bromberg, Esq., Redwood Shores, CA, Quinn Emanuel Urquhart & Sullivan, LLP; Kell M. Damsgaard, Esq., Philadelphia, PA, Brett M. Schuman, Esq., Ryan Scher, Esq., San Francisco, CA, Morgan, Lewis & Bockius LLP, Attorneys for Defendant.

November 20, 2013

*Richard G. Andrews*
ANDREWS, U.S. DISTRICT JUDGE:

Pending before the Court are the parties' post-trial motions. Plaintiff XpertUniverse, Inc.

("XU") filed a Motion to Alter or Amend the Judgment Pursuant to Federal Rule of Civil

Procedure 59(e) and Motion for Attorneys' Fees Pursuant to 35 U.S.C. § 285 (D.I. 702).

Defendant and Counterclaimant Cisco Systems, Inc. ("Cisco") filed a Motion for Judgment as a

Matter of Law under Rule 50(b) and, in the Alternative, for Remittitur or New Trial Under Rule

59(a)(1) (D.I. 699); a Motion for Enforcement of the Parties' Agreement to Limit Liability (D.I.

697); and for an order holding the patents in suit unenforceable due to inequitable conduct (D.I.

706).

XU brings this action against Cisco alleging that Cisco infringed its patents and

fraudulently concealed information from XU during the course of a relationship between the

parties, as set forth most recently in XU's Fourth Amended Complaint. (D.I. 82). Cisco

responded with numerous counterclaims and affirmative defenses, alleging that XU obtained its

patents via fraud on the United States Patent and Trademark Office. (D.I. 127). After a nine-day

jury trial, the jury returned the following verdict: Cisco committed fraud by concealment and

caused damages of $70 million; Cisco's Expert Advisor product infringed XU's U.S. Patent No.

7,366,709; Cisco's Expert Advisor and Remote Expert products infringed XU's U.S. Patent No.

7,499,903; XU should recover $15,463 for Cisco's infringement through Expert Advisor; and

XU should recover $18,920 for Cisco's infringement through Remote Expert.

The parties completed their post-trial briefing on June 27, 2013.

## DISCUSSION

### I. Cisco's Motion for Judgment as a Matter of Law

Judgment as a matter of law is appropriate if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party" on an issue. FED.R.CIV.P. 50(a)(1). "Entry of judgment as a matter of law is a sparingly invoked remedy," one "granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Marra v. Phila. Housing Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (internal quotation marks omitted).

"To prevail on a renewed motion for [judgment as a matter of law] following a jury trial, the [moving] party 'must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s implied [by] the jury's verdict cannot in law be supported by those findings.'" *Pannu v. Iolab Co)rp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (citation omitted). "'Substantial' evidence is such relevant evidence from the record taken as a whole as might be acceptable by a reasonable mind as adequate to support the finding under review." *Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984).

In assessing the sufficiency of the evidence, the court must give the non-moving party, "as [the] verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor, and in general, view the record in the light most favorable to him." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir. 1991). The court may not determine the credibility of the witnesses nor

3

"substitute its choice for that of the jury between conflicting elements of the evidence." *Perkin-Elmer Corp.*, 732 F.2d at 893. Rather, the court must determine whether the evidence reasonably supports the jury's verdict. *See Dawn Equip. Co. v. Ky. Farms Inc.,* 140 F.3d 1009, 1014 (Fed. Cir. 1998); *Gomez v. Allegheny Health Servs. Inc.*, 71 F.3d 1079, 1083 (3d Cir. 1995) (describing standard as "whether there is evidence upon which a reasonable jury could properly have found its verdict"); 9B WRIGHT & MILLER, Federal Practice & Procedure § 2524 (3d ed. 2008) ("The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury properly could find a verdict for that party.").

Federal Rule of Civil Procedure 59(a) provides, in pertinent part: "The court may . . . grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." While new trials are infrequently granted, the "most common reasons" for granting such motions are: "(1) when the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) when newly-discovered evidence would be likely to alter the outcome of the trial; (3) when improper conduct by an attorney or the court unfairly influenced the verdict; or (4) when the jury verdict was facially inconsistent. " *Zarow–Smith v. N.J. Transit Rail Operations*, 953 F.Supp. 581, 584 (D.N.J. 1997) (citations omitted).

The decision to grant or deny a new trial is committed to the sound discretion of the district court. *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980); *Olefins Trading, Inc. v. Han Yang Chem. Corp.*, 9 F.3d 282, 289 (3d Cir. 1993) (reviewing district court's grant or denial of new trial motion under deferential "abuse of discretion" standard). However, where the

4

ground for a new trial is that the jury's verdict was against the great weight of the evidence, the court should proceed cautiously, because such a ruling would necessarily substitute the court's judgment for that of the jury. *See Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir.1993). Although the standard for grant of a new trial is less rigorous than the standard for grant of judgment as a matter of law—in that the court need not view the evidence in the light most favorable to the verdict winner—a new trial should only be granted where "a miscarriage of justice would result if the verdict were to stand," the verdict "cries out to be overturned," or where the verdict "shocks [the] conscience." *Williamson*, 926 F.2d at 1352–53.

### A. Fraudulent Concealment

XU claims that Cisco concealed that Cisco denied XU entry into a partnership program called Solutions Plus in April 2006, and did not disclose that denial until January 2007. XU claims, and the jury found, that this concealment of XU's denial from April 2006 to January 2007 was fraudulent concealment that led to XU's demise and $70 million in damages.

The parties agree that California law governs XU's fraudulent concealment claim. (D.I. 580 at 4). The elements of a cause of action for fraud based on concealment are:

(1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage.

*Bank of Am. Corp. v. Superior Court*, 130 Cal. Rptr. 3d 504, 509-10 (Cal. Ct. App. 2011) (citations and internal quotation marks omitted). Cisco asserts that the fact concealed – XU's denial from Solutions Plus – was not material. A fact is material if "a reasonable man would

5

attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *Engalla v. Permanente Medical Group, Inc.*, 938 P.2d 903, 919 (Cal. 1997); *(see* D.I. 679 at 142). As such, materiality is generally a question of fact unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it.[1] *Id.*

The evidence at trial shows that after XU's application for Solutions Plus was presented to Cisco's Governance Council, the Council described the application as "denied" on April 25, 2006. (PTX 37 at CISCO38318). XU's former President and Chief Operating Officer at the time, Elizabeth Eiss, was the point person at XU for the Cisco relationship. (D.I. 675, Trial Tr. vol. 3, 474, 505-07, 564-65). By June 2006, Eiss knew XU's application had been submitted to the Council, that Council members had concerns regarding "getting clients on board and getting market traction" and "training and education issues," and that XU "didn't have an approval." (D.I. 675, Trial Tr. vol. 3, 629, 632, 633-37). XU witnesses testified that Cisco never told them that their application had been "denied," and Cisco emails show this to be the case. (D.I. 674, Trial Tr. vol. 2, 338-39; D.I. 675, Trial Tr. vol. 3, 561-62, 564, 567-68; PTX 38, PTX 47, PTX 46). The Cisco flowchart depicting the formal Solutions Plus approval process does not indicate any opportunity for lobbying or additional review after a rejection by the Governance Council, but Cisco employee John Hernandez testified that in practice, many Solutions Plus applications are accepted after being initially rejected. (DX 826 at XU68616; D.I. 676, Trial Tr. vol. 4, 975; D.I. 678, Trial Tr. vol. 6, 1712-15). In XU's case, after the April 2006 "denial," Eiss worked with Hernandez, her "champion" at Cisco, to address the Council members' concerns and get XU

---

[1] Cisco has not asserted that materiality is a question of law.

admitted to the program. (D.I. 675, Trial Tr. vol. 3, 636; D.I. 678, Trial Tr. vol. 6, 1767-91; DX 433, 435, 456.) Hernandez went on to convince Council member Carl Weise to support XU's application. (D.I. 678, Trial Tr. vol. 6, 1783-91; DX 455, DX 457 at 1, DX 579). But when a potential XU account canceled an XU pilot, Hernandez concluded that the Council's objections could not be overcome, and informed XU that Solutions Plus would not be available. (D.I. 678, Trial Tr. vol. 6, 1797-1800; PTX 41).

The evidence shows Cisco informed XU about the status of its application in every respect except for Cisco's use of the term "denied." The issue here is whether there is sufficient evidence from which a jury reasonably could find that there is a material difference between not being approved, and being denied. Generally, XU asserts materiality based on the testimony of Cisco employees that if Cisco's employees had been in XU's position, they would have wanted to know that the application had been denied. (D.I. 676, Trial Tr. vol. 4, 958-59; *id.* at 982). XU also asserts that the concealment of the denial itself speaks to the materiality of the information concealed.

More specifically, XU argues that knowing about the denial would have influenced XU's conduct. Eiss testified, "to characterize that we knew it hadn't been approved as equal to you knew it was denied, those are two totally different things." (D.I. 675, Trial Tr. vol. 3, 637-38). Cisco's expert characterized short periods of time, which would include the nine months from April 2006 to January 2007, as a lifetime and testified that XU had other opportunities in April 2006. (D.I. 679, Trial Tr. vol. 7, 2055-56, 2076-77). Eiss and Friedman testified that had XU known about the denial, XU could have abandoned its relationship and instead sought a partnership with a competitor, such as Genesys or IBM. (D.I. 675, Trial Tr. vol. 3, 569-70; D.I.

7

674, Trial Tr. vol. 2, 339-40). XU points to evidence that Cisco wanted to keep Genesys and XU from partnering. (*E.g.*, PTX 428, PTX 44). A former Citigroup Senior Vice President testified that Citigroup was considering an XU pilot and that Citigroup was not concerned whether XU was partnered with Cisco or IBM for that pilot. (D.I. 676, Trial Tr. vol. 4, 1003-04). XU argues that "the jury was entitled to infer that since the process went no further, had XU known of the denial[, it] would have pursued other opportunities." (D.I. 725 at 7).

The evidence does not support the conclusion that the process "went no further" after the April 2006 Governance Council meeting. Eiss and Hernandez continued to work towards approval through December 2006, and obtained Carl Weise's support. The evidence also does not support that XU would have pursued other opportunities if it had known of the "denial." Eiss and Friedman testified only that XU "could have" (*e.g.*, D.I. 675, Trial Tr. vol. 3, 532, 569-70) pursued relationships with other companies if they had learned about the denial - not that the information would have changed their own conduct, much less that of a reasonable person. For XU to prove the materiality of the concealment of the "denial" for nine months, the factfinder must infer that, had XU been told it was denied in April 2006, XU would have withdrawn from the active relationship with Cisco, and would have sought to resuscitate defunct relationships with IBM and Genesys. There is no evidence that XU would have done so.

More generally, there is no evidence that there is any material difference between "denied" and "not approved." While Eiss testified that to her there was a vague difference, she did not provide any evidence as to why her conduct would have been influenced by any such difference, or to allow the jury to infer what a reasonable person's conduct would have been. While the evidence shows that XU was "denied," it was also undisputed that Hernandez

8

continued to work, both internally and with Eiss, towards approval. XU's supposed status as terminally denied (as opposed to not approved with a chance of overcoming that lack of approval) is not supported by Cisco's internal emails after the "denial." (*See* PTX 38 (showing Hernandez continuing to "move this forward"); PTX 46 (leaving open the possibility of "pushing solution[] + if there is a large customer opportunity requiring it"); PTX 48 (noting Carl Weise's approval)). There is no evidence that the Governance Council's use of the word "denied" introduced any material difference from "not approved."

There is insufficient evidence for a jury to find that a reasonable person would attach importance to the knowledge that XU was "denied," as opposed to not approved, in determining his choice of action in the transaction in question. *See Engalla*, 938 P.2d at 919. Cisco's motion for judgment as a matter of law on the fraudulent concealment claim is granted. The Court need not reach Cisco's request for a new trial.

### B. Damages for Fraudulent Concealment

Because the Court has already found there was insufficient evidence for a jury to find Cisco concealed or suppressed a material fact, the Court need not reach Cisco's requests for judgment as a matter of law, new trial, and/or remittitur on the damages awarded for fraudulent concealment. However, as there are additional related deficiencies in the evidence underlying the fraudulent concealment verdict, the Court will briefly set forth its reasons why it would grant Cisco's request for a judgment as a matter of law on the $70 million concealment damages the jury awarded.

The inquiry is whether, as a result of the concealment or suppression of the fact, the plaintiff sustained damage. *Bank of America*, 130 Cal. Rptr. 3d at 511. An expert's opinion on

9

the measure of damages requires sufficient proof that the plaintiff's injury was caused by the defendant's conduct. *See Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F.Supp.2d 1319, 1352 (S.D. Fla. 2006).

Cisco frames its request for judgment as a matter of law on concealment damages under what it calls the "new business rule." Cisco claims that California law requires more stringent proof of lost profits for new businesses, like XU, than for established ones; that because XU's theory of lost value is based on partnering with larger companies to obtain customers and sales, that XU's "lost value" is essentially lost profits; and that XU has failed to meet the "new business" standard for showing those lost profits. (D.I. 700 at 8-14) (citing *Sargon Enterprises, Inc. v. University of Southern California*, 288 P.2d 1237 (Cal. 2012); *Kids' Universe v. In2Labs*, 95 Cal. App. 4th 870 (Cal. Ct. App. 2002)).

The deficiency in the evidence of causation is broader than Cisco's proposed "new business rule." At trial, XU's theory of causation was that the concealment of the "denial," as opposed to "not approved," from April 2006 to January 2007 destroyed XU. XU asserts it had numerous opportunities in April 2006 to derive value by partnering with larger companies like Cisco, IBM, or Genesys, or perhaps on a pilot program with Citibank. XU asserted, through its expert Walter Bratic, these partnership opportunities supported valuing XU at $70 million in April 2006. By January 2007, XU's theory goes, XU had spent all its resources on the Cisco integration, news of the denial from Solutions Plus caused its investors to pull out, and none of the partnership opportunities were available, making XU worth nothing.

A necessary corollary underlying this theory is that, had XU known it was "denied" in April 2006, not only would XU not have gone out of business and lost its entire $70 million in

10

value, it would have lost no value at all.[2] Because XU's $70 million valuation was based on partnering with another company (D.I. 677, Trial Tr. vol. 5, 1277), XU's causation theory requires showing that had XU known about the "denial" in April 2006, XU could have kept its value by partnering with a different company. This in turn depends on the assumptions that 1) had Cisco informed XU of its "denied" status in April 2006, XU would have separated from Cisco; and 2) had XU pursued a partnership with a different company in April 2006, it could have developed that partnership in a manner that kept XU in business and valued at $70 million. XU's causation theory also requires showing that the concealment through January 2007 destroyed the opportunities for those partnerships.

Only after proving causation, complete with these corollaries and assumptions, could XU reach Bratic's opinion. Bratic only assumed that Cisco's alleged concealment caused XU to lose its entire value, and he was precluded from opining on causation. (D.I. 647 at 2-3). XU was required to prove causation through fact testimony. *Id.* at 3. Bratic described his damages model as "but for" – comparing XU's value before and after the fraudulent concealment. Bratic's damages model was predicated on XU deriving value from partnering with somebody – Cisco, IBM, or Genesys. (D.I. 677, Trial Tr. vol. 5, 1277; *id.* at 1255). "For Bratic's opinions to be of any use, [XU] was required to offer sufficient proof of the assumptions that Bratic accepted as the foundation for his opinion, most importantly — that [XU]'s injury was caused by [Cisco]'s conduct. Only upon such a showing could [XU] proceed to the next prong of its [damages]

---

[2] In other words, XU's theory was that news of the "denial" in April 2006 would have had no effect, whereas the same news nine months later caused XU to go out of business.

11

analysis and offer Bratic's opinion to provide the jury with a non-speculative estimation of the amount of [XU] 's injury." *Alphamed*, 432 F.Supp.2d at 1352.

XU failed to prove that had it known about the "denial" in April 2006, things would have ended differently. First, there is no evidence that concealing news of the denial from April 2006 to January 2007 destroyed any potential partnership opportunities. XU argues that the Genesys partnership no longer existed "as a result" of XU spending all its resources, but cites no evidence of such causation. Acquisition by Genesys is unsupported by anything more than a Cisco email noting a "risk" of that acquisition; there is no evidence that XU was ever up for sale or that Genesys had ever made a bid. (*See* PTX 45 at CISCO33722). The Citibank opportunity, which XU pursued with Cisco, disappeared because of factors internal to Citibank. (D.I. 676, Trial Tr. vol. 4, 1005-06). IBM declined to purchase an XU license because XU's product was not ready. (D.I. 674, Trial Tr. vol. 2, 349-50).

Second, there is no evidence that had XU known about the "denial" in April 2006, it would have done anything differently, *i.e.*, that it would have left Cisco and that it could have monetized a different partnership. As noted in concluding XU failed to show the concealed information was material, there is no evidence that XU would have left Cisco to pursue any other partnership if it had known about the Governance Council's use of the term "denied." Nor is there any evidence that XU could have monetized any partnership if it had pursued one: as just noted, the Citibank opportunity disappeared because of factors unique to Citibank, and there is no evidence of any potential Genesys or IBM partnership to add value to XU, in April 2006 or at any other relevant time.

Third, there is no evidence that the effects of finding out about the "denial" in January

2007 were any different, or any more detrimental to XU, than finding out about the "denial" in

April, 2006. In other words, if disclosure of Cisco's "denial" in January 2007 destroyed XU, it is

reasonable to wonder why disclosure of the "denial" in April 2006 would not have had the same

effect. XU offered, at most, only speculation that an April 2006 disclosure would have turned

out any differently. Eiss and Friedman testified that the *denial* of Solutions Plus caused XU to

lose revenue and investment – but said nothing about the impact of the nine-month *concealment*

of the denial on investors or on any third party partnership. (*See* D.I. 674, Trial Tr. vol. 2, 338-

40; D.I. 675, Trial Tr. vol. 3, 569-70). XU notes testimony that by January 2007, XU had spent

all of its resources integrating the Cisco routing component into its solution. (D.I. 677, Trial Tr.

vol. 5, 1262, 1265, 1272-75). But, again, there is no evidence that XU could have capitalized on

anything else if it had not spent all its money on the Cisco integration, or if it had not been

abandoned by its investors.

The evidence presented by XU at trial is insufficient to show XU lost value because of

the concealment of its application being "denied," as opposed to being "not approved," from

April 2006 to January 2007. Without evidence of any causation, XU could not proceed to the

next prong - Bratic's opinion that XU was worth $70 million before the concealment, and had no

value after. There is no substantial evidence from which the jury could have found that

concealment of the "denial" for nine months caused XU to forego, or lose, other valuable

partnerships, and thereby lose its entire value. Thus, were the Court not granting judgment as a

matter of law on "materiality," the Court would grant it on "damages."

13

## C. Patent Infringement

Cisco asks for judgment as a matter of law, or in the alternative a new trial, on XU's direct infringement claims. XU's infringement expert, Dr. Illah Nourbakhsh, provided XU's only evidence of infringement. Cisco claims Dr. Nourbakhsh's testimony regarding five particular limitations ("inquiry-type database," "multiple layers of inquiry types," "skill-set database," "numeric routing identifier," and "monitors presenting inquiry criteria and values") is conclusory, unsupported by any probative evidence, and in some cases in conflict with testimony from lay witnesses. (D.I. 700 at 27-32). XU points out that for the most part, Cisco did not cross-examine Dr. Nourbakhsh on these limitations, and notes the jury's ability to reconcile any conflicts between different witnesses' testimony. (D.I. 725 at 33-38). Dr. Nourbakhsh testified specifically, albeit quickly, as to how each Cisco product met each limitation at issue, surpassing the level of testimony in Cisco's cited cases. *See Paradox Sec. Sys. v. ADT Sec. Servs.*, 388 F. App'x 976, 982 (Fed. Cir. 2010); *Rohm & Haas Co. v. Brotech Corp.*, 1995 WL 17878613, *10 (D. Del. June 30, 1995). Cisco has not shown there is insufficient evidence from which a jury reasonably could find liability, nor that the verdict is against the great weight of the evidence.

Cisco also asks for judgment as a matter of law that the '903 and '709 patents are invalid because they were on sale more than one year before their applications were filed, under 35 U.S.C. § 102(b); in the alternative, Cisco requests a new trial. Cisco asserts it proved XU offered the inventions described in those patents for sale to Allstate in 2002 and 2003, based on XU offering its platform for sale, on Dr. Sandeep Chatterjee's opinion that XU's software embodied the claims at issue before April 2, 2003, and on two XU inventors testifying the XU software embodied the claims at issue. (DX 110, 538, 540; D.I. 678, Trial Tr. vol. 6 1645-67; D.I. 677,

14

Trial Tr. vol. 5, 1576-80). Cisco claims this evidence entitles it to judgment as a matter of law, or a new trial, over testimony by XU's John Steinhoff, that the invention was not embodied in the demonstrations XU showed Allstate, and by Dr. Nourbakhsh, that the software did not embody the claims at issue. (*See* D.I. 695, Trial Tr. vol. 3 720, 728; D.I. 679, Trial Tr. vol. 7, 2095-96; *id.* at 2102-2110). Cisco argues that what is shown or demonstrated to prospective customers need not actually embody a patent, so long as the claimed invention is ready for patenting and is the subject of an offer for sale. (D.I. 700 at 32-33, *citing Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1368 (Fed. Cir. 2007)).

In response, XU notes Steinhoff's testimony that the Allstate demonstration environment did not embody the claims at issue, as it did not contain any code at all; that the jury was able to credit either Dr. Chatterjee's testimony that XU's source code at the time[3] embodied the claims at issue, or Dr. Nourbakhsh's testimony that it did not; and that the two named inventors testified only that XU's code embodied the claims at issue, without saying when. XU argues that Cisco did not meet its burden of establishing by clear and convincing evidence that the inventions were the subject of a commercial offer for sale and ready for patenting before the critical dates.

The evidence reasonably supports the verdict that the patents were not invalid due to the on-sale bar. The jury was entitled to weigh the testimony by Drs. Chatterjee and Nourbakhsh, and rely on Dr. Nourbakhsh's testimony if it so chose. Similarly, the jury could conclude that the inventors' testimony that the source code embodied the claims at issue did not prove the code did

---

[3] Dr. Chatterjee was precluded from testifying that the code he analyzed was executed or implemented in a product XU demonstrated, offered for sale, or sold. (D.I. 599 at 1-2).

15

so before the critical date. It was within the jury's province to find Cisco did not prove § 102(b) "on sale bar" invalidity by clear and convincing evidence.

## II. Cisco's Motion for Enforcement of the Parties' Agreement to Limit Liability

In the alternative to Cisco's motions for judgment as a matter of law or a new trial, Cisco asserts that limitations of liability in 2005 and 2006 agreements between Cisco and XU capped liability at $3 million. Because the Court has granted Cisco's motion on the fraud verdict, and because Cisco's asserted $3 million cap does not affect the remaining damages for patent infringement, the Court need not reach Cisco's motion for enforcement of those limitations of liability against that verdict. The motion is moot.

## III. Cisco's Request for an Order Holding the Patents Unenforceable

Cisco requests this Court find the patents in suit unenforceable because of the inventor(s)' inequitable conduct in intentionally not disclosing pre-filing marketing and sales activities that Cisco claims would have prevented XU from obtaining the patents in suit.

To prevail on an inequitable conduct claim, a defendant must establish both the materiality of the withheld reference and the applicant's intent to deceive the PTO. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (en banc). In *Therasense*, the Federal Circuit rejected the "sliding scale" approach to proving inequitable conduct, "where a weak showing of intent may be found sufficient based on a strong showing of materiality, and vice versa." *Id.* Instead, *Therasense* made clear that "[i]ntent and materiality are separate requirements." *Id.* Moreover, a district court may not infer intent solely from materiality, and thus "[p]roving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive." *Id.*

16

With respect to materiality, the standard is but-for materiality unless there is affirmative egregious misconduct (which is not alleged here). *Id.* at 1291–92. A prior art reference "is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art." *Id.* at 1291. In the inequitable conduct context, but-for materiality must be shown by a preponderance of the evidence, "giv[ing] claims their broadest reasonable construction." *Id.* at 1291–92; *see also Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1334 (Fed. Cir. 2012). "Often the patentability of a claim will be congruent with the validity determination—if a claim is properly invalidated in district court based on the deliberately withheld reference, then that reference is necessarily material because a finding of invalidity in a district court requires clear and convincing evidence, a higher evidentiary burden than that used in prosecution at the PTO." *Therasense*, 649 F.3d at 1292.

To satisfy the intent requirement, "the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it." *Id.* at 1290; *1st Media, LLC v. Elec. Arts, Inc.*, 694 F.3d 1367, 1374–75 (Fed.Cir. 2012) ("Knowledge of the reference and knowledge of materiality alone are insufficient after *Therasense* to show an intent to deceive .... To sustain a charge of inequitable conduct, 'clear and convincing evidence must show that the applicant made a deliberate decision to withhold a known material reference.' "). Thus, inequitable conduct requires clear and convincing evidence of a specific intent to deceive the PTO. *Therasense*, 649 F.3d at 1290. Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence. *Id.* However, "the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" *Id.* at 1290 (quoting

17

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008)).

"Indeed, the evidence must be sufficient to require a finding of deceitful intent in light of all of

the circumstances." *Id.* (internal quotation marks and citation omitted). "Hence, when there are

multiple reasonable inferences that may be drawn, intent to deceive cannot be found." *Id.* at

1290–91.

Cisco points to the development of XU's technology platform through several iterations,

including earlier versions called KnowledgeSHARE and XpertSHARE, and XU's attempts to

sell or license those versions and develop support documents for them. The underlying facts are

not in dispute.[4]  Named inventors Richard Mason and James Nevin, as well as XU's former vice

president David Rutberg, testified that the inventions claimed in the '709 Patent and the '903

Patent were embodied in XpertSHARE. (D.I. 677, Trial Tr. vol. 5, 1574-80). Cisco's expert, Dr.

Sandeep Chatterjee, opined that the claimed inventions were present in XU's source code by

April 3, 2003, more than a year before the applications for the patents were filed. (D.I. 678, Trial

Tr. vol. 6, 1645-67). Cisco points to XU's efforts to sell or license its platform to Allstate

Insurance Company in December 2002 (*e.g.*, DX 538, 540, 541, 110)); to Dell Computer Corp.

in July 2002 (D.I. 708-1, DX 537); and to Computer Associates in July 2002 (D.I. 708-1, DX 536

at 3-4). The named inventors were involved in the effort to sell to Allstate. (*E.g.*, DX 110). In

connection with these efforts, XU created user manuals and other documentation for its platform

bearing copyright dates of 2002. (DX 97, 33).

---

[4] The parties agreed to submit the issue of inequitable conduct to the Court for decision
after the jury trial. (D.I. 580 at 15, ¶4). The parties have treated the issue as one to be decided
without any further hearing, as evidenced in the briefing. (*See* D.I. 706, 726, 752). Therefore,
some of the record on this issue was not admitted at trial and is found only as appendices to the
briefing.

In 2004, XU hired an intellectual property consulting firm called ipCapital Group, Inc. to evaluate whether XU had any protectable intellectual property, through an "ipScan."[5] (D.I. 708, Ex. D, Tr. 244-45). Friedman and the named inventors were involved in the ipScan. (*Id.* Ex. D, Tr. 244-45; *id.* Ex. E, 25, 204; *id.* Ex. F, 55, 195; *id.* Ex. G, 183-84; *id.* Ex. H, 299).

XU filed a provisional patent application, No. 60/559907, on April 2, 2004, which listed Nevin, Steinhoff, Mason, Zelkin, and Rutberg as inventors. (D.I. 707, DX 204). On March 31, 2005, XU filed a patent application claiming priority therefrom, which issued on April 29, 2008, as the '709 Patent, listing Nevin, Steinhoff, Mason, and Zelkin as inventors.[6] (D.I. 707, DX 39). On January 24, 2005, XU filed another patent application, naming Nevin, Steinhoff, Mason, and Zelkin as inventors, which issued on March 3, 2009, as the '903 Patent. (D.I. 707, DX 40). For both patents, each inventor certified they were not aware of any publications, offers for sale, or uses more than a year before, and XU did not submit any prior art offers for sale. (D.I. 707, DX 77 at CISCO377026-29; DX 39; DX 76 at CISCO377189-92; DX 40).

On August 8, 2005, XU filed a third patent application claiming priority to the application that issued as the '709 Patent, U.S. Application Serial No. 11/200,520 ("the '520 Application"). (D.I. 707, DX 38). During the period when the applications that became the '903 and '709 Patents were pending, the PTO rejected claims in the '520 Application over Xpertshare 2.0 three times. (DX 38 [November 2, 2006; July 12, 2007; February 26, 2008]). After the patents in

---

[5] Cisco relies on the ipScan report (PTX 61) and transcripts of tape recordings of the ipScan meeting (D.I. 708, Ex. I) to assert that ipCapital flagged potential on sale bar issues to the inventors of the patents in suit. The Court excluded this report as hearsay, and excluded ipCapital's statements in the recordings as lacking sufficient foundation even if they were probative. (*See* D.I. 601 at 37-49; D.I. 608). The Court will not consider them now.

[6] Rutberg was originally named as an inventor too. (D.I. 707, DX 39).

suit had issued, the PTO rejected the claims in the '520 Application over

KnowledgeSHARE/XpertSHARE at least another four times. (DX 38). After further

amendments and multiple interviews with the Examiner, the claims were allowed with almost no

explanation on January 7, 2013. (D.I. 707, DX 38).

Cisco asserts that XU's offers to sell its platform to Allstate and Computer Associates

were material to the on-sale bar, and that Friedman and the inventors intentionally withheld

evidence that XU offered to sell the KnowledgeSHARE/XpertSHARE platform during

prosecution of the '903 and '709 Patents. XU disputes both but-for materiality and intent. The

Court begins with intent.

Cisco asserts it has shown specific intent to defraud by showing: 1) Friedman and the

named inventors had actual knowledge of XU's offers to sell; 2) XU, including Friedman and

Steinhoff as evidenced by their declarations in the '520 Application prosecution history, knew

from the rejections in the copending '520 Application that the PTO had patentability concerns

regarding XU's xpertshare 2.0; and 3) ipCapital put Friedman and the inventors on notice

regarding the prior offers for sale. Cisco argues that Friedman and the inventors were thus aware

of the prior offers for sale and their materiality, such that intent to deceive is the single most

reasonable inference able to be drawn from this evidence. *Id.* (citing *Therasense*, 649 F.3d at

1290). In response, XU does not dispute that Friedman and the inventors knew of the prior offers

for sale or of their significance to the PTO or to ipScan. XU argues that Cisco has shown no

evidence of any intent to deceive, and that Cisco's argument inferring intent from alleged materiality is improper.[7]

Cisco has not shown clear and convincing evidence of a specific intent to deceive the PTO - specifically, that XU's applicants made a deliberate decision to withhold the information. *See Therasense*, 649 F.3d at 1290. Assuming for purposes of discussing intent that the prior sale activities satisfy the but-for materiality standard and that Friedman and the inventors were aware of this materiality, there is zero evidence of intent other than their knowledge of the prior sale activities and their presumed materiality. The law is clear: this is insufficient. *1st Media, LLC*, 694 F.3d at 1375 ("An applicant's knowledge of a reference's materiality, however, cannot by itself prove, let alone clearly and convincingly prove, that any subsequent non-disclosure was based on a deliberate decision."). Cisco argues that intent to deceive is the single most reasonable inference, but provides no evidence of any deliberate decision to deceive. Without showing intent, Cisco cannot show inequitable conduct. Its motion is denied.[8]

## IV. XU's Motion to Alter or Amend the Judgment

XU moved to alter or amend the judgment pursuant to FED. R. CIV. P. 59(e), to grant XU the following with regard to the patent infringement verdict: 1) supplemental damages based on

---

[7] XU also notes it was represented by counsel in prosecuting the '520 Application and patents in suit. Cisco correctly counters that XU had never before asserted an advice of counsel defense, such that it would be improper to rely on such a defense to find there was no inequitable conduct.

[8] Because Cisco did not prove intent, the Court need not reach the element of materiality. However, the Court notes that the jury did not find Cisco proved an on-sale bar. As explained *supra*, the Court denied Cisco's request for a judgment as a matter of law on the issue. The Court would be hard pressed to find a basis for ruling the same activities meet the standard of but-for materiality in this context, even acknowledging that Cisco only has to meet the preponderance of the evidence standard to find materiality for inequitable conduct.

pre-verdict infringing sales and for any accounting that may be necessary; 2) prejudgment interest on the awarded damages under 35 U.S.C. § 284; 3) post-judgment interest under 28 U.S.C. § 1961; and 4) ongoing royalties for continued infringement after entry of the Judgment or, in the alternative, a permanent injunction.

### A. Pre-Verdict Infringing Sales

XU seeks sales information, and supplemental damages thereon, updated from the last information Cisco provided: for Expert Advisor, from January 29, 2012 through trial (March 22, 2013), and for Remote Expert, from April 12, 2012 through trial. Cisco responds that Expert Advisor has not been sold since January 29, 2012, and the only additional sales of Remote Expert in the version the jury found to infringe have been outside the United States, as Cisco changed the configuration. (D.I. 720 at 3-4). Cisco therefore concludes that there are no sales after the close of discovery of products the jury found infringe.

Regarding Expert Advisor, XU's somewhat strained interpretation of Cisco documentation to argue the product may still be sold or implemented (D.I. 703 at 11, D.I. 747 at 2-3) does not controvert Cisco's express representations, supported by employee testimony and a declaration, that it has not made any additional sales of Expert Advisor.[9] (*See* D.I. 677, Trial Tr. vol. 5, 1520; D.I. 722, Decl. of Tod Famous, ¶ 4, Ex. A). Any Cisco response to XU's request for updated sales information would be, "none." The Court will not order this exercise in redundancy.

---

[9] During a discovery dispute over Expert Advisor, counsel for XU conceded Cisco was no longer selling that product. (D.I. 598 at 30). The Court precluded further pretrial discovery into Expert Advisor. *Id.* at 31-32.

Regarding Remote Expert, as an initial matter, the parties do not appear to dispute that sales outside the United States do not infringe. Cisco represented to the Court before trial that if Remote Expert were found to infringe, Cisco would update its sales figures for Remote Expert versions 1.5 and 1.8. (D.I. 704-1 at 8, Hrg. Tr. at 24-25). Now, after trial, Cisco asserts there have been no additional U.S. sales of Remote Expert 1.5 or 1.8 with the matching and routing capabilities presented in XU's infringement case and evaluated by the jury. Cisco points to Dr. Nourbakhsh's testimony that Remote Expert practices the '903 Patent's limitation of "at least two layers of inquiry types" because of the way in which it supports implementations using multiple languages. (D.I. 676, Trial Tr. vol. 4, 1169-75). Dr. Nourbakhsh testified that using an independent translation file, such as Google Translate, does not use the invention of the '903 Patent. *Id.* at 1173-75. Cisco asserts, through an employee declaration, that it has modified Remote Expert so that it now uses Google Translate to convert the interface to another language. (D.I. 721, Decl. of William Dry, ¶ 13).

In reply, XU asserts that Remote Expert's "multi-lingual support was just one example that proved Remote Expert satisfied this limitation." (D.I. 747 at 6, citing D.I. 676 at 1052-53). Dr. Nourbakhsh stated in a declaration that Remote Expert 1.8's "locales" still denote multiple layers of inquiry types, even if the multiple languages do not. (D.I. 749, ¶¶ 7-8). XU asserts that the modified version of Remote Expert still contains infringing multiple layers (*i.e.*, the "locales"), making the change "no more than a colorable variation" that still infringes, as in *Creative Internet Advertising Corp. v. Yahoo! Inc.*, 674 F.Supp.2d 847, 856-59 (E.D. Tex. 2009).

XU bases its argument for preverdict sales information for the new version of Remote Expert on law addressing enforcement of an ongoing royalty against a new, post-verdict version

23

of a product. (D.I. 747 at 3 n.1; *id.* at 6-7 (citing *Creative Internet Advertising Corp.*, 674
F.Supp.2d at 856-59)). A party seeking to include a new product version in post-verdict relief
must prove that the new version is not more than colorably different from the product found to
infringe, and that the newly accused product actually infringes. *nCube Corp. v. Seachange Int'l
Inc.*, 2012 WL 4863049, *2 (D. Del. Oct. 9, 2012) (quoting *TiVo Inc. v. Echostar Corp.*, 646
F.3d 869, 882 (Fed. Cir. 2011) (en banc)); *see also Creative Internet Advertising Corp.*, 674
F.Supp.2d at 855. The Court "'must focus initially on the differences between the features relied
upon to establish infringement and the modified features of the newly accused products.'"
*nCube*, 2012 WL 4863049 at *4 (quoting *TiVo*, 646 F.3d at 882). In *nCube*, the plaintiff
accused a component called the Client1D of satisfying a specific limitation. After a verdict of
infringement and the award of an injunction, the defendant redesigned the Client1D component.
The plaintiff then claimed a second component in the new version, the SessionID, satisfied that
limitation. The SessionID was not changed or modified as part of the redesign effort.
Accordingly, the Court did not find in the SessionID allegations a basis for finding a lack of
colorable differences. *Id.* at *4-5. The plaintiff also failed to prove by clear and convincing
evidence that the modified system infringed. *Id.* at *5.

While this inquiry relates to preverdict sales information, and *nCube* addresses the scope
of post-verdict relief, factually, this case is very similar to *nCube*, but has even less of an
evidentiary basis to find a lack of colorable differences between the versions of Remote Expert or
to find that the new version infringes. The multilingual feature relied upon to establish
infringement of a specific limitation at trial is no longer present in Remote Expert; XU's expert
admitted the new method for achieving multiple languages does not infringe that limitation; and

the "locale" feature relied upon to establish infringement by the new version was not addressed at trial or even in XU's opening brief. (*See* D.I. 676; D.I. 703). Dr. Nourbakhsh's use of the word "example" at trial, his new two-paragraph "locales" opinion, and Cisco's employee's short declaration fail to prove that the new version of Remote Expert is not colorably different from the old version, or that the new version infringes. Further, based on the briefing, it is not clear what standard and burden of proof the Court should apply in the context of pre-verdict sales, whether Dr. Nourbakhsh's "locales" opinion is properly introduced at this juncture, or if the opinion was in Dr. Nourbaksh's expert report.

The Court notes Cisco's request for an evidentiary hearing. (D.I. 720, at 4). This approach has been adopted in the context of determining whether a new version fell within the scope of an ongoing royalty. *See Creative Internet Advertising Corp.*, 674 F.Supp.2d at 849. Another approach appears to be denying the request to include the unadjudicated version of Remote Expert without prejudice to the plaintiff filing a separate action involving that product. *See Fractus, S.A. v. Samsung Electronics Co., Ltd.*, 2013 WL 1136964, *2 (E.D. Tex. Mar. 15, 2013). Given the submissions' many substantive and procedural shortcomings and the indications that, under *nCube*, the new version of Remote Expert appears to be colorably different than the version found to infringe, this second approach is the most prudent.

The Court denies XU's request for pre-verdict sales information for both Expert Advisor and Remote Expert, without prejudice to XU filing for patent infringement by Remote Expert as configured after the verdict.[10]

---

[10] XU's ability to file a separate action without prejudice is noted only with regard to this particular issue of damages. The Court makes no ruling as to any other bar or defense, such as statute of limitations or waiver.

25

## B. *Prejudgment and Post-Judgment Interest*

XU moves to amend the judgment to provide for prejudgment and post-judgment interest based on the average prime rate, compounded quarterly. (D.I. 703 at 3-4). XU asserts the prime rate best compensates a plaintiff for lost revenues during infringement, as that rate represents the cost of borrowing money. *Id.* (citing *IMX, Inc. v. LendingTree, LLC*, 469 F.Supp.2d 203, 227-28 (D. Del. 2007). Cisco responds that prejudgment interest should be set at the T-Bill rate, compounded annually, and that XU has provided no justification for the higher prime rate such as borrowing money pending judgment or any risk of Cisco defaulting. (D.I. 720 at 4-6) (citing *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955 (Fed. Cir. 1997) (affirming a trial court's exercise of its discretion in setting the rate), and cases from other Districts).

The Court has broad discretion to select the pre-judgment interest rate to be applied, and the Federal Circuit has held that application of the prime rate is appropriate even if there is no evidence that the patent holder borrowed at the prime rate. *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991). Because the prime rate provides a better measure of the risk of nonpayment that XU bore, and thus, a better measure of the harm XU suffered by not receiving a reasonable royalty during the period of the hypothetical negotiation rate, the Court will award XU prejudgment and post-judgment interest at the prime rate, compounded quarterly. *See IMX*, 469 F.Supp.2d at 227-28 (citing *Mars, Inc. v. Conlux USA Corp.*, 818 F.Supp. 707, 720-21 (D. Del. 1993), *aff'd*, 16 F.3d 421 (Fed. Cir. 1993)).

The Court will also award post-judgment interest at the rate provided by statute. *See* 28 U.S.C. § 1961(a).

### C. *Permanent Injunction*

XU seeks a permanent injunction against Cisco's infringing products. XU has the burden

of showing that (1) it has suffered an irreparable injury; (2) remedies available at law are

inadequate to compensate for that injury; (3) considering the balance of hardships between the

plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be

disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391

(2006). Each factor will be taken in turn; in brief, XU has not shown any of the four factors, and

a permanent injunction is thus not warranted here.

#### i. Irreparable Harm

For the first factor, XU argues it has suffered irreparable injury because XU lost the

opportunity to license its technology to competitors, while Cisco was able to corner the market

for the technology, to obtain an exclusive license through its infringement, and to take advantage

of the head start that infringement afforded. In response, Cisco first asserts XU must be at risk of

irreparable harm from *future* infringement. Cisco asserts there is no such risk because it has

stopped selling Expert Advisor and the redesigned version of Remote Expert does not infringe.

*See* Section IV(1), *supra*. In reply, XU describes the new version of Remote Expert as

unadjudicated and irrelevant and claims that whether the new version is colorably different is "an

issue for another day." (D.I. 747 at 5).[11]

The Court takes XU to be conceding that the new version of Remote Expert does not

threaten XU with any future harm, or, at least, is not relevant to the analysis. Contrary to Cisco's

---

[11] This contrasts with XU's request for preverdict sales information for Remote Expert, based on the argument that the new version is not colorably different than the older version and infringes.

27

assertion, the absence of any future harm does not end the irreparable harm inquiry; the Court still must sift through XU's assertions of past harm. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861-62 (Fed. Cir. 2010) ("It [is] proper for the district court to consider evidence of past harm to [plaintiff]. Past harm to a patentee's market share, revenues, and brand recognition is relevant for determining whether the patentee 'has suffered an irreparable injury.' Although injunctions are tools for prospective relief designed to alleviate future harm, by its terms the first *eBay* factor looks, in part, at what has already occurred." (internal citations omitted)).

XU claims irreparable injury from losing the opportunity to license its technology to competitors, because Cisco has cornered the market for the technology and essentially obtained an exclusive license through its infringement and the head start that infringement afforded. Cisco responds with several piecemeal attacks based on XU's willingness to license and the extent to which XU has proven that Cisco meaningfully cornered any market with a nexus to the patents in suit.

The shortcomings in XU's case for irreparable injury are more fundamental than Cisco's arguments. While, as the Court just noted, the *eBay* standard establishes that past harm is relevant to the irreparable harm analysis, an injunction is by definition a prospective remedy. *See, e.g., i4i*, 598 F.3d at 861–62. "In this case, the irreparable harm factor weighs against granting a permanent injunction because the 'irreparable' component of the injury that [XU] alleges stems from [Cisco]'s past conduct, which allegedly 'shaped the market' and resulted in long-term" loss of licensing. *See LG Electronics U.S.A., Inc. v. Whirlpool Corp.*, 798 F.Supp.2d 541, 563 (D. Del. 2011); *see also Edwards LifeSciences AG v. Corevalve, Inc.*, 2011 WL 446203, *14-15 (D. Del. Feb. 7, 2011) ("At its core, the irreparable injury that [XU] asserts

stems from the fact that [Cisco] was the first to enter the market for the technology in question."). "This harm would continue even if a permanent injunction were issued, and [XU] makes no allegations of prospective lost customers or harms that are truly irreparable unless the court issues a permanent injunction. On the contrary, the court concludes that [XU] would not benefit substantially from an injunction being issued at this stage, several years after" Cisco allegedly cornered the market. *See LG Electronics*, 798 F.Supp.2d at 563; *see also Edwards LifeSciences*, 2011 WL 446203, *14-15 ("A permanent injunction would not change the fact that [Cisco] was the first to bring its technology to market. . . . . [XU] does not explain how the alleged competitive market advantage it alleges [Cisco] established before the trial would be remedied by a permanent injunction stretching into the future."). XU has not satisfied the first *eBay* factor of irreparable injury.

### ii. Adequacy of a Remedy at Law

In arguing that legal remedies are inadequate, XU repeats the arguments it made in asserting it had suffered irreparable harm, and further asserts that the patents are directed at the "core technology" of Cisco's infringing products. (D.I. 703 at 7). In response, Cisco points to XU's willingness to license the patents, a situation in which money damages are rarely inadequate. (D.I. 720 at 10) (citing *Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, 579 F.Supp.2d 554, 560 (D. Del. 2008)). Indeed, money damages are rarely inadequate for a patentholder that is willing to forego its exclusive right for some manner of compensation. *Advanced Cardiovascular Sys.*, 579 F.Supp.2d at 560; *Belden Techs. Inc. v. Superior Essex Comm's LP*, 802 F.Supp.2d 555, 578 (D. Del. 2011) (finding legal remedies to be adequate where plaintiffs offered to license the patents). XU does not cite any evidence whatsoever to

29

support its assertion that the patents represent the core technology of the infringing products. In short, XU has not shown any reason why money damages would be inadequate.

### iii. Balance of Harms

XU asserts that the balance of harms favors an injunction because the harm to Cisco from stopping selling its products is minimal compared to XU's inability to exploit the market by achieving a superior licensing deal. Cisco responds that because XU has failed to prove it would suffer any hardship at all without an injunction, it cannot show the balance of harms would tip in its favor. Cisco asserts it would suffer harm from the uncertainty that would stem from issuing an injunction covering infringing products and colorable imitations thereof.

XU has not shown that the balance of harms favors an injunction. As explained in the context of XU's claim of irreparable injury, XU has not shown that it would substantially benefit from an injunction, nor that it would suffer additional harm without one. The Court notes, without concluding, that the parties' dispute over the new version of Remote Expert at this stage lends credence to Cisco's assertion that an injunction may create harmful uncertainty as to what products XU may assert are covered.

### iv. Public Interest

XU asserts the public interest favors a strong patent system and small innovative companies like XU. Cisco responds that the public interest in patent enforcement cannot compel an injunction, as it is present in every patent case. *See ActiveVideo Networks, Inc. v. Verizon Comm's, Inc.*, 694 F.3d 1312, 1341 (Fed. Cir. 2012) ("If the general public interest in upholding patent rights alone was sufficient to mandate injunctive relief when none of the other three factors support injunctive relief, then we would be back to the general rule that a patentee should

30

always receive an injunction against infringement. But the Supreme Court rejected the idea that there is a general rule that courts should issue permanent injunctions against patent infringement" in *eBay*.). Cisco also asserts XU is not a source of innovation, given XU's lack of customers and a commercial product. Cisco goes on to argue an injunction would harm the public interest because XU's patents are only small components of the accused products, such that the injunction would disproportionately block consumer access to non-accused technologies.

The Court has no record from which to evaluate the proportion of the accused products covered by XU's patents. Whether XU had customers or a commercial product is not dispositive of whether it was innovative, but there is no other record evidence to suggest that XU was particularly innovative. (*See* D.I. 703 at 8, citing D.I. 704 Ex. 3, Trial Tr. at 996 (providing only a cursory opinion that small companies are generally innovative)). This leaves only XU's assertion that the public interest favors a strong patent system, which is insufficient to compel an injunction. *See ActiveVideo*, 694 F.3d at 1341. XU has not shown any additional reason why an injunction would be in the public interest.

### D. Enhanced Ongoing Royalties

In the alternative to an injunction, XU seeks an enhanced ongoing royalty for the life of the patents for future sales of Remote Expert and Expert Advisor according to the relevant factors in *Georgia-Pacific v. United States Plywood Corp.*, 381 F.Supp. 1116 (S.D.N.Y. 1970) and *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992). In response, Cisco again notes that it has stopped selling Expert Advisor and has designed around the Remote Expert feature found to infringe in favor of Google Translate, such that there are no future infringing sales on which to base a royalty. Cisco asks the Court to first direct the parties to negotiate a license

31

among themselves, and then, if necessary, to hold an evidentiary hearing to address the factual issues underlying an ongoing royalty. Cisco goes on to dispute XU's arguments under *Georgia-Pacific* and *Read.*

A court may decide that the award of an ongoing royalty is necessary to effectuate a remedy, but the provision of such relief does not follow as a matter of course any time permanent injunctive relief is denied. *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1314-15 (Fed. Cir. 2007). Like the decision to grant or deny injunctive relief, it is within the court's equitable discretion to determine whether an ongoing royalty need be imposed. As explained *supra*, Cisco stopped selling Expert Advisor, and XU has failed to show that the new version of Remote Expert infringes. There are therefore no future sales of any infringing product upon which to base an enhanced ongoing royalty. XU's request is denied.

### V. XU's Motion for Attorneys' Fees

XU seeks attorneys' fees, asserting this was an exceptional case under 35 U.S.C. § 285. XU asserts the fraud verdict shows Cisco's disregard for XU and its rights; that Cisco's launch of a new version of Remote Expert (which XU asserts infringes) justifies fees for XU's patent infringement case; and that Cisco's withholding of discovery regarding Remote Expert caused discovery proceedings to be multiplied. (D.I. 703 at 22-23). In response, Cisco points to the small percentage of XU's original case on which XU prevailed, and proposes that fees are not appropriate in that context. (D.I. 720 at 21, *citing Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1554 (Fed. Cir. 1989)). Cisco also argues that this is not an exceptional case, because there was no willful infringement pre- or post-trial, and because the Court resolved the

32

discovery issues surrounding Remote Expert raised by XU in Cisco's favor. *(See* D.I. 571, 591, 598, 601 at 4, 612 at 164-65).

The fraud verdict has been removed from the analysis. As explained above, the Court is not convinced that the new version of Remote Expert infringes, and therefore it cannot justify attorneys' fees on that basis. The Court found Cisco had not acted improperly in the context of the discovery dispute. There thus is no basis for finding this was an exceptional case.[12] XU's motion is denied.

## CONCLUSION

For the reasons stated herein, Cisco's Motion for Judgment as a Matter of Law is granted as to the fraud verdict and denied as to patent infringement, and the remainder is dismissed as moot; Cisco's Motion for Enforcement of the Parties' Agreement to Limit Liability is dismissed as moot; and Cisco's motion for an order holding the patents unenforceable is denied. XU's Motion to Alter or Amend the Judgment is denied as to the request for pre-verdict infringing sales; granted as to the request for pre- and post-judgment interest, at the prime rate compounded quarterly; denied as to the request for a permanent injunction; and denied as to the request for enhanced ongoing royalties. XU's Motion for Attorneys' Fees is denied.

An appropriate order will follow.

---

[12] The Court notes that the fact testimony at trial about the features of Expert Advisor and Remote Expert provided a reasonable basis to assert that there was no infringement. (D.I. 677, Trial Tr. vol. 5, 1493-1527, 1543-61; D.I. 678, Trial Tr. vol. 6, 1889-1922).

33